UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

—————————————————————
)
CHANNEL 781 NEWS,                                )
)
     Plaintiff,                                     )
)
v.                                               )      Civil Action No. 1:24-CV-11927-PBS
)
WALTHAM COMMUNITY ACCESS                         )
CORPORATION,                                     )
)
     Defendant.                                     )
—————————————————————)


**MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT OF
DEFENDANT WALTHAM COMMUNITY ACCESS CORPORATION**

Jeffrey J. Pyle (BBO #647438)
jpyle@princelobel.com
Sarah L. Doelger (BBO #712677)
sdoelger@princelobel.com
PRINCE LOBEL TYE LLP
One International Place, Suite 3700
Boston, MA 02110
T: 617-456-8000
F: 617-456-8100

*Attorneys for Waltham Community
Access Corporation*

INTRODUCTION

Plaintiff Channel 781 News ("Plaintiff" or "Channel 781") has sued defendant Waltham Community Access Corporation ("Defendant" or "WCAC") under the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 512(f), for "knowingly materially misrepresent[ing]" in takedown notices sent to YouTube that fifteen of Channel 781's videos on YouTube infringed WCAC's copyright. (Complaint ¶ 42 and Ex. D). Each of the Channel 781 videos mentioned in the notices consisted of an excerpt of WCAC's copyright-protected content, with no transformative additions or alterations. Plaintiff nonetheless alleges that WCAC had "actual subjective knowledge" that the videos were protected by "fair use," or alternatively that it "failed to consider" fair use before issuing the notices.[1] (*Id.* ¶¶ 54-55).

There is no genuine issue of fact for trial on this claim, because the following facts are undisputed: (1) WCAC "consider[ed] fair use" before sending its takedown notifications to YouTube, as the DMCA requires, *Lenz v. Universal Music Corp.*, 815 F.3d 1145, 1154 (9th Cir. 2016); (2) WCAC formed a good faith belief that certain of Channel 781's videos using WCAC content were not protected by fair use, while others might be, and (3) WCAC purposefully limited its takedown notices to the videos as to which it believed fair use did not apply. Accordingly, WCAC did not make a misrepresentation under 17 U.S.C. § 512(f).

In support of its motion for summary judgment, WCAC submits this Memorandum of Law, its Statement of Undisputed Material Facts, and the Affidavit of Jeffrey J. Pyle.

---

[1] Plaintiff also alleges that WCAC "should have known, if it had acted with reasonable care or diligence," that its uses of WCAC content were non-infringing. (Compl., ¶ 56). However, the leading circuit court opinion on the statute, *Lenz v. Universal Music Corp.*, 815 F.3d 1145, 1154 (9th Cir. 2016), holds that a copyright holder only "faces liability if it knowingly misrepresented in the takedown notification that it had formed a <u>good faith belief</u> the video was not authorized by the law, i.e., did not constitute fair use." *Id.* (emphasis supplied). As explained below, this is a subjective test, not an objective one that can be satisfied by a showing of mere negligence.

1

FACTS

WCAC is the community access cable television company in Waltham, Massachusetts. (Complaint ¶ 17). WCAC operates two public access channels. (*Id.*). The first is "the Waltham Channel," or WCAC-TV, which provides general interest programming, including a news show called "Waltham Newswatch." (*Id.*; Affidavit of Jeffrey J. Pyle, Ex. 1, Wangler Dep. at 12, 57-58).[2] The second is "MAC-TV," which airs recordings of Waltham city government meetings created by WCAC personnel. (Complaint ¶¶ 12, 38-44). WCAC makes its content available on cable television, social media, and its website, wcac.org. (*Id.* ¶¶ 30-31).

Joshua Kastorf has been a resident of Waltham since 2010. (Ex. 2, Kastorf Dep. at 21). In 2019 he became interested in Waltham politics and began exploring ways to use digital media to increase public awareness of local issues. (*Id.* at 21-22). In late 2021, Kastorf and another Walthamite, Chris Gamble, launched an informal organization called "Waltham DATA" to address "the lack of searchable information online" about local politics. (*Id.* at 27). Kastorf created a YouTube page by the same name.[3] (*Id.* at 25-27). He "envisioned Waltham DATA being kind of a non-profit studio like WCAC where [they] would eventually have different people producing different projects and [Kastorf would] help them out." (*Id.* at 32).

In late 2021, Kastorf and Gamble started a news project called "Channel 781 News" under the banner of "Waltham DATA." (*Id.* at 25). Ultimately, they "ended up spending all [their] time on Channel 781," so the "Waltham DATA" YouTube page "basically became the Channel 781 channel . . . ." (*Id.* at 25-26). The pair was joined in the news project by other Waltham residents, including Jamie Krikeles and Tom Benavides. (*Id.* at 27, 137).

---

[2] "Ex __" will hereinafter refer to the exhibits to the Affidavit of Jeffrey J. Pyle, submitted herewith.

[3] "DATA" stood for "Democracy Access and Transparency Alliance." (Ex. 2, Kastorf Dep. at 25).

