UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

—————————————————————
)
CHANNEL 781 NEWS,                              )
)
            Plaintiff,                         )
)
v.                                             )        Civil Action No. 1:24-CV-11927-PBS
)
WALTHAM COMMUNITY ACCESS               )
CORPORATION,                                   )
)
            Defendant.                         )
—————————————————————)

**STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT OF DEFENDANT
WALTHAM COMMUNITY ACCESS CORPORATION**

Pursuant to Fed. R. Civ. P. 56 and Local Rule 56.1, Defendant Waltham Community

Access Corporation submits the following statement of undisputed material facts in support of its

motion for summary judgment.

<u>FACTS</u>

1.      Waltham Community Access Corporation ("WCAC") is the community access

cable television company in Waltham, Massachusetts. (Complaint ¶ 17).

2.      WCAC operates two public access channels. (*Id.*). The first is "the Waltham

Channel," or WCAC-TV, which provides general interest programming, including a news show

called "Waltham Newswatch." (*Id.*; Affidavit of Jeffrey J. Pyle, Ex. 1, Wangler Dep. at 12, 57-

58).[1] The second is "MAC-TV," which airs recordings of Waltham city government meetings

---

[1] "Ex __" will hereinafter refer to the exhibits to the Affidavit of Jeffrey J. Pyle, submitted herewith.

created by WCAC personnel. (Complaint ¶¶ 12, 38-44). WCAC makes its content available on cable television, social media, and its website, wcac.org. (*Id.* ¶¶ 30-31).

3.      Joshua Kastorf has been a resident of Waltham since 2010. (Ex. 2, Kastorf Dep. at 21). In 2019 Kastorf became interested in Waltham politics and began exploring ways to use digital media to increase public awareness of local issues. (*Id.* at 21-22). In late 2021, Kastorf and another Walthamite, Chris Gamble, launched an informal organization called "Waltham DATA" to address "the lack of searchable information online" about local politics. (*Id.* at 27). Kastorf created a YouTube page by the same name. (*Id.* at 25-27). He "envisioned Waltham DATA being kind of a non-profit studio like WCAC where [they] would eventually have different people producing different projects and [Kastorf would] help them out." (*Id.* at 32).

4.      In late 2021, Kastorf and Gamble started a news project called "Channel 781 News" under the banner of "Waltham DATA." (*Id.* at 25). Ultimately, they "ended up spending all [their] time on Channel 781," so the "Waltham DATA" YouTube page "basically became the Channel 781 channel . . . ." (*Id.* at 25-26). The pair was joined in the news project by other Waltham residents, including Jamie Krikeles and Tom Benavides. (*Id.* at 27, 137).

5.      The "Channel 781 News" group posted several different kinds of videos on the "Waltham DATA" YouTube page. (Ex. 2, Kastorf Dep. at 42). At first it posted a weekly "city council recap show" consisting of a recording of a Zoom conference among Channel 781 members about that week's city council proceedings, sometimes with "clips" of meetings included. (*Id.* at 42-44). Some of these clips were excerpts of Defendant WCAC's MAC-TV government meeting recordings, which Kastorf copied from WCAC's website. (*Id.* at 44-45). The "recap" show later "evolved" and expanded into two shows: "a headline show that was scripted and just summarized the facts," and a "debrief show, which was unscripted and had all

2

the analysis." (*Id.* at 42). These shows also included clips copied from WCAC's website. (*Id.* at 44).

6.      Kastorf and other Channel 781 participants copied some of WCAC's recordings of government meetings from the WCAC website and re-posted them, in whole or in part, to the Waltham DATA YouTube page. (Ex. 2, Kastorf Dep. at 46, 55-56).

7.      When Kastorf first started the Waltham DATA YouTube page, he "repost[ed] whole episodes of WCAC," meaning "full government meeting recordings that WCAC had put on its website." (*Id.* at 100-101). Kastorf uploaded "10 to 20" of WCAC's full meeting videos to YouTube. (*Id.* at 106). In 2022, Kastorf decided that he would no longer do so, in part because he "was concerned" that he "was infringing copyright. . . ." (*Id.* at 104). He described his acts as "civil disobedience." (*Id.* at 107).

