# EXHIBIT 1



# Transcript of Christopher Wangler, Designated Representative & Individually

**Date:** July 9, 2025
**Case:** Channel 781 News -v- Waltham Community Access Corporation

**Planet Depos**
**Phone:** 888.433.3767 **| Email:** transcripts@planetdepos.com
**www.planetdepos.com**
**Michigan #8598 | Nevada #089F | New Mexico #566**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

**1**

```
 1        IN THE UNITED STATES DISTRICT COURT
 2        FOR THE DISTRICT OF MASSACHUSETTS
 3   - - - - - - - - - - - - - - - -x
 4   CHANNEL 781 NEWS,              :
 5         Plaintiff,               :
 6      v.                          : Case No.
 7   WALTHAM COMMUNITY ACCESS       : 1:24-cv-11927-PBS
 8   CORPORATION,                   :
 9         Defendant.               :
10   - - - - - - - - - - - - - - - -x
11
12        VIDEOTAPED 30(b)(6) DEPOSITION of WALTHAM
13   COMMUNITY ACCESS CORPORATION, taken by CHRISTOPHER
14      WANGLER, and by CHRISTOPHER WANGLER in his
15              personal capacity
16             Boston, Massachusetts
17            Wednesday, July 9, 2025
18                 9:08 a.m.
19
20
21
22   Job No.: 590641
23   Pages: 1 - 167
24   Reported By: Michelle Keegan, RMR, CRR, CSR
```

**2**

```
 1        Deposition of CHRISTOPHER WANGLER, held at
 2   the offices of:
 3
 4        BROWN RUDNICK LLP
 5        One Financial Center
 6        Boston, Massachusetts 02111
 7        (617) 856-8200
 8
 9
10
11
12        Pursuant to notice, before Michelle
13   Keegan, Registered Merit Reporter and Notary
14   Public in and for the Commonwealth of
15   Massachusetts.
16
17
18
19
20
21
22
23
24
```

**3**

```
 1             A P P E A R A N C E S
 2   ON BEHALF OF PLAINTIFF CHANNEL 781 NEWS:
 3        BETELHEM GEDLU, ESQ.
 4        MITCH STOLTZ, ESQ.
 5        ELECTRONIC FRONTIER FOUNDATION
 6        815 Eddy Street
 7        San Francisco, California 94109
 8        (415) 436-9333
 9
10   ON BEHALF OF DEFENDANT WALTHAM COMMUNITY ACCESS
11   CORPORATION:
12        JEFFREY J. PYLE, ESQ.
13        SARAH L DOELGER, ESQ.
14        PRINCE LOBEL TYE LLP
15        One International Place
16        Suite 3700
17        Boston, Massachusetts 02110
18        (617) 456-8000
19
20   ALSO PRESENT:
21        Isaac Weaver, Videographer
22        Stavros Atlamazoglou, Brown Rudnick summer
23        associate
24
```

**4**

```
 1             C O N T E N T S
 2   EXAMINATION OF CHRISTOPHER WANGLER        PAGE
 3     By Mr. Stoltz                             7
 4
 5
 6             E X H I B I T S
 7        (Attached to transcript.)
 8   WANGLER DEPOSITION EXHIBITS              PAGE
 9   Exhibit 31  Revised Notice of Deposition of    9
10               Waltham Community Access
11               Corporation
12   Exhibit 32  Article, "Star-Studded Support"   34
13   Exhibit 33  Article, "Mayor to Seek Sixth     35
14               Term"
15   Exhibit 34  Article, "Are Jeannette           35
16               McCarthy's Values Really
17               Waltham's Values?"
18   Exhibit 35  Article, "Eviction Notice?"       36
19   Exhibit 36  MAC-TV Channel Waltham            51
20               Government Television Policies &
21               Guidelines Mission Statement,
22               WCA0000556 through -560
23   Exhibit 37  Text Messages                     75
24
```

**Page 5**

```
              EXHIBITS (continued)
1
2  Exhibit 38  Email, WCA0000121 through -122      84
3  Exhibit 39  Letter dated November 22, 2023,     91
4              WCA0000119 through -120
5  Exhibit 40  Defendant Waltham Community          92
6              Access Corporation's Answers and
7              Objections to Plaintiff
8              Channel 781 News's First Set of
9              Interrogatories
10 Exhibit 41  Email, WCA0000433 through -434       99
11 Exhibit 42  Email, WCA0000123 through -125      126
12 Exhibit 43  Email, WCA0000422                   130
13 Exhibit 44  Document, "Fair Use - Copyright     130
14              on YouTube"
15 Exhibit 45  Email, WCA0000420                   147
16 Exhibit 46  Handwritten Document, WCA0000718    161
17
18
19
20
21 ** Documents quoted on the record are transcribed
22                as read **
23
24
```

**Page 6**

```
           P R O C E E D I N G S
1
2       THE VIDEOGRAPHER:  Here begins Media
3  Number 1 in the videotaped deposition of Chris
4  Wangler in the matter of Channel 781 News v.
5  Waltham Community Access Corporation in the United
6  States District Court for the District of
7  Massachusetts, Case Number 1:24-cv-11927-PBS.
8       Today's date is July 9th, 2025.  The time
9  on the video monitor is 9:08.  The videographer
10 today is Isaac Weaver, representing Planet Depos.
11 This video deposition is taking place at Brown
12 Rudnick LLP, One Financial Center, Boston,
13 Massachusetts.
14      Would counsel please voice-identify
15 themselves and state whom they represent.
16      MR. STOLTZ:  Mitch Stoltz, Electronic
17 Frontier Foundation, for the plaintiff, Channel
18 781 News.
19      MS. GEDLU:  Betelhem Gedlu, representing
20 Channel 781 News.
21      MR. PYLE:  Jeffrey Pyle, representing
22 Waltham Community Access Corporation.
23      THE VIDEOGRAPHER:  The court reporter
24 today is Michelle Keegan, representing Planet
```

**Page 7**

```
1  Depos.  The witness will now be sworn.
2            CHRISTOPHER WANGLER,
3  having been satisfactorily identified and duly
4  sworn by the Notary Public, was examined and
5  testified as follows:
6            EXAMINATION BY COUNSEL FOR
7            PLAINTIFF CHANNEL 781 NEWS
8  BY MR. STOLTZ:
9      Q.  Good morning, Mr. Wangler.
10     A.  Good morning.
11     Q.  Could you please state your full name for
12 the record.
13     A.  Christopher Dennis Wangler.
14     Q.  Have you ever been deposed before?
15     A.  No.
16     Q.  So to help our court reporter, only one of
17 us can speak at a time.  So I'd ask you to please
18 let me finish asking my question before you
19 answer, and I'll let you finish speaking before I
20 go on.  Is that all right?
21     A.  Yes.
22     Q.  And if you don't understand my question,
23 please say so and I'll rephrase it.  Can you do
24 that?
```

**Page 8**

```
1      A.  Yes.
2      Q.  We'll take breaks from time to time, but
3  if you need a break at any time please let me
4  know.  I'd only ask that if a question is pending,
5  that you answer the question before we break.  Can
6  you do that?
7      A.  Yes.
8      Q.  Have you done anything to prepare for
9  today's deposition?
10     A.  For the 30(b)(6) -- Rule 30(b)(6), yes.
11     Q.  How did you prepare?
12     A.  Reviewing the questions or the different
13 matters that were given in the 30(b)(6) document.
14     Q.  Did you meet with anyone to prepare for
15 today's testimony?
16     A.  Yes.
17     Q.  Who did you meet with?
18     A.  Jeff.
19     Q.  How many times did you meet?
20     A.  Three times.
21     Q.  Was anyone besides you and Jeff present at
22 those meetings?
23     A.  Yes.
24     Q.  Who else was at those meetings?
```

9

1     A. The other defendants in this matter.
2     Q. Would that be Maria Sheehan?
3     A. Yes.
4     Q. And Justin Barrett?
5     A. Yes.
6     Q. Anyone else?
7     A. No.
8     Q. Are you taking any medication or dealing
9  with any condition today that might interfere with
10 your ability to testify truthfully or understand
11 the questions?
12    A. No.
13    Q. Do you understand that when I say "WCAC,"
14 I mean Waltham Community Access Corporation?
15    A. Yes.
16    Q. And do you understand that when I say
17 "Channel 781," I'm referring to my clients, the
18 group that brought this lawsuit?
19    A. Yes.
20    Q. And you mentioned looking at the list of
21 30(b)(6) topics.  I'd like to show you that list.
22       MR. STOLTZ:  We'll mark that.
23       (Wangler Exhibit 31 was marked for
24 identification and is attached to the transcript.)

10

1     Q. If you could please look at the page
2  that's labeled "Schedule A."  It's the third page
3  of that document.
4     Can you confirm that you'll be testifying
5  on behalf of WCAC on Topic 4?
6     A. Yes.
7     Q. And also on Topics 7 through 10?
8     A. Yes.
9     Q. And also on Topics 12 through 15?
10    A. Yes.
11    Q. Thank you.  What city do you live in?
12    A. Natick, Massachusetts.
13    Q. How long have you lived there?
14    A. Since 2016.
15    Q. And where do you work?
16    A. I work at the Waltham Community Access
17 Corporation.
18    Q. Do you work anywhere else besides WCAC?
19    A. No.
20    Q. What's your job title at WCAC?
21    A. News director.
22    Q. When did you become news director?
23    A. 2009.
24    Q. What are your job duties as news director?

11

1     A. I produce a 30-minute television newscast
2  about the City of Waltham that airs every two
3  weeks.  I'm also responsible for posting news
4  content to our social media channels.  I also
5  upload some of our news content to YouTube.
6     And I am engaged in other news-gathering
7  activities in addition to various other roles at
8  the station, where an extra set of hands might be
9  required to shoot a show in the studio or assist
10 with an outdoor concert.
11    So I don't only work as the news director.
12 I can be called upon to do other responsibilities
13 as well.
14    Q. Do you have any other job responsibilities
15 other than the ones that you mentioned?
16    A. Answering phones occasionally.
17    Q. You mentioned creating a news program.
18 What's that program called?
19    A. It's called Waltham Newswatch.
20    Q. And what does that show include?
21    A. Waltham Newswatch covers anything related
22 to Waltham:  politics, city government, restaurant
23 openings, high school sports, people making a
24 difference, and especially nonprofits in the City

12

1  of Waltham.
2     Q. Do you have any job responsibilities with
3  respect to the MAC-TV channel?
4     A. Yes.
5     Q. And what are those?
6     A. Occasionally I will shoot a government
7  meeting.  If the MAC channel program coordinator
8  is unable to shoot that meeting, he has trained me
9  to operate the cameras in a government building in
10 Waltham and create recordings of government
11 meetings.
12    Q. Who is the MAC channel program
13 coordinator?
14    A. Bill Heatley.
15    Q. Did you have a role at WCAC before you
16 were news director?
17    A. Initially I approached the station to
18 learn more and to volunteer because I was out of
19 work at the time.  And I produced a series of
20 videos about Waltham Public Library, with
21 assistance from a former staff member who taught
22 me how to run the camera and use microphones and
23 other video production skills.
24    Q. Where did you work before WCAC?

13

1    A. Newton Free Library, which is a part of
2  the City of Waltham -- City of Newton.
3    Q. And how about before that?
4    A. I was a book editor, an author, at Lone
5  Pine Publishing in Edmonton, Alberta, Canada.
6    Q. Before you worked at WCAC, did you hold
7  any jobs in journalism?
8    A. Yes.
9    Q. What were those jobs?
10    A. When I lived in Edmonton, I was a reporter
11 for Vue Weekly, an arts and entertainment weekly
12 for the City of Edmonton, Alberta.
13    Q. Any others?
14    A. I published a story in an alumni magazine
15 for the University of Alberta, where I studied
16 from 1992 to 1996.
17    Q. Did you get a degree from the University
18 of Alberta?
19    A. Yes.
20    Q. What was that degree?
21    A. A bachelor of arts degree.
22    Q. In what field was that degree?
23    A. Philosophy major, English minor.
24    Q. Have you ever studied journalism?

14

1    A. Not in -- not at university.  No.
2    Q. Have you studied journalism in another
3  context?
4    A. I've learned how to become a journalist by
5  doing it.
6    Q. Have you ever worked in government?
7    A. I don't believe so.
8    Q. Have you ever run for elected office?
9    A. No.
10    Q. Are you a member of any government boards
11 or commissions?
12    A. No.
13    Q. Are you an officer or director of any
14 charities or nonprofit organizations other than
15 WCAC?
16    MR. PYLE:  Objection.
17    A. Could you repeat that?
18    Q. Are you an officer or director of any
19 charities or nonprofit organizations?
20    A. No.
21    Q. Are you a member of the Waltham Lions
22 Club?
23    A. No.
24    Q. Have you had any training in defamation or

15

1  libel law?
2    A. What do you mean by "training"?
3    Q. Any formal or informal education.
4    A. Several years ago a Waltham city
5  councillor made statements during a city council
6  meeting that became the subject of a report about
7  potential defamatory legal action.
8    Q. In that instance, was WCAC accused of
9  defamation?
10    A. No.
11    Q. So I asked whether you had any training in
12 defamation or libel law.  How was that episode a
13 form of training?
14    A. So the city councillor made statements
15 during the city council meeting, and those
16 statements involved a former city clerk for the
17 City of Waltham and his spouse.  And the
18 implication -- there was some implication of
19 impropriety in the statements made by the city
20 councillor.
21    As a result, both the woman, the spouse,
22 and the former city clerk, I approached them and
23 they said that they believed that the statements
24 the city councillor had made could be defamatory

16

1  and could lead to legal action.  And I reported on
2  that.
3    Q. When you say you approached them, do you
4  mean you approached them as a reporter?
5    A. Yes.
6    Q. And in reporting on that story, did you do
7  any research on the law of defamation?
8    A. Yes.
9    Q. Have you had any other experiences that
10 you would describe as training, formal or
11 informal, in defamation?
12    A. Not that I can recall.
13    Q. Have you had any training in copyright
14 law?
15    A. What do you mean by "training"?
16    Q. Formal or informal education.
17    A. As a reporter and as a news director, yes.
18    Q. From what sources?
19    A. In the course of news gathering, I would
20 need to, for example, reproduce a photo or video.
21 And in order to do that, I would need to have a
22 rudimentary understanding of the copyright
23 involved.
24    Q. From what sources did you seek that

17

1 understanding?

2     A. Online searches, online research.

3     Q. Do you recall any online resources in

4 particular that you consulted?

5     A. I don't recall specific -- I don't recall

6 specifically.

7     Q. You said in the course of news gathering

8 you would need to at times reproduce a photo or

9 video. Can you give me an example?

10     A. Yes. I shoot a lot of photographs.

11 There's no problem publishing my own photographs.

12     But I interview many people who I either

13 don't have a photograph of or cannot take a

14 photograph of who are newsworthy. And they may

15 have photographs. And in order to reproduce them,

16 I need to ask their permission because they would

17 own the copyright on that photograph.

18     Q. Have you ever, to your knowledge, used a

19 photograph or video that you -- WCAC did not

20 produce without asking for permission?

21     A. Yes.

22     Q. Can you tell me the circumstances?

23     A. In 2019, an 18-year-old motorcycle rider

24 was critically injured in a crash on Main Street

18

1 in Waltham. I was at the scene. I took

2 photographs of the motorcycle and first responders

3 on scene.

4     I did not have a picture of the victim at

5 the time, but I searched for photos of the victim

6 and discovered a yearbook photo from several years

7 earlier, a Waltham High School yearbook photo.

8     And I was able to scan a page -- a

9 yearbook page, crop the photo of this victim, and

10 reproduce that photo, but I was unable to

11 determine who took the photo or who owned the

12 copyright to the photograph.

13     Q. What, if anything, did you do to verify

14 that it would be lawful to use that photograph?

15     A. I searched through the yearbook to try to

16 determine who might have taken the photo. I tried

17 to determine who would have been the yearbook

18 coordinator at the time, but I was unable to do

19 that.

20     Q. Did you do anything else?

21     A. I can't recall.

22     Q. In that instance, did you do any research

23 into the fair use doctrine of copyright?

24     A. No and yes.

19

1     Q. Can you explain?

2     A. I had developed an understanding of the

3 fair use doctrine through news gathering and

4 through my work as a book editor.

5     Q. From what sources did you develop that

6 understanding?

7     A. Online searches about fair use.

8     Q. Anything else?

9     A. Not that I can recall.

10     Q. So other than online searches, would you

11 say you've had no training in the fair use

12 doctrine of copyright law?

13     A. What do you mean by "training"?

14     Q. Formal or informal education.

15     A. I felt like I had developed an

16 understanding of fair use through my news

17 gathering activities.

18     Q. How did news gathering activities give you

19 an understanding of fair use?

20     A. So ordinarily, in order to reproduce

21 content created by another person, we would seek

22 permission. And in almost every instance where I

23 reproduce media from someone else, I seek

24 permission.

20

1     But I understood that there are cases

2 where either I could not discover who created

3 that, who created the content, or I could not get

4 their permission but it would still be wise to

5 reproduce a photo or video because of public

6 interest. And that use without permission would

7 be covered by the fair use doctrine.

8     Q. Other than the episode that you mentioned

9 about the yearbook photo, was there any other

10 occasion when you used a photo or video without

11 permission?

12     A. Yes.

13     Q. What was that?

14     A. Following a very serious earthquake in

15 Haiti in 2010, the Haitian community in Waltham

16 was seriously adversely affected. And I reported

17 on the situation, but I did not have any

18 photographs from Haiti that I was able to take,

19 and I did not know anyone who shot photographs of

20 this tragedy.

21     But for my coverage I felt it was

22 important to include images of Haiti, so I found

23 images online and reproduced them and added credit

24 to reflect who shot the images.

21

1    Q. Did you make any attempt to locate the
2  copyright owner to contact them?
3    A. I can't recall.
4    Q. In that instance, did you give any
5  consideration to whether your use of that photo
6  was -- deprived the photographer of revenue?
7    A. I can't recall.
8    Q. Did you give any consideration to whether
9  you were using the photo for a different purpose
10 than the photographer?
11   A. I can't recall.
12   Q. Did you give any consideration to whether
13 the photo was creative?
14   A. What do you mean by "creative"?
15   Q. Whether it included creative choices made
16 by the photographer.
17   A. I can't recall.
18   Q. Did you consider whether there were any
19 alternative ways of obtaining a photo of the
20 tragedy in Haiti that you could use?
21   A. Again, I can't recall.
22   Q. Thank you.  I know that was a while ago.
23   MR. PYLE:  15 years.
24   Q. Going back to the yearbook photo, in that

22

1  instance did you give any consideration to whether
2  there was an alternative photo that you could use?
3    A. I recall finding some photos online, but
4  the yearbook photo seemed like a better
5  alternative because it showed the victim not -- it
6  showed the victim near the age at which he was
7  critically injured and ultimately killed.
8      Other photos depicted the victim as a
9  younger teen and so were less reflective of how
10 this victim looked at the time of this ultimately
11 fatal motorcycle crash.
12   Q. In that instance, did you give any
13 consideration to whether your use might deprive
14 the photographer of revenue?
15   A. I can't recall.
16   Q. You don't remember considering that?
17   A. The photograph was from a yearbook.  It
18 was not an AP photo or a photograph from the
19 Boston Globe.  It was a yearbook photo, so the
20 person who took the photo was probably a --
21 contracted by the high school to shoot photos.
22   Q. So is it fair to say you believed that
23 your use would not deprive that photographer of
24 revenue?

23

1    A. I can't recall.
2    Q. So you said, "It was not an AP photo or a
3  photograph of The Boston Globe.  It was a yearbook
4  photo, so the person who took the photo was
5  probably contracted by the high school to shoot
6  photos."
7      Was it your understanding that that
8  photographer was probably already paid?
9    A. I don't know if I considered that at the
10 time.  I can't recall.
11   Q. So again, you're telling me you can't
12 remember whether you ever considered whether your
13 use of the yearbook photo would deprive the
14 photographer of revenue?
15   A. Could you repeat that, please?
16   Q. Well, is it your testimony that you did
17 not consider whether the photographer would be
18 deprived of revenue because you used that yearbook
19 photo?
20   MR. PYLE:  Objection.
21   A. I don't know if I understand the question.
22 I'm sorry.  Could you rephrase?
23   Q. I'll try.  Let me ask this: You said the
24 photograph "was not an AP photo or a photograph

24

1  from the Boston Globe.  It was a yearbook photo,
2  so the person who took the photo was probably
3  contracted by the high school to shoot photos."
4      Why was that distinction significant to
5  you?
6    MR. PYLE:  Objection.
7    A. Sometimes I have to approach a news
8  organization to request a photograph.  And it's a
9  convention in news gathering to approach the news
10 organization and ask for permission to reproduce
11 their photograph.  So I understood how that
12 worked.
13     The yearbook photo was a different
14 situation.  I didn't know who the photographer was
15 and it wasn't clear who the yearbook -- who
16 created the yearbook, so I didn't really know who
17 to approach and I didn't know who the photographer
18 was.
19   Q. So is it correct that you can't recall
20 giving any thought to whether the photographer
21 would be deprived of revenue?
22   A. I can't recall that the photographer would
23 be deprived of revenue.  Yes.  I can't recall
24 whether the photographer would be deprived of

25

1  revenue.
2      Q. Have you personally posted any videos to
3  YouTube?
4      MR. PYLE:  Objection.
5      A. Yes.
6      Q. Have you posted any videos to YouTube as
7  part of your role at WCAC?
8      A. Yes.
9      Q. What sort of videos does WCAC post to
10 YouTube?
11     A. Videos from Waltham Newswatch as well as
12 some videos from our station that may have news
13 value.
14     Q. Does WCAC produce any original video
15 programming aside from Waltham Newswatch?
16     A. Yes.
17     Q. What other programming does WCAC produce?
18     A. So one of the producers, the program
19 director, Phil McGrady, he produces two shows.
20 One is called "The Hit Show," and it's a show
21 about the Boston Red Sox.
22        He also produces a show called "Armchair
23 Quarterback," and that's a show about the New
24 England Patriots.

26

1      Q. Any others?
2      A. Bill Heatley from the MAC channel is a
3  producer on a -- helps produce a show created by
4  community volunteers, but he plays an important
5  role in helping to produce the show.
6        So typically volunteers come in.  They
7  work the camera.  Do you know what I mean?  They
8  direct the show.
9        But for some of these shows, you know,
10 Bill Heatley helps producers that come in because
11 they may not have the technical skills required to
12 either direct the show or set up the cameras or
13 operate microphones.
14     Q. Have you learned about YouTube's copyright
15 enforcement methods?
16     A. Yes.
17     Q. From what sources?
18     A. Uploading videos.  For instance, having
19 content ID claims made against some of the videos.
20     Q. Can you give me an example?
21     A. Not specifically.
22     Q. There have been content ID claims made
23 against videos uploaded by WCAC.  Is that correct?
24     A. No.  Who do you mean by "WCAC"?

27

1      Q. Has a video that was uploaded by you or
2  anyone at WCAC been the subject of a content ID
3  claim?
4      A. Yes.
5      Q. Can you give me an example?
6      A. What I can say is we have permission from
7  an online music service to use music in Waltham
8  Newswatch videos and for other purposes at WCAC.
9  This company is called -- I believe it's called
10 ACM.
11        So we have permission to reproduce their
12 audio content on our channel, so I've used ACM
13 music in some of my videos, but when I've uploaded
14 the videos to YouTube, they received a content ID
15 claim because presumably they were flagged
16 somehow.
17     Q. What did you do in that instance?
18     A. I learned that no action was required
19 because the rights holder was not initiating a
20 copyright strike against the video.  They allowed
21 the video to remain on YouTube.  And they may have
22 monetized the video or taken another step to allow
23 it to remain.
24     Q. Aside from that experience, are there any

28

1  other sources from which you learned about
2  YouTube's copyright enforcement mechanisms?
3      A. In the course of watching YouTube videos,
4  I had watched videos that had been uploaded and
5  then deleted.
6      Q. How did that inform you about YouTube's
7  copyright enforcement mechanisms?
8      A. YouTube -- sometimes videos are uploaded
9  and later the videos are taken down by YouTube,
10 presumably because of copyright.
11     Q. Are there any other sources from which you
12 learned about YouTube copyright enforcement
13 mechanisms?
14     A. I watched a video called "YouTube
15 Copyright Fair Use," in 2023.
16     Q. Do you recall when in 2023 you watched
17 that?
18     A. Not precisely.
19     Q. Was it somewhere around June of 2023?
20     A. Possibly.  I can't recall exactly.
21     Q. Was it later than June of 2023?
22     A. I don't believe so.
23     Q. Have you learned about the process of
24 sending copyright infringement notices to YouTube?

29

1    A. Yes.
2    Q. From where did you learn that?
3    A. From the matter we're discussing now.
4    Q. Has WCAC sent infringement notices to
5 YouTube regarding any videos other than those
6 uploaded by Channel 781?
7    A. No, although I cannot speak on behalf of
8 other members of the staff. To my knowledge,
9 those are the only ones.
10    Q. If I could turn your attention back to the
11 exhibit we looked at earlier, the 30(b)(6)
12 deposition notice.
13        Were you designated to give testimony for
14 WCAC about Topic Number 8, WCAC's accusations of
15 copyright infringement against others?
16    A. Yes.
17    Q. And are you prepared to testify on behalf
18 of WCAC about accusations of copyright
19 infringement against others?
20    A. Yes.
21    Q. Do you know if other members of the staff
22 have sent copyright infringement notices to
23 YouTube with regard to an uploader other than
24 Channel 781?

30

1    A. Can you repeat that? Sorry.
2    Q. That's okay. Do you know if other members
3 of the WCAC staff have sent copyright infringement
4 notices to YouTube outside of this matter?
5    A. Not to my knowledge.
6    Q. Is it your understanding sitting here
7 today that YouTube might suspend a channel that
8 has received three or more infringement notices?
9    A. Today?
10    Q. Yes.
11    A. I understand that now, but I did not
12 understand that before.
13    Q. When did you become aware of that?
14    A. When the Waltham DATA YouTube channel was
15 shut down. I was not aware before.
16    Q. We've been going about an hour. Do you
17 need a break?
18    A. No. I'm good. Thank you.
19    Q. All right. So you told me about Waltham
20 Newswatch. Other than Waltham Newswatch, does
21 WCAC report the news in any other fashion?
22    A. So Waltham Newswatch is a television
23 program, but then there are social media channels
24 which include content that's similar, which would

31

1 be a Waltham Channel Facebook page.
2        And then there's a website that has a News
3 tab where things I report are published. And then
4 there's an X account where some news that I report
5 is also published.
6        So there's several different ways in which
7 news I gather is disseminated either on cable or
8 online.
9    Q. Do you consider yourself a reporter?
10    A. Yes.
11    Q. Are there any other reporters employed by
12 WCAC?
13    A. Members of the staff have acted as
14 reporters, but I don't know if I'd describe them
15 as reporters.
16    Q. Does any other member of the staff write
17 news stories that are published under the News
18 tab?
19    A. On the website?
20    Q. Yes, on the website.
21    A. So in the past, former news assistants
22 would take, for instance, something published on
23 Facebook and then they would copy it and publish
24 it on the website. So they were reporting, but

32

1 they were just basically cutting and pasting
2 something that I had already reported. And then
3 they would also add photos that I probably shot to
4 that reporting.
5        But typically I am the only person
6 reporting on the News tab on our WCAC.org website.
7    Q. Other than you, does anyone else at WCAC
8 write news copy that appears on social media?
9    A. Yes.
10    Q. And who is that?
11    A. It could be Maria Sheehan, the executive
12 director; Phil McGrady.
13        Maria Sheehan or Phil McGrady very
14 occasionally might be required to notify the
15 community of something on our social media
16 channels if I'm not around to do it myself, but
17 typically posting to these social media channels
18 falls to me.
19        But if I'm away on vacation, you know, one
20 of them would have to say, to give an example,
21 there's a summer concert series. That summer
22 concert series, there is a concert on this Tuesday
23 but rain is going to postpone that. Chris is away
24 on vacation. So Maria or Phil would post to our

33

1  social media channel that the concert is
2  postponed.
3      Q. Does WCAC produce any opinion writing?
4      A. Currently or in the past?
5      Q. At any time.
6      A. Not that I can recall.
7      Q. Does Waltham Newswatch ever contain an
8  opinion segment?
9      A. No.
10     Q. Does it ever contain anything you'd
11 describe as an editorial?
12     MR. PYLE:  Objection.
13     A. What do you mean by "editorial"?
14     Q. As a journalist, what do you understand an
15 editorial to be?
16     A. A position taken by the news gathering
17 entity about a particular issue that isn't
18 specifically news reporting.
19     Q. Has content of that sort appeared on
20 Waltham Newswatch, to your knowledge?
21     A. Very rarely.  I can't -- most of Waltham
22 Newswatch is just reporting.  We don't have an
23 editorial board such as a major newspaper would
24 have.  So, you know, typically no.

34

1      MR. STOLTZ:  That's to mark.
2      (Wangler Exhibit 32 was marked for
3  identification and is attached to the transcript.)
4      Q. Mr. Wangler, I'm showing you a printout
5  from WCAC's website.  Do you recognize it?
6      A. Yes.
7      Q. Is this a true and correct copy of an
8  article you posted to WCAC's website?
9      A. Yes.
10     Q. If you could look at the next-to-last page
11 of this document, there's a photograph of three
12 people.
13     A. These three people?
14     Q. Yes.
15     A. Yes.
16     Q. Could you read the photo caption, please.
17     A. Left to right, MHSA Board, MHSA board
18 president Justin Barrett, Janice Donovan, and MHSA
19 CEO Bob Mills.
20     Q. Justin Barrett is also the chairman of the
21 board of WCAC.  Is that right?
22     A. Yes.
23     Q. Does this article mention his role as
24 chairman of the board of WCAC?

35

1      A. No.
2      Q. Thank you.
3      (Wangler Exhibit 33 was marked for
4  identification and is attached to the transcript.)
5      Q. I'm showing you another printout of an
6  article from the WCAC website.  Do you recognize
7  it?
8      A. Yes.
9      Q. Did you write this article?
10     A. Yes, I did.
11     Q. Is this a true and correct copy of the
12 article that you wrote?
13     A. Yes.
14     Q. Would you consider to be this -- strike
15 that.
16     Would you consider this article to be news
17 reporting or opinion?
18     A. News.
19     Q. For the record, could you read the title
20 of the article.
21     A. "Mayor to Seek Sixth Term."
22     Q. Thank you.
23     (Wangler Exhibit 34 was marked for
24 identification and is attached to the transcript.)

36

1      Q. I'm showing you another printout from
2  WCAC's website.  Do you recognize it?
3      A. Yes.
4      Q. Is this an article that you wrote?
5      A. Yes.
6      Q. Could you read the title of the article.
7      A. "Are Jeannette McCarthy's Values Really
8  Waltham's Values?"
9      Q. Is this a true and correct copy of an
10 article that you wrote?
11     A. I'd need to look through it.  Sorry.
12     Q. Please take your time.
13     A. Yes.
14     Q. Thank you.  Is it fair to say this is an
15 article about the 2023 election for the mayor of
16 Waltham?
17     A. Yes.
18     Q. Would you consider this news reporting or
19 opinion?
20     A. News.
21     Q. Thank you.
22     (Wangler Exhibit 35 was marked for
23 identification and is attached to the transcript.)
24     Q. I've shown you what's been marked as

37

1 Exhibit 35, a printout from the WCAC website. Do
2 you recognize it?
3    A. Yes.
4    Q. Is this a story that you wrote for the
5 website?
6    A. Yes.
7    Q. Is this a true and correct copy of that
8 article?
9    A. Yes.
10    Q. Would you describe this article as news
11 reporting or opinion?
12    A. News.
13    Q. Which news publications in any medium
14 cover the City of Waltham on a regular basis?
15    A. Waltham Patch, Waltham News Tribune,
16 Brandeis Justice, 781 News. I believe that's it.
17 Possibly a Bentley student newspaper.
18    Q. What is Waltham Patch?
19    A. Waltham Patch is a hyper-local news
20 website, online only, providing information at the
21 grassroots level for individual communities.
22    Q. Do you know if Waltham Patch has
23 reporters?
24    A. Yes.

38

1    Q. Does it have reporters?
2    A. Sorry?
3    Q. Does Waltham Patch have reporters?
4    A. I believe so.
5    Q. Do you have an idea of how many?
6    A. No, I do not.
7    Q. To your knowledge, which news
8 publications, again in any medium, covered the
9 2023 municipal elections in Waltham?
10    A. Waltham Patch, 781 News, Brandeis Justice,
11 and a variety of -- there were some Facebook pages
12 involved with, say, Waltham politics that offered
13 some coverage but not reporting, per se, but
14 similar to reporting.
15    Q. I'd like to ask you a bit about the MAC-TV
16 channel. Which government meetings does WCAC
17 record on video?
18    A. Okay. I'll try to make a complete list.
19 It's the school committee, city council, various
20 city council committees, the Waltham zoning board
21 of appeals, the Waltham traffic commission, the
22 board of survey and planning, the license
23 commission, and possibly another. It's escaping
24 my mind.

39

1    Q. Any others that you're aware of?
2    A. The MAC channel airs some meetings that
3 are recorded via Zoom and then aired on our
4 channel. Does that make sense?
5    Q. It does.
6       Meetings of what body?
7    A. The Waltham Historical Commission, the
8 conservation commission. And I believe that's the
9 only two.
10    Q. Does WCAC through the MAC channel record
11 the meetings of every committee of the Waltham
12 City Council?
13    A. No.
14    Q. How does WCAC decide which committees and
15 other city government bodies to record?
16    A. We try to record as many as possible,
17 given staffing limitations. There are two staff
18 members who typically shoot these government
19 meetings. So they try to shoot as many committee
20 meetings, for instance, as possible, but there may
21 be some committee meetings that they can't shoot.
22    Q. Who are those two staff members?
23    A. Bill Heatley and Christian Buday.
24       And as I mentioned earlier, very

40

1 occasionally I would record a government meeting
2 in the event that either of those two staff
3 members could not cover it. And another staff
4 member, Phil, also would occasionally record one
5 of these meetings if either Bill or Christian was
6 unable to do it.
7    Q. Is that Phil McGrady?
8    A. Phil McGrady, yes.
9    Q. How do you spell Christian's last name?
10    A. B-U-D-A-Y.
11    Q. Thank you.
12    A. Yup.
13    Q. What types of equipment does WCAC use to
14 record government meetings?
15    A. So typically robotic cameras and a
16 switcher. Switcher, robotic cameras, and
17 different types of microphones such as PZM
18 microphones.
19       Does that answer your question?
20    Q. It does. But are there any other types of
21 equipment you would add?
22    A. So occasionally, for whatever reason, Phil
23 might be required to bring a more traditional
24 shoulder-mounted Sony news gathering camcorder to

41

1  shoot a meeting.
2      If, say, the pan and tilt robotic camera
3  system was not working -- and we've had that issue
4  in the past, so he's obligated to shoot these
5  meetings, but sometimes the equipment breaks down,
6  but he still needs to create a recording.
7      So he will take a tripod and, you know, a
8  Sony camcorder to the room where the meeting is
9  held and try to create a recording of the meeting.
10 But it looks less professional than the recordings
11 he creates with the switcher, pan and tilt
12 cameras, and the PZM or other microphones.
13     Q. When you say "switcher," what does a
14 switcher do?
15     A. So at government center where some of the
16 meetings are shot there's a piece of technology
17 that allows a producer to select certain cameras,
18 add graphics, add other -- add a date, add the
19 date, the name of the meeting.  So this switcher
20 allows the producer to create a professional
21 recording of the government meeting.
22     Q. Is there a robotic camera installed in the
23 Waltham City Council chamber?
24     A. Yes.

42

1      Q. How many cameras?
2      A. I believe three cameras.  I believe three
3  cameras.
4      Q. During a typical meeting, is there a WCAC
5  employee in the council chamber directing the
6  cameras?
7      A. Yes.
8      Q. Is that person controlling all of the
9  robotic cameras?
10     A. Yes.
11     Q. How does WCAC make videos of Waltham
12 government meetings available to the public?
13     A. Okay.  For some of the meetings, for
14 instance the school committee meeting and the city
15 council meeting, the meetings are aired live.  So
16 the producer, as soon as the meeting starts the
17 producer airs whatever is happening in the council
18 chamber on our channel live.
19     For some of the other meetings, recordings
20 are made of the meetings for subsequent broadcast
21 on cable and streaming on our website.
22     Q. Are meetings that are recorded live also
23 recorded for subsequent broadcasts on your channel
24 and online?

43

1      A. Yes.
2      Q. Other than broadcast on cable and
3  streaming on the website, does WCAC make meeting
4  videos available to the public in any other way?
5      A. Not that I'm aware of.
6      Can I amend my response?
7      Q. Yes.
8      A. Occasionally a request is made from, say,
9  a petitioner who appeared before one of these
10 boards.  They may seek a permanent record of a
11 meeting, say a meeting of the zoning board of
12 appeals, so they will request that a MAC channel
13 staff member create a DVD of that recording.
14     That's an additional way that the MAC
15 channel can make a meeting available to a member
16 of the public.
17     Now, the person requesting the DVD has to
18 pay a fee for that service.
19     Q. What's that fee?
20     A. $15.
21     Q. And who creates those DVDs?
22     A. Typically Bill Heatley.
23     Q. About how many times is each meeting shown
24 on the MAC-TV channel?

