# Exhibit A

# In the Matter of:

*Channel 781 News vs*

*Waltham Community Access Corporation*

---

*Joshua Kastorf*

*June 27, 2025*

---

*68 Commercial Wharf • Boston, MA 02110*
*888.825.3376 - 617.399.0130*
*Global Coverage*
*Magnals.com*



Channel 781 News vs                 30(b)(6)                 Joshua Kastorf
Waltham Community Access Corporation                         June 27, 2025

```
 1                                   VOL. 1
 2                                   PAGES 1 - 203
 3                                   EXHIBITS 10 - 13
 4                UNITED STATES DISTRICT COURT
 5              FOR THE DISTRICT OF MASSACHUSETTS
 6                   Civil Action No. 1:24-CV-11927-PBS
 7     -------------------------------------
 8   CHANNEL 781 NEWS,                        )
 9                    Plaintiff               )
10   v.                                       )
11   WALTHAM COMMUNITY ACCESS CORPORATION,    )
12                    Defendant               )
13     -------------------------------------
14
15   RULE 30(B)(6) DEPOSITION OF CHANNEL 781 NEWS, BY AND
16    THROUGH THEIR REPRESENTATIVE, JOSHUA PAUL KASTORF,
17             AND IN HIS INDIVIDUAL CAPACITY
18                   Friday, June 27, 2025
19                   10:10 a.m. - 4:04 p.m.
20                   Prince Lobel Tye, LLP
21                   One International Place
22                   Boston, Massachusetts
23                      *********
24       Reporter: Lauren M. Mitchell, CSR, RPR, CRR
```

2

1    APPEARANCES:

2

3            Brown Rudnick, LLP

4            Rebecca MacDowell Lecaroz, Esq.

5            One Financial Center

6            Boston, Massachusetts 02111

7            (617) 856-8200/rlecaroz@brownrudnick.com

8            -and-

9            Electronic Frontier Foundation

10           Mitch Stoltz, Esq.

11           Betelem Zewge Gedlu, Esq.

12           815 Eddy Street

13           San Francisco, California 94109

14           Counsel for the Plaintiff

15

16           Prince Lobel Tye, LLP

17           Jeffrey J. Pyle, Esq.

18           One International Place, Suite 3700

19           Boston, Massachusetts 02110

20           (617) 456-8000/jpyle@princelobel.com

21           Counsel for the Defendant

22

23   ALSO PRESENT VIA VIDEOCONFERENCE:

24           Chris Wangler

Channel 781 News vs                      30(b)(6)                    Joshua Kastorf
Waltham Community Access Corporation                               June 27, 2025

3

1                          I N D E X

2

3    WITNESS                                      PAGE

4    JOSHUA PAUL KASTORF

5    BY MR. PYLE:                                 6

6

7                     E X H I B I T S

8

9     Exhibit 10, notice of taking  deposition     24

10     of Plaintiff, Channel 781 News

11     Exhibit 11, group of text messages, Bates    29

12     Nos. C781_00000375 through C781_00000383

13     Exhibit 12, complaint for damages and        57

14     injunctive relief

15     Exhibit 13, text message string, Bates       184

16     No. 1309

17     Exhibit A, YouTube video                     201

18

19

20

21

22

23

24

4

```
 1                  REFERRED-TO EXHIBITS

 2   Benavides Exhibit 1                        109

 3   Benavides Exhibit 2                        124

 4   Benavides Exhibit 3                        142

 5   Benavides Exhibit 4                        161

 6   Benavides Exhibit 5                        166

 7   Benavides Exhibit 6                        174

 8   Benavides Exhibit 7                        179

 9   Benavides Exhibit 9                        192

10

11

12

13

14

15

16   ***EXHIBITS MARKED DURING THE WERE RETAINED BY

17      ATTORNEY PYLE.

18

19

20

21

22

23

24
```

5

```
 1                        PROCEEDINGS
 2                   JOSHUA PAUL KASTORF,
 3   a witness called for examination by counsel for the
 4   Defendant, WALTHAM COMMUNITY ACCESS CORPORATION, and
 5   having been satisfactorily identified by the
 6   production of his Massachusetts driver's license,
 7   was duly sworn/affirmed by the Notary Public and
 8   testified as follows:
 9             MR. PYLE:  Counsel, I thought we'd put
10   some stipulations on the record.  As before, all
11   objections, except as to the form of the question,
12   are reserved until trial.  All motions to strike are
13   also reserved until trial.
14             The witness, I assume, would like an
15   opportunity to read and sign the deposition
16   transcript.  Thirty days, would that be sufficient,
17   from the receipt of the transcript?
18             MS. MacDOWELL LECAROZ:  Yes.  That's
19   fine.
20             MR. PYLE:  And we can waive the
21   requirement of a notarized signature on that?
22             MS. MacDOWELL LECAROZ:  Yes.
23             MR. PYLE:  We also discussed that today
24   will be a combined Rule 30(b)(6) and individual
```

6

 1   deposition of Joshua Kastorf/Channel 781 News, the

 2   unincorporated association.  And as I understand it,

 3   I will endeavor to mark on the transcript when we

 4   transition from individual to Rule 30(b)(6), but to

 5   the extent I fail to do that, the plaintiff, Channel

 6   781 News, reserves the right to object to the use of

 7   any particular part of the deposition transcript

 8   that it does not believe falls within the scope of

 9   the Rule 30(b)(6) schedule to the extent needed

10   either at trial or summary judgment.

11              Does that more or less state our

12   position?

13              MS. MacDOWELL LECAROZ:  Yes.  We're in

14   agreement.

15              MR. PYLE:  Great.  Thank you.

16   EXAMINATION BY MR. PYLE:

17      Q.  All right.  Could you please tell me your

18   name?

19      A.  Josh Kastorf.

20      Q.  Is that your full name?

21      A.  Joshua P. Kastorf.

22      Q.  What does the P stand for?

23      A.  Paul.

24      Q.  I'll ask you, Mr. Kastorf, to keep your

Channel 781 News vs                    30(b)(6)                    Joshua Kastorf
Waltham Community Access Corporation                              June 27, 2025

7

1    voice up.  There's this loud white noise thing that
2    we have running here to make sure that statements
3    can't be heard out in the hallway.
4        A.  Oh, okay.
5        Q.  That's the reason for why it sounds like
6    we're in an airplane.
7                And where do you live, Mr. Kastorf?
8        A.  Waltham.
9        Q.  And what's your address?
10       A.  33A Everett Street.
11       Q.  Okay.  How long have you lived in Waltham?
12       A.  About, about 12 years.
13       Q.  Okay.  Could you tell me your educational
14   background starting with high school?
15       A.  Sure.  I went to high school in California,
16   it was a school called Rio Americano.
17       Q.  What town is that in?
18       A.  Sacramento, California.  I went to college
19   at the University of Southern California, and I went
20   to grad school at Northeastern.
21       Q.  And when you went to USC, did you have a
22   major?
23       A.  Yes.  Film and video production.
24       Q.  Okay.  A minor?

8

1      A.  No.

2      Q.  Okay.  And what year did you graduate USC?

3      A.  1997.

4      Q.  Same year I graduated college.  We must be

5   the same age.

6               And, so, then what did you do directly

7   after college?  Did you go right into grad school,

8   or did you do something else?

9      A.  No.  I worked briefly in Los Angeles, and

10   then I moved back to the Boston area.

11      Q.  When you say you moved back to the Boston

12   area, did you come from the Boston area originally?

13      A.  Yes.  I grew up in Pembroke, Massachusetts,

14   and my family moved to California when I was in high

15   school.

16      Q.  Oh, I see.  Okay.  How far into high school

17   did you move to California?

18      A.  Tenth grade.

19      Q.  And you didn't want to move back to the

20   South Shore, huh?

21      A.  No.  It wasn't my decision, though.

22      Q.  So, what did you do in Los Angeles after

23   college?

24      A.  I briefly worked on a television show, and

9

1    then after that I briefly worked as an

2    administrative assistant.

3        Q.   What show was that?

4        A.   Win Ben Stein's Money.

5        Q.   I remember that show.  Okay.

6             Did you get to meet Ben Stein?

7        A.   Yes.

8        Q.   And, so, then you worked as an

9    administrative assistant for what company or outfit?

10       A.   I don't remember.  It was a temp agency.

11       Q.   Okay.  So, how long did you spend between

12   college and moving back to Massachusetts?

13       A.   About six months.

14       Q.   Okay.  So, you moved back to Massachusetts

15   then in the year 1999 or thereabouts?

16       A.   I think it was '98.

17       Q.   '98, okay.  And, so, where did you move to

18   in Mass. when you got back here?

19       A.   Lexington.

20       Q.   Okay.  And what was the purpose of coming

21   back to Massachusetts?

22       A.   I was just moving back in with my parents.

23   They lived in Lexington.

24       Q.   Oh, okay.

                                                                    10
 1              MS. MacDOWELL LECAROZ:  Sorry.  Can we
 2    briefly go off the record for a minute?
 3              (Brief recess.)
 4              MR. PYLE:  Back on the record.
 5    EXAMINATION BY MR. PYLE:
 6        Q.  So, you moved back to Lexington in 1998?
 7        A.  Uh-huh.
 8        Q.  And then what did you do?
 9        A.  I started working as an administrative
10    assistant.  I eventually moved to Boston, and then
11    was in Boston for a long time, and then moved to
12    Waltham.
13        Q.  Did you at some point go to graduate school?
14        A.  Yes.
15        Q.  Okay.  And what year did you start graduate
16    school?
17        A.  2009.
18        Q.  2009.  So, you were working in Boston for
19    about 11 years before you went to grad school?
20        A.  That's correct.
21        Q.  Okay.  And what kind of work did you do in
22    that period?
23        A.  Administrative assistant.
24        Q.  Okay.  Anything else related to video

11

1    production or anything like that?

2        A.  Yes.  I did some free-lance video production

3    and video editing.

4        Q.  Okay.  For what kind of clients, projects?

5        A.  Mostly non-profits and educational

6    institutions.

7        Q.  Such as?

8        A.  Such as MIT, there was an organization

9    called Raising A Reader, and there was an

10   organization called Urbanity Dance that I worked

11   with.

12       Q.  What companies did you work as an

13   administrative assistant for during that 11-year

14   period?

15       A.  I first was at WGBH.  Then I was at MSPCA

16   Angell Hospital.  Then I was at a small video

17   distributor called Fanlight Productions.  And then I

18   was at MIT, and I've been at MIT since then.

19       Q.  Okay.  And what year did you start working

20   at MIT?

21       A.  2008.

22       Q.  And you've been in the same position since

23   2008 at MIT?

24       A.  I've been in different departments, but I've

12

1    been an administrative assistant the whole time.

2        Q.  Okay.  I want to -- well, since you started

3    in 2008, we'll try to go chronologically.

4              What was the department you started at

5    at MIT in 2008?

6        A.  Residential life.

7        Q.  Okay.  How long did you work at res. life?

8        A.  About two years.

9        Q.  Okay.  And then where did you go?

10       A.  Brain and cognitive sciences.

11       Q.  And how long were you there?

12       A.  About two years.

13       Q.  Okay.  What's next?

14       A.  Next is earth resources lab, where I started

15   in 2015, and I'm still there.  So, about 10 years.

16       Q.  About 10 years, great.  So, let's cycle back

17   to 2009 when you started grad school.

18             What did you go to grad school at

19   Northeastern for?

20       A.  Digital media.

21       Q.  And did you -- how long of a program in

22   terms of time was that?

23       A.  Well, I was taking one semester -- one

24   course per semester.  So, it took me seven years to

13

1  graduate.  I graduated in 2016.

2      Q.  And did you get a master's degree at that

3  point?

4      A.  Yes.

5      Q.  Okay.  And the master's degree is in what

6  again?

7      A.  So, it's called a master's of professional

8  studies in digital media.

9      Q.  A master's of professional studies in

10 digital media.

11          Briefly, can you tell me what's involved

12 in getting a master's in professional studies in

13 digital media?

14          What did you study?

15     A.  Sure.  My focus was on video.  So, I had

16 some classes that were more technical, specifically

17 learning to shoot and edit video and lighting and

18 that kind of thing.  And then there were classes

19 that were broader like storytelling and design and

20 general principles where we were also, in addition

21 to video, I was learning a little bit about other

22 media as well, including -- and I had to take a

23 coding class as well.

24     Q.  Okay.  Did you take any courses or have any

14

 1  discussion in grad school about copyright?

 2      A.  Not that I can recall.

 3      Q.  Okay.  How about intellectual property more

 4  generally?

 5      A.  Not that I remember.

 6      Q.  Okay.  Now, you said you did some free-lance

 7  video work for various clients during some of the

 8  period after you moved back to Massachusetts.

 9              Did you continue that work after you

10  went to grad school in 2009?

11      A.  Yeah, I continued that up until the pandemic

12  pretty much.

13      Q.  Okay.  And did you have a company or a

14  website for your free-lance services?

15      A.  Yes.  I had, I called it the Eighth Muse.

16  It's not up anymore, though.

17      Q.  Okay.  So, that was the name of sort of

18  your, either company or your marketing --

19      A.  Yeah, my brand.

20      Q.  Your brand?

21      A.  Uh-huh.

22      Q.  Okay.  And, again, what kind of videos were

23  you doing then at that time period between 2009 and

24  the pandemic?

Channel 781 News vs                    30(b)(6)                    Joshua Kastorf
Waltham Community Access Corporation                              June 27, 2025

15

1      A.  I was usually -- so, I was doing, for
2   Urbanity, I was recording dance performances and
3   then making edited versions of that.
4              For Raising A Reader, I made a
5   promotional video that involved interviews.  I also
6   had -- yeah, they were mostly informational videos
7   that involved interviews and then other footage.
8      Q.  So, edited produced videos?
9      A.  Yes.  More or less.
10     Q.  And you would edit these things together as
11  well as shoot the footage and all that?
12     A.  In most cases, yes.  In some cases, I might
13  have been asked to edit something that was already
14  shot or I might shoot something.
15     Q.  Okay.  And did you have your own camera
16  equipment?
17     A.  Yes.
18     Q.  All right.  Were some of these sort of like
19  documentaries almost?
20     A.  Yes.
21     Q.  Did they rely on the use of photographs or
22  archival footage that you hadn't actually created
23  yourself?
24     A.  The ones that I was being paid to do did

16

1   not.  I had personal projects and school projects

2   that were documentary that used archival footage.

3       Q.  Okay.  And what were those projects?

4       A.  For my master's project, I made a

5   documentary about a group of artists in 19th century

6   Boston.

7       Q.  What was that group of artists?

8       A.  It was called The Visionists.

9       Q.  It sounds very 19th century, sort of

10  Isabella Stewart Gardner.

11      A.  Yes.

12      Q.  And tell me about the filmmaking process for

13  that work.

14      A.  I did interviews.  I did a lot of research,

15  and I sourced archival materials in some cases

16  online.  And in some cases, there was one case where

17  I had, there was an antique book collector who

18  allowed me to shoot his materials.

19      Q.  Okay.  Did you give any consideration to

20  copyright issues while you were making that work?

21      A.  Yes.

22      Q.  Okay.  Tell me about that.

23      A.  What I used -- this took place in the 19th

24  century.  So, the things that were produced at that

Channel 781 News vs                    30(b)(6)                    Joshua Kastorf
Waltham Community Access Corporation                              June 27, 2025

17

1  time are now public domain.  So, for the most part,

2  it wasn't an issue.  Everything I was using was

3  public domain.

4      Q.  Did you look at the law to make sure that

5  was the case or at the standards or the dates to

6  make sure that was the case?

7      A.  Yes.

8      Q.  Okay.  What do you recall about how do you

9  calculate whether something's in public domain?

10     A.  There is a specific year, which I'm

11 forgetting at the moment, before which most things

12 are public domain, with some exceptions.

13     Q.  Okay.  And then afterwards, it has something

14 to do with the author's life, do you recall that?

15     A.  Yes.

16     Q.  Did you consider any issues -- well, if

17 everything was in the public domain, you didn't have

18 to consider issues of fair use?

19     A.  Correct.

20     Q.  Is that right?

21     A.  Correct.

22     Q.  At the time you were making that video and

23 others during this period, had you become familiar

24 with the issue of fair use?

18

1      A.  I feel like I've been familiar with that
2   concept for a long time.  I don't remember whether
3   it ever came up in relation to those projects.
4      Q.  When do you think -- and I know this is
5   probably a hard question.
6           When do you think you first became aware
7   of the concept of fair use?
8      A.  One of my first early administrative
9   assistant jobs at WGBH was for a lawyer there.  He
10  had the copyright act in a little book.  So, I read
11  it.
12     Q.  Was it Eric Brass?
13     A.  No.  It was -- I did know Eric Brass.  It
14  was a different lawyer there.
15     Q.  Eric's a buddy.
16           So, what lawyer was it?
17     A.  Jeff Garmel.
18     Q.  I know Jeff.
19     A.  Oh, nice.
20     Q.  And, so, you say you were doing some work
21  with Jeff Garmel about that subject.
22           Tell me what you did with fair use while
23  you were an administrative assistant.
24           MS. MacDOWELL LECAROZ:  Object to form.

19

1      A.   There's only one thing I remember that was

2   related to that.   There was a person who called and

3   wanted to use a clip or wanted to quote a

4   WGBH-produced show in a book, and wanted to get

5   permission.

6           So, I talked to Jeff about that.   And

7   then at some point, the person who was calling said,

8   you know if you don't give me permission I can use

9   it anyway, it's fair use.   I am asking this as a

10  courtesy.

11          And then Jeff said something to the

12  effect of, well, the fact that they're asking means

13  that it's not fair use.   And then this person

14  calling said, no, that's not correct.

15     Q.   Okay.   Interesting.   Do you know if that

16  person ended up using the clip?

17     A.   They did.   It was a quote, not a clip.

18     Q.   A quote.   Sorry.

19          Did WGBH give permission?

20     A.   I think, yes.

21     Q.   Any other experiences with the issue of fair

22  use while you were working at GBH?

23     A.   No.   I think that's the only time in my

24  professional career it's come up.

20

1      Q.  I see.  Have we now talked about all the

2   jobs that you've had since you graduated high

3   school, at least identified them?

4      A.  Yes.

5      Q.  Okay.  Now, your current position that

6   you've had since, I believe, 2015 --

7      A.  Yes.

8      Q.  -- tell me about that position and what sort

9   of work you do.

10      A.  I'm the primary administrator for an

11   interdisciplinary lab.  So, I reimburse people for

12   travel.  I order supplies.  I also maintain our

13   website and occasionally make content for the

14   website, and just general administrative help for

15   professors, and also organizing a big event once a

16   year for our member companies.

17      Q.  Okay.  Is it a full-time year-round job?

18      A.  Yes.

19      Q.  The content that you make for the website,

20   is any of that video content, or is it --

21      A.  Yes.  I've made one video for the website,

22   yes.

23            MR. PYLE:  Okay.  All right.  I'm going

24   to designate this as the first start of the 30(b)(6)

21

1  portion of the deposition.  Is that all right?

2          MS. MacDOWELL LECAROZ:  Yes.

3      Q.  Did there come a time when you moved to

4  Waltham?

5      A.  Uh-huh.

6      Q.  When was that?

7      A.  I think it was 2010.

8      Q.  Okay.  And --

9      A.  So, actually, that would mean -- earlier, I

10  think I said about 12 years.  So, it's a little more

11  than that.  It's more like 15 years.

12      Q.  Okay.  So, you've lived in Waltham maybe 15

13  years?

14      A.  Yes.

15      Q.  And at some point, did you start following

16  or becoming aware of Waltham city politics?

17      A.  Yes.  Not until I had been there for a

18  while.  It was more around 2019 and 2020 that I got

19  an interest in that.

20      Q.  Was there a particular issue that made you

21  interested in Waltham city politics at that time?

22      A.  Yes.  Initially, I was -- yes.  Initially, I

23  was interested in police, and then later I became

24  more interested in housing.

22

1      Q.  Policing was a bit of an issue in 2020,
2  wasn't it?
3      A.  Yes, yes.
4      Q.  Okay.  So, as part of that interest in
5  Waltham city politics, what, if anything, did you
6  start doing?
7      A.  When I started, I was volunteering for other
8  groups.  I started volunteering for a group called
9  Waltham Black Future Fund.  And then I started an
10 Instagram account where I was sharing information
11 about things going on in Waltham.
12          And then that eventually -- that was
13 somewhat successful and led to me looking for more
14 opportunities to use media to increase transparency,
15 access, and engagement in the government.
16     Q.  What was the Instagram called?
17     A.  Grouches of Waltham.
18     Q.  Did you create that Instagram account?
19     A.  Yes.
20     Q.  Why did you call it Grouches of Waltham?
21     A.  Caroll Spinney, who performed the character
22 of Oscar the Grouch on Sesame Street for over 50
23 years, was from Waltham.  And there are some grouchy
24 people in Waltham.  So, it was kind of a joke.

23

1    Q.  And did the Instagram account follow the
2    grouchy people around?
3    A.  Yes.  It wasn't so much about people, but,
4    yeah, I would post about, you know, issues, what I
5    knew about what was going on with issues that were
6    important to me.
7    Q.  You're not one of the grouches?
8    A.  Sometimes.
9    Q.  I think that speaks for all of us.
10    So, what kind of content did you post to
11    the Grouches of Waltham Instagram account?
12    A.  I would post pictures, usually some kind of
13    a picture to get attention when the caption had
14    information about something that was going on in
15    town.
16    Q.  Okay.  Like give me an example if you can
17    think of one.
18    A.  Yeah, I had several posts about -- there's a
19    property in Waltham called the Fernald that has been
20    very controversial for a long time.  So, I would
21    post sort of a, I did several posts on that issue.
22    Q.  Okay.  And did there --
23    MR. PYLE:  I'm going to mark our next
24    exhibit, if you don't mind, which is Exhibit 10.

24

1              (Marked, Exhibit 10, notice of taking

2     deposition of Plaintiff, Channel 781 News.)

3              MR. PYLE:  This is the Rule 30(b)(6)

4     deposition.

5        Q.  Mr. Kastorf, do you see what's been placed

6     in front of you as Exhibit 10?

7        A.  Okay.

8        Q.  Do you recognize this document?

9        A.  I don't think I've actually seen this

10    document before, but I understand what it is.

11       Q.  Okay.  Take a look at the part on Page 3

12    that says "Schedule A."

13       A.  Yes.

14       Q.  Have you seen this list of topics before?

15       A.  Yes.

16       Q.  Okay.  And are you prepared to testify about

17    all 14 of these topics today?

18       A.  Yes, yes.

19       Q.  Great.  Thank you.

20              So, did there come a time where you

21    created a YouTube page?

22       A.  Yes.

23       Q.  And what was that YouTube page called?

24       A.  It was called Waltham DATA.

25

1        Q.  And when did you create that page?

2        A.  Well, actually, so, I later also created a

3   Channel 781 page.  I was assuming you were referring

4   to the first one, but, yes, there were two times I

5   created a YouTube page.

6        Q.  Okay.  The first one was called Waltham

7   DATA?

8        A.  Yes.

9        Q.  And when did you create Waltham DATA?

10       A.  Around the beginning of 20 -- end of 2021,

11   or beginning of 2022.

12       Q.  And why did you call it Waltham DATA?

13       A.  As I said earlier, I started looking for

14   opportunities to work with people who wanted to use

15   media to increase access.

16            And, so, I -- Waltham DATA stood for

17   Democracy Access and Transparency Alliance, because

18   that is what I was going to call this project, this

19   set of projects.  And through that, I talked to

20   Chris Gamble.  We started Channel 781.

21            So, initially, I thought Channel 781

22   would be one of several projects under that banner.

