# Exhibit B



Planet Depos
We Make It *Happen*™

# Transcript of Christopher Wangler, Designated Representative & Individually

**Date:** July 9, 2025
**Case:** Channel 781 News -v- Waltham Community Access Corporation

**Planet Depos**
**Phone:** 888.433.3767 **| Email:** transcripts@planetdepos.com
**www.planetdepos.com**
**Michigan #8598 | Nevada #089F | New Mexico #566**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

1          IN THE UNITED STATES DISTRICT COURT

2           FOR THE DISTRICT OF MASSACHUSETTS

3    - - - - - - - - - - - - - - - -x

4    CHANNEL 781 NEWS,                  :

5          Plaintiff,                   :

6      v.                              : Case No.

7    WALTHAM COMMUNITY ACCESS          : 1:24-cv-11927-PBS

8    CORPORATION,                      :

9          Defendant.                  :

10   - - - - - - - - - - - - - - - -x

11

12       VIDEOTAPED 30(b)(6) DEPOSITION of WALTHAM

13   COMMUNITY ACCESS CORPORATION, taken by CHRISTOPHER

14      WANGLER, and by CHRISTOPHER WANGLER in his

15              personal capacity

16             Boston, Massachusetts

17             Wednesday, July 9, 2025

18                  9:08 a.m.

19

20

21

22   Job No.:  590641

23   Pages: 1 - 167

24   Reported By:  Michelle Keegan, RMR, CRR, CSR

1            Deposition of CHRISTOPHER WANGLER, held at

2     the offices of:

3

4            BROWN RUDNICK LLP

5            One Financial Center

6            Boston, Massachusetts 02111

7            (617) 856-8200

8

9

10

11

12            Pursuant to notice, before Michelle

13     Keegan, Registered Merit Reporter and Notary

14     Public in and for the Commonwealth of

15     Massachusetts.

16

17

18

19

20

21

22

23

24

```
1                    A P P E A R A N C E S

2    ON BEHALF OF PLAINTIFF CHANNEL 781 NEWS:

3           BETELHEM GEDLU, ESQ.

4           MITCH STOLTZ, ESQ.

5           ELECTRONIC FRONTIER FOUNDATION

6           815 Eddy Street

7           San Francisco, California 94109

8           (415) 436-9333

9

10   ON BEHALF OF DEFENDANT WALTHAM COMMUNITY ACCESS

11   CORPORATION:

12          JEFFREY J. PYLE, ESQ.

13          SARAH L DOELGER, ESQ.

14          PRINCE LOBEL TYE LLP

15          One International Place

16          Suite 3700

17          Boston, Massachusetts 02110

18          (617) 456-8000

19

20   ALSO PRESENT:

21          Isaac Weaver, Videographer

22          Stavros Atlamazoglou, Brown Rudnick summer

23          associate

24
```

1                    C O N T E N T S

2    EXAMINATION OF CHRISTOPHER WANGLER              PAGE

3        By Mr. Stoltz                                 7

4

5

6                     E X H I B I T S

7               (Attached to transcript.)

8    WANGLER DEPOSITION EXHIBITS                      PAGE

9    Exhibit 31  Revised Notice of Deposition of       9

10               Waltham Community Access

11               Corporation

12   Exhibit 32  Article, "Star-Studded Support"      34

13   Exhibit 33  Article, "Mayor to Seek Sixth        35

14               Term"

15   Exhibit 34  Article, "Are Jeannette              35

16               McCarthy's Values Really

17               Waltham's Values?"

18   Exhibit 35  Article, "Eviction Notice?"          36

19   Exhibit 36  MAC-TV Channel Waltham               51

20               Government Television Policies &

21               Guidelines Mission Statement,

22               WCA0000556 through -560

23   Exhibit 37  Text Messages                        75

24

Transcript of Christopher Wangler, Designated Representative & Individually
Conducted on July 9, 2025                                        5

```
1                    EXHIBITS (continued)

2    Exhibit 38  Email, WCA0000121 through -122      84

3    Exhibit 39  Letter dated November 22, 2023,     91

4                WCA0000119 through -120

5    Exhibit 40  Defendant Waltham Community          92

6                Access Corporation's Answers and

7                Objections to Plaintiff

8                Channel 781 News's First Set of

9                Interrogatories

10   Exhibit 41  Email, WCA0000433 through -434      99

11   Exhibit 42  Email, WCA0000123 through -125      126

12   Exhibit 43  Email, WCA0000422                   130

13   Exhibit 44  Document, "Fair Use - Copyright     130

14                on YouTube"

15   Exhibit 45  Email, WCA0000420                   147

16   Exhibit 46  Handwritten Document, WCA0000718    161

17

18

19

20

21   ** Documents quoted on the record are transcribed

22                     as read **

23

24
```

| | | |
|---|---|---|
| 1 | P R O C E E D I N G S | |
| 2 | THE VIDEOGRAPHER:  Here begins Media | 09:07:52 |
| 3 | Number 1 in the videotaped deposition of Chris | 09:07:55 |
| 4 | Wangler in the matter of Channel 781 News v. | 09:07:57 |
| 5 | Waltham Community Access Corporation in the United | 09:08:01 |
| 6 | States District Court for the District of | 09:08:04 |
| 7 | Massachusetts, Case Number 1:24-cv-11927-PBS. | 09:08:07 |
| 8 | Today's date is July 9th, 2025.  The time | 09:08:17 |
| 9 | on the video monitor is 9:08.  The videographer | 09:08:22 |
| 10 | today is Isaac Weaver, representing Planet Depos. | 09:08:26 |
| 11 | This video deposition is taking place at Brown | 09:08:30 |
| 12 | Rudnick LLP, One Financial Center, Boston, | 09:08:33 |
| 13 | Massachusetts. | 09:08:36 |
| 14 | Would counsel please voice-identify | 09:08:37 |
| 15 | themselves and state whom they represent. | 09:08:39 |
| 16 | MR. STOLTZ:  Mitch Stoltz, Electronic | 09:08:42 |
| 17 | Frontier Foundation, for the plaintiff, Channel | 09:08:46 |
| 18 | 781 News. | 09:08:48 |
| 19 | MS. GEDLU:  Betelhem Gedlu, representing | 09:08:49 |
| 20 | Channel 781 News. | 09:08:53 |
| 21 | MR. PYLE:  Jeffrey Pyle, representing | 09:08:54 |
| 22 | Waltham Community Access Corporation. | 09:08:55 |
| 23 | THE VIDEOGRAPHER:  The court reporter | 09:09:00 |
| 24 | today is Michelle Keegan, representing Planet | 09:09:01 |

1    Depos.  The witness will now be sworn.                    09:09:04

2              CHRISTOPHER WANGLER,

3    having been satisfactorily identified and duly

4    sworn by the Notary Public, was examined and

5    testified as follows:

6              EXAMINATION BY COUNSEL FOR

7              PLAINTIFF CHANNEL 781 NEWS

8    BY MR. STOLTZ:

9       Q. Good morning, Mr. Wangler.                          09:09:20

10      A. Good morning.                                       09:09:21

11      Q. Could you please state your full name for          09:09:22

12   the record.                                               09:09:23

13      A. Christopher Dennis Wangler.                         09:09:23

14      Q. Have you ever been deposed before?                  09:09:25

15      A. No.                                                 09:09:26

16      Q. So to help our court reporter, only one of         09:09:27

17   us can speak at a time.  So I'd ask you to please         09:09:31

18   let me finish asking my question before you               09:09:34

19   answer, and I'll let you finish speaking before I         09:09:36

20   go on.  Is that all right?                                09:09:39

21      A. Yes.                                                09:09:41

22      Q. And if you don't understand my question,           09:09:42

23   please say so and I'll rephrase it.  Can you do           09:09:46

24   that?                                                     09:09:48

| | | |
|---|---|---|
| 1 | A. Yes. | 09:09:48 |
| 2 | Q. We'll take breaks from time to time, but | 09:09:49 |
| 3 | if you need a break at any time please let me | 09:09:53 |
| 4 | know.  I'd only ask that if a question is pending, | 09:09:55 |
| 5 | that you answer the question before we break.  Can | 09:09:58 |
| 6 | you do that? | 09:10:00 |
| 7 | A. Yes. | 09:10:00 |
| 8 | Q. Have you done anything to prepare for | 09:10:00 |
| 9 | today's deposition? | 09:10:03 |
| 10 | A. For the 30(b)(6) -- Rule 30(b)(6), yes. | 09:10:04 |
| 11 | Q. How did you prepare? | 09:10:12 |
| 12 | A. Reviewing the questions or the different | 09:10:14 |
| 13 | matters that were given in the 30(b)(6) document. | 09:10:20 |
| 14 | Q. Did you meet with anyone to prepare for | 09:10:27 |
| 15 | today's testimony? | 09:10:29 |
| 16 | A. Yes. | 09:10:31 |
| 17 | Q. Who did you meet with? | 09:10:32 |
| 18 | A. Jeff. | 09:10:34 |
| 19 | Q. How many times did you meet? | 09:10:38 |
| 20 | A. Three times. | 09:10:39 |
| 21 | Q. Was anyone besides you and Jeff present at | 09:10:47 |
| 22 | those meetings? | 09:10:51 |
| 23 | A. Yes. | 09:10:52 |
| 24 | Q. Who else was at those meetings? | 09:10:55 |

1      A. The other defendants in this matter.                09:10:59

2      Q. Would that be Maria Sheehan?                         09:11:05

3      A. Yes.                                                 09:11:07

4      Q. And Justin Barrett?                                  09:11:08

5      A. Yes.                                                 09:11:09

6      Q. Anyone else?                                         09:11:09

7      A. No.                                                  09:11:12

8      Q. Are you taking any medication or dealing            09:11:13

9   with any condition today that might interfere with        09:11:18

10  your ability to testify truthfully or understand          09:11:21

11  the questions?                                             09:11:23

12     A. No.                                                  09:11:24

13     Q. Do you understand that when I say "WCAC,"            09:11:25

14  I mean Waltham Community Access Corporation?               09:11:31

15     A. Yes.                                                 09:11:33

16     Q. And do you understand that when I say                09:11:34

17  "Channel 781," I'm referring to my clients, the           09:11:35

18  group that brought this lawsuit?                           09:11:39

19     A. Yes.                                                 09:11:40

20     Q. And you mentioned looking at the list of            09:11:40

21  30(b)(6) topics.  I'd like to show you that list.         09:11:47

22        MR. STOLTZ:  We'll mark that.                        09:11:59

23        (Wangler Exhibit 31 was marked for                   09:12:01

24  identification and is attached to the transcript.)         09:12:20

| | | |
|---|---|---|
| 1 | Q. If you could please look at the page | 09:12:20 |
| 2 | that's labeled "Schedule A."  It's the third page | 09:12:23 |
| 3 | of that document. | 09:12:27 |
| 4 | Can you confirm that you'll be testifying | 09:12:29 |
| 5 | on behalf of WCAC on Topic 4? | 09:12:31 |
| 6 | A. Yes. | 09:12:39 |
| 7 | Q. And also on Topics 7 through 10? | 09:12:40 |
| 8 | A. Yes. | 09:12:44 |
| 9 | Q. And also on Topics 12 through 15? | 09:12:55 |
| 10 | A. Yes. | 09:12:59 |
| 11 | Q. Thank you.  What city do you live in? | 09:13:14 |
| 12 | A. Natick, Massachusetts. | 09:13:19 |
| 13 | Q. How long have you lived there? | 09:13:20 |
| 14 | A. Since 2016. | 09:13:22 |
| 15 | Q. And where do you work? | 09:13:24 |
| 16 | A. I work at the Waltham Community Access | 09:13:26 |
| 17 | Corporation. | 09:13:30 |
| 18 | Q. Do you work anywhere else besides WCAC? | 09:13:30 |
| 19 | A. No. | 09:13:34 |
| 20 | Q. What's your job title at WCAC? | 09:13:34 |
| 21 | A. News director. | 09:13:38 |
| 22 | Q. When did you become news director? | 09:13:39 |
| 23 | A. 2009. | 09:13:43 |
| 24 | Q. What are your job duties as news director? | 09:13:44 |

| | | |
|---|---|---|
| 1 | A. I produce a 30-minute television newscast | 09:13:48 |
| 2 | about the City of Waltham that airs every two | 09:13:54 |
| 3 | weeks.  I'm also responsible for posting news | 09:13:56 |
| 4 | content to our social media channels.  I also | 09:14:01 |
| 5 | upload some of our news content to YouTube. | 09:14:06 |
| 6 | And I am engaged in other news-gathering | 09:14:11 |
| 7 | activities in addition to various other roles at | 09:14:14 |
| 8 | the station, where an extra set of hands might be | 09:14:21 |
| 9 | required to shoot a show in the studio or assist | 09:14:23 |
| 10 | with an outdoor concert. | 09:14:29 |
| 11 | So I don't only work as the news director. | 09:14:32 |
| 12 | I can be called upon to do other responsibilities | 09:14:34 |
| 13 | as well. | 09:14:39 |
| 14 | Q. Do you have any other job responsibilities | 09:14:39 |
| 15 | other than the ones that you mentioned? | 09:14:43 |
| 16 | A. Answering phones occasionally. | 09:14:45 |
| 17 | Q. You mentioned creating a news program. | 09:15:03 |
| 18 | What's that program called? | 09:15:05 |
| 19 | A. It's called Waltham Newswatch. | 09:15:07 |
| 20 | Q. And what does that show include? | 09:15:10 |
| 21 | A. Waltham Newswatch covers anything related | 09:15:14 |
| 22 | to Waltham:  politics, city government, restaurant | 09:15:17 |
| 23 | openings, high school sports, people making a | 09:15:23 |
| 24 | difference, and especially nonprofits in the City | 09:15:29 |

1    of Waltham.                                            09:15:33

2        Q. Do you have any job responsibilities with       09:15:33

3    respect to the MAC-TV channel?                         09:15:38

4        A. Yes.                                             09:15:42

5        Q. And what are those?                             09:15:42

6        A. Occasionally I will shoot a government           09:15:44

7    meeting.  If the MAC channel program coordinator       09:15:50

8    is unable to shoot that meeting, he has trained me     09:15:55

9    to operate the cameras in a government building in     09:16:02

10   Waltham and create recordings of government            09:16:07

11   meetings.                                              09:16:11

12       Q. Who is the MAC channel program                  09:16:11

13   coordinator?                                           09:16:17

14       A. Bill Heatley.                                    09:16:18

15       Q. Did you have a role at WCAC before you          09:16:19

16   were news director?                                    09:16:26

17       A. Initially I approached the station to           09:16:26

18   learn more and to volunteer because I was out of       09:16:33

19   work at the time.  And I produced a series of          09:16:36

20   videos about Waltham Public Library, with              09:16:43

21   assistance from a former staff member who taught       09:16:46

22   me how to run the camera and use microphones and       09:16:49

23   other video production skills.                         09:16:53

24       Q. Where did you work before WCAC?                 09:17:00

| | | |
|---|---|---|
| 1 | A. Newton Free Library, which is a part of | 09:17:04 |
| 2 | the City of Waltham -- City of Newton. | 09:17:08 |
| 3 | Q. And how about before that? | 09:17:10 |
| 4 | A. I was a book editor, an author, at Lone | 09:17:14 |
| 5 | Pine Publishing in Edmonton, Alberta, Canada. | 09:17:21 |
| 6 | Q. Before you worked at WCAC, did you hold | 09:17:24 |
| 7 | any jobs in journalism? | 09:17:34 |
| 8 | A. Yes. | 09:17:35 |
| 9 | Q. What were those jobs? | 09:17:39 |
| 10 | A. When I lived in Edmonton, I was a reporter | 09:17:42 |
| 11 | for Vue Weekly, an arts and entertainment weekly | 09:17:48 |
| 12 | for the City of Edmonton, Alberta. | 09:17:53 |
| 13 | Q. Any others? | 09:17:55 |
| 14 | A. I published a story in an alumni magazine | 09:17:58 |
| 15 | for the University of Alberta, where I studied | 09:18:08 |
| 16 | from 1992 to 1996. | 09:18:11 |
| 17 | Q. Did you get a degree from the University | 09:18:20 |
| 18 | of Alberta? | 09:18:22 |
| 19 | A. Yes. | 09:18:23 |
| 20 | Q. What was that degree? | 09:18:23 |
| 21 | A. A bachelor of arts degree. | 09:18:25 |
| 22 | Q. In what field was that degree? | 09:18:29 |
| 23 | A. Philosophy major, English minor. | 09:18:31 |
| 24 | Q. Have you ever studied journalism? | 09:18:35 |

| | | |
|---|---|---|
| 1 | A. Not in -- not at university.  No. | 09:18:38 |
| 2 | Q. Have you studied journalism in another | 09:18:44 |
| 3 | context? | 09:18:47 |
| 4 | A. I've learned how to become a journalist by | 09:18:47 |
| 5 | doing it. | 09:18:54 |
| 6 | Q. Have you ever worked in government? | 09:19:01 |
| 7 | A. I don't believe so. | 09:19:02 |
| 8 | Q. Have you ever run for elected office? | 09:19:19 |
| 9 | A. No. | 09:19:22 |
| 10 | Q. Are you a member of any government boards | 09:19:24 |
| 11 | or commissions? | 09:19:28 |
| 12 | A. No. | 09:19:37 |
| 13 | Q. Are you an officer or director of any | 09:19:37 |
| 14 | charities or nonprofit organizations other than | 09:19:46 |
| 15 | WCAC? | 09:19:49 |
| 16 | MR. PYLE:  Objection. | 09:19:50 |
| 17 | A. Could you repeat that? | 09:19:51 |
| 18 | Q. Are you an officer or director of any | 09:19:54 |
| 19 | charities or nonprofit organizations? | 09:19:58 |
| 20 | A. No. | 09:19:59 |
| 21 | Q. Are you a member of the Waltham Lions | 09:20:01 |
| 22 | Club? | 09:20:05 |
| 23 | A. No. | 09:20:05 |
| 24 | Q. Have you had any training in defamation or | 09:20:07 |

| | | |
|---|---|---|
| 1 | libel law? | 09:20:22 |
| 2 | A. What do you mean by "training"? | 09:20:22 |
| 3 | Q. Any formal or informal education. | 09:20:31 |
| 4 | A. Several years ago a Waltham city | 09:20:36 |
| 5 | councillor made statements during a city council | 09:20:48 |
| 6 | meeting that became the subject of a report about | 09:20:50 |
| 7 | potential defamatory legal action. | 09:20:55 |
| 8 | Q. In that instance, was WCAC accused of | 09:21:04 |
| 9 | defamation? | 09:21:09 |
| 10 | A. No. | 09:21:10 |
| 11 | Q. So I asked whether you had any training in | 09:21:13 |
| 12 | defamation or libel law.  How was that episode a | 09:21:29 |
| 13 | form of training? | 09:21:34 |
| 14 | A. So the city councillor made statements | 09:21:35 |
| 15 | during the city council meeting, and those | 09:21:48 |
| 16 | statements involved a former city clerk for the | 09:21:54 |
| 17 | City of Waltham and his spouse.  And the | 09:21:58 |
| 18 | implication -- there was some implication of | 09:22:02 |
| 19 | impropriety in the statements made by the city | 09:22:05 |
| 20 | councillor. | 09:22:10 |
| 21 | As a result, both the woman, the spouse, | 09:22:12 |
| 22 | and the former city clerk, I approached them and | 09:22:17 |
| 23 | they said that they believed that the statements | 09:22:23 |
| 24 | the city councillor had made could be defamatory | 09:22:25 |

1    and could lead to legal action.  And I reported on       09:22:29

2    that.                                                    09:22:33

3         Q. When you say you approached them, do you         09:22:37

4    mean you approached them as a reporter?                  09:22:39

5         A. Yes.                                             09:22:41

6         Q. And in reporting on that story, did you do       09:22:45

7    any research on the law of defamation?                   09:22:49

8         A. Yes.                                             09:22:56

9         Q. Have you had any other experiences that          09:22:57

10   you would describe as training, formal or                09:23:05

11   informal, in defamation?                                 09:23:09

12        A. Not that I can recall.                           09:23:10

13        Q. Have you had any training in copyright           09:23:26

14   law?                                                     09:23:33

15        A. What do you mean by "training"?                  09:23:33

16        Q. Formal or informal education.                    09:23:39

17        A. As a reporter and as a news director, yes.       09:23:43

18        Q. From what sources?                               09:23:55

19        A. In the course of news gathering, I would         09:23:56

20   need to, for example, reproduce a photo or video.        09:24:07

21   And in order to do that, I would need to have a          09:24:14

22   rudimentary understanding of the copyright               09:24:17

23   involved.                                                09:24:21

24        Q. From what sources did you seek that              09:24:25

| | | |
|---|---|---|
| 1 | understanding? | 09:24:27 |
| 2 | A. Online searches, online research. | 09:24:28 |
| 3 | Q. Do you recall any online resources in | 09:24:34 |
| 4 | particular that you consulted? | 09:24:37 |
| 5 | A. I don't recall specific -- I don't recall | 09:24:38 |
| 6 | specifically. | 09:25:05 |
| 7 | Q. You said in the course of news gathering | 09:25:05 |
| 8 | you would need to at times reproduce a photo or | 09:25:24 |
| 9 | video.  Can you give me an example? | 09:25:28 |
| 10 | A. Yes.  I shoot a lot of photographs. | 09:25:34 |
| 11 | There's no problem publishing my own photographs. | 09:25:46 |
| 12 | But I interview many people who I either | 09:25:52 |
| 13 | don't have a photograph of or cannot take a | 09:25:55 |
| 14 | photograph of who are newsworthy.  And they may | 09:25:58 |
| 15 | have photographs.  And in order to reproduce them, | 09:26:04 |
| 16 | I need to ask their permission because they would | 09:26:06 |
| 17 | own the copyright on that photograph. | 09:26:09 |
| 18 | Q. Have you ever, to your knowledge, used a | 09:26:17 |
| 19 | photograph or video that you -- WCAC did not | 09:26:23 |
| 20 | produce without asking for permission? | 09:26:31 |
| 21 | A. Yes. | 09:26:36 |
| 22 | Q. Can you tell me the circumstances? | 09:26:42 |
| 23 | A. In 2019, an 18-year-old motorcycle rider | 09:26:47 |
| 24 | was critically injured in a crash on Main Street | 09:27:00 |

1    in Waltham.  I was at the scene.  I took          09:27:03

2    photographs of the motorcycle and first responders  09:27:09

3    on scene.                                          09:27:15

4         I did not have a picture of the victim at    09:27:17

5    the time, but I searched for photos of the victim  09:27:23

6    and discovered a yearbook photo from several years  09:27:26

7    earlier, a Waltham High School yearbook photo.     09:27:32

8         And I was able to scan a page -- a           09:27:36

9    yearbook page, crop the photo of this victim, and  09:27:41

10   reproduce that photo, but I was unable to          09:27:47

11   determine who took the photo or who owned the      09:27:53

12   copyright to the photograph.                       09:27:55

13        Q. What, if anything, did you do to verify    09:28:05

14   that it would be lawful to use that photograph?    09:28:10

15        A. I searched through the yearbook to try to  09:28:18

16   determine who might have taken the photo.  I tried  09:28:24

17   to determine who would have been the yearbook      09:28:29

18   coordinator at the time, but I was unable to do    09:28:35

19   that.                                              09:28:39

20        Q. Did you do anything else?                  09:28:42

21        A. I can't recall.                            09:28:44

22        Q. In that instance, did you do any research  09:29:02

23   into the fair use doctrine of copyright?           09:29:13

24        A. No and yes.                                09:29:16

| | | |
|---|---|---|
| 1 | Q. Can you explain? | 09:29:28 |
| 2 | A. I had developed an understanding of the | 09:29:31 |
| 3 | fair use doctrine through news gathering and | 09:29:34 |
| 4 | through my work as a book editor. | 09:29:37 |
| 5 | Q. From what sources did you develop that | 09:30:02 |
| 6 | understanding? | 09:30:04 |
| 7 | A. Online searches about fair use. | 09:30:05 |
| 8 | Q. Anything else? | 09:30:17 |
| 9 | A. Not that I can recall. | 09:30:18 |
| 10 | Q. So other than online searches, would you | 09:30:32 |
| 11 | say you've had no training in the fair use | 09:30:43 |
| 12 | doctrine of copyright law? | 09:30:46 |
| 13 | A. What do you mean by "training"? | 09:30:47 |
| 14 | Q. Formal or informal education. | 09:31:04 |
| 15 | A. I felt like I had developed an | 09:31:06 |
| 16 | understanding of fair use through my news | 09:31:11 |
| 17 | gathering activities. | 09:31:14 |
| 18 | Q. How did news gathering activities give you | 09:31:17 |
| 19 | an understanding of fair use? | 09:31:20 |
| 20 | A. So ordinarily, in order to reproduce | 09:31:21 |
| 21 | content created by another person, we would seek | 09:31:33 |
| 22 | permission.  And in almost every instance where I | 09:31:36 |
| 23 | reproduce media from someone else, I seek | 09:31:43 |
| 24 | permission. | 09:31:48 |

1      But I understood that there are cases                09:31:49

2  where either I could not discover who created           09:31:52

3  that, who created the content, or I could not get       09:32:01

4  their permission but it would still be wise to          09:32:06

5  reproduce a photo or video because of public            09:32:11

6  interest.  And that use without permission would        09:32:15

7  be covered by the fair use doctrine.                    09:32:19

8      Q. Other than the episode that you mentioned         09:32:23

9  about the yearbook photo, was there any other           09:33:00

10 occasion when you used a photo or video without         09:33:07

11 permission?                                             09:33:12

12     A. Yes.                                              09:33:15

13     Q. What was that?                                    09:33:18

14     A. Following a very serious earthquake in            09:33:18

15 Haiti in 2010, the Haitian community in Waltham         09:33:29

16 was seriously adversely affected.  And I reported       09:33:36

17 on the situation, but I did not have any                09:33:46

18 photographs from Haiti that I was able to take,         09:33:51

19 and I did not know anyone who shot photographs of       09:33:57

20 this tragedy.                                           09:34:01

21     But for my coverage I felt it was                    09:34:04

22 important to include images of Haiti, so I found        09:34:06

23 images online and reproduced them and added credit      09:34:11

24 to reflect who shot the images.                         09:34:18

1    Q. Did you make any attempt to locate the          09:34:22

2    copyright owner to contact them?                    09:34:31

3    A. I can't recall.                                  09:34:33

4    Q. In that instance, did you give any              09:34:41

5    consideration to whether your use of that photo     09:35:01

6    was -- deprived the photographer of revenue?        09:35:06

7    A. I can't recall.                                  09:35:09

8    Q. Did you give any consideration to whether        09:35:29

9    you were using the photo for a different purpose    09:35:35

10   than the photographer?                              09:35:37

11   A. I can't recall.                                  09:35:40

12   Q. Did you give any consideration to whether        09:35:54

13   the photo was creative?                             09:36:14

14   A. What do you mean by "creative"?                  09:36:16

15   Q. Whether it included creative choices made        09:36:22

16   by the photographer.                                09:36:30

17   A. I can't recall.                                  09:36:43

18   Q. Did you consider whether there were any          09:36:44

19   alternative ways of obtaining a photo of the        09:37:08

20   tragedy in Haiti that you could use?                09:37:12

21   A. Again, I can't recall.                           09:37:14

22   Q. Thank you.  I know that was a while ago.         09:37:35

23      MR. PYLE:  15 years.                             09:37:39

24   Q. Going back to the yearbook photo, in that        09:37:51

| | | |
|---|---|---|
| 1 | instance did you give any consideration to whether | 09:37:56 |
| 2 | there was an alternative photo that you could use? | 09:38:11 |
| 3 | A. I recall finding some photos online, but | 09:38:16 |
| 4 | the yearbook photo seemed like a better | 09:38:27 |
| 5 | alternative because it showed the victim not -- it | 09:38:33 |
| 6 | showed the victim near the age at which he was | 09:38:43 |
| 7 | critically injured and ultimately killed. | 09:38:48 |
| 8 | Other photos depicted the victim as a | 09:38:52 |
| 9 | younger teen and so were less reflective of how | 09:38:56 |
| 10 | this victim looked at the time of this ultimately | 09:39:02 |
| 11 | fatal motorcycle crash. | 09:39:06 |
| 12 | Q. In that instance, did you give any | 09:39:11 |
| 13 | consideration to whether your use might deprive | 09:39:17 |
| 14 | the photographer of revenue? | 09:39:19 |
| 15 | A. I can't recall. | 09:39:24 |
| 16 | Q. You don't remember considering that? | 09:39:30 |
| 17 | A. The photograph was from a yearbook.  It | 09:39:39 |
| 18 | was not an AP photo or a photograph from the | 09:39:50 |
| 19 | Boston Globe.  It was a yearbook photo, so the | 09:39:58 |
| 20 | person who took the photo was probably a -- | 09:40:08 |
| 21 | contracted by the high school to shoot photos. | 09:40:12 |
| 22 | Q. So is it fair to say you believed that | 09:40:14 |
| 23 | your use would not deprive that photographer of | 09:40:30 |
| 24 | revenue? | 09:40:32 |

| | | |
|---|---|---|
| 1 | A. I can't recall. | 09:40:32 |
| 2 | Q. So you said, "It was not an AP photo or a | 09:41:00 |
| 3 | photograph of The Boston Globe.  It was a yearbook | 09:41:04 |
| 4 | photo, so the person who took the photo was | 09:41:08 |
| 5 | probably contracted by the high school to shoot | 09:41:10 |
| 6 | photos." | 09:41:12 |
| 7 | Was it your understanding that that | 09:41:17 |
| 8 | photographer was probably already paid? | 09:41:19 |
| 9 | A. I don't know if I considered that at the | 09:41:39 |
| 10 | time.  I can't recall. | 09:41:41 |
| 11 | Q. So again, you're telling me you can't | 09:41:46 |
| 12 | remember whether you ever considered whether your | 09:41:55 |
| 13 | use of the yearbook photo would deprive the | 09:41:59 |
| 14 | photographer of revenue? | 09:42:03 |
| 15 | A. Could you repeat that, please? | 09:42:04 |
| 16 | Q. Well, is it your testimony that you did | 09:42:09 |
| 17 | not consider whether the photographer would be | 09:42:18 |
| 18 | deprived of revenue because you used that yearbook | 09:42:21 |
| 19 | photo? | 09:42:24 |
| 20 | MR. PYLE:  Objection. | 09:42:25 |
| 21 | A. I don't know if I understand the question. | 09:42:25 |
| 22 | I'm sorry.  Could you rephrase? | 09:42:32 |
| 23 | Q. I'll try.  Let me ask this:  You said the | 09:42:36 |
| 24 | photograph "was not an AP photo or a photograph | 09:43:04 |

| 1  | from the Boston Globe.  It was a yearbook photo, | 09:43:07 |
| 2  | so the person who took the photo was probably | 09:43:09 |
| 3  | contracted by the high school to shoot photos." | 09:43:11 |
| 4  | Why was that distinction significant to | 09:43:14 |
| 5  | you? | 09:43:17 |
| 6  | MR. PYLE:  Objection. | 09:43:17 |
| 7  | A. Sometimes I have to approach a news | 09:43:18 |
| 8  | organization to request a photograph.  And it's a | 09:43:31 |
| 9  | convention in news gathering to approach the news | 09:43:38 |
| 10 | organization and ask for permission to reproduce | 09:43:43 |
| 11 | their photograph.  So I understood how that | 09:43:48 |
| 12 | worked. | 09:43:52 |
| 13 | The yearbook photo was a different | 09:43:52 |
| 14 | situation.  I didn't know who the photographer was | 09:43:54 |
| 15 | and it wasn't clear who the yearbook -- who | 09:43:58 |
| 16 | created the yearbook, so I didn't really know who | 09:44:02 |
| 17 | to approach and I didn't know who the photographer | 09:44:05 |
| 18 | was. | 09:44:08 |
| 19 | Q. So is it correct that you can't recall | 09:44:17 |
| 20 | giving any thought to whether the photographer | 09:45:29 |
| 21 | would be deprived of revenue? | 09:45:33 |
| 22 | A. I can't recall that the photographer would | 09:45:38 |
| 23 | be deprived of revenue.  Yes.  I can't recall | 09:45:46 |
| 24 | whether the photographer would be deprived of | 09:45:51 |

| | | |
|---|---|---|
| 1 | revenue. | 09:45:52 |
| 2 | Q. Have you personally posted any videos to | 09:45:55 |
| 3 | YouTube? | 09:46:05 |
| 4 | MR. PYLE: Objection. | 09:46:08 |
| 5 | A. Yes. | 09:46:08 |
| 6 | Q. Have you posted any videos to YouTube as | 09:46:10 |
| 7 | part of your role at WCAC? | 09:46:17 |
| 8 | A. Yes. | 09:46:19 |
| 9 | Q. What sort of videos does WCAC post to | 09:46:21 |
| 10 | YouTube? | 09:46:28 |
| 11 | A. Videos from Waltham Newswatch as well as | 09:46:29 |
| 12 | some videos from our station that may have news | 09:46:36 |
| 13 | value. | 09:46:44 |
| 14 | Q. Does WCAC produce any original video | 09:46:52 |
| 15 | programming aside from Waltham Newswatch? | 09:47:05 |
| 16 | A. Yes. | 09:47:07 |
| 17 | Q. What other programming does WCAC produce? | 09:47:10 |
| 18 | A. So one of the producers, the program | 09:47:16 |
| 19 | director, Phil McGrady, he produces two shows. | 09:47:25 |
| 20 | One is called "The Hit Show," and it's a show | 09:47:33 |
| 21 | about the Boston Red Sox. | 09:47:37 |
| 22 | He also produces a show called "Armchair | 09:47:42 |
| 23 | Quarterback," and that's a show about the New | 09:47:47 |
| 24 | England Patriots. | 09:47:50 |