The "Channel 781 News" group posted several different kinds of videos on the "Waltham DATA" YouTube page. (Ex. 2, Kastorf Dep. at 42). At first it posted a weekly "city council recap show" consisting of a recording of a Zoom conference among Channel 781 members about that week's city council proceedings, sometimes with "clips" of meetings included. (*Id.* at 42-44). Some of these clips were excerpts of Defendant WCAC's MAC-TV government meeting recordings, which Kastorf copied from WCAC's website. (*Id.* at 44-45). The "recap" show later "evolved" and expanded into two shows: "a headline show that was scripted and just summarized the facts," and a "debrief show, which was unscripted and had all the analysis." (*Id.* at 42). These shows also included clips copied from WCAC's website. (*Id.* at 44).

Most importantly here, Kastorf and other Channel 781 members copied some of WCAC's recordings of government meetings from the WCAC website and re-posted them, in whole or in part, to the Waltham DATA YouTube page. (Ex. 2, Kastorf Dep. at 46, 55-56). When Kastorf first started the YouTube page, he "repost[ed] whole episodes of WCAC," meaning "full government meeting recordings that WCAC had put on its website." (*Id.* at 100-101). Kastorf uploaded "10 to 20" of WCAC's full meeting videos to YouTube. (*Id.* at 106). In 2022, Kastorf decided that he would no longer do so, in part because he "was concerned" that he "was infringing copyright. . . ." (*Id.* at 104). He described his acts as "civil disobedience." (*Id.* at 107).

Later, Kastorf and other Channel 781 members posted shorter videos consisting entirely of excerpts of WCAC recordings of government meetings. (Ex. 2, Kastorf Dep. at 46-47). These "standalone clips" took excerpts of meetings "that [Channel 781] believed [were] interesting or important" and put them on YouTube with a title written by Channel 781. (*Id.* at 47). According to Kastorf, the purposes of the standalone clips were: (1) "to give them an angle," (2) to

encourage people to discuss the content, (3) to access YouTube's auto-captioning feature, and (4) to ensure the videos would stay up longer than they did on WCAC's website. (*Id.* at 48).

At all relevant times, Chris Wangler was WCAC's News Director, having served in that position since 2009. (Ex. 1, Wangler Dep. at 11). In 2022, Wangler became aware that the "Waltham DATA" YouTube page was copying and posting WCAC's recordings of government meetings without permission. (*Id.* at 107, 120). Separately, in March 2023, Wangler learned that a news photograph he had taken on WCAC's behalf had been posted by an unknown user to the Reddit social media platform to criticize a Waltham resident for her anti-LGBTQ views. (Ex. 1, Wangler Dep. at 102-103). Wangler was concerned that readers would incorrectly think that WCAC had allowed the user to post the photo. (*Id.* at 103-104, 110).

Accordingly, Wangler suggested to WCAC Executive Director Maria Sheehan that she make an on-air statement asking viewers not to misuse copyrighted WCAC content. (Ex. 1, Wangler Dep. at 102). Wangler wrote a script of the statement, which was intended "to disassociate our station from the inclusion of our copyrighted media in this [Reddit] post." (*Id.* at 104). The statement was also intended to address Channel 781's unauthorized reproduction of MAC-TV recordings. (*Id.* at 104-105). It read:

> Over recent years photos from our news department and video from the MAC channel have been reproduced without our permission. We know this is a reality of the world we live in, but we put copyright disclaimers on our media for a reason. Some have used our content to score political points under the veil of anonymity. Others have used it to encourage residents to hate. These practices can damage reputations and spread misinformation, and we don't want to be a part of that. So, as we head into a contentious election season, I'm asking the public to respect the people who work hard to create our original content. In the interests of transparency, we will entertain requests to reuse our content for free, but misuse is not only wrong it's illegal. Moving forward, the Waltham Channel will take whatever legal steps necessary to protect our content.

(Ex. 3). On April 6, 2023, Sheehan delivered the statement on air. (Ex. 4, Sheehan Dep. at 95).

4

Sheehan's statement made Kastorf "angry" because he viewed it as being critical of Channel 781 while not addressing a prior request that he had made to WCAC to provide closed captioning of its content. (Ex. 2, Kastorf Dep. at 107-108, 110). In a "group chat" with other Channel 781 members on the Signal messaging platform, Kastorf remarked: "I'll respect her rights under the Copyright Act when she respects the rights of disabled people under the ADA." (*Id.* and Ex. 5 at C781_00510).

Kastorf wrote an email to Sheehan asking to speak with her, and they met at WCAC's office on June 15, 2023. (Ex. 2, Kastorf Dep. at 109, 116-117). Sheehan told Kastorf that people were "confused" about why WCAC footage was on Channel 781's YouTube page. (*Id.* at 117). Sheehan stated that she was planning to go to WCAC's board of directors to propose a policy about the use of clips, and that policy was "going to involve having to ask permission for each individual use, each individual clip." (*Id.* at 118). According to Kastorf, Sheehan stated that the problem was that Channel 781 was "not just using these clips to inform people. You're putting your spin on them." (*Id.* at 116-117). However, Sheehan assured Kastorf that she would not deny uses for political reasons. (*Id.*). Kastorf stated that he would like to come to an arrangement with WCAC, but "you have to understand we have a right to use this. This is fair use." (*Id.* at 119). Sheehan disagreed, explaining that other news stations routinely asked WCAC's permission to use its content. (*Id.* at 119). At some point, according to Kastorf, Sheehan said, "you're stealing, you're stealing," and became angry. (*Id.* at 119-120). Kastorf ended the meeting. (*Id.* at 120).