8.      Later, Kastorf and other Channel 781 members posted shorter videos consisting entirely of excerpts of WCAC recordings of government meetings. (Ex. 2, Kastorf Dep. at 46-47). These "standalone clips" took excerpts of meetings "that [Channel 781] believed [were] interesting or important" and put them on YouTube with a title written by Channel 781. (*Id.* at 47). According to Kastorf, the purposes of the standalone clips were: (1) "to give them an angle," (2) to encourage people to discuss the content, (3) to access YouTube's auto-captioning feature, and (4) to ensure the videos would stay up longer than they did on WCAC's website. (*Id.* at 48).

9.      At all relevant times, Chris Wangler was WCAC's News Director, having served in that position since 2009. (Ex. 1, Wangler Dep. at 11). In 2022, Wangler became aware that the "Waltham DATA" YouTube page was copying and posting WCAC's recordings of government meetings without permission. (*Id.* at 107, 120).

3

10.    Separately, in March 2023, Wangler learned that a news photograph he had taken on WCAC's behalf had been posted by an unknown user to the Reddit social media platform to criticize a Waltham resident for her anti-LGBTQ views. (Ex. 1, Wangler Dep. at 102-103). Wangler was concerned that readers would incorrectly think that WCAC had allowed the user to post the photo. (*Id.* at 103-104, 110).

11.    Wangler suggested to WCAC Executive Director Maria Sheehan that she make an on-air statement asking viewers not to misuse copyrighted WCAC content. (Ex. 1, Wangler Dep. at 102). Wangler wrote a script of the statement, which was intended "to disassociate our station from the inclusion of our copyrighted media in this [Reddit] post." (*Id.* at 104). The statement was also intended to address Channel 781's unauthorized reproduction of MAC-TV recordings. (*Id.* at 104-105). It read:

> Over recent years photos from our news department and video from the MAC channel have been reproduced without our permission. We know this is a reality of the world we live in, but we put copyright disclaimers on our media for a reason. Some have used our content to score political points under the veil of anonymity. Others have used it to encourage residents to hate. These practices can damage reputations and spread misinformation, and we don't want to be a part of that. So, as we head into a contentious election season, I'm asking the public to respect the people who work hard to create our original content. In the interests of transparency, we will entertain requests to reuse our content for free, but misuse is not only wrong it's illegal. Moving forward, the Waltham Channel will take whatever legal steps necessary to protect our content.

(Ex. 3). On April 6, 2023, Sheehan delivered the statement on air. (Ex. 4, Sheehan Dep. at 95).

12.    Sheehan's statement made Kastorf "angry" because he viewed it as being critical of Channel 781 while not addressing a prior request that he had made to WCAC to provide closed captioning of its content. (Ex. 2, Kastorf Dep. at 107-108, 110). In a "group chat" with other Channel 781 members on the Signal messaging platform, Kastorf remarked: "I'll respect

her rights under the Copyright Act when she respects the rights of disabled people under the ADA." (*Id.* and Ex. 5 at C781_00510).

13.     Kastorf wrote an email to Sheehan asking to speak with her, and they met at WCAC's office on June 15, 2023. (Ex. 2, Kastorf Dep. at 109, 116-117). Sheehan told Kastorf that people were "confused" about why WCAC footage was on Channel 781's YouTube page. (*Id.* at 117). Sheehan stated that she was planning to go to WCAC's board of directors to propose a policy about the use of clips, and that policy was "going to involve having to ask permission for each individual use, each individual clip." (*Id.* at 118). According to Kastorf, Sheehan stated that the problem was that Channel 781 was "not just using these clips to inform people. You're putting your spin on them." (*Id.* at 116-117). However, Sheehan assured Kastorf that she would not deny uses for political reasons. (*Id.*). Kastorf stated that he would like to come to an arrangement with WCAC, but "you have to understand we have a right to use this. This is fair use." (*Id.* at 119). Sheehan disagreed, explaining that other news stations routinely asked WCAC's permission to use its content. (*Id.* at 119). At some point, according to Kastorf, Sheehan said, "you're stealing, you're stealing," and became angry. (*Id.* at 119-120). Kastorf ended the meeting. (*Id.* at 120).