44

1      A. It depends.  Some meetings may be shown
2  more than others.  So, for instance, a city
3  council meeting may be of greater interest and
4  would be shown more or a -- let's say a special
5  meeting of either the school committee or the city
6  council may be of greater interest.
7      There may be some meetings, say about a
8  proposed liquor store at a wholesale retailer,
9  that is very -- there's wide public interest.  We
10 may receive requests, oh, when is that meeting
11 airing?
12     And as a result, that meeting will air
13 maybe more often than, say, a two-minute meeting
14 of the license commission where the commission
15 convenes only to rubber-stamp a number of items.
16 And it may be of limited interest to the public.
17     Q. For a meeting of greater interest,
18 typically how many times would it be shown on the
19 MAC-TV channel?
20     A. I don't know.
21     Q. Is it more than five?
22     A. Yes.
23     Q. Is it more than 10?
24     A. Possibly.

45

1    Q. Is it more than 20?
2    A. I don't want -- I can't say.
3    Q. For how many days after the meeting is a
4 meeting of high interest typically shown on the
5 MAC-TV channel?
6    A. Could be frequently. It could be for a
7 month, especially if there's wide interest.
8       MR. PYLE: I was wondering if now would be
9 a good time to take a break. It's been about an
10 hour and a half.
11      MR. STOLTZ: Absolutely.
12      MR. PYLE: Great. Thanks.
13      THE VIDEOGRAPHER: We are going off the
14 record. The time on the monitor is 10:34.
15      (Recess, 10:34 a.m. to 10:46 a.m.)
16      THE VIDEOGRAPHER: We are back on the
17 record. The time on the monitor is 10:46.
18 BY MR. STOLTZ:
19    Q. I had a couple of questions about things
20 we talked about before. I think you mentioned
21 that somebody at WCAC gave you on-the-job training
22 in news. Is that right?
23    A. More like video production training.
24    Q. And who was that?

46

1    A. Jeff Whiteley.
2    Q. Is he still at WCAC?
3    A. No. He's a TV teacher at Waltham High
4 School.
5    Q. Was he employed at WCAC?
6    A. Yes.
7    Q. And who was the city councillor accused of
8 defamation that you mentioned earlier?
9    A. Sharline Nabulime. And no legal action
10 was taken. Only the possibility of legal action
11 was mentioned.
12    Q. Thank you. We were talking about MAC-TV
13 and government meeting videos. How long does WCAC
14 make meeting videos available on its website?
15    A. We have limited server space, so maybe for
16 two years possibly.
17    Q. Is there a third-party company that hosts
18 the videos that appear on the WCAC website?
19    A. Yes.
20    Q. What's that company called?
21    A. TelVue.
22    Q. Does TelVue put captions on those videos?
23    A. I don't believe so.
24    Q. Does WCAC add captions to those videos?

47

1    A. No.
2    Q. Does WCAC post any meeting videos to
3 YouTube?
4    A. Possibly in the past. But to my
5 knowledge, not currently.
6    Q. Do you know when WCAC did that?
7    A. I can't recall.
8       MR. PYLE: Objection.
9    Q. Has WCAC posted meeting videos to YouTube
10 while you were news director?
11    A. The MAC channel had its own YouTube
12 channel which may or may not have meetings posted
13 to it. I can't recall.
14    Q. Today, does WCAC regularly post videos to
15 that channel?
16    A. No.
17    Q. When did WCAC stop posting videos to that
18 channel regularly?
19      MR. PYLE: Objection.
20    A. Twenty twenty -- I can't recall.
21    Q. Was it before the COVID pandemic?
22    A. I believe so.
23    Q. In 2023, was WCAC regularly posting
24 government meeting videos at any other online

48

1 location?
2    A. Not to my knowledge.
3    Q. Why did WCAC stop regularly posting MAC-TV
4 videos to YouTube?
5       MR. PYLE: Objection.
6    A. I don't know. I do not know.
7    Q. Who would have been in charge of that sort
8 of posting?
9    A. Bill Heatley or a former staff member at
10 the time, Kerry Quinlan.
11    Q. Has WCAC made any kind of commitment to
12 the Waltham city government to record government
13 meetings?
14    A. Could you repeat that?
15    Q. Has WCAC made a commitment to the Waltham
16 city government to record government meetings?
17    A. I know we shoot the meetings. I don't
18 know -- when you say "commitment," do you mean
19 like a contract or . . .
20    Q. Do you know if there is such a contract?
21    A. Contracts exist between the cable
22 providers and the city, but it's not something I
23 have detailed information about.
24    Q. Is there a contract between WCAC and the

49

1  city?

2      A. I do not know.

3      Q. Why does WCAC record government meetings?

4      A. It's part of the -- cable access stations

5  typically have a public component, educational

6  component, and a government component.  That's why

7  they're called PEG channels.

8          So public would be like the football show

9  that Phil produces or shows produced by community

10  producers.

11          Educational would be content that's

12  produced at the high school by Jeff Whiteley and

13  his students.

14          And then that third arm of the public

15  access reach is the government.  And so most cable

16  access stations I'm aware of record government

17  meetings in order to promote transparency as part

18  of the mission of the cable access stations.

19      Q. Is that why WCAC records government

20  meetings?

21      A. I believe so.

22      Q. Is there any other reason?

23      A. For instance, so residents can learn about

24  the actions of their government and be better

50

1  informed and make better decisions.

2      Q. To your knowledge, does the Waltham city

3  government itself record any city government

4  meetings on video?

5      A. Not to my knowledge.

6      Q. To your knowledge, does anyone besides

7  WCAC regularly record Waltham city government

8  meetings on video?

9      A. Perhaps not regularly but occasionally,

10  yes.

11      Q. And who would that be?

12      A. For instance, Channel 781.  They recorded

13  meetings -- they either recorded meetings that we

14  were also recording or they recorded committee

15  meetings that our channel was unable to record

16  because of staffing shortages.

17      Q. Does anyone else regularly record Waltham

18  city government meetings besides WCAC and

19  Channel 781?

20      A. Not to my knowledge.

21      Q. Do the government meeting videos broadcast

22  on MAC-TV include any commentary on the meeting?

23      A. What do you mean by "commentary"?

24      Q. Do the government meeting videos include

51

1  any commentary by WCAC staff?

2      A. No.

3      Q. Do those videos include the opinions of

4  WCAC?

5      A. No.

6      Q. Why not?

7      A. The meetings are recorded in an unedited

8  fashion.  And as much as possible, the producer of

9  the recordings tries to pick out in a close-up the

10  person who is speaking so it's clear that the

11  audience knows who's speaking.

12          And they may make other decisions during

13  shooting.  But typically the recordings only

14  include what is said by the government officials

15  or people who may be speaking from the public if,

16  for instance, it's a public hearing.  Those are

17  the only persons that are shown and heard in these

18  government meetings.

19      (Wangler Exhibit 36 was marked for

20  identification and is attached to the transcript.)

21      Q. I'm showing you what's been marked as

22  Exhibit 36.  Do you recognize this document?

23      A. No.  I'm afraid I'm not familiar with this

24  document.

52

1      Q. So I can represent that this was produced

2  to us from WCAC.  Do you know who might have

3  written it?

4      A. BOD approval pending, September 2023,

5  would lead me to believe that it had been written

6  possibly by the executive director, Maria Sheehan,

7  but I can't say for certain.

8      Q. Do you know if the board of directors

9  approved this document?

10      A. I don't know that.  I'm afraid I don't

11  know that.

12      Q. If you would please look at page 2 of this

13  document.

14      A. Yes.

15      Q. Near the top where it says "1B," a

16  paragraph beginning "Meeting telecasts," could you

17  read that paragraph, please.

18      A. "Meeting telecasts should be consistent in

19  terms of content, appearance, and viewability.

20  Wherever feasible, the speaker should be

21  on-camera.  Wherever possible, a graphic

22  indicating the meeting and date should be shown."

23      Q. Does WCAC typically follow those

24  guidelines for government meetings?

53

1      A. Yes, but with the exception I gave
2  earlier.  In the event that the switcher and
3  robotic camera system is not operating, a MAC
4  channel photographer may not be able to put the
5  speaker on camera with the same efficiency to show
6  in close-up as they could if they had a switcher.
7          And if the meeting is shot with a camera,
8  like a news gathering camera, the graphics
9  indicating the meeting and date cannot be shown
10 while the producer is photographing the meeting
11 because the news gathering camera does not have
12 the ability to put up a graphic.
13    Q. Other than those circumstances, do
14 government meeting videos always include a graphic
15 indicating the meeting and date?
16    A. Yes.
17    Q. Are there any other graphics that are
18 typically included in a government meeting video?
19    A. At times a petitioner will appear before a
20 government board and present, say, a PowerPoint
21 presentation.  I don't know if that would count as
22 a graphic.
23        But that PowerPoint presentation can be
24 broadcast as part of the MAC channel production so

54

1  that viewers at home can see what the petitioner
2  is speaking about at the lectern.
3      Q. Is it WCAC's regular practice to include
4  the MAC-TV logo on government meeting videos?
5      A. Yes.
6      Q. Could you read the next paragraph, please,
7  Paragraph C.
8      A. "C.  Series programming should be
9  consistent in terms of content, appearance, and
10 viewability from episode to episode."
11    Q. Is that WCAC's regular practice with
12 respect to government meeting videos?
13    A. Yes.
14    Q. Is it WCAC's regular practice, aside from
15 the exceptions that you mentioned already, to put
16 the speaker on camera during a government meeting
17 video?
18    A. As much as possible, yes.
19    Q. If you could turn the page, please, and
20 look at the section marked 4A near the top.  Could
21 you read that paragraph, please.
22    A. Yup.  "A.  WCAC MAC-TV produces unedited,
23 uncensored, and unbiased coverage of open
24 municipal meetings.  Through our coverage, we

55

1  provide a way for the viewer to witness a meeting
2  as if she/he were in the meeting chamber."
3      Q. Is that a regular practice of WCAC?
4      A. Yes.
5      Q. Could you read the first sentence under
6  Part B, please.
7      A. "Coverage, whether live or taped, is gavel
8  to gavel, beginning when the meeting is called to
9  order and ending when the meeting is adjourned.
10 This applies only to open sessions, i.e., open to
11 the public.
12      "Executive sessions are not covered
13 because the public is excluded from attendance.
14 An executive session that is conducted within,
15 rather than after, an open session is the only
16 reason a taping or live telecast may be
17 interrupted."
18    Q. Is that a regular practice of WCAC with
19 respect to government meeting videos?
20    A. Yes.
21    Q. Could you read just the first sentence
22 under Part C.
23    A. "Part C.  Under no circumstances should
24 any part of a recording or live telecast of an

56

1  open meeting be altered either as the meeting
2  occurs or in postproduction editing."
3      Q. Is that a regular practice of WCAC with
4  respect to government meeting videos?
5      A. Yes.
6      Q. And could you please read the first two
7  sentences under Part D.
8      A. "The producer should be an unbiased
9  nonparticipant in the meeting she/he is covering.
10 Anyone who might possibly participate in a meeting
11 should not produce that session."
12    Q. Is that a regular practice of WCAC with
13 respect to government meeting videos?
14    A. Yes.
15    Q. Thank you.  Do episodes of Waltham
16 Newswatch ever include clips of MAC-TV meeting
17 videos?
18    A. Yes.
19    Q. Do any other programs produced by WCAC
20 include clips of MAC-TV meeting videos?
21    A. Not to my knowledge.
22    Q. Are you aware of any programming that's
23 shown on The Waltham Channel but not produced by
24 WCAC that uses clips of MAC-TV meeting videos?

57

1      A. Could you say that once more?
2      Q. Are there programs that are aired on WCAC
3  that are not produced by WCAC that include clips
4  of MAC-TV meeting videos?
5      A. That appear on our channel?
6      Q. Yes.  Correct.
7      A. I don't know.  I'm sorry.  I don't know.
8      Q. There are none that you're aware of?
9      A. So you're asking about shows on our
10  channel produced externally that include MAC
11  channel government meeting footage.  Is that
12  correct?
13      Q. Let me ask it a different way.
14        Excluding Waltham Newswatch, is there any
15  programming on The Waltham Channel that includes
16  clips from MAC-TV meeting videos?
17      A. Not that I'm aware of.
18      Q. Do you edit episodes of Waltham Newswatch?
19      A. Yes and no.  I edit some of the news
20  packages that are part of Waltham Newswatch, but a
21  different editor assembles the entire program.
22        So there's two levels of editing involved.
23  That secondary editor also performs some simpler
24  editing on Waltham Newswatch.

58

1      Q. Who is that second editor?
2      A. Christian Buday.
3      Q. When you use clips from MAC-TV meeting
4  videos in an episode of Waltham Newswatch, who
5  creates those clips?
6      A. The clips that are used on Waltham
7  Newswatch?
8      Q. Correct.
9      A. The person who records whichever
10  government meeting is used.
11      Q. Who selects the clip that is used in an
12  episode of Waltham Newswatch?
13      A. So I do typically, but another staff
14  member could also be called upon to do that.  But
15  typically I, with the government meeting footage
16  incorporated into Waltham Newswatch, I am the
17  person who takes the government meeting footage
18  and determines which clips to use.
19      Q. How do you decide what to clip?
20      A. That's a good question.  Having done this
21  job for 15 years, I understand what is a good
22  sound bite and what is not.
23      Q. What do you believe makes a good sound
24  bite?

59

1      MR. PYLE:  Objection.
2      A. Something that reinforces the thrust of
3  the story or something of interest to the public
4  as it relates to the story.
5      Q. How do you decide where the clip begins
6  and ends?
7      A. Like any reporter, generally the most
8  essential part of whatever the clip happens to be
9  and nothing additional because efficiency in news
10  reporting is prized.
11        So you wouldn't want to select -- and this
12  is a mistake that younger editors make.  You
13  wouldn't want to select a long boring sound bite
14  if you can make the same point in something
15  shorter.
16      Q. Why does Waltham Newswatch include clips
17  of MAC-TV meeting videos from time to time?
18      A. Very newsworthy.
19      Q. Would you say, then, that you select those
20  clips in part based on how newsworthy they are?
21      A. Yes.
22      Q. Why does Waltham Newswatch include clips
23  of MAC-TV meeting videos when the videos of the
24  entire meetings are available on the MAC-TV

60

1  channel and on the website?
2      A. It provides an additional way for the
3  public to learn about the topic at hand.
4      Q. Why don't you simply direct the public to
5  the video on MAC-TV or on the website of the
6  entire meeting?
7      A. The public can watch the entire meeting
8  because it's hosted on our website, but they could
9  also watch a story about the meeting on my news
10  program and in either way could learn about the
11  topic at hand.
12        One requires a greater time commitment.
13  One may be less of a full account of what
14  happened.  A news story is less of a full account
15  of what happened.
16      Q. Do the clips of MAC-TV videos that are
17  used within Waltham Newswatch serve a different
18  purpose than the complete meeting videos that are
19  shown on MAC-TV and posted to the website?
20      A. Could you say that one more time?  I'm
21  sorry.  Repeat it.
22      Q. So you testified that from time to time
23  you use clips of government meeting videos in
24  Waltham Newswatch.  Correct?

61

1    A. Yes.
2    Q. And WCAC also posts entire meetings to its
3 website and shows them on MAC-TV. Is that right?
4    A. Yes.
5    Q. Do those two uses of government meeting
6 videos serve different purposes?
7    A. I mean, both exist to inform the public
8 about whatever the issue is at hand. The news
9 story does so in a way that's more concise and may
10 include additional context.
11      So for instance, an entire meeting may
12 cover, say, the third hearing for a 40B housing
13 project. If you were only to watch that
14 government meeting, you might not appreciate
15 everything that has happened in the previous two
16 meetings.
17      So a news story can -- even though it's
18 shorter can fill in some of the blanks and bring a
19 greater understanding of any given topic than a
20 full meeting.
21      That said, if you were to watch all three
22 zoning board of appeal meetings, you would have
23 the fullest potential understanding.
24    Q. That would take a long time, wouldn't it?

62

1    A. Yes. But some of our viewers want that
2 level of understanding so they will watch a number
3 of zoning board of appeals meetings in a row.
4 Other viewers prefer a reporter's report on what's
5 happening.
6    Q. Would you say that the use of clips of
7 government meeting videos within Waltham Newswatch
8 helps the public understand what is happening in
9 the city government?
10   A. Yes.
11   Q. Which employees of WCAC, if any, handle
12 copyright issues?
13   A. Typically me.
14   Q. Anyone else?
15   A. Not that I'm aware of.
16   Q. Does Maria Sheehan handle copyright
17 issues?
18   A. Yeah. Yes. But her understanding is
19 different than mine because she's less involved in
20 the day-to-day issues that come up with producing
21 news that are often related to copyright.
22   Q. Does WCAC have a lawyer on staff?
23   A. No.
24   Q. Is there a lawyer who WCAC consults with

63

1 regularly about copyright issues?
2    A. Jeff Pyle.
3    Q. Anyone else?
4    A. Not to my knowledge.
5    Q. When WCAC creates a video, in your
6 understanding what rights does WCAC have in
7 connection with that video?
8    A. So it depends. I mean, it depends. For
9 instance, a producer who produces their own show,
10 they own the copyright, in my understanding.
11      There's a different situation with
12 government meetings where we might control the
13 copyright and then a different situation would
14 apply for, say, the news program I produce.
15    Q. What's the difference between government
16 meetings -- strike that.
17      What's the difference between government
18 meeting videos that WCAC creates and the news
19 program you produce with respect to the rights
20 that WCAC has?
21      MR. PYLE: Objection.
22    A. When I recorded government meetings, those
23 meetings had a copyright disclaimer at the
24 beginning of the meeting and the end of the

64

1 meeting. My news program does not include the
2 same disclaimer -- disclaimers.
3    Q. With the caveat that I'm not asking you
4 for any advice you may have received from an
5 attorney, why do the MAC-TV government meeting
6 videos include copyright disclaimers?
7      MR. PYLE: And I'll interject and instruct
8 the witness to answer the question only to the
9 extent you can do so without revealing advice of
10 counsel.
11    A. Okay. So could you rephrase, please?
12    Q. Why do MAC-TV government meeting videos
13 include copyright disclaimers?
14    A. When I shot the meetings, I was told to
15 have the copyright disclaimers. I don't know why
16 those copyright disclaimers were added or who made
17 the decision to add them.
18    Q. Who told you to add them?
19    A. The MAC channel coordinator, Bill Heatley,
20 in teaching me how to record government meetings
21 in the basement of government center, instructed
22 me to add these copyright disclaimers at the
23 beginning of the meeting and the end of the
24 meeting, leading me to believe that these meetings

65

1 were copyright protected because other government
2 meetings had similar disclaimers.
3      Q. You said that there are no such
4 disclaimers on the Waltham Newswatch program. Why
5 not?
6      MR. PYLE: You need to answer verbally.
7 You just nodded your head.
8      Q. Pardon me. Let me ask the question again.
9      You said that there are no such
10 disclaimers on the Waltham News program. Why not?
11      A. I guess the person who had produced the
12 show before me didn't add them. It wasn't part of
13 the graphics incorporated into the program, so it
14 was not a practice I adopted or it was not a
15 practice adopted by the person who assembled the
16 news, so it did not have a disclaimer.
17      This program existed before in a different
18 form. Waltham Newswatch existed before in a
19 different form.
20      Q. Before June of 2023, did WCAC ever have to
21 decide whether some use of copyrighted material
22 was a fair use?
23      A. Do you mean our use or another's use?
24      Q. Either of those.

66

1      A. The scenario described earlier with the
2 yearbook photo as well as the photo from Haiti
3 that required me to be familiar with the fair use
4 doctrine and make a determination about fair use
5 because I was not able to secure the permission of
6 the rights holder.
7      Q. Were there any other instances besides
8 those two?
9      A. Probably, but I can't recall currently. I
10 can't recall currently.
11      But say if there was someone from Waltham
12 involved in newsworthy activities in, say -- on a
13 reality TV show and it was newsworthy for my
14 program, I would consider reproducing video from
15 that reality TV show if I was not able to contact
16 the rights holder and consider that a legitimate
17 fair use exception.
18      Q. Did that scenario happen?
19      A. Yes. I believe so. Someone from Waltham
20 appeared on Top Chef, which is a reality TV
21 program I believe on one of the cable networks.
22      And I created a series of videos more than
23 ten years ago about this contestant's appearance
24 on that reality show because he was a Waltham

67

1 resident.
2      Q. Did you use footage from the show in the
3 video that you created?
4      A. Yes.
5      Q. Did you get permission from the network or
6 anyone else to use that footage?
7      A. I can't recall.
8      Q. Did you consider whether using that
9 footage was a fair use?
10      A. Yes.
11      Q. What went into that consideration?
12      A. The footage was being used for news
13 reporting. My use of the footage was
14 transformative in that the Waltham angle on this
15 program involving people from all over America was
16 the focus. And I was not monetarily benefiting
17 from the use of this footage.
18      Q. Did the length of the clip that you used,
19 was that part of your consideration?
20      A. Yes. In my recollection, I was able to
21 record the entire episode and then use only the
22 parts that involved the Waltham guy.
23      Q. Do you recall whether the copyright owner
24 of Top Chef ever contacted you about that?

68

1      A. No.
2      Q. Sorry. Let me rephrase.
3      Did the copyright owner of Top Chef ever
4 contact you about that?
5      A. Nope.
6      Q. You used the term "transformative" a few
7 minutes ago. You said your use of the footage was
8 transformative. What do you understand that to
9 mean with respect to fair use?
10      A. That the use of the copyright-protected
11 media changed to such an extent that it created
12 this fair use exception.
13      Q. Was that video made for WCAC?
14      A. Which one?
15      Q. The story about the Waltham guy who was on
16 Top Chef, was that made for WCAC?
17      A. It was made for Waltham Newswatch. It was
18 more than one video, too. It was here is what he
19 did this week, here is what he did the next week.
20      Q. Did WCAC alter the clips of Top Chef at
21 all when you --
22      A. You mean edit or . . .
23      Q. I apologize. When you included clips from
24 Top Chef in Waltham Newswatch, did you alter those

69

1  clips in any way?
2      A. As I mentioned, they were edited.  Five
3  contestants, here is the clips with the Waltham
4  guy, edit those clips, identify those clips, and
5  then find the most interesting among those clips
6  and create a news package about it.
7      Q. Within those clips, did you alter the
8  video in any way?
9      A. Do you mean -- what do you mean by
10 "alter"?  I mean -- so yes.  So for some of the
11 clips, some of the clips served as B-Roll.  And
12 that involves altering.  A B-Roll clip will only
13 show the video and the sound from the original
14 broadcast is removed.  The sound is brought down.
15     So does that answer your question?  So
16 yes, I did alter some of the clips.  Yeah.
17     Q. Did some of those clips as they appeared
18 on Waltham Newswatch include the original sound?
19     A. Yes.
20     Q. Before 2023 and aside from Channel 781,
21 did WCAC ever identify some online material that
22 it believed infringed WCAC's copyright?
23     MR. PYLE:  Objection.
24     A. I don't believe so.

70

1      Q. Before June of 2023, did WCAC ever send an
2  infringement notice to YouTube?
3      A. Not to my knowledge.
4      Q. Has WCAC ever sent an infringement notice
5  to any other online platform besides YouTube?
6      A. Not to my knowledge.
7      Q. Aside from Channel 781, has WCAC ever
8  written a letter accusing someone of copyright
9  infringement?
10     A. Not that I can recall.
11     Q. How often does WCAC receive requests to
12 use its copyright material?
13     A. Periodically.
14     Q. About how often would you say?
15     A. Once every six months.  Could be more
16 often depending on -- depending on different
17 circumstances.
18     Q. What is a circumstance that might lead to
19 WCAC receiving more requests to use copyrighted
20 material?
21     A. For instance, let's say I have images or
22 video of someone who suddenly becomes newsworthy
23 for the entire region.  We would receive more
24 requests than typical to reproduce that media

71

1  because of its newsworthiness beyond Waltham.
2      Q. What type of person or entity typically
3  makes those requests?
4      A. Do you mean at network affiliates?
5      Q. Do network affiliates make those requests?
6      A. Yes.
7      Q. Do newspapers ever make those requests?
8      A. Possibly, but not for a significant amount
9  of time.  More typically assignment editors from
10 TV network affiliates call, make a request to
11 reproduce a photo or other media created by us and
12 for which we control the copyright, and ask how we
13 would like to be credited.
14     Q. Does WCAC ever receive requests to use
15 copyrighted media from amateur journalists who are
16 not affiliated with a network affiliate or a
17 newspaper?
18     A. You said amateur journalists or --
19     Q. Yes.
20     A. -- persons not affiliated with network
21 affiliates?
22     Q. That's right.
23     A. Yes, we have received those type of
24 requests.

72

1      Q. Can you give me an example?
2      A. In fall 2021, a New York City-based
3  documentary film company called Story Syndicate
4  approached our station, interested in reproducing
5  video of a meeting I shot following a grisly
6  triple homicide on Harding Avenue in Waltham.
7      Q. How did you respond to that request?
8      A. I referred it to Maria and gave -- I
9  characterized -- I characterized to Maria what the
10 footage was and told her what they were seeking
11 and put her in contact with the Story Syndicate
12 person who was handling the licensing of this
13 footage.
14     Q. Did Maria agree to their request?
15     A. Ultimately, yes.
16     Q. Can you think of any other examples where
17 a documentary filmmaker requested to use
18 copyrighted media?
19     A. No.  I can't recall.
20     Q. So you'd mentioned network affiliates,
21 newspapers, and a documentary filmmaker.  Any
22 other people who are not one of those things
23 requested to use WCAC media?
24     A. So the former staff member I described,

73

1 Jeff Whiteley, on occasion had requested something
2 I produced or a package I created for use with his
3 students at Waltham High School.
4    Q. Any other type of requester that you can
5 think of?
6    A. Possibly, yes.  More than ten years ago,
7 someone from the cable access community wanted to
8 take certain types of programming from different
9 access centers and incorporate it into a program
10 about what's happening in the region.  And so I
11 worked with her to allow our content to be used in
12 that way.
13    Q. Jumping back to the requests from Jeff
14 Whiteley that you mentioned, how did you respond
15 to Jeff's request?
16    A. Well, because Jeff is part of our PEG
17 family, he could use whatever he wanted,
18 especially given its instructional purpose.
19    Q. When you say "our PEG family," do you mean
20 people affiliated with WCAC?
21    A. Yes.
22    Q. Do you also mean people affiliated with
23 other PEG stations?
24    A. No.  I just meant our WCAC, which has the

74

1 public, the educational, and the government
2 functions.  And Jeff serves in the educational
3 function.
4    Q. Was Jeff teaching students at Waltham High
5 School as part of his role at WCAC?
6    A. He's actually an employee of the City of
7 Waltham.
8    Q. He wasn't an employee of WCAC?
9    A. No.  But we all -- we are part of the same
10 mission, and his channel is one of the three
11 channels that air locally in Waltham.
12    So again, there's the public channel,
13 which airs typically programming created by our
14 own volunteers and community producers.  There's
15 the government channel, which includes government
16 meetings.  There's also an educational channel.
17    And Jeff was in charge of creating content
18 for that component of our PEG cable access
19 enterprise.
20    Q. Do you know if he was on the faculty of
21 Waltham High School?
22    A. He's a TV teacher.
23    Q. Would you include anyone else in the
24 phrase "our PEG family"?

75

1    A. I don't think so.
2    Q. Does WCAC ever get requests from political
3 candidates to use copyrighted media?
4    A. Yes.
5    Q. Can you give me an example?
6    A. Ward 9 Waltham City Councillor Robert
7 Logan publishes a newsletter informing his
8 constituents of things happening in his ward.
9    And in the past -- and I can think of only
10 one.  I can't think specifically of the example.
11 He has wanted to reproduce, say, an image I shot
12 in connection with something happening that is
13 relative to his constituents and approached me to
14 ask if he could reproduce a photo and credit The
15 Waltham Channel.
16    Q. How did you respond?
17    A. Yes.
18    (Wangler Exhibit 37 was marked for
19 identification and is attached to the transcript.)
20    Q. I'm showing you what's been marked as
21 Exhibit 37.  And I apologize for the small text.
22    A. No problem.
23    Q. But I'm hoping you can read the second
24 chat bubble on this page.

76

1    A. This one here?
2    Q. Yes.
3    A. Okay.
4    "Tom Benavides.  Good morning, Phil.
5 Thank you for all your work on the candidate
6 interviews.  I enjoyed watching them all.  I was
7 wondering if us candidates had permission to clip
8 and repost said clips of our own You Don't Say
9 interviews for use on our social media with credit
10 to you and You Don't Say.  Thank you in advance.
11 Best, Emily.  Emily Saperia, candidate Waltham
12 City Council at large."
13    Q. And could you read the response just below
14 that?
15    A. "Phil McGrady.  Yes, Emily, you may use
16 your clip for You Don't Say.  We encouraged
17 candidates to bring a thumb drive at the time of
18 the recording.  Thank you.  Unfortunately, there
19 are organizations out there that are reediting our
20 original content, but all of the You Don't Say
21 content can be used by the candidates."
22    Q. Does Phil McGrady work for WCAC?
23    A. Yes.
24    Q. And who is Emily Saperia?

77

1    A. She is a former candidate for councillor
2 at large in Waltham.
3    Q. What is You Don't Say?
4    A. You Don't Say is a program produced by
5 Phil that allows people to come in off the street
6 and talk about anything they want to talk about.
7    Q. Did You Don't Say produce candidate
8 interviews for the candidates for city office in
9 2023?
10    A. Yes.
11    Q. Was Emily Saperia one of those candidates?
12    A. Yes.
13    Q. And Phil McGrady produced that show?
14    A. Yes.
15    Q. Why did WCAC allow Emily Saperia to use
16 her clip from You Don't Say?
17    MR. PYLE: Objection.
18    A. I believe we provided -- we allowed all of
19 the candidates who taped their statements for this
20 particular program to have their video to use for
21 whichever purposes they wanted.
22    Q. Were those candidates part of the PEG
23 family?
24    A. No.  Those are candidates running for

78

1 office in Waltham.
2    Q. Why did you allow all of the candidates to
3 use their video for whatever purposes they wanted?
4    MR. PYLE: Objection.
5    A. We received -- to my knowledge, we
6 received many requests from these candidates to
7 use these individual videos because they may have
8 not had experience taping these type of statements
9 and these statements could be useful to promote
10 their candidacy.  But it wasn't a decision that I
11 made.
12    Q. Does WCAC help candidates promote their
13 candidacy?
14    A. Yes.  This candidate -- You Don't Say
15 candidate show serves that purpose in every -- in
16 most of the municipal elections in recent years.
17    Q. So we've talked about a number of
18 instances where people have requested to use
19 copyrighted media.
20    Does WCAC ever get requests to use video
21 clips of government meetings?
22    A. The earlier scenario I described involving
23 Story Syndicate, the footage they were requesting
24 could potentially be considered a government

79

1 meeting because it involved former District
2 Attorney Gerry Leone, former Waltham Police Chief
3 Thomas LaCroix, a high-ranking member of State
4 Police investigating the triple homicide, and then
5 members of the community concerned about the
6 impact of this triple homicide on their community.
7    That meeting was organized by a former
8 Ward 5 city councillor and held in a public
9 building, a former elementary school in Waltham.
10    Q. Was that meeting shown on MAC-TV?
11    A. I can't -- it was 2011.  I can't recall.
12    Q. Was it shown on Waltham Newswatch?
13    A. In its entirety or . . .
14    I believe I may have made a news package
15 out of it.
16    Q. Do you know of any other occasion when
17 some outside party asked permission to use MAC-TV
18 video clips?
19    A. I can't recall.
20    Q. So sitting here, you're not aware of any
21 such requests?
22    A. I can't recall.
23    MR. STOLTZ: If it's all right, I'm going
24 to take a few more minutes to finish up this topic

80

1 and then we'll break for lunch, if that's all
2 right.
3    MR. PYLE: Sure.
4    Q. Does WCAC ever ask for payment in return
5 for permission to use its copyrighted media?
6    A. Yes.
7    Q. Can you give me an example?
8    A. Story Syndicate.  Story Syndicate produced
9 a streaming series called "The Murders Before the
10 Marathon" and, as I mentioned, approached us to
11 license a small amount of this community meeting
12 about this triple homicide for inclusion in that
13 program.
14    And they paid whatever the going rate was
15 for documentary film production at the time.
16    Q. Were there any other instances where WCAC
17 asked for payment in return for permission to use
18 copyrighted media?
19    A. I can't recall.
20    Q. Did WCAC ever ask a political candidate
21 for payment in return for permission for using a
22 You Don't Say video?
23    A. Did we ask for payment from a candidate
24 to -- for the You Don't Say videos?

81

1    Q. Correct.
2    A. No.
3    Q. Did WCAC ask for payment from City
4 Councillor Robert Logan?
5    A. No.
6    Q. Did WCAC ask for payment from Jeff
7 Whiteley?
8    A. No.
9    Q. Did WCAC ever ask for payment from a TV
10 network affiliate?
11    A. Typically we provided footage free of
12 charge as long as we were credited as the
13 copyright holder.
14    Q. Were there any other instances besides the
15 Story Syndicate request where WCAC asked for
16 payment for permission to use copyrighted media?
17    A. I can't recall.
18    Q. You're not aware of any other such
19 instance?
20    A. I can't recall any.
21    Q. So to be clear, the only instance that you
22 recall, sitting here today, of WCAC asking for
23 payment in return for permission to use
24 copyrighted media was Story Syndicate?

82

1    A. Yes.
2    Q. Why did WCAC ask for payment from Story
3 Syndicate and not from the other requesters that
4 we've discussed?
5    A. Story Syndicate was -- typically we
6 receive requests from network affiliates and, in
7 my experience, no payment is usually made.
8        This was a different type of request from
9 a for-profit documentary film house that had a
10 significant budget for a series that would air on
11 a top streaming platform.
12        And I believe they had offered to pay.  So
13 it was a very different request than the ones that
14 we typically fielded for reproduction of our
15 content.
16    Q. Has WCAC ever said no to a request to use
17 copyrighted media?
18    A. Not to my knowledge.
19    Q. I think I know the answer, but just for
20 the sake of completeness, did WCAC ask Emily
21 Saperia for payment in return for permission to
22 use her You Don't Say interview?
23    A. Phil would know, but I don't believe so.
24    Q. Thank you.

83

1        MR. STOLTZ: Okay.  I think this would be
2 a good time to break for lunch.
3        Shall we start again at 12:40?
4        MR. PYLE:  Sure.  I think that should be
5 enough.
6        MR. STOLTZ:  Great.  Thank you.
7        THE VIDEOGRAPHER:  We are going off the
8 record.  The time on the monitor is 12:07.
9        (Lunch recess, 12:07 p.m. to 12:52 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

84

1        A F T E R N O O N   S E S S I O N
2        THE VIDEOGRAPHER:  We are back on the
3 record.  The time on the monitor is 12:52.
4        (Wangler Exhibit 38 was marked for
5 identification and is attached to the transcript.)
6 BY MR. STOLTZ:
7    Q. I'm showing you what's been marked as
8 Exhibit 38, which appears to be a cover email and
9 an attachment titled "WCAC Video Use Policy."
10        Have you seen this document?
11    A. Yes.
12    Q. Who wrote it?
13    A. I believe Maria wrote it.  And she may
14 have run it by me.
15    Q. Do you know if anyone else contributed to
16 it?
17    A. I do not.
18    Q. Do you know if she ran it by anyone else?
19    A. It appears this email is to someone else.
20    Q. Is this an email to Justin Barrett?
21    A. Yes.  That would indicate he also received
22 it.
23    Q. Could you please read the second paragraph
24 of the attachment.

85

1    A. Number 2?

2    Q. The one that begins with "WCAC"?

3    A. "WCAC's fair use policy apply to news
4  gathering.  Please see Number 2 below.  Libraries
5  for archiving purpose, colleges, schools, and
6  nonprofits who work with the deaf and visually
7  impaired who use this footage for educational
8  purposes only.

9    "This is for classroom use only and does
10 not apply to rebroadcast online streaming of any
11 kind.  Request to use our footage for educational
12 purposes must be made in writing and must receive
13 written permission from the WCAC executive
14 director."