23   And then we ended up spending all our time on

24   Channel 781.  So, it basically became the Channel

26

1  781 channel even though it was originally supposed
2  to be broader than that.
3      Q.  Okay.  You said you were looking for
4  opportunities to expand access?
5      A.  Yes.
6      Q.  What do you mean by that?
7      A.  We had observed that if you were a voter and
8  you heard there was a municipal election next week
9  and you thought, it's my duty to vote but I'm not
10 informed, I better educate myself, if you were to go
11 online to look for information on the issues
12 important to you or to look for the record of your
13 councillor, particular councillor, you would find
14 basically nothing.  The information that was there
15 was not searchable and was not in a form that was
16 useful.
17            And, so, Chris ran for city council in
18 2021.  There was extremely low turnout for the
19 election, as there usually is.  And he said the most
20 common reason people gave for not voting was they
21 said they knew so little about what was going on in
22 town that they couldn't in good conscience vote.
23            And, so, that was the problem we were
24 trying to solve.  We were trying to create a way

27

1  that, better ways for people to get informed and
2  stay informed on the issues that were important to
3  them and on what their councillors were actually
4  doing.
5      Q.  And when you say "we," at this time in, say,
6  late 2021, does that refer to you and Chris Gamble?
7      A.  Yes.
8      Q.  Okay.  And was Chris Gamble, as of that
9  time, the only other person involved in Waltham
10 DATA/Channel 781?
11     A.  There was, I had another friend Emily who
12 helped me with some early videos.  And then Jamie
13 got involved very shortly after that.
14     Q.  Okay.  And does Emily refer to Emily
15 Saperia?
16     A.  Yes.
17     Q.  And Jamie refers to Jamie Krikeles?
18     A.  That's right.
19     Q.  And, so, as you envisioned the umbrella
20 organization of Waltham DATA, what did you think
21 that its activities would consist of as of this
22 time?
23     A.  The problem I was trying to solve was the
24 lack of searchable information online.  And, so,

28

1    Channel -- I thought about different ways of solving

2    that.

3               Another problem I was trying to solve is

4    the fact that the videos online were not captioned.

5    Channel 781 ended up sort of helping to address both

6    of those things.

7        Q.   And by the videos that were online, are you

8    referring to videos on the Waltham Community Access

9    Corporation's public access cable channel?

10       A.   Yes.

11       Q.   Website?

12       A.   Yes.

13       Q.   And, so, part of the Waltham DATA mission

14   was to provide captioned videos for people to watch?

15       A.   Yes.

16       Q.   And also to provide information more

17   generally about what's going on in Waltham city

18   government?

19       A.   Yes.

20       Q.   Were those the main purposes, have I

21   summarized that accurately?

22       A.   To provide information, to provide analysis

23   also.

24       Q.   Okay.

29

1      A.  And to enable conversations among other

2   people on social media.  So, to give our own

3   analysis and also make it possible for other people

4   to give their analysis.

5      Q.  Are there any other purposes for Waltham

6   DATA that we haven't talked about so far at the time

7   you established the YouTube channel?

8      A.  No.

9      Q.  Okay.

10           MR. PYLE:  Let's mark this document,

11   please, as Exhibit 11.

12           (Marked, Exhibit 11, group of text

13   messages, Bates Nos. C781_00000375 through

14   C781_00000383.)

15      Q.  Mr. Kastorf, I show you Exhibit 11, and ask

16   you just to tell me if you recognize this document?

17      A.  Yes.

18      Q.  You do?

19      A.  Yes.

20      Q.  If I could turn your attention to the second

21   page of this document, which is Bates numbered

22   C781_376.

23           There is a discussion that begins with a

24   message from Emily, I believe, asking Chris Gamble

30

1    about funds.

2        A.  Okay.

3        Q.  Do you recall this conversation?

4        A.  Yes.  I do remember this conversation.

5        Q.  How did this come about?

6        A.  At this time, Emily was part of our team,

7    so, she was part of our group chat.  This is our

8    group, and this is our group chat.  And this is an

9    issue.  You know, it looks like Emily raised this

10   issue.

11       Q.  And she raised the issue of funds going to

12   Chris Gamble, correct?

13       A.  Yeah, we're going to talk about all funds --

14   oh, I'm sorry.  Let me revise what I just said.

15            It was really -- okay.  Yes.  She's

16   talking -- she says, "If we're going to talk about

17   all funds going to Chris," I don't totally

18   understand why she raised that issue, but, yes, that

19   is what she was talking about.

20       Q.  Okay.  Chris down below says, "I don't

21   remember saying that all funds should go to me.  I

22   definitely don't think that should be the case.

23   Divvying up the money is part of the conversation we

24   need to have."

31

1      A.  Yes.

2      Q.  Was this a discussion about receiving

3   donations for Channel 781?

4      A.  Yes.  Well, it was a discussion -- yes.  It

5   was a discussion about having some kind of revenue.

6      Q.  Okay.  And do you recall how this

7   conversation got started?

8      A.  I believe, if I'm remembering the order of

9   things correctly, there was a previous conversation

10   where Chris said that he would like to get paid for

11   the work he's doing for Channel 781 because he was

12   in a difficult financial situation.

13      Q.  I see.  Was there ever a payment structure

14   within Channel 781?

15      A.  No.  As I recall, the result of that

16   conversation was we decided he would set up a

17   Patreon that's just for him and that he could

18   reference his work on Channel 781, but it would not

19   be a Patreon for Channel 781.

20      Q.  Okay.  There's discussion on Page 377 of

21   either a corporation or a sole proprietorship owned

22   by Chris Gamble.

23          That never happened, is that right?

24      A.  No.  That's right.

32

1      Q.   Okay.  On Page 378, you weigh in on this

2   question of money stuff.

3              Do you see that?

4      A.   Yes.

5      Q.   And you say, "I guess I envisioned Waltham

6   DATA being kind of a non-profit studio like WCAC

7   where we would eventually have different people

8   producing different projects and I'd help them out."

9              Is that true?

10     A.   Yes.

11     Q.   Okay.  Tell me about that.

12     A.   This goes back to what we were discussing

13  earlier.  I was looking for ways to use media, I was

14  looking for ways to increase access, transparency,

15  and engagement.  And I envisioned working with

16  different people on different types of things.  And

17  as it turned out, Chris had the idea to do a city

18  council recap show, which ended up at first, for a

19  long time, it was a weekly show.  So, that took up

20  all our time.

21              So, that idea of working with other

22  people to do other things, that never really

23  happened.  That's what I thought would happen at

24  first, and we ended up concentrating on one thing.

33

1    Q.  When you use the words "a non-profit studio
2  like WCAC," what did you mean by that?
3    A.  What I mean is, WCAC, like other public
4  access stations, they provide equipment, studio, and
5  resources but they don't necessarily -- the
6  leadership of the station doesn't decide what's on
7  the air.  Volunteers come in and act as producers
8  and create the content with support from staff.
9    Q.  Were you thinking of the Waltham channel in
10  particular when you were saying "like WCAC," which
11  is -- well, let me back up.  I'm sorry.  I haven't
12  laid a foundation for that.
13          Is there more than one cable access
14  channel that WCAC operates?
15    A.  Yes.
16    Q.  What are the channels, to your knowledge?
17    A.  I don't have cable but as I understand,
18  there's a public access channel with any kind of
19  community content, and there's a government channel,
20  which is just government content.
21    Q.  Okay.  Your focus, when you started Waltham
22  DATA was on increasing access to government
23  information, primarily, right?
24    A.  Yes, yes.

34

1      Q.  So, when you said "like WCAC," were you

2   thinking a channel kind of like the MAC-TV channel

3   that WCAC has?

4      A.  Not exactly.  What I meant was it would be

5   like public access in the sense that somebody comes

6   in with an idea and then I help enable it.  I wasn't

7   necessarily thinking about like a whole channel,

8   what kind of content it would be.

9      Q.  Okay.  And the idea in your head was that

10  Waltham DATA would be similar to WCAC in that it

11  would be a non-profit studio where the studio

12  doesn't decide what gets broadcast but the studio

13  helps members of the Waltham community produce their

14  own content, is that a fair summary?

15             MS. MacDOWELL LECAROZ:  Object to the

16  form.

17      A.  Yes.

18      Q.  Okay.  Were there any other similarities in

19  your mind between WCAC and Waltham DATA when you

20  wrote this text message?

21      A.  No.  I mean, the point I was making was the

22  structure where, you know, there would be different

23  people doing projects that I would help them with.

24  It really wasn't a comparison beyond that.

35

1    Q.  Well, would you agree that both Waltham DATA

2  and WCAC in their own ways have a mission of

3  informing the public about government activities?

4    A.  That's, that's a good question because my

5  understanding of the mission of public access and

6  government access in general is that the stations,

7  they use media to increase engagement, transparency,

8  access.  And there were different ways that they can

9  do that.

10          So, our mission is similar to the

11  general mission, but I don't actually know what

12  WCAC's mission statement is.  And in my

13  conversations with Ms. Sheehan and things she said

14  to the city council, it sounded like, actually, no,

15  she didn't see their mission as access.

16    Q.  What statements did Maria Sheehan make that

17  made you think she didn't see their mission as

18  access?

19    A.  Well, for one thing, she said, she stated

20  that she only is obligated to serve cable

21  subscribers, and that by putting content online,

22  that was going above and beyond her obligation.  So,

23  she didn't have a mission to serve the whole

24  community.

36

1          The other thing was she made comments
2   when she was asked, for example, why don't you put
3   things on YouTube, she made comments where she
4   indicated that protecting the reputations of people
5   in government was a priority for her.  And, so, that
6   is not -- so, it seemed to me she had other missions
7   that she was putting above access.
8      Q.  Okay.  Well, let me start first with the
9   issue of cable versus YouTube.
10          You said she said at some time that
11  their only obligation is to provide a cable channel,
12  and putting content online is extra?
13     A.  Yes.
14     Q.  When did she make that statement?
15     A.  She made that statement in a city council
16  meeting.  I don't know the date, but it was a
17  meeting of the Community and Economic Development
18  Committee when they asked her to come in to discuss
19  the possibility of recording more of their meetings,
20  because not all of them are recorded, and of adding
21  captions.
22          And in that meeting, one of the, you
23  know, one of the reasons she gave for not doing that
24  was that she wasn't required to do that, she was

37

1  only required to provide something for cable

2  subscribers.  The same thing, when we met, she made

3  a similar statement.  And I believe, yeah, also in

4  one of the e-mails she sent me after, I said, are

5  you saying that disabled people are not asking for

6  captions.  And her response was, subscribers were

7  not asking for captions.

8      Q.  Do you know if it's accurate to say that

9  WCAC is only obligated to provide a cable channel or

10  cable channels?

11     A.  I don't know for sure what they're legally

12  obligated to provide.

13     Q.  So, her statement might have been true?

14     A.  Yes.

15     Q.  And, well, within the universe of cable

16  subscribers, one of the things that WCAC provides is

17  a government channel?

18     A.  Yes.

19     Q.  And that government channel consists

20  entirely of recordings of government meetings, does

21  it?

22     A.  I don't know, actually.

23     Q.  Okay.

24     A.  I don't have the channel.  So, I know that's

38

1  mostly what's on there.  I don't know if it's
2  exclusively on that.
3      Q.  Okay.  So, within at least that universe of
4  the population, WCAC's mission is, in part, to
5  provide access to videos of government meetings?
6              MS. MacDOWELL LECAROZ:  Object to the
7  form.
8      A.  I mean, that's a thing they do.  As I said,
9  I don't know their mission statement, and I don't
10  know what they're legally required to do.
11      Q.  Okay.  Now, the other statement you made was
12  that she didn't want to put information or videos on
13  YouTube because she was concerned about reputation?
14      A.  Yes.
15      Q.  Okay.  When did she make that statement?
16      A.  So, in the meeting, I referenced the city
17  council meeting.  She gave a quote for how much it
18  would cost to caption the content, which sounded
19  very high.  And one of the councillors asked her,
20  haven't you considered just reposting everything to
21  YouTube so that it would get auto-captioned.  And
22  she said something like, well, then you'd have to
23  ask yourself, do you really want that out there for
24  people to get ahold of.  So, she was saying, she was

39

1    indicating that, you know, not all access is good

2    access.

3                She also, when she made her statement on

4    the channel about, warning about copyright, she said

5    that some use of their footage can damage

6    reputations.  And that's when she used the word

7    "reputation."

8                And when I met with her, I, again, asked

9    the question of why don't -- if it's cost

10   prohibitive to do captions, why not just repost to

11   YouTube because it would be free and it would have

12   other advantages.

13               And her response was, first, she was

14   concerned that it might be a violation of the

15   privacy of the elected officials.  And I said, I

16   don't understand how that can be true because the

17   stuff is already online, you're just putting it

18   online in one other place.  And she said that

19   putting it on YouTube causes a different audience to

20   see it.

21       Q.  What else has Maria Sheehan said about

22   protecting reputation?

23       A.  That's all is that it was -- she used the

24   word "reputation" in that statement.  And then in

40

1   response to those questions about YouTube, I don't

2   think she used the word "reputation" specifically,

3   but she implied that not -- that giving broader

4   access to her content could be a bad thing.

5       Q.  So, the three instances where she made

6   statements of this nature to your memory were a city

7   council meeting?

8       A.  Uh-huh.

9       Q.  The statement that she made on the Waltham

10  channel?

11      A.  Yes.

12      Q.  Was that in April of 2023, approximately?

13      A.  Yes.

14      Q.  And in her conversation with you at the

15  Waltham channel's offices?

16      A.  Yes.

17      Q.  Okay.  Have you exhausted your memory on all

18  the instances where she made --

19      A.  Yes.  So, those are all the --

20      Q.  I'm sorry.  You'll have to wait until I'm

21  finished with the question --

22      A.  Oh, I'm sorry.

23      Q.  -- so the court reporter can type down the

24  transcript.

41

1          Have you exhausted your memory of all

2     the instances where Maria Sheehan made statements

3     about reputation of this nature that you're talking

4     about?

5               MS. MacDOWELL LECAROZ:  Object to the

6     form.

7          A.  Yes.

8          Q.  Okay.  What was the approximate date of the

9     city council meeting that you're referencing?

10         A.  I'm sorry.  I don't know.

11         Q.  Was it before or after you had a

12    conversation with her about captioning at her

13    office?

14         A.  Before.

15         Q.  It was before that?

16         A.  Yes.  It was significantly before that.

17         Q.  Okay.  Can you give me a year?

18         A.  I'm pretty sure it was 2022.

19         Q.  Thank you.  So, the Waltham DATA YouTube

20    page, is it fair to say your earliest post was

21    somewhere in 2021 or 2022?

22         A.  2022 -- oh, no.  Actually, I'm sorry, we did

23    some things in December of 2021.

24         Q.  And over the course of time from late 2021

42

1  to the present, can you just give me sort of the

2  categories of types of videos that the Waltham DATA

3  YouTube channel had produced?

4      A.  Sure.  We started off with a city council

5  recap show that was weekly.  And then we would also

6  do interviews and special reports.  Those are sort

7  of a one-off.  We would sometimes interview people

8  or do a special report on a specific issue.

9            We -- well, as the city council debrief

10  show evolved, we found ourselves talking about other

11  things going on in town.  So, we dropped the city

12  council part and just made it Channel 781 News.  And

13  then later, we separated that out so that there was

14  a headline show that was scripted and just

15  summarized the facts, and then there's the Debrief

16  show, which was unscripted and had all the analysis.

17  And we still do interviews and special reports as

18  well.

19      Q.  Okay.  So, the first kind, the city council

20  recap, those were described as debriefs?

21      A.  Yes.  That was our informal term for what we

22  called it.  So, then that became the official name

23  for it eventually.

24      Q.  Then you say you had interviews.

43

1            Who were the interviews with?

2       A.  Initially, well, candidates for office,

3  sometimes other people in town.  For example, we

4  interviewed the principal of the high school.  Some

5  were not related to politics.  Like we interviewed a

6  student who is an artist and having some success.

7            So, it was mostly things related to city

8  council, but then some were broad community things

9  as well.

10      Q.  Okay.  What were the special reports?

11      A.  We did one on -- there was an issue where

12  someone was trying to ban books at the high school,

13  and at the same time, there was an episode of

14  vandalism that seemed it was related.  So, we did a

15  special report on that.

16            There was one where the city solicitor

17  issued an opinion that was controversial.  So, we

18  did a special report to break that down.

19      Q.  I remember that.

20      A.  Oh, okay.  Yes.  Actually, I'm proud of that

21  because we did a report to break it down, and then,

22  later, The Boston Globe said something pretty

23  similar to what we said, but, yeah, those were the

24  kinds of things.  It was usually a special issue

44

1    that came up that we needed to do a deeper dive for

2    people to understand what was going on.

3        Q.  So, as far as the city council debriefs, is

4    it fair to say those were sort of recorded Zoom

5    discussions among members of Channel 781 News

6    perhaps with clips interspersed in it?

7        A.  Yes.  That's how we produced it is on Zoom.

8    So, it was essentially a recording of a Zoom

9    meeting.  We would cut stuff out, mostly mistakes.

10   They weren't heavily edited.  And then we would add,

11   in some cases add in clips.

12       Q.  And what sort of clips did you add to the

13   debriefs?

14       A.  Clips from meetings, you know, where, clips

15   where, you know, someone expressed a certain idea or

16   certain attitude in a way where we thought the

17   audience needed to hear them say it rather than hear

18   us recount.

19       Q.  And where did the clips come from?

20       A.  Some came from the WCAC recordings, and some

21   came from our own recordings.

22       Q.  And the WCAC recordings, to be clear, are

23   videos posted to one of WCAC's websites?

24       A.  Correct.

45

1    Q.  And that were comprised of recordings of

2    government meetings produced by WCAC?

3                MS. MacDOWELL LECAROZ:  Object to the

4    form.

5    A.  Yes.

6    Q.  Okay.  Anything else about the content of

7    the Debriefs that you can tell us?

8    A.  Are you looking for something specific?

9    Q.  Well, do the Debriefs contain the sort of

10   analysis that you mentioned earlier?

11   A.  Yes.

12   Q.  And perhaps opinion?

13   A.  Yes.

14   Q.  And expressions of interpretations of what's

15   going on in city government by the Channel 781

16   contributors?

17   A.  Yes.

18   Q.  Tell me about the Headline videos.

19   A.  Those are videos that I was doing -- we just

20   -- I'm saying past tense because we actually have

21   not been active for the past few months.

22            Those are where they're just, you know,

23   maybe two to three minutes long and I read summaries

24   of things that are going on.  And it's scripted, so

46

1    that way I can have someone else look at it for some

2    fact checking.

3        Q.  Did those Headline videos also include

4    clips?

5        A.  Yes.

6        Q.  And were those clips similarly sometimes

7    clips of government meetings taken from the WCAC

8    website?

9        A.  Yes.

10       Q.  Okay.  And what was the purpose of putting

11   the clips into the Headlines show?

12       A.  Again, if there's a moment where a public

13   figure says something, expresses a certain idea or

14   certain attitude where it would benefit the audience

15   to hear them actually say it instead of our summary

16   of it.

17       Q.  Were there any other kinds of videos that

18   Waltham DATA folks put on the Waltham DATA YouTube

19   page?

20       A.  So, our team, we also put up clips that were

21   just clips and did not have, were not part of a

22   Debrief or a Headline show.  They were clips that

23   had a title and a description.

24       Q.  And those clips were similarly of WCAC

47

1    recordings of Waltham city government meetings?

2              MS. MacDOWELL LECAROZ:  Objection.

3        A.   That's correct.

4              THE WITNESS:  Sorry.

5        Q.   Give your lawyer time to interpose an

6    objection.

7        A.   Sorry.

8        Q.   And what was the purpose, generally

9    speaking, of creating those clips?  Let's call them

10   standalone clips.

11       A.   Sure.  So, there are a few different

12   purposes.  When the videos are posted on WCAC's

13   website, they are labeled with the type of meeting

14   that it is and the date.  There's no information

15   about what's discussed in that meeting.

16              So, what we were doing is taking

17   something that we believed was interesting or

18   important and we were telling the audience, by

19   taking it out and putting it with its own title, we

20   were sort of telling the audience why it was

21   interesting and important and what it was about.

22              So, the purpose was, first of all, to

23   contextualize them and a way to give them an angle

24   because, you know, it's a matter of opinion that

48

1    they're important.
2            The second purpose was, if you have an
3    hours'-long video about multiple topics, people
4    aren't going to discuss that online.  If you have a
5    short video about one topic, people will discuss it,
6    people will share it, and it will have a much bigger
7    impact in terms of not only us giving our opinion
8    but allowing other people to have a discussion about
9    it.
10            The third thing is captioning.  By
11   putting something on YouTube, we were allowing it to
12   be auto-captioned.
13            The other was longevity.  WCAC only
14   keeps their videos online for about a year, but a
15   city council term is two years.  And almost every
16   issue takes at least two years to resolve.  So, you
17   never have, a member of the public never has the
18   whole story.  So, when we put those clips online,
19   they stay online longer.
20            So, those were the different purposes
21   for it.
22        Q.  Are those all the purposes for putting up
23   standalone clips of government meetings taken from
24   WCAC's website?

49

1       A.   I guess there was one additional purpose in
2    that there was one case where I sent some of the
3    clips to The Boston Globe.  So, doing clips in order
4    to make it possible to draw someone else's attention
5    to it, other journalists' attention to it.
6       Q.   Any other purposes to doing the standalone
7    clips on the Waltham DATA YouTube page?
8       A.   No.
9       Q.   You mentioned that Channel 781/waltham DATA
10   hasn't been active recently?
11      A.   Yes.
12      Q.   When was the last time you did a video on
13   the YouTube page?
14      A.   I'm sorry.  I can't remember.
15      Q.   Okay.
16      A.   But there's only been a handful this year.
17   Basically, this calendar year, we've slowed down.
18      Q.   Why is that?
19      A.   Because of personal priorities.  I had
20   family priorities that were taking up a lot of time.
21   And Chris also had other priorities he wanted to
22   focus on.
23      Q.   Okay.  Did the time devoted to this
24   litigation also intrude on the ability to produce

50

1    content for the YouTube page?

2        A.  That's hard to say.  Yes, this takes time,

3    but does it prevent me from -- that's hard to

4    answer.

5        Q.  Okay.  I'll represent Tom Benavides

6    yesterday testified he thought it was taking some

7    time away.

8        A.  Yeah, yeah, well, I would say it takes some

9    energy away.

10       Q.  I'd like to ask about sort of the

11   organizational structure of 781 News to the extent

12   there was one.

13              Was there someone in charge of the

14   Waltham DATA, 781 News YouTube page?

15       A.  Not really.  I set it up, but other people

16   had access.  And there was -- you know, decisions

17   about what went up were mostly by consensus.

18       Q.  You registered it yourself, did you?

19       A.  Yes.

20       Q.  In late 2021?

21       A.  Yes.

22       Q.  So, at the time you registered it, it was

23   your YouTube page, Josh Kastorf?

24       A.  No.  It never had my name on it.

51

1      Q.  It never had your name on it.

2           Did it have your e-mail address

3   associated with it?

4      A.  It didn't have my main personal e-mail on

5   it.  It had a special address for that.

6      Q.  What was the special address?

7      A.  WalthamDATA@gmail.com.

8      Q.  And were you the only person who had access

9   to that address at the time you registered the

10  account?

11     A.  At the time I set it up, yes.

12     Q.  Okay.  Did other people get access to the

13  e-mail account later on?

14     A.  Yes.

15     Q.  Okay.  And as far as deciding what content

16  went up on the YouTube page, were there some

17  contributors to Channel 781 News who had more say

18  than others?

19     A.  Not in any official way, no.  I think that I

20  spoke up a lot about -- you know, I think there may

21  have been certain people's opinions who people

22  followed more, but there was no one who had any

23  official power more than anyone else.

24     Q.  So, there was no editor in chief?

52

1        A.   There was no editor in chief, no.

2        Q.   Suppose somebody wanted to put up content on

3    the YouTube page that someone else objected to.

4             Was there a process for resolving that

5    dispute?

6        A.   I don't recall that really coming up until,

7    you know, there was -- we had discussions about the

8    standalone clips.  Other than that, I don't remember

9    any issue where somebody had an objection, but we

10   would have discussions in our group chat about what

11   we were doing.  So, usually, by the time something

12   went up, you know, there had been a chance to talk

13   about it.