1     Q. Any others?                                    09:47:55

2     A. Bill Heatley from the MAC channel is a        09:47:56

3  producer on a -- helps produce a show created by    09:48:06

4  community volunteers, but he plays an important     09:48:12

5  role in helping to produce the show.                09:48:16

6        So typically volunteers come in.  They        09:48:19

7  work the camera.  Do you know what I mean?  They    09:48:21

8  direct the show.                                    09:48:26

9        But for some of these shows, you know,        09:48:27

10 Bill Heatley helps producers that come in because   09:48:32

11 they may not have the technical skills required to  09:48:36

12 either direct the show or set up the cameras or     09:48:39

13 operate microphones.                                09:48:44

14    Q. Have you learned about YouTube's copyright    09:48:54

15 enforcement methods?                                09:48:56

16    A. Yes.                                           09:49:00

17    Q. From what sources?                            09:49:00

18    A. Uploading videos.  For instance, having       09:49:04

19 content ID claims made against some of the videos.  09:49:20

20    Q. Can you give me an example?                   09:49:27

21    A. Not specifically.                             09:49:30

22    Q. There have been content ID claims made        09:49:45

23 against videos uploaded by WCAC.  Is that correct?  09:49:48

24    A. No.  Who do you mean by "WCAC"?               09:49:51

| | | |
|---|---|---|
| 1 | Q. Has a video that was uploaded by you or | 09:49:58 |
| 2 | anyone at WCAC been the subject of a content ID | 09:50:04 |
| 3 | claim? | 09:50:07 |
| 4 | A. Yes. | 09:50:07 |
| 5 | Q. Can you give me an example? | 09:50:08 |
| 6 | A. What I can say is we have permission from | 09:50:10 |
| 7 | an online music service to use music in Waltham | 09:50:28 |
| 8 | Newswatch videos and for other purposes at WCAC. | 09:50:40 |
| 9 | This company is called -- I believe it's called | 09:50:44 |
| 10 | ACM. | 09:50:48 |
| 11 | So we have permission to reproduce their | 09:50:49 |
| 12 | audio content on our channel, so I've used ACM | 09:50:54 |
| 13 | music in some of my videos, but when I've uploaded | 09:51:03 |
| 14 | the videos to YouTube, they received a content ID | 09:51:08 |
| 15 | claim because presumably they were flagged | 09:51:12 |
| 16 | somehow. | 09:51:21 |
| 17 | Q. What did you do in that instance? | 09:51:24 |
| 18 | A. I learned that no action was required | 09:51:26 |
| 19 | because the rights holder was not initiating a | 09:51:34 |
| 20 | copyright strike against the video.  They allowed | 09:51:40 |
| 21 | the video to remain on YouTube.  And they may have | 09:51:44 |
| 22 | monetized the video or taken another step to allow | 09:51:49 |
| 23 | it to remain. | 09:51:56 |
| 24 | Q. Aside from that experience, are there any | 09:52:27 |

1   other sources from which you learned about              09:52:30

2   YouTube's copyright enforcement mechanisms?             09:52:33

3       A. In the course of watching YouTube videos,        09:52:35

4   I had watched videos that had been uploaded and         09:52:54

5   then deleted.                                           09:52:58

6       Q. How did that inform you about YouTube's          09:53:05

7   copyright enforcement mechanisms?                       09:53:08

8       A. YouTube -- sometimes videos are uploaded         09:53:12

9   and later the videos are taken down by YouTube,         09:53:23

10  presumably because of copyright.                        09:53:28

11      Q. Are there any other sources from which you       09:53:33

12  learned about YouTube copyright enforcement             09:53:56

13  mechanisms?                                             09:54:00

14      A. I watched a video called "YouTube                09:54:00

15  Copyright Fair Use," in 2023.                           09:54:10

16      Q. Do you recall when in 2023 you watched           09:54:31

17  that?                                                   09:54:34

18      A. Not precisely.                                   09:54:34

19      Q. Was it somewhere around June of 2023?            09:54:59

20      A. Possibly.  I can't recall exactly.               09:55:01

21      Q. Was it later than June of 2023?                  09:55:06

22      A. I don't believe so.                              09:55:12

23      Q. Have you learned about the process of            09:55:15

24  sending copyright infringement notices to YouTube?      09:55:27

| | | |
|---|---|---|
| 1 | A. Yes. | 09:55:30 |
| 2 | Q. From where did you learn that? | 09:55:31 |
| 3 | A. From the matter we're discussing now. | 09:55:34 |
| 4 | Q. Has WCAC sent infringement notices to | 09:56:03 |
| 5 | YouTube regarding any videos other than those | 09:56:08 |
| 6 | uploaded by Channel 781? | 09:56:12 |
| 7 | A. No, although I cannot speak on behalf of | 09:56:14 |
| 8 | other members of the staff.  To my knowledge, | 09:56:26 |
| 9 | those are the only ones. | 09:56:32 |
| 10 | Q. If I could turn your attention back to the | 09:56:35 |
| 11 | exhibit we looked at earlier, the 30(b)(6) | 09:57:04 |
| 12 | deposition notice. | 09:57:07 |
| 13 | Were you designated to give testimony for | 09:57:12 |
| 14 | WCAC about Topic Number 8, WCAC's accusations of | 09:57:15 |
| 15 | copyright infringement against others? | 09:57:19 |
| 16 | A. Yes. | 09:57:21 |
| 17 | Q. And are you prepared to testify on behalf | 09:57:21 |
| 18 | of WCAC about accusations of copyright | 09:57:28 |
| 19 | infringement against others? | 09:57:32 |
| 20 | A. Yes. | 09:57:34 |
| 21 | Q. Do you know if other members of the staff | 09:57:34 |
| 22 | have sent copyright infringement notices to | 09:57:54 |
| 23 | YouTube with regard to an uploader other than | 09:57:58 |
| 24 | Channel 781? | 09:58:04 |

| | | |
|---|---|---|
| 1 | A. Can you repeat that?  Sorry. | 09:58:05 |
| 2 | Q. That's okay.  Do you know if other members | 09:58:12 |
| 3 | of the WCAC staff have sent copyright infringement | 09:58:17 |
| 4 | notices to YouTube outside of this matter? | 09:58:20 |
| 5 | A. Not to my knowledge. | 09:58:23 |
| 6 | Q. Is it your understanding sitting here | 09:58:25 |
| 7 | today that YouTube might suspend a channel that | 09:58:59 |
| 8 | has received three or more infringement notices? | 09:59:02 |
| 9 | A. Today? | 09:59:06 |
| 10 | Q. Yes. | 09:59:08 |
| 11 | A. I understand that now, but I did not | 09:59:09 |
| 12 | understand that before. | 09:59:14 |
| 13 | Q. When did you become aware of that? | 09:59:17 |
| 14 | A. When the Waltham DATA YouTube channel was | 09:59:20 |
| 15 | shut down.  I was not aware before. | 09:59:27 |
| 16 | Q. We've been going about an hour.  Do you | 09:59:37 |
| 17 | need a break? | 09:59:58 |
| 18 | A. No.  I'm good.  Thank you. | 09:59:58 |
| 19 | Q. All right.  So you told me about Waltham | 10:00:00 |
| 20 | Newswatch.  Other than Waltham Newswatch, does | 10:00:20 |
| 21 | WCAC report the news in any other fashion? | 10:00:23 |
| 22 | A. So Waltham Newswatch is a television | 10:00:30 |
| 23 | program, but then there are social media channels | 10:00:36 |
| 24 | which include content that's similar, which would | 10:00:38 |

| | | |
|---|---|---|
| 1 | be a Waltham Channel Facebook page. | 10:00:43 |
| 2 | And then there's a website that has a News | 10:00:51 |
| 3 | tab where things I report are published.  And then | 10:00:54 |
| 4 | there's an X account where some news that I report | 10:00:59 |
| 5 | is also published. | 10:01:05 |
| 6 | So there's several different ways in which | 10:01:07 |
| 7 | news I gather is disseminated either on cable or | 10:01:10 |
| 8 | online. | 10:01:19 |
| 9 | Q. Do you consider yourself a reporter? | 10:01:19 |
| 10 | A. Yes. | 10:01:23 |
| 11 | Q. Are there any other reporters employed by | 10:01:28 |
| 12 | WCAC? | 10:01:31 |
| 13 | A. Members of the staff have acted as | 10:01:31 |
| 14 | reporters, but I don't know if I'd describe them | 10:01:38 |
| 15 | as reporters. | 10:01:44 |
| 16 | Q. Does any other member of the staff write | 10:01:44 |
| 17 | news stories that are published under the News | 10:01:58 |
| 18 | tab? | 10:02:01 |
| 19 | A. On the website? | 10:02:01 |
| 20 | Q. Yes, on the website. | 10:02:10 |
| 21 | A. So in the past, former news assistants | 10:02:11 |
| 22 | would take, for instance, something published on | 10:02:22 |
| 23 | Facebook and then they would copy it and publish | 10:02:25 |
| 24 | it on the website.  So they were reporting, but | 10:02:30 |

1    they were just basically cutting and pasting          10:02:35

2    something that I had already reported.  And then      10:02:37

3    they would also add photos that I probably shot to    10:02:41

4    that reporting.                                        10:02:45

5            But typically I am the only person            10:02:49

6    reporting on the News tab on our WCAC.org website.     10:02:52

7        Q. Other than you, does anyone else at WCAC       10:03:02

8    write news copy that appears on social media?          10:03:21

9        A. Yes.                                            10:03:24

10       Q. And who is that?                                10:03:30

11       A. It could be Maria Sheehan, the executive        10:03:32

12   director; Phil McGrady.                                10:03:49

13           Maria Sheehan or Phil McGrady very            10:03:54

14   occasionally might be required to notify the           10:03:57

15   community of something on our social media             10:04:02

16   channels if I'm not around to do it myself, but        10:04:05

17   typically posting to these social media channels       10:04:09

18   falls to me.                                           10:04:11

19           But if I'm away on vacation, you know, one    10:04:12

20   of them would have to say, to give an example,         10:04:16

21   there's a summer concert series.  That summer          10:04:19

22   concert series, there is a concert on this Tuesday     10:04:28

23   but rain is going to postpone that.  Chris is away     10:04:32

24   on vacation.  So Maria or Phil would post to our       10:04:34

| | | |
|---|---|---|
| 1 | social media channel that the concert is | 10:04:37 |
| 2 | postponed. | 10:04:41 |
| 3 | Q. Does WCAC produce any opinion writing? | 10:04:42 |
| 4 | A. Currently or in the past? | 10:05:00 |
| 5 | Q. At any time. | 10:05:15 |
| 6 | A. Not that I can recall. | 10:05:16 |
| 7 | Q. Does Waltham Newswatch ever contain an | 10:05:43 |
| 8 | opinion segment? | 10:05:49 |
| 9 | A. No. | 10:05:51 |
| 10 | Q. Does it ever contain anything you'd | 10:05:53 |
| 11 | describe as an editorial? | 10:05:56 |
| 12 | MR. PYLE:  Objection. | 10:06:00 |
| 13 | A. What do you mean by "editorial"? | 10:06:01 |
| 14 | Q. As a journalist, what do you understand an | 10:06:10 |
| 15 | editorial to be? | 10:06:14 |
| 16 | A. A position taken by the news gathering | 10:06:15 |
| 17 | entity about a particular issue that isn't | 10:06:31 |
| 18 | specifically news reporting. | 10:06:37 |
| 19 | Q. Has content of that sort appeared on | 10:06:40 |
| 20 | Waltham Newswatch, to your knowledge? | 10:06:44 |
| 21 | A. Very rarely.  I can't -- most of Waltham | 10:06:46 |
| 22 | Newswatch is just reporting.  We don't have an | 10:07:00 |
| 23 | editorial board such as a major newspaper would | 10:07:08 |
| 24 | have.  So, you know, typically no. | 10:07:11 |

| | |
|---|---|
| 1 | MR. STOLTZ: That's to mark. | 10:07:55 |
| 2 | (Wangler Exhibit 32 was marked for | 10:07:56 |
| 3 | identification and is attached to the transcript.) | 10:08:13 |
| 4 | Q. Mr. Wangler, I'm showing you a printout | 10:08:13 |
| 5 | from WCAC's website. Do you recognize it? | 10:08:16 |
| 6 | A. Yes. | 10:08:18 |
| 7 | Q. Is this a true and correct copy of an | 10:08:19 |
| 8 | article you posted to WCAC's website? | 10:08:26 |
| 9 | A. Yes. | 10:08:28 |
| 10 | Q. If you could look at the next-to-last page | 10:08:39 |
| 11 | of this document, there's a photograph of three | 10:08:54 |
| 12 | people. | 10:08:57 |
| 13 | A. These three people? | 10:08:59 |
| 14 | Q. Yes. | 10:09:00 |
| 15 | A. Yes. | 10:09:01 |
| 16 | Q. Could you read the photo caption, please. | 10:09:01 |
| 17 | A. Left to right, MHSA Board, MHSA board | 10:09:09 |
| 18 | president Justin Barrett, Janice Donovan, and MHSA | 10:09:15 |
| 19 | CEO Bob Mills. | 10:09:21 |
| 20 | Q. Justin Barrett is also the chairman of the | 10:09:23 |
| 21 | board of WCAC. Is that right? | 10:09:28 |
| 22 | A. Yes. | 10:09:30 |
| 23 | Q. Does this article mention his role as | 10:09:30 |
| 24 | chairman of the board of WCAC? | 10:09:33 |

| | |
|---|---|
| 1 | A. No. | 10:09:35 |
| 2 | Q. Thank you. | 10:09:58 |
| 3 | (Wangler Exhibit 33 was marked for | 10:10:18 |
| 4 | identification and is attached to the transcript.) | 10:10:25 |
| 5 | Q. I'm showing you another printout of an | 10:10:25 |
| 6 | article from the WCAC website.  Do you recognize | 10:10:27 |
| 7 | it? | 10:10:29 |
| 8 | A. Yes. | 10:10:29 |
| 9 | Q. Did you write this article? | 10:10:29 |
| 10 | A. Yes, I did. | 10:10:35 |
| 11 | Q. Is this a true and correct copy of the | 10:10:36 |
| 12 | article that you wrote? | 10:10:42 |
| 13 | A. Yes. | 10:10:43 |
| 14 | Q. Would you consider to be this -- strike | 10:10:52 |
| 15 | that. | 10:11:09 |
| 16 | Would you consider this article to be news | 10:11:09 |
| 17 | reporting or opinion? | 10:11:12 |
| 18 | A. News. | 10:11:13 |
| 19 | Q. For the record, could you read the title | 10:11:31 |
| 20 | of the article. | 10:11:33 |
| 21 | A. "Mayor to Seek Sixth Term." | 10:11:33 |
| 22 | Q. Thank you. | 10:11:37 |
| 23 | (Wangler Exhibit 34 was marked for | 10:11:55 |
| 24 | identification and is attached to the transcript.) | 10:11:57 |

| | | |
|---|---|---|
| 1 | Q. I'm showing you another printout from | 10:11:57 |
| 2 | WCAC's website.  Do you recognize it? | 10:12:11 |
| 3 | A. Yes. | 10:12:14 |
| 4 | Q. Is this an article that you wrote? | 10:12:15 |
| 5 | A. Yes. | 10:12:18 |
| 6 | Q. Could you read the title of the article. | 10:12:19 |
| 7 | A. "Are Jeannette McCarthy's Values Really | 10:12:23 |
| 8 | Waltham's Values?" | 10:12:29 |
| 9 | Q. Is this a true and correct copy of an | 10:12:44 |
| 10 | article that you wrote? | 10:12:48 |
| 11 | A. I'd need to look through it.  Sorry. | 10:12:49 |
| 12 | Q. Please take your time. | 10:12:55 |
| 13 | A. Yes. | 10:12:57 |
| 14 | Q. Thank you.  Is it fair to say this is an | 10:14:10 |
| 15 | article about the 2023 election for the mayor of | 10:14:18 |
| 16 | Waltham? | 10:14:25 |
| 17 | A. Yes. | 10:14:25 |
| 18 | Q. Would you consider this news reporting or | 10:14:26 |
| 19 | opinion? | 10:14:32 |
| 20 | A. News. | 10:14:32 |
| 21 | Q. Thank you. | 10:14:48 |
| 22 | (Wangler Exhibit 35 was marked for | 10:15:22 |
| 23 | identification and is attached to the transcript.) | 10:15:23 |
| 24 | Q. I've shown you what's been marked as | 10:15:23 |

| | | |
|---|---|---|
| 1 | Exhibit 35, a printout from the WCAC website.  Do | 10:15:34 |
| 2 | you recognize it? | 10:15:41 |
| 3 | A. Yes. | 10:15:41 |
| 4 | Q. Is this a story that you wrote for the | 10:15:42 |
| 5 | website? | 10:15:45 |
| 6 | A. Yes. | 10:15:45 |
| 7 | Q. Is this a true and correct copy of that | 10:16:24 |
| 8 | article? | 10:16:28 |
| 9 | A. Yes. | 10:16:28 |
| 10 | Q. Would you describe this article as news | 10:16:38 |
| 11 | reporting or opinion? | 10:16:54 |
| 12 | A. News. | 10:16:55 |
| 13 | Q. Which news publications in any medium | 10:16:57 |
| 14 | cover the City of Waltham on a regular basis? | 10:17:13 |
| 15 | A. Waltham Patch, Waltham News Tribune, | 10:17:16 |
| 16 | Brandeis Justice, 781 News.  I believe that's it. | 10:17:33 |
| 17 | Possibly a Bentley student newspaper. | 10:17:59 |
| 18 | Q. What is Waltham Patch? | 10:18:02 |
| 19 | A. Waltham Patch is a hyper-local news | 10:18:05 |
| 20 | website, online only, providing information at the | 10:18:12 |
| 21 | grassroots level for individual communities. | 10:18:21 |
| 22 | Q. Do you know if Waltham Patch has | 10:18:36 |
| 23 | reporters? | 10:18:38 |
| 24 | A. Yes. | 10:18:39 |

1    Q. Does it have reporters?                    10:18:42

2    A. Sorry?                                     10:18:50

3    Q. Does Waltham Patch have reporters?         10:18:54

4    A. I believe so.                              10:18:57

5    Q. Do you have an idea of how many?           10:19:07

6    A. No, I do not.                              10:19:08

7    Q. To your knowledge, which news              10:19:14

8  publications, again in any medium, covered the  10:19:31

9  2023 municipal elections in Waltham?            10:19:33

10   A. Waltham Patch, 781 News, Brandeis Justice, 10:19:35

11 and a variety of -- there were some Facebook pages 10:20:03

12 involved with, say, Waltham politics that offered 10:20:13

13 some coverage but not reporting, per se, but     10:20:18

14 similar to reporting.                            10:20:23

15   Q. I'd like to ask you a bit about the MAC-TV 10:20:40

16 channel.  Which government meetings does WCAC    10:20:45

17 record on video?                                 10:20:49

18   A. Okay.  I'll try to make a complete list.   10:20:50

19 It's the school committee, city council, various 10:21:02

20 city council committees, the Waltham zoning board 10:21:08

21 of appeals, the Waltham traffic commission, the  10:21:13

22 board of survey and planning, the license        10:21:24

23 commission, and possibly another.  It's escaping 10:21:40

24 my mind.                                         10:21:55

1       Q. Any others that you're aware of?                    10:21:58

2       A. The MAC channel airs some meetings that             10:22:00

3   are recorded via Zoom and then aired on our                10:22:15

4   channel.  Does that make sense?                            10:22:23

5       Q. It does.                                            10:22:24

6          Meetings of what body?                              10:22:28

7       A. The Waltham Historical Commission, the              10:22:30

8   conservation commission.  And I believe that's the        10:22:34

9   only two.                                                  10:22:43

10      Q. Does WCAC through the MAC channel record            10:22:44

11  the meetings of every committee of the Waltham            10:22:56

12  City Council?                                              10:23:00

13      A. No.                                                 10:23:00

14      Q. How does WCAC decide which committees and           10:23:03

15  other city government bodies to record?                    10:23:11

16      A. We try to record as many as possible,               10:23:14

17  given staffing limitations.  There are two staff          10:23:23

18  members who typically shoot these government              10:23:31

19  meetings.  So they try to shoot as many committee         10:23:33

20  meetings, for instance, as possible, but there may        10:23:37

21  be some committee meetings that they can't shoot.          10:23:39

22      Q. Who are those two staff members?                    10:23:42

23      A. Bill Heatley and Christian Buday.                   10:23:57

24         And as I mentioned earlier, very                    10:24:02

| | | |
|---|---|---|
| 1 | occasionally I would record a government meeting | 10:24:05 |
| 2 | in the event that either of those two staff | 10:24:08 |
| 3 | members could not cover it.  And another staff | 10:24:10 |
| 4 | member, Phil, also would occasionally record one | 10:24:13 |
| 5 | of these meetings if either Bill or Christian was | 10:24:18 |
| 6 | unable to do it. | 10:24:23 |
| 7 | Q. Is that Phil McGrady? | 10:24:28 |
| 8 | A. Phil McGrady, yes. | 10:24:30 |
| 9 | Q. How do you spell Christian's last name? | 10:24:31 |
| 10 | A. B-U-D-A-Y. | 10:24:33 |
| 11 | Q. Thank you. | 10:24:36 |
| 12 | A. Yup. | 10:24:39 |
| 13 | Q. What types of equipment does WCAC use to | 10:24:44 |
| 14 | record government meetings? | 10:24:46 |
| 15 | A. So typically robotic cameras and a | 10:24:47 |
| 16 | switcher.  Switcher, robotic cameras, and | 10:25:07 |
| 17 | different types of microphones such as PZM | 10:25:13 |
| 18 | microphones. | 10:25:17 |
| 19 | Does that answer your question? | 10:25:26 |
| 20 | Q. It does.  But are there any other types of | 10:25:29 |
| 21 | equipment you would add? | 10:25:32 |
| 22 | A. So occasionally, for whatever reason, Phil | 10:25:32 |
| 23 | might be required to bring a more traditional | 10:25:40 |
| 24 | shoulder-mounted Sony news gathering camcorder to | 10:25:46 |

| | | |
|---|---|---|
| 1 | shoot a meeting. | 10:25:51 |
| 2 | If, say, the pan and tilt robotic camera | 10:25:53 |
| 3 | system was not working -- and we've had that issue | 10:25:58 |
| 4 | in the past, so he's obligated to shoot these | 10:26:02 |
| 5 | meetings, but sometimes the equipment breaks down, | 10:26:07 |
| 6 | but he still needs to create a recording. | 10:26:11 |
| 7 | So he will take a tripod and, you know, a | 10:26:14 |
| 8 | Sony camcorder to the room where the meeting is | 10:26:19 |
| 9 | held and try to create a recording of the meeting. | 10:26:23 |
| 10 | But it looks less professional than the recordings | 10:26:29 |
| 11 | he creates with the switcher, pan and tilt | 10:26:33 |
| 12 | cameras, and the PZM or other microphones. | 10:26:38 |
| 13 | Q. When you say "switcher," what does a | 10:26:42 |
| 14 | switcher do? | 10:26:44 |
| 15 | A. So at government center where some of the | 10:26:45 |
| 16 | meetings are shot there's a piece of technology | 10:26:48 |
| 17 | that allows a producer to select certain cameras, | 10:26:52 |
| 18 | add graphics, add other -- add a date, add the | 10:26:58 |
| 19 | date, the name of the meeting. So this switcher | 10:27:05 |
| 20 | allows the producer to create a professional | 10:27:11 |
| 21 | recording of the government meeting. | 10:27:14 |
| 22 | Q. Is there a robotic camera installed in the | 10:27:18 |
| 23 | Waltham City Council chamber? | 10:27:21 |
| 24 | A. Yes. | 10:27:22 |

| | | |
|---|---|---|
| 1 | Q. How many cameras? | 10:27:24 |
| 2 | A. I believe three cameras.  I believe three | 10:27:27 |
| 3 | cameras. | 10:27:37 |
| 4 | Q. During a typical meeting, is there a WCAC | 10:27:38 |
| 5 | employee in the council chamber directing the | 10:27:54 |
| 6 | cameras? | 10:27:58 |
| 7 | A. Yes. | 10:27:59 |
| 8 | Q. Is that person controlling all of the | 10:27:59 |
| 9 | robotic cameras? | 10:28:13 |
| 10 | A. Yes. | 10:28:15 |
| 11 | Q. How does WCAC make videos of Waltham | 10:28:16 |
| 12 | government meetings available to the public? | 10:28:46 |
| 13 | A. Okay.  For some of the meetings, for | 10:28:47 |
| 14 | instance the school committee meeting and the city | 10:28:58 |
| 15 | council meeting, the meetings are aired live.  So | 10:29:01 |
| 16 | the producer, as soon as the meeting starts the | 10:29:07 |
| 17 | producer airs whatever is happening in the council | 10:29:10 |
| 18 | chamber on our channel live. | 10:29:15 |
| 19 | For some of the other meetings, recordings | 10:29:21 |
| 20 | are made of the meetings for subsequent broadcast | 10:29:23 |
| 21 | on cable and streaming on our website. | 10:29:26 |
| 22 | Q. Are meetings that are recorded live also | 10:29:33 |
| 23 | recorded for subsequent broadcasts on your channel | 10:29:37 |
| 24 | and online? | 10:29:41 |

| | | |
|---|---|---|
| 1 | A. Yes. | 10:29:41 |
| 2 | Q. Other than broadcast on cable and | 10:29:42 |
| 3 | streaming on the website, does WCAC make meeting | 10:29:54 |
| 4 | videos available to the public in any other way? | 10:29:59 |
| 5 | A. Not that I'm aware of. | 10:30:01 |
| 6 | Can I amend my response? | 10:30:28 |
| 7 | Q. Yes. | 10:30:30 |
| 8 | A. Occasionally a request is made from, say, | 10:30:30 |
| 9 | a petitioner who appeared before one of these | 10:30:37 |
| 10 | boards.  They may seek a permanent record of a | 10:30:40 |
| 11 | meeting, say a meeting of the zoning board of | 10:30:46 |
| 12 | appeals, so they will request that a MAC channel | 10:30:49 |
| 13 | staff member create a DVD of that recording. | 10:30:54 |
| 14 | That's an additional way that the MAC | 10:30:59 |
| 15 | channel can make a meeting available to a member | 10:31:02 |
| 16 | of the public. | 10:31:07 |
| 17 | Now, the person requesting the DVD has to | 10:31:07 |
| 18 | pay a fee for that service. | 10:31:12 |
| 19 | Q. What's that fee? | 10:31:16 |
| 20 | A. $15. | 10:31:16 |
| 21 | Q. And who creates those DVDs? | 10:31:17 |
| 22 | A. Typically Bill Heatley. | 10:31:23 |
| 23 | Q. About how many times is each meeting shown | 10:31:28 |
| 24 | on the MAC-TV channel? | 10:31:32 |

| | | |
|---|---|---|
| 1 | A. It depends.  Some meetings may be shown | 10:31:34 |
| 2 | more than others.  So, for instance, a city | 10:31:52 |
| 3 | council meeting may be of greater interest and | 10:31:56 |
| 4 | would be shown more or a -- let's say a special | 10:31:59 |
| 5 | meeting of either the school committee or the city | 10:32:04 |
| 6 | council may be of greater interest. | 10:32:06 |
| 7 | There may be some meetings, say about a | 10:32:10 |
| 8 | proposed liquor store at a wholesale retailer, | 10:32:14 |
| 9 | that is very -- there's wide public interest.  We | 10:32:18 |
| 10 | may receive requests, oh, when is that meeting | 10:32:24 |
| 11 | airing? | 10:32:28 |
| 12 | And as a result, that meeting will air | 10:32:28 |
| 13 | maybe more often than, say, a two-minute meeting | 10:32:31 |
| 14 | of the license commission where the commission | 10:32:37 |
| 15 | convenes only to rubber-stamp a number of items. | 10:32:40 |
| 16 | And it may be of limited interest to the public. | 10:32:45 |
| 17 | Q. For a meeting of greater interest, | 10:32:50 |
| 18 | typically how many times would it be shown on the | 10:32:52 |
| 19 | MAC-TV channel? | 10:32:55 |
| 20 | A. I don't know. | 10:32:56 |
| 21 | Q. Is it more than five? | 10:32:56 |
| 22 | A. Yes. | 10:32:59 |
| 23 | Q. Is it more than 10? | 10:33:04 |
| 24 | A. Possibly. | 10:33:07 |