That evening, Kastorf emailed Sheehan with "additional research to clarify our understanding of copyright law and fair use." (Ex. 6). Among other things, Kastorf's email quoted the fair use section of the Copyright Act, 17 U.S.C. § 107, and the following "[s]et of principles regarding fair use for Journalism" published by American University:

5709573

In reviewing the history of contemporary fair use litigation, we find that judges return again and again to two key questions:

- Did the unlicensed use 'transform' the copyrighted material by using it for a different purpose than that of the original, or did it just repeat the work for the same intent and value as the original?

- Was the material taken reasonably appropriate in kind and amount, considering the nature of the copyrighted work and the use?

If the answers to these two questions are 'yes,' a court is likely to find a use fair.

(Ex. 6).

Sheehan told Wangler about her meeting with Kastorf and forwarded his email about fair use. (Ex. 1, Wangler Dep. at 117; Ex. 6). Wangler was already familiar with fair use principles. (Ex. 1, Wangler Dep. at 17-20). Before he worked for WCAC, he was a book editor and author at a publishing company in Alberta, Canada. (Ex. 1, Wangler Dep. at 13). He also worked as a reporter for a weekly newspaper. (*Id.* at 13). Over the course of his career in publishing, Wangler had learned from online research "that there are cases" where use of the content of another "without permission would be covered by the fair use doctrine." (*Id.* at 17-20).

Wangler read the text of Kastorf's email about fair use. (Ex. 1, Wangler Dep. at 127). On the same day, June 16, 2023, Wangler watched a five-minute video produced by YouTube concerning fair use. (*Id.* at 125, 129, 131). The video stated:

What counts as fair use? . . . Courts usually focus on whether your use of another person's song or video is <u>transformative</u>. Basically, they're asking if you added new expression or meaning to the original work, or if it <u>basically copies the original</u>. For example, in the US, content that might be considered fair use includes commentary, criticism, or news reporting.

\*   \*   \*

How is fair use determined by law? Determining fair use is never a cut-and-dried process. In the US, fair use can only be determined in court by a judge. The judge will look at your case overall based on a few different factors. Here are a few things to keep in mind based on what the courts look at.

> You're less likely to qualify as fair use if your video <u>merely copies</u> someone else's and adds nothing else, if you're trying to monetize your video, if you're using fictional copyrighted material rather than factual material, if you borrowed a <u>large amount of material</u> rather than a small portion, <u>if the main focus of your video is the copyright protected material</u>, or if your use of the material harms the copyright owner's ability to profit from their original work.
>
> So, all of these are helpful factors to consider when thinking about fair use. But also keep in mind there's no guarantee that you'll qualify for fair use just because you take these factors into account. For example, just because you don't monetize your video, or if you only use a small portion of the copyrighted material, that does not mean you automatically qualify for fair use. Again, the courts look at everything holistically, and there's always a risk involved when using someone else's copyrighted work. . . ."

(Ex. 7 (emphasis supplied)).

After watching this video, Wangler sent an email to Sheehan analyzing whether Channel 781's uses of WCAC content were covered by "fair use":

> Youtube does NOT determine fair use, only a judge would. But Youtube can strike or remove videos that directly copy copyrwritten material. That is what this is about.
>
> It's possible that 781 News Zoom videos using short clips qualify as Fair Use.
>
> What does not qualify are the large number of videos taken directly from us and reproduced verbatim with zero editing or commentary. Those will be the ones we should file copyright claims against because they 'merely copy', a lot of it is used without permission, and the main focus is the copywritten material.

(Ex. 8). Wangler attached to his email a "screenshot" from the YouTube video listing the fair use factors. It read:

> You're less likely to qualify for fair use if:
>
> Your video merely copies.
> You're trying to monetize.
> You're using fictional copyrighted material.
> You borrowed a large amount of material.
> The main focus is the copyrighted material.
> Your use harms the copyright owner's ability to profit.

(Ex. 9).

Wangler suggested to Sheehan that WCAC send notices to YouTube requesting that it take down Channel 781's "standalone" videos: those that merely excerpted WCAC content. (Ex. 1, Wangler Dep. at 120, 128-129; Ex. 6). Sheehan agreed, and delegated to Wangler responsibility for issuing the takedown requests and determining whether Channel 781 had the right to use particular WCAC content. (Ex. 4, Sheehan Dep. at 126-127; 136-137; 140).

In July 2023, Wangler attempted to submit a takedown request to YouTube for a single Channel 781 video. (Ex. 1, Wangler Dep. at 123). The video was a "stand-alone" excerpt of a WCAC recording of a City Council meeting. (*Id.* at 125). Wangler chose that video because he "did not believe that it qualified for . . . fair use." (*Id.*). However, his takedown request failed because "there was something not right with the format of the takedown request." (*Id.* at 123-124). Wangler "had to do additional research to determine how to set up the MAC channel YouTube account so it could successfully file a takedown notice." (*Id.* at 124).