14.     That evening, Kastorf emailed Sheehan with "additional research to clarify our understanding of copyright law and fair use." (Ex. 6). Among other things, Kastorf's email quoted the fair use section of the Copyright Act, 17 U.S.C. § 107, and the following "[s]et of principles regarding fair use for Journalism" published by American University:

> In reviewing the history of contemporary fair use litigation, we find that judges return again and again to two key questions:
>
> - Did the unlicensed use 'transform' the copyrighted material by using it for a different purpose than that of the original, or did it just repeat the work for the same intent and value as the original?

5

- Was the material taken reasonably appropriate in kind and amount, considering the nature of the copyrighted work and the use?

    If the answers to these two questions are 'yes,' a court is likely to find a use fair. (Ex. 6).

15.    Sheehan told Wangler about her meeting with Kastorf and forwarded his email about fair use. (Ex. 1, Wangler Dep. at 117; Ex. 6). Wangler was already familiar with fair use principles. (Ex. 1, Wangler Dep. at 17-20). Before he worked for WCAC, he was a book editor and author at a publishing company in Alberta, Canada. (Ex. 1, Wangler Dep. at 13). He also worked as a reporter for a weekly newspaper. (*Id.* at 13). Over the course of his career in publishing, Wangler had learned from online research "that there are cases" where use of the content of another "without permission would be covered by the fair use doctrine." (*Id.* at 17-20).

16.    Wangler read the text of Kastorf's email about fair use. (Ex. 1, Wangler Dep. at 127). On the same day, June 16, 2023, Wangler watched a five-minute video produced by YouTube concerning fair use. (*Id.* at 125, 129, 131). The video stated:

> What counts as fair use? . . . Courts usually focus on whether your use of another person's song or video is <u>transformative</u>. Basically, they're asking if you added new expression or meaning to the original work, or if it <u>basically copies the original</u>. For example, in the US, content that might be considered fair use includes commentary, criticism, or news reporting.
>
> \*   \*   \*
>
> How is fair use determined by law? Determining fair use is never a cut-and-dried process. In the US, fair use can only be determined in court by a judge. The judge will look at your case overall based on a few different factors. Here are a few things to keep in mind based on what the courts look at.
>
> You're less likely to qualify as fair use if your video <u>merely copies</u> someone else's and adds nothing else, if you're trying to monetize your video, if you're using fictional copyrighted material rather than factual material, if you borrowed a <u>large amount of material</u> rather than a small portion, <u>if the main focus of your video is the copyright protected material</u>, or if your use of the material harms the copyright owner's ability to profit from their original work.

6

> So, all of these are helpful factors to consider when thinking about fair use. But also keep in mind there's no guarantee that you'll qualify for fair use just because you take these factors into account. For example, just because you don't monetize your video, or if you only use a small portion of the copyrighted material, that does not mean you automatically qualify for fair use. Again, the courts look at everything holistically, and there's always a risk involved when using someone else's copyrighted work. . . ."

(Ex. 7 (emphasis supplied)).

17.    After watching this video, Wangler sent an email to Sheehan:

> Youtube does NOT determine fair use, only a judge would. But Youtube can strike or remove videos that directly copy copyrwritten material. That is what this is about.

> It's possible that 781 News Zoom videos using short clips qualify as Fair Use.

> What does not qualify are the large number of videos taken directly from us and reproduced verbatim with zero editing or commentary. Those will be the ones we should file copyright claims against because they 'merely copy', a lot of it is used without permission, and the main focus is the copywritten material.

(Ex. 8). Wangler attached to his email a "screenshot" from the YouTube video listing the fair use

factors. It read:

> You're less likely to qualify for fair use if:
>
> Your video merely copies.
> You're trying to monetize.
> You're using fictional copyrighted material.
> You borrowed a large amount of material.
> The main focus is the copyrighted material.
> Your use harms the copyright owner's ability to profit.