15   Q. And approximately when was this written?

16   A. I don't recall.

17   Q. What's the date on the cover email?

18   A. It says September 11th, 2023.

19   Q. Was the attachment written around that
20 time?

21   A. I believe so.

22   Q. So you mentioned earlier that Jeff
23 Whiteley I believe sometimes used WCAC media as
24 part of the class he taught at Waltham High

86

1  School?

2    A. Yeah.

3    Q. Did Mr. Whitely make a written request to
4  the WCAC executive director to use that media?

5    A. I don't recall.

6    Q. Could you take a look at the paragraph
7  labeled 2.

8    A. Yup.

9    Q. Could you read the first sentence of the
10 that section.

11   A. "Permission to streaming hard copy files
12 of WCAC MAC-TV programming for news gathering."

13   The entire section?

14   Q. No, thank you.

15   I forgot to ask earlier, but is this a
16 true and correct copy of the WCAC video use policy
17 that you have seen previously?

18   A. The grammar is -- the grammar might make
19 it appear like it's a draft, so I can't say with
20 certainty.  Some of the grammar does not appear
21 like it was edited.

22   Q. Do you believe this is a document written
23 by Ms. Sheehan?

24   A. Yes.

87

1    Q. Did you perhaps see a different version of
2  this document that had edits to the grammar?

3    A. Possibly.  I can't say -- some of it, it
4  looks likes run-on sentences or at least one.  So,
5  I mean, does she . . .

6    This is described as a rough draft in the
7  body of the email.

8    Q. Did you ever see a final draft?

9    A. Possibly.

10   Q. Have you looked at this document anytime
11 between September of 2023 and now?

12   A. Yes.

13   Q. Did you look at it in the course of your
14 work at WCAC?

15   A. Yes.

16   Q. Is this a policy that WCAC follows?

17   A. I believe some requests to use WCAC
18 copywritten content are made by telephone, so
19 they're not made in writing.  This says, "All
20 requests for use of WCAC MAC-TV content must be
21 made in writing to the WCAC director."

22   I received a number of requests to
23 reproduce footage that were not made in writing to
24 the executive director, and I handled those

88

1  requests through discussing it with Maria and then
2  giving permission to the person making the
3  request.

4    Q. Did any of those requests happen between
5  September 2023 and now?

6    A. Yes.

7    Q. Did any of them happen before
8  September 2023?

9    A. Yes.

10   Q. Well, Paragraph 2E says, in part,
11 "Producers requesting footage must provide their
12 name and phone number to the WCAC executive
13 director."

14   Is that an expectation that WCAC had at
15 any time?

16   A. I believe so.  We wanted to know who was
17 making the request.

18   Q. Was that an expectation that WCAC had
19 before September 11th, 2023?

20   A. Not necessarily.  A reporter could call
21 from a network affiliate, request to use some of
22 our content, and maybe not provide their phone
23 number.  But they might provide their name, I'm
24 from whichever channel, I'd like to reproduce your

89

1  content.  But they may not provide a phone number.
2      Q. Could you please read the sentence after
3  2F?
4      A. "If permission is granted, the user must
5  caption on the video file 'Waltham Community
6  Access Corporation.'"
7      Q. Is this an expectation that WCAC had at
8  any time?
9      A. The crediting was not always as given in
10 quotation marks in this document.  Sometimes the
11 credit read differently.
12     Q. Can you give me an example of a different
13 way of giving credit?
14     A. "WCAC TV Waltham."  And in one instance my
15 name and "WCAC Waltham."
16     Q. Do you know what was meant by "on the
17 video file"?
18     A. Presumably the footage in question would
19 have a credit in the top right-hand or left-hand
20 corner with the credit as given in Section F.
21     Q. Did WCAC consider it important which
22 corner the credit appeared in?
23     A. I don't believe so.
24     Q. Was there any other form of credit that

90

1  WCAC considered acceptable?
2      MR. PYLE:  At any time?
3      MR. STOLTZ:  At any time.
4      A. I believe so.  So, for instance, the Story
5  Syndicate footage could include a credit in the
6  credits of the program instead of on the video,
7  acknowledging the WCAC.
8      Q. Are there any others?
9      A. I mean, credit could be attributed, say,
10 not on the video per se but maybe in a caption
11 accompanying the video or some other written
12 record associated with that reproduced footage.
13     Q. Would WCAC consider that form of credit
14 acceptable?
15     A. Yes.
16     Q. Would putting "MAC-TV" on the video be
17 considered an acceptable form of credit?
18     A. Yes.
19     Q. Could you please read 2G.
20     A. "If WCAC MAC-TV footage is reedited and/or
21 used unlawfully, the user is entirely responsible
22 for any possible legal action resulting from this
23 misuse."
24     Q. What does "reedited" mean in this context?

91

1      MR. PYLE:  Objection.
2      A. I don't know.
3      (Wangler Exhibit 39 was marked for
4  identification and is attached to the transcript.)
5      Q. I'm showing you what's been marked as
6  Exhibit 39.  Do you recognize this?
7      A. Yes.
8      Q. What is it?
9      A. It's a letter from the WCAC executive
10 director to you, on November 22nd, 2023.
11     Q. And you've seen it before?
12     A. Yes.
13     Q. Did Ms. Sheehan write this letter?
14     A. I believe so.  Yes.
15     Q. Did anyone else contribute to the writing?
16     A. I can't recall.  I may have edited it.  I
17 can't recall precisely.
18     Q. Do you know if this letter was ever sent?
19     A. I do not know.
20     Q. If you could look at the top of the second
21 page, please, where it says, "We have had several
22 Boston television stations and national
23 documentary companies request our video."
24     Does that refer to the examples you gave

92

1  me earlier?
2      A. Yes.  WBZ, NBC 10, and national
3  documentary companies -- probably company -- which
4  is the Story Syndicate, a New York City-based
5  documentary film production house.
6      Q. Any others that this letter may have been
7  referring to?
8      MR. PYLE:  Objection.
9      A. Potentially other network affiliates
10 seeking to reproduce our content.
11     Q. The next sentence says, "Every request
12 from a legitimate media company was in writing. "
13 Is that accurate?
14     A. As I said before, some requests were made
15 over the telephone by assignment editors at
16 network affiliates on tight deadlines.  They
17 didn't necessarily put something in writing.  They
18 sought to reproduce something soon and they tried
19 to make a quick request of us, so it may not have
20 been in writing.
21     Q. And as far as you're aware, WCAC granted
22 all of those requests?
23     A. Yes.
24     (Wangler Exhibit 40 was marked for

93

1   identification and is attached to the transcript.)
2       Q. I'm showing you what's been marked as
3   Exhibit 40. It's labeled "Defendant Waltham
4   Community Access Corporation's Answers and
5   Objections to Plaintiff Channel 781 News's First
6   Set of Interrogatories."
7       Do you recognize this document?
8       A. Yes.
9       Q. If you could turn to page 12, please. I'm
10  sorry. Could you please turn to the top of
11  page 13.
12      Do you see where it says, "Pursuant to
13  Federal Rule of Civil Procedure 33(d), WCAC refers
14  to licenses produced in response to plaintiff's
15  request for production of documents"?
16      A. Yes.
17      Q. Does WCAC have any records of licenses to
18  use WCAC media?
19      A. Licenses?
20      Q. By "licenses" I mean any sort of written
21  permission.
22      A. To use our media?
23      Q. Yes.
24      A. Yes.

94

1       MR. STOLTZ: Jeff, I can represent that we
2   didn't receive any such licenses. So I would ask
3   that those be produced.
4       MR. PYLE: I'll look into that. My
5   understanding was that something related to the
6   documentary film was produced, but if that's not
7   the case I will look into that and get back to
8   you.
9       MR. STOLTZ: Thank you.
10      MR. PYLE: I'll also just note that there
11  is an objection on grounds of overbreadth and
12  irrelevance to producing or to identifying each
13  and every instance in which a person requested
14  permission.
15      Q. Are you familiar with Channel 781?
16      A. Yes.
17      Q. Are you aware that it is sometimes also
18  referred to as "Waltham DATA"?
19      A. Yes.
20      Q. When did you first become familiar with
21  Channel 781?
22      A. 2022.
23      Q. To your knowledge, who is part of
24  Channel 781?

95

1       A. Josh Kastorf, Tom Benavides, Jamie
2   Krikeles, Chris Gamble, potentially others that I
3   can't recall currently.
4       Q. What does Channel 781 do?
5       A. Channel 781 is a group of citizen
6   journalists that create reporting about Waltham
7   city government.
8       Q. Does Channel 781 have any of the same
9   missions as WCAC?
10      A. Yes.
11      Q. And what are those?
12      A. To inform the public about Waltham city
13  government.
14      Q. Would you refer to Channel 781 as a PEG
15  project?
16      A. No.
17      Q. Why not?
18      A. They're not a cable access station.
19      Q. Does Channel 781 do news reporting?
20      A. Yes.
21      Q. Does Channel 781 do opinion journalism?
22      A. I believe so.
23      Q. Is it your understanding that Channel 781
24  has a particular political orientation?

96

1       A. Yes.
2       Q. How would you describe that political
3   orientation?
4       A. In favor of greater government
5   transparency and having passionate beliefs about
6   certain core issues such as housing, cycling,
7   homelessness, and other issues.
8       Q. Is it your understanding that Channel 781
9   has a political bias?
10      A. Like any news organization, they have a
11  perspective on the news.
12      Q. How would you describe that perspective?
13      A. They appeal to a different audience than,
14  say, traditional print media.
15      Q. Do they appeal to a different audience
16  than MAC-TV does?
17      A. Yes and no.
18      Q. Can you explain what you mean?
19      A. Many MAC-TV viewers are older Waltham
20  residents that are interested in the workings of
21  city government. They watch the city councill
22  meetings and other government meetings, sometimes
23  in their entirety. They're more traditional
24  consumers of news, similar to what, say, the

97

1 network affiliate audience is.
2     Channel 781 News's audience is a younger
3 audience and not necessarily originally from
4 Waltham and having different political beliefs
5 than some of the older viewers that consume MAC
6 channel content.
7     Q. Can you tell me what you mean by
8 "different political beliefs"?
9     A. MAC channel viewers, in my experience, are
10 older, more establishment Waltham residents who
11 have likely lived in the city for many years and
12 may have -- may know who their elected officials
13 are very well, through personal relationships and
14 other ways, whereas Channel 781 is different.  Its
15 following appear to have more people that were
16 youthful with different beliefs about what should
17 be priorities for elected officials.
18     Q. To your knowledge, do older viewers spend
19 more time watching news media than younger
20 viewers?
21     A. Absolutely.  Yes.
22     Q. Does Channel 781 appeal to a different
23 audience than Waltham Newswatch?
24     A. Yes.

98

1     Q. How would you describe that difference?
2     A. Waltham Newswatch is a cable television
3 news program about Waltham.  And in my experience,
4 the people that watch cable access programming at
5 the local level are typically older residents,
6 residents who have come up to me over the years
7 and said, "I watch your program."
8     In almost every instance, it's a slightly
9 older person.  It's very similar with the network
10 affiliates.  People who consume television news
11 tend to skew older.
12     781 News is more of an online news
13 platform with a different audience.  It skews
14 younger.
15     Q. Among the viewers of Waltham Newswatch, do
16 more of them watch the show on cable than on the
17 Internet?
18     A. It's difficult to say because we have no
19 way of knowing how many people watch our televised
20 programming.  We have not done surveys to
21 determine that information, so we don't know.
22     But I can tell how many people stream
23 Waltham Newswatch online because our website
24 allows us to see how many hits an individual

99

1 episode receives.
2     Now, that hit may indicate someone only
3 watched the first 5 seconds, so we don't really
4 know if they watched the entire program.  But
5 someone clicked on a Waltham Newswatch episode
6 online and created a record of it whereas our
7 televised audience, we really -- it's difficult to
8 know how many people are watching.
9     Q. Does your website also allow you to see
10 how many hits a meeting recording on the MAC-TV
11 page receives?
12     A. Yes.
13     Q. Do younger audiences typically have a
14 different political orientation than older
15 audiences?
16     A. In my --
17     MR. PYLE:  Objection.
18     Go ahead.
19     A. In my experience, yes.
20     Q. Thank you.
21     (Wangler Exhibit 41 was marked for
22 identification and is attached to the transcript.)
23     Q. I'm showing you what's been marked as
24 Exhibit 41.  Do you recognize this document?

100

1     A. Yes.
2     Q. What is it?
3     A. It's an email from Justin Barrett,
4 responding to Waltham general executive director
5 Maria Sheehan about a statement she was to make on
6 Waltham Newswatch in early April 2023.
7     Q. And were you cc'd on this email?
8     A. Yes.
9     Q. Did you read it around the time it was
10 sent?
11     A. Yes.  Well, I believe I sent the email to
12 Maria and she then forwarded the content to
13 Justin.
14     Q. Is this a true and correct copy of that
15 email exchange?
16     A. Yes.
17     Q. Did you write the statement in this email?
18     A. Yes.
19     Q. Who else contributed to writing that
20 statement?
21     A. Maria Sheehan.
22     Q. Was the statement edited after you wrote
23 it?
24     A. Yes.

101

1    Q. Do you know who edited it?
2    A. So, as is indicated near the top of this
3 email chain, Maria had me add that we are a
4 nonprofit and receive no taxpayer monies. And
5 that statement was ultimately added to the
6 statement and read by Maria on my news program.
7    Q. Did Ms. Sheehan read this statement on the
8 April 6th, 2023 episode of Waltham Newswatch?
9    A. Yes.
10    Q. Did she read it with the edit that you
11 mentioned?
12    A. Yes.
13    Q. Why did you send this script to
14 Mr. Barrett?
15       MR. PYLE: Objection.
16       Go ahead.
17    Q. I'm sorry. Could you read just the very
18 first line of your email that was sent on
19 April 6th, 2023 at 7:52 a.m.?
20    A. "Hi, Maria, Justin. To be aired during
21 Thursday newscast and read by Maria."
22    Q. Did you, in fact, send this email to
23 Mr. Barrett?
24    A. I mean, it doesn't show in an email that

102

1 that was sent to him.
2    Q. At the top of this thread, did Mr. Barrett
3 respond to it?
4    A. Yes.
5    Q. So I'll ask, why did you share this script
6 with Mr. Barrett in particular?
7    A. It was something that Maria recommended
8 that could require a board opinion because it was
9 an unprecedented statement for Waltham Newswatch.
10    Q. Did Ms. Sheehan ask you to write this
11 statement?
12    A. No. I suggested we create a statement to
13 be read on my news program.
14    Q. Why did you make that suggestion?
15    A. A situation had emerged that had alarmed
16 us.
17    Q. Can you describe that situation?
18    A. A post was made by an anonymous user on
19 Reddit that included photographs I had shot that
20 were reproduced without WCAC permission.
21    Q. What were those photographs of?
22    A. I can only recall one photograph of a
23 woman -- a Waltham resident, a photograph from
24 October 2021 of a woman, a Waltham resident

103

1 holding two campaign signs as part of a
2 get-out-the-vote effort sometime before.
3    Q. When did WCAC become aware of that Reddit
4 post?
5    A. Shortly around late -- near the end of
6 March 2023.
7    Q. Do you know when it was posted to Reddit?
8    A. Presumably around the same time.
9    Q. Why did that post alarm you?
10    A. The post reproduced -- the post was about
11 a woman from Waltham with anti-LGBTQ views. And
12 the post was critical of her and her family. It
13 alarmed us because the photograph in this post,
14 which was by an anonymous user, was not being
15 reproduced with our permission. And the content
16 of the post was inflammatory, if not potentially
17 defamatory.
18       We worried that someone seeing this
19 photograph that I had taken and many in the
20 Waltham community knew was shot by me could create
21 the impression that we condoned the subject of
22 this Reddit post when we did not.
23       It could also create the impression that
24 we gave permission to reproduce this photo, which

104

1 we did not.
2       And it also had an additional component,
3 which was this woman who had anti-LGBTQ views,
4 which I had covered earlier, was holding a sign
5 for a political candidate who then could be
6 associated with whatever the subject of the Reddit
7 post was.
8       So I sought to disassociate our station
9 from the inclusion of our copyrighted media in
10 this post.
11    Q. Was there a single photograph in the post?
12    A. The post was deleted. I can't recall if
13 there was an additional photo I shot. But I
14 remember this photograph of this Waltham woman
15 holding the signs for the two political
16 candidates.
17    Q. Was WCAC identified in the photo at all?
18    A. Not that I recall.
19    Q. Were you identified in the photo at all?
20    A. No.
21    Q. Were there any other circumstances besides
22 that Reddit post that led to you suggesting this
23 statement on the air?
24    A. I had learned that Channel 781 was

105

1 reproducing some of our government meeting
2 content. And neither the anonymous poster nor
3 Channel 781 News were identified in this
4 statement. But we wanted to inform the community
5 that use of our content for purposes described in
6 the statement and without our permission could
7 lead to legal action on our behalf.
8     Q. So when you referred to video from the MAC
9 channel has been reproduced without our
10 permission, was that a reference to Channel 781's
11 use?
12    A. Yes.
13    Q. Did that refer to use by anyone other than
14 Channel 781?
15    A. I can't recall.
16    Q. Were there any other uses of WCAC media
17 aside from those by Channel 781 and by the
18 anonymous Reddit user that prompted this
19 statement?
20    A. Not that I can recall.
21    Q. If you could turn back to Exhibit 41,
22 please, the interrogatory responses.
23    A. I believe that's Exhibit 40.
24    Q. Pardon me. Exhibit 40.

106

1     If you could turn to page 13, please, and
2 if you could please read Answer Number 17.
3    A. "Other than uses of WCAC videos by Waltham
4 DATA at issue in this case, in early 2023 an
5 unknown person took a picture for which WCAC owned
6 the copyright and used it in a Reddit post without
7 permission. To disassociate itself from the
8 user's post, WCAC decided to make a statement
9 asking the public to honor its copyright in its
10 content."
11    Q. Is the Reddit post mentioned in this
12 answer the one you described earlier?
13    A. Yes.
14    Q. When did you first become aware that
15 Channel 781 was using government meeting clips
16 from WCAC?
17    A. 2022, presumably.
18    Q. How did you become aware of that?
19    A. Channel 781 used Reddit to inform the
20 public about their reporting, and I learned about
21 their channel and their activities through Reddit
22 posts.
23    Q. When you learned of those activities in
24 2022, did you watch any videos posted to the

107

1 Waltham DATA channel?
2    A. Yes.
3    Q. At that time did you see MAC-TV meeting
4 video clips used in Channel 781's Debrief show?
5    A. Yes.
6    Q. At that time, did you see MAC-TV meeting
7 video clips posted to YouTube and not embedded in
8 a longer program?
9     MR. PYLE: Objection.
10    A. Can you repeat the question, please?
11    Q. Let me rephrase it.
12     At some point, Channel 781 posted clips of
13 government meeting videos from WCAC standing alone
14 as YouTube videos. Is that right?
15    A. Yes.
16    Q. When did you first become aware of that
17 practice?
18    A. I don't recall.
19    Q. Was it in 2022?
20    A. Possibly.
21    Q. Was it before March of 2023?
22    A. I can't say with certainty.
23    Q. The statement script says, "Some have used
24 our content to score political points."

108

1     Can you explain what you meant by "score
2 political points"?
3    A. By reproducing this photo from the
4 get-out-the-vote post I created, this photograph
5 of the Waltham woman with the anti-LGBTQ views
6 holding campaign signs could be interpreted to
7 associate anti-LGBTQ views with the two candidates
8 whose signs were being held.
9    Q. You also wrote, "Others have used it to
10 encourage residents to hate." What did you mean
11 by "encourage residents to hate"?
12    A. The purpose of this Reddit post seemed to
13 be to foment hate against this woman and her
14 family, and the comments that followed confirmed
15 that suspicion. There were many hateful comments
16 in the comments which were ultimately not deleted
17 from Reddit.
18    Q. Why did you use the word "others" if that
19 sentence referred to the same Reddit post?
20    A. I regret that verbiage. I regret it. It
21 was not accurate.
22    Q. When you wrote this statement, did you
23 believe that Channel 781 used clips taken from
24 MAC-TV meeting videos to score political points?

109

1    A. Possibly.
2    Q. Can you explain why you thought so?
3    A. This relatively new news organization was
4 against the status quo. And I had noticed that
5 they had used some of our content to criticize
6 elected officials in Waltham that could be
7 interpreted as scoring political points.
8      But most of this statement was directed at
9 the author of the anonymous Reddit post.
10   Q. At the time you wrote this statement, did
11 you believe that the author of the anonymous
12 Reddit post was affiliated with Channel 781 in any
13 way?
14   A. There was no way to know. I did not
15 recognize the user's name.
16      The woman who was the subject of this
17 Reddit post, I had reported on earlier. She was
18 in favor of proposed book bans of two LGBTQ titles
19 in the Waltham High School library that became a
20 major news story in February 2022.
21      The woman from the Reddit post was one of
22 very few Waltham residents who spoke in favor of
23 these book bans. Many, many people in a show of
24 solidarity with Waltham's LGBTQ community came out

110

1 and criticized these book bans, including Josh
2 Kastorf from 781 News.
3    Q. At the time you wrote this statement, were
4 you concerned that Channel 781 had used some of
5 WCAC's content to criticize elected officials in
6 Waltham?
7    A. If they had, they were probably entitled
8 to do that. They're a news reporting
9 organization. They're entitled to criticize
10 whomever they please.
11   Q. But my question was, were you concerned by
12 that?
13   A. The primary concern was the use of our
14 content in this potentially defamatory way because
15 it was unclear if the inclusion of my photograph
16 could make our station in some way liable, should
17 a defamation action have been taken.
18      That was not something that was remotely a
19 possibility with anything Channel 781 News was
20 doing.
21   Q. When you wrote this statement, did you
22 believe that Channel 781 was using WCAC's content
23 to encourage residents to hate?
24   A. No.

111

1    Q. Did you believe that Channel 781 was using
2 WCAC footage in a way that could damage
3 reputations?
4    A. Potentially, but that's their prerogative
5 as a news organization. They can report on the
6 news. And if that happens, so be it.
7    Q. So why did you refer to video from the MAC
8 channel in this statement?
9    A. This statement also includes something
10 about a contentious election season. Tempers were
11 starting to grow and online discourse was starting
12 to get more toxic.
13      At this point, Channel 781 News was not
14 doing anything remotely similar to what happened
15 with this Reddit post that caused this.
16      But as the election season carried on, it
17 was unclear what could happen, what use of our
18 footage could happen. We didn't really know what
19 could happen. And that would not only count for
20 Channel 781 News but anyone with a stake in this
21 highly contentious election that had been -- way
22 back in April for a November election had caused
23 this alarming situation for our channel.
24      Additionally, 781 News had produced our

112

1 video without our permission, and we wanted to
2 acknowledge that, as I mentioned earlier, all the
3 meetings had copyright notices on them.
4      And we wanted to make it known that this
5 was our copywritten content and we take it
6 seriously. If they wanted to make a request, they
7 or anyone else wanted to make a request, as it
8 says in this statement, they could approach us and
9 we would entertain a request. And as we've
10 established, we would grant -- we would likely
11 grant any request to reproduce our footage.
12   Q. What actions, if any, did WCAC take with
13 respect to Channel 781 after this statement was
14 put on the air?
15   A. I believe Channel 781 may have watched
16 this statement and then set up a meeting with
17 executive director Maria Sheehan.
18   Q. Before that meeting, did WCAC contemplate
19 sending infringement notices to YouTube?
20   A. I can't recall. We were aware -- I was
21 aware of the situation. I can't recall.
22   Q. Before the meeting between Maria Sheehan
23 and Josh Kastorf, were there any conversations
24 among WCAC staff about Channel 781?

113

1     A. Yes. I had told -- notified Bill some of
2  your video is being reproduced by Channel 781.
3  And I also talked to Maria about the situation.
4         It was not something that we had ever
5  encountered before. We really hadn't had this
6  type of thing happen before. In almost every
7  instance where another news organization wanted to
8  reproduce our content, they would approach us
9  either via phone or with a written request, and we
10 would grant them permission to use our footage.
11        This created a slightly different
12 situation where a local news organization was
13 reproducing our content which had copyright
14 disclaimers on it. And we didn't have a clear
15 plan of what to do.
16    Q. You said earlier that you were not aware
17 of any instance where WCAC got a request to use
18 MAC-TV meeting video. Is that right?
19    A. Yes.
20    Q. Before that meeting between Maria and Josh
21 Kastorf, did WCAC take any action with respect to
22 Channel 781?
23    A. Not that I'm aware of. We became aware of
24 the situation and discussed it. But again, it was

114

1  an unprecedented news situation. And the
2  statement was to just remind people of our
3  copyright. And again, we were -- didn't quite
4  know what to do at the time.
5     MR. PYLE: Mitch, can we take a quick
6  break?
7     MR. STOLTZ: Absolutely.
8     MR. PYLE: Five minutes.
9     THE VIDEOGRAPHER: We are going off the
10 record. The time on the monitor is 14:06.
11    (Recess, 2:06 p.m. to 2:13 p.m.)
12    THE VIDEOGRAPHER: We are back on the
13 record. The time on the monitor is 14:13.
14 BY MR. STOLTZ:
15    Q. Jumping back to the Reddit post for a
16 moment, who was the woman in the photo?
17    A. Her name is Dee Vanaria.
18    Q. Did WCAC receive any complaints from the
19 public about the Reddit post?
20    A. A person sent an email to an info@ address
21 about Ms. Vanaria's views not reflecting those of
22 Waltham, and you know, could it be subject to
23 reporting.
24    Q. Was it your understanding that that email

115

1  was prompted by the Reddit post?
2     A. Yes.
3     Q. Do you know who sent the email?
4     A. The email was
5  concernedcitizen02452@outlook.com. At the time it
6  seemed like a recently created email address, and
7  the email did not include a signature revealing
8  the sender's name.
9     Q. Did you receive any communications --
10 strike that.
11        Did WCAC receive any communications from
12 elected officials prompted by the Reddit post?
13    A. I don't recall. I don't recall.
14    Q. Is it possible?
15    A. It's possible.
16    Q. So we were talking about the face-to-face
17 meeting between Maria Sheehan and Josh Kastorf.
18 Were you aware that that meeting was happening?
19    A. Yes.
20    Q. Did that meeting happen on June 15th,
21 2023?
22    A. Yes.
23    Q. Did WCAC staff discuss that meeting after
24 it happened?

116

1     A. Yes.
2     Q. Who discussed it?
3     A. I discussed it with Maria, and I discussed
4  it with Bill.
5     Q. Could you please walk me through that
6  discussion.
7     A. Separate discussions. Separate
8  discussions. Maria finished up the meeting and
9  characterized what had happened, what was said on
10 both sides.
11    Q. And what happened next?
12    A. Then I went and I -- having learned what
13 had happened, I talked to Bill, who is the MAC
14 channel program coordinator, to give him an idea
15 of what happened.
16    Q. And what happened after that?
17    A. Can you be more specific?
18    Q. How did Bill respond?
19    A. I don't recall. I don't recall.
20    Q. Did you speak with anyone else about the
21 meeting?
22    A. I can't recall.
23    Q. Did you speak with Mr. Barrett?
24    A. I don't believe so.

117

1    Q. How did Ms. Sheehan characterize the
2  meeting to you?
3    A. Non -- informative but nonproductive.
4    Q. Anything else?
5    A. (No verbal response)
6    Q. What did she say had happened?
7    A. She invited Josh to come into our station,
8  to use our station for their news program.  She
9  sort of described what we do.
10    And Josh wanted to know more about this
11 statement, so they discussed that.  But ultimately
12 they had a difference of opinion over reproducing
13 content.  And from how she characterized it to me,
14 they were in disagreement when the meeting ended.
15    Q. What were they in disagreement about?
16    A. Reproducing content, fair use, and
17 permissions to reproduce WCAC and MAC channel
18 content.
19    Q. In the discussions that you had internally
20 after that meeting, did anyone make a distinction
21 between the use of MAC channel video and other
22 WCAC video?
23    A. Yes.
24    Q. Can you explain?

118

1    A. Some MAC channel -- can I amend that?  I
2  don't recall.  I'm sorry.  I don't recall.
3    Q. It's possible that someone made that
4  distinction?
5    A. It's possible.
6    Q. Do you have any recollection of who that
7  might have been?
8    A. No.
9    Q. Could it possibly have been you?
10    A. Possibly.
11    Q. What was Bill's response to hearing about
12 the meeting?
13    A. He was not happy about anyone reproducing
14 his content because, as I mentioned before, there
15 were copyright disclaimers that are on every
16 single government video he produces, records, and
17 broadcasts.  So he wasn't happy.
18    But he also didn't really want to be
19 involved too much.  He didn't really care that
20 much.  But it was, you know, MAC channel video.
21    Q. In those discussions after the meeting
22 between Ms. Sheehan and Mr. Kastorf, did any of
23 the WCAC staff express concern about monetary harm
24 to WCAC based on what Channel 781 was doing?

119

1    A. No.
2    Q. At that time, why was WCAC concerned that
3  Channel 781 was using MAC-TV video clips?
4    A. As I mentioned, there were copyright
5  disclaimers on all the videos.  So any
6  reproduction of it without permission created a
7  new situation for us that we were unaccustomed to
8  because we had not confronted that.
9    Q. At that time, what harm did you see?
10    A. It's our copywritten material.  Someone's
11 using it without -- someone is infringing on our
12 copyright.  Someone is using our content without
13 our permission.
14    Consideration was made of fair use, for
15 instance, in Debrief segments.  Short clips from
16 MAC channel content was used in keeping with the
17 fair use doctrine, but there were entire city
18 council meetings and the stand-alone clips you
19 referred to earlier that were also part of the
20 Waltham DATA YouTube channel.
21    Q. Do you remember how many entire city
22 council meetings were posted to the Waltham DATA
23 YouTube channel?
24    A. No.

120

1    Q. Was it more than ten?
2    A. I couldn't say.
3    Q. Was it more than five?
4    A. I remember the rationale given in an email
5  that I wrote.  But the number of videos, I cannot
6  say with certainty.
7    Q. Who at WCAC first suggested sending
8  infringement notices to YouTube?
9    A. I did.
10    Q. Around when did you first suggest that?
11    A. After it became clear that the
12 disagreement Josh had with Maria over MAC channel
13 footage was unlikely to be resolved.
14    Q. Where had you learned that sending an
15 infringement notice to YouTube was a course you
16 could take?
17    A. I went on YouTube to determine what action
18 could be taken, if any, against an entity
19 infringing on copywritten content and discovered
20 that takedown notices were one of the remedies.
21    Q. In that period after the meeting between
22 Ms. Sheehan and Mr. Kastorf, did anyone at WCAC
23 mention a concern that Channel 781 would defame or
24 libel someone?

121

1   A. Yes.
2   Q. Do you know who mentioned that?
3   A. I think it could have -- Maria, possibly.
4   Q. Do you recall what she said?
5   A. No. Nope.
6   Q. Did she have the same type of concern that
7   you had described with respect to the Reddit post?
8   A. I can't say how she felt.
9   Q. Earlier I asked what harm you saw in
10  Channel 781 using MAC-TV video. Was there any
11  other harm that you saw besides what you mentioned
12  earlier?
13  A. We work hard to produce this content. We
14  knew from news gatherings that when someone wants
15  to reproduce anyone's content, they typically make
16  a request. We understood there is an exception
17  for fair use, but the idea that others would
18  reproduce it without our permission was new
19  because we take pride in professional work.
20  Q. Any other harm?
21  A. Potentially drawing, you know -- drawing
22  viewers to a different -- drawing viewers to
23  content we thought was copyright protected,
24  drawing eyeballs, drawing viewers to content that

122

1   we believed was infringing. So building an
2   audience based in part on infringing content, I
3   considered that maybe not a harm but not a
4   benefit.
5   Q. In that period after that meeting, did
6   anyone at WCAC mention the upcoming elections as a
7   reason to be concerned about what Channel 781 was
8   doing?
9   A. I mentioned it in my statement. I
10  referred to the upcoming contentious election in
11  my statement. So yes, it was a topic of
12  discussion because not only was it a contentious
13  election, it was an election where there would be
14  potentially higher turnout because it involved a
15  mayoral race.
16  Q. In those conversations, did anyone draw a
17  distinction between using WCAC government meeting
18  video for news reporting versus using it to
19  express an opinion?
20  MR. PYLE: Just for the record, are we
21  referring to the discussions with Maria and with
22  Bill after the Kastorf meeting? Is that what
23  we're talking about?
24  MR. STOLTZ: Yes.

123

1   MR. PYLE: Okay.
2   A. The question was?
3   Q. In the conversations that you had
4   internally at WCAC after that meeting between
5   Ms. Sheehan and Mr. Kastorf, did anyone draw a
6   distinction between using WCAC government meeting
7   video for news reporting versus using it to
8   express an opinion?
9   A. Maria, possibly.
10  Q. When you proposed -- strike that.
11  When did you first propose sending an
12  infringement notice to YouTube?
13  A. I believe it was July, around July. But
14  we had a problem. The YouTube channel associated
15  with the MAC channel had an email address linked
16  to a former staff member, so we weren't able to
17  access that email in order to make a takedown
18  request even though I assumed that the MAC channel
19  YouTube account would be the appropriate entity to
20  make any takedown request. So . . .
21  Q. So what happened?
22  A. I attempted to make a takedown request in
23  July and failed, received communications from
24  YouTube indicating that there was something not

124

1   right with the format of the takedown request.
2   And it kind of ended there because I had
3   to do additional research to determine how to set
4   up the MAC channel YouTube account so it could
5   successfully file a takedown notice.
6   Q. So you attempted to send an infringement
7   notice to YouTube in July?
8   A. I believe so, with the following
9   disclaimer. That initial attempt was made from a
10  different YouTube account associated with the MAC
11  channel. A different MAC channel YouTube account
12  was later created to make additional takedown
13  requests.
14  Q. In that initial takedown attempt, how many
15  videos did you include?
16  A. One.
17  Q. How would you describe that video?
18  A. The video was an excerpt from a
19  committee -- Waltham City Council committee of the
20  whole meeting, involving a discussion of the MBTA
21  Communities Act.
22  Q. Why did you choose that video in
23  particular?
24  A. It was a stand-alone video, and I did not

125

1 believe that it qualified for copyright protection
2 under fair use -- or exemption under fair use.
3 Pardon me.
4     Q. At the time you sent that first
5 infringement notice, what sources were you relying
6 on about the definition of "fair use"?
7     MR. PYLE: Objection.
8     Go ahead.
9     A. I had watched a video on YouTube about
10 copyright fair use, and I had communicated to
11 Maria who -- I had communicated to Maria in an
12 email that a distinction between videos on the
13 Waltham DATA 781 News YouTube page, a key
14 distinction.
15     Q. What was that distinction?
16     A. Uses of short clips interspersed with
17 correspondent reporting in Waltham 781 News.
18 Reporting by correspondents in their debriefs did
19 qualify or was likely to qualify as fair use of
20 MAC channel video. But longer videos that merely
21 copied copywritten MAC channel content and focused
22 entirely on the copywritten content and failed to
23 have a transformative effect on that content would
24 not qualify for copyright exemption under fair

126

1 use.
2     MR. STOLTZ: I'm sorry. Could we go off
3 the record for just a moment.
4     THE VIDEOGRAPHER: We are going off the
5 record. The time on the monitor is 14:41.
6     (Recess, 2:41 p.m. to 2:42 P.M.)
7     THE VIDEOGRAPHER: We are back on the
8 record. The time on the monitor is 14:42.
9     (Wangler Exhibit 42 was marked for
10 identification and is attached to the transcript.)
11 BY MR. STOLTZ:
12     Q. Mr. Wangler, I'm showing you what's been
13 marked as Exhibit 42. Do you recognize this
14 document?
15     A. Yes.
16     Q. Is it an email you sent to Ms. Sheehan?
17     A. Yes.
18     Q. On June 16th of 2023?
19     A. Yes.
20     Q. At 12:13 p.m.?
21     A. Yes.
22     Q. Is this a true and correct copy of that
23 email exchange?
24     A. Yes.

127

1     (Whereupon Attorney Doelger entered)
2     MR. PYLE: Let the record reflect Sarah
3 Doelger has just entered the room.
4     MS. DOELGER: Hi, everyone. How are you?
5     MR. STOLTZ: Hi, Sarah.
6     Q. This email thread includes an email from
7 Josh Kastorf to Ms. Sheehan. Is that right?
8     A. Yes.
9     Q. And Mr. Kastorf in his email includes
10 several links about copyright law. Is that right?
11     A. Yes.
12     Q. Did you read the links -- strike that.
13     Did you read the documents at the links
14 that Mr. Kastorf provided?
15     A. No. I read the email only.
16     Q. Could you please read your email to
17 Ms. Sheehan at the top of this thread.
18     A. "Fair use is not the reason given in the
19 Waltham DATA YouTube mission statement but rather,
20 quote, We do not own the rights to the WCAC
21 content, but we believe this is necessary because
22 WCAC is not meeting their legal obligation to
23 provide captions."
24     Q. Could you continue, please.