14       Q.   What physical actions would Channel 781

15   contributors have to take in order to create the

16   standalone clips of government meetings that we've

17   been talking about?

18       A.   They would either have to use a

19   screen-capturing program to capture the clip from

20   the WCAC website, or they would need to download the

21   entire file and use an editing program to get the

22   clip.

23       Q.   Okay.  What is a screen-capturing program?

24       A.   It's something, a program that captures

53

1    whatever's on your screen.  It can be just to
2    capture video.
3        Q.  So, if you're watching a video on your
4    computer screen, the screen-capturing program will
5    literally make a verbatim recording of the video
6    that you're watching?
7        A.  Correct.
8        Q.  And then you can edit that recording as you
9    wish afterwards?
10       A.  Yes.
11       Q.  Okay.  So, apart from using a
12   screen-capturing program or downloading the video to
13   their own computer, what else would Channel 781
14   contributors have to do in order to create the
15   standalone clips that we're talking about?
16       A.  They would need to upload it to YouTube and
17   give it a name, and then, in most cases, a
18   description and, in most cases, choose a thumbnail.
19       Q.  And what else -- and what is a thumbnail?
20       A.  A thumbnail is the picture that you see
21   before you hit play.  That gives you an idea of
22   what's in the video.
23       Q.  Okay.  And what's the process of uploading
24   something to YouTube?

54

1      A.  You log into YouTube, you click a button

2   that says -- I don't remember if it actually says

3   upload but, basically, you click a button.  You

4   select the file on your computer and then go through

5   a series of forms where you add in information about

6   it.

7      Q.  What else would a Channel 781 contributor

8   have to do in order to create these standalone

9   clips?

10     A.  Well, generally, there would be a discussion

11  about it in our group chat, about what we were

12  doing, not necessarily about every clip, but, no,

13  there's nothing -- I think the answer is nothing.

14     Q.  Okay.  Okay.  But when you referred to a

15  discussion, are you referring to a discussion, for

16  example, about how long of a clip to create or what

17  particular parts of a meeting are important or

18  interesting?

19     A.  Yeah, we would have discussions where we

20  might be talking about a meeting and someone would

21  say, oh, yeah, we need to clip that part where she

22  said that.  We didn't necessarily, in the chat --

23  the person doing the clip would figure out the

24  details of how long it was and things like that.  We

55

1    didn't discuss those kinds of details, but we

2    discussed why we were clipping.

3         Q.  So, the length of the clips was left up to

4    the discretion of the individual contributor?

5         A.  Yes.

6         Q.  Okay.  And was there a name to the

7    screen-capture program that Channel 781 contributors

8    used?

9         A.  I know the one I use.  I actually don't know

10   which ones other people used.

11        Q.  Which one did you use when you created

12   standalone clips?

13        A.  It's called Wondershare video converter.

14        Q.  Okay.  Is that free software?

15        A.  No.

16        Q.  Oh, okay.  And what's involved in

17   downloading the video from the WCAC website to the

18   user's own computer for editing?

19        A.  You would use either a program or an app

20   that is a video downloader for YouTube, that's

21   specialized for it.

22        Q.  And those programs can identify a video on a

23   website that isn't YouTube and download it to the

24   person's computer?

56

1      A.   On a website that isn't YouTube?

2      Q.   Well, you mentioned before that sometimes

3  Channel 781 contributors would use either

4  screen-capture recording software or they would

5  download the original --

6      A.   Oh, yes.

7      Q.   -- video themselves.

8      A.   I understand what you're asking.  Yes.  So,

9  to download -- so, WCAC's videos are not on YouTube.

10  They're on their own host.  And there are programs

11  that can also do that.

12          So, I was mistaken when I said you would

13  use one that was specific to YouTube.  We would use

14  one that we knew would work.

15      Q.   Are you aware what programs people would use

16  to download a video from the WCAC website on to a

17  computer?

18      A.   I was using Wondershare.  Like I said, I

19  don't know what other people were using.

20      Q.   So, Wondershare is both a screen cap and a

21  downloader?

22      A.   Yes.

23      Q.   I see.

24          MR. PYLE:  Can we go off the record for

57

1    a minute?

2                  (Discussion off the record.)

3                  MR. PYLE:  Let's mark Exhibit 12.

4                  (Marked, Exhibit 12, complaint for

5    damages and injunctive relief.)

6    EXAMINATION BY MR. PYLE:

7        Q.  Mr. Kastorf, do you recognize what's been

8    put in front of you as Exhibit 12?

9        A.  Yes.

10        Q.  What is it?

11        A.  This is our complaint.

12        Q.  Okay.  Does this complaint contain as

13    Appendix D a list of videos -- I should say

14    Exhibit D, toward the very end.

15        A.  Yes.

16        Q.  Okay.  And what do you understand this list

17    to be?

18        A.  This is the list of videos about which WCAC

19    submitted complaints to YouTube.

20        Q.  And these were videos that had been on the

21    Waltham DATA YouTube page?

22        A.  That's correct.

23        Q.  Okay.  Looking through this list, is it fair

24    to say each of these videos is a standalone video

58

1    like the kind we've been discussing?

2        A.  Yes.

3        Q.  Okay.  And I'm going to ask you some

4    questions about each of these videos.  And I'd like

5    the record to reflect that I have a laptop here

6    where each of these videos is available for watching

7    if you would like to watch them to refresh your

8    recollection in order to testify fully about each of

9    the videos.  And we can identify each video perhaps

10   by the number on the list in Exhibit D of the

11   complaint.

12           The first video listed here is No. 1 on

13   Exhibit D.  It's titled "CotW3623 MBTA Communities -

14   Durkee," D-u-r-k-e-e, "Just Asking Questions."

15           Do you see that?

16       A.  Yes.

17       Q.  What was the purpose of Channel 781 News in

18   posting this video?

19       A.  So, this was part of a playlist of clips.

20   And, actually, most of the ones here were part of

21   that same playlist.  They were all from the same

22   meeting.  They are from a meeting of the Committee

23   of the Whole, which is a committee of the city

24   council which has the same members of the city

59

 1  council.  And it's a meeting where they were

 2  discussing the MBTA Communities Act, which is a very

 3  controversial state law that has to do with housing.

 4  And it was actually the first time that they were

 5  discussing it in council.

 6              So, in this case, the city attorney was

 7  explaining the law to them, and they were giving

 8  their reactions to the law.  This was their first

 9  reactions.

10              And some of them had very -- most of

11  them had very negative reactions.  And in some

12  cases, it seemed like they were actively advocating

13  breaking the law or ignoring the law.

14              And, so, this came about, Jamie made

15  these clips in preparation for a Debrief show.  He

16  ended up making a lot of them, and we knew we

17  wouldn't be able to use them all in the Debrief

18  show.

19              So, I believe it is actually -- I'm not

20  sure if this is the first time, but it was one of

21  the first times we posted standalone clips because

22  we saw value in a person being able to look at this

23  and see how each of these councillors reacted to the

24  law.

60

1              So, the specific one you're referencing
2     is showing Councilor Durkee's reaction to the law.
3        Q.  You said a minute ago that this was part of
4     a playlist.
5              What did you mean by that?
6        A.  So, in YouTube, you can set up playlists,
7     which is a collection of videos, so, you can give
8     that a title so it contextualizes them all.  And you
9     can make that appear on your channel.
10              So, on our channel, at the time, there
11     was like a playlist of Debriefs, a playlist of
12     Headlines, and a playlist of clips.
13        Q.  If you clicked on the videos tab of the
14     Waltham DATA YouTube page, would you also see these
15     videos in the listing of videos --
16        A.  Yes.
17        Q.  -- on the page?
18        A.  Yes.
19        Q.  Okay.  So, each of these was a separate
20     video on the Waltham DATA YouTube page, correct?
21        A.  Correct.
22        Q.  And when I say "each of these," I mean each
23     of the clips from the March 6, 2023 Committee of the
24     whole meeting?

61

1      A.   That's correct.

2      Q.   Okay.  What was the specific purpose of

3  posting Video No. 1 in Exhibit D referring just to

4  that video itself?

5      A.   Sure.  So, in -- actually, why don't I watch

6  the video.  I think I remember the --

7           MR. PYLE:  Let the record reflect I'm

8  about to play the Durkee just-asking-questions video

9  marked as No. 1 on Exhibit D of the complaint.

10          (Video played.)

11     Q.   Okay.  Can you answer the question?

12     A.   Can you repeat the question?

13          MR. PYLE:  Could you read back my

14  question?

15          (Last question read back by Reporter.)

16     A.   So, first, I should mention, this is a clip

17  from a very long meeting where they also discussed

18  other topics.  So, this is something most people in

19  Waltham would never see because they'd never look

20  for it.  That's kind of general.

21          About this specific clip, this is

22  Councillor Durkee's reaction.  He asked if the city

23  can divorce the state.  I don't know how literal

24  he's being, but it expresses a certain attitude

62

1    about the relationship between the city and the
2    state that we thought was interesting.
3            He also expressed -- and he expresses it
4    in an interesting way.  Asking if they can, frankly,
5    asking if they can divorce the state, it doesn't
6    sound like the smartest way to ask that question.
7            The other thing is he's expressing very
8    specific attitudes about housing and the city's
9    public housing.  He's basically sort of implying
10   that the public housing Waltham has is a service we
11   provide to the state, like the people who need
12   housing belong to the state.  And because they
13   haven't given us, in his view, enough money to
14   maintain that housing, he thinks that undermines
15   their right to ask for something else.
16           His sister is on the board of the
17   Housing Authority.  So, his attitudes about housing
18   and about public housing are relevant to our
19   audience and some of the issues we've discussed.
20           So, this clip was chosen because he's
21   expressing attitudes that we thought were both
22   interesting and relevant to issues we've discussed.
23     Q.  So, those are the two aspects of his
24   questioning there that you've identified, I believe,

63

1    are this divorce concept?

2        A.   Yes.

3        Q.   And the notion that public housing is a

4    state obligation, not a Waltham obligation?

5        A.   Yes.

6        Q.   Okay.  Are there any other purposes for

7    choosing this clip as a clip to present on your

8    YouTube page?

9        A.   It was primarily Jamie's choice, so, I can't

10   say for sure there were no other reasons, but as I

11   understand it, those were the reasons.

12       Q.   Okay.  And just to refer back to Exhibit 10

13   very briefly, you're the designee for the purposes

14   of this deposition on No. 7, the reasons why Channel

15   781 News published the excerpts?

16       A.   Yes.

17       Q.   You're the designee on the video excerpts

18   themselves, No. 6?

19       A.   Yes.

20       Q.   You're the designee on Issue 10, the

21   editorial choices made by Channel 781 News as to the

22   length of each of the excerpts?

23       A.   Yes.

24       Q.   Okay.  Thank you.

64

1          This clip is one minute and 52 seconds

2     long?

3          A.  Yes.

4          Q.  Why couldn't it have been shorter?

5               MS. MacDOWELL LECAROZ:  Object to the

6     form.

7          A.  It could have been shorter.

8          Q.  Let me turn now to the next video on the

9     list, No. 2 on Exhibit D of the complaint, which is

10    Exhibit 12 in the deposition.

11              Oh, wait, before I -- I'm sorry.  Before

12    I move on there, if you turn to Paragraph 53 of the

13    actual complaint itself, which is in Exhibit 12, on

14    Page 8 of the complaint itself.

15         A.  Okay.

16         Q.  Do you see that Paragraph 53 alleges that

17    the government meeting video clips, including this

18    one, are, quote, "Intended for different and

19    transformational purposes, including," then it has

20    some language after that.

21              What were the different and

22    transformational purposes behind this video that

23    we've just watched that Channel 781 News published?

24         A.  The one we just watched?

65

1      Q.  Yes.  The one we just watched specifically.

2      A.  The Durkee one?

3              MS. MacDOWELL LECAROZ:  Just to be

4   clear, Video 1 on Exhibit D.

5      Q.  Video 1 on Exhibit D.  What were the

6   different and transformational purposes?

7      A.  Sure.  The main purpose is to identify this

8   to the public as something that's interesting and

9   relevant so that they can watch it.

10             Secondary to that, it's, in a way, it's

11  giving our take on it.  It says, "Just asking

12  questions," which is a little bit sarcastic.  So,

13  it's giving an angle to it.

14             It is taking a short clip from a very

15  long meeting, which is making it more watchable and

16  shareable on social media.

17             It is now captioned because it's posted

18  on YouTube.

19             And it will be available for longer than

20  a year, which is important because it will take

21  longer than a year to resolve the MBTA Communities

22  Act issue.

23     Q.  The two substantive elements of Durkee's

24  comments there, the divorce concept and the concept

66

1    of housing as a state job, those could have been

2    conveyed in shorter clips, correct?

3              MS. MacDOWELL LECAROZ:  Object to the

4    form.

5       A.  I would say yes but there's a tradeoff.  If

6    you -- the shorter you make the clip, the more that

7    the audience might feel that you're manipulating

8    what they're seeing.  So, it could have been shorter

9    and maybe gotten the whole point across, but

10   showing, you know, showing something that's not

11   super short and super edited gives the audience more

12   faith that they're watching the real thing.

13      Q.  Thank you.  Is it fair to say that within

14   each of the -- well, strike that question.

15              Let's move on to the next video.

16   Exhibit D, No. 2 is titled "McMenemin and Harris

17   versus Paz, Tenant Rights Notification Ordinance."

18              Did you create this clip?

19      A.  Yes.

20      Q.  How long is this clip?

21      A.  20 minutes and 40 seconds -- 46 seconds.

22      Q.  And what was the purpose of publishing this

23   clip?

24      A.  This clip was a controversial issue where

67

1  Councillor Paz, who later ran for mayor, wanted to
2  pass a tenants' rights notification ordinance.  The
3  rest of the council seemed, appeared very
4  unenthusiastic about it.  And one of the patterns
5  that we've seen in the city council that prevents
6  people from watching is they tend to argue a lot
7  about points of order.  They very rarely debate the
8  actual issue at hand.
9          So, what happened here was they were
10 discussing a tenants' rights notification order.
11 McMenemin and Harris both brought up technical
12 issues, basically saying Paz, he wanted to have a
13 public hearing about it, and they were saying he was
14 requesting the wrong type of hearing.  And this led
15 to a 20-minute-long argument.
16         So, you know, if you told somebody, you
17 know, tonight at the city council meeting they were
18 discussing the ordinance, well, they weren't really
19 discussing the ordinance.  They were arguing about a
20 point of order.  And they were wasting time.  And
21 they do this a lot.
22         And, so, the purpose of that clip is to
23 show people that -- how this works; that these two,
24 McMenemin and Harris, they appear to be against this

68

1    ordinance, but rather than saying why they're
2    against it, they're causing a delay that's very hard
3    for the public to follow or get any value out of it.
4    And we wanted to show people that that's what was
5    going on.
6                    There was also an additional thing,
7    reason for this.  In one of the back and forth, Paz
8    says something like, you know, I had previously
9    submitted this resolution with different language.
10   And McMenemin says, Other than English, which is a
11   racist joke at Paz's expense.
12                   So, we wanted people to actually see her
13   saying that because we thought she deserved to be
14   called out for it, but we also -- I wanted people to
15   see the entire conversation and how long it was
16   because it was a huge waste of time in the meeting.
17       Q.  Do you maintain that there were
18   transformational purposes to clipping this segment
19   of the meeting and making it available on the
20   YouTube page?
21       A.  Yes.
22       Q.  What were the transformational purposes?
23       A.  One was to draw people's attention to it by
24   letting them know that this is a clip that is

69

1  relevant to these three councillors, and that it's
2  something interesting and important, which they
3  probably would not have seen otherwise because they
4  would not be watching that long video of the meeting
5  unless they knew there was a reason to it.  It
6  was --
7      Q.  Let me stop you there.
8          How long was the original meeting?
9      A.  Two to three hours.
10     Q.  How do you know that?
11     A.  I remember at some point -- well, most of
12  them are about two to three hours.  I don't remember
13  the exact time.
14     Q.  Okay.  Please continue.
15     A.  Okay.  So, the transformational purpose was
16  to allow, to draw people's attention to it.  We did
17  say, reference it in a Debrief show where we said,
18  you know, McMenemin should apologize for the comment
19  she made about the language.  So, this would allow
20  people who saw her show to go and judge for
21  themselves.
22          So, by putting it in context, by making
23  it searchable, by expressing an opinion on it, by
24  allowing other people to express opinions on it, by

70

1  captioning it, and by keeping it online for longer

2  than a year, those were all purposes for this clip

3  that weren't accomplished by the original video.

4      Q.  Were there any other transformational

5  purposes for publishing this video?

6      A.  Not that I can think of right now.

7      Q.  Okay.  The video is 20 minutes and 46

8  seconds long?

9      A.  Yes.

10     Q.  Could you have used a smaller clip to

11  achieve the transformational purposes that you just

12  identified?

13          MS. MacDOWELL LECAROZ:  Objection.

14     A.  In this case, no.  In this case, the length

15  was part of the point I was trying to make.  This

16  was an extremely long conversation about nothing.

17     Q.  Okay.  And it's your view that the public

18  couldn't have appreciated that it was an extremely

19  long discussion about nothing by watching the

20  original video?

21          MS. MacDOWELL LECAROZ:  Objection.

22     A.  They could but they weren't likely to watch

23  the original video.  They had not reason to if they

24  didn't know that there was an interesting or

71

1  relevant conversation there.

2      Q.  Have you now exhausted all of the

3  transformational purposes for this particular video?

4      A.  I've exhausted all the ones I can think of

5  right now.

6      Q.  Okay.  Let's go to Video No. 3 on Exhibit D

7  to the complaint.  This one is entitled "Vidal

8  Pressures Committee to Meet in Person, Finance

9  Committee June 6, 2023."

10             And I ask you, did you create this

11  video?

12     A.  Yes.

13     Q.  How long is it?

14     A.  16 minutes and 24 seconds.

15     Q.  What was your purpose in clipping and

16  publishing this excerpt of a WCAC recording of a

17  government meeting?

18     A.  Sure.  So, this was a finance committee

19  hearing about the budget.  So, if you were someone

20  who was interested in issues of transparency and you

21  wouldn't necessarily be watching it, that wasn't the

22  subject, but Councillor Vidal used his -- he had

23  time to question the head of the Historic Commission

24  about their budget.  And because they had a Zoom fee

72

1    in their budget, he used that as a reason to sort of
2    interrogate this person about why do they meet on
3    Zoom instead of in person.
4              And he was rude.  He came across as a
5    bit of a bully.  And it showed an attitude that was
6    relevant to things we've been talking about, about
7    why are committees not meeting on Zoom.  So, it was
8    to show his attitude, and the way he treated another
9    government official, and his personality, and the
10   fact that, letting people know that these committees
11   that were choosing to meet on Zoom, which they had a
12   legal right to do, were being pressured not to do
13   that.
14      Q.  Were there transformational purposes behind
15   the posting of this video?
16      A.  Yes.  Posting it with this title let people
17   know that there was something interesting and
18   important going on there that would not have been
19   obvious otherwise because it was a budget hearing
20   about a different issue.  So, it was letting people
21   know that it was important and interesting, and that
22   there was an attitude expressed there that might be
23   interesting, and also allowing -- I think we also
24   discussed this in our Debrief show.  So, it allowed

73

1  us to have a discussion about it.  It allowed other

2  people online to have a discussion about it.  It

3  allowed it to be captioned.  And it allowed it to

4  stay online longer than a year.

5      Q.  Are those all of the transformational

6  purposes behind the posting of this particular

7  video?

8      A.  Those are all the ones I can think of right

9  now, yes.

10      Q.  And do you recall that this clip actually

11  included two different segments of the council

12  meeting?

13      A.  I did not recall that, no.

14      Q.  Okay.  You said there was questioning of the

15  chair of the Historical Commission?

16      A.  Yes.

17      Q.  Was there other discussion by Councillor

18  Vidal separate from that questioning concerning that

19  issue of meeting by Zoom?

20      A.  I think we better watch the video just to

21  make sure I'm not forgetting something.

22          (Video played.)

23      Q.  I'm going to skip ahead about six minutes

24  and 50 seconds into the video because I'll represent

74

1    that the first part of the video is indeed about the

2    questioning of the Historical Commission guy.

3        A.  Okay.

4                (Video played.)

5        Q.  So, I've now paused it about 7:14.

6                Does this refresh your recollection --

7        A.  Yes.

8        Q.  -- that there are two different segments?

9        A.  Yes.  So, this contains two different

10   segments.  One is the first we discussed already.

11               This one is Vidal questioning Mayor

12   McCarthy.

13       Q.  Okay.  And that questioning of Mayor

14   McCarthy goes on for probably most of the video?

15       A.  Looks like more than a half.

16       Q.  Okay.  And it was also on this issue of Zoom

17   hearings?

18       A.  Yes.  It's the same issue of why are

19   committees meeting on Zoom.  He seems to be

20   suggesting to the mayor that she should use her

21   power to force them to meet in person.

22       Q.  Okay.  Are there -- having now identified

23   the two portions of this video, are there any

24   additional transformational purposes you'd like to

75

1    identify with respect to publication of this video?

2        A.  Yes.  It also shows the mayor's attitude

3    about this.  And it also shows her attitude that

4    they should be meeting in person, and her

5    willingness to use her power to pressure them to do

6    something even though it's legal to do the meetings

7    over Zoom.

8        Q.  Okay.  Thank you.  Moving to Video No. 4 on

9    Exhibit D to the complaint, so, this one is entitled

10   "Bradley-MacArthur Constituents Ask Me Why Can't We

11   Have Nice Things, City Council, June 20, 2023."

12               Did you create this video?

13       A.  Yes.

14       Q.  Okay.  And what was your purpose in clipping

15   this video from WCAC and putting it on the Waltham

16   DATA YouTube page?

17       A.  This was -- actually, let's watch the video

18   so I don't make a mistake again.

19       Q.  It's a short one.

20       A.  Okay.

21               (Video played.)

22       Q.  So, we've now watched that whole video.

23               Can you tell me what were the

24   transformational purposes behind publishing that

76

1    clip in particular?

2        A.   Sure.  So, this is Councillor

3    Bradley-MacArthur, they're discussing the budget,

4    the city budget.  They're getting close to the point

5    of voting on it.  And the way this process worked is

6    the mayor decided that budgets could go up by five

7    percent.  And then she put together a budget, and

8    then the city council had many, many hours of

9    hearings with each department head to ask some

10   questions.  And they asked them all kinds of

11   questions about their departments, but there was

12   never a discussion of why five percent, why can we

13   only go up five percent.  And, in fact, I believe --

14   I don't remember the details.  I think there was

15   even a cut beyond that that she's referencing.

16               So, the fact that -- there were two

17   things.  The fact that she said why can't we have

18   nice things, I knew if I put that in the title,

19   people would watch it because they'd wonder, well,

20   what's she saying; that doesn't sound like something

21   you'd say in a city council meeting; what's she

22   talking about.

23               So, it was to give people a reason to

24   watch it because it was interesting to use that

77

1   phrase, but it was also because she's questioning
2   sort of the arbitrary austerity that was not being
3   questioned for the most part in this process.  And
4   she is explaining why she's going to vote, and she's
5   one of the only councillors who ever votes against
6   the mayor.  You would have no way of knowing that
7   prior to when we started doing this work.
8           So, the transformational purpose was to
9   show her expressing an attitude which is
10  controversial and unusual in the council that maybe
11  we don't have to have this arbitrary austerity.
12  Maybe there are things we really need that would
13  justify spending more money.
14      Q.  Were there any other transformational
15  purposes for the publication of this video in
16  particular, apart from the ones you've already
17  identified?
18      A.  You know, it expresses our opinion that we
19  think she's making a good point.
20      Q.  Where does it express that opinion?
21      A.  Well, it doesn't strongly express that
22  opinion.  It's the fact that we chose it indicates
23  that we found it to be interesting and important.
24  And also we discussed it in the Debrief show, and

78

1    then we later put the clip online.

2        Q.  Okay.  So, your testimony is that by

3    clipping it and presenting it on the Waltham DATA

4    YouTube page, you were conveying to your audience

5    that you thought this was a good point?