1      Q. Is it more than 20?                          10:33:14

2      A. I don't want -- I can't say.                 10:33:17

3      Q. For how many days after the meeting is a     10:33:22

4  meeting of high interest typically shown on the     10:33:33

5  MAC-TV channel?                                      10:33:35

6      A. Could be frequently.  It could be for a      10:33:36

7  month, especially if there's wide interest.         10:33:47

8      MR. PYLE:  I was wondering if now would be      10:33:59

9  a good time to take a break.  It's been about an    10:34:00

10  hour and a half.                                    10:34:03

11      MR. STOLTZ:  Absolutely.                        10:34:04

12      MR. PYLE:  Great.  Thanks.                      10:34:05

13      THE VIDEOGRAPHER:  We are going off the         10:34:06

14  record.  The time on the monitor is 10:34.         10:34:07

15      (Recess, 10:34 a.m. to 10:46 a.m.)             10:34:10

16      THE VIDEOGRAPHER:  We are back on the           10:46:27

17  record.  The time on the monitor is 10:46.         10:46:35

18  BY MR. STOLTZ:                                      10:46:38

19      Q. I had a couple of questions about things    10:46:43

20  we talked about before.  I think you mentioned      10:46:45

21  that somebody at WCAC gave you on-the-job training 10:46:47

22  in news.  Is that right?                            10:46:55

23      A. More like video production training.        10:46:56

24      Q. And who was that?                            10:47:03

1      A. Jeff Whiteley.                                    10:47:04

2      Q. Is he still at WCAC?                              10:47:06

3      A. No.  He's a TV teacher at Waltham High            10:47:08

4   School.                                                 10:47:12

5      Q. Was he employed at WCAC?                          10:47:12

6      A. Yes.                                              10:47:16

7      Q. And who was the city councillor accused of        10:47:16

8   defamation that you mentioned earlier?                  10:47:24

9      A. Sharline Nabulime.  And no legal action           10:47:26

10  was taken.  Only the possibility of legal action        10:47:40

11  was mentioned.                                          10:47:49

12     Q. Thank you.  We were talking about MAC-TV           10:47:53

13  and government meeting videos.  How long does WCAC      10:47:59

14  make meeting videos available on its website?           10:48:06

15     A. We have limited server space, so maybe for        10:48:10

16  two years possibly.                                     10:48:17

17     Q. Is there a third-party company that hosts          10:48:26

18  the videos that appear on the WCAC website?             10:48:30

19     A. Yes.                                              10:48:32

20     Q. What's that company called?                       10:48:34

21     A. TelVue.                                           10:48:37

22     Q. Does TelVue put captions on those videos?          10:48:40

23     A. I don't believe so.                               10:48:52

24     Q. Does WCAC add captions to those videos?            10:48:56

| | |
|---|---|
| 1 | A. No. | 10:49:02 |
| 2 | Q. Does WCAC post any meeting videos to | 10:49:03 |
| 3 | YouTube? | 10:49:09 |
| 4 | A. Possibly in the past.  But to my | 10:49:09 |
| 5 | knowledge, not currently. | 10:49:25 |
| 6 | Q. Do you know when WCAC did that? | 10:49:26 |
| 7 | A. I can't recall. | 10:49:32 |
| 8 | MR. PYLE:  Objection. | 10:49:34 |
| 9 | Q. Has WCAC posted meeting videos to YouTube | 10:49:35 |
| 10 | while you were news director? | 10:49:47 |
| 11 | A. The MAC channel had its own YouTube | 10:49:48 |
| 12 | channel which may or may not have meetings posted | 10:50:08 |
| 13 | to it.  I can't recall. | 10:50:13 |
| 14 | Q. Today, does WCAC regularly post videos to | 10:50:16 |
| 15 | that channel? | 10:50:26 |
| 16 | A. No. | 10:50:26 |
| 17 | Q. When did WCAC stop posting videos to that | 10:50:27 |
| 18 | channel regularly? | 10:50:35 |
| 19 | MR. PYLE:  Objection. | 10:50:36 |
| 20 | A. Twenty twenty -- I can't recall. | 10:50:37 |
| 21 | Q. Was it before the COVID pandemic? | 10:50:58 |
| 22 | A. I believe so. | 10:51:01 |
| 23 | Q. In 2023, was WCAC regularly posting | 10:51:04 |
| 24 | government meeting videos at any other online | 10:51:32 |

1   location?                                              10:51:38

2       A. Not to my knowledge.                            10:51:38

3       Q. Why did WCAC stop regularly posting MAC-TV      10:51:46

4   videos to YouTube?                                     10:52:05

5       MR. PYLE:  Objection.                              10:52:06

6       A. I don't know.  I do not know.                   10:52:07

7       Q. Who would have been in charge of that sort      10:52:10

8   of posting?                                            10:52:20

9       A. Bill Heatley or a former staff member at        10:52:21

10  the time, Kerry Quinlan.                               10:52:27

11      Q. Has WCAC made any kind of commitment to         10:52:36

12  the Waltham city government to record government       10:52:40

13  meetings?                                              10:52:41

14      A. Could you repeat that?                           10:52:42

15      Q. Has WCAC made a commitment to the Waltham       10:52:46

16  city government to record government meetings?         10:52:53

17      A. I know we shoot the meetings.  I don't          10:52:55

18  know -- when you say "commitment," do you mean         10:53:03

19  like a contract or . . .                               10:53:07

20      Q. Do you know if there is such a contract?        10:53:10

21      A. Contracts exist between the cable               10:53:12

22  providers and the city, but it's not something I      10:53:17

23  have detailed information about.                       10:53:27

24      Q. Is there a contract between WCAC and the        10:53:30

| | | |
|---|---|---|
| 1 | city? | 10:53:32 |
| 2 | A. I do not know. | 10:53:32 |
| 3 | Q. Why does WCAC record government meetings? | 10:53:38 |
| 4 | A. It's part of the -- cable access stations | 10:53:46 |
| 5 | typically have a public component, educational | 10:53:51 |
| 6 | component, and a government component. That's why | 10:53:55 |
| 7 | they're called PEG channels. | 10:53:58 |
| 8 | So public would be like the football show | 10:54:01 |
| 9 | that Phil produces or shows produced by community | 10:54:06 |
| 10 | producers. | 10:54:11 |
| 11 | Educational would be content that's | 10:54:12 |
| 12 | produced at the high school by Jeff Whiteley and | 10:54:15 |
| 13 | his students. | 10:54:18 |
| 14 | And then that third arm of the public | 10:54:19 |
| 15 | access reach is the government. And so most cable | 10:54:22 |
| 16 | access stations I'm aware of record government | 10:54:27 |
| 17 | meetings in order to promote transparency as part | 10:54:32 |
| 18 | of the mission of the cable access stations. | 10:54:37 |
| 19 | Q. Is that why WCAC records government | 10:54:41 |
| 20 | meetings? | 10:54:44 |
| 21 | A. I believe so. | 10:54:45 |
| 22 | Q. Is there any other reason? | 10:55:01 |
| 23 | A. For instance, so residents can learn about | 10:55:14 |
| 24 | the actions of their government and be better | 10:55:21 |

| | | |
|---|---|---|
| 1 | informed and make better decisions. | 10:55:23 |
| 2 | Q. To your knowledge, does the Waltham city | 10:55:31 |
| 3 | government itself record any city government | 10:55:37 |
| 4 | meetings on video? | 10:55:40 |
| 5 | A. Not to my knowledge. | 10:55:41 |
| 6 | Q. To your knowledge, does anyone besides | 10:55:44 |
| 7 | WCAC regularly record Waltham city government | 10:55:50 |
| 8 | meetings on video? | 10:55:53 |
| 9 | A. Perhaps not regularly but occasionally, | 10:55:54 |
| 10 | yes. | 10:56:04 |
| 11 | Q. And who would that be? | 10:56:04 |
| 12 | A. For instance, Channel 781. They recorded | 10:56:08 |
| 13 | meetings -- they either recorded meetings that we | 10:56:16 |
| 14 | were also recording or they recorded committee | 10:56:19 |
| 15 | meetings that our channel was unable to record | 10:56:23 |
| 16 | because of staffing shortages. | 10:56:28 |
| 17 | Q. Does anyone else regularly record Waltham | 10:56:32 |
| 18 | city government meetings besides WCAC and | 10:56:36 |
| 19 | Channel 781? | 10:56:39 |
| 20 | A. Not to my knowledge. | 10:56:40 |
| 21 | Q. Do the government meeting videos broadcast | 10:56:44 |
| 22 | on MAC-TV include any commentary on the meeting? | 10:56:56 |
| 23 | A. What do you mean by "commentary"? | 10:56:59 |
| 24 | Q. Do the government meeting videos include | 10:57:10 |

| | | |
|---|---|---|
| 1 | any commentary by WCAC staff? | 10:57:20 |
| 2 | A. No. | 10:57:25 |
| 3 | Q. Do those videos include the opinions of | 10:57:30 |
| 4 | WCAC? | 10:57:33 |
| 5 | A. No. | 10:57:35 |
| 6 | Q. Why not? | 10:57:35 |
| 7 | A. The meetings are recorded in an unedited | 10:57:43 |
| 8 | fashion. And as much as possible, the producer of | 10:57:54 |
| 9 | the recordings tries to pick out in a close-up the | 10:58:03 |
| 10 | person who is speaking so it's clear that the | 10:58:07 |
| 11 | audience knows who's speaking. | 10:58:09 |
| 12 | And they may make other decisions during | 10:58:12 |
| 13 | shooting. But typically the recordings only | 10:58:15 |
| 14 | include what is said by the government officials | 10:58:19 |
| 15 | or people who may be speaking from the public if, | 10:58:21 |
| 16 | for instance, it's a public hearing. Those are | 10:58:24 |
| 17 | the only persons that are shown and heard in these | 10:58:27 |
| 18 | government meetings. | 10:58:30 |
| 19 | (Wangler Exhibit 36 was marked for | 10:58:43 |
| 20 | identification and is attached to the transcript.) | 10:58:54 |
| 21 | Q. I'm showing you what's been marked as | 10:58:54 |
| 22 | Exhibit 36. Do you recognize this document? | 10:58:55 |
| 23 | A. No. I'm afraid I'm not familiar with this | 10:59:00 |
| 24 | document. | 10:59:17 |

| | | |
|---|---|---|
| 1 | Q. So I can represent that this was produced | 10:59:18 |
| 2 | to us from WCAC.  Do you know who might have | 10:59:47 |
| 3 | written it? | 10:59:49 |
| 4 | A. BOD approval pending, September 2023, | 10:59:50 |
| 5 | would lead me to believe that it had been written | 11:00:11 |
| 6 | possibly by the executive director, Maria Sheehan, | 11:00:15 |
| 7 | but I can't say for certain. | 11:00:22 |
| 8 | Q. Do you know if the board of directors | 11:00:24 |
| 9 | approved this document? | 11:00:44 |
| 10 | A. I don't know that.  I'm afraid I don't | 11:00:45 |
| 11 | know that. | 11:00:48 |
| 12 | Q. If you would please look at page 2 of this | 11:00:48 |
| 13 | document. | 11:01:06 |
| 14 | A. Yes. | 11:01:08 |
| 15 | Q. Near the top where it says "1B," a | 11:01:08 |
| 16 | paragraph beginning "Meeting telecasts," could you | 11:01:15 |
| 17 | read that paragraph, please. | 11:01:19 |
| 18 | A. "Meeting telecasts should be consistent in | 11:01:20 |
| 19 | terms of content, appearance, and viewability. | 11:01:22 |
| 20 | Wherever feasible, the speaker should be | 11:01:25 |
| 21 | on-camera.  Wherever possible, a graphic | 11:01:28 |
| 22 | indicating the meeting and date should be shown." | 11:01:30 |
| 23 | Q. Does WCAC typically follow those | 11:01:36 |
| 24 | guidelines for government meetings? | 11:01:41 |

1    A. Yes, but with the exception I gave                11:01:43

2    earlier.  In the event that the switcher and         11:01:51

3    robotic camera system is not operating, a MAC        11:01:54

4    channel photographer may not be able to put the      11:02:00

5    speaker on camera with the same efficiency to show   11:02:06

6    in close-up as they could if they had a switcher.    11:02:12

7         And if the meeting is shot with a camera,       11:02:18

8    like a news gathering camera, the graphics           11:02:22

9    indicating the meeting and date cannot be shown      11:02:26

10   while the producer is photographing the meeting      11:02:29

11   because the news gathering camera does not have      11:02:33

12   the ability to put up a graphic.                     11:02:37

13   Q. Other than those circumstances, do               11:02:42

14   government meeting videos always include a graphic   11:02:46

15   indicating the meeting and date?                     11:02:49

16   A. Yes.                                             11:02:51

17   Q. Are there any other graphics that are            11:02:51

18   typically included in a government meeting video?    11:03:00

19   A. At times a petitioner will appear before a       11:03:02

20   government board and present, say, a PowerPoint      11:03:10

21   presentation.  I don't know if that would count as  11:03:14

22   a graphic.                                           11:03:17

23        But that PowerPoint presentation can be        11:03:18

24   broadcast as part of the MAC channel production so   11:03:22

1    that viewers at home can see what the petitioner        11:03:28

2    is speaking about at the lectern.                        11:03:32

3        Q. Is it WCAC's regular practice to include          11:03:34

4    the MAC-TV logo on government meeting videos?            11:03:45

5        A. Yes.                                              11:03:48

6        Q. Could you read the next paragraph, please,        11:03:49

7    Paragraph C.                                             11:04:17

8        A. "C.  Series programming should be                 11:04:18

9    consistent in terms of content, appearance, and         11:04:23

10   viewability from episode to episode."                   11:04:26

11       Q. Is that WCAC's regular practice with              11:04:31

12   respect to government meeting videos?                    11:04:33

13       A. Yes.                                              11:04:36

14       Q. Is it WCAC's regular practice, aside from         11:04:37

15   the exceptions that you mentioned already, to put        11:04:47

16   the speaker on camera during a government meeting        11:04:51

17   video?                                                   11:04:55

18       A. As much as possible, yes.                         11:04:55

19       Q. If you could turn the page, please, and           11:04:57

20   look at the section marked 4A near the top.  Could       11:05:15

21   you read that paragraph, please.                         11:05:25

22       A. Yup.  "A.  WCAC MAC-TV produces unedited,          11:05:26

23   uncensored, and unbiased coverage of open                11:05:35

24   municipal meetings.  Through our coverage, we            11:05:37

1    provide a way for the viewer to witness a meeting          11:05:40

2    as if she/he were in the meeting chamber."                 11:05:43

3        Q. Is that a regular practice of WCAC?                 11:05:51

4        A. Yes.                                                11:05:53

5        Q. Could you read the first sentence under            11:05:54

6    Part B, please.                                            11:06:01

7        A. "Coverage, whether live or taped, is gavel          11:06:02

8    to gavel, beginning when the meeting is called to          11:06:08

9    order and ending when the meeting is adjourned.            11:06:11

10   This applies only to open sessions, i.e., open to          11:06:16

11   the public.                                                11:06:21

12        "Executive sessions are not covered                   11:06:23

13   because the public is excluded from attendance.            11:06:26

14   An executive session that is conducted within,            11:06:28

15   rather than after, an open session is the only             11:06:32

16   reason a taping or live telecast may be                    11:06:35

17   interrupted."                                              11:06:37

18       Q. Is that a regular practice of WCAC with             11:06:41

19   respect to government meeting videos?                      11:06:43

20       A. Yes.                                                11:06:46

21       Q. Could you read just the first sentence             11:06:47

22   under Part C.                                              11:06:58

23       A. "Part C.  Under no circumstances should            11:07:00

24   any part of a recording or live telecast of an             11:07:07

| | | |
|---|---|---|
| 1 | open meeting be altered either as the meeting | 11:07:11 |
| 2 | occurs or in postproduction editing." | 11:07:15 |
| 3 | Q. Is that a regular practice of WCAC with | 11:07:18 |
| 4 | respect to government meeting videos? | 11:07:23 |
| 5 | A. Yes. | 11:07:25 |
| 6 | Q. And could you please read the first two | 11:07:25 |
| 7 | sentences under Part D. | 11:07:31 |
| 8 | A. "The producer should be an unbiased | 11:07:32 |
| 9 | nonparticipant in the meeting she/he is covering. | 11:07:38 |
| 10 | Anyone who might possibly participate in a meeting | 11:07:45 |
| 11 | should not produce that session." | 11:07:46 |
| 12 | Q. Is that a regular practice of WCAC with | 11:07:51 |
| 13 | respect to government meeting videos? | 11:07:54 |
| 14 | A. Yes. | 11:07:56 |
| 15 | Q. Thank you.  Do episodes of Waltham | 11:07:56 |
| 16 | Newswatch ever include clips of MAC-TV meeting | 11:08:18 |
| 17 | videos? | 11:08:21 |
| 18 | A. Yes. | 11:08:21 |
| 19 | Q. Do any other programs produced by WCAC | 11:08:21 |
| 20 | include clips of MAC-TV meeting videos? | 11:08:32 |
| 21 | A. Not to my knowledge. | 11:08:35 |
| 22 | Q. Are you aware of any programming that's | 11:08:49 |
| 23 | shown on The Waltham Channel but not produced by | 11:09:01 |
| 24 | WCAC that uses clips of MAC-TV meeting videos? | 11:09:07 |

| | | |
|---|---|---|
| 1 | A. Could you say that once more? | 11:09:15 |
| 2 | Q. Are there programs that are aired on WCAC | 11:09:16 |
| 3 | that are not produced by WCAC that include clips | 11:09:27 |
| 4 | of MAC-TV meeting videos? | 11:09:32 |
| 5 | A. That appear on our channel? | 11:09:34 |
| 6 | Q. Yes.  Correct. | 11:09:43 |
| 7 | A. I don't know.  I'm sorry.  I don't know. | 11:09:50 |
| 8 | Q. There are none that you're aware of? | 11:09:53 |
| 9 | A. So you're asking about shows on our | 11:09:58 |
| 10 | channel produced externally that include MAC | 11:10:09 |
| 11 | channel government meeting footage.  Is that | 11:10:13 |
| 12 | correct? | 11:10:18 |
| 13 | Q. Let me ask it a different way. | 11:10:19 |
| 14 | Excluding Waltham Newswatch, is there any | 11:10:22 |
| 15 | programming on The Waltham Channel that includes | 11:10:28 |
| 16 | clips from MAC-TV meeting videos? | 11:10:30 |
| 17 | A. Not that I'm aware of. | 11:10:33 |
| 18 | Q. Do you edit episodes of Waltham Newswatch? | 11:10:44 |
| 19 | A. Yes and no.  I edit some of the news | 11:10:58 |
| 20 | packages that are part of Waltham Newswatch, but a | 11:11:08 |
| 21 | different editor assembles the entire program. | 11:11:13 |
| 22 | So there's two levels of editing involved. | 11:11:16 |
| 23 | That secondary editor also performs some simpler | 11:11:19 |
| 24 | editing on Waltham Newswatch. | 11:11:25 |

1    Q. Who is that second editor?                       11:11:26

2    A. Christian Buday.                                  11:11:30

3    Q. When you use clips from MAC-TV meeting            11:11:32

4    videos in an episode of Waltham Newswatch, who       11:11:41

5    creates those clips?                                 11:11:44

6    A. The clips that are used on Waltham                11:11:45

7    Newswatch?                                           11:11:52

8    Q. Correct.                                          11:11:53

9    A. The person who records whichever                  11:11:54

10   government meeting is used.                          11:11:56

11   Q. Who selects the clip that is used in an           11:11:59

12   episode of Waltham Newswatch?                        11:12:02

13   A. So I do typically, but another staff              11:12:03

14   member could also be called upon to do that.  But    11:12:14

15   typically I, with the government meeting footage     11:12:20

16   incorporated into Waltham Newswatch, I am the        11:12:23

17   person who takes the government meeting footage      11:12:26

18   and determines which clips to use.                   11:12:30

19   Q. How do you decide what to clip?                   11:12:32

20   A. That's a good question.  Having done this         11:12:48

21   job for 15 years, I understand what is a good        11:12:57

22   sound bite and what is not.                          11:13:01

23   Q. What do you believe makes a good sound            11:13:06

24   bite?                                                11:13:10

| | |
|---|---|
| 1 | MR. PYLE:  Objection. | 11:13:10 |
| 2 | A. Something that reinforces the thrust of | 11:13:11 |
| 3 | the story or something of interest to the public | 11:13:23 |
| 4 | as it relates to the story. | 11:13:33 |
| 5 | Q. How do you decide where the clip begins | 11:13:41 |
| 6 | and ends? | 11:13:43 |
| 7 | A. Like any reporter, generally the most | 11:13:44 |
| 8 | essential part of whatever the clip happens to be | 11:14:03 |
| 9 | and nothing additional because efficiency in news | 11:14:09 |
| 10 | reporting is prized. | 11:14:15 |
| 11 | So you wouldn't want to select -- and this | 11:14:17 |
| 12 | is a mistake that younger editors make.  You | 11:14:19 |
| 13 | wouldn't want to select a long boring sound bite | 11:14:21 |
| 14 | if you can make the same point in something | 11:14:24 |
| 15 | shorter. | 11:14:28 |
| 16 | Q. Why does Waltham Newswatch include clips | 11:14:37 |
| 17 | of MAC-TV meeting videos from time to time? | 11:14:49 |
| 18 | A. Very newsworthy. | 11:14:52 |
| 19 | Q. Would you say, then, that you select those | 11:15:09 |
| 20 | clips in part based on how newsworthy they are? | 11:15:11 |
| 21 | A. Yes. | 11:15:13 |
| 22 | Q. Why does Waltham Newswatch include clips | 11:15:15 |
| 23 | of MAC-TV meeting videos when the videos of the | 11:15:22 |
| 24 | entire meetings are available on the MAC-TV | 11:15:25 |

1    channel and on the website?                          11:15:28

2        A. It provides an additional way for the         11:15:29

3    public to learn about the topic at hand.             11:15:45

4        Q. Why don't you simply direct the public to     11:15:51

5    the video on MAC-TV or on the website of the         11:16:03

6    entire meeting?                                       11:16:06

7        A. The public can watch the entire meeting       11:16:08

8    because it's hosted on our website, but they could   11:16:13

9    also watch a story about the meeting on my news      11:16:16

10   program and in either way could learn about the      11:16:21

11   topic at hand.                                        11:16:26

12       One requires a greater time commitment.          11:16:29

13   One may be less of a full account of what            11:16:32

14   happened.  A news story is less of a full account    11:16:45

15   of what happened.                                     11:16:48

16       Q. Do the clips of MAC-TV videos that are        11:16:48

17   used within Waltham Newswatch serve a different      11:17:05

18   purpose than the complete meeting videos that are    11:17:09

19   shown on MAC-TV and posted to the website?           11:17:16

20       A. Could you say that one more time?  I'm        11:17:18

21   sorry.  Repeat it.                                    11:17:27

22       Q. So you testified that from time to time       11:17:28

23   you use clips of government meeting videos in        11:17:34

24   Waltham Newswatch.  Correct?                          11:17:39

| | | |
|---|---|---|
| 1 | A. Yes. | 11:17:41 |
| 2 | Q. And WCAC also posts entire meetings to its | 11:17:41 |
| 3 | website and shows them on MAC-TV.  Is that right? | 11:17:48 |
| 4 | A. Yes. | 11:17:50 |
| 5 | Q. Do those two uses of government meeting | 11:17:50 |
| 6 | videos serve different purposes? | 11:17:57 |
| 7 | A. I mean, both exist to inform the public | 11:17:59 |
| 8 | about whatever the issue is at hand.  The news | 11:18:09 |
| 9 | story does so in a way that's more concise and may | 11:18:15 |
| 10 | include additional context. | 11:18:20 |
| 11 | So for instance, an entire meeting may | 11:18:23 |
| 12 | cover, say, the third hearing for a 40B housing | 11:18:28 |
| 13 | project.  If you were only to watch that | 11:18:35 |
| 14 | government meeting, you might not appreciate | 11:18:38 |
| 15 | everything that has happened in the previous two | 11:18:43 |
| 16 | meetings. | 11:18:45 |
| 17 | So a news story can -- even though it's | 11:18:47 |
| 18 | shorter can fill in some of the blanks and bring a | 11:18:50 |
| 19 | greater understanding of any given topic than a | 11:18:53 |
| 20 | full meeting. | 11:18:57 |
| 21 | That said, if you were to watch all three | 11:18:58 |
| 22 | zoning board of appeal meetings, you would have | 11:19:01 |
| 23 | the fullest potential understanding. | 11:19:04 |
| 24 | Q. That would take a long time, wouldn't it? | 11:19:09 |

| | | |
|---|---|---|
| 1 | A. Yes.  But some of our viewers want that | 11:19:11 |
| 2 | level of understanding so they will watch a number | 11:19:14 |
| 3 | of zoning board of appeals meetings in a row. | 11:19:19 |
| 4 | Other viewers prefer a reporter's report on what's | 11:19:22 |
| 5 | happening. | 11:19:30 |
| 6 | Q. Would you say that the use of clips of | 11:19:36 |
| 7 | government meeting videos within Waltham Newswatch | 11:19:49 |
| 8 | helps the public understand what is happening in | 11:19:53 |
| 9 | the city government? | 11:19:57 |
| 10 | A. Yes. | 11:19:58 |
| 11 | Q. Which employees of WCAC, if any, handle | 11:20:00 |
| 12 | copyright issues? | 11:20:21 |
| 13 | A. Typically me. | 11:20:22 |
| 14 | Q. Anyone else? | 11:20:29 |
| 15 | A. Not that I'm aware of. | 11:20:30 |
| 16 | Q. Does Maria Sheehan handle copyright | 11:20:40 |
| 17 | issues? | 11:20:45 |
| 18 | A. Yeah.  Yes.  But her understanding is | 11:20:47 |
| 19 | different than mine because she's less involved in | 11:20:54 |
| 20 | the day-to-day issues that come up with producing | 11:20:58 |
| 21 | news that are often related to copyright. | 11:21:03 |
| 22 | Q. Does WCAC have a lawyer on staff? | 11:21:10 |
| 23 | A. No. | 11:21:13 |
| 24 | Q. Is there a lawyer who WCAC consults with | 11:21:13 |

| 1  | regularly about copyright issues?                        | 11:21:20 |
| 2  |     A. Jeff Pyle.                                         | 11:21:22 |
| 3  |     Q. Anyone else?                                       | 11:21:31 |
| 4  |     A. Not to my knowledge.                               | 11:21:32 |
| 5  |     Q. When WCAC creates a video, in your                | 11:21:33 |
| 6  | understanding what rights does WCAC have in              | 11:21:46 |
| 7  | connection with that video?                              | 11:21:49 |
| 8  |     A. So it depends.  I mean, it depends.  For           | 11:21:50 |
| 9  | instance, a producer who produces their own show,        | 11:22:15 |
| 10 | they own the copyright, in my understanding.             | 11:22:22 |
| 11 |     There's a different situation with                   | 11:22:27 |
| 12 | government meetings where we might control the           | 11:22:31 |
| 13 | copyright and then a different situation would           | 11:22:34 |
| 14 | apply for, say, the news program I produce.              | 11:22:38 |
| 15 |     Q. What's the difference between government           | 11:23:08 |
| 16 | meetings -- strike that.                                 | 11:23:10 |
| 17 |     What's the difference between government             | 11:23:13 |
| 18 | meeting videos that WCAC creates and the news            | 11:23:15 |
| 19 | program you produce with respect to the rights           | 11:23:22 |
| 20 | that WCAC has?                                            | 11:23:30 |
| 21 |     MR. PYLE:  Objection.                                 | 11:23:31 |
| 22 |     A. When I recorded government meetings, those         | 11:23:32 |
| 23 | meetings had a copyright disclaimer at the               | 11:23:38 |
| 24 | beginning of the meeting and the end of the              | 11:23:42 |

| | | |
|---|---|---|
| 1 | meeting.  My news program does not include the | 11:23:44 |
| 2 | same disclaimer -- disclaimers. | 11:23:47 |
| 3 | Q. With the caveat that I'm not asking you | 11:23:55 |
| 4 | for any advice you may have received from an | 11:24:14 |
| 5 | attorney, why do the MAC-TV government meeting | 11:24:17 |
| 6 | videos include copyright disclaimers? | 11:24:23 |
| 7 | MR. PYLE:  And I'll interject and instruct | 11:24:28 |
| 8 | the witness to answer the question only to the | 11:24:30 |
| 9 | extent you can do so without revealing advice of | 11:24:32 |
| 10 | counsel. | 11:24:34 |
| 11 | A. Okay.  So could you rephrase, please? | 11:24:37 |
| 12 | Q. Why do MAC-TV government meeting videos | 11:24:39 |
| 13 | include copyright disclaimers? | 11:24:46 |
| 14 | A. When I shot the meetings, I was told to | 11:24:48 |
| 15 | have the copyright disclaimers.  I don't know why | 11:24:53 |
| 16 | those copyright disclaimers were added or who made | 11:25:04 |
| 17 | the decision to add them. | 11:25:07 |
| 18 | Q. Who told you to add them? | 11:25:09 |
| 19 | A. The MAC channel coordinator, Bill Heatley, | 11:25:11 |
| 20 | in teaching me how to record government meetings | 11:25:18 |
| 21 | in the basement of government center, instructed | 11:25:20 |
| 22 | me to add these copyright disclaimers at the | 11:25:23 |
| 23 | beginning of the meeting and the end of the | 11:25:26 |
| 24 | meeting, leading me to believe that these meetings | 11:25:28 |