Meanwhile, on July 17, 2023, Sheehan asked a Massachusetts cable access organization for a referral to an intellectual property lawyer. (Ex. 4, Sheehan Dep. at 128; Ex. 10). She explained that "[w]e have a group of people in Waltham who have started their own news program and are using all of our footage. I had them come in to discuss what they are doing and they claim, 'Fair use.' They are using this footage to promote political candidates in the city." (Ex. 10). Gauthier recommended an attorney. (*Id.*) The next day, Sheehan forwarded the recommendation to Justin Barrett, WCAC's board director, who cautioned that the station should not retain a lawyer without a cost estimate. (Ex. 10; Ex. 4, Sheehan Dep. at 132).

There the matter stood until August 2023, when Channel 781 used another item of WCAC content without permission. (Ex. 1, Wangler Dep. at 141-143). Every election year, WCAC invites candidates to record campaign statements for broadcast on its "Waltham

Newswatch" program and online. (Ex. 2, Kastorf Dep. at 167). The candidates record the statements in WCAC's studio. (Ex. 1, Wangler Dep. at 141). Candidates are given as many "takes" as they need to get their statement right. (Ex. 4, Sheehan Dep. at 134; Ex. 2, Kastorf Dep. at 168; Ex. 1, Wangler Dep. at 143-144). In late August, incumbent mayor Jeannette McCarthy had several false starts when recording her statement, after which she had to begin her remarks again. (Ex. 2, Kastorf Dep. at 168). WCAC mistakenly posted the unedited recording of Mayor McCarthy's statement, with the outtakes, on its website. (*Id.* at 168, 171; Ex. 1, Wangler Dep. at 133-134). Before WCAC could take down the video and replace it, Channel 781 downloaded and posted it to its YouTube page.[4] (Ex. 2, Kastorf Dep. at 168; Ex. 1, Wangler Dep. at 142). Kastorf knew that posting the video would make Sheehan "angry." (Ex. 2, Kastorf Dep. at 171).

The mistaken uploading of the full video was embarrassing to WCAC. (Ex. 4, Sheehan Dep. at 134-135; Ex. 1, Wangler Dep. at 141). Channel 781's unauthorized reposting of it compounded the embarrassment and "rekindled the concern" within WCAC "over our content, copyright protected, being reproduced without [its] permission." (Ex. 1, Wangler Dep. at 147).

The following day, September 1, 2023, Wangler sent in a new takedown request directed at the same standalone Channel 781 video that he had identified as infringing in July. (Ex. 1, Wangler Dep. at 151). YouTube immediately took down the video in response to Wangler's takedown request. (Ex. 2, Kastorf Dep. at 142; Ex. 1, Wangler Dep. at 153).

YouTube notified Channel 781 News of the takedown. (Ex. 2, Kastorf Dep. at 147; Ex. 11 at C781_00000730). On September 4, Kastorf informed the other members of Channel 781 on their Signal group chat that the strike had occurred, and that it arose from a standalone clip of

---

[4] Kastorf testified that after the Waltham DATA YouTube page was restored, he took down the video of the mayor's speech (along with another video of the mayor speaking before a civic group) because it was a complete video rather than an excerpt and wasn't a video of a government meeting, and therefore might not qualify for fair use protection. (Ex. 2, Kastorf Dep. at 169-171).

9

WCAC content without additional commentary. (*Id.*). Channel 781 member Tom Benavides responded that every other "screen grab" of WCAC content "with no commentary" was a "pretty big liability" for a further strike. (Ex. 2, Kastorf Dep. at 147; Ex. 11 at C781_00000730). He continued: "it's prolly [probably] free [fair] use if we insert their clips into our reports. But if we're uploading their video recordings (which legally belong to them) without commentary, every one of those is a pretty big risk. At least that's what I assume." (*Id.* at C781_00000730). Benavides understood that under fair use principles, "the more you change something, the more protected you are," and that the standalone clips contained the least amount of creative input by Channel 781 members of the videos they posted. (Ex. 12, Benavides Dep. at 49, 68). Kastorf "thought [Benavides] might be correct," and that "Tom . . . had a good point," because "there's this aspect of fair use about being transformational," and while Kastorf did not "entirely agree with this . . . there could be an interpretation that a standalone clip is less transformational, and, therefore, somebody might interpret that as not fair use." (Ex. 2, Kastorf Dep. at 148).[5]

On September 6 and 7, 2023, Wangler issued more takedown notices for "stand-alone" Channel 781 videos consisting solely of WCAC content. (Ex. 1, Wangler Dep. at 152, 154). Wangler watched each of the videos in their entirety (except for one that was "quite lengthy"); determined that each was a "stand-alone" excerpt of a WCAC recording; considered the length of the videos; reviewed the other fair use factors listed in the YouTube instructional video; and determined that the videos were infringing. (*Id.* at 134, 153-159). YouTube took down each of

---

[5] Channel 781 – unlike WCAC – understood that if its YouTube page received three copyright strikes, the entire channel would be disabled. (Ex. 2, Kastorf Dep. at 144-145; Ex. 1, Wangler Dep. at 160, 163; Ex. 4, Sheehan Dep. at 129, 137). After the first strike against a standalone use of WCAC content, Channel 781 considered taking down its other similar uses of WCAC content, but decided not to do so. (Ex. 2, Kastorf Dep. at 146-147). Instead, Kastorf submitted an "appeal" to YouTube, which was promptly rejected. (*Id.* at 153).

these videos. (*Id.* at 159). Ultimately, YouTube removed the Waltham DATA page for having suffered three copyright "strikes." (Ex. 2, Kastorf Dep. at 158-159; Complaint ¶ 41).