(Ex. 9).

18.    Wangler suggested to Sheehan that WCAC send notices to YouTube requesting

that it take down Channel 781's "standalone" videos: those that merely excerpted WCAC

content. (Ex. 1, Wangler Dep. at 120, 128-129; Ex. 6). Sheehan agreed, and delegated to

7

Wangler responsibility for issuing the takedown requests and determining whether Channel 781 had the right to use particular WCAC content. (Ex. 4, Sheehan Dep. at 126-127; 136-137; 140).

19.     In July 2023, Wangler attempted to submit a takedown request to YouTube for a single Channel 781 video. (Ex. 1, Wangler Dep. at 123). The video was a "stand-alone" excerpt of a WCAC recording of a City Council meeting. (*Id.* at 125). Wangler chose that video because he "did not believe that it qualified for . . . fair use." (*Id.*). However, his takedown request failed because "there was something not right with the format of the takedown request." (*Id.* at 123-124). Wangler "had to do additional research to determine how to set up the MAC channel YouTube account so it could successfully file a takedown notice." (*Id.* at 124).

20.     Meanwhile, on July 17, 2023, Sheehan asked a Massachusetts cable access organization for a referral to an intellectual property lawyer. (Ex. 4, Sheehan Dep. at 128; Ex. 10). She explained that "[w]e have a group of people in Waltham who have started their own news program and are using all of our footage. I had them come in to discuss what they are doing and they claim, 'Fair use.' They are using this footage to promote political candidates in the city." (Ex. 10). Gauthier recommended an attorney. (*Id.*) The next day, Sheehan forwarded the recommendation to Justin Barrett, WCAC's board director, who cautioned that the station should not retain a lawyer without a cost estimate. (Ex. 10; Ex. 4, Sheehan Dep. at 132).

21.     Every election year, WCAC invites candidates to record campaign statements for broadcast on its "Waltham Newswatch" program and online. (Ex. 2, Kastorf Dep. at 167). The candidates record the statements in WCAC's studio. (Ex. 1, Wangler Dep. at 141). Candidates are given as many "takes" as they need to get their statement right. (Ex. 4, Sheehan Dep. at 134; Ex. 2, Kastorf Dep. at 168; Ex. 1, Wangler Dep. at 143-144). In late August 2023, incumbent mayor Jeannette McCarthy had several false starts when recording her statement, after which she

8

had to begin her remarks again. (Ex. 2, Kastorf Dep. at 168). WCAC mistakenly posted the unedited recording of Mayor McCarthy's statement, with the outtakes, on its website. (*Id.* at 168, 171; Ex. 1, Wangler Dep. at 133-134). Before WCAC could take down the video and replace it, Channel 781 downloaded and posted it to its YouTube page. (Ex. 2, Kastorf Dep. at 168; Ex. 1, Wangler Dep. at 142). Kastorf knew that posting the video would make Sheehan "angry." (Ex. 2, Kastorf Dep. at 171).

22.    The mistaken uploading of the full video was embarrassing to WCAC. (Ex. 4, Sheehan Dep. at 134-135; Ex. 1, Wangler Dep. at 141). Channel 781's unauthorized reposting of it compounded the embarrassment and "rekindled the concern" within WCAC "over our content, copyright protected, being reproduced without [its] permission." (Ex. 1, Wangler Dep. at 147).

23.    The following day, September 1, 2023, Wangler sent in a new takedown request directed at the same standalone Channel 781 video that he had identified as infringing in July. (Ex. 1, Wangler Dep. at 151). YouTube immediately took down the video in response to Wangler's takedown request. (Ex. 2, Kastorf Dep. at 142; Ex. 1, Wangler Dep. at 153).