128

1     A. "Maybe see what YouTube does when you
2 execute the copyright violation claims. He can
3 take it up with YouTube."
4     Q. Why did you write "Fair use is not the
5 reason given in the Waltham DATA YouTube mission
6 statement"?
7     A. Because it wasn't.
8     Q. Why did you find that significant enough
9 to mention in your email to Ms. Sheehan?
10     A. Because I believed our failure to caption
11 our MAC channel government meetings was a
12 significant motivating factor for posting our
13 copyright protected content on the Waltham DATA
14 YouTube page.
15     Q. What did you mean by "execute the
16 copyright violation claims"?
17     A. To take action to protect our copyright
18 with YouTube.
19     Q. Were you specifically referring to sending
20 infringement notices to YouTube?
21     A. I can't recall where the process was at
22 the time.
23     Q. Why did you say "Maybe see what YouTube
24 does"?

129

1    A. One potential remedy for copyright
2  infringement is to bring a civil complaint in
3  federal or superior court.
4        We did not have an attorney. We didn't
5  know of any intellectual property law firms. And
6  so what remedy did we have? I saw this as one of
7  the -- an initial remedy we could take because we
8  couldn't -- we couldn't take legal action.
9    Q. What did you mean by "He can take it up
10 with YouTube"?
11   A. If we filed these copyright violation
12 claims, Josh could file an appeal of whatever
13 takedown notice we might send to YouTube with the
14 fair use information that he provided in his
15 email.
16   Q. When you wrote this email, did you believe
17 that YouTube would make the final decision about
18 whether the clips infringed copyright?
19   A. Around the same time, I watched the video
20 I had just mentioned. And that video said very
21 explicitly at the start that only courts make
22 determinations about fair use, not YouTube.
23   Q. At the time you sent this email, were you
24 already contemplating sending infringement notices

130

1  to YouTube?
2    A. Yes.
3        (Wangler Exhibit 43 was marked for
4  identification and is attached to the transcript.)
5    Q. I'm showing you what's been marked as
6  Exhibit 43. Do you recognize this email?
7    A. Yes.
8    Q. Is this a true and correct copy of an
9  email that you sent to Ms. Sheehan?
10   A. Yes.
11       MR. PYLE: I'd like to state for the
12 record that the Exhibit 43 does not contain the
13 attachment that goes with this email.
14       (Wangler Exhibit 44 was marked for
15 identification and is attached to the transcript.)
16   Q. I'm also showing you what's been marked as
17 Exhibit 44. I can represent that this was
18 produced to us marked as an attachment to
19 Exhibit 43.
20       Do you recognize this document?
21   A. Yes.
22   Q. Is this a screen grab from the video you
23 mentioned?
24   A. Yes.

131

1    Q. And you said earlier that you watched the
2  entire video. Is that correct?
3    A. Yes.
4    Q. Before you made the initial attempt to
5  send an infringement notice to YouTube, did you
6  consider whether Channel 781 was trying to
7  monetize the clips from WCAC?
8    A. I did consider it. Yes.
9    Q. Did you believe at the time that that
10 criterion, which I'm reading from this screen
11 grab, was relevant?
12   A. No, it was not relevant.
13   Q. Why not?
14   A. Channel 781 News did not monetize their
15 videos.
16   Q. You didn't believe that that was a
17 relevant fact regarding fair use?
18   A. It is relevant regarding fair use, but it
19 wasn't relevant to the actions 781 News was
20 taking.
21   Q. Why not?
22   A. 781 News was not trying to monetize their
23 videos.
24   Q. So you didn't believe that that lack of

132

1  monetization was relevant to whether Channel 781
2  was engaged in a fair use?
3        MR. PYLE: Objection.
4    A. The potential monetization was relevant,
5  but I was aware that they were not monetizing
6  their videos.
7    Q. Based on your understanding at the time,
8  did the fact that Channel 781 didn't monetize
9  their videos make you consider their use more
10 likely to be a fair use?
11   A. Possibly.
12   Q. At that time did you consider whether
13 Channel 781 was using fictional copyrighted
14 material as opposed to factual material?
15   A. It was not fictional.
16   Q. Is that something you considered before
17 your initial attempt to send an infringement
18 notice to YouTube?
19   A. I had learned about the factual
20 distinction in this video. So yes, I did consider
21 it.
22   Q. Did the fact that the video used was
23 factual make you consider their use more likely to
24 be a fair use?

133

1    A. Possibly.
2    Q. If you can remember, approximately how
3 long was the clip referenced in your initial
4 infringement notice to YouTube in July of 2023?
5    A. Between 1 and 2 minutes.
6    Q. Did you consider whether that constituted
7 a large amount of material?
8    A. It was a difficult concept to understand
9 as a layperson what constitutes a large amount of
10 material, whether it be a song, a video, a poetry.
11 It's a complicated matter of law.
12      I focused more on the reproduction of our
13 copyright-protected video in its entirety. The
14 main focus was the copywritten material, and it
15 did not appear to transform the material at all,
16 in my consideration of fair use.
17    Q. At that time, what was your understanding
18 of what it meant to transform the material?
19    A. Again, a difficult legal concept which is
20 subject to much discussion, but taking video --
21 excerpting video and republishing it without
22 interspersing it with commentary, B-Roll, or other
23 factors seemed less likely to be fair use than
24 just taking video, copyright-protected video,

134

1 reproducing it, and the entire focus is the
2 copywritten content.
3    Q. At that time, did you consider whether
4 Channel 781's use of that particular video clip
5 harmed WCAC's ability to profit?
6    A. I did consider it. But both 781 News and
7 Waltham Channel are nonprofits, and it was not --
8 it was not as important a consideration as the
9 excerpting of copywritten material without a
10 transformative purpose.
11    Q. You said earlier that Channel 781 has a
12 different audience than MAC-TV. Is that right?
13    A. Yes.
14    Q. And you also said that Channel 781 has a
15 different audience than Waltham Newswatch. Is
16 that right?
17    A. Yes.
18    Q. Did you consider that when you were
19 determining whether there was a transformation?
20    A. I can't recall if I considered the
21 audience.
22    Q. Going back to Exhibit 43, could you read
23 the last paragraph of your email, please.
24    A. "What does not qualify are the large

135

1 numbers of video taken directly from us and
2 reproduced verbatim with zero editing or
3 commentary. Those will be the ones we should file
4 copyright claims against because they 'merely
5 copy.' A lot of it is used without permission and
6 the main focus is in," sic, "the copywritten
7 material."
8      MR. PYLE: Only a copy editor would
9 verbally put in "sic."
10    Q. Why did you leave out using fictional
11 copyrighted material from that email?
12      MR. PYLE: Objection.
13    A. The video -- the stand-alone clips,
14 self-evident they were not fictional. So I can't
15 recall why I didn't -- I can't recall why I didn't
16 include that fictional component.
17    Q. Why did you leave out "trying to
18 monetize"?
19      MR. PYLE: Objection.
20    A. I don't recall.
21    Q. You told me earlier that your
22 understanding was that Channel 781 was not trying
23 to monetize when it used that clip. Is that
24 right?

136

1    A. Yes.
2    Q. Why didn't you mention that in this email?
3      MR. PYLE: Objection.
4    A. It was evident to me and Maria that none
5 of us were making money off of this stuff. We're
6 all nonprofits here. I didn't monetize my own
7 YouTube videos.
8    Q. I think you said earlier that your
9 understanding at the time was that Channel 781's
10 use of WCAC video clips did not harm WCAC's
11 ability to profit.
12      MR. PYLE: Objection.
13    Q. Is that correct?
14    A. Define "profit."
15    Q. What did you understand "profit" to mean
16 when you saw the video attached to this email?
17    A. So there's monetary profit. But as I
18 described earlier, there's also the profit of
19 gathering followers using copywritten content.
20 And that was definitely something considered.
21    Q. Did you believe that Channel 781's use of
22 WCAC video clips harmed WCAC's ability to gather
23 followers?
24    A. Potentially.

137

1    Q. Can you explain what you mean by
2 "potentially"?
3    A. It's our video. We want people to watch
4 our video. We don't want people to go somewhere
5 else to watch our video. We want people to watch
6 our video. We worked hard to create this
7 copywritten video. It has copyright notices.
8 Please watch it on our channel in its entirety, as
9 intended.
10    Q. If you wouldn't mind turning back to
11 WCAC's interrogatory responses.
12    A. Yup.
13    MR. PYLE: Is that 40?
14    MR. STOLTZ: I believe that was 40.
15    A. Yes.
16    Q. If you could turn to page 6, please. And
17 if you could please read the first sentence of
18 Answer Number 5.
19    A. "WCAC states that its personnel did not
20 form any particularized belief at the time of
21 sending of the notices of claimed infringement as
22 to the effect that the claimed infringement would
23 have on the market value of each of the WCAC
24 videos on a work-by-work basis. Answering

138

1 further, WCAC states at the time" --
2    MR. PYLE: I think you can stop there.
3    THE WITNESS: Okay.
4    Q. Is that first sentence correct?
5    A. It's unclear what the market value of each
6 WCAC video would be.
7    Q. Would you agree, then, that WCAC did not
8 form any particularized belief about the effect of
9 market value? Strike that.
10    Would you agree that WCAC at the time it
11 sent that first notice of infringement did not
12 form any particularized belief about the effect
13 that Channel 781's use of the clip would have on
14 the market value of that clip?
15    MR. PYLE: Objection.
16    A. Presumably that's correct. I can't speak
17 for other personnel, but on my own I don't think I
18 formed an opinion about the market value.
19    MR. PYLE: Mitch, can I put on the record
20 that this interrogatory refers to several defined
21 terms, and the definitions aren't here in the
22 answers to the objections? I'm thinking in
23 particular about the defined term "WCAC videos."
24    So I just wanted to make that notification

139

1 as a part of my reason for objecting to the form.
2    MR. STOLTZ: Thank you. We'll come back
3 to it.
4    MR. PYLE: Okay.
5    Q. After you sent that initial infringement
6 notice to YouTube, when did WCAC next attempt to
7 send an infringement notice to YouTube concerning
8 Channel 781?
9    A. In early September.
10    Q. Did WCAC do anything with respect to
11 Channel 781 between July and early September?
12    A. I believe some attempts were made to
13 resolve the email issue that I alluded to earlier.
14    Q. Who made those attempts?
15    A. The proper authority for creating new
16 emails in our company is Maria. The email
17 associated with this -- with the Waltham MAC-TV
18 YouTube channel was a dot -- @gmail.com.
19    And we needed a @wcac.org email to send
20 these takedown notices. So we had to create a new
21 YouTube account, create a new email, and then
22 designate Maria instead of Bill as the entity
23 making the takedown request. So we had to alter
24 how the takedown requests were sent to YouTube.

140

1    Q. My question was, who at WCAC attempted to
2 resolve that issue?
3    A. Maria and myself, working with Bill, who
4 had some control of the earlier @gmail.com email
5 address.
6    Q. When did you resolve that issue?
7    A. I can't recall. Possibly July.
8    Q. Did WCAC take any action with respect to
9 Channel 781 after resolving that issue with
10 YouTube but before September 4th?
11    A. Not to my knowledge. It was summertime
12 and I had traveled to Hawaii with my family, and
13 other staff members were taking vacations at the
14 time. It was the middle of summer.
15    Q. Did WCAC send another infringement notice
16 on or around September 4th?
17    A. September 4th? September 4th, you said?
18    Q. Yes.
19    A. My recollection is no.
20    Q. In your recollection, when did WCAC next
21 attempt to send an infringement notice to YouTube?
22    A. September 1st.
23    Q. Why did WCAC choose to send another
24 infringement notice on or around September 1st?

141

1      A. We were trying to resolve this issue with
2  the copyright infringement.  I failed earlier, and
3  Maria and I decided, reached a consensus, to send
4  copyright infringement notices on or around that
5  date.
6      Q. So you had another discussion with Maria
7  on or around that date?
8      A. Yes.
9      Q. What, if anything, prompted that
10 discussion?
11     A. We had learned that Channel 781 had taken
12 some -- a video involving a candidate and
13 reproduced that video without our permission.  And
14 this was embarrassing to us.  And learning of this
15 action of theirs rekindled this entire discussion
16 of needing to take some action to protect our
17 copyright.
18     Q. Why was that embarrassing to WCAC?
19     A. The You Don't Say candidate statements are
20 a primary resource for voters in the City of
21 Waltham.  We invite every candidate in municipal
22 elections into our studio to tape brief statements
23 on-camera, and then we collect those statements
24 into a video or videos that air during the

142

1  election season to let the viewers meet and become
2  familiar with candidates for office.
3      The taping of these statements at times
4  involves people who are unaccustomed to appearing
5  on-camera, who may be reading from a teleprompter
6  and are not exactly ready for prime time or who
7  just sound wooden the first time they try.
8      So at times people struggle to tape a good
9  statement that represents them in their best
10 possible light.  And we extend them some rope to
11 allow them to tape one or more statements and tape
12 their best statement.
13     One candidate for office came in and she
14 taped a statement and it included a number of
15 false starts and stops.
16     And through a mistake of our own, Phil
17 McGrady and myself, this mistake of this candidate
18 starting and stopping and finally getting into a
19 rhythm was ultimately broadcast by us, intercepted
20 by 781 News, and then posted to one of their
21 social media channels.
22     Q. So again, why was that embarrassing to
23 WCAC?
24     A. Phil and I had made a mistake in including

143

1  something that really wasn't something we would
2  typically include in one of these videos about
3  these candidates, which is the false starts and
4  stops and struggling to get going.
5      Typically we would exclude that to allow
6  candidates to present, put their best face forward
7  in these candidate videos where they tell the
8  community about who they are and why they're
9  running for office.
10     Q. Did WCAC allow each candidate a certain
11 number of takes?
12     A. Some candidates required multiple takes.
13 Over the years some candidates required sometimes
14 three takes because, again, there were candidates
15 that would be running for the first time.  They
16 may have loaded a script into the teleprompter and
17 for whatever reason were not reading it well.
18     So we offered some leniency in terms of
19 ensuring that they were able to present the best
20 version of themselves to the voters.
21     Q. Were some candidates allowed fewer takes?
22     A. I don't recall.  But again, we wanted to
23 make sure that each candidate had the take that
24 they wanted and that they felt most comfortable

144

1  with.
2      Q. Were some candidates allowed more takes
3  than other candidates?
4      A. I can't recall.  In the past, I can't
5  recall.
6      Q. Who was the candidate whose statement was
7  in that video?
8      A. Jeannette McCarthy.
9      Q. Is she the current mayor of Waltham?
10     A. Yes.
11     Q. In 2023, was Mayor McCarthy a first-time
12 candidate?
13     A. She was seeking her sixth term.
14     MR. STOLTZ:  Let the record reflect that
15 the witness has held up the article he wrote
16 titled "Mayor's Sixth Term."
17     Q. In 2023 was Mayor McCarthy unaccustomed to
18 appearing on-camera?
19     MR. PYLE:  Objection.
20     A. She appeared on-camera in front of the
21 city council many, many times but appeared
22 infrequently on productions at our station and was
23 not exactly an old hand the way some elected
24 officials are when they give speeches or make

145

1  statements.
2      Q. Would you describe Mayor McCarthy in 2023
3  as not exactly ready for prime time?
4      MR. PYLE:  Objection.
5      A. No.  She doesn't like to give speeches.
6  She's a woman of few words, and any person who has
7  covered news in Waltham realizes that very
8  quickly.  She's not someone who is a politician
9  who knows how to give a good speech off the cuff.
10     Q. After learning that Channel 781 had posted
11 that video, did WCAC send an infringement notice
12 naming that video?
13     A. No.
14     Q. Why not?
15     A. It didn't -- I mean, I can't recall.  I
16 can't recall.  It appeared that the video was not
17 on their channel.
18     Q. But if the video was not on their channel,
19 how did you know about it?
20     A. We had learned about it.  Someone had
21 called the station and told us about it because it
22 was airing on our channel.
23     And someone told us it was airing on our
24 channel, but then we also realized that this

146

1  mistake, which was embarrassing, was something
2  that was something we had published.
3      But then Channel 781 News had excerpted
4  part of this video about the mayoral candidates as
5  well.
6      Q. Was it learning about that video that
7  prompted WCAC to make another attempt to send
8  infringement notices to YouTube on or around
9  September 1st?
10     A. I don't recall the exact conversation I
11 had with Maria.  But again, it rekindled the
12 concern we had over our content, copyright
13 protected, being reproduced without our
14 permission.
15     MR. PYLE:  Could we go off the record for
16 just a second before getting in the next exhibit?
17     MR. STOLTZ:  Yes.
18     THE VIDEOGRAPHER:  We are going off the
19 record.  The time is 15:29.
20     (Recess, 3:29 p.m. to 3:36 p.m.)
21     (Whereupon Attorney Pyle departed)
22     THE VIDEOGRAPHER:  We are back on the
23 record.  The time on the monitor is 15:36.
24 BY MR. STOLTZ:

147

1      Q. So we were talking about events occurring
2  around September 1st of 2023.  Who called to
3  inform you about the video of the mayor?
4      A. I don't know.
5      Q. Do you know who at WCAC received that
6  call?
7      A. (No verbal response)
8      (Wangler Exhibit 45 was marked for
9  identification and is attached to the transcript.)
10     Q. I'm showing you what's been marked as
11 Exhibit 45.  Do you recognize this email chain?
12     A. Yes.
13     Q. Is this a true and correct copy of that
14 email chain?
15     A. Yes.
16     Q. Do you see where Ms. Sheehan writes,
17 "Waltham DATA took the mayor's video with a
18 mistake and are using it"?
19     A. Yes.
20     Q. Does that refer to the episode that you
21 mentioned earlier?
22     A. Yes.
23     Q. How did you respond at 8:20 a.m. on
24 September 1st?

148

1      A. "We need to go through the motions again
2  to have YouTube take down all the videos."
3      Q. What did you mean by "all the videos"?
4      A. All the videos that did not qualify for
5  copyright exemption under fair use.
6      Q. You responded again in a second email
7  here.  Is that right?
8      A. Yes.
9      Q. How did you respond the second time?
10     A. "You have to become admin of Bill's
11 channel and make 30 removal claims."
12     Q. Why did you say 30?
13     A. I can't recall.  I can't recall.
14 Presumably the number of stand-alone videos.
15     Q. Sometime between July and the time of this
16 email, did you write a list of the stand-alone
17 videos?
18     A. No.
19     Q. Did you look through the Waltham DATA
20 YouTube channel to identify stand-alone videos?
21     A. Yes.
22     Q. Did you count those stand-alone videos?
23     A. I can't recall.
24     Q. When you say "all the videos," did that

149

1 include the mayor's video with the mistake?
2     A. I can't recall.
3     Q. If the mayor's video was not one of the
4 videos that you were referring to, then why did
5 you recommend having YouTube take down all the
6 videos?
7         MR. PYLE: Objection.
8     A. When I said we need to go through all the
9 motions again, the mayor's video did not exist, so
10 this email refers to an earlier period.
11         Presumably we need to go through all the
12 motions again. At some earlier period, I had
13 identified the stand-alone clips to have YouTube
14 take down all the videos.
15     Q. You said earlier that in July you sent a
16 single infringement notice to YouTube referencing
17 a single video. Is that correct?
18     A. Yup.
19     Q. But sometime in the interim you identified
20 more videos?
21     A. Possibly. Possibly.
22     Q. Did you watch each of those videos?
23     A. Yes. Some of the longer videos I may not
24 have watched in their entirety.

150

1     Q. But you didn't write a list?
2     A. No.
3     Q. When did you watch those videos?
4     A. I can't recall. I can't recall.
5     Q. Was it closer to July or closer to
6 September?
7     A. I had made the July 15th initial attempt
8 with the -- the initial attempt I made was for one
9 video.
10         And on the Waltham DATA YouTube channel,
11 similar stand-alone videos were part of a
12 playlist. And then if you navigated downwards,
13 you would see additional stand-alone videos, all
14 from MAC channel.
15         And I assume those new videos had been
16 added, so I had been aware for some time that
17 these stand-alone clips were on the Waltham DATA
18 YouTube channel.
19         An initial attempt had failed. It did not
20 appear that more of them were posted, but the
21 existing ones were still there as part of
22 playlists, including copywritten content not
23 subject to copyright exemption for fair use.
24     Q. You talked earlier about what you

151

1 considered before your first attempt at sending an
2 infringement notice in July of 2023.
3         At some point between then and, let's say,
4 middle of September 2023, did you go through that
5 same process with other videos?
6     A. Yes.
7     Q. And you sent another infringement notice
8 on September 1st. Is that right?
9     A. September 1st? Yes. September 1st, one
10 infringement or one takedown notice on
11 September 1st.
12     Q. Did that happen after you sent this series
13 of emails?
14     A. Yes.
15     Q. Why did that takedown notice only
16 reference one video?
17     A. It was the same video that I had tried to
18 send a takedown notice for back in July.
19     Q. Why did you choose to send a notice
20 referencing only that video after sending an email
21 that suggested making 30 removal claims?
22     A. I had never done this before. I had
23 failed the first time, and I wasn't going to waste
24 hours creating 30 takedown -- or 30 takedown

152

1 notices if they were bound to fail like the first
2 takedown that I had attempted.
3         So it was unclear that I would submit this
4 correctly, and I needed to try to submit one to
5 see if it would work.
6     Q. When did you next send an infringement
7 notice to YouTube?
8     A. September 6th.
9     Q. Do you recall how many videos were
10 referenced in that notice?
11     A. Five.
12     Q. When did you watch those five videos?
13     A. In order to make the takedown request, I
14 navigated to the Waltham DATA page, watched ones
15 that were stand-alone, determined they were
16 similar to the first video I had submitted a
17 takedown request for, and prepared takedown
18 requests for additional similar classes -- class
19 of videos, stand-alone videos.
20     Q. Did you consider the length of any of
21 those videos before choosing to include them in
22 your next takedown notice?
23     A. Yes.
24     Q. And what did you conclude?

153

1    A. Some of the videos were lengthy, long.
2  Some of the videos were shorter.
3    Q. Did you look to see whether any of those
4  five videos had been edited?
5    A. Yes.
6    Q. And what did you conclude?
7    A. A small Waltham or Channel 781 News
8  graphic I believe was added to the end to several
9  of the videos for a second or two possibly.
10   Q. Did you determine whether any of those
11 videos included more than one clip from a MAC-TV
12 meeting video?
13   A. You mean did an individual video include
14 edited sections put together to form one video?
15   Q. Yes.  That's right.
16   A. No.  Every one of these videos appeared to
17 be an excerpted clip from a MAC channel video.
18   Q. And what happened when you sent that
19 infringement notice to YouTube?
20   A. The initial -- the September 1st notice?
21   Q. Yes.  Let's start with the September 1st
22 notice.  What happened?
23   A. I received notice from YouTube that the
24 video had been taken down.

154

1    Q. What about after you sent the following
2  notice?
3    A. The additional five notices?
4    Q. Yes.
5    A. I received a similar notification that
6  those videos too had also been taken down.
7    Q. Did you send another infringement notice
8  to YouTube?
9    A. Yes.
10   Q. When was that?
11   A. September 7th.
12   Q. Do you recall how many videos that notice
13 included?
14   A. Nine.
15   Q. Did you watch all nine of those videos?
16   A. Yes, except one that was quite lengthy.
17   Q. How did you choose those nine?
18   A. The third set of videos were from a
19 playlist of committee of the whole MBTA
20 Communities Act videos.  And they were all from a
21 single meeting in 2023, and they all fit the
22 criterion of being excerpts from MAC channel
23 copyright-protected content that did not qualify
24 for fair use protection, in my judgment.

155

1    Q. What did you do to determine whether those
2  videos qualified for fair use protection, in your
3  judgment?
4    A. I referred back to the YouTube video I had
5  watched about fair use and determined that all of
6  the videos merely copied.  The focus of the video
7  was the copywritten content, and the videos did
8  not have a transformative effect.  And therefore,
9  they did not qualify for copyright protection
10 under fair use.
11   Q. Did you consider whether the videos were
12 fiction or factual?
13   A. I can't remember.
14   Q. Sitting here today, do you believe those
15 videos were fiction?
16   A. They're not fiction.
17   Q. Was that your conclusion at the time?
18   A. I can't recall whether I considered
19 fiction or nonfiction at the time.  I can't
20 recall.
21   Q. For each of those videos, did you consider
22 whether Channel 781's posting harmed WCAC
23 financially?
24   A. Yes.

156

1    Q. What did you conclude?
2    A. They were not monetizing the videos.  And
3  we weren't monetizing anything we produced, so
4  monetization did not appear to be a significant
5  factor in these takedown notices because neither
6  781 News nor our channel monetized our content.
7    Q. Did you consider whether Channel 781 was a
8  competitor to WCAC's news work?
9    A. Yes.
10   Q. And what did you conclude?
11   A. Channel 781 was reproducing these videos
12 without our permission, which was not in keeping
13 with professional practices we were accustomed to
14 with network affiliates and others.  And they were
15 trying to draw viewers and subscribers using our
16 copyright-protected content.
17   Q. At that time, did you believe that
18 Channel 781 was likely to draw viewers and/or
19 subscribers away from WCAC?
20   A. Possibly.  But the worry was more about
21 the use of copywritten content.
22   Q. You said earlier that Channel 781 serves a
23 different audience than Waltham Newswatch.  Is
24 that correct?

157

1   A. Yes.
2   Q. If that's the case, then why would those
3 clips have drawn viewers away from Waltham
4 Newswatch to Channel 781?
5   A. Waltham Newswatch also had younger
6 viewers. We had people that interact with our
7 content. And the news business is competitive.
8 The news business is competitive and news
9 organizations compete with each other.
10   Q. At that time, did you consider -- as part
11 of making your decision to include certain videos
12 in your infringement notice to YouTube, did you
13 consider whether Channel 781 was defaming anyone?
14   A. No.
15   Q. Did you consider whether Channel 781 was
16 encouraging anyone to hate?
17   A. No.
18   Q. Did you consider whether Channel 781 was
19 criticizing any candidates during election season?
20   A. These videos were produced prior to the
21 election season. I think they had been on their
22 page for a long time, if memory serves. And the
23 correspondents from 781 weren't criticizing anyone
24 by posting videos that were clips of WCAC

158

1 meetings. Their correspondents were not
2 criticizing elected officials through these clips.
3   Q. Did you consider the titles of the clips
4 as part of that process?
5   A. Yes.
6   Q. Did you find any of those titles to be a
7 form of criticism of elected officials?
8   A. Possibly.
9   Q. Did those titles factor into your decision
10 to include certain videos in your takedown notice?
11   A. Yes.
12   Q. How so?
13   A. Some of the titles may not have -- the
14 titles were intended to draw viewers to our
15 copywritten content through sensational --
16 possibly sensational titles, trying to draw
17 viewers to our copywritten content. I considered
18 that. Some titles were more sensational than
19 others.
20   Q. Did you choose to include any videos in
21 your infringement notice to YouTube whose titles
22 were less sensational?
23   A. Yes. Some of the titles are not
24 sensational at all.

159

1   Q. Did you choose to include videos whose
2 titles were more sensational?
3   A. Yes.
4   Q. Did you see those titles as a kind of
5 criticism of the people depicted in those clips?
6   A. Yes.
7   Q. Did you consider whether Channel 781 had
8 chosen those clips in part to portray the people
9 in the clips in a bad light?
10     MS. DOELGER: Objection.
11   A. I don't know. I don't know. Possibly.
12   Q. Was that an issue you considered?
13     MS. DOELGER: Objection.
14   A. The main consideration was this is a
15 stand-alone clip. It merely copies. The focus of
16 the clip is the copywritten content. It's not
17 transformative; therefore, it's subject to a
18 YouTube takedown notice.
19     And 15 of the videos were taken down.
20 There were other ones on there that were similar
21 that would also have qualified for takedown
22 notices.
23   Q. Did you send any more takedown notices
24 after September 7th?

160

1   A. No.
2   Q. Why not?
3   A. I learned that the Waltham DATA YouTube
4 channel had been taken down by YouTube.
5   Q. How did you learn that?
6   A. Through a social media post by members of
7 Channel 781 News.
8   Q. At that point, did you believe the problem
9 was solved?
10   A. I was very surprised and had no idea that
11 their entire channel, which included debriefs,
12 special reports, headlines, the stand-alone videos
13 we talked about, candidate interviews, and
14 interviews with various news makers, all of that
15 content would be removed. I had no clue that
16 that could happen, and I was shocked.
17   Q. Did you take any action after learning
18 that the channel had been suspended?
19   A. No.
20   Q. You didn't ask YouTube to reactivate the
21 channel?
22   A. We waited to see if someone from 781 News
23 would contact us to seek that remedy. And that
24 never happened.

161

1    Q. At some point did you receive notice from
2 YouTube that someone affiliated with Channel 781
3 had filed a counternotice?
4    A. Yes.
5       (Wangler Exhibit 46 was marked for
6 identification and is attached to the transcript.)
7    Q. I'm showing you what's been marked as
8 Exhibit 46, which appears to be handwritten notes.
9 Do you recognize this?
10    A. Yes.
11    Q. Do you know who wrote it?
12    A. I did.
13    Q. Is this a true and correct copy of what
14 you wrote?
15    A. Yes.
16    Q. What is this document?
17    A. It's a list of the second round of
18 takedown notices that I filed on September 6th,
19 2023.
20    MR. STOLTZ: Can we go off the record?
21    THE VIDEOGRAPHER: We are going off the
22 record. The time on the monitor is 16:11.
23    (Recess, 4:11 p.m. to 4:25 p.m.)
24    THE VIDEOGRAPHER: We are back on the

162

1 record. The time on the monitor is 16:25.
2 BY MR. STOLTZ:
3    Q. I just had a few follow-up questions.
4       Before sending the takedown notices to
5 YouTube in September of 2023, did you see any
6 evidence that WCAC was losing viewers to
7 Channel 781?
8    A. No.
9    Q. Did you believe that was happening?
10    A. Possibly. But how would you determine
11 that?
12    Q. You thought that Channel 781 was taking
13 viewers from WCAC?
14    A. I mean, yes. I mean, I couldn't calculate
15 how many.
16    Q. But you saw no evidence of that?
17    A. It's something I considered, but I
18 couldn't prove it.
19    Q. Talking about infringement notices to
20 YouTube, do you know what a strike is?
21    A. Yes. A copyright strike?
22    Q. Yes. What's a copyright strike?
23    A. It's when a video -- a copyright holder
24 takes action against a video, resulting in that

163

1 video being taken down.
2    Q. When did you first hear that term
3 "copyright strike"?
4    A. So one video I published received a
5 copyright strike.
6    Q. Was that a video that you published for
7 WCAC or personally?
8    A. Yes. For Waltham Newswatch YouTube page.
9    Q. When you got that copyright strike --
10 strike that.
11       At any time before September 2023, did you
12 come -- did you become aware that three copyright
13 strikes causes a YouTube channel to be suspended?
14    A. No.
15    Q. When you received a copyright strike, how
16 did you respond?
17    A. I concluded that Bob Dylan and Columbia
18 Records' parent company didn't want any reporting
19 on any of his music, in media of any kind.
20    Q. Did you submit a counternotice to YouTube?
21    MS. DOELGER: Objection.
22    A. No.
23    Q. Did you take any action?
24    MS. DOELGER: Objection.

164

1    A. No.
2    Q. Were you concerned at that time about
3 adverse consequences for the WCAC YouTube channel?
4    MR. PYLE: Objection.
5    A. I can't recall, but I expected anything
6 having to do with Bob Dylan to probably be flagged
7 and struck.
8    Q. After that time, was there any other
9 material about Bob Dylan posted on WCAC's YouTube
10 channel?
11    MS. DOELGER: Objection.
12    A. No.
13    Q. Did WCAC refrain from posting material
14 about Bob Dylan because it received a copyright
15 strike?
16    MS. DOELGER: Objection.
17    A. Bob Dylan visited Waltham twice. And only
18 one recording was made in 1963, only weeks before
19 his release of his groundbreaking The Freewheelin'
20 Bob Dylan album. I wasn't aware that there would
21 be any additional opportunity to report on Bob
22 Dylan in Waltham, so that was it.
23    MR. STOLTZ: Okay. Thank you.
24    Sara, did you have any questions?

165

1      MS. DOELGER: I don't. No.
2      MR. STOLTZ: We request to review the
3  transcript and potentially make corrections within
4  30 days of receiving it.
5      Do you also request?
6      MS. DOELGER: Yes.
7      MR. STOLTZ: Then we are finished.
8      THE VIDEOGRAPHER: Alrighty. This
9  concludes the deposition of Chris Wangler. We are
10  going off the record at 16:31.
11      (Off the record at 4:31 p.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24

166

1      ACKNOWLEDGMENT OF DEPONENT
2      I, CHRISTOPHER WANGLER, do hereby
3  acknowledge that I have read and examined the
4  foregoing testimony, and the same is a true,
5  correct, and complete transcription of the
6  testimony given by me and any corrections appear
7  on the attached errata sheet signed by me.
8
9  _____
10      (DATE)          (SIGNATURE)
11
12
13
14
15
16
17
18
19
20
21
22
23
24

167

1    CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC
2      I, MICHELLE KEEGAN, Registered Merit
3  Reporter and Notary Public in and for the
4  Commonwealth of Massachusetts, the officer before
5  whom the foregoing deposition was taken, do hereby
6  certify that the foregoing transcript is a true
7  and correct record of the testimony given; that
8  said testimony was taken by me stenographically
9  and thereafter reduced to typewriting under my
10  direction; that reading and signing was requested;
11  and that I am neither counsel for, related to, nor
12  employed by any of the parties to this case and
13  have no interest, financial or otherwise, in its
14  outcome.
15      IN WITNESS WHEREOF, I have hereunto set my
16  hand and affixed my notarial seal this 9th day of
17  July, 2025.
18  My commission expires May 15, 2026.
19
20
21
22  _____
23  NOTARY PUBLIC IN AND FOR
24  THE COMMONWEALTH OF MASSACHUSETTS

No. 590641

Re:     Deposition of **Christopher Wangler, Designated Representative & Individually**

Date: 7/9/2025

Case: Channel 781 News -v- Waltham Community Access Corporation

Return to: transcripts@planetdepos.com

| Page | Line | Correction/Change and Reason |
|------|------|------------------------------|
| 111 | 24 | Change "produced" to "reproduced." Correction to clarify key distinction. |
| 121 | 14 | Change "gatherings" to "gathering." Intended phrase is "news gathering." |
| 144 | 16 | Change "Mayor's Sixth Term" to "Mayor to Seek Sixth Term" Correct title of article. |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

_____          _____

(Date)                                                    (Signature)

No. 590641

Re:    Deposition of **Christopher Wangler, Designated Representative & Individually**
Date: 7/9/2025
Case: Channel 781 News -v- Waltham Community Access Corporation
Return to: transcripts@planetdepos.com

ACKNOWLEDGMENT OF DEPONENT


I, Christopher Wangler, Designated

Representative & Individually, do hereby acknowledge

that I have read and examined the foregoing

testimony, and the same is a true, correct and

complete transcription of the testimony given by me

and any corrections appear on the attached Errata

sheet signed by me.