6        A.  Let me revise that a little.  It's not

7    necessarily that we were saying we agreed with her.

8    We were saying this is an interesting and important

9    thing for people to hear.  That's our opinion.

10       Q.  Okay.  Could you have used a shorter clip

11   than two minutes and 18 seconds to get across the

12   point of the interest in her comments at city

13   council?

14               MS. MacDOWELL LECAROZ:  Objection.

15       A.  Possibly, yes.  I wanted to make sure it had

16   context.  I didn't want people to feel like it was

17   so short that it was manipulative.  So, maybe, yes,

18   maybe we could have used a shorter clip.

19       Q.  And I'm not sure if I asked you that

20   question about the last clip we talked about, the

21   16-minute clip where Vidal was both questioning the

22   mayor and the chair of the Historical Commission

23   about Zoom meetings.

24               Could you have used a shorter set of

Channel 781 News vs                    30(b)(6)                    Joshua Kastorf
Waltham Community Access Corporation                              June 27, 2025

79

1    clips for that compilation video?
2              MS. MacDOWELL LECAROZ:  Objection.
3        A.  We could have.  We could have possibly got
4    the same point across with shorter clips, but,
5    again, it's about -- we don't want to make people
6    feel that we're manipulating them by giving them
7    very short sound bites.
8        Q.  You could have captured his, Councillor
9    Vidal's confrontational tone in a shorter clip about
10   that issue, yes?
11             MS. MacDOWELL LECAROZ:  Objection.
12       A.  Yes.
13       Q.  You could have captured Mayor McCarthy's
14   openness to using her power to require committees to
15   meet in person with a shorter clip of that exchange?
16             MS. MacDOWELL LECAROZ:  Objection.
17       A.  Maybe.  That's hard to say.  I mean, people
18   have to have some context.  So, maybe we could have.
19       Q.  Okay.  Let's go to No. 5 on Exhibit D to the
20   complaint, which is titled "Councillor LaFauci,
21   Fossil Fuels Aren't Going Away."
22             Did you clip this video from WCAC?
23       A.  Yes.
24       Q.  And what was your purpose in clipping this

80

1  video from the WCAC recording of a city council

2  meeting?

3      A.  Sure.  So, this was a meeting where they

4  were discussing zoning codes.  And the city has a --

5  the state -- not zoning codes -- building codes.

6  The state sets the building codes, but the city has

7  the option to adopt stretch codes, which are more

8  environmental.

9          And, so, Councillor Bradley-MacArthur

10  had proposed doing that in this committee.  And

11  Councillor LaFauci was responding to it.  And he

12  made the statement, Fossil fuels aren't going away,

13  in a way to be dismissive of environmental concerns.

14  And that struck me because there's a big generation

15  gap there.  There's a big perception gap there.

16  There were people in Waltham who would be shocked to

17  hear him say that and people who wouldn't,

18  particularly younger people.

19          And, you know, it seemed out of touch

20  with the way politicians usually talk about climate

21  change these days, you know.

22          So, we wanted -- I thought it was

23  interesting and important for people to hear both

24  the broader context of what he was talking about,

81

1  but that specific point where he says that, and that

2  it would get people's attention.  It would cause a

3  conversation.

4          And, in fact, somebody actually, I

5  believe, reached out to me and thanked me for

6  posting this particular one.

7          So, it was to show people his attitude

8  about environmental issues that we -- that I

9  suspected was very out of touch with a lot of our

10  audience.

11      Q.  Were there transformational purposes behind

12  the posting of this particular clip?

13      A.  Yes.

14      Q.  What were they?

15      A.  This was a -- I forget which committee it

16  was, but it was a meeting about many topics,

17  including, you know, building codes.  There's no

18  reason you would think that this is the meeting

19  where you get to find out his overall attitude about

20  the environment.

21          So, by clipping it, we were telling

22  people that there was something important and

23  interesting worth watching here.  We were, you know,

24  giving an opinion on it, an opinion that it was

82

1    interesting and important.  We were allowing other

2    people to discuss it.  We were making it searchable.

3    We were making it captioned.  And we were keeping it

4    online longer.

5        Q.  Were there any other transformational

6    purposes for posting this particular clip?

7        A.  Not that I can think of, no.

8        Q.  Could you have used a shorter clip than two

9    minutes, 19 seconds to show the important points you

10   were seeking to raise about Councillor LaFauci's

11   attitudes concerning climate change --

12              MS. MacDOWELL LECAROZ:  Objection.

13       Q.  -- and fossil fuels?

14       A.  Maybe.  If we just wanted to show the part

15   where he said fossil fuels aren't going away, then

16   that would be shorter, but it would lack context,

17   and people might not understand why it was important

18   or feel that we're implying a meaning that's not

19   there.  It has the quote, and it has some context.

20   So, maybe it could have been shorter.  I'm not sure

21   about that.

22       Q.  Moving on to No. 6 on Exhibit D to the

23   complaint, which is Exhibit 12 to this deposition,

24   "Mayor refuses to break tie, clip from July 27, 2023

83

1    school committee meeting."

2             Who posted this clip?

3        A.  Cara, Cara Maloney.

4        Q.  Cara Maloney?

5        A.  Well, I don't know if she -- she clipped it.

6    Jamie may have actually posted it, but she was the

7    one who made it.

8        Q.  Who is Cara Maloney?

9        A.  She's Jamie's partner, and she's

10   occasionally part of our team by contributing.

11       Q.  Okay.  And what was the purpose of Channel

12   781 posting this clip?

13       A.  So, this was a really remarkable meeting.

14   The school committee had two candidates for

15   superintendent -- wait.  Was this principal or

16   superintendent?

17       Q.  Superintendent.

18       A.  Superintendent.  Thank you.  They had two

19   candidates for superintendent that had gone through

20   a whole process of interviews and the whole thing.

21   And there's six -- seven members of the committee,

22   and the mayor is one of them.

23             So, three members wanted Candidate A,

24   three member wanted Candidate B, and the mayor

84

1   wanted a third option, which is a woman who has been
2   working for her forever who she knows better.
3              So, what the mayor did was she refused
4   to break the tie, and she made them vote, and the
5   vote was a tie.  And then she immediately made them
6   vote again.  And she made them vote over and over
7   and over until it became painful to watch.
8              And, eventually, they had to do some way
9   to end it.  So, she said, I have an idea, why don't
10  we make my person the acting superintendent and
11  start this process all over again.
12             So, there were some reactions to this
13  where people were angry at the school committee
14  because they failed to do their job and make a
15  decision, but we saw it differently.  Her job was to
16  break the tie.  Like, the right thing to do was to
17  break the tie, and she didn't do it.  And somehow,
18  she made it like -- her attitude was, you know, she
19  was the victim here because they were forcing her to
20  do these votes over and over, but really it was a
21  tactic, and it worked.
22             So, Cara -- so, there would be a vote,
23  and then there'd be a few minutes of conversation.
24  Then there'd be another vote.

85

1          So, what Cara did is edited together
2    just the votes to show how repetitive and ridiculous
3    it was.
4        Q.  And those were all in one minute, six
5    seconds.
6        A.  Yeah, she just -- let's watch it, actually.
7        Q.  For the record, we're now watching the
8    Mayor-Refuses-to-Break-a-Tie video.
9                (Video played.)
10       A.  I'm sorry.  So, I misremembered this.
11             She didn't edit together the different
12    votes.  That was just -- yeah.  So, I think we had
13    two different videos about this, and I'm confusing
14    the two.
15             So, this one is just the clip of her
16    explaining why she won't break the tie.  And, also,
17    she says ballot 35, which implies they voted 35
18    times at that point.
19       Q.  Okay.  And were there transformational
20    purposes for your putting up this clip from the rest
21    of the school committee meeting?
22       A.  Yes.  This was just to give people, to draw
23    people's attention to what happened at this meeting,
24    that people were saying, you know, people were

86

1  saying on social media the school committee failed
2  to do its job.  And this was to draw people's
3  attention to the fact that there was more to the
4  story, that there were 35 votes, which is just
5  bizarre.
6      Q.  Okay.  Could you have used a shorter clip to
7  achieve those transformational purposes?
8          MS. MacDOWELL LECAROZ:  Objection.
9      A.  I mean, in this case, probably not.  Yeah,
10 it's kind of, you need a minimal amount of context
11 there.
12     Q.  Okay.  All right.  Now, the remaining videos
13 on the list all concern the Committee of the Whole
14 meeting that we discussed earlier, correct?
15     A.  Yes.  That's correct.
16     Q.  Okay.  Let's go to Video No. 7, which is
17 entitled, "CotW March 26, 2023 MBTA communities
18 Vidal," quote, "'A lot of businesses could sell
19 their lots,'" unquote.
20          What was the purpose of Channel 781 News
21 publishing this video?
22     A.  It was to show, similar to the other clips
23 here, it was to show his reaction, his attitude
24 regarding this law.

87

1    Q.  Were there any transformational purposes

2  behind putting this clip on the YouTube page?

3    A.  Yes.  It was the same purposes as the other

4  clips.

5    Q.  Which other clips?

6    A.  The other clips from this meeting that we've

7  discussed.

8    Q.  And could you just state for the record in a

9  general sense what were those purposes behind

10  putting up clips of the Committee of the Whole

11  meeting?

12    A.  We were drawing attention to something that

13  we believed was interesting and important and

14  relevant.  We were making it possible for other

15  people to have a discussion about it.  We were

16  allowing it to be captioned.  We were allowing it to

17  stay online longer.

18    Q.  And is it your testimony that those are the,

19  that is the universe of transformational purposes

20  that applies to Videos 7, 8, 9, 10, 11, 12, 13, 14,

21  and 15?

22    A.  Yes.  That's correct.

23    Q.  Okay.  Could you have used a shorter clip

24  from the Vidal video, Video No. 7, shorter than one

88

1  minute, 29 seconds --

2           MS. MacDOWELL LECAROZ:  Objection.

3      Q.  -- to attain these transformational

4  purposes?

5           MS. MacDOWELL LECAROZ:  Same objection.

6      A.  Again, it's a maybe.  I mean, that's only

7  one minute and 29 seconds.  Maybe you could cut it

8  down and still get across the point, but you're

9  risking people thinking that, you know, you're

10  leaving out context and risking people thinking that

11  you're manipulating them.

12     Q.  How about Video 8, two minutes and five

13  seconds, which comprises final thoughts and

14  committee assignment?  I'll represent this involves

15  Mayor McCarthy speaking.

16     A.  Yeah, let's watch that one.  I don't

17  remember that.

18           (Video played.)

19     Q.  Okay.  Having watched the video that we've

20  just been discussing, could this video have been

21  shorter and maintained the transformational purposes

22  you've identified?

23           MS. MacDOWELL LECAROZ:  Objection.

24     A.  I mean, in that case, yes, I think so.

89

1    Q.  Okay.  And just specifically what pieces

2   were essential to the transformational purposes

3   you've identified?

4            Let me ask, what pieces could have been

5   cut?

6    A.  So, I can't speak to Jamie's intent, but I

7   can speak to why this would be interesting to our

8   audience is that after this whole meeting where the

9   thing is being explained to them, she's telling them

10  that the real plan is actually much bigger than what

11  they were just told.  And then she's incredibly

12  vague about what that means.  And she talks about,

13  again, about the money for Waltham Housing

14  Authority, which really has nothing to do with that.

15            So, it's -- I think, I think you could

16  cut out the part where she says, where Councillor

17  Harris asked a question about will we get a copy of

18  this.  I don't know why she chose to include that.

19   Q.  So, it's really Mayor McCarthy's comment

20  about the Housing Authority --

21   A.  Yes.

22   Q.  -- that was relevant?

23   A.  Well, not just the Housing Authority but the

24  fact that the plan they were just presented is not

90

1   the full plan, and they don't know what the full

2   plan is.

3       Q.  Okay.  Let's go to Video No. 9, which is

4   entitled, "CotW March 6, 2023, MBT Communities,

5   Councillor McMenemin Explores Other Funds to Replace

6   Grants."  This clip is five minutes and 30 seconds

7   long.

8              Do you see that?

9       A.  Yes.

10      Q.  Okay.  I think we've identified the

11  transformational purposes that you're claiming in a

12  general sense for this video.

13             Could this clip have been shorter?

14             MS. MacDOWELL LECAROZ:  Objection.

15      A.  Let's look at the clip.

16      Q.  Just a moment.  I thought I had it here.

17             (Video played.)

18      Q.  All right.  Having reviewed this individual

19  Video No. 9 on the list, do you wish to identify any

20  additional transformational purposes for publication

21  of this clip?

22      A.  What's happening in this clip is she's

23  basically, she wants to ignore the law.  She's

24  asking the attorney to research if we ignore the law

91

 1   and the state retaliates by taking our funding away,

 2   do we have other funds we could use.

 3            So, now we know that's happening in a

 4   lot of towns, but at the time, we were kind of

 5   shocked by this, that she was openly calling for,

 6   basically for ignoring the law and also putting a

 7   charge on the attorney to find a way to ignore the

 8   law.  So, yeah, that's why this clip was important.

 9            As a secondary -- yeah, I'll stop there.

10   That's why this clip was important.

11       Q.  Could this clip have been shorter than five

12   minutes and 30 seconds to achieve the

13   transformational purposes that you've identified for

14   us?

15       A.  I would say, yes, that one could have been

16   shorter.  I probably, if I had cut it, I would have

17   cut it shorter, but I suspect -- so, she's giving a

18   specific charge to the lawyer.  And the way that

19   it's edited includes her whole charge.  So, maybe

20   that was Jamie's intent.  It could have been shorter

21   and made the point.

22       Q.  All right.  Video No. 10 on Exhibit D to the

23   complaint, "Committee of the Whole, March 6, 2023,

24   MBTA Communities, Joey Lacava's questions."

92

1          What was Channel 781's purposes in
2    putting up this clip?
3        A.  This is the same general purpose.  This is
4    showing each councillor's reaction to the law, and
5    that's something -- so, generally speaking, if you
6    want to find out what positions -- if you go on the
7    internet and you want to find out what position a
8    politician, a specific politician has taken, that's
9    almost impossible, but if you were to search on Joey
10   Lacava, now this would come up.  So, you'd get to
11   hear him saying in his own words his attitude about
12   this.
13       Q.  Okay.  Have you now identified the
14   transformational purposes for putting up this clip?
15       A.  Yes.  In addition to the ones I've mentioned
16   in general, such as captioning and longevity.
17       Q.  Could this clip have been shorter than two
18   minutes and 26 seconds to get its transformational
19   purposes across?
20            MS. MacDOWELL LECAROZ:  Objection.
21       A.  Maybe.
22       Q.  Want to watch the video and find out?
23       A.  I think it's the same answer -- yeah, let's
24   watch it.  Let's watch it.

93

1      Q.  The rest of them are short.

2           (Video played.)

3      Q.  So, having watched that video, could that

4  video have been shorter to achieve the

5  transformational purposes that you've identified?

6           MS. MacDOWELL LECAROZ:  Objection.

7      A.  Yes.  Probably, yes.

8      Q.  Okay.  What was the reference to 240 Beaver

9  Street at the end of that clip?

10     A.  I think that's the address of a farm

11 property that was controversial, and that's why it's

12 a joke.  He's suggesting it could be redeveloped to

13 housing.

14     Q.  And having watched this video now, what were

15 the -- well, strike that question.

16          MS. MacDOWELL LECAROZ:  I think we've

17 been going a little more than an hour now since the

18 last break.  So, it might be a good time.

19          MR. PYLE:  Yeah, sure.  We can take a

20 quick break.  I'd like to get through the rest of

21 the videos before lunch and then a break, if that's

22 okay.

23          (Brief recess.)

24          MR. PYLE:  Back on the record.

94

1    EXAMINATION BY MR. PYLE:

2        Q.  We can move on to No. 11, which is entitled,

3    "CotW 3/6/23 MBTA Communities, Vidal Assesses Supply

4    and Demand."

5              And I'll ask you, have we already

6    identified the transformational purposes for the

7    posting of this Video No. 11?

8        A.  Yes.  I would say that for all of these

9    videos, the specific content is different, but the

10   purpose is the same.  The purpose was to give a

11   cross-section of city councillors and what their

12   reactions to this law were, and the attitudes that

13   were expressed.

14       Q.  Could have Clip No. 11 have been shorter and

15   still achieved the same transformational purposes?

16              MS. MacDOWELL LECAROZ:  Objection.

17       A.  I would say, yes, it could be.  It's the

18   same as the other clips.  There's a tradeoff where

19   making it shorter might make people feel you cut out

20   something important, but anything can be shorter,

21   yes.

22       Q.  No. 12, Committee of the Whole, March 6,

23   2023, titled "MBTA Communities, Colleen

24   Bradley-MacArthur asks about ADUs."

95

1          Have we identified the transformational

2     purposes behind the posting of this clip?

3        A.  Yes.

4        Q.  Could this clip have been shorter and

5     achieved the same transformational purposes?

6        A.  Maybe.

7        Q.  I'd like to then show you that video so we

8     can figure out for sure.

9               (Video played.)

10       Q.  Okay.  Having reviewed this video, No. 12 on

11    the list, could have this video have been shorter

12    and achieved the same transformational purposes that

13    you've identified?

14              MS. MacDOWELL LECAROZ:  Objection.

15       A.  Yes.

16       Q.  Okay.  How so?

17       A.  It might not have been necessary to include

18    Attorney Azadi reading off the ADU definition.

19       Q.  Okay.  Anything else come to mind?

20       A.  No.

21       Q.  No. 13 on the list, Committee of the Whole,

22    March 6, 2023, "MBTA Communities, Harris Identifies

23    Ground Zero."

24              I believe we've identified the

96

1    transformational purposes behind this video,

2    correct?

3         A.  Yes.

4         Q.  Could this video have been shorter and

5    achieved the same transformational purposes that

6    you've identified?

7                 MS. MacDOWELL LECAROZ:  Objection.

8         A.  Yes.

9         Q.  No. 14, Committee of the Whole, March 6, '23

10   "MBTA Communities.  LeBlanc's thoughts on the

11   development of Felton Street."

12                 Have we identified the transformational

13   purposes behind posting of this video?

14        A.  Yes.

15        Q.  Could this video have been shorter and still

16   achieved the same transformational purposes that

17   you've identified?

18                 MS. MacDOWELL LECAROZ:  Objection.

19        A.  Yes.

20        Q.  No. 15, Committee of the Whole, March 6,

21   2023, "MBTA Communities, Plan to elevate the

22   commuter rail from 70 years ago."

23                 Have we identified the transformational

24   purposes behind the posting of this video?

97

1      A.  Yes.

2      Q.  Could this video have been shorter and

3   achieved the same transformational purposes?

4           MS. MacDOWELL LECAROZ:  Objection.

5      A.  Yes.

6           MR. PYLE:  Okay.  I think now would be a

7   fine time to take a break for lunch, if that's all

8   right with you.  I see Rebecca nodding her head.

9           We'll go off the record.

10           (Lunch recess.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

98

1                      AFTERNOON SESSION

2              JOSHUA PAUL KASTORF, resumed.

3              MS. MacDOWELL LECAROZ:  Before we get

4    going, just one thing I wanted to do before I

5    forget, which is to note that these depositions

6    yesterday and today are covered by the protective

7    order in this case, and, so, only intended to be

8    used for the purposes of this litigation.

9              MR. PYLE:  For sure.  Are you

10   designating either of them confidential under the

11   protective order?  Because the protective order says

12   anything designated confidential or not is to be

13   used only for purposes of the litigation.  Then

14   there's an extra level of protection we have in

15   there for confidential things.

16             MS. MacDOWELL LECAROZ:  I think

17   simply -- and Mitch can jump in if he wants to

18   correct me -- but I think pursuant to the protective

19   order, it will be used only for the purposes of the

20   litigation.

21             MR. PYLE:  Great.  Thank you.  And I'll

22   make the same statement on the record for the

23   depositions that are to take place later in July of

24   WCAC individuals.

99

1            MS. MacDOWELL LECAROZ:  Great.

2    EXAMINATION BY MR. PYLE:

3        Q.  Mr. Kastorf, have we discussed earlier today

4    the purposes of Channel 781's clipping of WCAC

5    videos?

6        A.  You're asking me did we discuss that?

7        Q.  Yes.

8        A.  Yes, we've discussed that.

9        Q.  And you've talked about all those purposes,

10   right?

11       A.  Yes.

12       Q.  All right.  Did Waltham DATA at one time

13   have a statement on its YouTube page about the

14   purposes of the YouTube page or its policies?

15       A.  I don't think so.

16       Q.  Did it have any kind of sort of mission

17   statement?

18       A.  No.

19       Q.  Did it have any statement on the front of

20   its, as part of its YouTube page, an explanation of

21   why it did WCAC postings of WCAC videos?

22       A.  I don't think so.

23       Q.  I'm going to read the following language to

24   you and ask you if you recognize it.

Channel 781 News vs                30(b)(6)                Joshua Kastorf
Waltham Community Access Corporation                      June 27, 2025

100

1      A.  Okay.

2      Q.  Quote, "WCAC cross posts.  In Waltham, many,

3   but not all, city meetings are recorded by public

4   access station WCAC.  Videos air on local cable and

5   are posted to WCAC's website without captions.  We

6   have advocated for all meetings to be recorded and

7   captioned.  The Channel 781 News team live streams

8   or records many of the unrecorded meetings and posts

9   them here.  We often repost full recordings or clips

10  of meetings from WCAC here so that they can be

11  auto-captioned.  We do not own the rights to the

12  WCAC content, but we believe this is necessary

13  because WCAC is not meeting their legal obligation

14  to provide captions," unquote.

15     A.  Okay.

16     Q.  Do you recognize that language?

17     A.  I do.

18     Q.  What is that language?

19     A.  I put that up earlier.  When I first started

20  the channel, I was looking for a solution to the

21  captioning issue, and I experimented with reposting

22  whole episodes of WCAC.  And I later decided that

23  was not a practical way to go about it.  So, we

24  stopped doing that.

101

1     Q.  What was the purpose of putting this

2  statement up on YouTube?  Strike that question,

3  please.

4            Did you put this statement that I just

5  read up on the YouTube page?

6     A.  Yes.

7     Q.  As a way of explaining why you were posting

8  WCAC videos?

9     A.  Yes.

10     Q.  And was that a true and accurate summary of

11  why you were posting WCAC videos, at least as you

12  believed it at the time?

13     A.  It was true and accurate for that time.

14  It's not complete in terms of the later clips we

15  posted.  We had additional reasons for posting them.

16     Q.  Okay.  The statement that I read says, "We

17  often repost whole recordings or clips of meetings

18  from WCAC."

19            So, my question is, did you, in fact,

20  post full government meeting recordings that WCAC

21  had put on its website?

22     A.  Yes.

23     Q.  What were those meetings?

24     A.  I'm sorry.  I don't remember.

102

1      Q.   Okay.  Do you remember any examples?

2      A.   I know they were -- you know, it was either

3  city council or one of the things we followed, but I

4  don't remember any examples now.

5      Q.   Okay.  You said you decided at some point

6  not to do that anymore?

7      A.   Correct.

8      Q.   Please tell me all the reasons why.

9      A.   As I mentioned, before we started Channel

10  781, at the beginning, the problem I was trying to

11  solve was the fact that videos were not searchable

12  and that they were not captioned.  And I had written

13  a letter to WCAC saying I think you should caption,

14  and I think you should make, record all the

15  meetings, not just some of them.  And I had some

16  friends who also sent letters.  We didn't hear back.

17           So, I was thinking, well, how can you

18  solve this problem.  And one thing I thought of was

19  if you were to repost the whole meetings, they would

20  be auto-captioned, and then they would be

21  searchable, and then you could take those

22  transcripts and use them as a searchable record.  I

23  decided not to do that because it was too labor

24  intensive.