1   were copyright protected because other government          11:25:31

2   meetings had similar disclaimers.                          11:25:34

3       Q. You said that there are no such                     11:25:40

4   disclaimers on the Waltham Newswatch program.  Why         11:25:44

5   not?                                                       11:25:50

6       MR. PYLE:  You need to answer verbally.                11:25:50

7   You just nodded your head.                                 11:25:52

8       Q. Pardon me.  Let me ask the question again.          11:25:57

9       You said that there are no such                        11:25:59

10  disclaimers on the Waltham News program.  Why not?         11:26:00

11      A. I guess the person who had produced the             11:26:03

12  show before me didn't add them.  It wasn't part of         11:26:13

13  the graphics incorporated into the program, so it          11:26:17

14  was not a practice I adopted or it was not a                11:26:22

15  practice adopted by the person who assembled the           11:26:25

16  news, so it did not have a disclaimer.                      11:26:27

17      This program existed before in a different             11:26:35

18  form.  Waltham Newswatch existed before in a                11:26:40

19  different form.                                             11:26:43

20      Q. Before June of 2023, did WCAC ever have to          11:26:43

21  decide whether some use of copyrighted material            11:27:20

22  was a fair use?                                            11:27:25

23      A. Do you mean our use or another's use?               11:27:29

24      Q. Either of those.                                    11:27:35

| | | |
|---|---|---|
| 1 | A. The scenario described earlier with the | 11:27:36 |
| 2 | yearbook photo as well as the photo from Haiti | 11:27:48 |
| 3 | that required me to be familiar with the fair use | 11:27:55 |
| 4 | doctrine and make a determination about fair use | 11:27:56 |
| 5 | because I was not able to secure the permission of | 11:28:04 |
| 6 | the rights holder. | 11:28:06 |
| 7 | Q. Were there any other instances besides | 11:28:14 |
| 8 | those two? | 11:28:15 |
| 9 | A. Probably, but I can't recall currently.  I | 11:28:16 |
| 10 | can't recall currently. | 11:28:38 |
| 11 | But say if there was someone from Waltham | 11:28:40 |
| 12 | involved in newsworthy activities in, say -- on a | 11:28:50 |
| 13 | reality TV show and it was newsworthy for my | 11:28:57 |
| 14 | program, I would consider reproducing video from | 11:29:04 |
| 15 | that reality TV show if I was not able to contact | 11:29:10 |
| 16 | the rights holder and consider that a legitimate | 11:29:16 |
| 17 | fair use exception. | 11:29:19 |
| 18 | Q. Did that scenario happen? | 11:29:23 |
| 19 | A. Yes.  I believe so.  Someone from Waltham | 11:29:25 |
| 20 | appeared on Top Chef, which is a reality TV | 11:29:41 |
| 21 | program I believe on one of the cable networks. | 11:29:50 |
| 22 | And I created a series of videos more than | 11:29:57 |
| 23 | ten years ago about this contestant's appearance | 11:30:04 |
| 24 | on that reality show because he was a Waltham | 11:30:08 |

| | | |
|---|---|---|
| 1 | resident. | 11:30:11 |
| 2 | Q. Did you use footage from the show in the | 11:30:17 |
| 3 | video that you created? | 11:30:20 |
| 4 | A. Yes. | 11:30:21 |
| 5 | Q. Did you get permission from the network or | 11:30:22 |
| 6 | anyone else to use that footage? | 11:30:26 |
| 7 | A. I can't recall. | 11:30:27 |
| 8 | Q. Did you consider whether using that | 11:30:31 |
| 9 | footage was a fair use? | 11:30:40 |
| 10 | A. Yes. | 11:30:42 |
| 11 | Q. What went into that consideration? | 11:30:43 |
| 12 | A. The footage was being used for news | 11:30:49 |
| 13 | reporting.  My use of the footage was | 11:30:56 |
| 14 | transformative in that the Waltham angle on this | 11:31:02 |
| 15 | program involving people from all over America was | 11:31:07 |
| 16 | the focus.  And I was not monetarily benefiting | 11:31:10 |
| 17 | from the use of this footage. | 11:31:19 |
| 18 | Q. Did the length of the clip that you used, | 11:31:29 |
| 19 | was that part of your consideration? | 11:31:34 |
| 20 | A. Yes.  In my recollection, I was able to | 11:31:35 |
| 21 | record the entire episode and then use only the | 11:31:46 |
| 22 | parts that involved the Waltham guy. | 11:31:52 |
| 23 | Q. Do you recall whether the copyright owner | 11:32:14 |
| 24 | of Top Chef ever contacted you about that? | 11:32:16 |

| | | |
|---|---|---|
| 1 | A. No. | 11:32:22 |
| 2 | Q. Sorry.  Let me rephrase. | 11:32:24 |
| 3 | Did the copyright owner of Top Chef ever | 11:32:31 |
| 4 | contact you about that? | 11:32:33 |
| 5 | A. Nope. | 11:32:36 |
| 6 | Q. You used the term "transformative" a few | 11:32:51 |
| 7 | minutes ago.  You said your use of the footage was | 11:33:41 |
| 8 | transformative.  What do you understand that to | 11:33:44 |
| 9 | mean with respect to fair use? | 11:33:49 |
| 10 | A. That the use of the copyright-protected | 11:33:51 |
| 11 | media changed to such an extent that it created | 11:34:01 |
| 12 | this fair use exception. | 11:34:08 |
| 13 | Q. Was that video made for WCAC? | 11:34:24 |
| 14 | A. Which one? | 11:34:31 |
| 15 | Q. The story about the Waltham guy who was on | 11:34:31 |
| 16 | Top Chef, was that made for WCAC? | 11:34:35 |
| 17 | A. It was made for Waltham Newswatch.  It was | 11:34:38 |
| 18 | more than one video, too.  It was here is what he | 11:34:43 |
| 19 | did this week, here is what he did the next week. | 11:34:46 |
| 20 | Q. Did WCAC alter the clips of Top Chef at | 11:34:58 |
| 21 | all when you -- | 11:35:11 |
| 22 | A. You mean edit or . . . | 11:35:18 |
| 23 | Q. I apologize.  When you included clips from | 11:35:22 |
| 24 | Top Chef in Waltham Newswatch, did you alter those | 11:35:27 |

| | | |
|---|---|---|
| 1 | clips in any way? | 11:35:31 |
| 2 | A. As I mentioned, they were edited.  Five | 11:35:32 |
| 3 | contestants, here is the clips with the Waltham | 11:35:40 |
| 4 | guy, edit those clips, identify those clips, and | 11:35:45 |
| 5 | then find the most interesting among those clips | 11:35:50 |
| 6 | and create a news package about it. | 11:35:54 |
| 7 | Q. Within those clips, did you alter the | 11:35:56 |
| 8 | video in any way? | 11:36:03 |
| 9 | A. Do you mean -- what do you mean by | 11:36:04 |
| 10 | "alter"?  I mean -- so yes.  So for some of the | 11:36:09 |
| 11 | clips, some of the clips served as B-Roll.  And | 11:36:13 |
| 12 | that involves altering.  A B-Roll clip will only | 11:36:19 |
| 13 | show the video and the sound from the original | 11:36:22 |
| 14 | broadcast is removed.  The sound is brought down. | 11:36:27 |
| 15 | So does that answer your question?  So | 11:36:31 |
| 16 | yes, I did alter some of the clips.  Yeah. | 11:36:33 |
| 17 | Q. Did some of those clips as they appeared | 11:36:35 |
| 18 | on Waltham Newswatch include the original sound? | 11:36:44 |
| 19 | A. Yes. | 11:36:47 |
| 20 | Q. Before 2023 and aside from Channel 781, | 11:36:48 |
| 21 | did WCAC ever identify some online material that | 11:37:40 |
| 22 | it believed infringed WCAC's copyright? | 11:37:49 |
| 23 | MR. PYLE:  Objection. | 11:37:58 |
| 24 | A. I don't believe so. | 11:38:01 |

| | | |
|---|---|---|
| 1 | Q. Before June of 2023, did WCAC ever send an | 11:38:02 |
| 2 | infringement notice to YouTube? | 11:38:28 |
| 3 | A. Not to my knowledge. | 11:38:36 |
| 4 | Q. Has WCAC ever sent an infringement notice | 11:38:41 |
| 5 | to any other online platform besides YouTube? | 11:38:48 |
| 6 | A. Not to my knowledge. | 11:38:51 |
| 7 | Q. Aside from Channel 781, has WCAC ever | 11:38:57 |
| 8 | written a letter accusing someone of copyright | 11:39:08 |
| 9 | infringement? | 11:39:15 |
| 10 | A. Not that I can recall. | 11:39:15 |
| 11 | Q. How often does WCAC receive requests to | 11:39:28 |
| 12 | use its copyright material? | 11:39:36 |
| 13 | A. Periodically. | 11:39:38 |
| 14 | Q. About how often would you say? | 11:39:42 |
| 15 | A. Once every six months.  Could be more | 11:39:44 |
| 16 | often depending on -- depending on different | 11:39:52 |
| 17 | circumstances. | 11:40:01 |
| 18 | Q. What is a circumstance that might lead to | 11:40:06 |
| 19 | WCAC receiving more requests to use copyrighted | 11:40:12 |
| 20 | material? | 11:40:15 |
| 21 | A. For instance, let's say I have images or | 11:40:16 |
| 22 | video of someone who suddenly becomes newsworthy | 11:40:23 |
| 23 | for the entire region.  We would receive more | 11:40:27 |
| 24 | requests than typical to reproduce that media | 11:40:33 |

| | | |
|---|---|---|
| 1 | because of its newsworthiness beyond Waltham. | 11:40:38 |
| 2 | Q. What type of person or entity typically | 11:40:49 |
| 3 | makes those requests? | 11:40:52 |
| 4 | A. Do you mean at network affiliates? | 11:40:53 |
| 5 | Q. Do network affiliates make those requests? | 11:41:02 |
| 6 | A. Yes. | 11:41:10 |
| 7 | Q. Do newspapers ever make those requests? | 11:41:10 |
| 8 | A. Possibly, but not for a significant amount | 11:41:14 |
| 9 | of time.  More typically assignment editors from | 11:41:28 |
| 10 | TV network affiliates call, make a request to | 11:41:34 |
| 11 | reproduce a photo or other media created by us and | 11:41:40 |
| 12 | for which we control the copyright, and ask how we | 11:41:45 |
| 13 | would like to be credited. | 11:41:49 |
| 14 | Q. Does WCAC ever receive requests to use | 11:42:01 |
| 15 | copyrighted media from amateur journalists who are | 11:42:15 |
| 16 | not affiliated with a network affiliate or a | 11:42:19 |
| 17 | newspaper? | 11:42:22 |
| 18 | A. You said amateur journalists or -- | 11:42:22 |
| 19 | Q. Yes. | 11:42:42 |
| 20 | A. -- persons not affiliated with network | 11:42:43 |
| 21 | affiliates? | 11:42:46 |
| 22 | Q. That's right. | 11:42:46 |
| 23 | A. Yes, we have received those type of | 11:42:47 |
| 24 | requests. | 11:42:49 |

| | | |
|---|---|---|
| 1 | Q. Can you give me an example? | 11:42:50 |
| 2 | A. In fall 2021, a New York City-based | 11:42:52 |
| 3 | documentary film company called Story Syndicate | 11:43:02 |
| 4 | approached our station, interested in reproducing | 11:43:07 |
| 5 | video of a meeting I shot following a grisly | 11:43:13 |
| 6 | triple homicide on Harding Avenue in Waltham. | 11:43:18 |
| 7 | Q. How did you respond to that request? | 11:43:23 |
| 8 | A. I referred it to Maria and gave -- I | 11:43:28 |
| 9 | characterized -- I characterized to Maria what the | 11:43:36 |
| 10 | footage was and told her what they were seeking | 11:43:42 |
| 11 | and put her in contact with the Story Syndicate | 11:43:48 |
| 12 | person who was handling the licensing of this | 11:43:55 |
| 13 | footage. | 11:43:57 |
| 14 | Q. Did Maria agree to their request? | 11:44:00 |
| 15 | A. Ultimately, yes. | 11:44:08 |
| 16 | Q. Can you think of any other examples where | 11:44:09 |
| 17 | a documentary filmmaker requested to use | 11:44:19 |
| 18 | copyrighted media? | 11:44:22 |
| 19 | A. No. I can't recall. | 11:44:25 |
| 20 | Q. So you'd mentioned network affiliates, | 11:44:49 |
| 21 | newspapers, and a documentary filmmaker. Any | 11:44:54 |
| 22 | other people who are not one of those things | 11:45:01 |
| 23 | requested to use WCAC media? | 11:45:08 |
| 24 | A. So the former staff member I described, | 11:45:09 |

| | | |
|---|---|---|
| 1 | Jeff Whiteley, on occasion had requested something | 11:45:16 |
| 2 | I produced or a package I created for use with his | 11:45:23 |
| 3 | students at Waltham High School. | 11:45:29 |
| 4 | Q. Any other type of requester that you can | 11:45:43 |
| 5 | think of? | 11:45:49 |
| 6 | A. Possibly, yes.  More than ten years ago, | 11:45:50 |
| 7 | someone from the cable access community wanted to | 11:45:58 |
| 8 | take certain types of programming from different | 11:46:07 |
| 9 | access centers and incorporate it into a program | 11:46:09 |
| 10 | about what's happening in the region.  And so I | 11:46:13 |
| 11 | worked with her to allow our content to be used in | 11:46:16 |
| 12 | that way. | 11:46:21 |
| 13 | Q. Jumping back to the requests from Jeff | 11:46:23 |
| 14 | Whiteley that you mentioned, how did you respond | 11:46:42 |
| 15 | to Jeff's request? | 11:46:45 |
| 16 | A. Well, because Jeff is part of our PEG | 11:46:48 |
| 17 | family, he could use whatever he wanted, | 11:46:52 |
| 18 | especially given its instructional purpose. | 11:46:56 |
| 19 | Q. When you say "our PEG family," do you mean | 11:47:00 |
| 20 | people affiliated with WCAC? | 11:47:31 |
| 21 | A. Yes. | 11:47:33 |
| 22 | Q. Do you also mean people affiliated with | 11:47:33 |
| 23 | other PEG stations? | 11:47:37 |
| 24 | A. No.  I just meant our WCAC, which has the | 11:47:40 |

```
1   public, the educational, and the government        11:47:47
2   functions.  And Jeff serves in the educational      11:47:51
3   function.                                           11:47:56
4       Q. Was Jeff teaching students at Waltham High   11:48:04
5   School as part of his role at WCAC?                 11:48:19
6       A. He's actually an employee of the City of     11:48:21
7   Waltham.                                            11:48:34
8       Q. He wasn't an employee of WCAC?               11:48:34
9       A. No.  But we all -- we are part of the same   11:48:36
10  mission, and his channel is one of the three        11:48:42
11  channels that air locally in Waltham.               11:48:47
12       So again, there's the public channel,          11:48:53
13  which airs typically programming created by our     11:48:55
14  own volunteers and community producers.  There's    11:48:59
15  the government channel, which includes government   11:49:03
16  meetings.  There's also an educational channel.     11:49:07
17       And Jeff was in charge of creating content     11:49:11
18  for that component of our PEG cable access          11:49:13
19  enterprise.                                         11:49:17
20      Q. Do you know if he was on the faculty of      11:49:17
21  Waltham High School?                                11:49:27
22      A. He's a TV teacher.                           11:49:28
23      Q. Would you include anyone else in the         11:49:37
24  phrase "our PEG family"?                            11:49:44
```

1        A. I don't think so.                              11:49:46

2        Q. Does WCAC ever get requests from political     11:49:57

3    candidates to use copyrighted media?                  11:50:08

4        A. Yes.                                           11:50:10

5        Q. Can you give me an example?                    11:50:26

6        A. Ward 9 Waltham City Councillor Robert          11:50:30

7    Logan publishes a newsletter informing his            11:50:38

8    constituents of things happening in his ward.         11:50:47

9            And in the past -- and I can think of only    11:50:53

10   one.  I can't think specifically of the example.      11:50:56

11   He has wanted to reproduce, say, an image I shot       11:50:59

12   in connection with something happening that is         11:51:04

13   relative to his constituents and approached me to      11:51:07

14   ask if he could reproduce a photo and credit The       11:51:10

15   Waltham Channel.                                       11:51:16

16       Q. How did you respond?                            11:51:16

17       A. Yes.                                            11:51:18

18           (Wangler Exhibit 37 was marked for            11:51:38

19   identification and is attached to the transcript.)     11:51:38

20       Q. I'm showing you what's been marked as           11:51:38

21   Exhibit 37.  And I apologize for the small text.       11:51:42

22       A. No problem.                                     11:51:46

23       Q. But I'm hoping you can read the second          11:51:47

24   chat bubble on this page.                              11:51:55

1       A. This one here?                                11:51:58

2       Q. Yes.                                          11:51:59

3       A. Okay.                                         11:52:00

4          "Tom Benavides.  Good morning, Phil.          11:52:03

5   Thank you for all your work on the candidate        11:52:06

6   interviews.  I enjoyed watching them all.  I was    11:52:09

7   wondering if us candidates had permission to clip   11:52:13

8   and repost said clips of our own You Don't Say      11:52:16

9   interviews for use on our social media with credit  11:52:20

10  to you and You Don't Say.  Thank you in advance.    11:52:23

11  Best, Emily.  Emily Saperia, candidate Waltham      11:52:27

12  City Council at large."                             11:52:33

13      Q. And could you read the response just below   11:52:34

14  that?                                               11:52:38

15      A. "Phil McGrady.  Yes, Emily, you may use      11:52:39

16  your clip for You Don't Say.  We encouraged         11:52:44

17  candidates to bring a thumb drive at the time of    11:52:48

18  the recording.  Thank you.  Unfortunately, there    11:52:51

19  are organizations out there that are reediting our  11:52:56

20  original content, but all of the You Don't Say      11:52:59

21  content can be used by the candidates."             11:53:02

22      Q. Does Phil McGrady work for WCAC?             11:53:09

23      A. Yes.                                          11:53:11

24      Q. And who is Emily Saperia?                     11:53:12

1       A. She is a former candidate for councillor          11:53:17

2   at large in Waltham.                                     11:53:22

3       Q. What is You Don't Say?                            11:53:23

4       A. You Don't Say is a program produced by            11:53:27

5   Phil that allows people to come in off the street        11:53:33

6   and talk about anything they want to talk about.         11:53:39

7       Q. Did You Don't Say produce candidate               11:53:42

8   interviews for the candidates for city office in         11:54:06

9   2023?                                                    11:54:10

10      A. Yes.                                              11:54:11

11      Q. Was Emily Saperia one of those candidates?        11:54:12

12      A. Yes.                                              11:54:19

13      Q. And Phil McGrady produced that show?              11:54:19

14      A. Yes.                                              11:54:29

15      Q. Why did WCAC allow Emily Saperia to use           11:54:30

16  her clip from You Don't Say?                             11:54:54

17          MR. PYLE:  Objection.                            11:54:56

18      A. I believe we provided -- we allowed all of        11:54:56

19  the candidates who taped their statements for this       11:55:09

20  particular program to have their video to use for        11:55:13

21  whichever purposes they wanted.                          11:55:17

22      Q. Were those candidates part of the PEG             11:55:30

23  family?                                                  11:55:32

24      A. No.  Those are candidates running for             11:55:35

| | | |
|---|---|---|
| 1 | office in Waltham. | 11:55:42 |
| 2 | Q. Why did you allow all of the candidates to | 11:55:43 |
| 3 | use their video for whatever purposes they wanted? | 11:56:07 |
| 4 | MR. PYLE: Objection. | 11:56:10 |
| 5 | A. We received -- to my knowledge, we | 11:56:10 |
| 6 | received many requests from these candidates to | 11:56:23 |
| 7 | use these individual videos because they may have | 11:56:25 |
| 8 | not had experience taping these type of statements | 11:56:35 |
| 9 | and these statements could be useful to promote | 11:56:37 |
| 10 | their candidacy. But it wasn't a decision that I | 11:56:40 |
| 11 | made. | 11:56:43 |
| 12 | Q. Does WCAC help candidates promote their | 11:56:43 |
| 13 | candidacy? | 11:57:01 |
| 14 | A. Yes. This candidate -- You Don't Say | 11:57:02 |
| 15 | candidate show serves that purpose in every -- in | 11:57:08 |
| 16 | most of the municipal elections in recent years. | 11:57:14 |
| 17 | Q. So we've talked about a number of | 11:57:31 |
| 18 | instances where people have requested to use | 11:57:34 |
| 19 | copyrighted media. | 11:57:37 |
| 20 | Does WCAC ever get requests to use video | 11:57:41 |
| 21 | clips of government meetings? | 11:57:44 |
| 22 | A. The earlier scenario I described involving | 11:57:54 |
| 23 | Story Syndicate, the footage they were requesting | 11:58:05 |
| 24 | could potentially be considered a government | 11:58:13 |

| | | |
|---|---|---|
| 1 | meeting because it involved former District | 11:58:17 |
| 2 | Attorney Gerry Leone, former Waltham Police Chief | 11:58:23 |
| 3 | Thomas LaCroix, a high-ranking member of State | 11:58:29 |
| 4 | Police investigating the triple homicide, and then | 11:58:36 |
| 5 | members of the community concerned about the | 11:58:38 |
| 6 | impact of this triple homicide on their community. | 11:58:41 |
| 7 | That meeting was organized by a former | 11:58:45 |
| 8 | Ward 5 city councillor and held in a public | 11:58:49 |
| 9 | building, a former elementary school in Waltham. | 11:58:53 |
| 10 | Q. Was that meeting shown on MAC-TV? | 11:58:58 |
| 11 | A. I can't -- it was 2011.  I can't recall. | 11:59:03 |
| 12 | Q. Was it shown on Waltham Newswatch? | 11:59:11 |
| 13 | A. In its entirety or . . . | 11:59:14 |
| 14 | I believe I may have made a news package | 11:59:24 |
| 15 | out of it. | 11:59:26 |
| 16 | Q. Do you know of any other occasion when | 11:59:29 |
| 17 | some outside party asked permission to use MAC-TV | 11:59:42 |
| 18 | video clips? | 11:59:46 |
| 19 | A. I can't recall. | 11:59:47 |
| 20 | Q. So sitting here, you're not aware of any | 12:00:10 |
| 21 | such requests? | 12:00:12 |
| 22 | A. I can't recall. | 12:00:13 |
| 23 | MR. STOLTZ:  If it's all right, I'm going | 12:00:32 |
| 24 | to take a few more minutes to finish up this topic | 12:00:33 |

1    and then we'll break for lunch, if that's all          12:00:36

2    right.                                                  12:00:38

3         MR. PYLE:  Sure.                                   12:00:39

4         Q. Does WCAC ever ask for payment in return       12:00:40

5    for permission to use its copyrighted media?            12:00:42

6         A. Yes.                                            12:00:47

7         Q. Can you give me an example?                     12:00:47

8         A. Story Syndicate.  Story Syndicate produced      12:00:52

9    a streaming series called "The Murders Before the       12:00:57

10   Marathon" and, as I mentioned, approached us to         12:01:00

11   license a small amount of this community meeting        12:01:06

12   about this triple homicide for inclusion in that        12:01:11

13   program.                                                12:01:14

14        And they paid whatever the going rate was          12:01:15

15   for documentary film production at the time.            12:01:19

16        Q. Were there any other instances where WCAC       12:01:30

17   asked for payment in return for permission to use       12:01:34

18   copyrighted media?                                      12:01:38

19        A. I can't recall.                                 12:01:39

20        Q. Did WCAC ever ask a political candidate         12:02:06

21   for payment in return for permission for using a        12:02:09

22   You Don't Say video?                                    12:02:12

23        A. Did we ask for payment from a candidate         12:02:13

24   to -- for the You Don't Say videos?                     12:02:20

1    Q. Correct.                                     12:02:23

2    A. No.                                          12:02:23

3    Q. Did WCAC ask for payment from City           12:02:27

4    Councillor Robert Logan?                        12:02:42

5    A. No.                                          12:02:43

6    Q. Did WCAC ask for payment from Jeff           12:02:44

7    Whiteley?                                       12:02:57

8    A. No.                                          12:02:57

9    Q. Did WCAC ever ask for payment from a TV      12:02:57

10   network affiliate?                              12:03:14

11   A. Typically we provided footage free of        12:03:15

12   charge as long as we were credited as the       12:03:29

13   copyright holder.                               12:03:32

14   Q. Were there any other instances besides the   12:03:52

15   Story Syndicate request where WCAC asked for    12:03:55

16   payment for permission to use copyrighted media? 12:04:01

17   A. I can't recall.                              12:04:04

18   Q. You're not aware of any other such           12:04:30

19   instance?                                       12:04:32

20   A. I can't recall any.                          12:04:32

21   Q. So to be clear, the only instance that you   12:04:46

22   recall, sitting here today, of WCAC asking for  12:04:53

23   payment in return for permission to use         12:04:58

24   copyrighted media was Story Syndicate?          12:04:59

| | | |
|---|---|---|
| 1 | A. Yes. | 12:05:02 |
| 2 | Q. Why did WCAC ask for payment from Story | 12:05:02 |
| 3 | Syndicate and not from the other requesters that | 12:05:10 |
| 4 | we've discussed? | 12:05:12 |
| 5 | A. Story Syndicate was -- typically we | 12:05:16 |
| 6 | receive requests from network affiliates and, in | 12:05:27 |
| 7 | my experience, no payment is usually made. | 12:05:30 |
| 8 | This was a different type of request from | 12:05:34 |
| 9 | a for-profit documentary film house that had a | 12:05:37 |
| 10 | significant budget for a series that would air on | 12:05:44 |
| 11 | a top streaming platform. | 12:05:48 |
| 12 | And I believe they had offered to pay.  So | 12:05:51 |
| 13 | it was a very different request than the ones that | 12:05:55 |
| 14 | we typically fielded for reproduction of our | 12:05:58 |
| 15 | content. | 12:06:00 |
| 16 | Q. Has WCAC ever said no to a request to use | 12:06:09 |
| 17 | copyrighted media? | 12:06:17 |
| 18 | A. Not to my knowledge. | 12:06:18 |
| 19 | Q. I think I know the answer, but just for | 12:07:05 |
| 20 | the sake of completeness, did WCAC ask Emily | 12:07:07 |
| 21 | Saperia for payment in return for permission to | 12:07:11 |
| 22 | use her You Don't Say interview? | 12:07:14 |
| 23 | A. Phil would know, but I don't believe so. | 12:07:16 |
| 24 | Q. Thank you. | 12:07:20 |

| | | |
|---|---|---|
| 1 | MR. STOLTZ:  Okay.  I think this would be | 12:07:44 |
| 2 | a good time to break for lunch. | 12:07:45 |
| 3 | Shall we start again at 12:40? | 12:07:48 |
| 4 | MR. PYLE:  Sure.  I think that should be | 12:07:51 |
| 5 | enough. | 12:07:53 |
| 6 | MR. STOLTZ:  Great.  Thank you. | 12:07:54 |
| 7 | THE VIDEOGRAPHER:  We are going off the | 12:07:55 |
| 8 | record.  The time on the monitor is 12:07. | 12:07:56 |
| 9 | (Lunch recess, 12:07 p.m. to 12:52 p.m.) | 12:08:00 |
| 10 | | |
| 11 | | |
| 12 | | |
| 13 | | |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |

| | | |
|---|---|---|
| 1 | A F T E R N O O N   S E S S I O N | 12:52:30 |
| 2 | THE VIDEOGRAPHER:  We are back on the | 12:52:30 |
| 3 | record.  The time on the monitor is 12:52. | 12:52:38 |
| 4 | (Wangler Exhibit 38 was marked for | 12:52:59 |
| 5 | identification and is attached to the transcript.) | 12:53:02 |
| 6 | BY MR. STOLTZ: | 12:53:02 |
| 7 | Q. I'm showing you what's been marked as | 12:53:05 |
| 8 | Exhibit 38, which appears to be a cover email and | 12:53:06 |
| 9 | an attachment titled "WCAC Video Use Policy." | 12:53:16 |
| 10 | Have you seen this document? | 12:53:22 |
| 11 | A. Yes. | 12:53:23 |
| 12 | Q. Who wrote it? | 12:53:24 |
| 13 | A. I believe Maria wrote it.  And she may | 12:53:27 |
| 14 | have run it by me. | 12:53:39 |
| 15 | Q. Do you know if anyone else contributed to | 12:53:46 |
| 16 | it? | 12:53:48 |
| 17 | A. I do not. | 12:53:48 |
| 18 | Q. Do you know if she ran it by anyone else? | 12:53:49 |
| 19 | A. It appears this email is to someone else. | 12:53:57 |
| 20 | Q. Is this an email to Justin Barrett? | 12:54:00 |
| 21 | A. Yes.  That would indicate he also received | 12:54:06 |
| 22 | it. | 12:54:14 |
| 23 | Q. Could you please read the second paragraph | 12:54:18 |
| 24 | of the attachment. | 12:54:43 |

| | | |
|---|---|---|
| 1 | A. Number 2? | 12:54:45 |
| 2 | Q. The one that begins with "WCAC"? | 12:54:46 |
| 3 | A. "WCAC's fair use policy apply to news | 12:54:50 |
| 4 | gathering.  Please see Number 2 below.  Libraries | 12:54:54 |
| 5 | for archiving purpose, colleges, schools, and | 12:54:58 |
| 6 | nonprofits who work with the deaf and visually | 12:55:01 |
| 7 | impaired who use this footage for educational | 12:55:03 |
| 8 | purposes only. | 12:55:06 |
| 9 | "This is for classroom use only and does | 12:55:07 |
| 10 | not apply to rebroadcast online streaming of any | 12:55:10 |
| 11 | kind.  Request to use our footage for educational | 12:55:13 |
| 12 | purposes must be made in writing and must receive | 12:55:16 |
| 13 | written permission from the WCAC executive | 12:55:19 |
| 14 | director." | 12:55:21 |
| 15 | Q. And approximately when was this written? | 12:55:22 |
| 16 | A. I don't recall. | 12:55:44 |
| 17 | Q. What's the date on the cover email? | 12:55:48 |
| 18 | A. It says September 11th, 2023. | 12:55:55 |
| 19 | Q. Was the attachment written around that | 12:55:59 |
| 20 | time? | 12:56:06 |
| 21 | A. I believe so. | 12:56:07 |
| 22 | Q. So you mentioned earlier that Jeff | 12:56:08 |
| 23 | Whiteley I believe sometimes used WCAC media as | 12:56:54 |
| 24 | part of the class he taught at Waltham High | 12:56:59 |

| | | |
|---|---|---|
| 1 | School? | 12:57:01 |
| 2 | A. Yeah. | 12:57:01 |
| 3 | Q. Did Mr. Whitely make a written request to | 12:57:02 |
| 4 | the WCAC executive director to use that media? | 12:57:10 |
| 5 | A. I don't recall. | 12:57:13 |
| 6 | Q. Could you take a look at the paragraph | 12:57:15 |
| 7 | labeled 2. | 12:57:40 |
| 8 | A. Yup. | 12:57:42 |
| 9 | Q. Could you read the first sentence of the | 12:57:44 |
| 10 | that section. | 12:57:47 |
| 11 | A. "Permission to streaming hard copy files | 12:57:47 |
| 12 | of WCAC MAC-TV programming for news gathering." | 12:57:52 |
| 13 | The entire section? | 12:58:10 |
| 14 | Q. No, thank you. | 12:58:11 |
| 15 | I forgot to ask earlier, but is this a | 12:58:15 |
| 16 | true and correct copy of the WCAC video use policy | 12:58:18 |
| 17 | that you have seen previously? | 12:58:24 |
| 18 | A. The grammar is -- the grammar might make | 12:58:26 |
| 19 | it appear like it's a draft, so I can't say with | 12:58:36 |
| 20 | certainty.  Some of the grammar does not appear | 12:58:39 |
| 21 | like it was edited. | 12:58:44 |
| 22 | Q. Do you believe this is a document written | 12:58:50 |
| 23 | by Ms. Sheehan? | 12:58:56 |
| 24 | A. Yes. | 12:58:57 |