On September 27, 2023, members of Channel 781 met over Zoom with a lawyer from the Electronic Frontier Foundation, and received legal advice concerning copyright and fair use. (Ex. 2, Kastorf Dep. at 179-180). The same day, Benavides summarized the substance of that meeting in a series of messages on the Channel 781 group chat. (Ex. 13, C781_00834-835).[6] Kastorf replied that he had identified the videos that had been the subject of the requests and listed them. (*Id.* at C781_00836). Another member observed that, "as we expected," the stricken videos were "the ones without commentary. I think if we stop using those, even adding 20 seconds at the beginning of us explaining the clip, I think we should be good." (*Id.* at C781_00838). Kastorf agreed. (*Id.* at C781_00839; Ex. 2, Kastorf Dep. at 182).

On July 24, 2024, Channel 781 brought this lawsuit against WCAC. In its complaint, it alleges that the stricken videos were "a self-evidently non-infringing fair use" of WCAC's content, and that WCAC "violated 17 U.S.C. § 512(f) by knowingly materially misrepresenting that Channel 781's use . . . was infringing" in the takedown requests. (Complaint, ¶ 52). Plaintiff alleges that WCAC either subjectively knew that the videos identified in its takedown notices were non-infringing, or it failed to consider "fair use" before sending them. (*Id.* at ¶¶ 54-55).

<u>ARGUMENT</u>

There is no genuine issue of material fact for trial on Plaintiff's complaint for "misrepresentation" under 17 U.S.C. §152(f). The undisputed facts show that WCAC considered fair use before issuing the takedown notices and formed a belief that the videos identified in the notices were infringing. There is no evidence this belief was formed in anything other than good

---

[6] The messages as produced in discovery were redacted to withhold the substance of the advice. (Ex. 13 at C781_00834-835; Ex. 2, Kastorf Dep. at 180).

faith. Evidence that WCAC was spurred to send the takedown notices by its embarrassment at Channel 781's reposting of the unedited mayor's statement, or its discomfort with Channel 781's use of WCAC content for political purposes, fails to create an issue of fact, because such evidence has nothing to do with whether WCAC misrepresented to YouTube that it had a good faith belief that Plaintiff's videos infringed WCAC's copyright.

## I.     PLAINTIFF MUST PROVE THAT WCAC SUBJECTIVELY LACKED A GOOD FAITH BELIEF THAT CHANNEL 781'S VIDEOS WERE INFRINGING.

A misrepresentation claim under 17 U.S.C. § 512(f) includes a demanding scienter requirement. A plaintiff in such a case must prove that the sender of the takedown request "knowingly misrepresented in the takedown notification[s] that it had formed a good faith belief" that the referenced videos were "not authorized by the law, i.e., did not constitute fair use." *Lenz*, 815 F.3d at 1154. This is a "subjective, rather than objective standard," *Id.* at 1153-54, citing *Rossi v. Motion Picture Ass'n of Am. Inc.,* 391 F.3d 1000 (9th Cir. 2004), and it sets a "high bar" for liability.[7] *Ouellette v. Viacom Intern., Inc.*, CV 10-133-M-DWM-JCL, 2012 WL 1435703, at *3 (D. Mont. Apr. 25, 2012), *aff'd*, 671 Fed. Appx. 972 (9th Cir. 2016) (unpub.).

Under the DMCA, a copyright holder may send a take-down notice to a service provider to request that material posted by a third party be removed from the platform. 17 U.S.C. § 512(c). Such a notice must include, *inter alia*: "[i]dentification of the copyrighted work claimed to have been infringed," "[i]dentification of the material that is claimed to be infringing," and, importantly here, "[a] statement that the complaining party has a good faith belief that use of the

---

[7] *See also Shaffer v. Kavarnos,* No. 23-CV-10059 (KMK), 2025 WL 2299173, at *2 (S.D.N.Y. Aug. 7, 2025) ("Section 512(f) establishes a high bar to liability. . . ."); *Turner v. Henderson*, No. CV 5:25-244-DCR, 2025 WL 2045172, at *3 (E.D. Ky. July 21, 2025) (noting in *dicta* that "a number of courts have held that Section 512(f) imposes a demanding *scienter* requirement to assert a viable claim against the filer of either a 'takedown' or 'putback' notice.")

material in the manner complained of is not authorized by the copyright owner, its agent, or the law." 17 U.S.C. § 512(c)(3)(A)(ii),(iii), (v).

Section 512(f) of the DMCA prohibits knowing and material misrepresentations in DMCA takedown notices. It provides that "[a]ny person who knowingly materially misrepresents under this section . . . that material or activity is infringing . . . shall be liable for any damages, including costs and attorneys' fees, incurred by the alleged infringer . . . who is injured by such misrepresentation, as the result of the service provider relying upon such misrepresentation in removing or disabling access to the material or activity claimed to be infringing. . . ." 17 U.S.C. § 512(f).