24.    YouTube notified Channel 781 News of the takedown. (Ex. 2, Kastorf Dep. at 147; Ex. 11 at C781_00000730). On September 4, Kastorf informed the other members of Channel 781 on their Signal group chat that the strike had occurred, and that it arose from a standalone clip of WCAC content without additional commentary. (*Id.*). Channel 781 member Tom Benavides responded that every other "screen grab" of WCAC content "with no commentary" was a "pretty big liability" for a further strike. (Ex. 2, Kastorf Dep. at 147; Ex. 11 at C781_00000730). He continued: "it's prolly [probably] free [fair] use if we insert their clips into our reports. But if we're uploading their video recordings (which legally belong to them) without commentary, every one of those is a pretty big risk. At least that's what I assume." (*Id.* at

9

C781_00000730). Benavides understood that under fair use principles, "the more you change something, the more protected you are," and that the standalone clips contained the least amount of creative input by Channel 781 members of the videos they posted. (Ex. 12, Benavides Dep. at 49, 68). Kastorf "thought [Benavides] might be correct," and that "Tom . . . had a good point," because "there's this aspect of fair use about being transformational," and while Kastorf did not "entirely agree with this . . . there could be an interpretation that a standalone clip is less transformational, and, therefore, somebody might interpret that as not fair use." (Ex. 2, Kastorf Dep. at 148).

25.    Channel 781 understood that if its YouTube page received three copyright strikes, the entire channel would be disabled. (Ex. 2, Kastorf Dep. at 144-145). WCAC did not know this. (Ex. 1, Wangler Dep. at 160, 163; Ex. 4, Sheehan Dep. at 129, 137). After the first strike against a standalone use of WCAC content, Channel 781 considered taking down its other similar uses of WCAC content, but decided not to do so. (Ex. 2, Kastorf Dep. at 146-147). Instead, Kastorf submitted an "appeal" to YouTube, which was promptly rejected. (*Id*. at 153).

26.    On September 6 and 7, 2023, Wangler issued more takedown notices for "stand-alone" Channel 781 videos consisting solely of WCAC content. (Ex. 1, Wangler Dep. at 152, 154). Wangler watched each of the videos in their entirety (except for one that was "quite lengthy"); determined that each was a "stand-alone" excerpt of a WCAC recording; considered the length of the videos; reviewed the other fair use factors listed in the YouTube instructional video, including whether Channel 781's use of WCAC recordings "harmed WCAC's ability to profit"; and determined that the videos were infringing. (*Id*. at 134, 152-159). YouTube took down each of these videos. (*Id.* at 159). Ultimately, YouTube removed the Waltham DATA page for having suffered three copyright "strikes." (Ex. 2, Kastorf Dep. at 158-159; Complaint ¶ 41).

10

27.     On September 27, 2023, members of Channel 781 met over Zoom with a lawyer from the Electronic Frontier Foundation, and received legal advice concerning copyright and fair use. (Ex. 2, Kastorf Dep. at 179-180). The same day, Benavides summarized the substance of that meeting in a series of messages on the Channel 781 group chat. (Ex. 13, C781_00834-835). Kastorf then replied that he had identified the videos that had been the subject of the requests and listed them. (*Id.* at C781_00836). Another member observed that, "as we expected," the stricken videos were "the ones without commentary. I think if we stop using those, even adding 20 seconds at the beginning of us explaining the clip, I think we should be good." (*Id.* at C781_00838). Kastorf agreed. (*Id.* at C781_00839; Ex. 2, Kastorf Dep. at 182).

Respectfully submitted,

WALTHAM COMMUNITY ACCESS CORPORATION,

By its attorneys,

*/s/ Jeffrey J. Pyle*
Jeffrey J. Pyle (BBO # 647438)
jpyle@princelobel.com
Sarah L. Doelger (BBO # 712677)
sdoelger@princelobel.com
PRINCE LOBEL TYE LLP
One International Place, Suite 3700
Boston, MA 02110
T: 617-456-8000
F: 617-456-8100

Dated: November 13, 2025

## Certificate of Service

I hereby certify that the within document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and by first-class mail to any non-registered participants.

/s/ Jeffrey J. Pyle
Jeffrey J. Pyle

#5904692v1