August 13, 2025                Chris Wangler
_____                _____
     (Date)                          (Signature)

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM

**A**

**ability**
9:10, 53:12,
134:5, 136:11,
136:22

**able**
18:8, 20:18,
53:4, 66:5,
66:15, 67:20,
123:16, 143:19

**about**
11:2, 12:20,
13:3, 15:6,
19:7, 20:9,
25:21, 25:23,
26:14, 28:1,
28:6, 28:12,
28:23, 29:14,
29:18, 30:16,
30:19, 33:17,
36:15, 38:15,
43:23, 44:7,
45:9, 45:19,
45:20, 46:12,
48:23, 49:23,
54:2, 57:9,
60:3, 60:9,
60:10, 61:8,
63:1, 66:4,
66:23, 67:24,
68:4, 68:15,
69:6, 70:14,
73:10, 77:6,
78:17, 79:5,
80:12, 95:6,
95:12, 96:5,
97:16, 98:3,
100:5, 103:10,
106:20, 111:10,
112:24, 113:3,
114:19, 114:21,
115:16, 116:20,
117:10, 117:15,
118:11, 118:13,
118:23, 122:7,
122:23, 125:6,
125:9, 127:10,

129:17, 129:22,
132:19, 138:8,
138:12, 138:18,
138:23, 143:2,
143:8, 145:19,
145:20, 145:21,
146:4, 146:6,
147:1, 147:3,
150:24, 154:1,
155:5, 156:20,
160:13, 162:19,
164:2, 164:9,
164:14

**absolutely**
45:11, 97:21,
114:7

**acceptable**
90:1, 90:14,
90:17

**access**
1:7, 1:13,
3:10, 4:10, 5:6,
6:5, 6:22, 9:14,
10:16, 49:4,
49:15, 49:16,
49:18, 73:7,
73:9, 74:18,
89:6, 93:4,
95:18, 98:4,
123:17

**accompanying**
90:11

**account**
31:4, 60:13,
60:14, 123:19,
124:4, 124:10,
124:11, 139:21

**accurate**
92:13, 108:21

**accusations**
29:14, 29:18

**accused**
15:8, 46:7

**accusing**
70:8

**accustomed**
156:13

**acknowledge**
112:2, 166:3

**acknowledging**
90:7

**acknowledgment**
166:1

**acm**
27:10, 27:12

**act**
124:21, 154:20

**acted**
31:13

**action**
15:7, 16:1,
27:18, 46:9,
46:10, 90:22,
105:7, 110:17,
113:21, 120:17,
128:17, 129:8,
140:8, 141:15,
141:16, 160:17,
162:24, 163:23

**actions**
49:24, 112:12,
131:19

**activities**
11:7, 19:17,
19:18, 66:12,
106:21, 106:23

**actually**
74:6

**add**
32:3, 40:21,
41:18, 46:24,
64:17, 64:18,
64:22, 65:12,
101:3

**added**
20:23, 64:16,
101:5, 150:16,
153:8

**addition**
11:7

**additional**
43:14, 59:9,
60:2, 61:10,
104:2, 104:13,
124:3, 124:12,
150:13, 152:18,
154:3, 164:21

**additionally**
111:24

**address**
114:20, 115:6,
123:15, 140:5

**adjourned**
55:9

**admin**
148:10

**adopted**
65:14, 65:15

**advance**
76:10

**adverse**
164:3

**adversely**
20:16

**advice**
64:4, 64:9

**affected**
20:16

**affiliate**
71:16, 81:10,
88:21, 97:1

**affiliated**
71:16, 71:20,
73:20, 73:22,
109:12, 161:2

**affiliates**
71:4, 71:5,
71:10, 71:21,
72:20, 82:6,
92:9, 92:16,
98:10, 156:14

**affixed**
167:16

**afraid**
51:23, 52:10

**after**
45:3, 55:15,
89:2, 100:22,
112:13, 115:23,
116:16, 117:20,
118:21, 120:11,
120:21, 122:5,
122:22, 123:4,
139:5, 140:9,
145:10, 151:12,

151:20, 154:1,
159:24, 160:17,
164:8
**again**
21:21, 23:11,
38:8, 65:8,
74:12, 83:3,
113:24, 114:3,
133:19, 142:22,
143:14, 143:22,
146:11, 148:1,
148:6, 149:9,
149:12
**against**
26:19, 26:23,
27:20, 29:15,
29:19, 108:13,
109:4, 120:18,
135:4, 162:24
**age**
22:6
**ago**
15:4, 21:22,
66:23, 68:7,
73:6
**agree**
72:14, 138:7,
138:10
**ahead**
99:18, 101:16,
125:8
**air**
44:12, 74:11,
82:10, 104:23,
112:14, 141:24
**aired**
39:3, 42:15,
57:2, 101:20
**airing**
44:11, 145:22,
145:23
**airs**
11:2, 39:2,
42:17, 74:13
**alarm**
103:9
**alarmed**
102:15, 103:13

**alarming**
111:23
**alberta**
13:5, 13:12,
13:15, 13:18
**album**
164:20
**all**
7:20, 30:19,
42:8, 61:21,
67:15, 68:21,
74:9, 76:5,
76:6, 76:20,
77:18, 78:2,
79:23, 80:1,
87:19, 92:22,
104:17, 104:19,
112:2, 119:5,
133:15, 136:6,
148:2, 148:3,
148:4, 148:24,
149:5, 149:8,
149:11, 149:14,
150:13, 154:15,
154:20, 154:21,
155:5, 158:24,
160:14
**allow**
27:22, 73:11,
77:15, 78:2,
99:9, 142:11,
143:5, 143:10
**allowed**
27:20, 77:18,
143:21, 144:2
**allows**
41:17, 41:20,
77:5, 98:24
**alluded**
139:13
**almost**
19:22, 98:8,
113:6
**alone**
107:13
**already**
23:8, 32:2,
54:15, 129:24

**alrighty**
165:8
**also**
3:20, 10:7,
10:9, 11:3,
11:4, 25:22,
31:5, 32:3,
34:20, 40:4,
42:22, 50:14,
57:23, 58:14,
60:9, 61:2,
73:22, 74:16,
84:21, 94:10,
94:17, 99:9,
103:23, 104:2,
108:9, 111:9,
113:3, 118:18,
119:19, 130:16,
134:14, 136:18,
145:24, 154:6,
157:5, 159:21,
165:5
**alter**
68:20, 68:24,
69:7, 69:10,
69:16, 139:23
**altered**
56:1
**altering**
69:12
**alternative**
21:19, 22:2,
22:5
**although**
29:7
**alumni**
13:14
**always**
53:14, 89:9
**amateur**
71:15, 71:18
**amend**
43:6, 118:1
**america**
67:15
**among**
69:5, 98:15,
112:24

**amount**
71:8, 80:11,
133:7, 133:9
**angle**
67:14
**anonymous**
102:18, 103:14,
105:2, 105:18,
109:9, 109:11
**another**
14:2, 19:21,
27:22, 35:5,
36:1, 38:23,
40:3, 58:13,
113:7, 140:15,
140:23, 141:6,
146:7, 151:7,
154:7
**another's**
65:23
**answer**
7:19, 8:5,
40:19, 64:8,
65:6, 69:15,
82:19, 106:2,
106:12, 137:18
**answering**
11:16, 137:24
**answers**
5:6, 93:4,
138:22
**anti-lgbtq**
103:11, 104:3,
108:5, 108:7
**anyone**
8:14, 8:21,
9:6, 20:19,
27:2, 32:7,
50:6, 50:17,
56:10, 62:14,
63:3, 67:6,
74:23, 84:15,
84:18, 91:15,
105:13, 111:20,
112:7, 116:20,
117:20, 118:13,
120:22, 122:6,
122:16, 123:5,

157:13, 157:16,
157:23
**anyone's**
121:15
**anything**
8:8, 11:21,
18:13, 18:20,
19:8, 33:10,
77:6, 110:19,
111:14, 117:4,
139:10, 141:9,
156:3, 164:5
**anytime**
87:10
**anywhere**
10:18
**ap**
22:18, 23:2,
23:24
**apologize**
68:23, 75:21
**appeal**
61:22, 96:13,
96:15, 97:22,
129:12
**appeals**
38:21, 43:12,
62:3
**appear**
46:18, 53:19,
57:5, 86:19,
86:20, 97:15,
133:15, 150:20,
156:4, 166:6
**appearance**
52:19, 54:9,
66:23
**appeared**
33:19, 43:9,
66:20, 69:17,
89:22, 144:20,
144:21, 145:16,
153:16
**appearing**
142:4, 144:18
**appears**
32:8, 84:8,
84:19, 161:8

**applies**
55:10
**apply**
63:14, 85:3,
85:10
**appreciate**
61:14
**approach**
24:7, 24:9,
24:17, 112:8,
113:8
**approached**
12:17, 15:22,
16:3, 16:4,
72:4, 75:13,
80:10
**appropriate**
123:19
**approval**
52:4
**approved**
52:9
**approximately**
85:15, 133:2
**april**
100:6, 101:8,
101:19, 111:22
**archiving**
85:5
**aren't**
138:21
**arm**
49:14
**armchair**
25:22
**around**
28:19, 32:16,
85:19, 100:9,
103:5, 103:8,
120:10, 123:13,
129:19, 140:16,
140:24, 141:4,
141:7, 146:8,
147:2
**article**
4:12, 4:13,
4:15, 4:18,
34:8, 34:23,

35:6, 35:9,
35:12, 35:16,
35:20, 36:4,
36:6, 36:10,
36:15, 37:8,
37:10, 144:15
**arts**
13:11, 13:21
**aside**
25:15, 27:24,
54:14, 69:20,
70:7, 105:17
**asked**
15:11, 79:17,
80:17, 81:15,
121:9
**asking**
7:18, 17:20,
57:9, 64:3,
81:22, 106:9
**assembled**
65:15
**assembles**
57:21
**assignment**
71:9, 92:15
**assist**
11:9
**assistance**
12:21
**assistants**
31:21
**associate**
3:23, 108:7
**associated**
90:12, 104:6,
123:14, 124:10,
139:17
**assume**
150:15
**assumed**
123:18
**atlamazoglou**
3:22
**attached**
4:7, 9:24,
34:3, 35:4,
35:24, 36:23,

51:20, 75:19,
84:5, 91:4,
93:1, 99:22,
126:10, 130:4,
130:15, 136:16,
147:9, 161:6,
166:7
**attachment**
84:9, 84:24,
85:19, 130:13,
130:18
**attempt**
21:1, 124:9,
124:14, 131:4,
132:17, 139:6,
140:21, 146:7,
150:7, 150:8,
150:19, 151:1
**attempted**
123:22, 124:6,
140:1, 152:2
**attempts**
139:12, 139:14
**attendance**
55:13
**attention**
29:10
**attorney**
64:5, 79:2,
127:1, 129:4,
146:21
**attributed**
90:9
**audience**
51:11, 96:13,
96:15, 97:1,
97:2, 97:3,
97:23, 98:13,
99:7, 122:2,
134:12, 134:15,
134:21, 156:23
**audiences**
99:13, 99:15
**audio**
27:12
**author**
13:4, 109:9,
109:11

**authority**
139:15
**available**
42:12, 43:4,
43:15, 46:14,
59:24
**avenue**
72:6
**aware**
30:13, 30:15,
39:1, 43:5,
49:16, 56:22,
57:8, 57:17,
62:15, 79:20,
81:18, 92:21,
94:17, 103:3,
106:14, 106:18,
107:16, 112:20,
112:21, 113:16,
113:23, 115:18,
132:5, 150:16,
163:12, 164:20
**away**
32:19, 32:23,
156:19, 157:3

**B**
**b)(6**
1:12, 8:10,
8:13, 9:21,
29:11
**b-roll**
69:11, 69:12,
133:22
**b-u-d-a-y**
40:10
**bachelor**
13:21
**back**
21:24, 29:10,
45:16, 73:13,
84:2, 94:7,
105:21, 111:22,
114:12, 114:15,
126:7, 134:22,
137:10, 139:2,
146:22, 151:18,
155:4, 161:24

**bad**
159:9
**bans**
109:18, 109:23,
110:1
**barrett**
9:4, 34:18,
34:20, 84:20,
100:3, 101:14,
101:23, 102:2,
102:6, 116:23
**based**
59:20, 118:24,
122:2, 132:7
**basement**
64:21
**basically**
32:1
**basis**
37:14, 137:24
**became**
15:6, 109:19,
113:23, 120:11
**because**
12:18, 17:16,
20:5, 22:5,
23:18, 26:10,
27:15, 27:19,
28:10, 50:16,
53:11, 55:13,
59:9, 60:8,
62:19, 65:1,
66:5, 66:24,
71:1, 73:16,
78:7, 79:1,
98:18, 98:23,
102:8, 103:13,
110:14, 118:14,
119:8, 121:19,
122:12, 122:14,
124:2, 127:21,
128:7, 128:10,
129:7, 135:4,
143:14, 145:21,
156:5, 164:14
**become**
10:22, 14:4,
30:13, 94:20,

**103:3, 106:14,**
106:18, 107:16,
142:1, 148:10,
163:12
**becomes**
70:22
**been**
7:3, 7:14,
18:17, 26:22,
27:2, 28:4,
30:16, 36:24,
45:9, 48:7,
51:21, 52:5,
75:20, 84:7,
91:5, 92:6,
92:20, 93:2,
99:23, 105:9,
110:17, 111:21,
118:7, 118:9,
126:12, 130:5,
130:16, 147:10,
150:15, 150:16,
153:4, 153:24,
154:6, 157:21,
160:4, 160:18,
161:7
**before**
2:12, 7:14,
7:18, 7:19, 8:5,
12:15, 12:24,
13:3, 13:6,
30:12, 30:15,
43:9, 45:20,
47:21, 53:19,
65:12, 65:17,
65:18, 65:20,
69:20, 70:1,
80:9, 88:7,
88:19, 91:11,
92:14, 103:2,
107:21, 112:18,
112:22, 113:5,
113:6, 113:20,
118:14, 131:4,
132:16, 140:10,
146:16, 151:1,
151:22, 152:21,
162:4, 163:11,

**164:18, 167:4**
**beginning**
52:16, 55:8,
63:24, 64:23
**begins**
6:2, 59:5, 85:2
**behalf**
3:2, 3:10,
10:5, 29:7,
29:17, 105:7
**being**
67:12, 103:14,
108:8, 113:2,
146:13, 154:22,
163:1
**belief**
137:20, 138:8,
138:12
**beliefs**
96:5, 97:4,
97:8, 97:16
**believe**
14:7, 27:9,
28:22, 37:16,
38:4, 39:8,
42:2, 46:23,
47:22, 49:21,
52:5, 58:23,
64:24, 66:19,
66:21, 69:24,
77:18, 79:14,
82:12, 82:23,
84:13, 85:21,
85:23, 86:22,
87:17, 88:16,
89:23, 90:4,
91:14, 95:22,
100:11, 105:23,
108:23, 109:11,
110:22, 111:1,
112:15, 116:24,
123:13, 124:8,
125:1, 127:21,
129:16, 131:9,
131:16, 131:24,
136:21, 137:14,
139:12, 153:8,
155:14, 156:17,

160:8, 162:9
**believed**
15:23, 22:22,
69:22, 122:1,
128:10
**below**
76:13, 85:4
**benavides**
76:4, 95:1
**benefit**
122:4
**benefiting**
67:16
**bentley**
37:17
**besides**
8:21, 10:18,
50:6, 50:18,
66:7, 70:5,
81:14, 104:21,
121:11
**best**
76:11, 142:9,
142:12, 143:6,
143:19
**betelhem**
3:3, 6:19
**better**
22:4, 49:24,
50:1
**between**
48:21, 48:24,
63:15, 63:17,
87:11, 88:4,
112:22, 113:20,
115:17, 117:21,
118:22, 120:21,
122:17, 123:4,
123:6, 125:12,
133:5, 139:11,
148:15, 151:3
**beyond**
71:1
**bias**
96:9
**bill**
12:14, 26:2,
26:10, 39:23,

40:5, 43:22,
48:9, 64:19,
113:1, 116:4,
116:13, 116:18,
122:22, 139:22,
140:3
**bill's**
118:11, 148:10
**bit**
38:15
**bite**
58:22, 58:24,
59:13
**blanks**
61:18
**board**
33:23, 34:17,
34:21, 34:24,
38:20, 38:22,
43:11, 52:8,
53:20, 61:22,
62:3, 102:8
**boards**
14:10, 43:10
**bob**
34:19, 163:17,
164:6, 164:9,
164:14, 164:17,
164:20, 164:21
**bod**
52:4
**bodies**
39:15
**body**
39:6, 87:7
**book**
13:4, 19:4,
109:18, 109:23,
110:1
**boring**
59:13
**boston**
1:16, 2:6,
3:17, 6:12,
22:19, 23:3,
24:1, 25:21,
91:22
**both**
15:21, 61:7,

116:10, 134:6
**bound**
152:1
**brandeis**
37:16, 38:10
**break**
8:3, 8:5,
30:17, 45:9,
80:1, 83:2,
114:6
**breaks**
8:2, 41:5
**brief**
141:22
**bring**
40:23, 61:18,
76:17, 129:2
**broadcast**
42:20, 43:2,
50:21, 53:24,
69:14, 142:19
**broadcasts**
42:23, 118:17
**brought**
9:18, 69:14
**brown**
2:4, 3:22, 6:11
**bubble**
75:24
**buday**
39:23, 58:2
**budget**
82:10
**building**
12:9, 79:9,
122:1
**business**
157:7, 157:8

| C |

**c**
54:8
**cable**
31:7, 42:21,
43:2, 48:21,
49:4, 49:15,
49:18, 66:21,
73:7, 74:18,

95:18, 98:2,
98:4, 98:16
**calculate**
162:14
**california**
3:7
**call**
71:10, 88:20,
147:6
**called**
11:12, 11:18,
11:19, 25:20,
25:22, 27:9,
28:14, 46:20,
49:7, 55:8,
58:14, 72:3,
80:9, 145:21,
147:2
**camcorder**
40:24, 41:8
**came**
109:24, 142:13
**camera**
12:22, 26:7,
41:2, 41:22,
53:3, 53:5,
53:7, 53:8,
53:11, 54:16
**cameras**
12:9, 26:12,
40:15, 40:16,
41:12, 41:17,
42:1, 42:2,
42:3, 42:6, 42:9
**campaign**
103:1, 108:6
**can't**
18:21, 21:3,
21:7, 21:11,
21:17, 21:21,
22:15, 23:1,
23:10, 23:11,
24:19, 24:22,
24:23, 28:20,
33:21, 39:21,
45:2, 47:7,
47:13, 47:20,
52:7, 66:9,

66:10, 67:7,
72:19, 75:10,
79:11, 79:19,
79:22, 80:19,
81:17, 81:20,
86:19, 87:3,
91:16, 91:17,
95:3, 104:12,
105:15, 107:22,
112:20, 112:21,
116:22, 121:8,
128:21, 134:20,
135:14, 135:15,
138:16, 140:7,
144:4, 145:15,
145:16, 148:13,
148:23, 149:2,
150:4, 155:13,
155:18, 155:19,
164:5
**canada**
13:5
**candidacy**
78:10, 78:13
**candidate**
76:5, 76:11,
77:1, 77:7,
78:14, 78:15,
80:20, 80:23,
104:5, 141:12,
141:19, 141:21,
142:13, 142:17,
143:7, 143:10,
143:23, 144:6,
144:12, 160:13
**candidates**
75:3, 76:7,
76:17, 76:21,
77:8, 77:11,
77:19, 77:22,
77:24, 78:2,
78:6, 78:12,
104:16, 108:7,
142:2, 143:3,
143:6, 143:12,
143:13, 143:14,
143:21, 144:2,
144:3, 146:4,

157:19
**cannot**
17:13, 29:7,
53:9, 120:5
**capacity**
1:15
**caption**
34:16, 89:5,
90:10, 128:10
**captions**
46:22, 46:24,
127:23
**care**
118:19
**carried**
111:16
**case**
1:6, 6:7, 94:7,
106:4, 157:2,
167:12
**cases**
20:1
**caused**
111:15, 111:22
**causes**
163:13
**caveat**
64:3
**cc'd**
100:7
**center**
2:5, 6:12,
41:15, 64:21
**centers**
73:9
**ceo**
34:19
**certain**
41:17, 52:7,
73:8, 96:6,
143:10, 157:11,
158:10
**certainty**
86:20, 107:22,
120:6
**certificate**
167:1
**certify**
167:6

**chain**
101:3, 147:11,
147:14
**chairman**
34:20, 34:24
**chamber**
41:23, 42:5,
42:18, 55:2
**changed**
68:11
**channels**
11:4, 30:23,
32:16, 32:17,
49:7, 74:11,
142:21
**characterize**
117:1
**characterized**
72:9, 116:9,
117:13
**charge**
48:7, 74:17,
81:12
**charities**
14:14, 14:19
**chat**
75:24
**chef**
66:20, 67:24,
68:3, 68:16,
68:20, 68:24
**chief**
79:2
**choices**
21:15
**choose**
124:22, 140:23,
151:19, 154:17,
158:20, 159:1
**choosing**
152:21
**chosen**
159:8
**chris**
6:3, 32:23,
95:2, 165:9
**christian**
39:23, 40:5,

58:2
**christian's**
40:9
**christopher**
1:13, 1:14,
2:1, 4:2, 7:2,
7:13, 166:2
**circumstance**
70:18
**circumstances**
17:22, 53:13,
55:23, 70:17,
104:21
**citizen**
95:5
**city**
10:11, 11:2,
11:22, 11:24,
13:2, 13:12,
15:4, 15:5,
15:14, 15:15,
15:16, 15:17,
15:19, 15:22,
15:24, 37:14,
38:19, 38:20,
39:12, 39:15,
41:23, 42:14,
44:2, 44:5,
46:7, 48:12,
48:16, 48:22,
49:1, 50:2,
50:3, 50:7,
50:18, 62:9,
74:6, 75:6,
76:12, 77:8,
79:8, 81:3,
95:7, 95:12,
96:21, 97:11,
119:17, 119:21,
124:19, 141:20,
144:21
**city-based**
72:2, 92:4
**civil**
93:13, 129:2
**claim**
27:3, 27:15
**claimed**
137:21, 137:22

claims
26:19, 26:22,
128:2, 128:16,
129:12, 135:4,
148:11, 151:21
class
85:24, 152:18
classes
152:18
classroom
85:9
clear
24:15, 51:10,
81:21, 113:14,
120:11
clerk
15:16, 15:22
clicked
99:5
clients
9:17
clip
58:11, 58:19,
59:5, 59:8,
67:18, 69:12,
76:7, 76:16,
77:16, 133:3,
134:4, 135:23,
138:13, 138:14,
153:11, 153:17,
159:15, 159:16
clips
56:16, 56:20,
56:24, 57:3,
57:16, 58:3,
58:5, 58:6,
58:18, 59:16,
59:20, 59:22,
60:16, 60:23,
62:6, 68:20,
68:23, 69:1,
69:3, 69:4,
69:5, 69:7,
69:11, 69:16,
69:17, 76:8,
78:21, 79:18,
106:15, 107:4,
107:7, 107:12,

108:23, 119:3,
119:15, 119:18,
125:16, 129:18,
131:7, 135:13,
136:10, 136:22,
149:13, 150:17,
157:3, 157:24,
158:2, 158:3,
159:5, 159:8,
159:9
close-up
51:9, 53:6
closer
150:5
club
14:22
clue
160:15
collect
141:23
colleges
85:5
columbia
163:17
com
115:5, 139:18,
140:4
come
26:6, 26:10,
62:20, 77:5,
98:6, 117:7,
139:2, 163:12
comfortable
143:24
commentary
50:22, 50:23,
51:1, 133:22,
135:3
comments
108:14, 108:15,
108:16
commission
38:21, 38:23,
39:7, 39:8,
44:14, 167:18
commissions
14:11
commitment
48:11, 48:15,

48:18, 60:12
committee
38:19, 39:11,
39:19, 39:21,
42:14, 44:5,
50:14, 124:19,
154:19
committees
38:20, 39:14
commonwealth
2:14, 167:4,
167:24
communicated
125:10, 125:11
communications
115:9, 115:11,
123:23
communities
37:21, 124:21,
154:20
community
1:7, 1:13,
3:10, 4:10, 5:5,
6:5, 6:22, 9:14,
10:16, 20:15,
26:4, 32:15,
49:9, 73:7,
74:14, 79:5,
79:6, 80:11,
89:5, 93:4,
103:20, 105:4,
109:24, 143:8
companies
91:23, 92:3
company
27:9, 46:17,
46:20, 72:3,
92:3, 92:12,
139:16, 163:18
compete
157:9
competitive
157:7, 157:8
competitor
156:8
complaint
129:2
complaints
114:18

complete
38:18, 60:18,
166:5
completeness
82:20
complicated
133:11
component
49:5, 49:6,
74:18, 104:2,
135:16
concept
133:8, 133:19
concern
110:13, 118:23,
120:23, 121:6,
146:12
concerned
79:5, 110:4,
110:11, 119:2,
122:7, 164:2
concernedcitizen-
@outlook
115:5
concerning
139:7
concert
11:10, 32:21,
32:22, 33:1
concise
61:9
conclude
152:24, 153:6,
156:1, 156:10
concluded
163:17
concludes
165:9
conclusion
155:17
condition
9:9
condoned
103:21
conducted
55:14
confirm
10:4

confirmed
108:14
confronted
119:8
connection
63:7, 75:12
consensus
141:3
consequences
164:3
conservation
39:8
consider
21:18, 23:17,
31:9, 35:14,
35:16, 36:18,
66:14, 66:16,
67:8, 89:21,
90:13, 131:6,
131:8, 132:9,
132:12, 132:20,
132:23, 133:6,
134:3, 134:6,
134:18, 152:20,
155:11, 155:21,
156:7, 157:10,
157:13, 157:15,
157:18, 158:3,
159:7
consideration
21:5, 21:8,
21:12, 22:1,
22:13, 67:11,
67:19, 119:14,
133:16, 134:8,
159:14
considered
23:9, 23:12,
78:24, 90:1,
90:17, 122:3,
132:16, 134:20,
136:20, 151:1,
155:18, 158:17,
159:12, 162:17
considering
22:16
consistent
52:18, 54:9

constituents
75:8, 75:13
constituted
133:6
constitutes
133:9
consulted
17:4
consults
62:24
consume
97:5, 98:10
consumers
96:24
contact
21:2, 66:15,
68:4, 72:11,
160:23
contacted
67:24
contain
33:7, 33:10,
130:12
contemplate
112:18
contemplating
129:24
content
11:4, 11:5,
19:21, 20:3,
26:19, 26:22,
27:2, 27:12,
27:14, 30:24,
33:19, 49:11,
52:19, 54:9,
73:11, 74:17,
76:20, 76:21,
82:15, 87:18,
87:20, 88:22,
89:1, 92:10,
97:6, 100:12,
103:15, 105:2,
105:5, 106:10,
107:24, 109:5,
110:5, 110:14,
110:22, 112:5,
113:8, 113:13,
117:13, 117:16,

117:18, 118:14,
119:12, 119:16,
120:19, 121:13,
121:15, 121:23,
121:24, 122:2,
125:21, 125:22,
125:23, 127:21,
128:13, 134:2,
136:19, 146:12,
150:22, 154:23,
155:7, 156:6,
156:16, 156:21,
157:7, 158:15,
158:17, 159:16,
160:15
contentious
111:10, 111:21,
122:10, 122:12
contestant's
66:23
contestants
69:3
context
14:3, 61:10,
90:24
continue
127:24
continued
5:1
contract
48:19, 48:20,
48:24
contracted
22:21, 23:5,
24:3
contracts
48:21
contribute
91:15
contributed
84:15, 100:19
control
63:12, 71:12,
140:4
controlling
42:8
convenes
44:15

convention
24:9
conversation
146:10
conversations
112:23, 122:16,
123:3
coordinator
12:7, 12:13,
18:18, 64:19,
116:14
copied
125:21, 155:6
copies
159:15
copy
31:23, 32:8,
34:7, 35:11,
36:9, 37:7,
86:11, 86:16,
100:14, 126:22,
130:8, 135:5,
135:8, 147:13,
161:13
copyright
5:13, 16:13,
16:22, 17:17,
18:12, 18:23,
19:12, 21:2,
26:14, 27:20,
28:2, 28:7,
28:10, 28:12,
28:15, 28:24,
29:15, 29:18,
29:22, 30:3,
62:12, 62:16,
62:21, 63:1,
63:10, 63:13,
63:23, 64:6,
64:13, 64:15,
64:16, 64:22,
65:1, 67:23,
68:3, 69:22,
70:8, 70:12,
71:12, 81:13,
106:6, 106:9,
112:3, 113:13,
114:3, 118:15,

119:4, 119:12,
121:23, 125:1,
125:10, 125:24,
127:10, 128:2,
128:13, 128:16,
128:17, 129:1,
129:11, 129:18,
135:4, 137:7,
141:2, 141:4,
141:17, 146:12,
148:5, 150:23,
155:9, 162:21,
162:22, 162:23,
163:3, 163:5,
163:9, 163:12,
163:15, 164:14
**copyright-protec-ted**
68:10, 133:13,
133:24, 154:23,
156:16
**copyrighted**
65:21, 70:19,
71:15, 72:18,
75:3, 78:19,
80:5, 80:18,
81:16, 81:24,
82:17, 104:9,
132:13, 135:11
**copywritten**
87:18, 112:5,
119:10, 120:19,
125:21, 125:22,
133:14, 134:2,
134:9, 135:6,
136:19, 137:7,
150:22, 155:7,
156:21, 158:15,
158:17, 159:16
**core**
96:6
**corner**
89:20, 89:22
**corporation**
1:8, 1:13,
3:11, 4:11, 6:5,
6:22, 9:14,
10:17, 89:6

**corporation's**
5:6, 93:4
**correct**
24:19, 26:23,
34:7, 35:11,
36:9, 37:7,
57:6, 57:12,
58:8, 60:24,
81:1, 86:16,
100:14, 126:22,
130:8, 131:2,
136:13, 138:4,
138:16, 147:13,
149:17, 156:24,
161:13, 166:5,
167:7
**corrections**
165:3, 166:6
**correctly**
152:4
**correspondent**
125:17
**correspondents**
125:18, 157:23,
158:1
**could**
7:11, 10:1,
14:17, 15:24,
16:1, 20:2,
20:3, 21:20,
22:2, 23:15,
23:22, 29:10,
32:11, 34:10,
34:16, 35:19,
36:6, 40:3,
45:6, 48:14,
52:16, 53:6,
54:6, 54:19,
54:20, 55:5,
55:21, 56:6,
57:1, 58:14,
60:8, 60:10,
60:20, 64:11,
70:15, 73:17,
75:14, 76:13,
78:9, 78:24,
84:23, 86:6,
86:9, 88:20,

89:2, 90:5,
90:9, 90:19,
91:20, 93:9,
93:10, 101:17,
102:8, 103:20,
103:23, 104:5,
105:6, 105:21,
106:1, 106:2,
108:6, 109:6,
110:16, 111:2,
111:17, 111:18,
111:19, 112:8,
114:22, 116:5,
118:9, 120:16,
120:18, 121:3,
124:4, 126:2,
127:16, 127:24,
129:7, 129:12,
134:22, 137:16,
137:17, 146:15,
160:16
**couldn't**
120:2, 129:8,
162:14, 162:18
**council**
15:5, 15:15,
38:19, 38:20,
39:12, 41:23,
42:5, 42:15,
42:17, 44:3,
44:6, 76:12,
119:18, 119:22,
124:19, 144:21
**councill**
96:21
**councillor**
15:5, 15:14,
15:20, 15:24,
46:7, 75:6,
77:1, 79:8, 81:4
**counsel**
6:14, 7:6,
64:10, 167:11
**count**
53:21, 111:19,
148:22
**counternotice**
161:3, 163:20

**couple**
45:19
**course**
16:19, 17:7,
28:3, 87:13,
120:15
**court**
1:1, 6:6, 6:23,
7:16, 129:3
**courts**
129:21
**cover**
37:14, 40:3,
61:12, 84:8,
85:17
**coverage**
20:21, 38:13,
54:23, 54:24,
55:7
**covered**
20:7, 38:8,
55:12, 104:4,
145:7
**covering**
56:9
**covers**
11:21
**covid**
47:21
**crash**
17:24, 22:11
**create**
12:10, 41:6,
41:9, 41:20,
43:13, 69:6,
95:6, 102:12,
103:20, 103:23,
137:6, 139:20,
139:21
**created**
19:21, 20:2,
20:3, 24:16,
26:3, 66:22,
67:3, 68:11,
71:11, 73:2,
74:13, 99:6,
108:4, 113:11,
115:6, 119:6,

124:12
**creates**
41:11, 43:21,
58:5, 63:5,
63:18
**creating**
11:17, 74:17,
139:15, 151:24
**creative**
21:13, 21:14,
21:15
**credit**
20:23, 75:14,
76:9, 89:11,
89:13, 89:19,
89:20, 89:22,
89:24, 90:5,
90:9, 90:13,
90:17
**credited**
71:13, 81:12
**crediting**
89:9
**credits**
90:6
**criterion**
131:10, 154:22
**critical**
103:12
**critically**
17:24, 22:7
**criticism**
158:7, 159:5
**criticize**
109:5, 110:5,
110:9
**criticized**
110:1
**criticizing**
157:19, 157:23,
158:2
**crop**
18:9
**crr**
1:24
**csr**
1:24
**cuff**
145:9

**current**
144:9
**currently**
33:4, 47:5,
66:9, 66:10,
95:3
**cutting**
32:1
**cycling**
96:6

**D**

**d**
93:13
**damage**
111:2
**data**
30:14, 94:18,
106:4, 107:1,
119:20, 119:22,
125:13, 127:19,
128:5, 128:13,
147:17, 148:19,
150:10, 150:17,
152:14, 160:3
**date**
6:8, 41:18,
41:19, 52:22,
53:9, 53:15,
85:17, 141:5,
141:7, 166:10
**dated**
5:3
**day**
167:16
**day-to-day**
62:20
**days**
45:3, 165:4
**deadlines**
92:16
**deaf**
85:6
**dealing**
9:8
**debrief**
107:4, 119:15
**debriefs**
125:18, 160:11

**decide**
39:14, 58:19,
59:5, 65:21
**decided**
106:8, 141:3
**decision**
64:17, 78:10,
129:17, 157:11,
158:9
**decisions**
50:1, 51:12
**dee**
114:17
**defamation**
14:24, 15:9,
15:12, 16:7,
16:11, 46:8,
110:17
**defamatory**
15:7, 15:24,
103:17, 110:14
**defame**
120:23
**defaming**
157:13
**defendant**
1:9, 3:10, 5:5,
93:3
**defendants**
9:1
**define**
136:14
**defined**
138:20, 138:23
**definitely**
136:20
**definition**
125:6
**definitions**
138:21
**degree**
13:17, 13:20,
13:21, 13:22
**deleted**
28:5, 104:12,
108:16
**dennis**
7:13

**departed**
146:21
**depending**
70:16
**depends**
44:1, 63:8
**depicted**
22:8, 159:5
**deponent**
166:1
**depos**
6:10, 7:1
**deposed**
7:14
**deposition**
1:12, 2:1, 4:8,
4:9, 6:3, 6:11,
8:9, 29:12,
165:9, 167:5
**deprive**
22:13, 22:23,
23:13
**deprived**
21:6, 23:18,
24:21, 24:23,
24:24
**describe**
16:10, 31:14,
33:11, 37:10,
96:2, 96:12,
98:1, 102:17,
124:17, 145:2
**described**
66:1, 72:24,
78:22, 87:6,
105:5, 106:12,
117:9, 121:7,
136:18
**designate**
139:22
**designated**
29:13
**detailed**
48:23
**determination**
66:4
**determinations**
129:22

**determine**
18:11, 18:16,
18:17, 98:21,
120:17, 124:3,
153:10, 155:1,
162:10
**determined**
152:15, 155:5
**determines**
58:18
**determining**
134:19
**develop**
19:5
**developed**
19:2, 19:15
**difference**
11:24, 63:15,
63:17, 98:1,
117:12
**different**
8:12, 21:9,
24:13, 31:6,
40:17, 57:13,
57:21, 60:17,
61:6, 62:19,
63:11, 63:13,
65:17, 65:19,
70:16, 73:8,
82:8, 82:13,
87:1, 89:12,
96:13, 96:15,
97:4, 97:8,
97:14, 97:16,
97:22, 98:13,
99:14, 113:11,
121:22, 124:10,
124:11, 134:12,
134:15, 156:23
**differently**
89:11
**difficult**
98:18, 99:7,
133:8, 133:19
**direct**
26:8, 26:12,
60:4
**directed**
109:8

**directing**
42:5
**direction**
167:10
**directly**
135:1
**director**
10:21, 10:22,
10:24, 11:11,
12:16, 14:13,
14:18, 16:17,
25:19, 32:12,
47:10, 52:6,
85:14, 86:4,
87:21, 87:24,
88:13, 91:10,
100:4, 112:17
**directors**
52:8
**disagreement**
117:14, 117:15,
120:12
**disassociate**
104:8, 106:7
**disclaimer**
63:23, 64:2,
65:16, 124:9
**disclaimers**
64:2, 64:6,
64:13, 64:15,
64:16, 64:22,
65:2, 65:4,
65:10, 113:14,
118:15, 119:5
**discourse**
111:11
**discover**
20:2
**discovered**
18:6, 120:19
**discuss**
115:23
**discussed**
82:4, 113:24,
116:2, 116:3,
117:11
**discussing**
29:3, 88:1

**discussion**
116:6, 122:12,
124:20, 133:20,
141:6, 141:10,
141:15
**discussions**
116:7, 116:8,
117:19, 118:21,
122:21
**disseminated**
31:7
**distinction**
24:4, 117:20,
118:4, 122:17,
123:6, 125:12,
125:14, 125:15,
132:20
**district**
1:1, 1:2, 6:6,
79:1
**doctrine**
18:23, 19:3,
19:12, 20:7,
66:4, 119:17
**document**
5:13, 5:16,
8:13, 10:3,
34:11, 51:22,
51:24, 52:9,
52:13, 84:10,
86:22, 87:2,
87:10, 89:10,
93:7, 99:24,
126:14, 130:20,
161:16
**documentary**
72:3, 72:17,
72:21, 80:15,
82:9, 91:23,
92:3, 92:5, 94:6
**documents**
5:21, 93:15,
127:13
**doelger**
3:13, 127:1,
127:3, 127:4,
159:10, 159:13,
163:21, 163:24,