103

1    Q.  At what point did you decide no longer to
2    post full meeting videos?
3        A.  I'm not sure exactly, but I believe it was
4    in 2021.  It was pretty soon after we started doing
5    Channel -- I'm sorry; 2022.  So, pretty soon after
6    we started doing Channel 781, because I thought that
7    was a better way to create a searchable record was
8    to put up our own content rather than try and copy
9    all of their content.
10       Q.  Why was it too labor intensive to, say,
11   screen record an entire meeting and then upload into
12   YouTube?
13       A.  Well, the meeting is anywhere from an hour
14   to three hours long, and you screen record in real
15   time.  So, to screen record a three-hour meeting
16   would take three hours.  And then it's a large file
17   that you then have to re-upload to YouTube.  And
18   then you have to go in and label and make sure each
19   file has the right label and so on.
20       Q.  Okay.  Were there any other reasons why you
21   decided not to do that anymore in 2022?  By "that,"
22   I mean post whole meetings.
23       A.  No.
24       Q.  Okay.  Did you at any time come to form an

104

1  opinion about whether the screen recording and

2  posting of a full meeting as recorded by WCAC would

3  amount to copyright infringement?

4            MS. MacDOWELL LECAROZ:  Objection.

5      A.  I was concerned that it probably did amount

6  to copyright.  And I had done it in a way because I

7  was being ignored by WCAC.  And I thought if they

8  contacted me about it, then I would have a chance to

9  ask them about these issues.

10            So, I did not believe -- I was

11  concerned, yes, that I was infringing copyright when

12  I was putting up those whole episodes.

13     Q.  And when did you form that concern?

14     A.  As soon as I started doing it.

15     Q.  I'm going to show you a video -- and don't

16  worry, we're not going to watch the whole thing.

17     A.  Okay.

18     Q.  -- of a city council meeting on the Channel

19  781 archives page, and ask you if you recognize it?

20            (Video played.)

21     Q.  Okay.  Having shown you the first 19 seconds

22  of this video, do you recognize this?

23     A.  More or less, yeah.  I don't remember

24  posting it, but I know what it is.

105

1    Q.  What do you recognize it to be?

2    A.  It is either a long clip or a complete

3  meeting because it says it's almost two hours.  So,

4  it's either that entire meeting or it's a big chunk

5  of that meeting.

6    Q.  And by "that meeting," what meeting are you

7  referring to?

8    A.  The city council meeting from December 5 of

9  2022.

10    Q.  And what was the subject of the meeting?

11    A.  Well, the subject that interested us at

12  least was MBTA bus route changes.

13    Q.  Okay.  And the date of this meeting was

14  December 5, 2022?

15    A.  Yes.

16    Q.  So, that's pretty late in the year of 2022

17  that this full meeting video was posted, is it not?

18         MS. MacDOWELL LECAROZ:  Objection.

19    A.  It is.  And I stand corrected.  We must have

20  posted, I must have remembered wrong when we stopped

21  doing this.  And I didn't realize it was still up

22  there.  I thought we had taken down all, I thought I

23  had taken down all the ones that showed complete

24  meetings like this.

106

1      Q.  So, how many complete meetings would you

2   estimate you put up on to the YouTube page --

3              MS. MacDOWELL LECAROZ:  Objection to

4   form.

5      Q.  -- over the time that you had the policy of

6   posting full meetings?

7              MS. MacDOWELL LECAROZ:  Objection.

8      A.  I don't remember.  I would guess in the area

9   of 10 to 20.

10     Q.  And is it your testimony that you took some

11  of them down?

12     A.  Yes.

13     Q.  Okay.  And you thought you had taken all of

14  them down?

15     A.  Yes.

16     Q.  You intended to take all of them down?

17     A.  Yes.

18     Q.  Okay.  Why?

19     A.  Because we found an alternate solution to

20  the problem.  And it wasn't necessary to do this

21  anymore.

22     Q.  What was the alternate solution to the

23  problem?

24     A.  By doing our Debrief shows and our Headline

107

1   shows and posting them with timestamps and with
2   captions, they were searchable.  So, a person who
3   was looking, wanted to know when a certain issue was
4   discussed at a meeting, if they searched, they would
5   find our video.  And whether or not they agreed with
6   our opinions, that would clue them in as to what
7   meeting this was discussed at.  So, then they could
8   find that on the WCAC site and watch it.  So, we
9   were creating a searchable record of the city
10  council, which is what I wanted.
11      Q.  Were there any other reasons that you
12  decided to take down those 20 or so videos?
13          MS. MacDOWELL LECAROZ:  Objection.
14      A.  I was concerned that it could be, could have
15  been considered copyright infringement.
16          I took a risk because I was being an
17  activist.  You know, I took a risk doing something
18  that might not be allowed, and then that risk wasn't
19  necessary anymore.
20      Q.  Have you described that as civil
21  disobedience before?
22      A.  I have described it as that, yes.
23      Q.  Do you recall at some time a recorded video
24  statement by Maria Sheehan of WCAC about the use of

108

1    WCAC content by others?

2        A.  Yes.

3        Q.  Okay.  Tell me about that.

4        A.  A member of our team drew it to our

5    attention.  It was something, it was sort of a

6    special segment she did on an episode of their

7    weekly news show.  It was not clear who she was

8    referring to, but we were concerned that she was

9    referring to us.  In the statement, she said that

10   whoever she was referring to was promoting hate, and

11   that really bothered me.  And that was initially why

12   I asked to meet with her.  I wanted to know what she

13   meant by that.

14            And then by the time I actually did meet

15   with her, there were other things to discuss, but I

16   remember, I wanted to know whether she was referring

17   to us so that -- and if she was, I wanted to be able

18   to -- well, I wanted to be able to have a

19   conversation with her.  And if we could work out a

20   way to use the clips that was okay with them, we

21   would do that, but it turned out we weren't able to

22   do that.

23       Q.  I'd like to show you what's been previously

24   marked as Exhibit 1.

109

1                (Witness provided Benavides Exhibit 1.)

2        Q.  Do you have that document before you, and do

3    you recognize it?

4        A.  Yes.  This is -- yes, I recognize this, and

5    I have it before me.

6        Q.  When you say a member of your team alerted

7    you to the statement, is that reflected on the first

8    page of this exhibit?

9        A.  Yes.  You can see Eamon posted a link to the

10   news -- the video with a note at what time that it

11   took place.

12       Q.  Okay.  And did you have any other, apart

13   from what you've just talked about, any other

14   immediate reaction to learning about this statement?

15       A.  Immediate reaction?  No.  What I've stated

16   already is all.

17       Q.  Okay.  On Page 510 of this document, you

18   say, "I'm going to call her."

19            Do you see that at the bottom?

20       A.  Yes.

21       Q.  Okay.  Did you call Maria?

22       A.  I ended up not calling because I couldn't

23   find a phone number on the website.  So, instead, I

24   e-mailed her and asked for a phone meeting.

110

1    Q.  Okay.  And we'll talk about that meeting in
2  a minute.
3            You write, "I'll respect her rights
4  under the Copyright Act when she respects the rights
5  of disabled people under the ADA."
6            What did you mean to convey by that
7  statement?
8    A.  I was angry because I felt that I had got in
9  touch with them to ask them to do the right thing.
10  They didn't do it, and, now, they're calling us out
11  publicly, or we thought it was us.
12            So, yeah, I was expressing anger at the
13  fact that we were being called out for our supposed
14  wrongdoing when they weren't addressing an issue
15  that we had raised or that I had raised with them.
16    Q.  So, is part of what you meant to convey,
17  too, that we wouldn't need to post clips of WCAC
18  content if only they captioned the meetings?
19            MS. MacDOWELL LECAROZ:  Objection.
20    A.  Sort of but it's not just the captioning.
21  There are other reasons to post it, but they all
22  have to do with things that WCAC is not providing.
23    Q.  At the top of Page 511, you wrote, "She's
24  responding mostly to the Reddit post about

111

 1  Mrs. Vanaria, I think, which used WCAC photos, but
 2  she's also referring to 781."
 3          What are you referring to in that text
 4  message?
 5      A.  There was a post on Reddit calling out a
 6  person in the community who was, Mrs. Vanaria, who
 7  is an influential person who had been posting
 8  extremely transphobic comments on social media.  And
 9  that post included a picture which had come from
10  Waltham channel.
11      Q.  Mrs. Vanaria posted a Waltham channel photo
12  or someone else -- -
13      A.  Someone else, whoever the person who
14  authored that post.
15      Q.  And what was the photo?
16      A.  I believe it was a photo of Mrs. Vanaria
17  holding, at a campaign rally, holding a sign for a
18  specific councillor.
19      Q.  Was the photo altered in any way, do you
20  know?
21      A.  I don't think so.
22      Q.  And did the Reddit post call out
23  Mrs. Vanaria for her positions?
24      A.  Yes.

112

1      Q.   What did the post say?

2      A.   The post was calling her out for her

3   transphobia.

4      Q.   Okay.  And why did you think that WCAC's

5   statement on April 6 was about Mrs. Vanaria?

6      A.   It was the timing.  That was a post, it was

7   very controversial.  It had lots of comments.  So,

8   it was a thing people were talking about.  And then

9   this happened just after that.  So, that's why I

10  suspected it was partly in response to that.

11     Q.   Was this part of the Waltham politics sub

12  Reddit?

13     A.   It's just the Waltham sub Reddit.

14     Q.   The Waltham sub Reddit?

15     A.   Yes.

16     Q.   Okay.  A few entries down, you write, "When

17  I was reposting a whole meeting, that was a

18  violation of their copyright which I intended as

19  civil disobedience."

20          Do you see that?

21     A.   Yes.

22     Q.   What was that in reference to?

23     A.   That was referring to the period where I was

24  posting whole meetings in order to get them

113

1    captioned.

2        Q.  And you acknowledge there that was a

3    violation of their copyright, of WCAC's copyright,

4    right?

5            MS. MacDOWELL LECAROZ:  Objection.

6        A.  Yes -- well, let me back up.  I think you

7    could make a case that it was fair use because --

8        Q.  I'm only asking your opinion.

9        A.  Yeah, yeah, but my opinion was I was very

10   concerned that it was probably copyright

11   infringement.

12       Q.  Because you didn't think posting somebody

13   else's content on YouTube just to generate

14   auto-captions made it, that reposting fair use,

15   right?

16           MS. MacDOWELL LECAROZ:  Objection.

17       A.  Not exactly.  I was more concerned about the

18   fact that it was a whole video with no alterations.

19       Q.  Down at the bottom of, or toward the bottom

20   of 511, you write, "Well, I e-mailed her and

21   requested a phone meeting.  We'll see what happens.

22   Hopefully, Justin Barrett doesn't break my

23   kneecaps."

24           I assume that was a joke?

114

1      A.   That was a joke.

2      Q.   What was the truth behind the joke?

3      A.   Justin Barrett, we had joked about him being

4  the godfather of Waltham because he was connected in

5  so many ways behind the scene.  That's something we

6  discussed before.

7      Q.   How is he connected?

8      A.   He's on the board of WCAC.  I believe he's

9  currently on the -- he's currently on one city

10 board, I forget which one, but he served on other

11 city boards in the past.  He's also very involved in

12 the Waltham Lions Club, which is an organization

13 that includes all the most influential people in

14 town.

15     Q.   Okay.  Anything else?

16     A.   He's also -- yes, actually.  He was also --

17 I forget his specific title but he worked for

18 Middlesex Human Services Agency, which is the

19 organization that runs the homeless shelters and

20 services for homeless people in Waltham.

21     Q.   Did Maria Sheehan eventually write you back

22 in response to your e-mail to her?

23     A.   Yes.

24     Q.   And did that e-mail from Maria Sheehan lead

115

1  to a meeting?

2      A.  Yes.

3      Q.  And when did that meeting take place?

4      A.  I don't remember -- June 15, 2023.

5      Q.  I'll note for the record that you refreshed

6  your recollection from Schedule A --

7      A.  Yes.

8      Q.  -- to the deposition notice.  Okay.

9          I'd like you to tell me from start to

10 finish the entire story of that meeting, where it

11 occurred, when it occurred, what time of day, and

12 everything that was discussed.

13          MS. MacDOWELL LECAROZ:  Object to the

14 form.

15     A.  So, I had asked for a phone meeting.  She

16 got back to me some time later and asked me to come

17 in for an in-person meeting.

18          I went to the meeting, I went to their

19 station.  She was very polite and nice and started

20 the meeting by giving me a tour of the station.

21          And then we sat down to talk, and she

22 said, So, why don't you do your show out of here?

23 And that caught me off guard.  I didn't understand

24 why she was asking that.  I didn't think she really

116

1   wanted us to do that, but I didn't know why, I
2   didn't know if she was just being polite or what.
3             So, I said, Well, let me ask you
4   something else first.  Why don't you do captions?
5             And, so, we talked about captions for
6   some time.  She said that she was not legally
7   obligated to do them.  She said that no one was
8   asking for her to do them.
9             And I said, Well, I'm asking.  And she
10  said, Well, what's your disability?  And that,
11  again, caught me off guard.  I wasn't expecting her
12  to ask me about my disability.  I said that I had a
13  visual -- I had an auditory processing issue.  And
14  she responded by saying something about her hearing
15  issues, like she was kind of saying like everyone
16  has that.
17            So, at this point in this conversation
18  on captions, she made a reference to sometimes news
19  stations use clips of their shows.  I don't remember
20  specifically what she said, but she made some
21  reference to clips.  I said, oh, okay, well, that
22  gets us to the other thing we have to talk about.
23            And she said, you know, she said, the
24  problem with what you're doing is that you're not

117

1   just using these clips to inform people.  You're
2   putting your spin on them.
3              And I -- she also said that people were
4   -- I asked her if people had complained to her about
5   use of the clips.  She said people were confused,
6   people were confused about why they didn't -- and I
7   said, oh, I'm surprised -- people were confused that
8   WCAC footage was on our channel.
9              And I said, oh, I'm surprised to hear
10  that because we talked extensively about why we use
11  those and the issues with transparency and why we do
12  that.  And, also, most of the times when you use the
13  clip, often you can see the WCAC tab.  So, I'm
14  surprised to hear people were confused, but I
15  thought we could find a mutually-agreeable
16  arrangement where I would say, you know, we would
17  acknowledge them in the clip in some way that worked
18  for her, and then it would be okay, but her response
19  was, well, if you can see the logo, that just proves
20  that it's copyright infringement, which I didn't
21  understand.  And that didn't seem consistent with
22  her previous reason.
23             So, she said -- we talked about what I
24  was doing.  At first she had said -- at some point

118

1   in the conversation she had said she hadn't seen
2   anything that we had done, which seemed to
3   contradict her having an opinion on it earlier.
4               And, so, she said that she would be
5   willing to go to her board and ask them to make a
6   policy about use of clips, but no matter what the
7   policy was, it was going to involve us having to ask
8   permission for each individual use, each individual
9   clip.
10              And I said, well -- she also said many
11  times in the conversation she believes in free
12  speech.  And, so, I said, well, I think you can see
13  how that's not going to work from a free speech
14  point of view because if we have to ask permission
15  for each clip, you could say no based on the content
16  and based on politics.  And she said, I don't follow
17  Waltham politics.  And that also seemed wrong to me
18  because she had made another comment in the meeting
19  about the farm issue, actually, where her comment --
20  she made a joke about it where the joke wouldn't
21  have made sense if you weren't following the issue.
22              So, I didn't believe her she was not
23  following Waltham politics.  I said, the head of
24  your board is on several city boards.  And she said,

119

1   Justin doesn't care what we do.

2           So, she was trying to say that they

3   weren't going to use this power to censor us, but

4   that made not sense to me.  She had to have a reason

5   to bring us in there, someone asked her.

6           So, I said to her, well, listen, I'd

7   like to come to an arrangement -- not my exact words

8   -- I said something to the effect of, I'd like to

9   come to an arrangement with you so we can use the

10  clips, but you have to understand we have a right to

11  use this.  This is fair use.

12          And she did not agree with that, but she

13  never at any point said it's not fair use because.

14  She never seemed to respond directly to the question

15  of fair use.  She said -- she gave examples.  She

16  said, you know, there was one time where such and

17  such professional news station asked to use our

18  clips, and we said okay, and they had to ask our

19  permission.  And I said, yes, I understand that's

20  standard in the industry to ask permission, but

21  there is still this legal concept of fair use, and

22  we're within our rights to use this.

23          So, the meeting got -- and then at some

24  point, she said, you're stealing, you're stealing.

120

1   And when she said that, her demeanor kind of
2   changed, like she was angry.  And it made me
3   question everything else she said in the meeting
4   because she had been fairly congenial up until that
5   point.
6              So, it was clear that, it seemed clear
7   to me that she was angry about our use of the clips,
8   and that she considered it criminal, which I was not
9   expecting.
10             So, I ended the meeting.  It was getting
11  tense.  It was clear we weren't going to reach a
12  compromise.  So, I said, I think we both need to do
13  more research on captions, and we both need to do
14  more research on fair use.
15             So, as we walked out, I think we were
16  both very tense.  There was no angry words
17  exchanged, but we were both on the verge of being
18  angry, I think.
19             So, I left.  I did some additional
20  research on fair use, and I sent her an e-mail about
21  it.  I sent her e-mails trying to, you know, clarify
22  certain things she had said.  I also found out more
23  information about captions.  And I found out, in
24  fact, there's an exception where she's not legally

121

1    required to do it.

2        Q.  You said -- first of all, have you now told

3    the whole story of that meeting?

4        A.  It was a long meeting.  So, there could be

5    elements I haven't told, but that's a complete

6    summary, I think.

7        Q.  Okay.  Thank you.

8            You used the word "criminal" just a

9    moment ago.

10           Did she say that your use of WCAC clips

11   was criminal in so many words?

12       A.  She didn't use -- no.  She said it was

13   stealing.  And the way that she said it, you know,

14   put a certain emphasis that she saw it as a serious

15   thing.

16       Q.  I see.  At the beginning of your discussion

17   on the issue of use of clips, you said that she had

18   a problem with your putting your own spin on the

19   clips?

20       A.  That's correct.

21       Q.  Did she say anything else about that

22   subject?

23       A.  Not really.  I mean, we talked about it for

24   a little while, but that was her main point that the

122

1  primary reason she objected to what we were doing

2  was we were putting our own spin on things.  We

3  weren't just informing the public.

4       Q.  Okay.  I wanted to clarify, approximately

5  what date did you decide to take down the

6  whole-meeting recordings from the Channel 781

7  YouTube page?

8       A.  I'm not quite sure because I thought it was

9  early or mid 2022, but you just showed me an example

10 of one from late 2022.  So, I would have to say it

11 was at least late 2022.

12      Q.  Do you think that you took them down before

13 the June 15, 2023 meeting with Maria Sheehan?

14      A.  Yes.

15      Q.  Okay.  Why do you think that?

16      A.  Because of these discussions we had about

17 why we believed it was okay to use clips, you know,

18 I was trying to be consistent and take down the

19 stuff that we weren't sure about.  And this is

20 something we thought about a lot before I met with

21 Maria.  So, that's why I think I took them down.

22 Obviously, there was at least one I missed, but I

23 had taken them down prior to that.

24      Q.  Had you taken those whole-meeting videos

123

1    down prior to the April 6 statement by Maria on the

2    Waltham Newswatch program regarding use of WCAC

3    recordings and photos?

4              MS. MacDOWELL LECAROZ:  Objection.

5        A.  No.  Apparently not because we just saw one

6    that was after that.  So, I actually am sorry, I

7    don't remember when we took them down.

8        Q.  Well, I think that the video we looked at

9    was from December of 2022?

10       A.  Yes.

11       Q.  The statement on Waltham Newswatch was in

12   April of '23.

13       A.  Oh, okay.

14       Q.  So, I ask you, did the clip, did the big

15   whole-meeting videos come down before or after the

16   April 2023 statement?

17       A.  I think they came down before that.

18       Q.  Before that?

19       A.  Yes.  With the exception of the one that

20   didn't come down at all.

21       Q.  They didn't come down because of or in

22   response to Maria Sheehan's statements --

23       A.  No.

24       Q.  Okay.  You have to let me finish my

124

1    question.

2        A.  Oh, sorry.

3            MS. MacDOWELL LECAROZ:  And give me a

4    chance to object.

5        Q.  They didn't come down because of Maria

6    Sheehan's April statement?

7        A.  No.

8        Q.  Okay.  You weren't reacting to that

9    statement by taking them down?

10       A.  No.

11       Q.  You had decided independently that the

12   copyright risk was too great, you needed to take

13   them down?

14           MS. MacDOWELL LECAROZ:  Objection.

15       A.  I want to revise a little.  I'm not

16   absolutely certain they came down.  I can't say for

17   sure that it wasn't a response to her announcement.

18   I recall that they were earlier, but I'm not sure

19   about them.

20       Q.  Okay.  It could have been in response to her

21   statement?

22       A.  It could have been, yes.

23       Q.  All right.  I show you now Exhibit 2.

24           (Witness provided Benavides Exhibit 2.)

125

1       Q.   Do you recognize this document?

2       A.   Yes.

3       Q.   And what is this document?

4       A.   This is from our Channel 781 group Signal

5    chat and from just after I had that meeting.

6       Q.   Actually, I'm sorry.  Before we talk about

7    this document, you said one of the things that Maria

8    Sheehan said during the meeting was that people were

9    confused --

10      A.   Yes.

11      Q.   -- about why WCAC's content was on your

12   YouTube page, right?

13      A.   Yes.

14      Q.   Okay.  Do you think that people could have

15   been confused if they saw entire WCAC videos on your

16   page --

17           MS. MacDOWELL LECAROZ:  Objection.

18      Q.   -- as to whether Channel 781 was affiliated

19   with WCAC in some way?

20           MS. MacDOWELL LECAROZ:  Objection.

21      A.   I'm not sure about that.  Maybe.  Maybe.

22           I mean, it was clearly labeled as our

23   page, and you read me the language I wrote

24   explaining why we were doing it.  So, I don't really

126

1   think it was confusing, but, of course, somebody

2   could have been confused.

3       Q.  People wouldn't necessarily see that

4   statement?

5       A.  Right, right.

6       Q.  Right?

7       A.  Right.

8       Q.  Because you have to click on a separate tab

9   on the YouTube page to get to it?

10      A.  Yes.

11      Q.  So, they might see that whole meeting there

12  and assume there was some affiliation between

13  Channel 781 and WCAC?

14          MS. MacDOWELL LECAROZ:  Objection.

15      A.  Possibly.

16      Q.  If, for example, an entire movie created by

17  somebody appears on somebody else's YouTube channel,

18  do you think there might be some confusion as to an

19  affiliation between the YouTube page and the

20  filmmaker?

21          MS. MacDOWELL LECAROZ:  Objection.

22      A.  Yes.  Maybe.

23      Q.  All right.  Back to Exhibit 2.  You say on

24  the first page of this, "Just met with exec director

127

1    of WCAC."

2                    Do you see that?

3        A.  Yes.

4        Q.  Do the messages from you that follow

5    summarize your meeting with Maria Sheehan?

6        A.  Yes.

7        Q.  Okay.  There is something you say in the

8    second message here that Channel 781 could only use

9    WCAC clips for fact reporting, not opinions?

10       A.  Correct.

11       Q.  So, I don't believe you included that in

12   your summary of the meeting just now.

13                    Is that something that she said

14   during --

15       A.  Well, no.  Actually, she didn't say you can

16   only do this.  She didn't say you can do anything.

17                    When we started the conversation, the

18   initial reason she gave for why what we were doing

19   was problematic was because it was opinion stating

20   as opposed to facts.

21       Q.  So, she never said that as a matter of

22   policy going forward that she would only grant

23   Channel 781 permission to use WCAC clips if those

24   clips were being used for fact reporting not

128

1   opinions?

2           MS. MacDOWELL LECAROZ:  Objection.

3       A.  She didn't say -- she didn't present it as

4   -- no.  She didn't say that exactly.  She said that

5   was her problem with it.  She never gave a condition

6   under which she would or wouldn't approve it.

7       Q.  In fact, she said she had to create a policy

8   and then present it to the board for approval,

9   right?

10      A.  That's correct.

11      Q.  So, she wasn't stating here what WCAC's

12  policy would necessarily be going forward on the use

13  of clips with permission?