1    Q. Did you perhaps see a different version of            12:58:57

2    this document that had edits to the grammar?            12:59:36

3    A. Possibly.  I can't say -- some of it, it             12:59:41

4    looks likes run-on sentences or at least one.  So,      12:59:48

5    I mean, does she . . .                                  12:59:59

6         This is described as a rough draft in the          13:00:02

7    body of the email.                                      13:00:05

8    Q. Did you ever see a final draft?                      13:00:12

9    A. Possibly.                                            13:00:14

10   Q. Have you looked at this document anytime             13:00:22

11   between September of 2023 and now?                      13:00:46

12   A. Yes.                                                 13:00:52

13   Q. Did you look at it in the course of your             13:00:53

14   work at WCAC?                                           13:00:59

15   A. Yes.                                                 13:01:01

16   Q. Is this a policy that WCAC follows?                  13:01:03

17   A. I believe some requests to use WCAC                  13:01:22

18   copywritten content are made by telephone, so           13:01:40

19   they're not made in writing.  This says, "All           13:01:42

20   requests for use of WCAC MAC-TV content must be         13:01:48

21   made in writing to the WCAC director."                  13:01:51

22        I received a number of requests to                 13:01:56

23   reproduce footage that were not made in writing to      13:01:59

24   the executive director, and I handled those             13:02:05

| | | |
|---|---|---|
| 1 | requests through discussing it with Maria and then | 13:02:07 |
| 2 | giving permission to the person making the | 13:02:13 |
| 3 | request. | 13:02:15 |
| 4 | Q. Did any of those requests happen between | 13:02:20 |
| 5 | September 2023 and now? | 13:02:23 |
| 6 | A. Yes. | 13:02:38 |
| 7 | Q. Did any of them happen before | 13:02:53 |
| 8 | September 2023? | 13:02:55 |
| 9 | A. Yes. | 13:02:57 |
| 10 | Q. Well, Paragraph 2E says, in part, | 13:03:18 |
| 11 | "Producers requesting footage must provide their | 13:03:41 |
| 12 | name and phone number to the WCAC executive | 13:03:44 |
| 13 | director." | 13:03:48 |
| 14 | Is that an expectation that WCAC had at | 13:03:49 |
| 15 | any time? | 13:03:55 |
| 16 | A. I believe so.  We wanted to know who was | 13:03:55 |
| 17 | making the request. | 13:04:07 |
| 18 | Q. Was that an expectation that WCAC had | 13:04:08 |
| 19 | before September 11th, 2023? | 13:04:21 |
| 20 | A. Not necessarily.  A reporter could call | 13:04:25 |
| 21 | from a network affiliate, request to use some of | 13:04:44 |
| 22 | our content, and maybe not provide their phone | 13:04:48 |
| 23 | number.  But they might provide their name, I'm | 13:04:52 |
| 24 | from whichever channel, I'd like to reproduce your | 13:04:59 |

1    content.  But they may not provide a phone number.        13:05:02

2        Q. Could you please read the sentence after          13:05:05

3    2F?                                                        13:05:12

4        A. "If permission is granted, the user must           13:05:13

5    caption on the video file 'Waltham Community              13:05:16

6    Access Corporation.'"                                      13:05:22

7        Q. Is this an expectation that WCAC had at            13:05:24

8    any time?                                                  13:05:30

9        A. The crediting was not always as given in           13:05:31

10   quotation marks in this document.  Sometimes the         13:05:42

11   credit read differently.                                  13:05:47

12       Q. Can you give me an example of a different          13:05:55

13   way of giving credit?                                      13:05:58

14       A. "WCAC TV Waltham."  And in one instance my         13:06:02

15   name and "WCAC Waltham."                                   13:06:16

16       Q. Do you know what was meant by "on the              13:06:24

17   video file"?                                               13:06:26

18       A. Presumably the footage in question would           13:06:30

19   have a credit in the top right-hand or left-hand          13:06:40

20   corner with the credit as given in Section F.             13:06:46

21       Q. Did WCAC consider it important which               13:06:54

22   corner the credit appeared in?                             13:06:57

23       A. I don't believe so.                                13:07:02

24       Q. Was there any other form of credit that           13:07:28

| | | |
|---|---|---|
| 1 | WCAC considered acceptable? | 13:07:35 |
| 2 | MR. PYLE: At any time? | 13:07:41 |
| 3 | MR. STOLTZ: At any time. | 13:07:42 |
| 4 | A. I believe so. So, for instance, the Story | 13:07:43 |
| 5 | Syndicate footage could include a credit in the | 13:08:22 |
| 6 | credits of the program instead of on the video, | 13:08:25 |
| 7 | acknowledging the WCAC. | 13:08:32 |
| 8 | Q. Are there any others? | 13:08:50 |
| 9 | A. I mean, credit could be attributed, say, | 13:08:51 |
| 10 | not on the video per se but maybe in a caption | 13:09:11 |
| 11 | accompanying the video or some other written | 13:09:17 |
| 12 | record associated with that reproduced footage. | 13:09:23 |
| 13 | Q. Would WCAC consider that form of credit | 13:09:31 |
| 14 | acceptable? | 13:09:35 |
| 15 | A. Yes. | 13:09:36 |
| 16 | Q. Would putting "MAC-TV" on the video be | 13:09:37 |
| 17 | considered an acceptable form of credit? | 13:10:01 |
| 18 | A. Yes. | 13:10:03 |
| 19 | Q. Could you please read 2G. | 13:10:03 |
| 20 | A. "If WCAC MAC-TV footage is reedited and/or | 13:10:20 |
| 21 | used unlawfully, the user is entirely responsible | 13:10:25 |
| 22 | for any possible legal action resulting from this | 13:10:30 |
| 23 | misuse." | 13:10:33 |
| 24 | Q. What does "reedited" mean in this context? | 13:10:38 |

| | | |
|---|---|---|
| 1 | MR. PYLE:  Objection. | 13:10:43 |
| 2 | A. I don't know. | 13:10:44 |
| 3 | (Wangler Exhibit 39 was marked for | 13:11:34 |
| 4 | identification and is attached to the transcript.) | 13:11:35 |
| 5 | Q. I'm showing you what's been marked as | 13:11:35 |
| 6 | Exhibit 39.  Do you recognize this? | 13:11:41 |
| 7 | A. Yes. | 13:11:48 |
| 8 | Q. What is it? | 13:11:53 |
| 9 | A. It's a letter from the WCAC executive | 13:11:56 |
| 10 | director to you, on November 22nd, 2023. | 13:12:05 |
| 11 | Q. And you've seen it before? | 13:12:14 |
| 12 | A. Yes. | 13:12:16 |
| 13 | Q. Did Ms. Sheehan write this letter? | 13:12:17 |
| 14 | A. I believe so.  Yes. | 13:12:28 |
| 15 | Q. Did anyone else contribute to the writing? | 13:12:28 |
| 16 | A. I can't recall.  I may have edited it.  I | 13:12:32 |
| 17 | can't recall precisely. | 13:12:59 |
| 18 | Q. Do you know if this letter was ever sent? | 13:13:00 |
| 19 | A. I do not know. | 13:13:10 |
| 20 | Q. If you could look at the top of the second | 13:13:11 |
| 21 | page, please, where it says, "We have had several | 13:13:31 |
| 22 | Boston television stations and national | 13:13:35 |
| 23 | documentary companies request our video." | 13:13:37 |
| 24 | Does that refer to the examples you gave | 13:13:44 |

| | | |
|---|---|---|
| 1 | me earlier? | 13:13:46 |
| 2 | A. Yes.  WBZ, NBC 10, and national | 13:13:47 |
| 3 | documentary companies -- probably company -- which | 13:13:53 |
| 4 | is the Story Syndicate, a New York City-based | 13:13:57 |
| 5 | documentary film production house. | 13:14:03 |
| 6 | Q. Any others that this letter may have been | 13:14:05 |
| 7 | referring to? | 13:14:13 |
| 8 | MR. PYLE:  Objection. | 13:14:15 |
| 9 | A. Potentially other network affiliates | 13:14:15 |
| 10 | seeking to reproduce our content. | 13:14:21 |
| 11 | Q. The next sentence says, "Every request | 13:14:24 |
| 12 | from a legitimate media company was in writing. " | 13:14:34 |
| 13 | Is that accurate? | 13:14:39 |
| 14 | A. As I said before, some requests were made | 13:14:39 |
| 15 | over the telephone by assignment editors at | 13:14:46 |
| 16 | network affiliates on tight deadlines.  They | 13:14:50 |
| 17 | didn't necessarily put something in writing.  They | 13:14:53 |
| 18 | sought to reproduce something soon and they tried | 13:14:55 |
| 19 | to make a quick request of us, so it may not have | 13:15:01 |
| 20 | been in writing. | 13:15:06 |
| 21 | Q. And as far as you're aware, WCAC granted | 13:15:07 |
| 22 | all of those requests? | 13:15:15 |
| 23 | A. Yes. | 13:15:16 |
| 24 | (Wangler Exhibit 40 was marked for | 13:16:03 |

1  identification and is attached to the transcript.)           13:16:04

2      Q. I'm showing you what's been marked as               13:16:04

3  Exhibit 40.  It's labeled "Defendant Waltham                13:16:11

4  Community Access Corporation's Answers and                  13:16:17

5  Objections to Plaintiff Channel 781 News's First            13:16:18

6  Set of Interrogatories."                                    13:16:21

7      Do you recognize this document?                         13:16:24

8      A. Yes.                                                  13:16:25

9      Q. If you could turn to page 12, please.  I'm           13:16:26

10 sorry.  Could you please turn to the top of                 13:17:10

11 page 13.                                                     13:17:15

12     Do you see where it says, "Pursuant to                  13:17:19

13 Federal Rule of Civil Procedure 33(d), WCAC refers          13:17:21

14 to licenses produced in response to plaintiff's             13:17:24

15 request for production of documents"?                        13:17:27

16     A. Yes.                                                  13:17:28

17     Q. Does WCAC have any records of licenses to            13:17:29

18 use WCAC media?                                              13:17:48

19     A. Licenses?                                             13:17:56

20     Q. By "licenses" I mean any sort of written             13:17:58

21 permission.                                                  13:18:01

22     A. To use our media?                                    13:18:04

23     Q. Yes.                                                  13:18:08

24     A. Yes.                                                  13:18:09

| | | |
|---|---|---|
| 1 | MR. STOLTZ:  Jeff, I can represent that we | 13:18:39 |
| 2 | didn't receive any such licenses.  So I would ask | 13:18:42 |
| 3 | that those be produced. | 13:18:44 |
| 4 | MR. PYLE:  I'll look into that.  My | 13:18:47 |
| 5 | understanding was that something related to the | 13:18:52 |
| 6 | documentary film was produced, but if that's not | 13:18:55 |
| 7 | the case I will look into that and get back to | 13:18:58 |
| 8 | you. | 13:19:00 |
| 9 | MR. STOLTZ:  Thank you. | 13:19:00 |
| 10 | MR. PYLE:  I'll also just note that there | 13:19:11 |
| 11 | is an objection on grounds of overbreadth and | 13:19:13 |
| 12 | irrelevance to producing or to identifying each | 13:19:16 |
| 13 | and every instance in which a person requested | 13:19:19 |
| 14 | permission. | 13:19:23 |
| 15 | Q. Are you familiar with Channel 781? | 13:19:23 |
| 16 | A. Yes. | 13:19:51 |
| 17 | Q. Are you aware that it is sometimes also | 13:19:51 |
| 18 | referred to as "Waltham DATA"? | 13:19:57 |
| 19 | A. Yes. | 13:19:59 |
| 20 | Q. When did you first become familiar with | 13:19:59 |
| 21 | Channel 781? | 13:20:03 |
| 22 | A. 2022. | 13:20:04 |
| 23 | Q. To your knowledge, who is part of | 13:20:19 |
| 24 | Channel 781? | 13:20:21 |

| | | |
|---|---|---|
| 1 | A. Josh Kastorf, Tom Benavides, Jamie | 13:20:22 |
| 2 | Krikeles, Chris Gamble, potentially others that I | 13:20:31 |
| 3 | can't recall currently. | 13:20:51 |
| 4 | Q. What does Channel 781 do? | 13:20:52 |
| 5 | A. Channel 781 is a group of citizen | 13:21:03 |
| 6 | journalists that create reporting about Waltham | 13:21:06 |
| 7 | city government. | 13:21:10 |
| 8 | Q. Does Channel 781 have any of the same | 13:21:25 |
| 9 | missions as WCAC? | 13:21:28 |
| 10 | A. Yes. | 13:21:30 |
| 11 | Q. And what are those? | 13:21:31 |
| 12 | A. To inform the public about Waltham city | 13:21:33 |
| 13 | government. | 13:21:38 |
| 14 | Q. Would you refer to Channel 781 as a PEG | 13:21:44 |
| 15 | project? | 13:21:48 |
| 16 | A. No. | 13:21:48 |
| 17 | Q. Why not? | 13:21:51 |
| 18 | A. They're not a cable access station. | 13:21:53 |
| 19 | Q. Does Channel 781 do news reporting? | 13:22:11 |
| 20 | A. Yes. | 13:22:14 |
| 21 | Q. Does Channel 781 do opinion journalism? | 13:22:15 |
| 22 | A. I believe so. | 13:22:22 |
| 23 | Q. Is it your understanding that Channel 781 | 13:22:38 |
| 24 | has a particular political orientation? | 13:22:41 |

1        A. Yes.                                          13:22:46

2        Q. How would you describe that political         13:22:46

3    orientation?                                         13:22:52

4        A. In favor of greater government                13:22:52

5    transparency and having passionate beliefs about    13:22:59

6    certain core issues such as housing, cycling,        13:23:06

7    homelessness, and other issues.                      13:23:20

8        Q. Is it your understanding that Channel 781     13:23:27

9    has a political bias?                                13:23:32

10       A. Like any news organization, they have a       13:23:34

11   perspective on the news.                             13:23:52

12       Q. How would you describe that perspective?      13:23:59

13       A. They appeal to a different audience than,     13:24:01

14   say, traditional print media.                        13:24:08

15       Q. Do they appeal to a different audience        13:24:21

16   than MAC-TV does?                                    13:24:23

17       A. Yes and no.                                   13:24:25

18       Q. Can you explain what you mean?                13:24:34

19       A. Many MAC-TV viewers are older Waltham         13:24:36

20   residents that are interested in the workings of    13:24:41

21   city government.  They watch the city councill      13:24:44

22   meetings and other government meetings, sometimes    13:24:50

23   in their entirety.  They're more traditional         13:24:53

24   consumers of news, similar to what, say, the         13:24:56

| 1 | network affiliate audience is. | 13:25:00 |
| 2 | Channel 781 News's audience is a younger | 13:25:03 |
| 3 | audience and not necessarily originally from | 13:25:06 |
| 4 | Waltham and having different political beliefs | 13:25:14 |
| 5 | than some of the older viewers that consume MAC | 13:25:18 |
| 6 | channel content. | 13:25:21 |
| 7 | Q. Can you tell me what you mean by | 13:25:23 |
| 8 | "different political beliefs"? | 13:25:30 |
| 9 | A. MAC channel viewers, in my experience, are | 13:25:31 |
| 10 | older, more establishment Waltham residents who | 13:25:42 |
| 11 | have likely lived in the city for many years and | 13:25:50 |
| 12 | may have -- may know who their elected officials | 13:25:53 |
| 13 | are very well, through personal relationships and | 13:25:58 |
| 14 | other ways, whereas Channel 781 is different.  Its | 13:26:02 |
| 15 | following appear to have more people that were | 13:26:12 |
| 16 | youthful with different beliefs about what should | 13:26:15 |
| 17 | be priorities for elected officials. | 13:26:19 |
| 18 | Q. To your knowledge, do older viewers spend | 13:26:32 |
| 19 | more time watching news media than younger | 13:26:38 |
| 20 | viewers? | 13:26:43 |
| 21 | A. Absolutely.  Yes. | 13:26:44 |
| 22 | Q. Does Channel 781 appeal to a different | 13:26:45 |
| 23 | audience than Waltham Newswatch? | 13:27:04 |
| 24 | A. Yes. | 13:27:07 |

| | | |
|---|---|---|
| 1 | Q. How would you describe that difference? | 13:27:08 |
| 2 | A. Waltham Newswatch is a cable television | 13:27:16 |
| 3 | news program about Waltham.  And in my experience, | 13:27:22 |
| 4 | the people that watch cable access programming at | 13:27:28 |
| 5 | the local level are typically older residents, | 13:27:32 |
| 6 | residents who have come up to me over the years | 13:27:38 |
| 7 | and said, "I watch your program." | 13:27:41 |
| 8 | In almost every instance, it's a slightly | 13:27:44 |
| 9 | older person.  It's very similar with the network | 13:27:47 |
| 10 | affiliates.  People who consume television news | 13:27:50 |
| 11 | tend to skew older. | 13:27:54 |
| 12 | 781 News is more of an online news | 13:27:58 |
| 13 | platform with a different audience.  It skews | 13:28:01 |
| 14 | younger. | 13:28:04 |
| 15 | Q. Among the viewers of Waltham Newswatch, do | 13:28:23 |
| 16 | more of them watch the show on cable than on the | 13:28:27 |
| 17 | Internet? | 13:28:33 |
| 18 | A. It's difficult to say because we have no | 13:28:33 |
| 19 | way of knowing how many people watch our televised | 13:28:43 |
| 20 | programming.  We have not done surveys to | 13:28:49 |
| 21 | determine that information, so we don't know. | 13:28:54 |
| 22 | But I can tell how many people stream | 13:28:59 |
| 23 | Waltham Newswatch online because our website | 13:29:02 |
| 24 | allows us to see how many hits an individual | 13:29:05 |

| | | |
|---|---|---|
| 1 | episode receives. | 13:29:09 |
| 2 | Now, that hit may indicate someone only | 13:29:11 |
| 3 | watched the first 5 seconds, so we don't really | 13:29:14 |
| 4 | know if they watched the entire program.  But | 13:29:17 |
| 5 | someone clicked on a Waltham Newswatch episode | 13:29:19 |
| 6 | online and created a record of it whereas our | 13:29:22 |
| 7 | televised audience, we really -- it's difficult to | 13:29:26 |
| 8 | know how many people are watching. | 13:29:29 |
| 9 | Q. Does your website also allow you to see | 13:29:35 |
| 10 | how many hits a meeting recording on the MAC-TV | 13:29:38 |
| 11 | page receives? | 13:29:44 |
| 12 | A. Yes. | 13:29:45 |
| 13 | Q. Do younger audiences typically have a | 13:29:45 |
| 14 | different political orientation than older | 13:30:40 |
| 15 | audiences? | 13:30:42 |
| 16 | A. In my -- | 13:30:43 |
| 17 | MR. PYLE:  Objection. | 13:30:45 |
| 18 | Go ahead. | 13:30:45 |
| 19 | A. In my experience, yes. | 13:30:46 |
| 20 | Q. Thank you. | 13:30:47 |
| 21 | (Wangler Exhibit 41 was marked for | 13:30:57 |
| 22 | identification and is attached to the transcript.) | 13:30:58 |
| 23 | Q. I'm showing you what's been marked as | 13:30:58 |
| 24 | Exhibit 41.  Do you recognize this document? | 13:31:02 |

| | | |
|---|---|---|
| 1 | A. Yes. | 13:31:07 |
| 2 | Q. What is it? | 13:31:08 |
| 3 | A. It's an email from Justin Barrett, | 13:31:11 |
| 4 | responding to Waltham general executive director | 13:31:18 |
| 5 | Maria Sheehan about a statement she was to make on | 13:31:22 |
| 6 | Waltham Newswatch in early April 2023. | 13:31:29 |
| 7 | Q. And were you cc'd on this email? | 13:31:36 |
| 8 | A. Yes. | 13:31:43 |
| 9 | Q. Did you read it around the time it was | 13:31:44 |
| 10 | sent? | 13:31:49 |
| 11 | A. Yes.  Well, I believe I sent the email to | 13:31:49 |
| 12 | Maria and she then forwarded the content to | 13:31:58 |
| 13 | Justin. | 13:32:02 |
| 14 | Q. Is this a true and correct copy of that | 13:32:07 |
| 15 | email exchange? | 13:32:09 |
| 16 | A. Yes. | 13:32:09 |
| 17 | Q. Did you write the statement in this email? | 13:32:10 |
| 18 | A. Yes. | 13:32:24 |
| 19 | Q. Who else contributed to writing that | 13:32:25 |
| 20 | statement? | 13:32:28 |
| 21 | A. Maria Sheehan. | 13:32:29 |
| 22 | Q. Was the statement edited after you wrote | 13:32:32 |
| 23 | it? | 13:32:38 |
| 24 | A. Yes. | 13:32:38 |

```
1      Q. Do you know who edited it?                      13:32:46

2      A. So, as is indicated near the top of this         13:32:48

3  email chain, Maria had me add that we are a            13:32:56

4  nonprofit and receive no taxpayer monies.  And        13:33:02

5  that statement was ultimately added to the            13:33:07

6  statement and read by Maria on my news program.       13:33:12

7      Q. Did Ms. Sheehan read this statement on the      13:33:17

8  April 6th, 2023 episode of Waltham Newswatch?         13:33:19

9      A. Yes.                                             13:33:22

10      Q. Did she read it with the edit that you          13:33:22

11 mentioned?                                             13:33:34

12      A. Yes.                                             13:33:34

13      Q. Why did you send this script to                 13:33:36

14 Mr. Barrett?                                           13:33:50

15         MR. PYLE:  Objection.                           13:33:53

16         Go ahead.                                       13:33:56

17      Q. I'm sorry.  Could you read just the very        13:33:58

18 first line of your email that was sent on              13:34:02

19 April 6th, 2023 at 7:52 a.m.?                          13:34:06

20      A. "Hi, Maria, Justin.  To be aired during         13:34:09

21 Thursday newscast and read by Maria."                  13:34:12

22      Q. Did you, in fact, send this email to            13:34:16

23 Mr. Barrett?                                           13:34:19

24      A. I mean, it doesn't show in an email that        13:34:22
```

| | | |
|---|---|---|
| 1 | that was sent to him. | 13:34:34 |
| 2 | Q. At the top of this thread, did Mr. Barrett | 13:34:37 |
| 3 | respond to it? | 13:34:39 |
| 4 | A. Yes. | 13:34:40 |
| 5 | Q. So I'll ask, why did you share this script | 13:34:40 |
| 6 | with Mr. Barrett in particular? | 13:34:50 |
| 7 | A. It was something that Maria recommended | 13:34:51 |
| 8 | that could require a board opinion because it was | 13:34:58 |
| 9 | an unprecedented statement for Waltham Newswatch. | 13:35:01 |
| 10 | Q. Did Ms. Sheehan ask you to write this | 13:35:05 |
| 11 | statement? | 13:35:18 |
| 12 | A. No.  I suggested we create a statement to | 13:35:19 |
| 13 | be read on my news program. | 13:35:28 |
| 14 | Q. Why did you make that suggestion? | 13:35:41 |
| 15 | A. A situation had emerged that had alarmed | 13:35:48 |
| 16 | us. | 13:35:55 |
| 17 | Q. Can you describe that situation? | 13:35:59 |
| 18 | A. A post was made by an anonymous user on | 13:36:00 |
| 19 | Reddit that included photographs I had shot that | 13:36:12 |
| 20 | were reproduced without WCAC permission. | 13:36:16 |
| 21 | Q. What were those photographs of? | 13:36:19 |
| 22 | A. I can only recall one photograph of a | 13:36:26 |
| 23 | woman -- a Waltham resident, a photograph from | 13:36:37 |
| 24 | October 2021 of a woman, a Waltham resident | 13:36:44 |