In *Lenz v. Universal Music Corp.*, 815 F.3d 1145, 1154 (9th Cir. 2016), the Ninth Circuit held that the sender of a takedown notice "faces liability if it knowingly misrepresented in the takedown notification that it had formed a good faith belief" that allegedly infringing material "was not authorized by the law, i.e., did not constitute fair use." *Id.*[8] As such, "[t]he DMCA requires consideration of fair use prior to sending a takedown notification." *Id.* However, if "a copyright holder forms a subjective *good faith* belief the allegedly infringing material does not constitute fair use," courts are "in no position to dispute the copyright holder's belief even if [they] would have reached the opposite conclusion." *Id.* (emphasis in original).

## II.    IT IS UNDISPUTED THAT WCAC CONSIDERED FAIR USE AND DETERMINED THAT IT DID NOT APPLY.

The evidence uniformly shows that WCAC considered fair use and determined that it did not apply to the videos at issue. Accordingly, there is no genuine issue of fact on Plaintiff's theory that WCAC violated Section 512(f) by failing to consider fair use. (Complaint, ¶ 55).

---

[8] The First Circuit has not yet had occasion to interpret Section 512(f).

Chris Wangler, WCAC's news director, was responsible for the takedown notices. (Ex. 1, Wangler Dep. at 120; Ex. 4, Sheehan Dep. at 126-127; 136-137; 140). Wangler was familiar with fair use from his years in publishing and from online research. (Ex. 1, Wangler Dep. at 13-25). Before sending the takedown notices in September 2023, Wangler reviewed Kastorf's June 2023 email to Sheehan concerning fair use and the YouTube instructional video explaining the doctrine. (*Id.* at 125-131). Those materials correctly emphasized that courts pay particular attention to whether a use is "transformative," (Exs. 6-9), meaning (in the words of the instructional video) whether the user "added new expression or meaning to the original work," as opposed to merely copying it. (Ex. 7). The video also stated that fair use is less likely to apply where "the main focus of [the] video is the copyright protected material." (*Id.*).

Based on his preexisting understanding of fair use, his review of these materials, and his review of the Channel 781 videos, on June 16, 2023, Wangler formed a belief that Channel 781's "standalone" videos – those consisting solely of excerpts of WCAC recordings -- did not qualify as fair use, and said so in an email to Sheehan. (Ex. 8). In addition to the lack of transformative elements, Wangler considered that the videos were not particularly short, ranging from 1:06 to 20:46 minutes in length (Complaint, Ex. D; Ex. 1, Wangler Dep. at 152-153), and that the main focus of the videos was the WCAC content. (Ex. 1, Wangler Dep. at 125-126; Ex. 8). Wangler also considered whether Channel 781's use of WCAC recordings "harmed WCAC's ability to profit," and concluded that where "both 781 News and Waltham Channel are nonprofits . . . it was not as important a consideration as the excerpting of copywritten material without a transformative purpose." (Ex. 1, Wangler Dep. at 134). At the same time, Wangler thought that Channel 781's uses of short clips of WCAC content interspersed with Channel 781's original news reporting and analysis was sufficiently transformative to qualify as fair use. (*Id.* at 125).

Accordingly, Wangler recommended to Sheehan that WCAC send in takedown requests only for the standalone videos. (*Id.* at 152). On September 1-8, 2023, he did so. (*Id.*).

Channel 781 can point to no evidence that creates a triable dispute as to whether WCAC considered fair use and reached the belief that it was inapplicable. Joshua Kastorf, Plaintiff's Rule 30(b)(6) witness on this subject, testified that Channel 781's sole basis for alleging that WCAC failed to consider fair use was that, during the June 15, 2023 meeting, Sheehan "didn't explain why she disagreed" with him that the uses were fair, and did not respond to the email that he sent her on the subject. (Ex. 2, Kastorf Dep. at 189-190). But this shows only that WCAC did not convey its analysis of fair use to Channel 781 before sending the takedown notices, not that WCAC failed to "consider" it at all. *Cf. Johnson v. New Destiny Christian Ctr. Church, Inc.,* 826 F. App'x 766, 772–73 (11th Cir. 2020) (granting summary judgment where defendant relied on opinions of counsel on fair use, rejecting "bare and speculative statement" that they would not have filed the takedown notifications if they had considered it).

## III.    CHANNEL 781 HAS FAILED TO CREATE A GENUINE ISSUE OF FACT AS TO WHETHER WCAC'S SUBJECTIVE BELIEF WAS A "GOOD FAITH" ONE.

There is also no genuine factual issue as to whether WCAC "form[e]d a subjective *good faith* belief the allegedly infringing material [did] not constitute fair use." *Lenz*, 815 F.3d at 1154 (emphasis in original). Channel 781 has failed to elicit any evidence that Wangler's application of the fair use factors to the videos was not in "good faith," such that a rational jury could find "that [WCAC], in pursuing takedown notices, made a *knowing* material misrepresentation." *Stern v. Lavender*, 319 F. Supp. 3d 650, 684 (S.D.N.Y. 2018)(granting summary judgment).