**164:11, 164:16,**
165:1, 165:6
**doing**
14:5, 110:20,
111:14, 118:24,
122:8
**done**
8:8, 58:20,
98:20, 151:22
**donovan**
34:18
**dot**
139:18
**down**
28:9, 30:15,
41:5, 69:14,
148:2, 149:5,
149:14, 153:24,
154:6, 159:19,
160:4, 163:1
**downwards**
150:12
**draft**
86:19, 87:6,
87:8
**draw**
122:16, 123:5,
156:15, 156:18,
158:14, 158:16
**drawing**
121:21, 121:22,
121:24
**drawn**
157:3
**drive**
76:17
**duly**
7:3
**during**
15:5, 15:15,
42:4, 51:12,
54:16, 101:20,
141:24, 157:19
**duties**
10:24
**dvd**
43:13, 43:17
**dvds**
43:21

dylan
163:17, 164:6,
164:9, 164:14,
164:17, 164:20,
164:22

**E**

each
43:23, 94:12,
137:23, 138:5,
143:10, 143:23,
149:22, 155:21,
157:9
earlier
18:7, 29:11,
39:24, 46:8,
53:2, 66:1,
78:22, 85:22,
86:15, 92:1,
104:4, 106:12,
109:17, 112:2,
113:16, 119:19,
121:9, 121:12,
131:1, 134:11,
135:21, 136:8,
136:18, 139:13,
140:4, 141:2,
147:21, 149:10,
149:12, 149:15,
150:24, 156:22
early
100:6, 106:4,
139:9, 139:11
earthquake
20:14
eddy
3:6
edit
57:18, 57:19,
68:22, 69:4,
101:10
edited
69:2, 86:21,
91:16, 100:22,
101:1, 153:4,
153:14
editing
56:2, 57:22,

57:24, 135:2
editor
13:4, 19:4,
57:21, 57:23,
58:1, 135:8
editorial
33:11, 33:13,
33:15, 33:23
editors
59:12, 71:9,
92:15
edits
87:2
edmonton
13:5, 13:10,
13:12
education
15:3, 16:16,
19:14
educational
49:5, 49:11,
74:1, 74:2,
74:16, 85:7,
85:11
effect
125:23, 137:22,
138:8, 138:12,
155:8
efficiency
53:5, 59:9
effort
103:2
either
17:12, 20:2,
26:12, 31:7,
40:2, 40:5,
44:5, 50:13,
56:1, 60:10,
65:24, 113:9
elected
14:8, 97:12,
97:17, 109:6,
110:5, 115:12,
144:23, 158:2,
158:7
election
36:15, 111:10,
111:16, 111:21,

111:22, 122:10,
122:13, 142:1,
157:19, 157:21
elections
38:9, 78:16,
122:6, 141:22
electronic
3:5, 6:16
elementary
79:9
else
8:24, 9:6,
10:18, 18:20,
19:8, 19:23,
32:7, 50:17,
62:14, 63:3,
67:6, 74:23,
84:15, 84:18,
84:19, 91:15,
100:19, 112:7,
116:20, 117:4,
137:5
email
5:2, 5:10,
5:11, 5:12,
5:15, 84:8,
84:19, 84:20,
85:17, 87:7,
100:3, 100:7,
100:11, 100:15,
100:17, 101:3,
101:18, 101:22,
101:24, 114:20,
114:24, 115:3,
115:4, 115:6,
115:7, 120:4,
123:15, 123:17,
125:12, 126:16,
126:23, 127:6,
127:9, 127:15,
127:16, 128:9,
129:15, 129:16,
129:23, 130:6,
130:9, 130:13,
134:23, 135:11,
136:2, 136:16,
139:13, 139:16,
139:19, 139:21,

140:4, 147:11,
147:14, 148:6,
148:16, 149:10,
151:20
emails
139:16, 151:13
embarrassing
141:14, 141:18,
142:22, 146:1
embedded
107:7
emerged
102:15
emily
76:11, 76:15,
76:24, 77:11,
77:15, 82:20
employed
31:11, 46:5,
167:12
employee
42:5, 74:6,
74:8
employees
62:11
encountered
113:5
encourage
108:10, 108:11,
110:23
encouraged
76:16
encouraging
157:16
end
63:24, 64:23,
103:5, 153:8
ended
117:14, 124:2
ending
55:9
ends
59:6
enforcement
26:15, 28:2,
28:7, 28:12
engaged
11:6, 132:2

england
25:24
english
13:23
enjoyed
76:6
enough
83:5, 128:8
ensuring
143:19
entered
127:1, 127:3
enterprise
74:19
entertain
112:9
entertainment
13:11
entire
57:21, 59:24,
60:6, 60:7,
61:2, 61:11,
67:21, 70:23,
86:13, 99:4,
119:17, 119:21,
131:2, 134:1,
141:15, 160:11
entirely
90:21, 125:22
entirety
79:13, 96:23,
133:13, 137:8,
149:24
entitled
110:7, 110:9
entity
33:17, 71:2,
120:18, 123:19,
139:22
episode
15:12, 20:8,
54:10, 58:4,
58:12, 67:21,
99:1, 99:5,
101:8, 147:20
episodes
56:15, 57:18
equipment
40:13, 40:21,

41:5
errata
166:7
escaping
38:23
especially
11:24, 45:7,
73:18
esq
3:3, 3:4, 3:12,
3:13
essential
59:8
established
112:10
establishment
97:10
even
61:17, 123:18
event
40:2, 53:2
events
147:1
ever
7:14, 13:24,
14:6, 14:8,
17:18, 23:12,
33:7, 33:10,
56:16, 65:20,
67:24, 68:3,
69:21, 70:1,
70:4, 70:7,
71:7, 71:14,
75:2, 78:20,
80:4, 80:20,
81:9, 82:16,
87:8, 91:18,
113:4
every
11:2, 19:22,
39:11, 70:15,
78:15, 92:11,
94:13, 98:8,
113:6, 118:15,
141:21, 153:16
everyone
127:4
everything
61:15

eviction
4:18
evidence
162:6, 162:16
evident
136:4
exact
146:10
exactly
28:20, 142:6,
144:23, 145:3
examination
4:2, 7:6
examined
7:4, 166:3
example
16:20, 17:9,
26:20, 27:5,
32:20, 72:1,
75:5, 75:10,
80:7, 89:12
examples
72:16, 91:24
except
154:16
exception
53:1, 66:17,
68:12, 121:16
exceptions
54:15
excerpt
124:18
excerpted
146:3, 153:17
excerpting
133:21, 134:9
excerpts
154:22
exchange
100:15, 126:23
exclude
143:5
excluded
55:13
excluding
57:14
execute
128:2, 128:15

executive
32:11, 52:6,
55:12, 55:14,
85:13, 86:4,
87:24, 88:12,
91:9, 100:4,
112:17
exemption
125:2, 125:24,
148:5, 150:23
exhibit
4:9, 4:12,
4:13, 4:15,
4:18, 4:19,
4:23, 5:2, 5:3,
5:5, 5:10, 5:11,
5:12, 5:13,
5:15, 5:16,
9:23, 29:11,
34:2, 35:3,
35:23, 36:22,
37:1, 51:19,
51:22, 75:18,
75:21, 84:4,
84:8, 91:3,
91:6, 92:24,
93:3, 99:21,
99:24, 105:21,
105:23, 105:24,
126:9, 126:13,
130:3, 130:6,
130:12, 130:14,
130:17, 130:19,
134:22, 146:16,
147:8, 147:11,
161:5, 161:8
exhibits
4:8, 5:1
exist
48:21, 61:7,
149:9
existed
65:17, 65:18
existing
150:21
expectation
88:14, 88:18,
89:7

**expected**
164:5
**experience**
27:24, 78:8,
82:7, 97:9,
98:3, 99:19
**experiences**
16:9
**expires**
167:18
**explain**
19:1, 96:18,
108:1, 109:2,
117:24, 137:1
**explicitly**
129:21
**express**
118:23, 122:19,
123:8
**extend**
142:10
**extent**
64:9, 68:11
**externally**
57:10
**extra**
11:8
**eyeballs**
121:24

**F**
**face**
143:6
**face-to-face**
115:16
**facebook**
31:1, 31:23,
38:11
**fact**
101:22, 131:17,
132:8, 132:22
**factor**
128:12, 156:5,
158:9
**factors**
133:23
**factual**
132:14, 132:19,

132:23, 155:12
**faculty**
74:20
**fail**
152:1
**failed**
123:23, 125:22,
141:2, 150:19,
151:23
**failure**
128:10
**fair**
5:13, 18:23,
19:3, 19:7,
19:11, 19:16,
19:19, 20:7,
22:22, 28:15,
36:14, 65:22,
66:3, 66:4,
66:17, 67:9,
68:9, 68:12,
85:3, 117:16,
119:14, 119:17,
121:17, 125:2,
125:6, 125:10,
125:19, 125:24,
127:18, 128:4,
129:14, 129:22,
131:17, 131:18,
132:2, 132:10,
132:24, 133:16,
133:23, 148:5,
150:23, 154:24,
155:2, 155:5,
155:10
**fall**
72:2
**falls**
32:18
**false**
142:15, 143:3
**familiar**
51:23, 66:3,
94:15, 94:20,
142:2
**family**
73:17, 73:19,
74:24, 77:23,

103:12, 108:14,
140:12
**far**
92:21
**fashion**
30:21, 51:8
**fatal**
22:11
**favor**
96:4, 109:18,
109:22
**feasible**
52:20
**february**
109:20
**federal**
93:13, 129:3
**fee**
43:18, 43:19
**felt**
19:15, 20:21,
121:8, 143:24
**few**
68:6, 79:24,
109:22, 145:6,
162:3
**fewer**
143:21
**fiction**
155:12, 155:15,
155:16, 155:19
**fictional**
132:13, 132:15,
135:10, 135:14,
135:16
**field**
13:22
**fielded**
82:14
**file**
89:5, 89:17,
124:5, 129:12,
135:3
**filed**
129:11, 161:3,
161:18
**files**
86:11

**fill**
61:18
**film**
72:3, 80:15,
82:9, 92:5, 94:6
**filmmaker**
72:17, 72:21
**final**
87:8, 129:17
**finally**
142:18
**financial**
2:5, 6:12,
167:13
**financially**
155:23
**find**
69:5, 128:8,
158:6
**finding**
22:3
**finish**
7:18, 7:19,
79:24
**finished**
116:8, 165:7
**firms**
129:5
**first**
5:8, 18:2,
55:5, 55:21,
56:6, 86:9,
93:5, 94:20,
99:3, 101:18,
106:14, 107:16,
120:7, 120:10,
123:11, 125:4,
137:17, 138:4,
138:11, 142:7,
143:15, 151:1,
151:23, 152:1,
152:16, 163:2
**first-time**
144:11
**fit**
154:21
**five**
44:21, 69:2,

114:8, 120:3,
152:11, 152:12,
153:4, 154:3
**flagged**
27:15, 164:6
**focus**
67:16, 133:14,
134:1, 135:6,
155:6, 159:15
**focused**
125:21, 133:12
**follow**
52:23
**follow-up**
162:3
**followed**
108:14
**followers**
136:19, 136:23
**following**
20:14, 72:5,
97:15, 124:8,
154:1
**follows**
7:5, 87:16
**foment**
108:13
**footage**
57:11, 58:15,
58:17, 67:2,
67:6, 67:9,
67:12, 67:13,
67:17, 68:7,
72:10, 72:13,
78:23, 81:11,
85:7, 85:11,
87:23, 88:11,
89:18, 90:5,
90:12, 90:20,
111:2, 111:18,
112:11, 113:10,
120:13
**football**
49:8
**for-profit**
82:9
**foregoing**
166:4, 167:5,

167:6
**forgot**
86:15
**form**
15:13, 65:18,
65:19, 89:24,
90:13, 90:17,
137:20, 138:8,
138:12, 139:1,
153:14, 158:7
**formal**
15:3, 16:10,
16:16, 19:14
**format**
124:1
**formed**
138:18
**former**
12:21, 15:16,
15:22, 31:21,
48:9, 72:24,
77:1, 79:1,
79:2, 79:7,
79:9, 123:16
**forward**
143:6
**forwarded**
100:12
**found**
20:22
**foundation**
3:5, 6:17
**francisco**
3:7
**free**
13:1, 81:11
**freewheelin**
164:19
**frequently**
45:6
**front**
144:20
**frontier**
3:5, 6:17
**full**
7:11, 60:13,
60:14, 61:20
**fullest**
61:23

**function**
74:3
**functions**
74:2
**further**
138:1

## G

**gamble**
95:2
**gather**
31:7, 136:22
**gathering**
16:19, 17:7,
19:3, 19:17,
19:18, 24:9,
33:16, 40:24,
53:8, 53:11,
85:4, 86:12,
136:19
**gatherings**
121:14
**gave**
45:21, 53:1,
72:8, 91:24,
103:24
**gavel**
55:7, 55:8
**gedlu**
3:3, 6:19
**general**
100:4
**generally**
59:7
**gerry**
79:2
**get-out-the-vote**
103:2, 108:4
**getting**
142:18, 146:16
**give**
17:9, 19:18,
21:4, 21:8,
21:12, 22:1,
22:12, 26:20,
27:5, 29:13,
32:20, 72:1,
75:5, 80:7,

89:12, 116:14,
144:24, 145:5,
145:9
**given**
8:13, 39:17,
61:19, 73:18,
89:9, 89:20,
120:4, 127:18,
128:5, 166:6,
167:7
**giving**
24:20, 88:2,
89:13
**globe**
22:19, 23:3,
24:1
**go**
7:20, 99:18,
101:16, 125:8,
126:2, 137:4,
146:15, 148:1,
149:8, 149:11,
151:4, 161:20
**goes**
130:13
**going**
21:24, 30:16,
32:23, 45:13,
79:23, 80:14,
83:7, 114:9,
126:4, 134:22,
143:4, 146:18,
151:23, 161:21,
165:10
**good**
7:9, 7:10,
30:18, 45:9,
58:20, 58:21,
58:23, 76:4,
83:2, 142:8,
145:9
**government**
4:20, 11:22,
12:6, 12:9,
12:10, 14:6,
14:10, 38:16,
39:15, 39:18,
40:1, 40:14,

41:15, 41:21,
42:12, 46:13,
47:24, 48:12,
48:16, 49:3,
49:6, 49:15,
49:16, 49:19,
49:24, 50:3,
50:7, 50:18,
50:21, 50:24,
51:14, 51:18,
52:24, 53:14,
53:18, 53:20,
54:4, 54:12,
54:16, 55:19,
56:4, 56:13,
57:11, 58:10,
58:15, 58:17,
60:23, 61:5,
61:14, 62:7,
62:9, 63:12,
63:15, 63:17,
63:22, 64:5,
64:12, 64:20,
64:21, 65:1,
74:1, 74:15,
78:21, 78:24,
95:7, 95:13,
96:4, 96:21,
96:22, 105:1,
106:15, 107:13,
118:16, 122:17,
123:6, 128:11
**grab**
130:22, 131:11
**grammar**
86:18, 86:20,
87:2
**grant**
112:10, 112:11,
113:10
**granted**
89:4, 92:21
**graphic**
52:21, 53:12,
53:14, 53:22,
153:8
**graphics**
41:18, 53:8,

53:17, 65:13
**grassroots**
37:21
**great**
45:12, 83:6
**greater**
44:3, 44:6,
44:17, 60:12,
61:19, 96:4
**grisly**
72:5
**groundbreaking**
164:19
**grounds**
94:11
**group**
9:18, 95:5
**grow**
111:11
**guess**
65:11
**guidelines**
4:21, 52:24
**guy**
67:22, 68:15,
69:4

---
**H**
---
**haiti**
20:15, 20:18,
20:22, 21:20,
66:2
**haitian**
20:15
**half**
45:10
**hand**
60:3, 60:11,
61:8, 144:23,
167:16
**handle**
62:11, 62:16
**handled**
87:24
**handling**
72:12
**hands**
11:8

**handwritten**
5:16, 161:8
**happen**
66:18, 88:4,
88:7, 111:17,
111:18, 111:19,
113:6, 115:20,
151:12, 160:16
**happened**
60:14, 60:15,
61:15, 111:14,
115:24, 116:9,
116:11, 116:13,
116:15, 116:16,
117:6, 123:21,
153:18, 153:22,
160:24
**happening**
42:17, 62:5,
62:8, 73:10,
75:8, 75:12,
115:18, 162:9
**happens**
59:8, 111:6
**happy**
118:13, 118:17
**hard**
86:11, 121:13,
137:6
**harding**
72:6
**harm**
118:23, 119:9,
121:9, 121:11,
121:20, 122:3,
136:10
**harmed**
134:5, 136:22,
155:22
**hate**
108:10, 108:11,
108:13, 110:23,
157:16
**hateful**
108:15
**hawaii**
140:12
**head**
65:7

**headlines**
160:12
**hear**
163:2
**heard**
51:17
**hearing**
51:16, 61:12,
118:11
**heatley**
12:14, 26:2,
26:10, 39:23,
43:22, 48:9,
64:19
**held**
2:1, 41:9,
79:8, 108:8,
144:15
**help**
7:16, 78:12
**helping**
26:5
**helps**
26:3, 26:10,
62:8
**here**
6:2, 30:6,
68:18, 68:19,
69:3, 76:1,
79:20, 81:22,
136:6, 138:21,
148:7, 155:14
**hereby**
166:2, 167:5
**hereunto**
167:15
**hi**
101:20, 127:4,
127:5
**high**
11:23, 18:7,
22:21, 23:5,
24:3, 45:4,
46:3, 49:12,
73:3, 74:4,
74:21, 85:24,
109:19
**high-ranking**
79:3

higher
122:14
highly
111:21
historical
39:7
hit
25:20, 99:2
hits
98:24, 99:10
hold
13:6
holder
27:19, 66:6,
66:16, 81:13,
162:23
holding
103:1, 104:4,
104:15, 108:6
home
54:1
homelessness
96:7
homicide
72:6, 79:4,
79:6, 80:12
honor
106:9
hoping
75:23
hosted
60:8
hosts
46:17
hour
30:16, 45:10
hours
151:24
house
82:9, 92:5
housing
61:12, 96:6
hyper-local
37:19

**I**

id
26:19, 26:22,

27:2, 27:14
idea
38:5, 116:14,
121:17, 160:10
identification
9:24, 34:3,
35:4, 35:24,
36:23, 51:20,
75:19, 84:5,
91:4, 93:1,
99:22, 126:10,
130:4, 130:15,
147:9, 161:6
identified
7:3, 104:17,
104:19, 105:3,
149:13, 149:19
identify
69:4, 69:21,
148:20
identifying
94:12
image
75:11
images
20:22, 20:23,
20:24, 70:21
impact
79:6
impaired
85:7
implication
15:18
important
20:22, 26:4,
89:21, 134:8
impression
103:21, 103:23
impropriety
15:19
include
11:20, 20:22,
30:24, 50:22,
50:24, 51:3,
51:14, 53:14,
54:3, 56:16,
56:20, 57:3,
57:10, 59:16,

59:22, 61:10,
64:1, 64:6,
64:13, 69:18,
74:23, 90:5,
115:7, 124:15,
135:16, 143:2,
149:1, 152:21,
153:13, 157:11,
158:10, 158:20,
159:1
included
21:15, 53:18,
68:23, 102:19,
142:14, 153:11,
154:13, 160:11
includes
57:15, 74:15,
111:9, 127:6,
127:9
including
110:1, 142:24,
150:22
inclusion
80:12, 104:9,
110:15
incorporate
73:9
incorporated
58:16, 65:13
indicate
84:21, 99:2
indicated
101:2
indicating
52:22, 53:9,
53:15, 123:24
individual
37:21, 78:7,
98:24, 153:13
inflammatory
103:16
info@
114:20
inform
28:6, 61:7,
95:12, 105:4,
106:19, 147:3
informal
15:3, 16:11,

16:16, 19:14
information
37:20, 48:23,
98:21, 129:14
informative
117:3
informed
50:1
informing
75:7
infrequently
144:22
infringed
69:22, 129:18
infringement
28:24, 29:4,
29:15, 29:19,
29:22, 30:3,
30:8, 70:2,
70:4, 70:9,
112:19, 120:8,
120:15, 123:12,
124:6, 125:5,
128:20, 129:2,
129:24, 131:5,
132:17, 133:4,
137:21, 137:22,
138:11, 139:5,
139:7, 140:15,
140:21, 140:24,
141:2, 141:4,
145:11, 146:8,
149:16, 151:2,
151:7, 151:10,
152:6, 153:19,
154:7, 157:12,
158:21, 162:19
infringing
119:11, 120:19,
122:1, 122:2
initial
124:9, 124:14,
129:7, 131:4,
132:17, 133:3,
139:5, 150:7,
150:8, 150:19,
153:20
initially
12:17

initiating
27:19
injured
17:24, 22:7
installed
41:22
instance
15:8, 18:22,
19:22, 21:4,
22:1, 22:12,
26:18, 27:17,
31:22, 39:20,
42:14, 44:2,
49:23, 50:12,
51:16, 61:11,
63:9, 70:21,
81:19, 81:21,
89:14, 90:4,
94:13, 98:8,
113:7, 113:17,
119:15
instances
66:7, 78:18,
80:16, 81:14
instead
90:6, 139:22
instruct
64:7
instructed
64:21
instructional
73:18
intellectual
129:5
intended
137:9, 158:14
interact
157:6
intercepted
142:19
interest
20:6, 44:3,
44:6, 44:9,
44:16, 44:17,
45:4, 45:7,
59:3, 167:13
interested
72:4, 96:20

interesting
69:5
interfere
9:9
interim
149:19
interject
64:7
internally
117:19, 123:4
international
3:15
internet
98:17
interpreted
108:6, 109:7
interrogatories
5:9, 93:6
interrogatory
105:22, 137:11,
138:20
interrupted
55:17
interspersed
125:16
interspersing
133:22
interview
17:12, 82:22
interviews
76:6, 76:9,
77:8, 160:13,
160:14
investigating
79:4
invite
141:21
invited
117:7
involved
15:16, 16:23,
38:12, 57:22,
62:19, 66:12,
67:22, 79:1,
118:19, 122:14
involves
69:12, 142:4
involving
67:15, 78:22,

124:20, 141:12
irrelevance
94:12
isaac
3:21, 6:10
issue
33:17, 41:3,
61:8, 106:4,
139:13, 140:2,
140:6, 140:9,
141:1, 159:12
issues
62:12, 62:17,
62:20, 63:1,
96:6, 96:7
items
44:15
itself
50:3, 106:7

**J**

jamie
95:1
janice
34:18
jeannette
4:15, 36:7,
144:8
jeff
8:8, 8:21,
46:1, 49:12,
63:2, 73:1,
73:13, 73:16,
74:2, 74:4,
74:17, 81:6,
85:22, 94:1
jeff's
73:15
jeffrey
3:12, 6:21
job
1:22, 10:20,
10:24, 11:14,
12:2, 58:21
jobs
13:7, 13:9
josh
95:1, 110:1,

112:23, 113:20,
115:17, 117:7,
117:10, 120:12,
127:7, 129:12
journalism
13:7, 13:24,
14:2, 95:21
journalist
14:4, 33:14
journalists
71:15, 71:18,
95:6
judgment
154:24, 155:3
july
1:17, 6:8,
123:13, 123:23,
124:7, 133:4,
139:11, 140:7,
148:15, 149:15,
150:5, 150:7,
151:2, 151:18,
167:17
jumping
73:13, 114:15
june
28:19, 28:21,
65:20, 70:1,
115:20, 126:18
justice
37:16, 38:10
justin
9:4, 34:18,
34:20, 84:20,
100:3, 100:13,
101:20

**K**

kastorf
95:1, 110:2,
112:23, 113:21,
115:17, 118:22,
120:22, 122:22,
123:5, 127:7,
127:9, 127:14
keegan
1:24, 2:13,
6:24, 167:2

**keeping**
119:16, 156:12
**kerry**
48:10
**key**
125:13
**killed**
22:7
**kind**
48:11, 85:11,
124:2, 159:4,
163:19
**knew**
103:20, 121:14
**know**
8:4, 20:19,
21:22, 23:9,
23:21, 24:14,
24:16, 24:17,
26:7, 26:9,
29:21, 30:2,
31:14, 32:19,
33:24, 37:22,
41:7, 44:20,
47:6, 48:6,
48:17, 48:18,
48:20, 49:2,
52:2, 52:8,
52:10, 52:11,
53:21, 57:7,
64:15, 74:20,
79:16, 82:19,
82:23, 84:15,
84:18, 88:16,
89:16, 91:2,
91:18, 91:19,
97:12, 98:21,
99:4, 99:8,
101:1, 103:7,
109:14, 111:18,
114:4, 114:22,
115:3, 117:10,
118:20, 121:2,
121:21, 129:5,
145:19, 147:4,
147:5, 159:11,
161:11, 162:20
**knowing**
98:19

**knowledge**
17:18, 29:8,
30:5, 33:20,
38:7, 47:5,
48:2, 50:2,
50:5, 50:6,
50:20, 56:21,
63:4, 70:3,
70:6, 78:5,
82:18, 94:23,
97:18, 140:11
**known**
112:4
**knows**
51:11, 145:9
**krikeles**
95:2

**L**

**labeled**
10:2, 86:7,
93:3
**lack**
131:24
**lacroix**
79:3
**large**
76:12, 77:2,
133:7, 133:9,
134:24
**last**
40:9, 134:23
**late**
103:5
**later**
28:9, 28:21,
124:12
**law**
15:1, 15:12,
16:7, 16:14,
19:12, 127:10,
129:5, 133:11
**lawful**
18:14
**lawsuit**
9:18
**lawyer**
62:22, 62:24

**layperson**
133:9
**lead**
16:1, 52:5,
70:18, 105:7
**leading**
64:24
**learn**
12:18, 29:2,
49:23, 60:3,
60:10, 160:5
**learned**
14:4, 26:14,
27:18, 28:1,
28:12, 28:23,
104:24, 106:20,
106:23, 116:12,
120:14, 132:19,
141:11, 145:20,
160:3
**learning**
141:14, 145:10,
146:6, 160:17
**least**
87:4
**leave**
135:10, 135:17
**lectern**
54:2
**led**
104:22
**left**
34:17
**left-hand**
89:19
**legal**
15:7, 16:1,
46:9, 46:10,
90:22, 105:7,
127:22, 129:8,
133:19
**legitimate**
66:16, 92:12
**length**
67:18, 152:20
**lengthy**
153:1, 154:16
**leniency**
143:18

**leone**
79:2
**less**
22:9, 41:10,
60:13, 60:14,
62:19, 133:23,
158:22
**let's**
44:4, 70:21,
151:3, 153:21
**letter**
5:3, 70:8,
91:9, 91:13,
91:18, 92:6
**level**
37:21, 62:2,
98:5
**levels**
57:22
**lgbtq**
109:18, 109:24
**liable**
110:16
**libel**
15:1, 15:12,
120:24
**libraries**
85:4
**library**
12:20, 13:1,
109:19
**license**
38:22, 44:14,
80:11
**licenses**
93:14, 93:17,
93:19, 93:20,
94:2
**licensing**
72:12
**light**
142:10, 159:9
**likely**
97:11, 112:10,
125:19, 132:10,
132:23, 133:23,
156:18
**likes**
87:4

**limitations**
39:17
**limited**
44:16, 46:15
**line**
101:18
**linked**
123:15
**links**
127:10, 127:12,
127:13
**lions**
14:21
**liquor**
44:8
**list**
9:20, 9:21,
38:18, 148:16,
150:1, 161:17
**live**
10:11, 42:15,
42:18, 42:22,
55:7, 55:16,
55:24
**lived**
10:13, 13:10,
97:11
**llp**
2:4, 3:14, 6:12
**loaded**
143:16
**lobel**
3:14
**local**
98:5, 113:12
**locally**
74:11
**locate**
21:1
**location**
48:1
**logan**
75:7, 81:4
**logo**
54:4
**lone**
13:4
**long**
10:13, 46:13,

59:13, 61:24,
81:12, 133:3,
153:1, 157:22
**longer**
107:8, 125:20,
149:23
**look**
10:1, 34:10,
36:11, 52:12,
54:20, 86:6,
87:13, 91:20,
94:4, 94:7,
148:19, 153:3
**looked**
22:10, 29:11,
87:10
**looking**
9:20
**looks**
41:10, 87:4
**losing**
162:6
**lot**
17:10, 135:5
**lunch**
80:1, 83:2,
83:9

---

**M**

**mac**
12:7, 12:12,
26:2, 39:2,
39:10, 43:12,
43:14, 47:11,
53:3, 53:24,
57:10, 64:19,
97:5, 97:9,
105:8, 111:7,
116:13, 117:17,
117:21, 118:1,
118:20, 119:16,
120:12, 123:15,
123:18, 124:4,
124:10, 124:11,
125:20, 125:21,
128:11, 150:14,
153:17, 154:22
**mac-tv**
4:19, 12:3,

38:15, 43:24,
44:19, 45:5,
46:12, 48:3,
50:22, 54:4,
54:22, 56:16,
56:20, 56:24,
57:4, 57:16,
58:3, 59:17,
59:23, 59:24,
60:5, 60:16,
60:19, 61:3,
64:5, 64:12,
79:10, 79:17,
86:12, 87:20,
90:16, 90:20,
96:16, 96:19,
99:10, 107:3,
107:6, 108:24,
113:18, 119:3,
121:10, 134:12,
139:17, 153:11
**made**
15:5, 15:14,
15:19, 15:24,
21:15, 26:19,
26:22, 42:20,
43:8, 48:11,
48:15, 64:16,
68:13, 68:16,
68:17, 78:11,
79:14, 82:7,
85:12, 87:18,
87:19, 87:21,
87:23, 92:14,
102:18, 118:3,
119:14, 124:9,
131:4, 139:12,
139:14, 142:24,
150:7, 150:8,
164:18
**magazine**
13:14
**main**
17:24, 133:14,
135:6, 159:14
**major**
13:23, 33:23,
109:20

**make**
21:1, 38:18,
39:4, 42:11,
43:3, 43:15,
46:14, 50:1,
51:12, 59:12,
59:14, 66:4,
71:5, 71:7,
71:10, 86:3,
86:18, 92:19,
100:5, 102:14,
106:8, 110:16,
112:4, 112:6,
112:7, 117:20,
121:15, 123:17,
123:20, 123:22,
124:12, 129:17,
129:21, 132:9,
132:23, 138:24,
143:23, 144:24,
146:7, 148:11,
152:13, 165:3
**makers**
160:14
**makes**
58:23, 71:3
**making**
11:23, 88:2,
88:17, 136:5,
139:23, 151:21,
157:11
**many**
8:19, 17:12,
38:5, 39:16,
39:19, 42:1,
43:23, 44:18,
45:3, 78:6,
96:19, 97:11,
98:19, 98:22,
98:24, 99:8,
99:10, 103:19,
108:15, 109:23,
119:21, 124:14,
144:21, 152:9,
154:12, 162:15
**marathon**
80:10
**march**
103:6, 107:21

**maria**
9:2, 32:11,
32:13, 32:24,
52:6, 62:16,
72:8, 72:9,
72:14, 84:13,
88:1, 100:5,
100:12, 100:21,
101:3, 101:6,
101:20, 101:21,
102:7, 112:17,
112:22, 113:3,
113:20, 115:17,
116:3, 116:8,
120:12, 121:3,
122:21, 123:9,
125:11, 136:4,
139:16, 139:22,
140:3, 141:3,
141:6, 146:11
**mark**
9:22, 34:1
**marked**
9:23, 34:2,
35:3, 35:23,
36:22, 36:24,
51:19, 51:21,
54:20, 75:18,
75:20, 84:4,
84:7, 91:3,
91:5, 92:24,
93:2, 99:21,
99:23, 126:9,
126:13, 130:3,
130:5, 130:14,
130:16, 130:18,
147:8, 147:10,
161:5, 161:7
**market**
137:23, 138:5,
138:9, 138:14,
138:18
**marks**
89:10
**massachusetts**
1:2, 1:16, 2:6,
2:15, 3:17, 6:7,
6:13, 10:12,

167:4, 167:24
**material**
65:21, 69:21,
70:12, 70:20,
119:10, 132:14,
133:7, 133:10,
133:14, 133:15,
133:18, 134:9,
135:7, 135:11,
164:9, 164:13
**matter**
6:4, 9:1, 29:3,
30:4, 133:11
**matters**
8:13
**maybe**
44:13, 46:15,
88:22, 90:10,
122:3, 128:1,
128:23
**mayor**
4:13, 35:21,
36:15, 144:9,
144:11, 144:17,
145:2, 147:3
**mayor's**
144:16, 147:17,
149:1, 149:3,
149:9
**mayoral**
122:15, 146:4
**mbta**
124:20, 154:19
**mccarthy**
144:8, 144:11,
144:17, 145:2
**mccarthy's**
4:16, 36:7
**mcgrady**
25:19, 32:12,
32:13, 40:7,
40:8, 76:15,
76:22, 77:13,
142:17
**mean**
9:14, 15:2,
16:4, 16:15,
19:13, 21:14,

26:7, 26:24,
33:13, 48:18,
50:23, 61:7,
63:8, 65:23,
68:9, 68:22,
69:9, 69:10,
71:4, 73:19,
73:22, 87:5,
90:9, 90:24,
93:20, 96:18,
97:7, 101:24,
108:10, 128:15,
129:9, 136:15,
137:1, 145:15,
148:3, 153:13,
162:14
**meant**
73:24, 89:16,
108:1, 133:18
**mechanisms**
28:2, 28:7,
28:13
**media**
6:2, 11:4,
19:23, 30:23,
32:8, 32:15,
32:17, 33:1,
68:11, 70:24,
71:11, 71:15,
72:18, 72:23,
75:3, 76:9,
78:19, 80:5,
80:18, 81:16,
81:24, 82:17,
85:23, 86:4,
92:12, 93:18,
93:22, 96:14,
97:19, 104:9,
105:16, 142:21,
160:6, 163:19
**medication**
9:8
**medium**
37:13, 38:8
**meet**
8:14, 8:17,
8:19, 142:1
**meetings**
8:22, 8:24,

12:11, 38:16,
39:2, 39:6,
39:11, 39:19,
39:20, 39:21,
40:5, 40:14,
41:5, 41:16,
42:12, 42:13,
42:15, 42:19,
42:20, 42:22,
44:1, 44:7,
47:12, 48:13,
48:16, 48:17,
49:3, 49:17,
49:20, 50:4,
50:8, 50:13,
50:15, 50:18,
51:7, 51:18,
52:24, 54:24,
59:24, 61:2,
61:16, 61:22,
62:3, 63:12,
63:16, 63:22,
63:23, 64:14,
64:20, 64:24,
65:2, 74:16,
78:21, 96:22,
112:3, 119:18,
119:22, 128:11,
158:1
**member**
12:21, 14:10,
14:21, 31:16,
40:4, 43:13,
43:15, 48:9,
58:14, 72:24,
79:3, 123:16
**members**
29:8, 29:21,
30:2, 31:13,
39:18, 39:22,
40:3, 79:5,
140:13, 160:6
**memory**
157:22
**mention**
34:23, 120:23,
122:6, 128:9,
136:2

**mentioned**
9:20, 11:15,
11:17, 20:8,
39:24, 45:20,
46:8, 46:11,
54:15, 69:2,
72:20, 73:14,
80:10, 85:22,
101:11, 106:11,
112:2, 118:14,
119:4, 121:2,
121:11, 122:9,
129:20, 130:23,
147:21
**merely**
125:20, 135:4,
155:6, 159:15
**merit**
2:13, 167:2
**messages**
4:23
**methods**
26:15
**mhsa**
34:17, 34:18
**michelle**
1:24, 2:12,
6:24, 167:2
**microphones**
12:22, 26:13,
40:17, 40:18,
41:12
**middle**
140:14, 151:4
**might**
9:9, 11:8,
18:16, 22:13,
30:7, 32:14,
40:23, 52:2,
56:10, 61:14,
63:12, 70:18,
86:18, 88:23,
118:7, 129:13
**mills**
34:19
**mind**
38:24, 137:10
**mine**
62:19

**minor**
13:23
**minute**
11:1
**minutes**
68:7, 79:24,
114:8, 133:5
**mission**
4:21, 49:18,
74:10, 127:19,
128:5
**missions**
95:9
**mistake**
59:12, 142:16,
142:17, 142:24,
146:1, 147:18,
149:1
**misuse**
90:23
**mitch**
3:4, 6:16,
114:5, 138:19
**moment**
114:16, 126:3
**monetarily**
67:16
**monetary**
118:23, 136:17
**monetization**
132:1, 132:4,
156:4
**monetize**
131:7, 131:14,
131:22, 132:8,
135:18, 135:23,
136:6
**monetized**
27:22, 156:6
**monetizing**
132:5, 156:2,
156:3
**money**
136:5
**monies**
101:4
**monitor**
6:9, 45:14,

45:17, 83:8,
84:3, 114:10,
114:13, 126:5,
126:8, 146:23,
161:22, 162:1
**month**
45:7
**months**
70:15
**more**
12:18, 30:8,
40:23, 44:2,
44:4, 44:13,
44:21, 44:23,
45:1, 45:23,
57:1, 60:20,
61:9, 66:22,
68:18, 70:15,
70:19, 70:23,
71:9, 73:6,
79:24, 96:23,
97:10, 97:15,
97:19, 98:12,
98:16, 111:12,
116:17, 117:10,
120:1, 120:3,
132:9, 132:23,
133:12, 142:11,
144:2, 149:20,
150:20, 153:11,
156:20, 158:18,
159:2, 159:23
**morning**
7:9, 7:10, 76:4
**most**
33:21, 49:15,
59:7, 69:5,
78:16, 109:8,
143:24
**motions**
148:1, 149:9,
149:12
**motivating**
128:12
**motorcycle**
17:23, 18:2,
22:11
**much**
51:8, 54:18,