14      A.  That's correct.  She was clear that the

15  policy still had to be made by the board.

16      Q.  Do you see on Page 599 of this document,

17  Exhibit 2, there's an entry from Tom Benavides at

18  the top saying, "Yeah, kind of ironic that the thing

19  she mainly has beef with clipping during debrief is

20  what's probably the legally safest from our end."

21              Do you see that?

22      A.  Yes.

23      Q.  He continues, "From a fair use point of

24  view.  Just assuming.  Don't actually know for

129

1    sure."

2        A.   Sure.

3        Q.   Okay.   What did you understand Tom Benavides

4    to mean by that?

5        A.   Well, the way -- I think what his intent was

6    to say is that if we were -- so, he's kind of not

7    entirely correct here.   He says the thing she mainly

8    had a beef with was clipping during debrief.   That's

9    not entirely true, because she didn't make a

10   distinction between different uses of the clips in

11   our meeting.   She only talked about it in general.

12   So, that's not exactly true.

13              I think his intent here was to say that

14   if we're using it to express a political opinion,

15   that's the point of fair use.   That makes the fair

16   use case stronger.   So, she was kind of saying the

17   opposite.   She was saying the more opinionated it

18   is, the more legal it is.

19       Q.   And, in fact, you say that Maria had, in

20   fact, expressed to you that her problem was you're

21   putting your own spin on the clips, right?

22       A.   Correct.

23       Q.   Okay.   So, you understood him to be saying

24   that if you're using clips to exemplify or

130

1    illustrate opinions, that's more protected by fair

2    use than other types of uses, right?

3                    MS. MacDOWELL LECAROZ:  Objection.

4        A.  That's -- sorry.

5        Q.  Go ahead.

6        A.  That's how I interpreted it, and I think

7    that's how Tom meant it here.

8        Q.  Okay.  He also writes down toward the bottom

9    of this, "Damn, starting to wish I had taken out the

10   legal insurance my job offers."

11                   What did you understand him to mean by

12   that?

13       A.  So, I initially thought he was worried that

14   we were going to get sued and that he wished he had

15   taken insurance in case we got sued.

16                   When I re-read this later, I don't think

17   that's what he meant.  He meant that if he had the

18   insurance, we could go talk to a lawyer, use a

19   lawyer.  I thought he was, yeah, I thought he was

20   worried about getting sued, but when I went back and

21   read it again, that's not right.

22       Q.  Well, when you read this the first time in

23   2023, you understood him to be referring to getting

24   sued?

131

1      A.  Yeah, I thought he was saying I wish we had

2   insurance in case we got sued.

3      Q.  Did you talk to Tom Benavides about his

4   deposition yesterday?

5      A.  No.

6      Q.  Okay.

7      A.  Wait.  Did I talk to him since the

8   deposition?

9      Q.  Did you talk to him after the deposition?

10     A.  No, I did not.

11     Q.  Okay.  Do you have any knowledge of what he

12  testified to at his deposition?

13     A.  No.

14     Q.  Have you talked to Tom Benavides at any time

15  about what he meant by this statement here?

16     A.  No -- well, actually, he did later clarify

17  it a little bit in this conversation, I believe.

18            Oh, okay.  "No worries about

19  responsibility.  I just mentioned the insurance

20  because that means easy access lawyer we could use."

21  So, yeah, he kind of clarifies that it wasn't that

22  he was worried about being sued.  It was that he was

23  thinking it would be helpful to have access to a

24  lawyer.

132

1      Q.  Okay.  But your testimony still is when you
2    read this before you thought it was in reference to
3    him getting sued?
4              MS. MacDOWELL LECAROZ:  Objection.
5      A.  Yes.
6      Q.  You write just after his comment on Page
7    599, "In the unlikely event they take legal action,
8    I will take responsibility for our content since I
9    started the YouTube channel."
10             Do you see that?
11     A.  Yes.
12     Q.  So, you were referring to a lawsuit when you
13   wrote that, right?
14             MS. MacDOWELL LECAROZ:  Objection.
15     A.  Yes -- well, not exactly.  I said "legal
16   action."
17     Q.  What did you mean by "legal action"?
18     A.  Well, it could mean a lawsuit or just
19   sending us a letter from a lawyer.
20     Q.  Okay.  Mr. Kastorf, there's a redacted entry
21   on this page on Page 600.
22     A.  Okay.
23     Q.  And I will represent to you that there's
24   been a representation made to the defendant by your

133

1    counsel that this entry reflects legal advice.  So,

2    I'm going to ask you some questions about that.  Yes

3    or no for now.

4              Did you consult with a lawyer on or

5    around this date?

6        A.  No.

7        Q.  Did you write in this message anything to do

8    with legal advice you had received?

9        A.  I don't remember the content of this

10   message, but it couldn't have been about me

11   receiving advice from a lawyer because I didn't

12   receive advice from a lawyer.

13       Q.  Okay.  So, is it your testimony that this

14   entry does not reflect the provision of legal advice

15   to you?

16       A.  I'm not sure I understand.

17       Q.  Is it your testimony that whatever is

18   redacted in this message does not contain anything

19   about legal advice?

20            MS. MacDOWELL LECAROZ:  Objection.

21       A.  I don't remember what it contained.  It may

22   have contained something relating to legal advice.

23   It did not include me relaying something I was told

24   by a lawyer because I hadn't spoken to a lawyer.

134

1    Q.  Okay.  The entry in the privilege log we

2    received for this particular redacted message reads

3    as follows:  "Confidential communication with the

4    members of Channel 781 relaying confidential

5    communication from another attorney (not counsel in

6    this action) constituting legal advice."

7              And I ask you, is it your testimony

8    that's inaccurate?

9              MS. MacDOWELL LECAROZ:  Objection.

10   A.  I guess I can't -- I'm not sure.  I don't

11   know what it refers to.

12             MR. PYLE:  Okay.  Well, given that the

13   writer of the message has now testified he doesn't

14   know what's in here and doesn't believe he consulted

15   a lawyer, I guess I'd make a request for this to be

16   unredacted and provided.  And we can confer on that

17   at a later time.

18             MS. MacDOWELL LECAROZ:  That's fine.  We

19   can reserve on that.

20             I think what his testimony was, he's not

21   sure what's in that message, and, so, he can't

22   testify as to whether it contained legal advice at

23   this moment.

24   Q.  Well, Mr. Kastorf, you're confident you did

135

1  not consult with a lawyer on or around this date,

2  correct?

3      A.  Correct.

4      Q.  Okay.  Is your brother a lawyer?

5      A.  Yes.

6      Q.  Without getting into the substance, did you

7  consult with your brother at any time about

8  copyright infringement issues?

9          MS. MacDOWELL LECAROZ:  Again, I just

10  remind you, that's a yes-or-no question.

11      A.  No.

12      Q.  You did not consult with your brother about

13  copyright?

14      A.  That's correct.

15      Q.  Okay.  What kind of law does your brother

16  practice?

17      A.  Contracts.

18      Q.  Okay.  On the next page, 601, you write,

19  "Also, everyone hide your copyrights because I'm

20  about to go on a clipping crime spree."

21          What were you referring to there?

22      A.  That was a joke.

23      Q.  Okay.  Did you clip in response to your --

24  did you clip WCAC content in response to your

136

1    meeting with Maria Sheehan?

2              MS. MacDOWELL LECAROZ:  Objection.

3        A.  I know after this point, I did clips.  I

4    don't remember how close in time it was.  I'm not

5    sure whether it was in response to the meeting.  I

6    did clip, continue to do clips after this point, but

7    I wouldn't say it was in response to the meeting

8    exactly.

9        Q.  On the following page, do you see a link to

10   Headlines dated June 16, 2023?

11       A.  Yes.

12       Q.  That's the day after your meeting with Maria

13   Sheehan?

14       A.  Can I look at the -- yes, that's the day

15   after.

16       Q.  So, did you put a whole lot of WCAC clips

17   into your Headlines video that day?

18              MS. MacDOWELL LECAROZ:  Objection.

19       A.  I don't remember that episode specifically,

20   but I think the answer is no because I never used a

21   lot of clips on any of them.  I think the most I

22   ever used in one was two clips.

23       Q.  Okay.  So, you didn't actually engage in a

24   crime spree?

137

1      A.  No, I did not.

2          MS. MacDOWELL LECAROZ:  Objection.

3      Q.  Who is Tom Benavides?

4      A.  He is a member of our team.

5      Q.  And has he been, has he substantially

6  contributed to Channel 781 News over the years?

7          MS. MacDOWELL LECAROZ:  Object to the

8  form.

9      A.  Yes.

10     Q.  In what ways?

11     A.  At first, he was sort of an audience member

12 who gave us some feedback.  Then we brought him on

13 as a, a few times as a contributor on topics that he

14 was an expert on.  And, eventually, he became a

15 regular on the Debrief show.

16     Q.  And did you ask him to become a regular on

17 the Debrief show?

18     A.  I don't recall.  It might have been Chris.

19 I know we wanted him to be.  I don't recall who had

20 a conversation with him about it.

21     Q.  Why did you want Tom to be a regular on the

22 show?

23     A.  Because he's very smart, and he knew -- he

24 was an expert on certain issues that we discussed.

138

1   And when he was a contributor, he did a nice job of,

2   you know, giving information that was accurate and

3   helpful, but also in an interesting and engaging

4   way.

5        Q.  Do you find him to be a thoughtful person?

6        A.  Yes.

7        Q.  Do you find him to be a reasonable person?

8        A.  Yes.

9        Q.  And I assume you valued his input to Channel

10  781 News affairs to the extent he provided it?

11       A.  Yes.

12       Q.  What, if anything, did you do as a result of

13  your meeting with Maria Sheehan on June 15?

14            MS. MacDOWELL LECAROZ:  Objection.

15       A.  I wrote, I did some additional research.  I

16  filed a complaint with the FCC.  And I wrote her

17  e-mails, I wrote her a follow-up e-mail trying to

18  clarify certain things she said.  And then after she

19  responded to that, I wrote her another e-mail that

20  had information about fair use.

21       Q.  Okay.  Did you write an e-mail memorializing

22  the meeting, what was discussed at the meeting?

23       A.  Yes.  That's what I meant.  When I say

24  clarifying, I was like, this is what I think you

139

1    said; is that what you thought you said.

2        Q.  Did you at any time decide to take any

3    content down off of the Channel 781 YouTube page as

4    a result of your meeting with Maria?

5        A.  I'm pretty sure the answer is no.  Because I

6    misremembered earlier the dates of some of those

7    things, it's maybe possible I took something down

8    after that, but I'm pretty sure I did not.

9        Q.  Okay.  We have looked at a chat in Exhibit 2

10   about your meeting with Maria Sheehan.

11            Did members of Channel 781 have any

12   other communication about that meeting outside of

13   the Signal group chat?

14            MS. MacDOWELL LECAROZ:  Objection.

15       A.  I don't know for sure.

16       Q.  Okay.  Did you typically communicate with

17   Channel 781 contributors through other means besides

18   the Signal group chat?

19       A.  No.  Or very rarely.  If it was about

20   Channel 781, we kept it confined to that.

21       Q.  Never met in person?

22            MS. MacDOWELL LECAROZ:  Objection.

23       A.  We did meet in person, not around this time,

24   but, yes, we've met in person.  We did, we recorded

140

1   a show in person.  It was like a special, but all of

2   our discussions were either in the Signal chat or

3   they were during Zooms where we were recording the

4   meetings.

5        Q.  And during the -- well, tell me about that.

6            What do you mean by the Zooms where you

7   were recording the meetings?

8        A.  Well, the way -- recording the shows, the

9   that we produce the show is by doing the meeting in

10  Zoom and recording that meeting.

11       Q.  That refers to the Debrief shows?

12       A.  Yes.

13       Q.  Any others?

14       A.  I also used Zoom to do the Headlines show,

15  although there usually wasn't anyone else there.  It

16  was just me.  We also did that for specials and

17  interviews.

18       Q.  Okay.  What was the FCC complaint?

19       A.  Based on the research I did, I believed that

20  they were legally obligated to provide captions

21  under the ADA.  So, I submitted a complaint saying

22  that they weren't doing that.

23       Q.  And did anything happen with respect to that

24  complaint?

141

1      A.  Yes.  I received an automated e-mail back
2   from the FCC saying before we proceed with your
3   complaint, here are some things you need to know.
4   And it had a lot of information that I had not been
5   able to find online.  And part of that was there's a
6   budget cap.  If an organization's total budget is
7   below a certain point, then they're not required to
8   provide captions.  And that applies to WCAC, but I
9   didn't know that until I heard that from this
10  automated e-mail from the FCC.
11      Q.  I see.  So, you learned at that time that
12  WCAC is not legally obligated to provide captions?
13      A.  That's correct.
14      Q.  And, so, did you withdraw the complaint?
15      A.  I didn't withdraw it because the thing they
16  sent back was like, we're only going forward if
17  you've read this and tell us -- so, it wasn't
18  necessary.  They indicated it was done unless I
19  followed up.
20      Q.  I see.  Okay.  Did anything else happen with
21  respect to the subjects of your meeting with Maria
22  Sheehan between June 15 and when the first video
23  takedown happened?
24      A.  Did anything else happen?  No.  I mean, we

142

1    may have had further discussions about it in the

2    Signal group.  I don't remember when those happened,

3    but, no, I don't, there wasn't any, there wasn't any

4    other follow-up that I can think of.

5        Q.  I show you what's been marked as Exhibit 3,

6    and ask if you recognize it?

7                (Witness provided Benavides Exhibit 3.)

8        A.  Yes.  I recognize it.

9                MR. STOLTZ:  Jeff -- sorry -- if you

10   wouldn't mind, could you please read the Bates

11   numbers?

12               MR. PYLE:  Sorry.  Exhibit 3 is 729.

13       Q.  What do you recognize Exhibit 3 to be?

14       A.  This is from our Channel 781 Signal chat in

15   September of 2023.

16       Q.  Okay.  And on September 4, you write, "WCAC

17   got one of our videos taken down."

18               Do you see that?

19       A.  Yes.

20       Q.  Okay.  Was this the first you learned of a

21   takedown complaint and a YouTube takedown action?

22       A.  Yes.

23       Q.  Okay.  Had you been notified of the

24   complaint at the time it was made?

Channel 781 News vs                    30(b)(6)                    Joshua Kastorf
Waltham Community Access Corporation                              June 27, 2025

143

1      A.  No.

2      Q.  Okay.

3      A.  As I recall, I didn't know -- it wasn't
4   until the notice that I'm screenshotting here, I
5   don't remember anything before that.

6              The first communication I got was saying
7   that they were taking action.

8      Q.  And that first communication was sent on
9   September 4, was it?

10     A.  Yes -- well, let's see.  Yes.  That's
11  correct.

12     Q.  I see in the screenshot just below your
13  message, "Strike on September 1, 2023."

14             Do you see that?

15     A.  Yes.

16     Q.  Okay.  Do you know whether any e-mail
17  address associated with Channel 781 received notice
18  of the strike on September 1?

19     A.  I don't.  There was -- at that time, there
20  was an old account associated with the channel that
21  I wasn't checking off.  So, that's why I'm
22  hesitating.  It's possible there could have been
23  something prior to that I missed, but I don't
24  remember anything prior to that.

Channel 781 News vs                    30(b)(6)                    Joshua Kastorf
Waltham Community Access Corporation                              June 27, 2025

144

1        Q.   This is an old e-mail account?

2        A.   Yes.

3        Q.   Okay.  So, what is this -- what actually is

4    this screenshot of?

5        A.   This is from -- I'm not sure if this was in

6    the e-mail they sent me or if I took this off the

7    screen in YouTube, but this is showing the video

8    that was complained about and the fact that they

9    consider it a strike.

10       Q.   Okay.  And it's one of the Committee of the

11   Whole March 6, 2023 videos that we watched earlier

12   today?

13       A.   Uh-huh.

14       Q.   You have to say yes or no.  You can't say

15   uh-huh.  I'm sorry.

16       A.   I can't see the whole title there, but, I

17   believe, yes, it is one of the ones we looked at

18   today.

19       Q.   Okay.  Do you happen to know which one it

20   was?

21       A.   No.  Actually, I don't.  It was one of the

22   ones from that Committee of the Whole meeting that

23   we discussed, but I don't know which one.

24       Q.   Okay.  On the next page, Tom Benavides says,

145

1    "So, we run the risk of losing the channel if we get
2    three copyright strikes."
3              Do you see that?
4        A.  Yes.
5        Q.  Okay.  Did you know that at the time that he
6    sent that to you?
7        A.  I believe so.  I believe that was in the
8    e-mail that I got.
9        Q.  And it looks like you sent the same point
10   right around the same time he did, right?
11       A.  Sorry?
12       Q.  Your message, "So, it's not a huge loss, but
13   if we get enough strikes, the channel can get
14   suspended."
15             Do you see that you wrote that?
16       A.  Oh, yes.  Okay.  This looks like we must
17   have been typing at the same time.  So, I did know
18   that.
19       Q.  So, you both wrote that at roughly the same
20   time?
21       A.  Yes.
22       Q.  Did you consider taking any action to
23   prevent losing the channel with the three copyright
24   strikes?

146

1     A.   Yes.

2     Q.   And what did you consider doing?

3     A.   First, I said I would do the copyright

4  school thing, and then I didn't end up doing it in

5  time.

6          Second, we had a conversation which you

7  can see here about whether we should change what we

8  were posting in order to minimize the risk of

9  another takedown.

10         I also began attempting to download all

11 the videos on the site so if it got taken down, we

12 would have backups.  I didn't end up completing that

13 by the time it was taken down.

14    Q.   Okay.  Did you decide not to take down any

15 clips notwithstanding this strike?

16         MS. MacDOWELL LECAROZ:  Objection.

17    A.   That's correct.  Maria, in my meeting with

18 her, she had not given us, either in our meeting or

19 in her announcement, she had not given us any

20 guideline for what she considered problematic.

21         So, Tom suggested that standalone clips

22 might be more problematic, but we didn't want -- it

23 didn't make sense to take things down when we didn't

24 know what the problem was.  So, we didn't end up

147

1   taking things down as a result of that.

2       Q.  Did you see and understand at the time that

3   the first strike was about a standalone clip?

4       A.  Yes.

5       Q.  And because, in fact, you wrote on Page 730,

6   "It was a screen grab and it was just a clip with no

7   commentary"?

8       A.  Yes.

9       Q.  Okay.  Tom expresses the opinion here, "And

10  I feel like every," quote, "screen grab with no

11  commentary," unquote, "is a pretty big liability."

12          What did you think of that opinion at

13  the time?

14          MS. MacDOWELL LECAROZ:  Objection.

15      A.  I thought he might be correct.  He was

16  probably correct, but I did not believe that the

17  standalone clips were copyright infringement.  I had

18  no reason to think -- other than the first one they

19  took down was a standalone clip, but other than

20  that, we had no reason to think that was what they

21  had a problem with.  That wasn't what -- I mean,

22  according to what Maria said in the meeting, where

23  she said, if you're just providing info, that's

24  better than if you have an opinion.

148

1          So, in that case, a clip with no
2    commentary should be better from her point of view.
3    Right?  So, I didn't want to preemptively take
4    things down.  Even though I thought Tom was, had a
5    good point, I didn't think that that was a reason to
6    take them down.
7          Q.  Why did you think that Tom had a good point?
8          A.  Because there's this aspect of fair use
9    about being transformational.  And somebody -- and I
10   didn't -- as I've said today, when I explained the
11   reasons we did the clips, I don't entirely agree
12   with this, but there could be an interpretation that
13   a standalone clip is less transformational, and,
14   therefore, somebody might interpret that as not fair
15   use.
16         Q.  Could there be a reasonable argument that a
17   standalone clip that doesn't include any creative
18   input whatsoever is not transformational at all?
19              MS. MacDOWELL LECAROZ:  Objection.
20         A.  Someone might argue with that.  I don't
21   agree with that.  I think that by taking something
22   and putting it in a new context with a new label and
23   by making it more shareable, and by making it
24   captioned, those things are transformational even if

149

1    there's not a commentary in the sense of giving a

2    political opinion.

3        Q.  Okay.  But you thought at the time there was

4    a risk that the legal determination could go against

5    you on that question, right?

6                MS. MacDOWELL LECAROZ:  Objection.

7        A.  It wasn't, we weren't really talking about a

8    legal determination.  We were talking about YouTube

9    and what YouTube would do.  So, he's talking about

10   what are they most likely to complain about, and

11   what is most likely YouTube's response.

12               So, it wasn't exactly a question about

13   legality.  It was a practical question of what's

14   going to get us -- what's going to cause a problem.

15       Q.  Okay.  Well, you are talking about legality

16   in this exchange, are you not?

17               MS. MacDOWELL LECAROZ:  Objection.

18       Q.  On Page 730.

19       A.  No.  I would say no because I think it's

20   pretty clear here we're talking about the risk.

21   We're not talking about legality.  We're talking

22   about risk.

23       Q.  What about the message where you say, at the

24   bottom, "When we are uploading clips we are

150

1   recontextualizing them, and I believe that

2   constitutes fair use under the Copyright Act"?

3              MS. MacDOWELL LECAROZ:  Object to the

4   form.

5       A.  Okay.  So, in that particular -- yes, I'm

6   talking about -- whether I believe it's risky, I

7   believe it's legal.

8       Q.  Okay.  So, you are talking about the law

9   here?

10      A.  Okay.  Yes.  So, in that part, I am.

11      Q.  And Tom, just a few entries ago -- well,

12  actually, in the very message you're responding to,

13  Tom says, "If we're uploading their video

14  recordings, which legally belong to them, without

15  commentary, every one of those is a big risk," you

16  respond with a reference to the Copyright Act.

17             So you were talking about the legalities

18  here, right?

19             MS. MacDOWELL LECAROZ:  Objection.

20      A.  Yes.

21             THE WITNESS:  Sorry.

22      Q.  Thank you.  And you thought he had a pretty

23  good point that the standalone clips might not

24  qualify as fair use, right?

151

1              MS. MacDOWELL LECAROZ:  Objection.

2      A.  No.  I thought he had a good point that the

3  standalone clips might be more likely to be taken

4  down.

5      Q.  What about might be less likely to be deemed

6  fair use?

7              MS. MacDOWELL LECAROZ:  Objection.

8      A.  It depends what you mean by "deemed."  I

9  mean, we weren't talking about going to court here.

10  We were talking about our strategy in relation to

11  YouTube and what to put on YouTube.

12      Q.  Okay.

13      A.  Maybe I'm not understanding your question.

14      Q.  No, I think you are.

15              I'm looking at the text here and asking

16  you what is meant by the text.  And when you wrote,

17  "When we are uploading clips, we are

18  recontextualizing them, and I believe it constitutes

19  fair use under the Copyright Act," that's not a

20  reference to YouTube, is it?

21              MS. MacDOWELL LECAROZ:  Objection.

22      A.  That's correct.  In that particular -- the

23  conversation in general below is about reducing

24  risk, but in that comment, yes, I'm saying I believe

152

1    it's legal.

2         Q.  Okay.  And Tom is expressing the opposite

3    view that it's probably not legal?

4         A.  I don't think --

5              MS. MacDOWELL LECAROZ:  Objection.

6         A.  I don't think that's correct.  I think Tom

7    was talking about risk.  He was saying that they're

8    more likely to be taken down.  He wasn't saying that

9    he personally believed they were copyright

10   infringement.

11             I mean, you talked to him yesterday, so,

12   you know what he said, but that's what I interpret.

13        Q.  All right.  Even though you -- you say that

14   his e-mail, his text message beginning with the

15   word, "Yeah," you interpret that as referring only

16   to YouTube's actions, and so you respond to that

17   with a reference to the Copyright Act?

18             MS. MacDOWELL LECAROZ:  Objection.

19   Asked and answered.

20             Jeff, I think you're getting a little

21   argumentative here.

22             MR. PYLE:  I'm just trying to figure out

23   whether this is the case.