1    holding two campaign signs as part of a                     13:36:52

2    get-out-the-vote effort sometime before.                    13:36:56

3        Q. When did WCAC become aware of that Reddit            13:37:08

4    post?                                                        13:37:13

5        A. Shortly around late -- near the end of               13:37:13

6    March 2023.                                                  13:37:22

7        Q. Do you know when it was posted to Reddit?            13:37:26

8        A. Presumably around the same time.                     13:37:39

9        Q. Why did that post alarm you?                         13:38:00

10       A. The post reproduced -- the post was about            13:38:01

11   a woman from Waltham with anti-LGBTQ views.  And            13:38:14

12   the post was critical of her and her family.  It            13:38:24

13   alarmed us because the photograph in this post,             13:38:32

14   which was by an anonymous user, was not being               13:38:38

15   reproduced with our permission.  And the content            13:38:43

16   of the post was inflammatory, if not potentially            13:38:48

17   defamatory.                                                 13:38:55

18       We worried that someone seeing this                     13:39:03

19   photograph that I had taken and many in the                 13:39:07

20   Waltham community knew was shot by me could create          13:39:11

21   the impression that we condoned the subject of              13:39:16

22   this Reddit post when we did not.                           13:39:20

23       It could also create the impression that               13:39:24

24   we gave permission to reproduce this photo, which           13:39:26

| | | |
|---|---|---|
| 1 | we did not. | 13:39:31 |
| 2 | And it also had an additional component, | 13:39:32 |
| 3 | which was this woman who had anti-LGBTQ views, | 13:39:37 |
| 4 | which I had covered earlier, was holding a sign | 13:39:44 |
| 5 | for a political candidate who then could be | 13:39:52 |
| 6 | associated with whatever the subject of the Reddit | 13:39:54 |
| 7 | post was. | 13:39:59 |
| 8 | So I sought to disassociate our station | 13:40:01 |
| 9 | from the inclusion of our copyrighted media in | 13:40:05 |
| 10 | this post. | 13:40:09 |
| 11 | Q. Was there a single photograph in the post? | 13:40:22 |
| 12 | A. The post was deleted.  I can't recall if | 13:40:24 |
| 13 | there was an additional photo I shot.  But I | 13:40:34 |
| 14 | remember this photograph of this Waltham woman | 13:40:45 |
| 15 | holding the signs for the two political | 13:40:48 |
| 16 | candidates. | 13:40:51 |
| 17 | Q. Was WCAC identified in the photo at all? | 13:40:55 |
| 18 | A. Not that I recall. | 13:41:00 |
| 19 | Q. Were you identified in the photo at all? | 13:41:03 |
| 20 | A. No. | 13:41:06 |
| 21 | Q. Were there any other circumstances besides | 13:41:08 |
| 22 | that Reddit post that led to you suggesting this | 13:41:17 |
| 23 | statement on the air? | 13:41:25 |
| 24 | A. I had learned that Channel 781 was | 13:41:25 |

| 1  | reproducing some of our government meeting | 13:41:33 |
| 2  | content.  And neither the anonymous poster nor | 13:41:41 |
| 3  | Channel 781 News were identified in this | 13:41:45 |
| 4  | statement.  But we wanted to inform the community | 13:41:49 |
| 5  | that use of our content for purposes described in | 13:41:51 |
| 6  | the statement and without our permission could | 13:42:05 |
| 7  | lead to legal action on our behalf. | 13:42:09 |
| 8  | Q. So when you referred to video from the MAC | 13:42:25 |
| 9  | channel has been reproduced without our | 13:42:30 |
| 10 | permission, was that a reference to Channel 781's | 13:42:33 |
| 11 | use? | 13:42:36 |
| 12 | A. Yes. | 13:42:36 |
| 13 | Q. Did that refer to use by anyone other than | 13:42:38 |
| 14 | Channel 781? | 13:42:45 |
| 15 | A. I can't recall. | 13:42:46 |
| 16 | Q. Were there any other uses of WCAC media | 13:42:51 |
| 17 | aside from those by Channel 781 and by the | 13:43:09 |
| 18 | anonymous Reddit user that prompted this | 13:43:11 |
| 19 | statement? | 13:43:16 |
| 20 | A. Not that I can recall. | 13:43:16 |
| 21 | Q. If you could turn back to Exhibit 41, | 13:43:25 |
| 22 | please, the interrogatory responses. | 13:44:04 |
| 23 | A. I believe that's Exhibit 40. | 13:44:09 |
| 24 | Q. Pardon me.  Exhibit 40. | 13:44:12 |

| | | |
|---|---|---|
| 1 | If you could turn to page 13, please, and | 13:44:19 |
| 2 | if you could please read Answer Number 17. | 13:44:27 |
| 3 | A. "Other than uses of WCAC videos by Waltham | 13:44:30 |
| 4 | DATA at issue in this case, in early 2023 an | 13:44:34 |
| 5 | unknown person took a picture for which WCAC owned | 13:44:38 |
| 6 | the copyright and used it in a Reddit post without | 13:44:42 |
| 7 | permission.  To disassociate itself from the | 13:44:46 |
| 8 | user's post, WCAC decided to make a statement | 13:44:50 |
| 9 | asking the public to honor its copyright in its | 13:44:54 |
| 10 | content." | 13:44:57 |
| 11 | Q. Is the Reddit post mentioned in this | 13:45:01 |
| 12 | answer the one you described earlier? | 13:45:03 |
| 13 | A. Yes. | 13:45:05 |
| 14 | Q. When did you first become aware that | 13:45:05 |
| 15 | Channel 781 was using government meeting clips | 13:45:55 |
| 16 | from WCAC? | 13:46:01 |
| 17 | A. 2022, presumably. | 13:46:02 |
| 18 | Q. How did you become aware of that? | 13:46:19 |
| 19 | A. Channel 781 used Reddit to inform the | 13:46:21 |
| 20 | public about their reporting, and I learned about | 13:46:29 |
| 21 | their channel and their activities through Reddit | 13:46:33 |
| 22 | posts. | 13:46:36 |
| 23 | Q. When you learned of those activities in | 13:46:57 |
| 24 | 2022, did you watch any videos posted to the | 13:46:59 |

| | | |
|---|---|---|
| 1 | Waltham DATA channel? | 13:47:06 |
| 2 | A. Yes. | 13:47:08 |
| 3 | Q. At that time did you see MAC-TV meeting | 13:47:08 |
| 4 | video clips used in Channel 781's Debrief show? | 13:47:21 |
| 5 | A. Yes. | 13:47:31 |
| 6 | Q. At that time, did you see MAC-TV meeting | 13:47:32 |
| 7 | video clips posted to YouTube and not embedded in | 13:47:43 |
| 8 | a longer program? | 13:47:53 |
| 9 | MR. PYLE: Objection. | 13:47:59 |
| 10 | A. Can you repeat the question, please? | 13:47:59 |
| 11 | Q. Let me rephrase it. | 13:48:07 |
| 12 | At some point, Channel 781 posted clips of | 13:48:24 |
| 13 | government meeting videos from WCAC standing alone | 13:48:32 |
| 14 | as YouTube videos. Is that right? | 13:48:47 |
| 15 | A. Yes. | 13:48:50 |
| 16 | Q. When did you first become aware of that | 13:48:50 |
| 17 | practice? | 13:48:55 |
| 18 | A. I don't recall. | 13:48:55 |
| 19 | Q. Was it in 2022? | 13:49:01 |
| 20 | A. Possibly. | 13:49:16 |
| 21 | Q. Was it before March of 2023? | 13:49:17 |
| 22 | A. I can't say with certainty. | 13:49:27 |
| 23 | Q. The statement script says, "Some have used | 13:49:39 |
| 24 | our content to score political points." | 13:50:21 |

| | | |
|---|---|---|
| 1 | Can you explain what you meant by "score | 13:50:25 |
| 2 | political points"? | 13:50:28 |
| 3 | A. By reproducing this photo from the | 13:50:28 |
| 4 | get-out-the-vote post I created, this photograph | 13:50:36 |
| 5 | of the Waltham woman with the anti-LGBTQ views | 13:50:42 |
| 6 | holding campaign signs could be interpreted to | 13:50:47 |
| 7 | associate anti-LGBTQ views with the two candidates | 13:50:53 |
| 8 | whose signs were being held. | 13:51:00 |
| 9 | Q. You also wrote, "Others have used it to | 13:51:05 |
| 10 | encourage residents to hate."  What did you mean | 13:51:11 |
| 11 | by "encourage residents to hate"? | 13:51:14 |
| 12 | A. The purpose of this Reddit post seemed to | 13:51:17 |
| 13 | be to foment hate against this woman and her | 13:51:24 |
| 14 | family, and the comments that followed confirmed | 13:51:26 |
| 15 | that suspicion.  There were many hateful comments | 13:51:30 |
| 16 | in the comments which were ultimately not deleted | 13:51:34 |
| 17 | from Reddit. | 13:51:38 |
| 18 | Q. Why did you use the word "others" if that | 13:51:39 |
| 19 | sentence referred to the same Reddit post? | 13:51:51 |
| 20 | A. I regret that verbiage.  I regret it.  It | 13:51:54 |
| 21 | was not accurate. | 13:51:59 |
| 22 | Q. When you wrote this statement, did you | 13:52:00 |
| 23 | believe that Channel 781 used clips taken from | 13:52:12 |
| 24 | MAC-TV meeting videos to score political points? | 13:52:19 |

1    A. Possibly.                                      13:52:22

2    Q. Can you explain why you thought so?            13:52:29

3    A. This relatively new news organization was      13:52:31

4    against the status quo.  And I had noticed that   13:52:49

5    they had used some of our content to criticize    13:52:53

6    elected officials in Waltham that could be        13:53:01

7    interpreted as scoring political points.          13:53:05

8        But most of this statement was directed at    13:53:10

9    the author of the anonymous Reddit post.          13:53:15

10    Q. At the time you wrote this statement, did     13:53:25

11   you believe that the author of the anonymous      13:53:28

12   Reddit post was affiliated with Channel 781 in any 13:53:30

13   way?                                              13:53:35

14    A. There was no way to know.  I did not          13:53:35

15   recognize the user's name.                        13:53:37

16       The woman who was the subject of this         13:53:43

17   Reddit post, I had reported on earlier.  She was  13:53:47

18   in favor of proposed book bans of two LGBTQ titles 13:53:54

19   in the Waltham High School library that became a  13:54:04

20   major news story in February 2022.                13:54:09

21       The woman from the Reddit post was one of     13:54:14

22   very few Waltham residents who spoke in favor of  13:54:17

23   these book bans.  Many, many people in a show of  13:54:21

24   solidarity with Waltham's LGBTQ community came out 13:54:26

1    and criticized these book bans, including Josh          13:54:30

2    Kastorf from 781 News.                                  13:54:35

3        Q. At the time you wrote this statement, were      13:54:55

4    you concerned that Channel 781 had used some of         13:54:57

5    WCAC's content to criticize elected officials in        13:55:02

6    Waltham?                                                13:55:05

7        A. If they had, they were probably entitled        13:55:05

8    to do that.  They're a news reporting                   13:55:15

9    organization.  They're entitled to criticize           13:55:22

10   whomever they please.                                   13:55:24

11       Q. But my question was, were you concerned by      13:55:30

12   that?                                                   13:55:34

13       A. The primary concern was the use of our          13:55:35

14   content in this potentially defamatory way because      13:55:44

15   it was unclear if the inclusion of my photograph        13:55:50

16   could make our station in some way liable, should       13:55:55

17   a defamation action have been taken.                    13:56:00

18       That was not something that was remotely a         13:56:06

19   possibility with anything Channel 781 News was          13:56:10

20   doing.                                                  13:56:13

21       Q. When you wrote this statement, did you          13:56:19

22   believe that Channel 781 was using WCAC's content       13:57:50

23   to encourage residents to hate?                         13:57:54

24       A. No.                                             13:57:55

1    Q. Did you believe that Channel 781 was using          13:57:56

2    WCAC footage in a way that could damage                13:58:06

3    reputations?                                           13:58:09

4    A. Potentially, but that's their prerogative           13:58:10

5    as a news organization.  They can report on the        13:58:27

6    news.  And if that happens, so be it.                  13:58:31

7    Q. So why did you refer to video from the MAC          13:58:49

8    channel in this statement?                             13:59:14

9    A. This statement also includes something              13:59:18

10   about a contentious election season.  Tempers were     13:59:24

11   starting to grow and online discourse was starting     13:59:32

12   to get more toxic.                                      13:59:37

13       At this point, Channel 781 News was not            13:59:40

14   doing anything remotely similar to what happened       13:59:43

15   with this Reddit post that caused this.                13:59:49

16       But as the election season carried on, it         13:59:52

17   was unclear what could happen, what use of our         13:59:56

18   footage could happen.  We didn't really know what      14:00:00

19   could happen.  And that would not only count for       14:00:03

20   Channel 781 News but anyone with a stake in this       14:00:08

21   highly contentious election that had been -- way       14:00:11

22   back in April for a November election had caused       14:00:18

23   this alarming situation for our channel.               14:00:20

24       Additionally, 781 News had produced our           14:00:36

1  video without our permission, and we wanted to            14:00:41

2  acknowledge that, as I mentioned earlier, all the         14:00:45

3  meetings had copyright notices on them.                   14:00:50

4        And we wanted to make it known that this            14:00:54

5  was our copywritten content and we take it                14:00:56

6  seriously.  If they wanted to make a request, they        14:01:00

7  or anyone else wanted to make a request, as it            14:01:03

8  says in this statement, they could approach us and        14:01:06

9  we would entertain a request.  And as we've               14:01:07

10  established, we would grant -- we would likely           14:01:11

11  grant any request to reproduce our footage.              14:01:14

12      Q. What actions, if any, did WCAC take with          14:02:04

13  respect to Channel 781 after this statement was          14:02:07

14  put on the air?                                           14:02:18

15      A. I believe Channel 781 may have watched            14:02:19

16  this statement and then set up a meeting with            14:02:27

17  executive director Maria Sheehan.                         14:02:30

18      Q. Before that meeting, did WCAC contemplate         14:02:51

19  sending infringement notices to YouTube?                 14:03:05

20      A. I can't recall.  We were aware -- I was           14:03:08

21  aware of the situation.  I can't recall.                  14:03:17

22      Q. Before the meeting between Maria Sheehan          14:03:27

23  and Josh Kastorf, were there any conversations           14:03:45

24  among WCAC staff about Channel 781?                       14:03:50

| | | |
|---|---|---|
| 1 | A. Yes.  I had told -- notified Bill some of | 14:03:57 |
| 2 | your video is being reproduced by Channel 781. | 14:04:05 |
| 3 | And I also talked to Maria about the situation. | 14:04:11 |
| 4 | It was not something that we had ever | 14:04:14 |
| 5 | encountered before.  We really hadn't had this | 14:04:16 |
| 6 | type of thing happen before.  In almost every | 14:04:19 |
| 7 | instance where another news organization wanted to | 14:04:24 |
| 8 | reproduce our content, they would approach us | 14:04:26 |
| 9 | either via phone or with a written request, and we | 14:04:31 |
| 10 | would grant them permission to use our footage. | 14:04:34 |
| 11 | This created a slightly different | 14:04:38 |
| 12 | situation where a local news organization was | 14:04:40 |
| 13 | reproducing our content which had copyright | 14:04:44 |
| 14 | disclaimers on it.  And we didn't have a clear | 14:04:49 |
| 15 | plan of what to do. | 14:04:54 |
| 16 | Q. You said earlier that you were not aware | 14:05:32 |
| 17 | of any instance where WCAC got a request to use | 14:05:39 |
| 18 | MAC-TV meeting video.  Is that right? | 14:05:45 |
| 19 | A. Yes. | 14:05:49 |
| 20 | Q. Before that meeting between Maria and Josh | 14:05:51 |
| 21 | Kastorf, did WCAC take any action with respect to | 14:06:12 |
| 22 | Channel 781? | 14:06:18 |
| 23 | A. Not that I'm aware of.  We became aware of | 14:06:19 |
| 24 | the situation and discussed it.  But again, it was | 14:06:29 |

| | | |
|---|---|---|
| 1 | an unprecedented news situation.  And the | 14:06:31 |
| 2 | statement was to just remind people of our | 14:06:37 |
| 3 | copyright.  And again, we were -- didn't quite | 14:06:41 |
| 4 | know what to do at the time. | 14:06:46 |
| 5 | MR. PYLE:  Mitch, can we take a quick | 14:06:50 |
| 6 | break? | 14:06:52 |
| 7 | MR. STOLTZ:  Absolutely. | 14:06:52 |
| 8 | MR. PYLE:  Five minutes. | 14:06:53 |
| 9 | THE VIDEOGRAPHER:  We are going off the | 14:06:54 |
| 10 | record.  The time on the monitor is 14:06. | 14:06:56 |
| 11 | (Recess, 2:06 p.m. to 2:13 p.m.) | 14:06:59 |
| 12 | THE VIDEOGRAPHER:  We are back on the | 14:13:49 |
| 13 | record.  The time on the monitor is 14:13. | 14:13:55 |
| 14 | BY MR. STOLTZ: | 14:14:02 |
| 15 | Q. Jumping back to the Reddit post for a | 14:14:02 |
| 16 | moment, who was the woman in the photo? | 14:14:06 |
| 17 | A. Her name is Dee Vanaria. | 14:14:08 |
| 18 | Q. Did WCAC receive any complaints from the | 14:14:11 |
| 19 | public about the Reddit post? | 14:14:18 |
| 20 | A. A person sent an email to an info@ address | 14:14:21 |
| 21 | about Ms. Vanaria's views not reflecting those of | 14:14:33 |
| 22 | Waltham, and you know, could it be subject to | 14:14:39 |
| 23 | reporting. | 14:14:45 |
| 24 | Q. Was it your understanding that that email | 14:14:46 |

| | | |
|---|---|---|
| 1 | was prompted by the Reddit post? | 14:14:51 |
| 2 | A. Yes. | 14:14:55 |
| 3 | Q. Do you know who sent the email? | 14:14:55 |
| 4 | A. The email was | 14:14:58 |
| 5 | concernedcitizen02452@outlook.com.  At the time it | 14:15:13 |
| 6 | seemed like a recently created email address, and | 14:15:17 |
| 7 | the email did not include a signature revealing | 14:15:21 |
| 8 | the sender's name. | 14:15:25 |
| 9 | Q. Did you receive any communications -- | 14:15:33 |
| 10 | strike that. | 14:15:37 |
| 11 | Did WCAC receive any communications from | 14:15:38 |
| 12 | elected officials prompted by the Reddit post? | 14:15:40 |
| 13 | A. I don't recall.  I don't recall. | 14:15:44 |
| 14 | Q. Is it possible? | 14:15:58 |
| 15 | A. It's possible. | 14:16:01 |
| 16 | Q. So we were talking about the face-to-face | 14:16:15 |
| 17 | meeting between Maria Sheehan and Josh Kastorf. | 14:16:21 |
| 18 | Were you aware that that meeting was happening? | 14:16:31 |
| 19 | A. Yes. | 14:16:33 |
| 20 | Q. Did that meeting happen on June 15th, | 14:16:33 |
| 21 | 2023? | 14:16:40 |
| 22 | A. Yes. | 14:16:41 |
| 23 | Q. Did WCAC staff discuss that meeting after | 14:16:41 |
| 24 | it happened? | 14:16:47 |

| | | |
|---|---|---|
| 1 | A. Yes. | 14:16:48 |
| 2 | Q. Who discussed it? | 14:16:49 |
| 3 | A. I discussed it with Maria, and I discussed | 14:16:53 |
| 4 | it with Bill. | 14:17:05 |
| 5 | Q. Could you please walk me through that | 14:17:16 |
| 6 | discussion. | 14:17:18 |
| 7 | A. Separate discussions.  Separate | 14:17:18 |
| 8 | discussions.  Maria finished up the meeting and | 14:17:26 |
| 9 | characterized what had happened, what was said on | 14:17:29 |
| 10 | both sides. | 14:17:33 |
| 11 | Q. And what happened next? | 14:17:37 |
| 12 | A. Then I went and I -- having learned what | 14:17:38 |
| 13 | had happened, I talked to Bill, who is the MAC | 14:17:43 |
| 14 | channel program coordinator, to give him an idea | 14:17:47 |
| 15 | of what happened. | 14:17:50 |
| 16 | Q. And what happened after that? | 14:17:56 |
| 17 | A. Can you be more specific? | 14:17:57 |
| 18 | Q. How did Bill respond? | 14:18:08 |
| 19 | A. I don't recall.  I don't recall. | 14:18:12 |
| 20 | Q. Did you speak with anyone else about the | 14:18:21 |
| 21 | meeting? | 14:18:24 |
| 22 | A. I can't recall. | 14:18:24 |
| 23 | Q. Did you speak with Mr. Barrett? | 14:18:37 |
| 24 | A. I don't believe so. | 14:18:39 |

1    Q. How did Ms. Sheehan characterize the        14:19:31

2    meeting to you?                                 14:19:34

3    A. Non -- informative but nonproductive.        14:19:34

4    Q. Anything else?                               14:19:53

5    A. (No verbal response)                         14:19:54

6    Q. What did she say had happened?               14:20:03

7    A. She invited Josh to come into our station,   14:20:05

8    to use our station for their news program.  She 14:20:13

9    sort of described what we do.                   14:20:23

10       And Josh wanted to know more about this      14:20:28

11   statement, so they discussed that.  But ultimately 14:20:32

12   they had a difference of opinion over reproducing 14:20:35

13   content.  And from how she characterized it to me, 14:20:42

14   they were in disagreement when the meeting ended. 14:20:50

15   Q. What were they in disagreement about?        14:20:54

16   A. Reproducing content, fair use, and           14:20:57

17   permissions to reproduce WCAC and MAC channel   14:21:11

18   content.                                         14:21:14

19   Q. In the discussions that you had internally   14:21:15

20   after that meeting, did anyone make a distinction 14:21:26

21   between the use of MAC channel video and other  14:21:37

22   WCAC video?                                      14:21:42

23   A. Yes.                                          14:21:43

24   Q. Can you explain?                             14:21:53

|   |   |   |
|---|---|---|
| 1 | A. Some MAC channel -- can I amend that?  I | 14:21:57 |
| 2 | don't recall.  I'm sorry.  I don't recall. | 14:22:13 |
| 3 | Q. It's possible that someone made that | 14:22:26 |
| 4 | distinction? | 14:22:28 |
| 5 | A. It's possible. | 14:22:29 |
| 6 | Q. Do you have any recollection of who that | 14:22:31 |
| 7 | might have been? | 14:22:37 |
| 8 | A. No. | 14:22:38 |
| 9 | Q. Could it possibly have been you? | 14:22:45 |
| 10 | A. Possibly. | 14:22:48 |
| 11 | Q. What was Bill's response to hearing about | 14:23:17 |
| 12 | the meeting? | 14:23:25 |
| 13 | A. He was not happy about anyone reproducing | 14:23:26 |
| 14 | his content because, as I mentioned before, there | 14:23:42 |
| 15 | were copyright disclaimers that are on every | 14:23:46 |
| 16 | single government video he produces, records, and | 14:23:53 |
| 17 | broadcasts.  So he wasn't happy. | 14:23:59 |
| 18 | But he also didn't really want to be | 14:24:03 |
| 19 | involved too much.  He didn't really care that | 14:24:08 |
| 20 | much.  But it was, you know, MAC channel video. | 14:24:12 |
| 21 | Q. In those discussions after the meeting | 14:24:20 |
| 22 | between Ms. Sheehan and Mr. Kastorf, did any of | 14:24:40 |
| 23 | the WCAC staff express concern about monetary harm | 14:24:47 |
| 24 | to WCAC based on what Channel 781 was doing? | 14:24:58 |

| | | |
|---|---|---|
| 1 | A. No. | 14:25:02 |
| 2 | Q. At that time, why was WCAC concerned that | 14:25:03 |
| 3 | Channel 781 was using MAC-TV video clips? | 14:25:22 |
| 4 | A. As I mentioned, there were copyright | 14:25:26 |
| 5 | disclaimers on all the videos.  So any | 14:25:33 |
| 6 | reproduction of it without permission created a | 14:25:36 |
| 7 | new situation for us that we were unaccustomed to | 14:25:41 |
| 8 | because we had not confronted that. | 14:25:46 |
| 9 | Q. At that time, what harm did you see? | 14:26:02 |
| 10 | A. It's our copywritten material.  Someone's | 14:26:04 |
| 11 | using it without -- someone is infringing on our | 14:26:10 |
| 12 | copyright.  Someone is using our content without | 14:26:13 |
| 13 | our permission. | 14:26:18 |
| 14 | Consideration was made of fair use, for | 14:26:20 |
| 15 | instance, in Debrief segments.  Short clips from | 14:26:23 |
| 16 | MAC channel content was used in keeping with the | 14:26:32 |
| 17 | fair use doctrine, but there were entire city | 14:26:35 |
| 18 | council meetings and the stand-alone clips you | 14:26:39 |
| 19 | referred to earlier that were also part of the | 14:26:44 |
| 20 | Waltham DATA YouTube channel. | 14:26:46 |
| 21 | Q. Do you remember how many entire city | 14:26:51 |
| 22 | council meetings were posted to the Waltham DATA | 14:27:03 |
| 23 | YouTube channel? | 14:27:06 |
| 24 | A. No. | 14:27:07 |

1    Q. Was it more than ten?                          14:27:07

2    A. I couldn't say.                                14:27:10

3    Q. Was it more than five?                         14:27:13

4    A. I remember the rationale given in an email     14:27:14

5  that I wrote.  But the number of videos, I cannot    14:27:25

6  say with certainty.                                  14:27:32

7    Q. Who at WCAC first suggested sending            14:27:33

8  infringement notices to YouTube?                     14:27:43

9    A. I did.                                         14:27:45

10   Q. Around when did you first suggest that?        14:27:47

11   A. After it became clear that the                 14:27:50

12 disagreement Josh had with Maria over MAC channel    14:28:05

13 footage was unlikely to be resolved.                 14:28:12

14   Q. Where had you learned that sending an          14:28:25

15 infringement notice to YouTube was a course you      14:28:33

16 could take?                                          14:28:38

17   A. I went on YouTube to determine what action     14:28:39

18 could be taken, if any, against an entity            14:28:46

19 infringing on copywritten content and discovered     14:28:53

20 that takedown notices were one of the remedies.      14:28:56

21   Q. In that period after the meeting between       14:29:10

22 Ms. Sheehan and Mr. Kastorf, did anyone at WCAC      14:29:14

23 mention a concern that Channel 781 would defame or   14:29:21

24 libel someone?                                       14:29:32

| | | |
|---|---|---|
| 1 | A. Yes. | 14:29:32 |
| 2 | Q. Do you know who mentioned that? | 14:29:40 |
| 3 | A. I think it could have -- Maria, possibly. | 14:29:42 |
| 4 | Q. Do you recall what she said? | 14:29:48 |
| 5 | A. No.  Nope. | 14:29:50 |
| 6 | Q. Did she have the same type of concern that | 14:30:02 |
| 7 | you had described with respect to the Reddit post? | 14:30:05 |
| 8 | A. I can't say how she felt. | 14:30:06 |
| 9 | Q. Earlier I asked what harm you saw in | 14:31:19 |
| 10 | Channel 781 using MAC-TV video.  Was there any | 14:31:24 |
| 11 | other harm that you saw besides what you mentioned | 14:31:33 |
| 12 | earlier? | 14:31:43 |
| 13 | A. We work hard to produce this content.  We | 14:31:44 |
| 14 | knew from news gatherings that when someone wants | 14:31:47 |
| 15 | to reproduce anyone's content, they typically make | 14:31:50 |
| 16 | a request.  We understood there is an exception | 14:31:53 |
| 17 | for fair use, but the idea that others would | 14:31:57 |
| 18 | reproduce it without our permission was new | 14:32:00 |
| 19 | because we take pride in professional work. | 14:32:05 |
| 20 | Q. Any other harm? | 14:32:16 |
| 21 | A. Potentially drawing, you know -- drawing | 14:32:17 |
| 22 | viewers to a different -- drawing viewers to | 14:32:43 |
| 23 | content we thought was copyright protected, | 14:32:50 |
| 24 | drawing eyeballs, drawing viewers to content that | 14:32:58 |

| | | |
|---|---|---|
| 1 | we believed was infringing.  So building an | 14:33:01 |
| 2 | audience based in part on infringing content, I | 14:33:04 |
| 3 | considered that maybe not a harm but not a | 14:33:11 |
| 4 | benefit. | 14:33:14 |
| 5 | Q. In that period after that meeting, did | 14:33:15 |
| 6 | anyone at WCAC mention the upcoming elections as a | 14:33:31 |
| 7 | reason to be concerned about what Channel 781 was | 14:33:37 |
| 8 | doing? | 14:33:40 |
| 9 | A. I mentioned it in my statement.  I | 14:33:40 |
| 10 | referred to the upcoming contentious election in | 14:33:53 |
| 11 | my statement.  So yes, it was a topic of | 14:33:56 |
| 12 | discussion because not only was it a contentious | 14:33:59 |
| 13 | election, it was an election where there would be | 14:34:04 |
| 14 | potentially higher turnout because it involved a | 14:34:07 |
| 15 | mayoral race. | 14:34:10 |
| 16 | Q. In those conversations, did anyone draw a | 14:34:16 |
| 17 | distinction between using WCAC government meeting | 14:34:20 |
| 18 | video for news reporting versus using it to | 14:34:26 |
| 19 | express an opinion? | 14:34:32 |
| 20 | MR. PYLE:  Just for the record, are we | 14:34:40 |
| 21 | referring to the discussions with Maria and with | 14:34:42 |
| 22 | Bill after the Kastorf meeting?  Is that what | 14:34:45 |
| 23 | we're talking about? | 14:34:48 |
| 24 | MR. STOLTZ:  Yes. | 14:34:50 |

| | | |
|---|---|---|
| 1 | MR. PYLE:  Okay. | 14:34:51 |
| 2 | A. The question was? | 14:34:53 |
| 3 | Q. In the conversations that you had | 14:34:56 |
| 4 | internally at WCAC after that meeting between | 14:34:58 |
| 5 | Ms. Sheehan and Mr. Kastorf, did anyone draw a | 14:35:04 |
| 6 | distinction between using WCAC government meeting | 14:35:07 |
| 7 | video for news reporting versus using it to | 14:35:10 |
| 8 | express an opinion? | 14:35:13 |
| 9 | A. Maria, possibly. | 14:35:14 |
| 10 | Q. When you proposed -- strike that. | 14:35:33 |
| 11 | When did you first propose sending an | 14:35:37 |
| 12 | infringement notice to YouTube? | 14:35:40 |
| 13 | A. I believe it was July, around July.  But | 14:35:42 |
| 14 | we had a problem.  The YouTube channel associated | 14:35:54 |
| 15 | with the MAC channel had an email address linked | 14:36:05 |
| 16 | to a former staff member, so we weren't able to | 14:36:12 |
| 17 | access that email in order to make a takedown | 14:36:17 |
| 18 | request even though I assumed that the MAC channel | 14:36:24 |
| 19 | YouTube account would be the appropriate entity to | 14:36:30 |
| 20 | make any takedown request.  So . . . | 14:36:34 |
| 21 | Q. So what happened? | 14:36:43 |
| 22 | A. I attempted to make a takedown request in | 14:36:44 |
| 23 | July and failed, received communications from | 14:36:49 |
| 24 | YouTube indicating that there was something not | 14:36:55 |

| | | |
|---|---|---|
| 1 | right with the format of the takedown request. | 14:37:00 |
| 2 | And it kind of ended there because I had | 14:37:06 |
| 3 | to do additional research to determine how to set | 14:37:10 |
| 4 | up the MAC channel YouTube account so it could | 14:37:14 |
| 5 | successfully file a takedown notice. | 14:37:18 |
| 6 | Q. So you attempted to send an infringement | 14:37:22 |
| 7 | notice to YouTube in July? | 14:37:27 |
| 8 | A. I believe so, with the following | 14:37:29 |
| 9 | disclaimer. That initial attempt was made from a | 14:37:39 |
| 10 | different YouTube account associated with the MAC | 14:37:45 |
| 11 | channel. A different MAC channel YouTube account | 14:37:50 |
| 12 | was later created to make additional takedown | 14:37:59 |
| 13 | requests. | 14:38:08 |
| 14 | Q. In that initial takedown attempt, how many | 14:38:08 |
| 15 | videos did you include? | 14:38:16 |
| 16 | A. One. | 14:38:19 |
| 17 | Q. How would you describe that video? | 14:38:24 |
| 18 | A. The video was an excerpt from a | 14:38:25 |
| 19 | committee -- Waltham City Council committee of the | 14:38:36 |
| 20 | whole meeting, involving a discussion of the MBTA | 14:38:39 |
| 21 | Communities Act. | 14:38:47 |
| 22 | Q. Why did you choose that video in | 14:38:53 |
| 23 | particular? | 14:38:54 |
| 24 | A. It was a stand-alone video, and I did not | 14:38:55 |

| | | |
|---|---|---|
| 1 | believe that it qualified for copyright protection | 14:39:03 |
| 2 | under fair use -- or exemption under fair use. | 14:39:06 |
| 3 | Pardon me. | 14:39:15 |
| 4 | Q. At the time you sent that first | 14:39:16 |
| 5 | infringement notice, what sources were you relying | 14:39:28 |
| 6 | on about the definition of "fair use"? | 14:39:37 |
| 7 | MR. PYLE: Objection. | 14:39:41 |
| 8 | Go ahead. | 14:39:43 |
| 9 | A. I had watched a video on YouTube about | 14:39:44 |
| 10 | copyright fair use, and I had communicated to | 14:39:52 |
| 11 | Maria who -- I had communicated to Maria in an | 14:39:57 |
| 12 | email that a distinction between videos on the | 14:40:02 |
| 13 | Waltham DATA 781 News YouTube page, a key | 14:40:07 |
| 14 | distinction. | 14:40:12 |
| 15 | Q. What was that distinction? | 14:40:21 |
| 16 | A. Uses of short clips interspersed with | 14:40:23 |
| 17 | correspondent reporting in Waltham 781 News. | 14:40:31 |
| 18 | Reporting by correspondents in their debriefs did | 14:40:36 |
| 19 | qualify or was likely to qualify as fair use of | 14:40:42 |
| 20 | MAC channel video. But longer videos that merely | 14:40:47 |
| 21 | copied copywritten MAC channel content and focused | 14:40:54 |
| 22 | entirely on the copywritten content and failed to | 14:41:01 |
| 23 | have a transformative effect on that content would | 14:41:04 |
| 24 | not qualify for copyright exemption under fair | 14:41:08 |

```
1    use.                                              14:41:17

2         MR. STOLTZ:  I'm sorry.  Could we go off     14:41:30

3    the record for just a moment.                     14:41:31

4         THE VIDEOGRAPHER:  We are going off the      14:41:33

5    record.  The time on the monitor is 14:41.        14:41:35

6         (Recess, 2:41 p.m. to 2:42 P.M.)             14:41:37

7         THE VIDEOGRAPHER:  We are back on the         14:42:03

8    record.  The time on the monitor is 14:42.        14:42:05

9         (Wangler Exhibit 42 was marked for           14:42:10

10   identification and is attached to the transcript.) 14:42:19

11   BY MR. STOLTZ:                                     14:42:19

12      Q. Mr. Wangler, I'm showing you what's been     14:42:20

13   marked as Exhibit 42.  Do you recognize this       14:42:22

14   document?                                          14:42:28

15      A. Yes.                                          14:42:29

16      Q. Is it an email you sent to Ms. Sheehan?       14:42:30

17      A. Yes.                                          14:42:39

18      Q. On June 16th of 2023?                         14:42:40

19      A. Yes.                                          14:42:44

20      Q. At 12:13 p.m.?                                14:42:44

21      A. Yes.                                          14:42:47

22      Q. Is this a true and correct copy of that      14:42:47

23   email exchange?                                    14:42:54

24      A. Yes.                                          14:42:55
```

| | | |
|---|---|---|
| 1 | (Whereupon Attorney Doelger entered) | 14:42:59 |
| 2 | MR. PYLE:  Let the record reflect Sarah | 14:43:03 |
| 3 | Doelger has just entered the room. | 14:43:05 |
| 4 | MS. DOELGER:  Hi, everyone.  How are you? | 14:43:07 |
| 5 | MR. STOLTZ:  Hi, Sarah. | 14:43:08 |
| 6 | Q. This email thread includes an email from | 14:43:24 |
| 7 | Josh Kastorf to Ms. Sheehan.  Is that right? | 14:43:41 |
| 8 | A. Yes. | 14:43:44 |
| 9 | Q. And Mr. Kastorf in his email includes | 14:43:44 |
| 10 | several links about copyright law.  Is that right? | 14:44:00 |
| 11 | A. Yes. | 14:44:03 |
| 12 | Q. Did you read the links -- strike that. | 14:44:04 |
| 13 | Did you read the documents at the links | 14:44:12 |
| 14 | that Mr. Kastorf provided? | 14:44:16 |
| 15 | A. No.  I read the email only. | 14:44:17 |
| 16 | Q. Could you please read your email to | 14:44:18 |
| 17 | Ms. Sheehan at the top of this thread. | 14:44:35 |
| 18 | A. "Fair use is not the reason given in the | 14:44:37 |
| 19 | Waltham DATA YouTube mission statement but rather, | 14:44:40 |
| 20 | quote, We do not own the rights to the WCAC | 14:44:44 |
| 21 | content, but we believe this is necessary because | 14:44:46 |
| 22 | WCAC is not meeting their legal obligation to | 14:44:50 |
| 23 | provide captions." | 14:44:54 |
| 24 | Q. Could you continue, please. | 14:44:58 |