The "'good faith belief' requirement" in the DMCA "encompasses a subjective, rather than objective standard." *Lenz,* 815 F.3d at 1153-54, citing *Rossi,* 391 F.3d 1000. For liability to attach, "there must be a demonstration of some actual knowledge of misrepresentation on the

part of the copyright owner," not merely a mistake. *Rossi,* 391 F.3d at 1005; *Hosseinzadeh v. Klein*, 276 F. Supp. 3d 34, 47 (S.D.N.Y. 2017) (granting summary judgment on section 512(f) claim where plaintiff "failed to proffer any evidence that suggests defendants lacked a subjective 'good faith belief,' and therefore has failed to create a triable issue.") Thus, it is not enough for a plaintiff to show that the sender of a takedown notice "should have known the [material] qualifies for fair use as a matter of law." *Lenz,* 815 F.3d at 1153-54. "A copyright owner cannot be liable simply because an unknowing mistake is made, even if the copyright owner acted unreasonably in making the mistake." *Rossi,* 391 F.3d at 1005. Rather, "[b]ecause the DMCA requires consideration of fair use prior to sending a takedown notification, a jury must determine whether [WCAC's] actions were sufficient to form a subjective good faith belief about the video[s'] fair use or lack thereof." *Lenz,* 815 F.3d at 1154.

As a matter of law, Wangler's actions were sufficient for WCAC to form the subjective good faith belief that the "standalone" videos were not fair. Wangler read Kastorf's email to Sheehan emphasizing the importance of "transformativeness" under fair use caselaw and determined that factor was absent from the standalone videos. (Ex. 1, Wangler Dep. at 127; Ex. 6). Wangler reviewed the YouTube instructional video, which likewise stated that a video is "less likely to qualify as fair use" if it "merely copies someone else's" work and "adds nothing else." (Ex. 1, Wangler Dep. at 125, 129, 131; Ex. 7). Wangler watched the videos and saw that they "merely copied" WCAC content, and that the focus of the videos was WCAC content, another factor identified in the instructional video as favoring a non-fair-use determination (Ex. 1, Wangler Dep. at 125, 129, 131; Ex. 7). The videos used "a lot" of WCAC content, up to 20 minutes in one instance. (Ex. 8; Complaint, Ex. D). Further, Wangler carefully distinguished

among Channel 781's videos, challenging only its "standalone" uses of WCAC content and leaving Plaintiff's more transformative analytical uses of similar content unchallenged. (Ex. 8).

The depth and care of Wangler's analysis distinguish this case from other § 512(f) claims that have been allowed to go to trial. For example, in *Disney Enters., Inc. v. Hotfile Corp.,* No. 11–cv–20427, 2013 WL 6336286, at *48 (S.D. Fla. Sept. 20, 2013), the court denied summary judgment on a § 512(f) counterclaim because "there is sufficient evidence in the record to suggest that [the counterclaim defendant] intentionally targeted files it knew it had no right to remove." *Id.* Here, the evidence is the opposite: Wangler targeted the videos that merely copied WCAC content without transformative additions, and intentionally avoided sending takedown notices for uses that he thought might be deemed fair. *See also Lenz,* 815 F.3d at 1149 (finding genuine issue of fact where takedown request targeted video that used protected song, where notice-giver considered only whether the song was "the focus of the video," not whether any other fair use factor applied).

The evidence, in short, "uniformly supports [the] defense of good faith," and the record contains no "factual basis on which to find the opposite: that [WCAC], in pursuing takedown notices, made a knowing material misrepresentation." *Stern v. Lavender*, 319 F. Supp. 3d 650, 684 (S.D.N.Y. 2018); *see also Hosseinzadeh v. Klein,* 276 F. Supp. 3d 34, 47 (S.D.N.Y. 2017)(granting summary judgment on misrepresentation claim where "[i]t is undisputed that defendants understand the concept of fair use" and "[p]laintiff has failed to proffer any evidence that suggests defendants lacked a subjective 'good faith belief,' in the truth of a counter-notification); *Handshoe v. Perret*, No. 1:15CV382-HSO-JCG, 2018 WL 4374188, at *8–9 (S.D. Miss. Sept. 13, 2018) (granting summary judgment where plaintiff "has not come forth with competent summary judgment evidence that calls into question Leary's good faith belief.").

The good faith of WCAC's determination that the "standalone" videos were not fair use is reinforced by the fact that Channel 781's own members reached the same conclusion. After the first takedown notice, Channel 781 member Tom Benavides told his fellow participants that the standalone uses of WCAC content were a "pretty big liability" from a fair use point of view, whereas the clips used in Channel 781's analysis programming were probably fair. (Ex. 2, Kastorf Dep. at 147; Ex. 11 at C781_00000730). Kastorf thought that Benavides had a "good point" because the standalone excerpts were not very "transformational." (Ex. 2, Kastorf Dep. at 148). Indeed, Channel 781 members subscribed to this opinion even after consulting with counsel, resolving to no longer use standalone clips. (Ex. 2, Kastorf Dep. at 182, Ex. 13 at C781_00838-00839). For Channel 781 to now assert that WCAC's fair use determination was not in good faith when its own core members made the same determination requires considerable *chutzpah,* and reinforces the absence of any genuine issue for trial.