118:19, 118:20,
133:20
**multiple**
143:12
**municipal**
38:9, 54:24,
78:16, 141:21
**murders**
80:9
**music**
27:7, 27:13,
163:19
**must**
85:12, 87:20,
88:11, 89:4
**myself**
32:16, 140:3,
142:17

**N**

**nabulime**
46:9
**name**
7:11, 40:9,
41:19, 88:12,
88:23, 89:15,
109:15, 114:17,
115:8
**naming**
145:12
**natick**
10:12
**national**
91:22, 92:2
**navigated**
150:12, 152:14
**nbc**
92:2
**nd**
91:10
**near**
22:6, 52:15,
54:20, 101:2,
103:5
**necessarily**
88:20, 92:17,
97:3
**necessary**
127:21

**need**
8:3, 16:20,
16:21, 17:8,
17:16, 30:17,
36:11, 65:6,
148:1, 149:8,
149:11
**needed**
139:19, 152:4
**needing**
141:16
**needs**
41:6
**neither**
105:2, 156:5,
167:11
**network**
67:5, 71:4,
71:5, 71:10,
71:16, 71:20,
72:20, 81:10,
82:6, 88:21,
92:9, 92:16,
97:1, 98:9,
156:14
**networks**
66:21
**never**
151:22, 160:24
**new**
25:23, 72:2,
92:4, 109:3,
119:7, 121:18,
139:15, 139:20,
139:21, 150:15
**news's**
5:8, 93:5, 97:2
**news-gathering**
11:6
**newscast**
11:1, 101:21
**newsletter**
75:7
**newspaper**
33:23, 37:17,
71:17
**newspapers**
71:7, 72:21

**newswatch**
11:19, 11:21,
25:11, 25:15,
27:8, 30:20,
30:22, 33:7,
33:20, 33:22,
56:16, 57:14,
57:18, 57:20,
57:24, 58:4,
58:7, 58:12,
58:16, 59:16,
59:22, 60:17,
60:24, 62:7,
65:4, 65:18,
68:17, 68:24,
69:18, 79:12,
97:23, 98:2,
98:15, 98:23,
99:5, 100:6,
101:8, 102:9,
134:15, 156:23,
157:4, 157:5,
163:8
**newsworthiness**
71:1
**newsworthy**
17:14, 59:18,
59:20, 66:12,
66:13, 70:22
**newton**
13:1, 13:2
**next**
54:6, 68:19,
92:11, 116:11,
139:6, 140:20,
146:16, 152:6,
152:22
**next-to-last**
34:10
**nine**
154:14, 154:15,
154:17
**nodded**
65:7
**non**
117:3
**none**
57:8, 136:4

**nonfiction**
155:19
**nonparticipant**
56:9
**nonproductive**
117:3
**nonprofit**
14:14, 14:19,
101:4
**nonprofits**
11:24, 85:6,
134:7, 136:6
**nope**
68:5, 121:5
**notarial**
167:16
**notary**
2:13, 7:4,
167:1, 167:3,
167:23
**note**
94:10
**notes**
161:8
**nothing**
59:9
**notice**
2:12, 4:9,
4:18, 29:12,
70:2, 70:4,
120:15, 123:12,
124:5, 124:7,
125:5, 129:13,
131:5, 132:18,
133:4, 138:11,
139:6, 139:7,
140:15, 140:21,
140:24, 145:11,
149:16, 151:2,
151:7, 151:10,
151:15, 151:18,
151:19, 152:7,
152:10, 152:22,
153:19, 153:20,
153:22, 153:23,
154:2, 154:7,
154:12, 157:12,
158:10, 158:21,

159:18, 161:1
**noticed**
109:4
**notices**
28:24, 29:4,
29:22, 30:4,
30:8, 112:3,
112:19, 120:8,
120:20, 128:20,
129:24, 137:7,
137:21, 139:20,
141:4, 146:8,
152:1, 154:3,
156:5, 159:22,
159:23, 161:18,
162:4, 162:19
**notification**
138:24, 154:5
**notified**
113:1
**notify**
32:14
**november**
5:3, 91:10,
111:22
**number**
6:3, 6:7,
29:14, 44:15,
62:2, 78:17,
85:1, 85:4,
87:22, 88:12,
88:23, 89:1,
106:2, 120:5,
137:18, 142:14,
143:11, 148:14
**numbers**
135:1

---
**O**
---

**objecting**
139:1
**objection**
14:16, 23:20,
24:6, 25:4,
33:12, 47:8,
47:19, 48:5,
59:1, 63:21,
69:23, 77:17,

78:4, 91:1,
92:8, 94:11,
99:17, 101:15,
107:9, 125:7,
132:3, 135:12,
135:19, 136:3,
136:12, 138:15,
144:19, 145:4,
149:7, 159:10,
159:13, 163:21,
163:24, 164:4,
164:11, 164:16
**objections**
5:7, 93:5,
138:22
**obligated**
41:4
**obligation**
127:22
**obtaining**
21:19
**occasion**
20:10, 73:1,
79:16
**occasionally**
11:16, 12:6,
32:14, 40:1,
40:4, 40:22,
43:8, 50:9
**occurring**
147:1
**occurs**
56:2
**october**
102:24
**offered**
38:12, 82:12,
143:18
**office**
14:8, 77:8,
78:1, 142:2,
142:13, 143:9
**officer**
14:13, 14:18,
167:4
**offices**
2:2
**officials**
51:14, 97:12,

97:17, 109:6,
110:5, 115:12,
144:24, 158:2,
158:7
**often**
44:13, 62:21,
70:11, 70:14,
70:16
**oh**
44:10
**okay**
30:2, 38:18,
42:13, 64:11,
76:3, 83:1,
123:1, 138:3,
139:4, 164:23
**old**
144:23
**older**
96:19, 97:5,
97:10, 97:18,
98:5, 98:9,
98:11, 99:14
**on-camera**
52:21, 141:23,
142:5, 144:18,
144:20
**on-the-job**
45:21
**once**
57:1, 70:15
**one**
2:5, 3:15,
6:12, 7:16,
25:18, 25:20,
32:19, 40:4,
43:9, 60:12,
60:13, 60:20,
66:21, 68:14,
68:18, 72:22,
74:10, 75:10,
76:1, 77:11,
85:2, 87:4,
89:14, 102:22,
106:12, 109:21,
120:20, 124:16,
129:1, 129:6,
142:11, 142:13,

142:20, 143:2,
149:3, 150:8,
151:9, 151:10,
151:16, 152:4,
153:11, 153:14,
153:16, 154:16,
163:4, 164:18
**ones**
11:15, 29:9,
82:13, 135:3,
150:21, 152:14,
159:20
**online**
17:2, 17:3,
19:7, 19:10,
20:23, 22:3,
27:7, 31:8,
37:20, 42:24,
47:24, 69:21,
70:5, 85:10,
98:12, 98:23,
99:6, 111:11
**only**
7:16, 8:4,
11:11, 29:9,
32:5, 37:20,
39:9, 44:15,
46:10, 51:13,
51:17, 55:10,
55:15, 61:13,
64:8, 67:21,
69:12, 75:9,
81:21, 85:8,
85:9, 99:2,
102:22, 111:19,
122:12, 127:15,
129:21, 135:8,
151:15, 151:20,
164:17, 164:18
**open**
54:23, 55:10,
55:15, 56:1
**openings**
11:23
**operate**
12:9, 26:13
**operating**
53:3

**opinion**
33:3, 33:8,
35:17, 36:19,
37:11, 95:21,
102:8, 117:12,
122:19, 123:8,
138:18
**opinions**
51:3
**opportunity**
164:21
**opposed**
132:14
**order**
16:21, 17:15,
19:20, 49:17,
55:9, 123:17,
152:13
**ordinarily**
19:20
**org**
32:6, 139:19
**organization**
24:8, 24:10,
96:10, 109:3,
110:9, 111:5,
113:7, 113:12
**organizations**
14:14, 14:19,
76:19, 157:9
**organized**
79:7
**orientation**
95:24, 96:3,
99:14
**original**
25:14, 69:13,
69:18, 76:20
**originally**
97:3
**other**
9:1, 11:6,
11:7, 11:12,
11:14, 11:15,
12:23, 14:14,
16:9, 19:10,
20:8, 20:9,
22:8, 25:17,

27:8, 28:1,
28:11, 29:5,
29:8, 29:21,
29:23, 30:2,
30:20, 30:21,
31:11, 31:16,
32:7, 39:15,
40:20, 41:12,
41:18, 42:19,
43:2, 43:4,
47:24, 49:22,
51:12, 53:13,
53:17, 56:19,
62:4, 65:1,
66:7, 70:5,
71:11, 72:16,
72:22, 73:4,
73:23, 79:16,
80:16, 81:14,
81:18, 82:3,
89:24, 90:11,
92:9, 96:7,
96:22, 97:14,
104:21, 105:13,
105:16, 106:3,
117:21, 121:11,
121:20, 133:22,
138:17, 140:13,
144:3, 151:5,
157:9, 159:20,
164:8
**others**
13:13, 26:1,
29:15, 29:19,
39:1, 44:2,
90:8, 92:6,
95:2, 108:9,
108:18, 121:17,
156:14, 158:19
**otherwise**
167:13
**out**
12:18, 51:9,
76:19, 79:15,
109:24, 135:10,
135:17
**outcome**
167:14

**outdoor**
11:10
**outside**
30:4, 79:17
**over**
67:15, 92:15,
98:6, 117:12,
120:12, 143:13,
146:12
**overbreadth**
94:11
**own**
17:11, 17:17,
47:11, 63:9,
63:10, 74:14,
76:8, 127:20,
136:6, 138:17,
142:16
**owned**
18:11, 106:5
**owner**
21:2, 67:23,
68:3

---

**P**

**package**
69:6, 73:2,
79:14
**packages**
57:20
**page**
4:2, 4:8, 10:1,
10:2, 18:8,
18:9, 31:1,
34:10, 52:12,
54:19, 75:24,
91:21, 93:9,
93:11, 99:11,
106:1, 125:13,
128:14, 137:16,
152:14, 157:22,
163:8
**pages**
1:23, 38:11
**paid**
23:8, 80:14
**pan**
41:2, 41:11

**pandemic**
47:21
**paragraph**
52:16, 52:17,
54:6, 54:7,
54:21, 84:23,
86:6, 88:10,
134:23
**pardon**
65:8, 105:24,
125:3
**parent**
163:18
**part**
13:1, 25:7,
49:4, 49:17,
53:24, 55:6,
55:22, 55:23,
55:24, 56:7,
57:20, 59:8,
59:20, 65:12,
67:19, 73:16,
74:5, 74:9,
77:22, 85:24,
88:10, 94:23,
103:1, 119:19,
122:2, 139:1,
146:4, 150:11,
150:21, 157:10,
158:4, 159:8
**participate**
56:10
**particular**
17:4, 33:17,
77:20, 95:24,
102:6, 124:23,
134:4, 138:23
**particularized**
137:20, 138:8,
138:12
**parties**
167:12
**parts**
67:22
**party**
79:17
**passionate**
96:5

**past**
31:21, 33:4,
41:4, 47:4,
75:9, 144:4
**pasting**
32:1
**patch**
37:15, 37:18,
37:19, 37:22,
38:3, 38:10
**patriots**
25:24
**pay**
43:18, 82:12
**payment**
80:4, 80:17,
80:21, 80:23,
81:3, 81:6,
81:9, 81:16,
81:23, 82:2,
82:7, 82:21
**peg**
49:7, 73:16,
73:19, 73:23,
74:18, 74:24,
77:22, 95:14
**pending**
8:4, 52:4
**people**
11:23, 17:12,
34:12, 34:13,
51:15, 67:15,
72:22, 73:20,
73:22, 77:5,
78:18, 97:15,
98:4, 98:10,
98:19, 98:22,
99:8, 109:23,
114:2, 137:3,
137:4, 137:5,
142:4, 142:8,
157:6, 159:5,
159:8
**performs**
57:23
**perhaps**
50:9, 87:1
**period**
120:21, 122:5,

149:10, 149:12
**periodically**
70:13
**permanent**
43:10
**permission**
17:16, 17:20,
19:22, 19:24,
20:4, 20:6,
20:11, 24:10,
27:6, 27:11,
66:5, 67:5,
76:7, 79:17,
80:5, 80:17,
80:21, 81:16,
81:23, 82:21,
85:13, 86:11,
88:2, 89:4,
93:21, 94:14,
102:20, 103:15,
103:24, 105:6,
105:10, 106:7,
112:1, 113:10,
119:6, 119:13,
121:18, 135:5,
141:13, 146:14,
156:12
**permissions**
117:17
**person**
19:21, 22:20,
23:4, 24:2,
32:5, 42:8,
43:17, 51:10,
58:9, 58:17,
65:11, 65:15,
71:2, 72:12,
88:2, 94:13,
98:9, 106:5,
114:20, 145:6
**personal**
1:15, 97:13
**personally**
25:2, 163:7
**personnel**
137:19, 138:17
**persons**
51:17, 71:20

**perspective**
96:11, 96:12
**petitioner**
43:9, 53:19,
54:1
**phil**
25:19, 32:12,
32:13, 32:24,
40:4, 40:7,
40:8, 40:22,
49:9, 76:4,
76:15, 76:22,
77:5, 77:13,
82:23, 142:16,
142:24
**philosophy**
13:23
**phone**
88:12, 88:22,
89:1, 113:9
**phones**
11:16
**photo**
16:20, 17:8,
18:6, 18:7,
18:9, 18:10,
18:11, 18:16,
20:5, 20:9,
20:10, 21:5,
21:9, 21:13,
21:19, 21:24,
22:2, 22:4,
22:18, 22:19,
22:20, 23:2,
23:4, 23:13,
23:19, 23:24,
24:1, 24:2,
24:13, 34:16,
66:2, 71:11,
75:14, 103:24,
104:13, 104:17,
104:19, 108:3,
114:16
**photograph**
17:13, 17:14,
17:17, 17:19,
18:12, 18:14,
22:17, 22:18,

23:3, 23:24,
24:8, 24:11,
34:11, 102:22,
102:23, 103:13,
103:19, 104:11,
104:14, 108:4,
110:15
**photographer**
21:6, 21:10,
21:16, 22:14,
22:23, 23:8,
23:14, 23:17,
24:14, 24:17,
24:20, 24:22,
24:24, 53:4
**photographing**
53:10
**photographs**
17:10, 17:11,
17:15, 18:2,
20:18, 20:19,
102:19, 102:21
**photos**
18:5, 22:3,
22:8, 22:21,
23:6, 24:3, 32:3
**phrase**
74:24
**pick**
51:9
**picture**
18:4, 106:5
**piece**
41:16
**pine**
13:5
**place**
3:15, 6:11
**plaintiff**
1:5, 3:2, 5:7,
6:17, 7:7, 93:5
**plaintiff's**
93:14
**plan**
113:15
**planet**
6:10, 6:24
**planning**
38:22

**platform**
70:5, 82:11,
98:13
**playlist**
150:12, 154:19
**playlists**
150:22
**plays**
26:4
**please**
6:14, 7:11,
7:17, 7:23, 8:3,
10:1, 23:15,
34:16, 36:12,
52:12, 52:17,
54:6, 54:19,
54:21, 55:6,
56:6, 64:11,
84:23, 85:4,
89:2, 90:19,
91:21, 93:9,
93:10, 105:22,
106:1, 106:2,
107:10, 110:10,
116:5, 127:16,
127:24, 134:23,
137:8, 137:16,
137:17
**poetry**
133:10
**point**
59:14, 107:12,
111:13, 151:3,
160:8, 161:1
**points**
107:24, 108:2,
108:24, 109:7
**police**
79:2, 79:4
**policies**
4:20
**policy**
84:9, 85:3,
86:16, 87:16
**political**
75:2, 80:20,
95:24, 96:2,
96:9, 97:4,

97:8, 99:14,
104:5, 104:15,
107:24, 108:2,
108:24, 109:7
**politician**
145:8
**politics**
11:22, 38:12
**portray**
159:8
**position**
33:16
**possibility**
46:10, 110:19
**possible**
39:16, 39:20,
51:8, 52:21,
54:18, 90:22,
115:14, 115:15,
118:3, 118:5,
142:10
**possibly**
28:20, 37:17,
38:23, 44:24,
46:16, 47:4,
52:6, 56:10,
71:8, 73:6,
87:3, 87:9,
107:20, 109:1,
118:9, 118:10,
121:3, 123:9,
132:11, 133:1,
140:7, 149:21,
153:9, 156:20,
158:8, 158:16,
159:11, 162:10
**post**
25:9, 32:24,
47:2, 47:14,
102:18, 103:4,
103:9, 103:10,
103:12, 103:13,
103:16, 103:22,
104:7, 104:10,
104:11, 104:12,
104:22, 106:6,
106:8, 106:11,
108:4, 108:12,

108:19, 109:9,
109:12, 109:17,
109:21, 111:15,
114:15, 114:19,
115:1, 115:12,
121:7, 160:6
**posted**
25:2, 25:6,
34:8, 47:9,
47:12, 60:19,
103:7, 106:24,
107:7, 107:12,
119:22, 142:20,
145:10, 150:20,
164:9
**poster**
105:2
**posting**
11:3, 32:17,
47:17, 47:23,
48:3, 48:8,
128:12, 155:22,
157:24, 164:13
**postpone**
32:23
**postponed**
33:2
**postproduction**
56:2
**posts**
61:2, 106:22
**potential**
15:7, 61:23,
129:1, 132:4
**potentially**
78:24, 92:9,
95:2, 103:16,
110:14, 111:4,
121:21, 122:14,
136:24, 137:2,
165:3
**powerpoint**
53:20, 53:23
**practice**
54:3, 54:11,
54:14, 55:3,
55:18, 56:3,
56:12, 65:14,

65:15, 107:17
**practices**
156:13
**precisely**
28:18, 91:17
**prefer**
62:4
**prepare**
8:8, 8:11, 8:14
**prepared**
29:17, 152:17
**prerogative**
111:4
**present**
3:20, 8:21,
53:20, 143:6,
143:19
**presentation**
53:21, 53:23
**president**
34:18
**presumably**
27:15, 28:10,
89:18, 103:8,
106:17, 138:16,
148:14, 149:11
**previous**
61:15
**previously**
86:17
**pride**
121:19
**primary**
110:13, 141:20
**prime**
142:6, 145:3
**prince**
3:14
**print**
96:14
**printout**
34:4, 35:5,
36:1, 37:1
**prior**
157:20
**priorities**
97:17
**prized**
59:10

**probably**
22:20, 23:5,
23:8, 24:2,
32:3, 66:9,
92:3, 110:7,
164:6
**problem**
17:11, 75:22,
123:14, 160:8
**procedure**
93:13
**process**
28:23, 128:21,
151:5, 158:4
**produce**
11:1, 17:20,
25:14, 25:17,
26:3, 26:5,
33:3, 56:11,
63:14, 63:19,
77:7, 121:13
**produced**
12:19, 49:9,
49:12, 52:1,
56:19, 56:23,
57:3, 57:10,
65:11, 73:2,
77:4, 77:13,
80:8, 93:14,
94:3, 94:6,
111:24, 130:18,
156:3, 157:20
**producer**
26:3, 41:17,
41:20, 42:16,
42:17, 51:8,
53:10, 56:8,
63:9
**producers**
25:18, 26:10,
49:10, 74:14,
88:11
**produces**
25:19, 25:22,
49:9, 54:22,
63:9, 118:16
**producing**
62:20, 94:12

**production**
12:23, 45:23,
53:24, 80:15,
92:5, 93:15
**productions**
144:22
**professional**
41:10, 41:20,
121:19, 156:13
**profit**
134:5, 136:11,
136:14, 136:15,
136:17, 136:18
**program**
11:17, 11:18,
12:7, 12:12,
25:18, 30:23,
57:21, 60:10,
63:14, 63:19,
64:1, 65:4,
65:10, 65:13,
65:17, 66:14,
66:21, 67:15,
73:9, 77:4,
77:20, 80:13,
90:6, 98:3,
98:7, 99:4,
101:6, 102:13,
107:8, 116:14,
117:8
**programming**
25:15, 25:17,
54:8, 56:22,
57:15, 73:8,
74:13, 86:12,
98:4, 98:20
**programs**
56:19, 57:2
**project**
61:13, 95:15
**promote**
49:17, 78:9,
78:12
**prompted**
105:18, 115:1,
115:12, 141:9,
146:7
**proper**
139:15

**property**
129:5
**propose**
123:11
**proposed**
44:8, 109:18,
123:10
**protect**
128:17, 141:16
**protected**
65:1, 121:23,
128:13, 146:13
**protection**
125:1, 154:24,
155:2, 155:9
**prove**
162:18
**provide**
55:1, 88:11,
88:22, 88:23,
89:1, 127:23
**provided**
77:18, 81:11,
127:14, 129:14
**providers**
48:22
**provides**
60:2
**providing**
37:20
**public**
2:14, 7:4,
12:20, 20:5,
42:12, 43:4,
43:16, 44:9,
44:16, 49:5,
49:8, 49:14,
51:15, 51:16,
55:11, 55:13,
59:3, 60:3,
60:4, 60:7,
61:7, 62:8,
74:1, 74:12,
79:8, 95:12,
106:9, 106:20,
114:19, 167:1,
167:3, 167:23
**publications**
37:13, 38:8

**publish**
31:23
**published**
13:14, 31:3,
31:5, 31:17,
31:22, 146:2,
163:4, 163:6
**publishes**
75:7
**publishing**
13:5, 17:11
**purpose**
21:9, 60:18,
73:18, 78:15,
85:5, 108:12,
134:10
**purposes**
27:8, 61:6,
77:21, 78:3,
85:8, 85:12,
105:5
**pursuant**
2:12, 93:12
**put**
46:22, 53:4,
53:12, 54:15,
72:11, 92:17,
112:14, 135:9,
138:19, 143:6,
153:14
**putting**
90:16
**pyle**
3:12, 6:21,
14:16, 21:23,
23:20, 24:6,
25:4, 33:12,
45:8, 45:12,
47:8, 47:19,
48:5, 59:1,
63:2, 63:21,
64:7, 65:6,
69:23, 77:17,
78:4, 80:3,
83:4, 90:2,
91:1, 92:8,
94:4, 94:10,
99:17, 101:15,

107:9, 114:5,
114:8, 122:20,
123:1, 125:7,
127:2, 130:11,
132:3, 135:8,
135:12, 135:19,
136:3, 136:12,
137:13, 138:2,
138:15, 138:19,
139:4, 144:19,
145:4, 146:15,
146:21, 149:7,
164:4
**pzm**
40:17, 41:12

**Q**

**qualified**
125:1, 155:2,
159:21
**qualify**
125:19, 125:24,
134:24, 148:4,
154:23, 155:9
**quarterback**
25:23
**question**
7:18, 7:22,
8:4, 8:5, 23:21,
40:19, 58:20,
64:8, 65:8,
69:15, 89:18,
107:10, 110:11,
123:2, 140:1
**questions**
8:12, 9:11,
45:19, 162:3,
164:24
**quick**
92:19, 114:5
**quickly**
145:8
**quinlan**
48:10
**quite**
114:3, 154:16
**quo**
109:4

**quotation**
89:10
**quote**
127:20
**quoted**
5:21

**R**

**race**
122:15
**rain**
32:23
**ran**
84:18
**rarely**
33:21
**rate**
80:14
**rather**
55:15, 127:19
**rationale**
120:4
**reach**
49:15
**reached**
141:3
**reactivate**
160:20
**read**
5:22, 34:16,
35:19, 36:6,
52:17, 54:6,
54:21, 55:5,
55:21, 56:6,
75:23, 76:13,
84:23, 86:9,
89:2, 89:11,
90:19, 100:9,
101:6, 101:7,
101:10, 101:17,
101:21, 102:13,
106:2, 127:12,
127:13, 127:15,
127:16, 134:22,
137:17, 166:3
**reading**
131:10, 142:5,
143:17, 167:10

**ready**
142:6, 145:3
**reality**
66:13, 66:15,
66:20, 66:24
**realized**
145:24
**realizes**
145:7
**really**
4:16, 24:16,
36:7, 99:3,
99:7, 111:18,
113:5, 118:18,
118:19, 143:1
**reason**
40:22, 49:22,
55:16, 122:7,
127:18, 128:5,
139:1, 143:17
**rebroadcast**
85:10
**recall**
16:12, 17:3,
17:5, 18:21,
19:9, 21:3,
21:7, 21:11,
21:17, 21:21,
22:3, 22:15,
23:1, 23:10,
24:19, 24:22,
24:23, 28:16,
28:20, 33:6,
47:7, 47:13,
47:20, 66:9,
66:10, 67:7,
67:23, 70:10,
72:19, 79:11,
79:19, 79:22,
80:19, 81:17,
81:20, 81:22,
85:16, 86:5,
91:16, 91:17,
95:3, 102:22,
104:12, 104:18,
105:15, 105:20,
107:18, 112:20,
112:21, 115:13,

116:19, 116:22,
118:2, 121:4,
128:21, 134:20,
135:15, 135:20,
140:7, 143:22,
144:4, 144:5,
145:15, 145:16,
146:10, 148:13,
148:23, 149:2,
150:4, 152:9,
154:12, 155:18,
155:20, 164:5
**receive**
44:10, 70:11,
70:23, 71:14,
82:6, 85:12,
94:2, 101:4,
114:18, 115:9,
115:11, 161:1
**received**
27:14, 30:8,
64:4, 71:23,
78:5, 78:6,
84:21, 87:22,
123:23, 147:5,
153:23, 154:5,
163:4, 163:15,
164:14
**receives**
99:1, 99:11
**receiving**
70:19, 165:4
**recent**
78:16
**recently**
115:6
**recess**
45:15, 83:9,
114:11, 126:6,
146:20, 161:23
**recognize**
34:5, 35:6,
36:2, 37:2,
51:22, 91:6,
93:7, 99:24,
109:15, 126:13,
130:6, 130:20,
147:11, 161:9

**recollection**
67:20, 118:6,
140:19, 140:20
**recommend**
149:5
**recommended**
102:7
**record**
5:21, 7:12,
35:19, 38:17,
39:10, 39:15,
39:16, 40:1,
40:4, 40:14,
43:10, 45:14,
45:17, 48:12,
48:16, 49:3,
49:16, 50:3,
50:7, 50:15,
50:17, 64:20,
67:21, 83:8,
84:3, 90:12,
99:6, 114:10,
114:13, 122:20,
126:3, 126:6,
126:8, 127:2,
130:12, 138:19,
144:14, 146:15,
146:19, 146:23,
161:20, 161:22,
162:1, 165:10,
165:11, 167:7
**recorded**
39:3, 42:22,
42:23, 50:12,
50:13, 50:14,
51:7, 63:22
**recording**
41:6, 41:9,
41:21, 43:13,
50:14, 55:24,
76:18, 99:10,
164:18
**recordings**
12:10, 41:10,
42:19, 51:9,
51:13
**records**
49:19, 58:9,

93:17, 118:16,
163:18
**red**
25:21
**reddit**
102:19, 103:3,
103:7, 103:22,
104:6, 104:22,
105:18, 106:6,
106:11, 106:19,
106:21, 108:12,
108:17, 108:19,
109:9, 109:12,
109:17, 109:21,
111:15, 114:15,
114:19, 115:1,
115:12, 121:7
**reduced**
167:9
**reedited**
90:20, 90:24
**reediting**
76:19
**refer**
91:24, 95:14,
105:13, 111:7,
147:20
**reference**
105:10, 151:16
**referenced**
133:3, 152:10
**referencing**
149:16, 151:20
**referred**
72:8, 94:18,
105:8, 108:19,
119:19, 122:10,
155:4
**referring**
9:17, 92:7,
122:21, 128:19,
149:4
**refers**
93:13, 138:20,
149:10
**reflect**
20:24, 127:2,
144:14

**reflecting**
114:21
**reflective**
22:9
**refrain**
164:13
**regard**
29:23
**regarding**
29:5, 131:17,
131:18
**region**
70:23, 73:10
**registered**
2:13, 167:2
**regret**
108:20
**regular**
37:14, 54:3,
54:11, 54:14,
55:3, 55:18,
56:3, 56:12
**regularly**
47:14, 47:18,
47:23, 48:3,
50:7, 50:9,
50:17, 63:1
**reinforces**
59:2
**rekindled**
141:15, 146:11
**related**
11:21, 62:21,
94:5, 167:11
**relates**
59:4
**relationships**
97:13
**relative**
75:13
**relatively**
109:3
**release**
164:19
**relevant**
131:11, 131:12,
131:17, 131:18,
131:19, 132:1,

**132:4**
**relying**
125:5
**remain**
27:21, 27:23
**remedies**
120:20
**remedy**
129:1, 129:6,
129:7, 160:23
**remember**
22:16, 23:12,
104:14, 119:21,
120:4, 133:2,
155:13
**remind**
114:2
**remotely**
110:18, 111:14
**removal**
148:11, 151:21
**removed**
69:14, 160:15
**repeat**
14:17, 23:15,
30:1, 48:14,
60:21, 107:10
**rephrase**
7:23, 23:22,
64:11, 68:2,
107:11
**report**
15:6, 30:21,
31:3, 31:4,
62:4, 111:5,
164:21
**reported**
1:24, 16:1,
20:16, 32:2,
109:17
**reporter**
2:13, 6:23,
7:16, 13:10,
16:4, 16:17,
31:9, 59:7,
88:20, 167:1,
167:3
**reporter's**
62:4

**reporters**
31:11, 31:14,
31:15, 37:23,
38:1, 38:3
**reporting**
16:6, 31:24,
32:4, 32:6,
33:18, 33:22,
35:17, 36:18,
37:11, 38:13,
38:14, 59:10,
67:13, 95:6,
95:19, 106:20,
110:8, 114:23,
122:18, 123:7,
125:17, 125:18,
163:18
**reports**
160:12
**repost**
76:8
**represent**
6:15, 52:1,
94:1, 130:17
**representing**
6:10, 6:19,
6:21, 6:24
**represents**
142:9
**reproduce**
16:20, 17:8,
17:15, 18:10,
19:20, 19:23,
20:5, 24:10,
27:11, 70:24,
71:11, 75:11,
75:14, 87:23,
88:24, 92:10,
92:18, 103:24,
112:11, 113:8,
117:17, 121:15,
121:18
**reproduced**
20:23, 90:12,
102:20, 103:10,
103:15, 105:9,
113:2, 135:2,
141:13, 146:13

**reproducing**
66:14, 72:4,
105:1, 108:3,
113:13, 117:12,
117:16, 118:13,
134:1, 156:11
**reproduction**
82:14, 119:6,
133:12
**republishing**
133:21
**reputations**
111:3
**request**
24:8, 43:8,
43:12, 71:10,
72:7, 72:14,
73:15, 81:15,
82:8, 82:13,
82:16, 85:11,
86:3, 88:3,
88:17, 88:21,
91:23, 92:11,
92:19, 93:15,
112:6, 112:7,
112:9, 112:11,
113:9, 113:17,
121:16, 123:18,
123:20, 123:22,
124:1, 139:23,
152:13, 152:17,
165:2, 165:5
**requested**
72:17, 72:23,
73:1, 78:18,
94:13, 167:10
**requester**
73:4
**requesters**
82:3
**requesting**
43:17, 78:23,
88:11
**requests**
44:10, 70:11,
70:19, 70:24,
71:3, 71:5,
71:7, 71:14,

71:24, 73:13,
75:2, 78:6,
78:20, 79:21,
82:6, 87:17,
87:20, 87:22,
88:1, 88:4,
92:14, 92:22,
124:13, 139:24,
152:18
**require**
102:8
**required**
11:9, 26:11,
27:18, 32:14,
40:23, 66:3,
143:12, 143:13
**requires**
60:12
**research**
16:7, 17:2,
18:22, 124:3
**resident**
67:1, 102:23,
102:24
**residents**
49:23, 96:20,
97:10, 98:5,
98:6, 108:10,
108:11, 109:22,
110:23
**resolve**
139:13, 140:2,
140:6, 141:1
**resolved**
120:13
**resolving**
140:9
**resource**
141:20
**resources**
17:3
**respect**
12:3, 54:12,
55:19, 56:4,
56:13, 63:19,
68:9, 112:13,
113:21, 121:7,
139:10, 140:8

**respond**
72:7, 73:14,
75:16, 102:3,
116:18, 147:23,
148:9, 163:16
**responded**
148:6
**responders**
18:2
**responding**
100:4
**response**
43:6, 76:13,
93:14, 117:5,
118:11, 147:7
**responses**
105:22, 137:11
**responsibilities**
11:12, 11:14,
12:2
**responsible**
11:3, 90:21
**restaurant**
11:22
**result**
15:21, 44:12
**resulting**
90:22, 162:24
**retailer**
44:8
**return**
80:4, 80:17,
80:21, 81:23,
82:21
**revealing**
64:9, 115:7
**revenue**
21:6, 22:14,
22:24, 23:14,
23:18, 24:21,
24:23, 25:1
**review**
165:2
**reviewing**
8:12
**revised**
4:9
**rhythm**
142:19

**rider**
17:23
**right**
7:20, 30:19,
34:17, 34:21,
45:22, 61:3,
71:22, 79:23,
80:2, 107:14,
113:18, 124:1,
127:7, 127:10,
134:12, 134:16,
135:24, 148:7,
151:8, 153:15
**right-hand**
89:19
**rights**
27:19, 63:6,
63:19, 66:6,
66:16, 127:20
**rmr**
1:24
**robert**
75:6, 81:4
**robotic**
40:15, 40:16,
41:2, 41:22,
42:9, 53:3
**role**
12:15, 25:7,
26:5, 34:23,
74:5
**roles**
11:7
**room**
41:8, 127:3
**rope**
142:10
**rough**
87:6
**round**
161:17
**row**
62:3
**rubber-stamp**
44:15
**rudimentary**
16:22
**rudnick**
2:4, 3:22, 6:12

| | | | |
|---|---|---|---|
| **rule**<br>8:10, 93:13<br>**run**<br>12:22, 14:8,<br>84:14<br>**run-on**<br>87:4<br>**running**<br>77:24, 143:9,<br>143:15<br><br>**S**<br>**s**<br>105:10, 107:4,<br>134:4, 136:9,<br>136:21, 138:13,<br>155:22<br>**said**<br>15:23, 17:7,<br>23:2, 23:23,<br>51:14, 61:21,<br>65:3, 65:9,<br>68:7, 71:18,<br>76:8, 82:16,<br>92:14, 98:7,<br>113:16, 116:9,<br>121:4, 129:20,<br>131:1, 134:11,<br>134:14, 136:8,<br>140:17, 149:8,<br>149:15, 156:22,<br>167:8<br>**sake**<br>82:20<br>**same**<br>53:5, 59:14,<br>64:2, 74:9,<br>95:8, 103:8,<br>108:19, 121:6,<br>129:19, 151:5,<br>151:17, 166:4<br>**san**<br>3:7<br>**saperia**<br>76:11, 76:24,<br>77:11, 77:15,<br>82:21<br>**sara**<br>164:24 | **sarah**<br>3:13, 127:2,<br>127:5<br>**satisfactorily**<br>7:3<br>**saw**<br>121:9, 121:11,<br>129:6, 136:16,<br>162:16<br>**say**<br>7:23, 9:13,<br>9:16, 16:3,<br>19:11, 22:22,<br>27:6, 32:20,<br>36:14, 38:12,<br>41:2, 41:13,<br>43:8, 43:11,<br>44:4, 44:7,<br>44:13, 45:2,<br>48:18, 52:7,<br>53:20, 57:1,<br>59:19, 60:20,<br>61:12, 62:6,<br>63:14, 66:11,<br>66:12, 70:14,<br>70:21, 73:19,<br>75:11, 76:8,<br>76:10, 76:16,<br>76:20, 77:3,<br>77:4, 77:7,<br>77:16, 78:14,<br>80:22, 80:24,<br>82:22, 86:19,<br>87:3, 90:9,<br>96:14, 96:24,<br>98:18, 107:22,<br>117:6, 120:2,<br>120:6, 121:8,<br>128:23, 141:19,<br>148:12, 148:24,<br>151:3<br>**says**<br>52:15, 85:18,<br>87:19, 88:10,<br>91:21, 92:11,<br>93:12, 107:23,<br>112:8<br>**scan**<br>18:8 | **scenario**<br>66:1, 66:18,<br>78:22<br>**scene**<br>18:1, 18:3<br>**schedule**<br>10:2<br>**school**<br>11:23, 18:7,<br>22:21, 23:5,<br>24:3, 38:19,<br>42:14, 44:5,<br>46:4, 49:12,<br>73:3, 74:5,<br>74:21, 79:9,<br>86:1, 109:19<br>**schools**<br>85:5<br>**score**<br>107:24, 108:1,<br>108:24<br>**scoring**<br>109:7<br>**screen**<br>130:22, 131:10<br>**script**<br>101:13, 102:5,<br>107:23, 143:16<br>**se**<br>38:13, 90:10<br>**seal**<br>167:16<br>**searched**<br>18:5, 18:15<br>**searches**<br>17:2, 19:7,<br>19:10<br>**season**<br>111:10, 111:16,<br>142:1, 157:19,<br>157:21<br>**second**<br>58:1, 75:23,<br>84:23, 91:20,<br>146:16, 148:6,<br>148:9, 153:9,<br>161:17<br>**secondary**<br>57:23 | **seconds**<br>99:3<br>**section**<br>54:20, 86:10,<br>86:13, 89:20<br>**sections**<br>153:14<br>**secure**<br>66:5<br>**see**<br>54:1, 85:4,<br>87:1, 87:8,<br>93:12, 98:24,<br>99:9, 107:3,<br>107:6, 119:9,<br>128:1, 128:23,<br>147:16, 150:13,<br>152:5, 153:3,<br>159:4, 160:22,<br>162:5<br>**seeing**<br>103:18<br>**seek**<br>4:13, 16:24,<br>19:21, 19:23,<br>35:21, 43:10,<br>160:23<br>**seeking**<br>72:10, 92:10,<br>144:13<br>**seemed**<br>22:4, 108:12,<br>115:6, 133:23<br>**seen**<br>84:10, 86:17,<br>91:11<br>**segment**<br>33:8<br>**segments**<br>119:15<br>**select**<br>41:17, 59:11,<br>59:13, 59:19<br>**selects**<br>58:11<br>**self-evident**<br>135:14<br>**send**<br>70:1, 101:13, |