24        A.  What I'm saying is, I'm standing on

153

1  principle.  He's saying, let's be practical and

2  reduce our risk.  And I'm saying, I don't want to do

3  that because I believe we're right.

4      Q.  Okay.  Did you appeal the first takedown?

5      A.  Yes.

6      Q.  And when did you do that?

7      A.  I think it was immediately after I received

8  the e-mail.

9      Q.  Okay.  And on the Page 731, it reflects that

10  you appealed the takedown, right?

11      A.  Yes.

12      Q.  What happened with that appeal?

13      A.  It was denied.  It appeared to be denied

14  automatically.

15      Q.  When was it denied?

16      A.  I don't remember.  I think it was within

17  days after I did the appeal, but I don't remember

18  specifically when I heard.

19      Q.  Could it have been the same day?

20      A.  It could have been the same day, yes.

21      Q.  Okay.  Once your appeal was rejected, what,

22  if anything, did you do about the copyright issue

23  we're talking about?

24              MS. MacDOWELL LECAROZ:  Objection.

154

1      A.  I intended to take the copyright school, and
2  I intended to backup the entire channel.  And I
3  didn't complete either of those because of time.
4      Q.  Okay.  What do you think Tom Benavides's
5  purpose was in sending you this message on Page 730
6  saying that if we're uploading their video
7  recordings without commentary, every one of those is
8  a pretty big risk?
9            MS. MacDOWELL LECAROZ:  Objection.
10     A.  Yeah, I thought we discussed this already.
11  I interpreted that to mean that he's talking about
12  -- he's not expressing an opinion on what he thinks
13  is legal.  He's talking about what would reduce our
14  risk of another takedown.
15     Q.  Did you think he was making a
16  misrepresentation to you?
17     A.  No.
18     Q.  Did you think that this message was in good
19  faith?
20     A.  Yes.
21            MS. MacDOWELL LECAROZ:  Jeff, maybe we
22  could take a quick break?
23            MR. PYLE:  Yeah, sure.  I was just
24  looking ahead to see what more I have, but that

155

1    would be fine.

2                (Brief recess.)

3                MR. PYLE:  Back on the record.

4                MS. MacDOWELL LECAROZ:  Jeff, just

5    before we keep going, Josh did want to correct just

6    one thing from earlier testimony.  So, I was going

7    to give him a chance to do that.

8    EXAMINATION BY MR. PYLE:

9        Q.  Okay.

10       A.  So, I did speak to my brother on the phone

11   after the meeting with Maria.  He's very -- he's not

12   my lawyer, and he's very careful about saying things

13   that could be legal advice.  So, that's why I was

14   confused when you asked the question, like, did you

15   consult with a lawyer.  It's like, well, he's not my

16   lawyer, and I don't know what exact -- but he gave

17   me the advice to write her an e-mail.

18       Q.  All right.  What else did he ask you to do?

19       A.  Nothing else.  That's all.  He said what I

20   sometimes do --

21               MS. MacDOWELL LECAROZ:  Hang on.  Just

22   in this context, because you are talking to your

23   brother about a legal issue you were having, I want

24   to instruct you not to provide details about any

156

1    advice that he may have given you.

2              MR. PYLE:  Wait.  Josh just said he

3    wasn't his lawyer, wasn't acting as his lawyer.

4    And, so, I think I'm entitled to know what Josh's

5    brother said during that conversation.

6              MS. MacDOWELL LECAROZ:  I think what he

7    also said was that he sought legal advice from his

8    brother, who happens to be a lawyer.  And, so, the

9    advice provided to him is legal advice that is

10   fairly withheld on the basis of privilege.

11             MR. PYLE:  So, I actually put in my

12   outline that this is a test for what this is all

13   about.  Legal advice has to be sought -- are we on

14   the record?

15             THE REPORTER:  I thought we were back on

16   the record.

17             MR. PYLE:  I suppose you can stay on the

18   record.

19             I don't want to make this a lengthy

20   colloquy, but I just wanted to make sure that the

21   instruction would still stand.

22             "Where legal advice of any kind is

23   sought from a professional legal advisor in his

24   capacity as such, the communications relating to

157

1   that purpose, made in confidence by the client at

2   his instance, are protected from disclosure, except

3   the protection being waived."

4             It sounds to me like we don't have that

5   communication because legal advice was not sought

6   from a professional legal advisor in his capacity as

7   such.  And that's why Josh's memory was that he

8   didn't speak to a lawyer.  And Josh just testified

9   that his brother was not his lawyer.

10            So, I guess I ask you whether you wish

11  to maintain the instruction or not.

12            MS. MacDOWELL LECAROZ:  I do.  And,

13  Josh, when you spoke to your brother about this, you

14  understood your brother was a lawyer, and that you

15  were seeking advice from him in that capacity,

16  right?

17            THE WITNESS:  It was in his capacity as

18  my brother, who happens to be a lawyer, yes.  I

19  don't think I had an opinion about whether it's

20  privileged, but, yes, I understood he was a lawyer.

21      Q.  I'll ask you, did you instruct members of

22  Channel 781 who received whatever is in that text

23  message to keep it in confidence?

24      A.  No, I did not.

158

1    Q.  Okay.  So, they were free to discuss it with

2  whomever?

3         MS. MacDOWELL LECAROZ:  Objection.

4    Q.  Were they free to discuss it with others --

5    A.  Yes.

6    Q.  -- if they wished to?

7    A.  Yes.

8         MR. PYLE:  Okay.  All right.  Well, I

9  think we should have a discussion about this

10  offline.

11         MS. MacDOWELL LECAROZ:  That's fine.

12    Q.  All right.  Did there come a time when the

13  Waltham DATA YouTube channel was taken down

14  entirely?

15    A.  Yes, there did.

16    Q.  When did that happen?

17    A.  That happened in, I don't remember the date

18  but it was in September just before the preliminary

19  election.

20    Q.  Please tell me what happened.

21    A.  We were gearing up for the preliminary

22  election in Waltham.  It was a controversial

23  election because a city councillor was challenging

24  the mayor who has been the mayor for a very long

159

 1   time.  There was originally three candidates.  So,
 2   they called a preliminary, but then one candidate
 3   dropped out.  So, the results of the preliminary
 4   were probably going to be the results of the
 5   election.  So, this was a big deal.
 6            During that time, we were doing a lot of
 7   work, making candidate videos and trying to inform
 8   people.  And then I heard from Tom that our channel
 9   was down.  And the notices about the takedown had
10   gone to -- there were apparently two e-mails
11   associated with the channel.  So, they were going to
12   the other one.  I didn't see them right away.
13            So, at first I didn't know which videos
14   had been complained about or anything.  We just knew
15   that it was down.  So, we had a discussion about
16   what to do about it.
17      Q.  Okay.  And you had a discussion about what
18   to do about it.
19            What happened next?
20      A.  We drafted a statement about it that we put
21   on social media.  And then we set up a new channel,
22   and we began trying to upload videos to the new
23   channel.  At first, we were going to try to upload
24   like a year's worth, and that was time intensive.

160

1   So, we ended up only uploading a small number.

2       Q.  And what videos did you upload to the new

3   channel?

4       A.  The first ones I did were the candidate

5   interviews because that was immediately relevant.

6              And then I just, we sort of went

7   chronologically.  I tried to do the most recent ones

8   first.

9       Q.  So, you still had access to the candidate

10  interview videos that Channel 781 had created?

11      A.  Yes.

12      Q.  And how long approximately were those

13  candidate interviews down off the internet?

14      A.  I think about 24 hours.  I don't remember

15  exactly when the new one went up, but it was around

16  then.

17      Q.  Okay.  And what other videos did you

18  immediately re-upload?

19      A.  I don't remember.  I could tell you if I

20  looked at the channel, but I don't remember.

21      Q.  Did you promote the new channel to Waltham

22  residents?

23      A.  Yes, we did.  In fact, we set up the channel

24  before we put out the statement so that in the

161

1    statement, we could direct people to the new

2    channel.

3        Q.   Okay.   I show you what's been previously

4    marked as Exhibit 4.

5            MR. PYLE:   Mitch, it's Page 732.

6            (Witness provided Benavides Exhibit 4.)

7        Q.   On the first page of this, is this Tom

8    Benavides alerting you that the YouTube channel was

9    terminated?   Bottom of 732.

10       A.   Yes.   I just want to make sure -- because

11   it's a big packet, I want to make sure I know what

12   this whole thing is.

13       Q.   Sure.

14       A.   Yes.   That statement from Tom, that was how

15   we learned, how I learned it had been taken down.

16       Q.   Okay.   And that statement was on September

17   8?

18       A.   That's correct.

19       Q.   Okay.   And you respond to him pretty

20   quickly, "I can set up a new channel and re-upload

21   the recent videos later today."

22            Do you see that?

23       A.   Yes.

24       Q.   Do you think you re-uploaded the recent

162

1    videos that very day, September 8?

2        A.  I uploaded many of them.  I think I

3    continued after that date to upload some additional

4    ones.

5        Q.  Did you start with the candidate interviews?

6        A.  I believe so, yes.

7        Q.  Tom then posts what is a reply to his

8    earlier post regarding his fair use opinion and

9    writes, "I also obviously professional opinions are

10   better but I remain fairly certain that this would

11   be a better line of what is/isn't safe to upload."

12           Did you read that at that time?

13       A.  Yes.

14       Q.  And what did you think of that point of view

15   at the time?

16       A.  I thought that was a valid point and, in

17   fact, we did stop.  After that point, we no longer

18   uploaded the standalone clips as a way to mitigate

19   risk.  I still believed they were legal, but he was

20   correct that they were risky.

21       Q.  And you wrote back to him and said,

22   essentially, that he was right, correct?

23           MS. MacDOWELL LECAROZ:  Objection.

24       A.  Uh-huh.

163

1    Q.  You wrote --

2    A.  Yes.  I meant to write, yes, you were right,

3    the clips that were just clips were a problem.

4    Q.  Okay.  And when you say "just clips," you

5    were referring to the standalone videos that we've

6    been discussing?

7    A.  Correct.

8    Q.  And at this time, you inform everybody that

9    your appeal had been denied, correct?

10    A.  Yes.

11    Q.  Okay.  It had been denied some time prior to

12    September 8?

13    A.  Yes.

14    Q.  Do you know how many days prior to the 8th

15    it was denied?

16    A.  I don't.  I know it was quickly after I

17    submitted it but I don't know exactly.

18    Q.  Okay.  If I could turn your attention to

19    Page 741, which is pretty far into this, you

20    reference toward the bottom, "Then we release a

21    fiery statement that makes everyone want to go check

22    out the new channels and watch the videos, which

23    make them want to vote for our friends on Tuesday,

24    so then the whole thing totally backfires for WCAC."

164

1            Do you see that?

2       A.  Yes.

3       Q.  Okay.  Was that your hope and plan at the

4  time?

5       A.  Yes.

6       Q.  And did that fiery statement end up being

7  published by your organization?

8       A.  Yes.

9       Q.  Okay.  Did it drive new viewers to the new

10  channel?

11      A.  I believe so.  We don't know exactly why --

12  a view is a view, but I believe so, yes.

13      Q.  How quickly did the new channel get back --

14  did the new channel -- strike that.  It's late.

15           Did the new channel start to receive new

16  subscribers?

17      A.  Yes.

18      Q.  Okay.  And what was that channel called?

19      A.  Channel 781.

20      Q.  Did you scrap the Waltham DATA name at that

21  time?

22      A.  Yes.  I had been intending to scrap it

23  earlier, and then making a new channel just provided

24  an opportunity to do that.

165

1      Q.  Were you pleased at the number of new

2   subscribers that got to the new channel?

3      A.  I was pleased -- we very quickly got up to,

4   I believe 50 was the number we needed to continue

5   doing live streams.  So, I was pleased that we got

6   to 50 so quickly.

7              I don't remember, I don't remember what

8   the total subscriber count ended up being or if I

9   was pleased by it.

10     Q.  Did the subscriber count end up exceeding

11  the old Waltham DATA subscriber count?

12     A.  I actually don't know.

13     Q.  Okay.  Would there be a way to find out, do

14  you know?

15     A.  Yes, because both channels are now up.  I

16  mean, it's possible the old channel has more new

17  subscribers.  So, you could go online and see which

18  has more subscribers.

19     Q.  So, you could compare the two subscribers --

20  the two channels and their number of subscribers

21  today and see how it shook out?

22              MS. MacDOWELL LECAROZ:  Objection.

23     A.  Yes.

24     Q.  Okay.  So, on Page 742, Tom and Chris Hammer

166

1    have a discussion about public domain versus fair

2    use.

3            Do you see that?

4        A.  Yes.

5        Q.  And Tom links to a Stanford.edu article.

6            Do you see that?

7        A.  Yes.

8        Q.  Did you click on and read that article at

9    the time?

10       A.  I think so, but I don't recall.

11       Q.  Okay.  I show you Exhibit 5.

12            (Witness provided Benavides Exhibit 5.)

13       Q.  Does that refresh your recollection?  Take a

14   minute to look at it.

15            MS. MacDOWELL LECAROZ:  For the record,

16   Exhibit 5 is the Stanford article that's linked in

17   this chat.

18            MR. PYLE:  Thank you.

19       A.  I know I have seen an article like this that

20   described fair use.  I don't remember if it was this

21   exact one or not, but I believe I've seen this

22   before, yes.

23       Q.  You believe you've seen it before some time?

24       A.  Yeah, I've seen a document that gives the

167

1   four factors before.

2       Q.  Okay.  And, so, is it more likely than not

3   that you clicked on this link and looked at the

4   article at the time?

5       A.  Yes.  I don't remember, but I probably

6   clicked on it, and I probably read it.

7       Q.  Okay.  At Page 745, there's an exchange

8   between Chris Gamble and you.

9       A.  We're on 4?

10      Q.  745.

11      A.  Of Exhibit 4?

12      Q.  I'm sorry.  Of Exhibit 4.  I'm sorry.  I've

13  gone back to Exhibit 4.

14      A.  Okay.

15      Q.  Do you see in the middle of the page where

16  Chris says, "We are feeling pretty confident it was

17  the clips that got us and the mayoral interview"?

18  Do you see that?

19      A.  Yes.

20      Q.  What was the mayoral interview?

21      A.  There was -- so, before each election, WCAC

22  invites each candidate to record a statement that

23  they show on their channel and also upload online.

24              They come in and they do it live,

168

1   basically.  They are told that they have two takes.
2   And it won't be edited.  And, you know, they can
3   start over once, but they can't go back and edit it.
4              So, what happened was what they
5   published that, they had made a mistake -- well,
6   maybe it wasn't a mistake.  I don't know that for
7   sure.  They published the full recording of the
8   mayor, and she did three takes.  And you see her,
9   she does her two takes, and then she says to the
10  guy, you know, we need to start over, just with the
11  assumption that the rules don't apply to her.  So,
12  we posted that.
13       Q.  You posted the entirety of the video?
14       A.  Yes.
15       Q.  So, including the entirety of her speech?
16       A.  Yes.
17       Q.  Okay.  And, so, when you write back to Chris
18  and write, "But most likely the mayor thing was one
19  of them," what were you trying to say?
20       A.  I didn't know which clips had been taken
21  down.  The timing of the takedown led me to believe
22  that it was that mayor video that provoked them to
23  do that.  So, that's why I thought when we found out
24  which ones were taken down, that might be among

169

1  them, but it wasn't.

2      Q.  So, WCAC did not, in fact, issue a takedown

3  notice, to your knowledge, about the mayoral

4  interview video?

5      A.  That's correct.

6      Q.  Okay.  Did you yourself remove the mayoral

7  video from the Channel 781 YouTube page or the

8  Waltham DATA YouTube page?

9      A.  Yes, I did.

10     Q.  When did you do that?

11     A.  I believe it was once the channel came back

12  up, we went in and looked at things that might be

13  risky.  And I believe that's when -- I'm not totally

14  sure, but I believe that's when I took it down.

15     Q.  And why did you think that the mayoral

16  interview video was risky?

17             MS. MacDOWELL LECAROZ:  Objection.

18     A.  It was diverting from our -- because it was

19  diverging from our usual standards of how we use

20  clips.  We never put a whole show.

21             Also, technically, it was not a

22  government meeting.  Although it was definitely

23  government related, it was not technically a

24  government meeting, which all our other ones had

170

1    been.

2            So, it wasn't consistent with --

3    although I thought we did the right thing to post it

4    at the time, since it wasn't consistent with our

5    general policy, I later decided we should take it

6    down, or we decided as a group to take it down.

7        Q.  What other videos did you decide, as a

8    group, to take down after your channel was restored?

9            MS. MacDOWELL LECAROZ:  Object to the

10   form.

11       A.  I believe there was just one other.  It was

12   another one where it was a clip of the mayor giving

13   a speech, and it was civic related, but it wasn't

14   technically at a government meeting.  It was at a

15   Chamber of Commerce meeting.  So, I took that down

16   so we could be consistent.

17       Q.  A Chamber of Commerce meeting?

18       A.  Yes.

19       Q.  And what do you mean by "be consistent"?

20       A.  That we were only going to, going forward we

21   were only going to use clips strictly from

22   government meetings and not -- you know, be

23   consistent about how we were using the WCAC footage.

24       Q.  Why did you draw a distinction between WCAC

171

1  footage that consisted of government meetings and
2  WCAC footage that consisted of other things?
3      A.  Because I think the fair use -- I thought
4  our fair use argument might be stronger with the
5  government meeting.  There were people who suggested
6  that maybe a government meeting shouldn't even be
7  considered a copyrighted material to begin with.
8  It's a verbatim transcript.
9              So, I just wanted to be consistent.  So,
10 I just wanted to stick with the government meetings.
11     Q.  Okay.  Why did you think that the mayor's
12 interview was one of the clips that got stricken?
13     A.  Because of the timing.  The first notice
14 came in very shortly after that.  And because I knew
15 it was something that would make them angry.
16     Q.  Make who angry?
17     A.  Make Ms. Sheehan and possibly the mayor.
18     Q.  Why did you think that it would make
19 Ms. Sheehan angry?
20     A.  Because her team made a mistake by posting
21 that, and it was embarrassing to the mayor.  And she
22 -- I believe that she had a very close relationship
23 with the mayor.
24     Q.  Why do you believe that Maria Sheehan had a

172

1  very close relationship with the mayor?

2      A.  Because I saw them together at a high school

3  sports game, and because of the decisions that Maria

4  was making seemingly to protect the mayor's

5  administration.

6      Q.  What decisions did you see Maria Sheehan

7  making to protect the mayor's administration?

8      A.  Limiting access.

9      Q.  To what?

10     A.  By not doing captions, by not doing all the

11 meetings, by not keeping them online for more than a

12 year.  We saw a pattern of not providing -- them

13 choosing not to provide as much access as they

14 could.

15     Q.  Anything else?

16     A.  WCAC gets its funding through the city.  And

17 Chris Wangler relies on relationships with people in

18 city government to get the news.  So, I felt that

19 they relied heavily on the city government, and

20 that's why they would value their relationship with

21 the mayor.

22     Q.  That's why you thought Maria Sheehan would

23 be inclined to try to protect the mayor by issuing

24 copyright strikes?

173

1      A.  Yes.  I mean, not -- in general, yes, by
2  trying to place limits on accessibility of her
3  footage.
4      Q.  Well, does the fact that they didn't submit
5  a copyright strike for the interview with the mayor
6  tend to disprove that in your mind now?
7      A.  I don't know.  I don't know why they didn't
8  -- why they chose to only -- when I spoke to her,
9  there was never any indication that any one type of
10 use was better than another.  So, I don't know to
11 this day why they chose to only submit complaints
12 about those specific clips as opposed to any other
13 clips.
14     Q.  Sorry.  Just seeing if I have anything else
15 with this document.  I do not.
16            MS. MacDOWELL LECAROZ:  Jeff, could we
17 take another quick break?
18            MR. PYLE:  Sure.
19            MS. MacDOWELL LECAROZ:  Just a short
20 one.
21            MR. PYLE:  Sure.
22            (Brief recess.)
23            MR. PYLE:  Back on the record.
24 EXAMINATION BY MR. PYLE:

174

1          Q.   Did there come a time when Channel 781 News
2    was asked to comment on this takedown to a Brandeis
3    Justice reporter?
4          A.   Yes.
5          Q.   What is Brandeis Justice?
6          A.   It's the student newspaper at Brandeis
7    University.
8          Q.   Okay.  Did you receive outreach from a
9    reporter from that --
10         A.   Yes.
11         Q.   -- student newspaper?  Okay.
12              And did Channel 781 News comment to
13   Brandeis Justice about this subject?
14         A.   Yes.
15         Q.   Okay.  I show you Exhibit 6, which starts at
16   Page 767.
17              (Witness provided Benavides Exhibit 6.)
18         Q.   And I ask you if you recognize this
19   document?
20         A.   Yes.
21         Q.   Is this another segment of the group chat?
22         A.   That's right.
23         Q.   Okay.  Do you see that there's discussion
24   starting at the middle of 768 about the Brandeis

175

1    Justice reporter reaching out?

2        A.  Yes.

3        Q.  Okay.  And do you then have some

4    conversation with Jamie Krikeles about speaking to

5    the reporter?

6        A.  Yes.

7        Q.  And do you then, on Page 770, give your

8    opinion about how the story should be framed to the

9    Brandeis Justice newspaper?

10       A.  Yes.

11       Q.  Okay.  I'd like you to read aloud the first

12   sentence of your text message in the middle of Page

13   770 starting with, "My feeling is..."

14       A.  "My feeling is it's not a story about WCAC

15   illegally suppressing us because there's a lot of

16   gray area there.  The question is, why did they

17   choose to suppress us given that we have the same

18   mission of informing people, which gets into the

19   bigger issues about attitude toward transparency in

20   Waltham.  Based on the Reddit conversation, it seems

21   like there is a lot to discuss about YouTube and the

22   DMCA and what it means for local journalism more

23   generally."

24       Q.  Okay.  Thank you.

Channel 781 News vs                 30(b)(6)                 Joshua Kastorf
Waltham Community Access Corporation                        June 27, 2025

176

1              What did you mean by "illegally
2    suppressing us"?
3        A.  That I was not clear at that time whether
4    what they had done was illegal but -- that's it.  I
5    wasn't clear at that time whether what they had done
6    was illegal or not.
7        Q.  And what did you mean by "there is a lot of
8    gray area there"?
9        A.  I meant -- well, first, because there's a
10   matter of interpretation of fair use.  And then
11   there's the matter of, you know, the way YouTube
12   handles these things does not necessarily reflect
13   what the law says about these things.
14       Q.  Okay.  And when you say it's a matter of
15   interpretation about fair use, what do you mean by
16   that?
17       A.  Well, like it says on the Stanford thing,
18   the only way to get a definitive answer on whether a
19   particular use is a fair use is to have it resolved
20   in federal court.
21       Q.  I'll state for the record that you're
22   reading from Exhibit 5.
23       A.  Yes.  It's expressed as well, yes.
24       Q.  So, your feeling at the time was it wasn't

177

1    necessarily illegal what WCAC was doing because fair

2    use is a squishy concept?

3              MS. MacDOWELL LECAROZ:  Objection.

4        A.  I wasn't certain, yeah.

5        Q.  Okay.  I would like to direct your attention

6    now back to what I believe is Exhibit 10, the

7    complaint in this case.

8              Do you have that in front of you?

9        A.  I think it's 12.

10       Q.  Is it 12?  Exhibit 12.

11             MS. MacDOWELL LECAROZ:  The complaint?

12             MR. PYLE:  Yes.

13       Q.  And I turn your attention to Page 8, please.

14   Paragraph 53, you allege, "Channel 781's use of the

15   government meeting video clips is a self-evidently

16   non-infringing fair use pursuant to 17 USC Section

17   107."

18             Do you see that?

19       A.  Yes.

20       Q.  That wasn't your opinion back in September

21   of 2023, was it?

22             MS. MacDOWELL LECAROZ:  Objection.

23       A.  That was my opinion.  When I say there was

24   gray area, I firmly believed it was fair use.  I

178

1    wasn't clear that WCAC had done anything illegal by

2    reporting it to YouTube.  That's the part I wasn't

3    clear about.