1    A. "Maybe see what YouTube does when you          14:44:59

2  execute the copyright violation claims.  He can      14:45:03

3  take it up with YouTube."                            14:45:05

4    Q. Why did you write "Fair use is not the         14:45:19

5  reason given in the Waltham DATA YouTube mission     14:45:21

6  statement"?                                          14:45:26

7    A. Because it wasn't.                              14:45:26

8    Q. Why did you find that significant enough       14:45:30

9  to mention in your email to Ms. Sheehan?             14:45:32

10    A. Because I believed our failure to caption     14:45:35

11  our MAC channel government meetings was a           14:45:43

12  significant motivating factor for posting our       14:45:47

13  copyright protected content on the Waltham DATA     14:45:55

14  YouTube page.                                       14:45:58

15    Q. What did you mean by "execute the             14:45:58

16  copyright violation claims"?                        14:46:30

17    A. To take action to protect our copyright       14:46:32

18  with YouTube.                                        14:46:41

19    Q. Were you specifically referring to sending   14:46:42

20  infringement notices to YouTube?                    14:46:52

21    A. I can't recall where the process was at       14:46:53

22  the time.                                           14:47:05

23    Q. Why did you say "Maybe see what YouTube       14:47:05

24  does"?                                              14:47:09

1    A. One potential remedy for copyright                14:47:10

2  infringement is to bring a civil complaint in          14:47:15

3  federal or superior court.                             14:47:21

4        We did not have an attorney.  We didn't          14:47:23

5  know of any intellectual property law firms.  And      14:47:29

6  so what remedy did we have?  I saw this as one of      14:47:34

7  the -- an initial remedy we could take because we      14:47:39

8  couldn't -- we couldn't take legal action.            14:47:42

9    Q. What did you mean by "He can take it up          14:47:49

10 with YouTube"?                                         14:47:51

11   A. If we filed these copyright violation            14:47:52

12 claims, Josh could file an appeal of whatever          14:47:57

13 takedown notice we might send to YouTube with the      14:48:07

14 fair use information that he provided in his           14:48:16

15 email.                                                 14:48:19

16   Q. When you wrote this email, did you believe       14:48:29

17 that YouTube would make the final decision about       14:48:52

18 whether the clips infringed copyright?                 14:48:55

19   A. Around the same time, I watched the video        14:48:59

20 I had just mentioned.  And that video said very        14:49:05

21 explicitly at the start that only courts make          14:49:08

22 determinations about fair use, not YouTube.            14:49:12

23   Q. At the time you sent this email, were you         14:49:16

24 already contemplating sending infringement notices     14:49:30

1    to YouTube?                                        14:49:34

2        A. Yes.                                        14:49:34

3        (Wangler Exhibit 43 was marked for             14:49:57

4    identification and is attached to the transcript.) 14:49:59

5        Q. I'm showing you what's been marked as       14:49:59

6    Exhibit 43.  Do you recognize this email?          14:50:04

7        A. Yes.                                        14:50:07

8        Q. Is this a true and correct copy of an       14:50:09

9    email that you sent to Ms. Sheehan?                14:50:14

10       A. Yes.                                        14:50:15

11       MR. PYLE:  I'd like to state for the           14:50:19

12   record that the Exhibit 43 does not contain the    14:50:21

13   attachment that goes with this email.              14:50:23

14       (Wangler Exhibit 44 was marked for             14:50:36

15   identification and is attached to the transcript.) 14:50:39

16       Q. I'm also showing you what's been marked as  14:50:39

17   Exhibit 44.  I can represent that this was         14:50:41

18   produced to us marked as an attachment to          14:50:46

19   Exhibit 43.                                        14:50:51

20       Do you recognize this document?                14:50:53

21       A. Yes.                                        14:50:54

22       Q. Is this a screen grab from the video you    14:50:55

23   mentioned?                                         14:51:01

24       A. Yes.                                        14:51:02

| 1 | Q. And you said earlier that you watched the | 14:51:02 |
| 2 | entire video.  Is that correct? | 14:51:47 |
| 3 | A. Yes. | 14:51:48 |
| 4 | Q. Before you made the initial attempt to | 14:51:48 |
| 5 | send an infringement notice to YouTube, did you | 14:52:21 |
| 6 | consider whether Channel 781 was trying to | 14:52:29 |
| 7 | monetize the clips from WCAC? | 14:52:34 |
| 8 | A. I did consider it.  Yes. | 14:52:43 |
| 9 | Q. Did you believe at the time that that | 14:52:44 |
| 10 | criterion, which I'm reading from this screen | 14:52:52 |
| 11 | grab, was relevant? | 14:52:57 |
| 12 | A. No, it was not relevant. | 14:52:57 |
| 13 | Q. Why not? | 14:53:01 |
| 14 | A. Channel 781 News did not monetize their | 14:53:02 |
| 15 | videos. | 14:53:07 |
| 16 | Q. You didn't believe that that was a | 14:53:13 |
| 17 | relevant fact regarding fair use? | 14:53:16 |
| 18 | A. It is relevant regarding fair use, but it | 14:53:18 |
| 19 | wasn't relevant to the actions 781 News was | 14:53:24 |
| 20 | taking. | 14:53:28 |
| 21 | Q. Why not? | 14:53:30 |
| 22 | A. 781 News was not trying to monetize their | 14:53:38 |
| 23 | videos. | 14:53:41 |
| 24 | Q. So you didn't believe that that lack of | 14:54:12 |

| | | |
|---|---|---|
| 1 | monetization was relevant to whether Channel 781 | 14:54:17 |
| 2 | was engaged in a fair use? | 14:54:24 |
| 3 | MR. PYLE:  Objection. | 14:54:26 |
| 4 | A. The potential monetization was relevant, | 14:54:26 |
| 5 | but I was aware that they were not monetizing | 14:54:37 |
| 6 | their videos. | 14:54:40 |
| 7 | Q. Based on your understanding at the time, | 14:55:21 |
| 8 | did the fact that Channel 781 didn't monetize | 14:55:24 |
| 9 | their videos make you consider their use more | 14:55:28 |
| 10 | likely to be a fair use? | 14:55:37 |
| 11 | A. Possibly. | 14:55:39 |
| 12 | Q. At that time did you consider whether | 14:55:47 |
| 13 | Channel 781 was using fictional copyrighted | 14:56:11 |
| 14 | material as opposed to factual material? | 14:56:18 |
| 15 | A. It was not fictional. | 14:56:20 |
| 16 | Q. Is that something you considered before | 14:56:28 |
| 17 | your initial attempt to send an infringement | 14:56:31 |
| 18 | notice to YouTube? | 14:56:33 |
| 19 | A. I had learned about the factual | 14:56:34 |
| 20 | distinction in this video.  So yes, I did consider | 14:56:40 |
| 21 | it. | 14:56:42 |
| 22 | Q. Did the fact that the video used was | 14:56:43 |
| 23 | factual make you consider their use more likely to | 14:56:53 |
| 24 | be a fair use? | 14:57:03 |

1      A. Possibly.                                        14:57:04

2      Q. If you can remember, approximately how          14:57:35

3  long was the clip referenced in your initial           14:57:39

4  infringement notice to YouTube in July of 2023?        14:57:43

5      A. Between 1 and 2 minutes.                         14:57:46

6      Q. Did you consider whether that constituted       14:57:51

7  a large amount of material?                             14:58:06

8      A. It was a difficult concept to understand        14:58:07

9  as a layperson what constitutes a large amount of      14:58:21

10  material, whether it be a song, a video, a poetry.    14:58:26

11  It's a complicated matter of law.                      14:58:33

12      I focused more on the reproduction of our         14:58:35

13  copyright-protected video in its entirety.  The        14:58:41

14  main focus was the copywritten material, and it        14:58:47

15  did not appear to transform the material at all,       14:58:51

16  in my consideration of fair use.                       14:58:54

17      Q. At that time, what was your understanding       14:59:10

18  of what it meant to transform the material?            14:59:22

19      A. Again, a difficult legal concept which is      14:59:25

20  subject to much discussion, but taking video --        14:59:33

21  excerpting video and republishing it without          14:59:43

22  interspersing it with commentary, B-Roll, or other    14:59:49

23  factors seemed less likely to be fair use than        14:59:55

24  just taking video, copyright-protected video,         15:00:02

| | | |
|---|---|---|
| 1 | reproducing it, and the entire focus is the | 15:00:05 |
| 2 | copywritten content. | 15:00:11 |
| 3 | Q. At that time, did you consider whether | 15:00:18 |
| 4 | Channel 781's use of that particular video clip | 15:00:25 |
| 5 | harmed WCAC's ability to profit? | 15:00:31 |
| 6 | A. I did consider it.  But both 781 News and | 15:00:34 |
| 7 | Waltham Channel are nonprofits, and it was not -- | 15:00:44 |
| 8 | it was not as important a consideration as the | 15:00:55 |
| 9 | excerpting of copywritten material without a | 15:00:59 |
| 10 | transformative purpose. | 15:01:07 |
| 11 | Q. You said earlier that Channel 781 has a | 15:01:19 |
| 12 | different audience than MAC-TV.  Is that right? | 15:01:27 |
| 13 | A. Yes. | 15:01:31 |
| 14 | Q. And you also said that Channel 781 has a | 15:01:33 |
| 15 | different audience than Waltham Newswatch.  Is | 15:01:36 |
| 16 | that right? | 15:01:39 |
| 17 | A. Yes. | 15:01:39 |
| 18 | Q. Did you consider that when you were | 15:01:39 |
| 19 | determining whether there was a transformation? | 15:01:52 |
| 20 | A. I can't recall if I considered the | 15:01:58 |
| 21 | audience. | 15:02:06 |
| 22 | Q. Going back to Exhibit 43, could you read | 15:02:06 |
| 23 | the last paragraph of your email, please. | 15:02:55 |
| 24 | A. "What does not qualify are the large | 15:02:56 |

| | | |
|---|---|---|
| 1 | numbers of video taken directly from us and | 15:02:59 |
| 2 | reproduced verbatim with zero editing or | 15:03:02 |
| 3 | commentary.  Those will be the ones we should file | 15:03:06 |
| 4 | copyright claims against because they 'merely | 15:03:08 |
| 5 | copy.'  A lot of it is used without permission and | 15:03:12 |
| 6 | the main focus in," sic, "the copywritten | 15:03:17 |
| 7 | material." | 15:03:22 |
| 8 | MR. PYLE:  Only a copy editor would | 15:03:30 |
| 9 | verbally put in "sic." | 15:03:32 |
| 10 | Q. Why did you leave out using fictional | 15:03:51 |
| 11 | copyrighted material from that email? | 15:03:54 |
| 12 | MR. PYLE:  Objection. | 15:03:58 |
| 13 | A. The video -- the stand-alone clips, | 15:03:58 |
| 14 | self-evident they were not fictional.  So I can't | 15:04:15 |
| 15 | recall why I didn't -- I can't recall why I didn't | 15:04:27 |
| 16 | include that fictional component. | 15:04:31 |
| 17 | Q. Why did you leave out "trying to | 15:04:33 |
| 18 | monetize"? | 15:04:46 |
| 19 | MR. PYLE:  Objection. | 15:04:46 |
| 20 | A. I don't recall. | 15:04:46 |
| 21 | Q. You told me earlier that your | 15:05:05 |
| 22 | understanding was that Channel 781 was not trying | 15:05:07 |
| 23 | to monetize when it used that clip.  Is that | 15:05:12 |
| 24 | right? | 15:05:18 |

1        A. Yes.                                          15:05:18

2        Q. Why didn't you mention that in this email?    15:05:19

3            MR. PYLE:  Objection.                         15:05:24

4        A. It was evident to me and Maria that none      15:05:25

5    of us were making money off of this stuff.  We're    15:05:33

6    all nonprofits here.  I didn't monetize my own       15:05:36

7    YouTube videos.                                       15:05:42

8        Q. I think you said earlier that your            15:05:58

9    understanding at the time was that Channel 781's     15:06:00

10   use of WCAC video clips did not harm WCAC's          15:06:08

11   ability to profit.                                    15:06:16

12           MR. PYLE:  Objection.                         15:06:19

13       Q. Is that correct?                               15:06:20

14       A. Define "profit."                               15:06:21

15       Q. What did you understand "profit" to mean      15:06:34

16   when you saw the video attached to this email?       15:06:37

17       A. So there's monetary profit.  But as I         15:06:40

18   described earlier, there's also the profit of        15:06:45

19   gathering followers using copywritten content.       15:06:47

20   And that was definitely something considered.        15:06:51

21       Q. Did you believe that Channel 781's use of     15:07:01

22   WCAC video clips harmed WCAC's ability to gather     15:07:04

23   followers?                                            15:07:10

24       A. Potentially.                                   15:07:10

| | | |
|---|---|---|
| 1 | Q. Can you explain what you mean by | 15:07:18 |
| 2 | "potentially"? | 15:07:20 |
| 3 | A. It's our video.  We want people to watch | 15:07:21 |
| 4 | our video.  We don't want people to go somewhere | 15:07:25 |
| 5 | else to watch our video.  We want people to watch | 15:07:27 |
| 6 | our video.  We worked hard to create this | 15:07:29 |
| 7 | copywritten video.  It has copyright notices. | 15:07:32 |
| 8 | Please watch it on our channel in its entirety, as | 15:07:36 |
| 9 | intended. | 15:07:39 |
| 10 | Q. If you wouldn't mind turning back to | 15:07:40 |
| 11 | WCAC's interrogatory responses. | 15:08:18 |
| 12 | A. Yup. | 15:08:20 |
| 13 | MR. PYLE:  Is that 40? | 15:08:21 |
| 14 | MR. STOLTZ:  I believe that was 40. | 15:08:23 |
| 15 | A. Yes. | 15:08:25 |
| 16 | Q. If you could turn to page 6, please.  And | 15:10:39 |
| 17 | if you could please read the first sentence of | 15:10:45 |
| 18 | Answer Number 5. | 15:10:48 |
| 19 | A. "WCAC states that its personnel did not | 15:10:49 |
| 20 | form any particularized belief at the time of | 15:10:53 |
| 21 | sending of the notices of claimed infringement as | 15:10:56 |
| 22 | to the effect that the claimed infringement would | 15:10:59 |
| 23 | have on the market value of each of the WCAC | 15:11:01 |
| 24 | videos on a work-by-work basis.  Answering | 15:11:05 |

1   further, WCAC states at the time" --                    15:11:09

2          MR. PYLE:  I think you can stop there.            15:11:13

3          THE WITNESS:  Okay.                               15:11:18

4      Q. Is that first sentence correct?                    15:11:23

5      A. It's unclear what the market value of each         15:11:25

6   WCAC video would be.                                     15:11:44

7      Q. Would you agree, then, that WCAC did not           15:11:54

8   form any particularized belief about the effect of       15:11:57

9   market value?  Strike that.                              15:12:00

10         Would you agree that WCAC at the time it           15:12:04

11  sent that first notice of infringement did not           15:12:10

12  form any particularized belief about the effect          15:12:15

13  that Channel 781's use of the clip would have on         15:12:22

14  the market value of that clip?                           15:12:27

15         MR. PYLE:  Objection.                             15:12:32

16     A. Presumably that's correct.  I can't speak          15:12:33

17  for other personnel, but on my own I don't think I       15:13:04

18  formed an opinion about the market value.                15:13:08

19         MR. PYLE:  Mitch, can I put on the record         15:13:26

20  that this interrogatory refers to several defined        15:13:28

21  terms, and the definitions aren't here in the            15:13:35

22  answers to the objections?  I'm thinking in              15:13:39

23  particular about the defined term "WCAC videos."         15:13:42

24         So I just wanted to make that notification        15:13:47

| | | |
|---|---|---|
| 1 | as a part of my reason for objecting to the form. | 15:13:51 |
| 2 | MR. STOLTZ:  Thank you.  We'll come back | 15:13:58 |
| 3 | to it. | 15:14:00 |
| 4 | MR. PYLE:  Okay. | 15:14:00 |
| 5 | Q. After you sent that initial infringement | 15:14:13 |
| 6 | notice to YouTube, when did WCAC next attempt to | 15:14:23 |
| 7 | send an infringement notice to YouTube concerning | 15:14:29 |
| 8 | Channel 781? | 15:14:31 |
| 9 | A. In early September. | 15:14:32 |
| 10 | Q. Did WCAC do anything with respect to | 15:14:36 |
| 11 | Channel 781 between July and early September? | 15:14:44 |
| 12 | A. I believe some attempts were made to | 15:14:55 |
| 13 | resolve the email issue that I alluded to earlier. | 15:15:02 |
| 14 | Q. Who made those attempts? | 15:15:10 |
| 15 | A. The proper authority for creating new | 15:15:12 |
| 16 | emails in our company is Maria.  The email | 15:15:18 |
| 17 | associated with this -- with the Waltham MAC-TV | 15:15:24 |
| 18 | YouTube channel was a dot -- @gmail.com. | 15:15:31 |
| 19 | And we needed a @wcac.org email to send | 15:15:41 |
| 20 | these takedown notices.  So we had to create a new | 15:15:50 |
| 21 | YouTube account, create a new email, and then | 15:15:56 |
| 22 | designate Maria instead of Bill as the entity | 15:16:02 |
| 23 | making the takedown request.  So we had to alter | 15:16:07 |
| 24 | how the takedown requests were sent to YouTube. | 15:16:11 |

1    Q. My question was, who at WCAC attempted to        15:16:16

2    resolve that issue?                                  15:16:21

3    A. Maria and myself, working with Bill, who          15:16:22

4    had some control of the earlier @gmail.com email     15:16:33

5    address.                                             15:16:41

6    Q. When did you resolve that issue?                  15:16:45

7    A. I can't recall.  Possibly July.                   15:16:47

8    Q. Did WCAC take any action with respect to          15:17:01

9    Channel 781 after resolving that issue with          15:17:08

10   YouTube but before September 4th?                    15:17:16

11   A. Not to my knowledge.  It was summertime           15:17:20

12   and I had traveled to Hawaii with my family, and     15:17:25

13   other staff members were taking vacations at the     15:17:28

14   time.  It was the middle of summer.                  15:17:32

15   Q. Did WCAC send another infringement notice         15:17:34

16   on or around September 4th?                          15:17:39

17   A. September 4th?  September 4th, you said?          15:17:41

18   Q. Yes.                                              15:17:59

19   A. My recollection is no.                            15:17:59

20   Q. In your recollection, when did WCAC next          15:18:05

21   attempt to send an infringement notice to YouTube?   15:18:09

22   A. September 1st.                                     15:18:11

23   Q. Why did WCAC choose to send another               15:18:25

24   infringement notice on or around September 1st?      15:18:28

1     A. We were trying to resolve this issue with          15:18:30

2     the copyright infringement.  I failed earlier, and    15:18:42

3     Maria and I decided, reached a consensus, to send     15:18:55

4     copyright infringement notices on or around that      15:19:00

5     date.                                                 15:19:04

6     Q. So you had another discussion with Maria           15:19:07

7     on or around that date?                               15:19:11

8     A. Yes.                                                15:19:12

9     Q. What, if anything, prompted that                   15:19:13

10    discussion?                                            15:19:17

11    A. We had learned that Channel 781 had taken          15:19:18

12    some -- a video involving a candidate and             15:19:32

13    reproduced that video without our permission.  And    15:19:38

14    this was embarrassing to us.  And learning of this    15:19:45

15    action of theirs rekindled this entire discussion     15:19:52

16    of needing to take some action to protect our         15:19:55

17    copyright.                                             15:19:59

18    Q. Why was that embarrassing to WCAC?                 15:20:00

19    A. The You Don't Say candidate statements are         15:20:09

20    a primary resource for voters in the City of          15:20:18

21    Waltham.  We invite every candidate in municipal      15:20:23

22    elections into our studio to tape brief statements    15:20:26

23    on-camera, and then we collect those statements       15:20:33

24    into a video or videos that air during the            15:20:36

| | | |
|---|---|---|
| 1 | election season to let the viewers meet and become | 15:20:38 |
| 2 | familiar with candidates for office. | 15:20:42 |
| 3 | The taping of these statements at times | 15:20:45 |
| 4 | involves people who are unaccustomed to appearing | 15:20:48 |
| 5 | on-camera, who may be reading from a teleprompter | 15:20:52 |
| 6 | and are not exactly ready for prime time or who | 15:20:58 |
| 7 | just sound wooden the first time they try. | 15:21:01 |
| 8 | So at times people struggle to tape a good | 15:21:05 |
| 9 | statement that represents them in their best | 15:21:11 |
| 10 | possible light.  And we extend them some rope to | 15:21:14 |
| 11 | allow them to tape one or more statements and tape | 15:21:17 |
| 12 | their best statement. | 15:21:23 |
| 13 | One candidate for office came in and she | 15:21:24 |
| 14 | taped a statement and it included a number of | 15:21:27 |
| 15 | false starts and stops. | 15:21:31 |
| 16 | And through a mistake of our own, Phil | 15:21:36 |
| 17 | McGrady and myself, this mistake of this candidate | 15:21:40 |
| 18 | starting and stopping and finally getting into a | 15:21:45 |
| 19 | rhythm was ultimately broadcast by us, intercepted | 15:21:47 |
| 20 | by 781 News, and then posted to one of their | 15:21:53 |
| 21 | social media channels. | 15:21:57 |
| 22 | Q. So again, why was that embarrassing to | 15:22:06 |
| 23 | WCAC? | 15:22:18 |
| 24 | A. Phil and I had made a mistake in including | 15:22:18 |

| | | |
|---|---|---|
| 1 | something that really wasn't something we would | 15:22:21 |
| 2 | typically include in one of these videos about | 15:22:23 |
| 3 | these candidates, which is the false starts and | 15:22:26 |
| 4 | stops and struggling to get going. | 15:22:32 |
| 5 | Typically we would exclude that to allow | 15:22:36 |
| 6 | candidates to present, put their best face forward | 15:22:42 |
| 7 | in these candidate videos where they tell the | 15:22:45 |
| 8 | community about who they are and why they're | 15:22:48 |
| 9 | running for office. | 15:22:50 |
| 10 | Q. Did WCAC allow each candidate a certain | 15:22:52 |
| 11 | number of takes? | 15:22:59 |
| 12 | A. Some candidates required multiple takes. | 15:23:00 |
| 13 | Over the years some candidates required sometimes | 15:23:04 |
| 14 | three takes because, again, there were candidates | 15:23:07 |
| 15 | that would be running for the first time.  They | 15:23:14 |
| 16 | may have loaded a script into the teleprompter and | 15:23:17 |
| 17 | for whatever reason were not reading it well. | 15:23:20 |
| 18 | So we offered some leniency in terms of | 15:23:22 |
| 19 | ensuring that they were able to present the best | 15:23:29 |
| 20 | version of themselves to the voters. | 15:23:32 |
| 21 | Q. Were some candidates allowed fewer takes? | 15:23:37 |
| 22 | A. I don't recall.  But again, we wanted to | 15:23:40 |
| 23 | make sure that each candidate had the take that | 15:23:46 |
| 24 | they wanted and that they felt most comfortable | 15:23:49 |

| | | |
|---|---|---|
| 1 | with. | 15:23:52 |
| 2 | Q. Were some candidates allowed more takes | 15:23:56 |
| 3 | than other candidates? | 15:23:59 |
| 4 | A. I can't recall. In the past, I can't | 15:24:00 |
| 5 | recall. | 15:24:22 |
| 6 | Q. Who was the candidate whose statement was | 15:24:22 |
| 7 | in that video? | 15:24:24 |
| 8 | A. Jeannette McCarthy. | 15:24:25 |
| 9 | Q. Is she the current mayor of Waltham? | 15:24:27 |
| 10 | A. Yes. | 15:24:31 |
| 11 | Q. In 2023, was Mayor McCarthy a first-time | 15:24:32 |
| 12 | candidate? | 15:24:42 |
| 13 | A. She was seeking her sixth term. | 15:24:42 |
| 14 | MR. STOLTZ: Let the record reflect that | 15:24:58 |
| 15 | the witness has held up the article he wrote | 15:25:00 |
| 16 | titled "Mayor's Sixth Term." | 15:25:02 |
| 17 | Q. In 2023 was Mayor McCarthy unaccustomed to | 15:25:20 |
| 18 | appearing on-camera? | 15:25:23 |
| 19 | MR. PYLE: Objection. | 15:25:27 |
| 20 | A. She appeared on-camera in front of the | 15:25:29 |
| 21 | city council many, many times but appeared | 15:25:32 |
| 22 | infrequently on productions at our station and was | 15:25:39 |
| 23 | not exactly an old hand the way some elected | 15:25:46 |
| 24 | officials are when they give speeches or make | 15:25:52 |

| | | |
|---|---|---|
| 1 | statements. | 15:25:55 |
| 2 | Q. Would you describe Mayor McCarthy in 2023 | 15:26:01 |
| 3 | as not exactly ready for prime time? | 15:26:05 |
| 4 | MR. PYLE:  Objection. | 15:26:12 |
| 5 | A. No.  She doesn't like to give speeches. | 15:26:21 |
| 6 | She's a woman of few words, and any person who has | 15:26:24 |
| 7 | covered news in Waltham realizes that very | 15:26:30 |
| 8 | quickly.  She's not someone who is a politician | 15:26:33 |
| 9 | who knows how to give a good speech off the cuff. | 15:26:38 |
| 10 | Q. After learning that Channel 781 had posted | 15:26:55 |
| 11 | that video, did WCAC send an infringement notice | 15:26:58 |
| 12 | naming that video? | 15:27:02 |
| 13 | A. No. | 15:27:03 |
| 14 | Q. Why not? | 15:27:06 |
| 15 | A. It didn't -- I mean, I can't recall.  I | 15:27:06 |
| 16 | can't recall.  It appeared that the video was not | 15:27:17 |
| 17 | on their channel. | 15:27:19 |
| 18 | Q. But if the video was not on their channel, | 15:27:26 |
| 19 | how did you know about it? | 15:27:29 |
| 20 | A. We had learned about it.  Someone had | 15:27:30 |
| 21 | called the station and told us about it because it | 15:27:35 |
| 22 | was airing on our channel. | 15:27:42 |
| 23 | And someone told us it was airing on our | 15:27:47 |
| 24 | channel, but then we also realized that this | 15:27:51 |