## IV. EVIDENCE THAT WCAC HAD OTHER REASONS FOR SENDING THE TAKEDOWN NOTICES IN ADDITION TO ITS GOOD FAITH BELIEF OF INFRINGEMENT DOES NOT SHOW A MISREPRESENTATION.

Channel 781 cannot establish a genuine issue of fact by relying on evidence that WCAC had other reasons to submit the takedown notices besides its good faith belief that the videos infringed its copyright. Such evidence of *motive*, even if accepted by a jury, goes no distance toward showing that WCAC knowingly and materially *misrepresented* that it had a "good faith belief that use of the material in the manner complained of is not authorized by the copyright owner, its agent, or the law." 17 U.S.C. § 512(c)(3)(A)(v), (f).

WCAC representatives testified at deposition that they were spurred to send the takedown notices when Channel 781 reposted the entirety of WCAC's recording of the campaign statement by the mayor of Waltham, including false starts that WCAC had neglected to edit out. (Ex. 1,

Wangler Dep. at 141, 147; Ex. 4, Sheehan Dep. at 134-135). The reposting of the video – which Kastorf acknowledged was a copyright infringement – embarrassed WCAC by highlighting its failure to make its standard edits. (*Id.*; Ex. 2, Kastorf Dep. at 169-171). In addition, Sheehan made statements earlier in 2023 objecting to "scor[ing] political points" or "promot[ing] political candidates" using WCAC content, statements Channel 781 may assert reflect a political motivation for the takedown requests. (Exs. 3, 10).

Whatever conclusions a jury could draw from such evidence,[9] it does not create a genuine issue of fact as to whether WCAC made a knowing misrepresentation regarding its belief that the videos identified in the takedown requests were unprotected by fair use. 17 U.S.C. § 512(f) (imposing liability on any person who "knowingly materially misrepresents . . . that material or activity is *infringing*") (emphasis supplied). At least where the submitter of a takedown notice has considered the fair use factors and formed a subjective belief as to its inapplicability, evidence of the sender's additional subjective *motivation* for sending the notices fails to show that it "knowingly *misrepresented* in the takedown notification that it had formed a good faith belief" that the allegedly infringing material "was not authorized by the law, i.e., did not constitute fair use."[10] *Lenz*, 815 F.3d at 1154.

---

[9] The videos selected by WCAC for copyright strikes, each of which was a standalone excerpt of a government meeting, do not reflect any such political motivation. (Ex. 2, Kastorf Dep. at 182-183). If WCAC had been motivated by Channel 781's politics, it would have sent strikes for its Zoom-based analysis programs instead. (*Id.* at 168-169).

[10] In a pair of pre-*Lenz* decisions, district courts allowed claims under Section 512(f) to proceed on the ground that no reasonable copyright holder would have believed infringement had occurred and the notice-giver intended to suppress certain content. *Diebold, Inc.,* 337 F.Supp.2d at 1204; *Automattic Inc. v. Steiner*, 82 F. Supp. 3d 1011, 1026–27 (N.D. Cal. 2015). These cases do not avail Plaintiff, because later *Lenz* opinion makes clear the defendant's *subjective* belief about the infringing nature of the videos is what matters, not the *objective* reasonableness of its belief. *Lenz*, 815 F.3d at 1154 (holding that courts must judge actions of notice-giver "by the subjective beliefs it formed about the video.") In any event, neither *Diebold* or *Automattic* featured undisputed evidence, present in this case, that the defendant considered fair use and determined it did not apply. Further, Wangler's fair use determination was reasonable, where the targeted videos consisted only of WCAC content with no transformative

In other words, two things can be true at the same time: WCAC was annoyed by Channel 781's conduct, and WCAC formed a good faith belief that the videos it identified in the takedown notices were not protected by fair use. The latter is all that 17 U.S.C. § 512(f) is concerned with. There is no genuine issue of fact on Channel 781's claim that WCAC "knowingly materially misrepresent[ed]" that it had "form[e]d a subjective *good faith* belief the allegedly infringing material [did] not constitute fair use," so WCAC is entitled to judgment in its favor as a matter of law. *Lenz*, 815 F.3d at 1154 (emphasis in original).

<u>CONCLUSION</u>

For the foregoing reasons, Waltham Community Access Corporation requests that its motion for summary judgment be allowed.

Respectfully submitted,

WALTHAM COMMUNITY ACCESS CORPORATION,

By its attorneys,

*/s/ Jeffrey J. Pyle*
Jeffrey J. Pyle (BBO # 647438)
jpyle@princelobel.com
Sarah L. Doelger (BBO # 712677)
sdoelger@princelobel.com
PRINCE LOBEL TYE LLP
One International Place, Suite 3700
Boston, MA 02110
T: 617-456-8000
F: 617-456-8100

Dated: November 13, 2025

---

alterations, the focus of the videos was WCAC content, and they were posted for the same purpose for which WCAC published the original videos: informing viewers about public affairs in Waltham.

5709573

**<u>Certificate of Service</u>**

I hereby certify that the within document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and by first-class mail to any non-registered participants.

/s/ Jeffrey J. Pyle
Jeffrey J. Pyle

21

5709573