101:22, 124:6,
129:13, 131:5,
132:17, 139:7,
139:19, 140:15,
140:21, 140:23,
141:3, 145:11,
146:7, 151:18,
151:19, 152:6,
154:7, 159:23
**sender's**
115:8
**sending**
28:24, 112:19,
120:7, 120:14,
123:11, 128:19,
129:24, 137:21,
151:1, 151:20,
162:4
**sensational**
158:15, 158:16,
158:18, 158:22,
158:24, 159:2
**sense**
39:4
**sent**
29:4, 29:22,
30:3, 70:4,
91:18, 100:10,
100:11, 101:18,
102:1, 114:20,
115:3, 125:4,
126:16, 129:23,
130:9, 138:11,
139:5, 139:24,
149:15, 151:7,
151:12, 153:18,
154:1
**sentence**
55:5, 55:21,
86:9, 89:2,
92:11, 108:19,
137:17, 138:4
**sentences**
56:7, 87:4
**separate**
116:7
**september**
52:4, 85:18,

87:11, 88:5,
88:8, 88:19,
139:9, 139:11,
140:10, 140:16,
140:17, 140:22,
140:24, 146:9,
147:2, 147:24,
150:6, 151:4,
151:8, 151:9,
151:11, 152:8,
153:20, 153:21,
154:11, 159:24,
161:18, 162:5,
163:11
**series**
12:19, 32:21,
32:22, 54:8,
66:22, 80:9,
82:10, 151:12
**serious**
20:14
**seriously**
20:16, 112:6
**serve**
60:17, 61:6
**served**
69:11
**server**
46:15
**serves**
74:2, 78:15,
156:22, 157:22
**service**
27:7, 43:18
**session**
55:14, 55:15,
56:11
**sessions**
55:10, 55:12
**set**
5:8, 11:8,
26:12, 93:6,
112:16, 124:3,
154:18, 167:15
**several**
15:4, 18:6,
31:6, 91:21,
127:10, 138:20,

153:8
**shall**
83:3
**share**
102:5
**sharline**
46:9
**sheehan**
9:2, 32:11,
32:13, 52:6,
62:16, 86:23,
91:13, 100:5,
100:21, 101:7,
102:10, 112:17,
112:22, 115:17,
117:1, 118:22,
120:22, 123:5,
126:16, 127:7,
127:17, 128:9,
130:9, 147:16
**sheet**
166:7
**shocked**
160:16
**shoot**
11:9, 12:6,
12:8, 17:10,
22:21, 23:5,
24:3, 39:18,
39:19, 39:21,
41:1, 41:4,
48:17
**shooting**
51:13
**short**
119:15, 125:16
**shortages**
50:16
**shorter**
59:15, 61:18,
153:2
**shorthand**
167:1
**shortly**
103:5
**shot**
20:19, 20:24,
32:3, 41:16,

53:7, 64:14,
72:5, 75:11,
102:19, 103:20,
104:13
**should**
52:18, 52:20,
52:22, 54:8,
55:23, 56:8,
56:11, 83:4,
97:16, 110:16,
135:3
**shoulder-mounted**
40:24
**show**
9:21, 11:9,
11:20, 25:20,
25:22, 25:23,
26:3, 26:5,
26:8, 26:12,
49:8, 53:5,
63:9, 65:12,
66:13, 66:15,
66:24, 67:2,
69:13, 77:13,
78:15, 98:16,
101:24, 107:4,
109:23
**showed**
22:5, 22:6
**showing**
34:4, 35:5,
36:1, 51:21,
75:20, 84:7,
91:5, 93:2,
99:23, 126:12,
130:5, 130:16,
147:10, 161:7
**shown**
36:24, 43:23,
44:1, 44:4,
44:18, 45:4,
51:17, 52:22,
53:9, 56:23,
60:19, 79:10,
79:12
**shows**
25:19, 26:9,
49:9, 57:9, 61:3

**shut**
30:15
**sic**
135:6, 135:9
**sides**
116:10
**sign**
104:4
**signature**
115:7, 166:10
**signature-p1kal**
167:21
**signed**
166:7
**significant**
24:4, 71:8,
82:10, 128:8,
128:12, 156:4
**signing**
167:10
**signs**
103:1, 104:15,
108:6, 108:8
**similar**
30:24, 38:14,
65:2, 96:24,
98:9, 111:14,
150:11, 152:16,
152:18, 154:5,
159:20
**simpler**
57:23
**simply**
60:4
**since**
10:14
**single**
104:11, 118:16,
149:16, 149:17,
154:21
**sitting**
30:6, 79:20,
81:22, 155:14
**situation**
20:17, 24:14,
63:11, 63:13,
102:15, 102:17,
111:23, 112:21,

113:3, 113:12,
113:24, 114:1,
119:7
**six**
70:15
**sixth**
4:13, 35:21,
144:13, 144:16
**skew**
98:11
**skews**
98:13
**skills**
12:23, 26:11
**slightly**
98:8, 113:11
**small**
75:21, 80:11,
153:7
**social**
11:4, 30:23,
32:8, 32:15,
32:17, 33:1,
76:9, 142:21,
160:6
**solidarity**
109:24
**solved**
160:9
**some**
11:5, 15:18,
22:3, 25:12,
26:9, 26:19,
27:13, 31:4,
38:11, 38:13,
39:2, 39:21,
41:15, 42:13,
42:19, 44:1,
44:7, 57:19,
57:23, 61:18,
62:1, 65:21,
69:10, 69:11,
69:16, 69:17,
69:21, 79:17,
86:20, 87:3,
87:17, 88:21,
90:11, 92:14,
97:5, 105:1,

107:12, 107:23,
109:5, 110:4,
110:16, 113:1,
118:1, 139:12,
140:4, 141:12,
141:16, 142:10,
143:12, 143:13,
143:18, 143:21,
144:2, 144:23,
149:12, 149:23,
150:16, 151:3,
153:1, 153:2,
158:13, 158:18,
158:23, 161:1
**somebody**
45:21
**somehow**
27:16
**someone**
19:23, 66:11,
66:19, 70:8,
70:22, 73:7,
84:19, 99:2,
99:5, 103:18,
118:3, 119:11,
119:12, 120:24,
121:14, 145:8,
145:20, 145:23,
160:22, 161:2
**someone's**
119:10
**something**
31:22, 32:2,
32:15, 48:22,
59:2, 59:3,
59:14, 73:1,
75:12, 92:17,
92:18, 94:5,
102:7, 110:18,
111:9, 113:4,
123:24, 132:16,
136:20, 143:1,
146:1, 146:2,
162:17
**sometime**
103:2, 148:15,
149:19
**sometimes**
24:7, 28:8,

41:5, 85:23,
89:10, 94:17,
96:22, 143:13
**somewhere**
28:19, 137:4
**song**
133:10
**sony**
40:24, 41:8
**soon**
42:16, 92:18
**sorry**
23:22, 30:1,
36:11, 38:2,
57:7, 60:21,
68:2, 93:10,
101:17, 118:2,
126:2
**sort**
25:9, 33:19,
48:7, 93:20,
117:9
**sought**
92:18, 104:8
**sound**
58:22, 58:23,
59:13, 69:13,
69:14, 69:18,
142:7
**sources**
16:18, 16:24,
19:5, 26:17,
28:1, 28:11,
125:5
**sox**
25:21
**space**
46:15
**speak**
7:17, 29:7,
116:20, 116:23,
138:16
**speaker**
52:20, 53:5,
54:16
**speaking**
7:19, 51:10,
51:11, 51:15,

special
44:4, 160:12
specific
17:5, 116:17
specifically
17:6, 26:21,
33:18, 75:10,
128:19
speech
145:9
speeches
144:24, 145:5
spell
40:9
spend
97:18
spoke
109:22
sports
11:23
spouse
15:17, 15:21
staff
12:21, 29:8,
29:21, 30:3,
31:13, 31:16,
39:17, 39:22,
40:2, 40:3,
43:13, 48:9,
51:1, 58:13,
62:22, 72:24,
112:24, 115:23,
118:23, 123:16,
140:13
staffing
39:17, 50:16
stake
111:20
stand-alone
119:18, 124:24,
135:13, 148:14,
148:16, 148:20,
148:22, 149:13,
150:11, 150:13,
150:17, 152:15,
152:19, 159:15,
160:12

standing
107:13
star-studded
4:12
start
83:3, 129:21,
153:21
starting
111:11, 142:18
starts
42:16, 142:15,
143:3
state
6:15, 7:11,
79:3, 130:11
statement
4:21, 100:5,
100:17, 100:20,
100:22, 101:5,
101:6, 101:7,
102:9, 102:11,
102:12, 104:23,
105:4, 105:6,
105:19, 106:8,
107:23, 108:22,
109:8, 109:10,
110:3, 110:21,
111:8, 111:9,
112:8, 112:13,
112:16, 114:2,
117:11, 122:9,
122:11, 127:19,
128:6, 142:9,
142:12, 142:14,
144:6
statements
15:5, 15:14,
15:16, 15:19,
15:23, 77:19,
78:8, 78:9,
141:19, 141:22,
141:23, 142:3,
142:11, 145:1
states
1:1, 6:6,
137:19, 138:1
station
11:8, 12:17,

25:12, 72:4,
95:18, 104:8,
110:16, 117:7,
117:8, 144:22,
145:21
stations
49:4, 49:16,
49:18, 73:23,
91:22
status
109:4
stavros
3:22
stenographically
167:8
step
27:22
still
20:4, 41:6,
46:2, 150:21
stoltz
3:4, 4:3, 6:16,
7:8, 9:22, 34:1,
45:11, 45:18,
79:23, 83:1,
83:6, 84:6,
90:3, 94:1,
94:9, 114:7,
114:14, 122:24,
126:2, 126:11,
127:5, 137:14,
139:2, 144:14,
146:17, 146:24,
161:20, 162:2,
164:23, 165:2,
165:7
stop
47:17, 48:3,
138:2
stopping
142:18
stops
142:15, 143:4
store
44:8
stories
31:17
story
13:14, 16:6,

37:4, 59:3,
59:4, 60:9,
60:14, 61:9,
61:17, 68:15,
72:3, 72:11,
78:23, 80:8,
81:15, 81:24,
82:2, 82:5,
90:4, 92:4,
109:20
stream
98:22
streaming
42:21, 43:3,
80:9, 82:11,
85:10, 86:11
street
3:6, 17:24,
77:5
strike
27:20, 35:14,
63:16, 115:10,
123:10, 127:12,
138:9, 162:20,
162:21, 162:22,
163:3, 163:5,
163:9, 163:10,
163:15, 164:15
strikes
163:13
struck
164:7
struggle
142:8
struggling
143:4
student
37:17
students
49:13, 73:3,
74:4
studied
13:15, 13:24,
14:2
studio
11:9, 141:22
stuff
136:5

subject
15:6, 27:2,
103:21, 104:6,
109:16, 114:22,
133:20, 150:23,
159:17
submit
152:3, 152:4,
163:20
submitted
152:16
subscribers
156:15, 156:19
subsequent
42:20, 42:23
successfully
124:5
suddenly
70:22
suggest
120:10
suggested
102:12, 120:7,
151:21
suggesting
104:22
suggestion
102:14
suite
3:16
summer
3:22, 32:21,
140:14
summertime
140:11
superior
129:3
support
4:12
sure
80:3, 83:4,
143:23
surprised
160:10
survey
38:22
surveys
98:20

suspend
30:7
suspended
160:18, 163:13
suspicion
108:15
switcher
40:16, 41:11,
41:13, 41:14,
41:19, 53:2,
53:6
sworn
7:1, 7:4
syndicate
72:3, 72:11,
78:23, 80:8,
81:15, 81:24,
82:3, 82:5,
90:5, 92:4
system
41:3, 53:3

**T**

tab
31:3, 31:18,
32:6
take
8:2, 17:13,
20:18, 31:22,
36:12, 41:7,
45:9, 61:24,
73:8, 79:24,
86:6, 112:5,
112:12, 113:21,
114:5, 120:16,
121:19, 128:3,
128:17, 129:7,
129:8, 129:9,
140:8, 141:16,
143:23, 148:2,
149:5, 149:14,
160:17, 163:23
takedown
120:20, 123:17,
123:20, 123:22,
124:1, 124:5,
124:12, 124:14,
129:13, 139:20,

139:23, 139:24,
151:10, 151:15,
151:18, 151:24,
152:2, 152:13,
152:17, 152:22,
156:5, 158:10,
159:18, 159:21,
159:23, 161:18,
162:4
taken
1:13, 18:16,
27:22, 28:9,
33:16, 46:10,
103:19, 108:23,
110:17, 120:18,
135:1, 141:11,
153:24, 154:6,
159:19, 160:4,
163:1, 167:5,
167:8
takes
58:17, 143:11,
143:12, 143:14,
143:21, 144:2,
162:24
taking
6:11, 9:8,
131:20, 133:20,
133:24, 140:13,
162:12
talk
77:6
talked
45:20, 78:17,
113:3, 116:13,
150:24, 160:13
talking
46:12, 115:16,
122:23, 147:1,
162:19
tape
141:22, 142:8,
142:11
taped
55:7, 77:19,
142:14
taping
55:16, 78:8,

142:3
taught
12:21, 85:24
taxpayer
101:4
teacher
46:3, 74:22
teaching
64:20, 74:4
technical
26:11
technology
41:16
teen
22:9
telecast
55:16, 55:24
telecasts
52:16, 52:18
telephone
87:18, 92:15
teleprompter
142:5, 143:16
televised
98:19, 99:7
television
4:20, 11:1,
30:22, 91:22,
98:2, 98:10
tell
17:22, 97:7,
98:22, 143:7
telling
23:11
telvue
46:21, 46:22
tempers
111:10
ten
66:23, 73:6,
120:1
tend
98:11
term
4:14, 35:21,
68:6, 138:23,
144:13, 144:16,
163:2

**terms**
52:19, 54:9,
138:21, 143:18
**testified**
7:5, 60:22
**testify**
9:10, 29:17
**testifying**
10:4
**testimony**
8:15, 23:16,
29:13, 166:4,
166:6, 167:7,
167:8
**text**
4:23, 75:21
**th**
85:18, 88:19,
115:20, 126:18,
150:7
**thank**
10:11, 21:22,
30:18, 35:2,
35:22, 36:14,
36:21, 40:11,
46:12, 56:15,
76:5, 76:10,
76:18, 82:24,
83:6, 86:14,
94:9, 99:20,
139:2, 164:23
**thanks**
45:12
**theirs**
141:15
**themselves**
6:15, 143:20
**thereafter**
167:9
**therefore**
155:8, 159:17
**thing**
113:6
**things**
31:3, 45:19,
72:22, 75:8
**think**
45:20, 72:16,

73:5, 75:1,
75:9, 75:10,
82:19, 83:1,
83:4, 121:3,
136:8, 138:2,
138:17, 157:21
**thinking**
138:22
**third**
10:2, 49:14,
61:12, 154:18
**third-party**
46:17
**thomas**
79:3
**thought**
24:20, 109:2,
121:23, 162:12
**thread**
102:2, 127:6,
127:17
**three**
8:20, 30:8,
34:11, 34:13,
42:2, 61:21,
74:10, 143:14,
163:12
**through**
4:22, 5:2, 5:4,
5:10, 5:11,
10:7, 10:9,
18:15, 19:3,
19:4, 19:16,
36:11, 39:10,
54:24, 88:1,
97:13, 106:21,
116:5, 142:16,
148:1, 148:19,
149:8, 149:11,
151:4, 158:2,
158:15, 160:6
**thrust**
59:2
**thumb**
76:17
**thursday**
101:21
**tight**
92:16

**tilt**
41:2, 41:11
**time**
6:8, 7:17, 8:2,
8:3, 12:19,
18:5, 18:18,
22:10, 23:10,
33:5, 36:12,
45:9, 45:14,
45:17, 48:10,
59:17, 60:12,
60:20, 60:22,
61:24, 71:9,
76:17, 80:15,
83:2, 83:8,
84:3, 85:20,
88:15, 89:8,
90:2, 90:3,
97:19, 100:9,
103:8, 107:3,
107:6, 109:10,
110:3, 114:4,
114:10, 114:13,
115:5, 119:2,
119:9, 125:4,
126:5, 126:8,
128:22, 129:19,
129:23, 131:9,
132:7, 132:12,
133:17, 134:3,
136:9, 137:20,
138:1, 138:10,
140:14, 142:6,
142:7, 143:15,
145:3, 146:19,
146:23, 148:9,
148:15, 150:16,
151:23, 155:17,
155:19, 156:17,
157:10, 157:22,
161:22, 162:1,
163:11, 164:2,
164:8
**times**
8:19, 8:20,
17:8, 43:23,
44:18, 53:19,
142:3, 142:8,

**title**
10:20, 35:19,
36:6
**titled**
84:9, 144:16
**titles**
109:18, 158:3,
158:6, 158:9,
158:13, 158:14,
158:16, 158:18,
158:21, 158:23,
159:2, 159:4
**today**
6:10, 6:24,
9:9, 30:7, 30:9,
47:14, 81:22,
155:14
**today's**
6:8, 8:9, 8:15
**together**
153:14
**told**
30:19, 64:14,
64:18, 72:10,
113:1, 135:21,
145:21, 145:23
**tom**
76:4, 95:1
**took**
18:1, 18:11,
22:20, 23:4,
24:2, 106:5,
147:17
**top**
52:15, 54:20,
66:20, 67:24,
68:3, 68:16,
68:20, 68:24,
82:11, 89:19,
91:20, 93:10,
101:2, 102:2,
127:17
**topic**
10:5, 29:14,
60:3, 60:11,
61:19, 79:24,
122:11

**topics**
9:21, 10:7,
10:9
**toxic**
111:12
**traditional**
40:23, 96:14,
96:23
**traffic**
38:21
**tragedy**
20:20, 21:20
**trained**
12:8
**training**
14:24, 15:2,
15:11, 15:13,
16:10, 16:13,
16:15, 19:11,
19:13, 45:21,
45:23
**transcribed**
5:21
**transcript**
4:7, 9:24,
34:3, 35:4,
35:24, 36:23,
51:20, 75:19,
84:5, 91:4,
93:1, 99:22,
126:10, 130:4,
130:15, 147:9,
161:6, 165:3,
167:6
**transcription**
166:5
**transform**
133:15, 133:18
**transformation**
134:19
**transformative**
67:14, 68:6,
68:8, 125:23,
134:10, 155:8,
159:17
**transparency**
49:17, 96:5
**traveled**
140:12

**tribune**
37:15
**tried**
18:16, 92:18,
151:17
**tries**
51:9
**triple**
72:6, 79:4,
79:6, 80:12
**tripod**
41:7
**true**
34:7, 35:11,
36:9, 37:7,
86:16, 100:14,
126:22, 130:8,
147:13, 161:13,
166:4, 167:6
**truthfully**
9:10
**try**
18:15, 23:23,
38:18, 39:16,
39:19, 41:9,
142:7, 152:4
**trying**
131:6, 131:22,
135:17, 135:22,
141:1, 156:15,
158:16
**tuesday**
32:22
**turn**
29:10, 54:19,
93:9, 93:10,
105:21, 106:1,
137:16
**turning**
137:10
**turnout**
122:14
**tv**
46:3, 66:13,
66:15, 66:20,
71:10, 74:22,
81:9, 89:14
**twenty**
47:20

**twice**
164:17
**two**
11:2, 25:19,
39:9, 39:17,
39:22, 40:2,
46:16, 56:6,
57:22, 61:5,
61:15, 66:8,
103:1, 104:15,
108:7, 109:18,
153:9
**two-minute**
44:13
**tye**
3:14
**type**
71:2, 71:23,
73:4, 78:8,
82:8, 113:6,
121:6
**types**
40:13, 40:17,
40:20, 73:8
**typewriting**
167:9
**typical**
42:4, 70:24
**typically**
26:6, 32:5,
32:17, 33:24,
39:18, 40:15,
43:22, 44:18,
45:4, 49:5,
51:13, 52:23,
53:18, 58:13,
58:15, 62:13,
71:2, 71:9,
74:13, 81:11,
82:5, 82:14,
98:5, 99:13,
121:15, 143:2,
143:5

U

**ultimately**
22:7, 22:10,
72:15, 101:5,

108:16, 117:11,
142:19
**unable**
12:8, 18:10,
18:18, 40:6,
50:15
**unaccustomed**
119:7, 142:4,
144:17
**unbiased**
54:23, 56:8
**uncensored**
54:23
**unclear**
110:15, 111:17,
138:5, 152:3
**under**
31:17, 55:5,
55:22, 55:23,
56:7, 125:2,
125:24, 148:5,
155:10, 167:9
**understand**
7:22, 9:10,
9:13, 9:16,
23:21, 30:11,
30:12, 33:14,
58:21, 62:8,
68:8, 133:8,
136:15
**understanding**
16:22, 17:1,
19:2, 19:6,
19:16, 19:19,
23:7, 30:6,
61:19, 61:23,
62:2, 62:18,
63:6, 63:10,
94:5, 95:23,
96:8, 114:24,
132:7, 133:17,
135:22, 136:9
**understood**
20:1, 24:11,
121:16
**unedited**
51:7, 54:22
**unfortunately**
76:18

**united**
1:1, 6:5
**university**
13:15, 13:17,
14:1
**unknown**
106:5
**unlawfully**
90:21
**unlikely**
120:13
**unprecedented**
102:9, 114:1
**upcoming**
122:6, 122:10
**upload**
11:5
**uploaded**
26:23, 27:1,
27:13, 28:4,
28:8, 29:6
**uploader**
29:23
**uploading**
26:18
**useful**
78:9
**user**
89:4, 90:21,
102:18, 103:14,
105:18
**user's**
106:8, 109:15
**uses**
56:24, 61:5,
105:16, 106:3,
125:16
**using**
21:9, 67:8,
80:21, 106:15,
110:22, 111:1,
119:3, 119:11,
119:12, 121:10,
122:17, 122:18,
123:6, 123:7,
132:13, 135:10,
136:19, 147:18,
156:15

**usually**
82:7

**V**

**vacation**
32:19, 32:24
**vacations**
140:13
**value**
25:13, 137:23,
138:5, 138:9,
138:14, 138:18
**values**
4:16, 4:17,
36:7, 36:8
**vanaria**
114:17
**vanaria's**
114:21
**variety**
38:11
**various**
11:7, 38:19,
160:14
**verbal**
117:5, 147:7
**verbally**
65:6, 135:9
**verbatim**
135:2
**verbiage**
108:20
**verify**
18:13
**version**
87:1, 143:20
**versus**
122:18, 123:7
**via**
39:3, 113:9
**victim**
18:4, 18:5,
18:9, 22:5,
22:6, 22:8,
22:10
**videographer**
3:21, 6:2, 6:9,
6:23, 45:13,

45:16, 83:7,
84:2, 114:9,
114:12, 126:4,
126:7, 146:18,
146:22, 161:21,
161:24, 165:8
**videotaped**
1:12, 6:3
**viewability**
52:19, 54:10
**viewer**
55:1
**viewers**
54:1, 62:1,
62:4, 96:19,
97:5, 97:9,
97:18, 97:20,
98:15, 121:22,
121:24, 142:1,
156:15, 156:18,
157:3, 157:6,
158:14, 158:17,
162:6, 162:13
**views**
103:11, 104:3,
108:5, 108:7,
114:21
**violation**
128:2, 128:16,
129:11
**visited**
164:17
**visually**
85:6
**voice-identify**
6:14
**volunteer**
12:18
**volunteers**
26:4, 26:6,
74:14
**voters**
141:20, 143:20
**vue**
13:11

**W**

**waited**
160:22

**walk**
116:5
**waltham's**
4:17, 36:8,
109:24
**wangler**
1:14, 2:1, 4:2,
4:8, 6:4, 7:2,
7:9, 7:13, 9:23,
34:2, 34:4,
35:3, 35:23,
36:22, 51:19,
75:18, 84:4,
91:3, 92:24,
99:21, 126:9,
126:12, 130:3,
130:14, 147:8,
161:5, 165:9,
166:2
**want**
45:2, 59:11,
59:13, 62:1,
77:6, 118:18,
137:3, 137:4,
137:5, 163:18
**wanted**
73:7, 73:17,
75:11, 77:21,
78:3, 88:16,
105:4, 112:1,
112:4, 112:6,
112:7, 113:7,
117:10, 138:24,
143:22, 143:24
**wants**
121:14
**ward**
75:6, 75:8,
79:8
**waste**
151:23
**watch**
60:7, 60:9,
61:13, 61:21,
62:2, 96:21,
98:4, 98:7,
98:16, 98:19,
106:24, 137:3,

**watched**
28:4, 28:14,
28:16, 99:3,
99:4, 112:15,
125:9, 129:19,
131:1, 149:24,
152:14, 155:5

**watching**
28:3, 76:6,
97:19, 99:8

**way**
43:4, 43:14,
55:1, 57:13,
60:2, 60:10,
61:9, 69:1,
69:8, 73:12,
89:13, 98:19,
109:13, 109:14,
110:14, 110:16,
111:2, 111:21,
144:23

**ways**
21:19, 31:6,
97:14

**wbz**
92:2

**wca**
4:22, 5:2, 5:4,
5:10, 5:11,
5:12, 5:15, 5:16

**wcac's**
29:14, 34:5,
34:8, 36:2,
54:3, 54:11,
54:14, 69:22,
85:3, 110:5,
110:22, 134:5,
136:10, 136:22,
137:11, 156:8,
164:9

**we'll**
8:2, 9:22,
80:1, 139:2

**we're**
29:3, 122:23,

**136:5**

**we've**
30:16, 41:3,
78:17, 82:4,
112:9

**weaver**
3:21, 6:10

**website**
31:2, 31:19,
31:20, 31:24,
32:6, 34:5,
34:8, 35:6,
36:2, 37:1,
37:5, 37:20,
42:21, 43:3,
46:14, 46:18,
60:1, 60:5,
60:8, 60:19,
61:3, 98:23,
99:9

**wednesday**
1:17

**week**
68:19

**weekly**
13:11

**weeks**
11:3, 164:18

**went**
67:11, 116:12,
120:17

**weren't**
123:16, 156:3,
157:23

**whatever**
40:22, 42:17,
59:8, 61:8,
73:17, 78:3,
80:14, 104:6,
129:12, 143:17

**whereas**
97:14, 99:6

**whereof**
167:15

**whereupon**
127:1, 146:21

**wherever**
52:20, 52:21

**whether**
15:11, 21:5,
21:8, 21:12,
21:15, 21:18,
22:1, 22:13,
23:12, 23:17,
24:20, 24:24,
55:7, 65:21,
67:8, 67:23,
129:18, 131:6,
132:1, 132:12,
133:6, 133:10,
134:3, 134:19,
153:3, 153:10,
155:1, 155:11,
155:18, 155:22,
156:7, 157:13,
157:15, 157:18,
159:7

**whichever**
58:9, 77:21,
88:24

**whiteley**
46:1, 49:12,
73:1, 73:14,
81:7, 85:23

**whitely**
86:3

**whole**
124:20, 154:19

**wholesale**
44:8

**whomever**
110:10

**wide**
44:9, 45:7

**wise**
20:4

**within**
55:14, 60:17,
62:7, 69:7,
165:3

**without**
17:20, 20:6,
20:10, 64:9,
102:20, 105:6,
105:9, 106:6,
112:1, 119:6,

**119:11, 119:12,**
121:18, 133:21,
134:9, 135:5,
141:13, 146:13,
156:12

**witness**
7:1, 55:1,
64:8, 138:3,
144:15, 167:15

**woman**
15:21, 102:23,
102:24, 103:11,
104:3, 104:14,
108:5, 108:13,
109:16, 109:21,
114:16, 145:6

**wondering**
45:8, 76:7

**wooden**
142:7

**word**
108:18

**words**
145:6

**work**
10:15, 10:16,
10:18, 11:11,
12:19, 12:24,
19:4, 26:7,
76:5, 76:22,
85:6, 87:14,
121:13, 121:19,
152:5, 156:8

**work-by-work**
137:24

**worked**
13:6, 14:6,
24:12, 73:11,
137:6

**working**
41:3, 140:3

**workings**
96:20

**worried**
103:18

**worry**
156:20

**wouldn't**
59:11, 59:13,

61:24, 137:10

**write**
31:16, 32:8,
35:9, 91:13,
100:17, 102:10,
128:4, 148:16,
150:1

**writes**
147:16

**writing**
33:3, 85:12,
87:19, 87:21,
87:23, 91:15,
92:12, 92:17,
92:20, 100:19

**written**
52:3, 52:5,
70:8, 85:13,
85:15, 85:19,
86:3, 86:22,
90:11, 93:20,
113:9

**wrote**
35:12, 36:4,
36:10, 37:4,
84:12, 84:13,
100:22, 108:9,
108:22, 109:10,
110:3, 110:21,
120:5, 129:16,
144:15, 161:11,
161:14

**X**

**x**
1:3, 1:10

**Y**

**yeah**
62:18, 69:16,
86:2

**year-old**
17:23

**yearbook**
18:6, 18:7,
18:9, 18:15,
18:17, 20:9,
21:24, 22:4,

22:17, 22:19,
23:3, 23:13,
23:18, 24:1,
24:13, 24:15,
24:16, 66:2

**years**
15:4, 18:6,
21:23, 46:16,
58:21, 66:23,
73:6, 78:16,
97:11, 98:6,
143:13

**york**
72:2, 92:4

**younger**
22:9, 59:12,
97:2, 97:19,
98:14, 99:13,
157:5

**yourself**
31:9

**youthful**
97:16

**youtube**
5:14, 11:5,
25:3, 25:6,
25:10, 27:14,
27:21, 28:3,
28:8, 28:9,
28:12, 28:14,
28:24, 29:5,
29:23, 30:4,
30:7, 30:14,
47:3, 47:9,
47:11, 48:4,
70:2, 70:5,
107:7, 107:14,
112:19, 119:20,
119:23, 120:8,
120:15, 120:17,
123:12, 123:14,
123:19, 123:24,
124:4, 124:7,
124:10, 124:11,
125:9, 125:13,
127:19, 128:1,
128:3, 128:5,
128:14, 128:18,

128:20, 128:23,
129:10, 129:13,
129:17, 129:22,
130:1, 131:5,
132:18, 133:4,
136:7, 139:6,
139:7, 139:18,
139:21, 139:24,
140:10, 140:21,
146:8, 148:2,
148:20, 149:5,
149:13, 149:16,
150:10, 150:18,
152:7, 153:19,
153:23, 154:8,
155:4, 157:12,
158:21, 159:18,
160:3, 160:4,
160:20, 161:2,
162:5, 162:20,
163:8, 163:13,
163:20, 164:3,
164:9

**youtube's**
26:14, 28:2,
28:6

**yup**
40:12, 54:22,
86:8, 137:12,
149:18

**Z**

**zero**
135:2

**zoning**
38:20, 43:11,
61:22, 62:3

**zoom**
39:3

**$**

**$15**
43:20

**0**

**0000119**
5:4

**0000121**
5:2

**0000123**
5:11

**0000420**
5:15

**0000422**
5:12

**0000433**
5:10

**0000556**
4:22

**0000718**
5:16

**02110**
3:17

**02111**
2:6

**02452**
115:5

**06**
114:10, 114:11

**07**
83:8, 83:9

**08**
1:18, 6:9

**1**

**10**
10:7, 44:23,
45:14, 45:15,
45:17, 92:2

**11**
85:18, 88:19,
161:22, 161:23

**11927**
1:7, 6:7

**12**
10:9, 83:3,
83:8, 83:9,
84:3, 93:9,
126:20

**120**
5:4

**122**
5:2

**125**
5:11

**126**
5:11

**13**
93:11, 106:1,
114:11, 114:13,
126:20
**130**
5:12, 5:13
**14**
114:10, 114:13,
126:5, 126:8
**147**
5:15
**15**
10:9, 21:23,
58:21, 115:20,
146:19, 146:23,
150:7, 159:19,
167:18
**16**
126:18, 161:22,
162:1, 165:10
**161**
5:16
**167**
1:23
**17**
106:2
**18**
17:23
**1963**
164:18
**1992**
13:16
**1996**
13:16
**1:-cv--pbs**
1:7, 6:7
**1b**
52:15
**1st**
140:22, 140:24,
146:9, 147:2,
147:24, 151:8,
151:9, 151:11,
153:20, 153:21

---
**2**
---

**2**
114:11, 126:6

**20**
45:1, 147:23
**2009**
10:23
**2010**
20:15
**2011**
79:11
**2016**
10:14
**2019**
17:23
**2021**
72:2, 102:24
**2022**
94:22, 106:17,
106:24, 107:19,
109:20
**2023**
5:3, 28:15,
28:16, 28:19,
28:21, 36:15,
38:9, 47:23,
52:4, 65:20,
69:20, 70:1,
77:9, 85:18,
87:11, 88:5,
88:8, 88:19,
91:10, 100:6,
101:8, 101:19,
103:6, 106:4,
107:21, 115:21,
126:18, 133:4,
144:11, 144:17,
145:2, 147:2,
151:2, 151:4,
154:21, 161:19,
162:5, 163:11
**2025**
1:17, 6:8,
167:17
**2026**
167:18
**22**
5:3, 91:10
**24**
1:7, 6:7
**25**
161:23, 162:1

**29**
146:19, 146:20
**2e**
88:10
**2f**
89:3
**2g**
90:19

---
**3**
---

**3**
146:20
**30**
1:12, 8:10,
8:13, 9:21,
11:1, 29:11,
148:11, 148:12,
151:21, 151:24,
165:4
**31**
4:9, 9:23,
165:10, 165:11
**32**
4:12, 34:2
**33**
4:13, 35:3,
93:13
**34**
4:12, 4:15,
35:23, 45:14,
45:15
**35**
4:13, 4:15,
4:18, 36:22,
37:1
**36**
4:18, 4:19,
51:19, 51:22,
146:20, 146:23
**37**
4:23, 75:18,
75:21
**3700**
3:16
**38**
5:2, 84:4, 84:8
**39**
5:3, 91:3, 91:6

---
**4**
---

**4**
161:23, 165:11
**40**
5:5, 61:12,
83:3, 92:24,
93:3, 105:23,
105:24, 137:13,
137:14
**41**
5:10, 99:21,
99:24, 105:21,
126:5, 126:6
**415**
3:8
**42**
5:11, 126:6,
126:8, 126:9,
126:13
**43**
5:12, 130:3,
130:6, 130:12,
130:19, 134:22
**434**
5:10
**436**
3:8
**44**
5:13, 130:14,
130:17
**45**
5:15, 147:8,
147:11
**456**
3:18
**46**
5:16, 45:15,
45:17, 161:5,
161:8
**4a**
54:20
**4th**
140:10, 140:16,
140:17

---
**5**
---

**51**
4:19

**52**
83:9, 84:3,
101:19
**560**
4:22
**590641**
1:22

### 6

**617**
2:7, 3:18
**6th**
101:8, 101:19,
152:8, 161:18

### 7

**7**
101:19
**75**
4:23
**7th**
154:11, 159:24

### 8

**8**
147:23
**8000**
3:18
**815**
3:6
**8200**
2:7
**84**
5:2
**856**
2:7

### 9

**9**
1:18, 6:9
**91**
5:3
**92**
5:5
**9333**
3:8
**94109**
3:7

**99**
5:10
**9th**
6:8, 167:16

### @

**@gmail**
139:18, 140:4
**@wcac**
139:19