4        Q.  Okay.  If we go back to Exhibit 6 -- sorry

5    -- you ask the question, "Why did they choose to

6    suppress us given that we have the same mission of

7    informing people?"

8            What did you mean by "the same mission

9    of informing people"?

10       A.  I was talking generally about what I

11   understood the mission of public access and

12   government access to be, which is to use media to

13   inform people, give people access to government.

14           We came along and started doing stuff on

15   top of what they were doing that was also helpful.

16   So, the question is, why did they see us as the

17   enemy; why did they have a problem with what we were

18   doing; and beyond the copyright question itself,

19   what was their motivation to use the copyright

20   question to shut us down as opposed to some other

21   resolution.

22       Q.  Channel 781 News' mission was to inform

23   people, yes?

24       A.  Broadly, yes.

1      Q.  WCAC's mission was, you were saying here, to
2  inform people, too, right?
3                  MS. MacDOWELL LECAROZ:  Objection.
4      A.  Yeah, I don't know if that's their actual
5  mission statement, but, broadly, that's what I
6  understand the point of government access to be.
7      Q.  I'd like to direct your attention now to
8  Exhibit 7, which is 833.
9                  (Witness provided Benavides Exhibit 7.)
10     Q.  Do you see starting at Page 834, there's
11 discussion about a meeting with EFF?
12     A.  Yes.
13     Q.  And there's a Zoom link?
14     A.  Yes.
15     Q.  And then following that, there are some
16 redacted messages from Tom Benavides?
17     A.  I see that.
18     Q.  And he asks you, "Josh, let me know if I
19 missed anything important."
20             Do you see that?
21     A.  Yes.
22     Q.  Okay.  Were you in a meeting on or about
23 September 27 with EFF?
24     A.  Yes.

180

1      Q.  Okay.  Who was present in that meeting?

2      A.  Tom was there, Jamie, and I don't remember

3   her name, a woman who worked for EFF.

4      Q.  Okay.  Is that woman a lawyer?

5      A.  I believe so, yes.

6      Q.  Okay.  And was anybody else in the meeting?

7      A.  Not that I can recall.

8      Q.  Was Mitch Stoltz there?

9      A.  No.  He was -- he had to miss it for some

10  reason.

11     Q.  Okay.  So, you spoke to a woman at EFF who

12  you believe to be a lawyer?

13     A.  Yes.

14     Q.  Okay.  Is that person one of your attorneys

15  in this case now?

16     A.  I don't think so.

17     Q.  Okay.  And did you receive legal advice

18  during this Zoom meeting?  Yes or no.

19     A.  Yes.

20     Q.  Okay.  Did that legal advice concern

21  copyright issues?

22     A.  Yes.

23     Q.  Did that legal advice concern fair use?

24     A.  Yes.

181

1      Q.   Okay.  Was Chris Gamble on this group chat
2   at the time?
3      A.   This main group chat that we've been talking
4   about?
5      Q.   Yes.
6      A.   Yes.
7      Q.   In fact, he responds at Page 838.  Okay.
8           And could you please read his message,
9   the first one of his on 838 aloud?
10     A.   "Yes, we expected it was the ones without
11  commentary" -- "yes, as we expected, it was the ones
12  without commentary.  I think if we stop using these,
13  even adding 20 seconds at the beginning of us
14  explaining the clip, I think we should be good.
15  Down to talk more about it soon."
16     Q.   What did you understand him to be conveying
17  in that message?
18     A.   That using the clips would be less risky if
19  there were additional context.
20     Q.   Okay.  And do you respond at Page 839?
21     A.   Yes.
22     Q.   You say, "Chris, I think you are probably
23  right about not using standalone clips but we can
24  get his opinion on that."

182

1              Do you see that?

2      A.  Yes.

3      Q.  And does that refer back to the lawyer who

4  missed today's meeting on the previous page?

5      A.  I believe that refers to Mitch.  I think we

6  knew his name from e-mail even though he wasn't

7  actually -- I believe that referred to Mitch.  It

8  referred to whoever we were going to be talking to.

9      Q.  But you were agreeing with Chris at the time

10 that you should avoid using standalone clips in the

11 future?

12              MS. MacDOWELL LECAROZ:  Objection.

13     A.  Yes.

14     Q.  Okay.

15     A.  Yes.

16     Q.  And why did you agree with Chris at the time

17 that you should avoid using standalone clips in the

18 future?

19              MS. MacDOWELL LECAROZ:  Objection.

20     A.  Because at this point, I had retrieved the

21 information about what clips they reported, and they

22 were all standalone clips.  So, although WCAC had

23 never indicated to us which clips they had a problem

24 with, we now had an indication that we now knew they

183

 1  were only reporting the standalone clips.

 2      Q.  You had expected, though, that the

 3  standalone clips were the problem, yes?

 4              MS. MacDOWELL LECAROZ:  Objection.

 5      A.  Not exactly.  I thought the mayor one was

 6  maybe also a problem or more of a problem.

 7      Q.  Well, that sort of was a standalone clip in

 8  and of itself in that it wasn't surrounded by

 9  commentary or original content by Channel 781 News,

10  right?

11              MS. MacDOWELL LECAROZ:  Objection.

12      A.  Yes.  If you're calling that a standalone

13  clip, then, yes, because I said earlier, you know,

14  here's what I think the problem clips were.  And

15  that's what I said.

16      Q.  So, Chris was correct that you expected at

17  this time that it was standalone clips that were the

18  ones that had been the subject of the strikes?

19              MS. MacDOWELL LECAROZ:  Objection.

20      A.  Yeah, he's saying, yes, as we expected.  I'm

21  not sure I was as convinced of that as he was, but I

22  mean, yes, we had conversation.  We saw the previous

23  conversation about how standalone clips were more

24  risky.

184

1      Q.  This exchange with Chris is on September 27,
2   is that right, that we're talking about on Page 838?
3      A.  Yes.
4      Q.  Okay.  And that was the same day as your
5   Zoom meeting with EFF?
6      A.  I am not sure, and I can't exactly tell that
7   from looking at this.
8      Q.  If you go back to Page 834.
9      A.  So, it was the Wednesday after whenever I
10  said that.  So, that's why I'm not sure.
11     Q.  Okay.  So, if September 27 turned out to be
12  a Wednesday, that was probably the day?
13     A.  Yes.
14     Q.  Okay.  So, we'll let the calendar speak on
15  that.
16     A.  Yes, we'll let the calendar --
17     Q.  Okay.
18         MR. PYLE:  Down to my last two exhibits.
19         I'd like to mark the next exhibit, which
20  will be Exhibit 13.
21         (Marked, Exhibit 13, text message
22  string, Bates No. 1309.)
23         MR. PYLE:  It is Bates 1309.
24     Q.  Do you recognize this document that's been

185

1    put in front of you?

2        A.  Yes.

3        Q.  What is it?

4        A.  It's a Signal chat between myself and

5    Jonathan Paz.

6        Q.  Is the gray text at the top Jonathan Paz

7    texting you?

8        A.  Yes.

9        Q.  And does this concern a request for a quote

10   about this lawsuit?

11       A.  Yes.

12       Q.  You had just recently filed this lawsuit,

13   had you not?

14       A.  Yes.

15       Q.  Okay.  You provide him a quote in the next

16   response, right?

17       A.  Yes.

18       Q.  And you wrote, "'WCAC knew it had no right

19   to stop people from using video recordings of public

20   meetings but asked YouTube to shut us down anyway,'

21   Channel 781 co-founder Joshua Kastorf said."

22               Do you see that?

23       A.  Yes.

24       Q.  You were authorizing Councillor Paz to

186

1   attribute that statement to you?

2       A.  Yes.

3       Q.  What was your factual basis for saying that

4   WCAC knew it had no right to stop people from using

5   video recordings of public meetings?

6       A.  It was based on my meeting with her and my

7   follow-up e-mail where I gave her information that I

8   thought very clearly showed that it was fair use.

9   And I never received a response from that.  And

10  that's why I believe that to be true.

11      Q.  Is there any other factual basis for that

12  statement?

13      A.  No.

14      Q.  What about the statement that WCAC asked

15  YouTube to shut us down, what was your factual basis

16  for saying that?

17      A.  It would maybe be more accurate to say they

18  submitted complaints that led to us being shut down.

19      Q.  Because none of the DMCA takedown requests

20  necessarily asked for YouTube to shut down Channel

21  781 News, is that right?

22              MS. MacDOWELL LECAROZ:  Objection.

23      A.  I don't remember all the texts of it, but,

24  no, probably it doesn't specifically say that.

187

1    Q.  Okay.  Why do you say it would be more

2    accurate to say that they --

3    A.  Because I don't know if they specifically

4    said, please shut down Channel 781.  They took

5    actions that resulted in them shutting it down.

6    Q.  You have no evidence that they asked for

7    that remedy, do you?

8         MS. MacDOWELL LECAROZ:  Objection.

9    A.  I mean, it depends on whether they knew that

10   a shutdown was a possible consequence, which they

11   probably did, but you're right that I don't know

12   that for sure.

13   Q.  Okay.  And if it turns out that they did not

14   know about YouTube's three-strikes-and-you're-out

15   policy, then this would be an inaccurate statement,

16   right?

17        MS. MacDOWELL LECAROZ:  Objection.

18   A.  Yes.  I mean, I think the point is still

19   valid, but the way it's worded is slightly

20   inaccurate.

21   Q.  Okay.  I'd like to turn your attention

22   briefly back to Exhibit 12, the complaint, and

23   specifically Page 8.

24   A.  Okay.

188

1      Q.  You allege in Paragraph 54, "On information

2   and belief, WCAC had actual subjective knowledge

3   that the government meeting video clips did not

4   infringe any copyright on Defendants."

5              Do you see that in Paragraph 54?

6              What was the factual basis for making

7   that allegation?

8      A.  The basis was that I explained it to her in

9   the meeting.  I reiterated it in the e-mail with

10  appropriate quotes from authorities.  And she never

11  indicated that she disagreed with me.  She never

12  indicated that it was wrong.  They simply went ahead

13  and did the complaint.

14             So, the subjective knowledge was because

15  I told her so, and I gave her evidence of it that I

16  had gotten from reliable sources.

17     Q.  Is there any other factual basis for the

18  allegation in Paragraph 54?

19     A.  No, not that I can think of.

20     Q.  All right.  In Paragraph 55, you write, you

21  allege, "In the alternative, on information and

22  belief, Defendant failed to consider whether Channel

23  781's use of the government meeting videos was a

24  fair use.  Accordingly, Defendant did not form and

189

1    could not have formed a good-faith belief that the

2    government meeting video clips were infringing at

3    the time it sent the infringement notices."

4              Do you see that?

5         A.  Yes.

6         Q.  What was your factual basis for the

7    allegations contained in Paragraph 55?

8         A.  The fact that when in the meeting I

9    explained to her that it was fair use and she had no

10   response to that.  She didn't explain why she

11   disagreed.  She didn't say if she disagreed.

12             And when I sent her the e-mail again

13   explaining it and giving sources, she never said, I

14   disagree.  She never said, this is wrong, I doubt

15   this.  She had the information, and if she had

16   reason, any reason to believe it was untrue, she

17   never expressed that.

18        Q.  Is there any other factual basis for the

19   allegation contained in Paragraph 55?

20        A.  No, not that I know of.

21        Q.  Sitting here today or at the time you allege

22   this?

23        A.  Sorry?

24        Q.  Let me ask the question differently.

190

1           Do you have any additional factual basis
2    for the allegations contained in Paragraph 55?
3       A.   Oh, you mean that I didn't have at the time?
4       Q.   Right.
5       A.   No.
6       Q.   How about Paragraph 54, what we just talked
7    about?
8       A.   No.  I don't have any additional
9    information.
10      Q.   Okay.
11      A.   I guess I should add on to that.
12           There's also, her statement that she
13   made on the air seemed to imply that she wasn't
14   going to consider fair use.  She said, you know,
15   basically, categorically, that we couldn't, that
16   people couldn't use their footage.  So, she didn't
17   leave any room for fair use in the statement that
18   she made.
19      Q.   But at the time you had your meeting with
20   her in June of 2023, she mentioned the possible
21   creation of a policy, right?
22      A.   Correct.
23      Q.   And the confines and details of that policy
24   were as yet to be determined?

191

1          MS. MacDOWELL LECAROZ:  Objection.

2     A.  That's correct.

3     Q.  And you don't know whether they considered

4  any kind of fair use analysis in any sort of policy

5  they might have been considering in the future?

6          MS. MacDOWELL LECAROZ:  Objection.

7     A.  I don't know for sure.  When she said she

8  was going to bring it to her board, that seemed to

9  me to be in bad faith.  I didn't believe she was

10 going to do that because she would have done it

11 already.  If she wanted a policy, she would have

12 done that before she met with me.

13          So, I don't -- so, no, I don't know for

14 sure what she discussed with her board, but I don't

15 know that there was any discussion.

16    Q.  And in any event, her statement in April of

17 2023 was before you sent her your e-mail with fair

18 use resources, right?

19    A.  That's correct.

20    Q.  All right.  Do you understand that Channel

21 781 News is seeking monetary damages in this case?

22    A.  Yes.

23    Q.  Okay.  What damages has Channel 781 News

24 suffered?

192

1      A.   Primarily, we suffered damage to our right

2    to freedom of speech because we were censored, and

3    we were prevented from sharing information with our

4    community.

5               Secondarily, there was time that we

6    spent dealing with this issue, making a new YouTube

7    channel, re-uploading.  In my view, we had been

8    working for two years to create something that

9    didn't exist before, which was a searchable record

10   of the city council that would be available just

11   before the election.  And then it wasn't available

12   just before the election.

13              So, in my mind, they reduced the value

14   of all the work we had done over the past two years

15   by taking the product that we had made for the

16   community and taking it away from the community.

17     Q.   Any other damages?

18     A.   No.

19     Q.   I'd like to show you what has previously

20   been marked as Exhibit 9, which is Channel 781's

21   answers to interrogatories.

22              (Witness provided Benavides Exhibit 9.)

23     Q.   And I direct your attention to Page 5 and

24   Interrogatory 5, which asks for the basis of your

193

1    damages claim.

2              Do you see that?

3        A.   Uh-huh.

4        Q.   Okay.  Does this comprise all of the ways in

5    which Channel 781 News was injured in this case?

6        A.   Not exactly.  I would add to this what I

7    expressed earlier, that the time we had put into

8    taking, creating this resource, then the resource

9    was devalued.  And that's not exactly stated here.

10   So, I would add that on as an additional way we were

11   injured.

12       Q.   What monetary value do you assign to that

13   additional injury?

14       A.   I don't know.

15       Q.   Can you give me a range?

16       A.   I don't know how I would determine that.

17       Q.   Okay.  What monetary value would you assign

18   to the first bullet point in Interrogatory No. 5,

19   injuries to Channel 781 members' First Amendment

20   right to speak on matters of public concern?

21       A.   I don't know.  I don't know what the

22   precedent is of how you compensate something like

23   that.

24       Q.   I'm not asking for a legal analysis.

194

1      A.   Okay.

2      Q.   I'm only asking for what your assessment of

3   the monetary value of this injury is that you're

4   seeking monetary damages for.

5           MS. MacDOWELL LECAROZ:  Objection.

6      A.   I'm sorry.  I don't know how to determine

7   that.

8      Q.   Maybe this one's easier.  Time spent by

9   Channel 781 members setting up the YouTube channel,

10  this interrogatory answer says approximately six

11  hours.

12          Do you see that?

13     A.   Yes.

14     Q.   Okay.  At what hourly rate do you suggest

15  that Channel 781 members ought to be compensated for

16  that work?

17     A.   When I was doing free-lance video work, I

18  was paid $60 an hour.  So, I would suggest that as a

19  reasonable rate.

20     Q.   Do you think that you need to have the kind

21  of training that you had at Northeastern to upload

22  videos to a YouTube channel and set up a new YouTube

23  channel?

24          MS. MacDOWELL LECAROZ:  Objection.

195

1    A.  Not necessarily, no.

2    Q.  Okay.  YouTube is a consumer service that

3 can be used by pretty much anybody, right?

4    A.  Yes.

5    Q.  Okay.  You don't need special training to

6 upload the video to YouTube, do you?

7         MS. MacDOWELL LECAROZ:  Objection.

8    A.  No, not necessarily.

9    Q.  Okay.  So, with that in mind, do you think

10 the rate of $30 an hour would be reasonable?

11         MS. MacDOWELL LECAROZ:  Objection.

12    A.  No.  I mean, you know, I used the comparison

13 of what I charged when I was doing free-lance video

14 work, and not everything I did required a certain

15 level of education.  It's not the level of expertise

16 that necessarily determines the rate.

17    Q.  Okay.  What other -- have we now discussed

18 all the kinds of injury that Channel 781 News has

19 suffered as a result of the takedown notices?

20    A.  Yes.

21    Q.  What injury have you suffered personally, if

22 any, from the takedown notices?

23    A.  It's the same types of injury, just my share

24 of them.  I put a lot of time into creating this

196

1  thing.  I put some time into putting the new channel

2  back up, but, yes, you know, this was, this was a

3  smack in the face after two years of trying to help

4  my community to have these rights taken away.

5             And, so, the effect on me isn't

6  necessarily different than it was on the other

7  members of the group, but it did have a big effect

8  on me.

9     Q.  What amount of money would make you whole

10  for that injury?

11     A.  I don't know how to determine that.  I'm

12  sorry.

13     Q.  Can you give me a range?

14     A.  No.  I'm sorry.  I don't know how these

15  things are determined.

16     Q.  And what amount of money do you think WCAC

17  should pay to Channel 781 News to compensate it for

18  its injuries in this case?

19     A.  We said six hours, and if I'm giving a rate

20  of $60 an hour, that would be $360.

21     Q.  Anything else?

22     A.  No.

23     Q.  Do you agree that if Channel 781 News had

24  taken down the clip-only videos between September 4

197

1   and September 8, that it could have avoided the

2   channel coming down?

3               MS. MacDOWELL LECAROZ:  Objection.

4       A.  No.  I'm not -- maybe.  I'm not convinced of

5   that.

6       Q.  Well, you discussed taking those clip-only

7   videos down on September 4, did you not?

8       A.  I'm sorry.  I'm not remembering --

9       Q.  On the date of the first takedown.

10      A.  Yes.  We discussed it.  And if we had done

11  it, I'm not sure it would have prevented it.

12      Q.  Why not?

13      A.  Because they could have submitted -- when I

14  met with her, she didn't give me any indication that

15  any clip was any more egregious than any other.  So,

16  if we had taken those down, that might have been the

17  end of it, or they might have submitted complaints

18  about other types of videos.

19      Q.  Okay.

20              MR. PYLE:  I'd like to take a

21  five-minute break, check in with my client, and then

22  come right back, but I've reached the end of my

23  initial road here.

24              (Brief recess.)

198

1              MR. PYLE:  I have no further questions.

2              THE WITNESS:  I want to make a

3    correction.

4              You had asked me besides the time, you

5    had asked me are there any additional injuries,

6    damages besides what I described.  And I didn't

7    mention the attorney's fees because I thought,

8    somehow I interpreted your question to mean damage

9    to us personally.  That's money to the attorneys,

10   but, yes, we were damaged in that we now need an

11   attorney.

12   EXAMINATION BY MR. PYLE:

13       Q.  All right.  So, now that you've opened that

14   door, how much in attorney's fees have you paid to

15   EFF?

16       A.  None.

17       Q.  How much in attorney's fees have you paid to

18   Brown Rudnick?

19       A.  None.

20       Q.  Are you obligated, if you win or lose this

21   case or it's dismissed, to pay attorney's fees to

22   Brown Rudnick or EFF?

23       A.  No.

24       Q.  Are you obligated to pay any costs in

199

```
 1    relation to them?

 2        A.  No.

 3        Q.  Your representation here is entirely pro

 4    bono, is it not?

 5        A.  Correct.

 6        Q.  Okay.  And, so, WCAC will not be on the hook

 7    for any monetary amount on account of attorney's

 8    fees or costs in this case, to your knowledge?

 9            MS. MacDOWELL LECAROZ:  Objection.

10        Q.  I'm sorry.  I think I misspoke.

11            Channel 781 News will not be obligated

12    to pay anything to Brown Rudnick or EFF under any

13    circumstances that we know of, right?

14            MS. MacDOWELL LECAROZ:  Objection.

15        A.  Correct.

16        Q.  So -- all right.  I think we've covered it.

17            MR. PYLE:  Thank you.  I have no further

18    questions.

19            Do you have any cross-examination?

20            MS. MacDOWELL LECAROZ:  Nothing from me.

21            MR. PYLE:  Okay.  Thank you.

22            THE REPORTER:  Could I just ask counsel

23    to state on the record what they'd like for

24    transcripts?
```

200

1              MR. PYLE:  Sure.  I'd like a transcript.

2              THE REPORTER:  Okay.  Would you like it

3     electronically?

4              MR. PYLE:  Yes, please.

5              MS. MacDOWELL LECAROZ:  Mitch, same for

6     you?

7              MR. STOLTZ:  We would also like a

8     transcript.  Electronic is fine.

9              THE REPORTER:  And I'll just note that

10    Exhibits 10 through and including 13 were marked

11    today.  What would you like to do with the exhibits?

12             MS. MacDOWELL LECAROZ:  Before we go

13    off, I'd just like to make a request on the record

14    that you send the link to the one YouTube video that

15    you used that wasn't a part of that Exhibit D to all

16    counsel.

17             MR. PYLE:  Okay.  I will.  Let me make a

18    note of that.

19             Should we, maybe on the record, since

20    you raised a very good point, maybe we should mark

21    that video for identification as, I don't know, A

22    for identification.

23             MS. MacDOWELL LECAROZ:  That would be

24    fine with me.

201

1          (Marked, Exhibit A, YouTube video.)

2          MS. MacDOWELL LECAROZ:  Mitch, anything

3   else from you?

4          MR. STOLTZ:  Nothing from us.

5          (4:04 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Channel 781 News vs                        30(b)(6)                        Joshua Kastorf
Waltham Community Access Corporation                                      June 27, 2025

202

1                    E R R A T A     S H E E T

2          I, JOSHUA PAUL KASTORF, do hereby certify

3    that I have read the foregoing transcript of my

4    testimony, and further certify that it is a true and

5    accurate record of my testimony (with the exception

6    of the corrections listed below):

7    Page      Line              Correction/Reason

8     58       13      3/6/23 instead of 3623           Typo

9     59       15      she instead of he                Mistake

10    69       20      our instead of her               Mistake

11    83       3, 4, 8    Kara Moloney instead of Cara Maloney   Typo

12    84       22      Kara instead of Cara             Typo

13    85       1       Kara instead of Cara             Typo

14    116      17      some point instead of this point   Mistake

15    129      18      illegal instead of legal         Typo

16    _____    _____    _____

17    _____    _____    _____

18    _____    _____    _____

19

20   Signed under the pains and penalties of perjury this

21    1st  day of  August                    , 20 25   .

22

23                          _____

24                          JOSHUA PAUL KASTORF

                                                                203

1    Commonwealth of Massachusetts)

2    Suffolk, ss.                    )

3          I, Lauren M. Mitchell, Registered

4    Professional Reporter and Notary Public in and

5    for the Commonwealth of Massachusetts, do hereby

6    certify that JOSHUA PAUL KASTORF came before me on

7    Friday, June 27, 2025, the deponent herein, who was

8    duly sworn; and the within transcript is a true

9    record of the testimony given at said deposition.

10         I FURTHER CERTIFY that I am neither attorney

11   or counsel for, nor related to or employed by any of

12   the parties to the action in which this deposition

13   is taken; and, further, that I am not a relative or

14   employee of any attorney or counsel employed by the

15   parties hereto, or financially interested in the

16   outcome of the action.

17         IN WITNESS WHEREOF I have hereunto set my

18   hand this 9th day of July, 2025, at Boston.

19

20

21   

22

23         Lauren M. Mitchell, Notary Public

24         My Commission expires:  5/1/2031