| | | |
|---|---|---|
| 1 | mistake, which was embarrassing, was something | 15:27:54 |
| 2 | that was something we had published. | 15:27:57 |
| 3 | But then Channel 781 News had excerpted | 15:28:00 |
| 4 | part of this video about the mayoral candidates as | 15:28:03 |
| 5 | well. | 15:28:08 |
| 6 | Q. Was it learning about that video that | 15:28:08 |
| 7 | prompted WCAC to make another attempt to send | 15:28:48 |
| 8 | infringement notices to YouTube on or around | 15:28:52 |
| 9 | September 1st? | 15:28:55 |
| 10 | A. I don't recall the exact conversation I | 15:28:55 |
| 11 | had with Maria. But again, it rekindled the | 15:29:00 |
| 12 | concern we had over our content, copyright | 15:29:07 |
| 13 | protected, being reproduced without our | 15:29:13 |
| 14 | permission. | 15:29:16 |
| 15 | MR. PYLE: Could we go off the record for | 15:29:33 |
| 16 | just a second before getting in the next exhibit? | 15:29:35 |
| 17 | MR. STOLTZ: Yes. | 15:29:38 |
| 18 | THE VIDEOGRAPHER: We are going off the | 15:29:38 |
| 19 | record. The time is 15:29. | 15:29:39 |
| 20 | (Recess, 3:29 p.m. to 3:36 p.m.) | 15:29:42 |
| 21 | (Whereupon Attorney Pyle departed) | 15:36:26 |
| 22 | THE VIDEOGRAPHER: We are back on the | 15:36:26 |
| 23 | record. The time on the monitor is 15:36. | 15:36:36 |
| 24 | BY MR. STOLTZ: | 15:36:40 |

| | | |
|---|---|---|
| 1 | Q. So we were talking about events occurring | 15:36:45 |
| 2 | around September 1st of 2023.  Who called to | 15:36:47 |
| 3 | inform you about the video of the mayor? | 15:36:51 |
| 4 | A. I don't know. | 15:36:54 |
| 5 | Q. Do you know who at WCAC received that | 15:36:55 |
| 6 | call? | 15:37:03 |
| 7 | A. (No verbal response) | 15:37:05 |
| 8 | (Wangler Exhibit 45 was marked for | 15:37:32 |
| 9 | identification and is attached to the transcript.) | 15:37:33 |
| 10 | Q. I'm showing you what's been marked as | 15:37:33 |
| 11 | Exhibit 45.  Do you recognize this email chain? | 15:37:35 |
| 12 | A. Yes. | 15:37:36 |
| 13 | Q. Is this a true and correct copy of that | 15:37:37 |
| 14 | email chain? | 15:37:41 |
| 15 | A. Yes. | 15:37:42 |
| 16 | Q. Do you see where Ms. Sheehan writes, | 15:37:42 |
| 17 | "Waltham DATA took the mayor's video with a | 15:37:54 |
| 18 | mistake and are using it"? | 15:37:57 |
| 19 | A. Yes. | 15:37:59 |
| 20 | Q. Does that refer to the episode that you | 15:37:59 |
| 21 | mentioned earlier? | 15:38:01 |
| 22 | A. Yes. | 15:38:02 |
| 23 | Q. How did you respond at 8:20 a.m. on | 15:38:02 |
| 24 | September 1st? | 15:38:22 |

| | | |
|---|---|---|
| 1 | A. "We need to go through the motions again | 15:38:23 |
| 2 | to have YouTube take down all the videos." | 15:38:26 |
| 3 | Q. What did you mean by "all the videos"? | 15:38:32 |
| 4 | A. All the videos that did not qualify for | 15:38:35 |
| 5 | copyright exemption under fair use. | 15:38:39 |
| 6 | Q. You responded again in a second email | 15:38:42 |
| 7 | here.  Is that right? | 15:39:02 |
| 8 | A. Yes. | 15:39:03 |
| 9 | Q. How did you respond the second time? | 15:39:03 |
| 10 | A. "You have to become admin of Bill's | 15:39:06 |
| 11 | channel and make 30 removal claims." | 15:39:10 |
| 12 | Q. Why did you say 30? | 15:39:16 |
| 13 | A. I can't recall.  I can't recall. | 15:39:19 |
| 14 | Presumably the number of stand-alone videos. | 15:39:25 |
| 15 | Q. Sometime between July and the time of this | 15:39:32 |
| 16 | email, did you write a list of the stand-alone | 15:39:41 |
| 17 | videos? | 15:39:49 |
| 18 | A. No. | 15:39:50 |
| 19 | Q. Did you look through the Waltham DATA | 15:39:50 |
| 20 | YouTube channel to identify stand-alone videos? | 15:40:12 |
| 21 | A. Yes. | 15:40:14 |
| 22 | Q. Did you count those stand-alone videos? | 15:40:15 |
| 23 | A. I can't recall. | 15:40:19 |
| 24 | Q. When you say "all the videos," did that | 15:41:12 |

| | | |
|---|---|---|
| 1 | include the mayor's video with the mistake? | 15:41:15 |
| 2 | A. I can't recall. | 15:41:18 |
| 3 | Q. If the mayor's video was not one of the | 15:42:10 |
| 4 | videos that you were referring to, then why did | 15:42:14 |
| 5 | you recommend having YouTube take down all the | 15:42:19 |
| 6 | videos? | 15:42:21 |
| 7 | MR. PYLE: Objection. | 15:42:26 |
| 8 | A. When I said we need to go through all the | 15:42:27 |
| 9 | motions again, the mayor's video did not exist, so | 15:42:33 |
| 10 | this email refers to an earlier period. | 15:42:39 |
| 11 | Presumably we need to go through all the | 15:42:43 |
| 12 | motions again. At some earlier period, I had | 15:42:45 |
| 13 | identified the stand-alone clips to have YouTube | 15:42:48 |
| 14 | take down all the videos. | 15:42:51 |
| 15 | Q. You said earlier that in July you sent a | 15:42:56 |
| 16 | single infringement notice to YouTube referencing | 15:43:02 |
| 17 | a single video. Is that correct? | 15:43:05 |
| 18 | A. Yup. | 15:43:06 |
| 19 | Q. But sometime in the interim you identified | 15:43:07 |
| 20 | more videos? | 15:43:15 |
| 21 | A. Possibly. Possibly. | 15:43:16 |
| 22 | Q. Did you watch each of those videos? | 15:43:20 |
| 23 | A. Yes. Some of the longer videos I may not | 15:43:27 |
| 24 | have watched in their entirety. | 15:43:33 |

1    Q. But you didn't write a list?                    15:43:34

2    A. No.                                             15:43:53

3    Q. When did you watch those videos?               15:43:56

4    A. I can't recall.  I can't recall.               15:44:06

5    Q. Was it closer to July or closer to             15:44:19

6  September?                                           15:44:21

7    A. I had made the July 15th initial attempt       15:44:22

8  with the -- the initial attempt I made was for one  15:44:33

9  video.                                              15:44:41

10        And on the Waltham DATA YouTube channel,     15:44:43

11  similar stand-alone videos were part of a          15:44:46

12  playlist.  And then if you navigated downwards,    15:44:50

13  you would see additional stand-alone videos, all   15:44:53

14  from MAC channel.                                  15:44:56

15        And I assume those new videos had been       15:45:00

16  added, so I had been aware for some time that      15:45:04

17  these stand-alone clips were on the Waltham DATA   15:45:08

18  YouTube channel.                                   15:45:12

19        An initial attempt had failed.  It did not   15:45:14

20  appear that more of them were posted, but the      15:45:17

21  existing ones were still there as part of          15:45:19

22  playlists, including copywritten content not       15:45:21

23  subject to copyright exemption for fair use.       15:45:26

24    Q. You talked earlier about what you             15:45:40

| | | |
|---|---|---|
| 1 | considered before your first attempt at sending an | 15:45:45 |
| 2 | infringement notice in July of 2023. | 15:45:51 |
| 3 | At some point between then and, let's say, | 15:46:00 |
| 4 | middle of September 2023, did you go through that | 15:46:09 |
| 5 | same process with other videos? | 15:46:14 |
| 6 | A. Yes. | 15:46:16 |
| 7 | Q. And you sent another infringement notice | 15:46:18 |
| 8 | on September 1st.  Is that right? | 15:46:36 |
| 9 | A. September 1st?  Yes.  September 1st, one | 15:46:39 |
| 10 | infringement or one takedown notice on | 15:46:44 |
| 11 | September 1st. | 15:46:49 |
| 12 | Q. Did that happen after you sent this series | 15:46:53 |
| 13 | of emails? | 15:47:02 |
| 14 | A. Yes. | 15:47:02 |
| 15 | Q. Why did that takedown notice only | 15:47:06 |
| 16 | reference one video? | 15:47:15 |
| 17 | A. It was the same video that I had tried to | 15:47:16 |
| 18 | send a takedown notice for back in July. | 15:47:24 |
| 19 | Q. Why did you choose to send a notice | 15:47:38 |
| 20 | referencing only that video after sending an email | 15:47:41 |
| 21 | that suggested making 30 removal claims? | 15:47:45 |
| 22 | A. I had never done this before.  I had | 15:47:48 |
| 23 | failed the first time, and I wasn't going to waste | 15:47:52 |
| 24 | hours creating 30 takedown -- or 30 takedown | 15:47:57 |

| | | |
|---|---|---|
| 1 | notices if they were bound to fail like the first | 15:48:03 |
| 2 | takedown that I had attempted. | 15:48:07 |
| 3 | So it was unclear that I would submit this | 15:48:09 |
| 4 | correctly, and I needed to try to submit one to | 15:48:12 |
| 5 | see if it would work. | 15:48:16 |
| 6 | Q. When did you next send an infringement | 15:48:22 |
| 7 | notice to YouTube? | 15:48:24 |
| 8 | A. September 6th. | 15:48:25 |
| 9 | Q. Do you recall how many videos were | 15:48:31 |
| 10 | referenced in that notice? | 15:48:33 |
| 11 | A. Five. | 15:48:35 |
| 12 | Q. When did you watch those five videos? | 15:48:43 |
| 13 | A. In order to make the takedown request, I | 15:48:51 |
| 14 | navigated to the Waltham DATA page, watched ones | 15:48:59 |
| 15 | that were stand-alone, determined they were | 15:49:04 |
| 16 | similar to the first video I had submitted a | 15:49:06 |
| 17 | takedown request for, and prepared takedown | 15:49:10 |
| 18 | requests for additional similar classes -- class | 15:49:15 |
| 19 | of videos, stand-alone videos. | 15:49:18 |
| 20 | Q. Did you consider the length of any of | 15:49:27 |
| 21 | those videos before choosing to include them in | 15:49:42 |
| 22 | your next takedown notice? | 15:49:44 |
| 23 | A. Yes. | 15:49:46 |
| 24 | Q. And what did you conclude? | 15:49:47 |

1     A. Some of the videos were lengthy, long.                    15:49:51

2  Some of the videos were shorter.                                15:49:57

3     Q. Did you look to see whether any of those                  15:50:14

4  five videos had been edited?                                    15:50:17

5     A. Yes.                                                      15:50:23

6     Q. And what did you conclude?                                15:50:23

7     A. A small Waltham or Channel 781 News                       15:50:26

8  graphic I believe was added to the end to several               15:50:37

9  of the videos for a second or two possibly.                     15:50:40

10    Q. Did you determine whether any of those                    15:50:52

11 videos included more than one clip from a MAC-TV                 15:50:54

12 meeting video?                                                  15:51:02

13    A. You mean did an individual video include                  15:51:03

14 edited sections put together to form one video?                 15:51:07

15    Q. Yes.  That's right.                                       15:51:11

16    A. No.  Every one of these videos appeared to                15:51:12

17 be an excerpted clip from a MAC channel video.                  15:51:15

18    Q. And what happened when you sent that                      15:51:31

19 infringement notice to YouTube?                                 15:51:49

20    A. The initial -- the September 1st notice?                  15:51:51

21    Q. Yes.  Let's start with the September 1st                  15:51:56

22 notice.  What happened?                                         15:51:58

23    A. I received notice from YouTube that the                   15:51:59

24 video had been taken down.                                      15:52:05

1      Q. What about after you sent the following      15:52:12

2   notice?                                            15:52:13

3      A. The additional five notices?                 15:52:14

4      Q. Yes.                                          15:52:17

5      A. I received a similar notification that        15:52:18

6   those videos too had also been taken down.         15:52:21

7      Q. Did you send another infringement notice      15:52:37

8   to YouTube?                                         15:52:39

9      A. Yes.                                          15:52:39

10     Q. When was that?                                15:52:40

11     A. September 7th.                                15:52:41

12     Q. Do you recall how many videos that notice     15:52:48

13  included?                                           15:52:50

14     A. Nine.                                         15:52:51

15     Q. Did you watch all nine of those videos?       15:52:51

16     A. Yes, except one that was quite lengthy.       15:52:59

17     Q. How did you choose those nine?                15:53:40

18     A. The third set of videos were from a           15:53:42

19  playlist of committee of the whole MBTA            15:53:47

20  Communities Act videos.  And they were all from a  15:53:55

21  single meeting in 2023, and they all fit the       15:53:59

22  criterion of being excerpts from MAC channel       15:54:03

23  copyright-protected content that did not qualify   15:54:10

24  for fair use protection, in my judgment.           15:54:13

|    |                                                              |          |
|----|--------------------------------------------------------------|----------|
| 1  | Q. What did you do to determine whether those                | 15:54:19 |
| 2  | videos qualified for fair use protection, in your            | 15:54:22 |
| 3  | judgment?                                                     | 15:54:25 |
| 4  | A. I referred back to the YouTube video I had                | 15:54:25 |
| 5  | watched about fair use and determined that all of            | 15:54:32 |
| 6  | the videos merely copied.  The focus of the video            | 15:54:38 |
| 7  | was the copywritten content, and the videos did              | 15:54:46 |
| 8  | not have a transformative effect.  And therefore,            | 15:54:49 |
| 9  | they did not qualify for copyright protection                | 15:54:54 |
| 10 | under fair use.                                              | 15:54:57 |
| 11 | Q. Did you consider whether the videos were                  | 15:54:58 |
| 12 | fiction or factual?                                          | 15:55:09 |
| 13 | A. I can't remember.                                         | 15:55:10 |
| 14 | Q. Sitting here today, do you believe those                  | 15:55:30 |
| 15 | videos were fiction?                                         | 15:55:32 |
| 16 | A. They're not fiction.                                      | 15:55:34 |
| 17 | Q. Was that your conclusion at the time?                     | 15:55:42 |
| 18 | A. I can't recall whether I considered                       | 15:55:44 |
| 19 | fiction or nonfiction at the time.  I can't                  | 15:55:50 |
| 20 | recall.                                                       | 15:55:52 |
| 21 | Q. For each of those videos, did you consider               | 15:55:56 |
| 22 | whether Channel 781's posting harmed WCAC                     | 15:56:24 |
| 23 | financially?                                                  | 15:56:31 |
| 24 | A. Yes.                                                       | 15:56:36 |

1     Q. What did you conclude?                               15:56:37

2        A. They were not monetizing the videos.  And        15:56:41

3     we weren't monetizing anything we produced, so          15:56:49

4     monetization did not appear to be a significant         15:56:54

5     factor in these takedown notices because neither        15:56:58

6     781 News nor our channel monetized our content.         15:57:07

7        Q. Did you consider whether Channel 781 was a        15:57:11

8     competitor to WCAC's news work?                         15:57:34

9        A. Yes.                                              15:57:41

10       Q. And what did you conclude?                        15:57:42

11       A. Channel 781 was reproducing these videos          15:57:45

12    without our permission, which was not in keeping        15:57:54

13    with professional practices we were accustomed to       15:57:57

14    with network affiliates and others.  And they were      15:57:59

15    trying to draw viewers and subscribers using our        15:58:07

16    copyright-protected content.                            15:58:13

17       Q. At that time, did you believe that                15:58:19

18    Channel 781 was likely to draw viewers and/or           15:58:33

19    subscribers away from WCAC?                             15:58:38

20       A. Possibly.  But the worry was more about           15:58:43

21    the use of copywritten content.                         15:58:55

22       Q. You said earlier that Channel 781 serves a        15:59:13

23    different audience than Waltham Newswatch.  Is          15:59:18

24    that correct?                                           15:59:25

1    A. Yes.                                              15:59:25

2    Q. If that's the case, then why would those         15:59:26

3  clips have drawn viewers away from Waltham            15:59:36

4  Newswatch to Channel 781?                             15:59:40

5    A. Waltham Newswatch also had younger               15:59:44

6  viewers.  We had people that interact with our        15:59:48

7  content.  And the news business is competitive.       15:59:52

8  The news business is competitive and news            15:59:54

9  organizations compete with each other.                15:59:57

10   Q. At that time, did you consider -- as part        15:59:59

11 of making your decision to include certain videos     16:00:56

12 in your infringement notice to YouTube, did you       16:00:59

13 consider whether Channel 781 was defaming anyone?     16:01:04

14   A. No.                                              16:01:13

15   Q. Did you consider whether Channel 781 was         16:01:24

16 encouraging anyone to hate?                           16:01:26

17   A. No.                                              16:01:28

18   Q. Did you consider whether Channel 781 was         16:01:33

19 criticizing any candidates during election season?    16:01:53

20   A. These videos were produced prior to the          16:01:56

21 election season.  I think they had been on their      16:02:07

22 page for a long time, if memory serves.  And the      16:02:12

23 correspondents from 781 weren't criticizing anyone    16:02:18

24 by posting videos that were clips of WCAC             16:02:22

| | | |
|---|---|---|
| 1 | meetings.  Their correspondents were not | 16:02:26 |
| 2 | criticizing elected officials through these clips. | 16:02:34 |
| 3 | Q. Did you consider the titles of the clips | 16:02:40 |
| 4 | as part of that process? | 16:02:43 |
| 5 | A. Yes. | 16:02:45 |
| 6 | Q. Did you find any of those titles to be a | 16:02:52 |
| 7 | form of criticism of elected officials? | 16:02:56 |
| 8 | A. Possibly. | 16:02:58 |
| 9 | Q. Did those titles factor into your decision | 16:03:10 |
| 10 | to include certain videos in your takedown notice? | 16:03:13 |
| 11 | A. Yes. | 16:03:16 |
| 12 | Q. How so? | 16:03:20 |
| 13 | A. Some of the titles may not have -- the | 16:03:21 |
| 14 | titles were intended to draw viewers to our | 16:03:35 |
| 15 | copywritten content through sensational -- | 16:03:41 |
| 16 | possibly sensational titles, trying to draw | 16:03:49 |
| 17 | viewers to our copywritten content.  I considered | 16:03:52 |
| 18 | that.  Some titles were more sensational than | 16:03:55 |
| 19 | others. | 16:03:58 |
| 20 | Q. Did you choose to include any videos in | 16:04:10 |
| 21 | your infringement notice to YouTube whose titles | 16:04:14 |
| 22 | were less sensational? | 16:04:19 |
| 23 | A. Yes.  Some of the titles are not | 16:04:20 |
| 24 | sensational at all. | 16:04:26 |

1      Q. Did you choose to include videos whose           16:04:27

2  titles were more sensational?                           16:04:30

3      A. Yes.                                             16:04:32

4      Q. Did you see those titles as a kind of            16:04:46

5  criticism of the people depicted in those clips?        16:04:50

6      A. Yes.                                             16:04:52

7      Q. Did you consider whether Channel 781 had         16:04:56

8  chosen those clips in part to portray the people        16:05:23

9  in the clips in a bad light?                            16:05:33

10     MS. DOELGER:  Objection.                            16:05:43

11     A. I don't know.  I don't know.  Possibly.          16:05:44

12     Q. Was that an issue you considered?                16:05:51

13     MS. DOELGER:  Objection.                            16:05:53

14     A. The main consideration was this is a             16:05:54

15  stand-alone clip.  It merely copies.  The focus of     16:05:58

16  the clip is the copywritten content.  It's not         16:06:04

17  transformative; therefore, it's subject to a           16:06:06

18  YouTube takedown notice.                               16:06:09

19     And 15 of the videos were taken down.              16:06:14

20  There were other ones on there that were similar       16:06:18

21  that would also have qualified for takedown            16:06:22

22  notices.                                               16:06:36

23     Q. Did you send any more takedown notices           16:06:36

24  after September 7th?                                   16:06:39

| | | |
|---|---|---|
| 1 | A. No. | 16:06:40 |
| 2 | Q. Why not? | 16:06:41 |
| 3 | A. I learned that the Waltham DATA YouTube | 16:06:43 |
| 4 | channel had been taken down by YouTube. | 16:06:48 |
| 5 | Q. How did you learn that? | 16:06:54 |
| 6 | A. Through a social media post by members of | 16:06:55 |
| 7 | Channel 781 News. | 16:07:01 |
| 8 | Q. At that point, did you believe the problem | 16:07:03 |
| 9 | was solved? | 16:07:28 |
| 10 | A. I was very surprised and had no idea that | 16:07:29 |
| 11 | their entire channel, which included debriefs, | 16:07:39 |
| 12 | special reports, headlines, the stand-alone videos | 16:07:45 |
| 13 | we talked about, candidate interviews, and | 16:07:54 |
| 14 | interviews with various news makers, all of that | 16:07:56 |
| 15 | content would be removed.  I had no clue that | 16:07:59 |
| 16 | could happen, and I was shocked. | 16:08:02 |
| 17 | Q. Did you take any action after learning | 16:08:10 |
| 18 | that the channel had been suspended? | 16:08:14 |
| 19 | A. No. | 16:08:17 |
| 20 | Q. You didn't ask YouTube to reactivate the | 16:08:29 |
| 21 | channel? | 16:08:33 |
| 22 | A. We waited to see if someone from 781 News | 16:08:33 |
| 23 | would contact us to seek that remedy.  And that | 16:08:38 |
| 24 | never happened. | 16:08:41 |

1     Q. At some point did you receive notice from          16:08:41

2   YouTube that someone affiliated with Channel 781        16:08:54

3   had filed a counternotice?                              16:08:57

4     A. Yes.                                               16:08:58

5        (Wangler Exhibit 46 was marked for                 16:09:47

6   identification and is attached to the transcript.)      16:09:48

7     Q. I'm showing you what's been marked as              16:09:48

8   Exhibit 46, which appears to be handwritten notes.      16:09:50

9   Do you recognize this?                                  16:09:57

10    A. Yes.                                                16:09:57

11    Q. Do you know who wrote it?                           16:09:58

12    A. I did.                                              16:10:01

13    Q. Is this a true and correct copy of what            16:10:02

14  you wrote?                                              16:10:06

15    A. Yes.                                                16:10:06

16    Q. What is this document?                              16:10:07

17    A. It's a list of the second round of                 16:10:16

18  takedown notices that I filed on September 6th,         16:10:21

19  2023.                                                  16:11:11

20       MR. STOLTZ:  Can we go off the record?             16:11:11

21       THE VIDEOGRAPHER:  We are going off the            16:11:13

22  record.  The time on the monitor is 16:11.             16:11:14

23       (Recess, 4:11 p.m. to 4:25 p.m.)                   16:11:17

24       THE VIDEOGRAPHER:  We are back on the              16:25:42

| | | |
|---|---|---|
| 1 | record.  The time on the monitor is 16:25. | 16:25:51 |
| 2 | BY MR. STOLTZ: | 16:25:56 |
| 3 | Q. I just had a few follow-up questions. | 16:25:59 |
| 4 | Before sending the takedown notices to | 16:26:02 |
| 5 | YouTube in September of 2023, did you see any | 16:26:07 |
| 6 | evidence that WCAC was losing viewers to | 16:26:12 |
| 7 | Channel 781? | 16:26:15 |
| 8 | A. No. | 16:26:16 |
| 9 | Q. Did you believe that was happening? | 16:26:18 |
| 10 | A. Possibly.  But how would you determine | 16:26:22 |
| 11 | that? | 16:26:33 |
| 12 | Q. You thought that Channel 781 was taking | 16:26:36 |
| 13 | viewers from WCAC? | 16:26:39 |
| 14 | A. I mean, yes.  I mean, I couldn't calculate | 16:26:42 |
| 15 | how many. | 16:26:45 |
| 16 | Q. But you saw no evidence of that? | 16:26:54 |
| 17 | A. It's something I considered, but I | 16:27:01 |
| 18 | couldn't prove it. | 16:27:06 |
| 19 | Q. Talking about infringement notices to | 16:27:28 |
| 20 | YouTube, do you know what a strike is? | 16:27:30 |
| 21 | A. Yes.  A copyright strike? | 16:27:34 |
| 22 | Q. Yes.  What's a copyright strike? | 16:27:37 |
| 23 | A. It's when a video -- a copyright holder | 16:27:39 |
| 24 | takes action against a video, resulting in that | 16:27:52 |

| | | |
|---|---|---|
| 1 | video being taken down. | 16:27:56 |
| 2 | Q. When did you first hear that term | 16:28:01 |
| 3 | "copyright strike"? | 16:28:03 |
| 4 | A. So one video I published received a | 16:28:05 |
| 5 | copyright strike. | 16:28:09 |
| 6 | Q. Was that a video that you published for | 16:28:15 |
| 7 | WCAC or personally? | 16:28:18 |
| 8 | A. Yes.  For Waltham Newswatch YouTube page. | 16:28:19 |
| 9 | Q. When you got that copyright strike -- | 16:28:27 |
| 10 | strike that. | 16:28:36 |
| 11 | At any time before September 2023, did you | 16:28:36 |
| 12 | come -- did you become aware that three copyright | 16:28:46 |
| 13 | strikes causes a YouTube channel to be suspended? | 16:28:49 |
| 14 | A. No. | 16:28:53 |
| 15 | Q. When you received a copyright strike, how | 16:28:54 |
| 16 | did you respond? | 16:29:04 |
| 17 | A. I concluded that Bob Dylan and Columbia | 16:29:04 |
| 18 | Records' parent company didn't want any reporting | 16:29:14 |
| 19 | on any of his music, in media of any kind. | 16:29:18 |
| 20 | Q. Did you submit a counternotice to YouTube? | 16:29:24 |
| 21 | MS. DOELGER:  Objection. | 16:29:34 |
| 22 | A. No. | 16:29:34 |
| 23 | Q. Did you take any action? | 16:29:35 |
| 24 | MS. DOELGER:  Objection. | 16:29:40 |

| | | |
|---|---|---|
| 1 | A. No. | 16:29:40 |
| 2 | Q. Were you concerned at that time about | 16:29:41 |
| 3 | adverse consequences for the WCAC YouTube channel? | 16:30:02 |
| 4 | MR. PYLE: Objection. | 16:30:09 |
| 5 | A. I can't recall, but I expected anything | 16:30:09 |
| 6 | having to do with Bob Dylan to probably be flagged | 16:30:20 |
| 7 | and struck. | 16:30:25 |
| 8 | Q. After that time, was there any other | 16:30:28 |
| 9 | material about Bob Dylan posted on WCAC's YouTube | 16:30:32 |
| 10 | channel? | 16:30:38 |
| 11 | MS. DOELGER: Objection. | 16:30:42 |
| 12 | A. No. | 16:30:43 |
| 13 | Q. Did WCAC refrain from posting material | 16:30:43 |
| 14 | about Bob Dylan because it received a copyright | 16:30:52 |
| 15 | strike? | 16:30:55 |
| 16 | MS. DOELGER: Objection. | 16:30:56 |
| 17 | A. Bob Dylan visited Waltham twice. And only | 16:31:05 |
| 18 | one recording was made in 1963, only weeks before | 16:31:09 |
| 19 | his release of his groundbreaking The Freewheelin' | 16:31:16 |
| 20 | Bob Dylan album. I wasn't aware that there would | 16:31:20 |
| 21 | be any additional opportunity to report on Bob | 16:31:23 |
| 22 | Dylan in Waltham, so that was it. | 16:31:25 |
| 23 | MR. STOLTZ: Okay. Thank you. | 16:31:34 |
| 24 | Sara, did you have any questions? | 16:31:36 |

1          MS. DOELGER:  I don't.  No.                    16:31:38

2          MR. STOLTZ:  We request to review the          16:31:40

3    transcript and potentially make corrections within   16:31:43

4    30 days of receiving it.                              16:31:45

5          Do you also request?                            16:31:47

6          MS. DOELGER:  Yes.                              16:31:48

7          MR. STOLTZ:  Then we are finished.              16:31:50

8          THE VIDEOGRAPHER:  Alrighty.  This              16:31:51

9    concludes the deposition of Chris Wangler.  We are    16:31:53

10   going off the record at 16:31.                        16:31:55

11         (Off the record at 4:31 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

No. 590641

Re:     Deposition of **Christopher Wangler, Designated Representative & Individually**
        Date: 7/9/2025
        Case: Channel 781 News -v- Waltham Community Access Corporation
        Return to: transcripts@planetdepos.com

| Page | Line | Correction/Change and Reason |
|------|------|------------------------------|
| 111 | 24 | Change "produced" to "reproduced." Correction to clarify key distinction. |
| 121 | 14 | Change "gatherings" to "gathering." Intended phrase is "news gathering." |
| 144 | 16 | Change "Mayor's Sixth Term" to "Mayor to Seek Sixth Term" Correct title of article. |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

_____          _____
        (Date)                            (Signature)

No. 590641

Re:    Deposition of **Christopher Wangler, Designated Representative & Individually**
Date: 7/9/2025
Case: Channel 781 News -v- Waltham Community Access Corporation
Return to: transcripts@planetdepos.com

ACKNOWLEDGMENT OF DEPONENT


I, Christopher Wangler, Designated

Representative & Individually, do hereby acknowledge

that I have read and examined the foregoing

testimony, and the same is a true, correct and

complete transcription of the testimony given by me

and any corrections appear on the attached Errata

sheet signed by me.


August 13, 2025          Chris Wgl
_____          _____
    (Date)                  (Signature)

1    CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

2         I, MICHELLE KEEGAN, Registered Merit

3    Reporter and Notary Public in and for the

4    Commonwealth of Massachusetts, the officer before

5    whom the foregoing deposition was taken, do hereby

6    certify that the foregoing transcript is a true

7    and correct record of the testimony given; that

8    said testimony was taken by me stenographically

9    and thereafter reduced to typewriting under my

10   direction; that reading and signing was requested;

11   and that I am neither counsel for, related to, nor

12   employed by any of the parties to this case and

13   have no interest, financial or otherwise, in its

14   outcome.

15         IN WITNESS WHEREOF, I have hereunto set my

16   hand and affixed my notarial seal this 9th day of

17   July, 2025.

18   My commission expires May 15, 2026.

19

20

21

22   _____

23   NOTARY PUBLIC IN AND FOR

24   THE COMMONWEALTH OF MASSACHUSETTS