# Exhibit C





# Transcript of Maria Sheehan

**Date:** July 10, 2025
**Case:** Channel 781 News -v- Waltham Community Access Corporation

**Planet Depos**
**Phone:** 888.433.3767 **| Email:** transcripts@planetdepos.com
**www.planetdepos.com**
**Michigan #8598 | Nevada #089F | New Mexico #566**

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF MASSACHUSETTS

3          Case No. 1:24-cv-11927-PBS

4 ---------------------------------------x

5 CHANNEL 781 NEWS,

6        Plaintiff,

7 vs.

8 WALTHAM COMMUNITY ACCESS CORPORATION,

9        Defendant.

10 ---------------------------------------x

11

12     VIDEOTAPED DEPOSITION OF MARIA SHEEHAN

13      Thursday, July 10, 2025 9:15 a.m.

14        Brown & Rudnick LLP

15    One Financial Center, Boston, MA 02111

16

17

18

19

20

21

22 Reported by:  Janet McHugh, RMR, CRR, CLR

23 JOB NO. 590642

24

1                          July 10, 2025

2                          9:14 a.m.

3

4

5

6              Videotaped deposition of MARIA SHEEHAN,

7    held at the offices of Brown Rudnick LLP, One

8    Financial Center, Boston, Massachusetts, pursuant

9    to Agreement, before Janet McHugh, a Registered

10   Merit Reporter, Certified Realtime Reporter,

11   Certified LiveNote Reporter, and a Notary Public

12   within and for the Commonwealth of Massachusetts.

13

14

15

16

17

18

19

20

21

22

23

24

1    APPEARANCES:

2

3         ELECTRONIC FRONTIER FOUNDATION

4         Mitchell Stoltz, Esquire

5         Betelhem Zewge Gedlu, Esquire

6         815 Eddy Street

7         San Francisco, CA 94109

8         415.436.9333

9    - and -

10        BROWN RUDNICK LLP

11        By Marcus Strong, Esquire

12        7 Times Square

13        47th Floor

14        New York, New York 10036

15        212.209.4800

16        Counsel for the Plaintiff, Channel 781 News.

17

18

19

20

21

22   - Continued -

23

24

1    APPEARANCES:   (Continued)

2

3         PRINCE LOBEL TYE LLP

4         (By Jeffrey Pyle, Esquire)

5         One International Place

6         Suite 3700

7         Boston, Massachusetts 02110

8         617.456.8000

9         Counsel for the Defendant, Waltham Community

10        Access Corporation.

11

12   ALSO PRESENT:

13        Isaac Weaver, Videographer

14

15

16

17

18

19

20

21

22

23

24

```
 1                      I N D E X

 2   WITNESS          DIRECT    CROSS     REDIRECT    RECROSS

 3   MARIA SHEEHAN

 4   By Mr. Stoltz       9

 5

 6                    E X H I B I T S

 7   Number            Description                    Page

 8   Exhibit 47  City Council Docket for

 9               April 22, 2024                        29

10   Exhibit 48  Document Bates-stamped

11               WCAC0000760 and -0761                 31

12   Exhibit 49  Letter dated February 29, 2024,

13               with attachment                       32

14   Exhibit 50  Document Bates-stamped

15               WCAC0000664 through -0697             38

16   Exhibit 51  2021 Income Tax Return for

17               Waltham Community Access

18               Corporation                           43

19   Exhibit 52  Document Bates-stamped

20               WCAC0000121 and -0122                 72

21   Exhibit 53  Document Bates-stamped

22               WCAC0000419                           83

23   Exhibit 54  Document Bates-stamped

24               WCAC0000437                           92
```

```
 1              E X H I B I T S

 2    Number          Description              Page

 3    Exhibit 55  Document Bates-stamped

 4              WCAC0000129                    105

 5    Exhibit 56  Letter dated November 8, 2023

 6              to Maria Sheehan from

 7              Mitchell Stoltz                138

 8

 9          PREVIOUSLY MARKED EXHIBITS

10    Number

11    Exhibit 31                           13

12    Exhibit 30                           113

13    Exhibit 39                           114

14    Exhibit 22                           127

15    Exhibit 45                           132

16    Exhibit 42                           137

17

18       EXHIBITS MARKED FOR IDENTIFICATION

19    Letter                               Page

20    Exhibit A   Video entitled "Economic &

21              Community Development 3-7-2022"

22              https://www.youtube.com/

23              watch?v=JyzNit9UyS4          49

24
```

1              P R O C E E D I N G S

2              THE VIDEOGRAPHER:  Here begins Media

3    No. 1 in the videotaped deposition of Maria

4    Sheehan in the matter of Channel 781 News versus

5    Waltham Community Access Corporation in the

6    United States District Court for the District of

7    Massachusetts, Case No. 1:24-CV-11927-PBS.

8              Today's date is July 10th, 2025.  The

9    time on the video monitor is 9:15.  The

10   videographer today is Isaac Weaver representing

11   Planet Depos.

12             This video deposition is taking place

13   at Brown Rudnick, LLP on One Financial Center,

14   Boston, Massachusetts.

15             Would counsel please voice identify

16   themselves and state whom they represent.

17             MR. STOLTZ:  Mitchell Stoltz for the

18   plaintiff, Channel 781 News.

19             MS. GEDLU:  Betelhem Gedlu,

20   representing Channel 781 News.

21             MR. STRONG:  Marcus Strong representing

22   Channel 781 News.

23             MR. PYLE:  Jeffrey Pyle representing

24   Waltham Community Access Corporation.

1          THE VIDEOGRAPHER:  The court reporter

2     today is Janet McHugh, representing Planet Depos.

3     The witness will now be sworn.

4          MARIA SHEEHAN, having been duly sworn,

5     after presenting identification in the form of a

6     driver's license, deposes and says as follows:

7          MR. STOLTZ:  Do we have the same

8     stipulations as the previous depos?

9          MR. PYLE:  Yes.  In addition, back

10    during the deposition of Joshua Kastorf, Rebecca

11    put on the record that just our understanding

12    that all of these deposition transcripts are

13    subject to the protective order that was entered

14    into by the Court, and I would just repeat that

15    understanding.

16          I'm not marking anything confidential

17    under that protective order, but she had put that

18    on the record.  And I wanted to put on the record

19    that the WCAC depositions of Justin Barrett and

20    Chris Wangler and Maria Sheehan are all similarly

21    subject to the protective order.

22          MR. STOLTZ:  Understood.  Thank you.

23          MR. PYLE:  Thank you.

24          MR. STOLTZ:  And do we have an

1  agreement that today's deposition is both the

2  deposition of Ms. Sheehan and also a continuation

3  of the 30(b)(6) deposition of WCAC?

4          MR. PYLE:  Yes.

5          MR. STOLTZ:  Thank you.

6                  DIRECT EXAMINATION

7  BY MR. STOLTZ:

8      Q.   Good morning, Ms. Sheehan.

9      A.   Good morning.

10     Q.   Could you please state your full name

11 for the record.

12     A.   Maria Sheehan.

13     Q.   Have you ever been deposed before?

14     A.   No.

15     Q.   Okay.  To help our court reporter, only

16 one of us can speak at a time.  So I ask you,

17 please, to let me finish my question before you

18 start to answer, and I'll wait for you to finish

19 your answer before I speak again.

20          Is that all right?

21     A.   Yes.

22     Q.   If you don't understand my question,

23 please say so and I'll rephrase it.

24          Can you do that?

1          A.    Yes.

2          Q.    I'll take breaks from time to time.

3    But if you need a break any time, please let me

4    know.  I'd only ask that if there's a question

5    pending that you answer the question before we

6    take a break.

7          Is that all right?

8          A.    Yes.

9          Q.    Have you done anything to prepare for

10   today's deposition?

11         A.    Can you be more specific?

12         Q.    Did you meet with anyone to prepare for

13   today's deposition?

14         A.    Yeah.  Yes.

15         Q.    Who did you meet with?

16         A.    With my lawyer.

17         Q.    Was anyone else present at that

18   meeting?

19         A.    No.

20         Q.    That lawyer was Mr. Pyle?

21         A.    Yes.

22         Q.    Was Mr. Wangler present at that

23   meeting?

24         A.    There were two different times that we

1    met.  And when he talked to me specifically, we

2    were -- it was just the two of us.  But there was

3    a time when we all talked a little bit together,

4    and then we all went in individually and talked

5    to him individually.

6        Q.   And when you talked together, who was

7    on that, who was in that meeting?

8        A.   It was Justin, Chris, and I.

9        Q.   So you mentioned two meetings.  Did you

10   have any other meetings --

11       A.   It wasn't in --

12       Q.   -- in preparation for this deposition?

13           MR. PYLE:  I just ask the witness to

14   wait until Mr. Stoltz finishes his question.

15           THE WITNESS:  Okay.  I'm sorry.  I'm

16   sorry.

17           MR. PYLE:  Do you want to repeat the

18   question?

19   BY MR. STOLTZ:

20       Q.   You mentioned two meetings.  Did you

21   have any other meetings specifically to prepare

22   for this deposition?

23       A.   Not that I recall.

24       Q.   Did you review any documents to prepare

1 for this deposition?

2      A.   Yes.

3      Q.   Did those documents refresh your memory

4 about the things described?

5      A.   Yes.

6      Q.   Are you taking any medication or

7 dealing with any condition today that might

8 impair your ability to testify truthfully or

9 understand the questions?

10      A.   No.

11      Q.   And you understand that when I say

12 "WCAC" --

13      A.   Correct.

14      Q.   -- I mean Waltham Community Access

15 Corporation?

16      A.   Yes.

17      Q.   And you understand that when I say

18 Channel 781, I'm referring to the group that

19 brought this lawsuit?

20      A.   Yes.

21      Q.   Do you understand that you're going to

22 be testifying on behalf of WCAC on certain

23 topics?

24      A.   Yes.

 1            MR. STOLTZ:  I'd like to show the

 2    witness Exhibit 31 already marked.

 3            (Previously marked Exhibit 31

 4        incorporated by reference.)

 5    BY MR. STOLTZ:

 6        Q.    Ms. Sheehan, do you recognize that

 7    document?

 8        A.    Yes.

 9        Q.    Could you please turn to the page

10    labeled, I think it's Appendix A.

11        A.    Mm-hmm.

12        Q.    Sorry, Schedule A.  Can you confirm

13    that you're going to be testifying on behalf of

14    WCAC on Topics 1, 2, and 3?

15        A.    Yes.

16        Q.    And also on Topic 5?

17        A.    Yes.

18        Q.    And Topic 6?

19        A.    Yes.

20        Q.    And Topic 11?

21        A.    Yes.

22        Q.    Thank you.  Do you live in Waltham,

23    Massachusetts?

24        A.    No.

| | | |
|---|---|---|
| 1 | Q. | Where do you live? |
| 2 | A. | Millbury, Massachusetts. |
| 3 | Q. | How long have you lived there? |
| 4 | A. | Oh, boy.  I think about 16 years. |
| 5 | Q. | And where do you work? |
| 6 | A. | WCAC.  Waltham Community Access |
| 7 | Corporation. | |
| 8 | Q. | What is your job title there? |
| 9 | A. | Executive director. |
| 10 | Q. | When did you become executive director? |
| 11 | A. | August of 2008. |
| 12 | Q. | How did you get that role? |
| 13 | A. | I interviewed. |
| 14 | Q. | Did you have a role at WCAC before |
| 15 | that? | |
| 16 | A. | No. |
| 17 | Q. | Where did you work before WCAC? |
| 18 | A. | Westborough TV.  I was the general |
| 19 | manager there. | |
| 20 | Q. | Is that a public access station? |
| 21 | A. | It is. |
| 22 | Q. | How long did you work there? |
| 23 | A. | A year. |
| 24 | Q. | And where did you work before that? |

1      A.    Shrewsbury Media Connection.  I was the

2  government access coordinator.

3      Q.    What is Shrewsbury Media Connection?

4      A.    It's the public access station for the

5  Town of Shrewsbury.

6      Q.    How about before that, where did you

7  work?

8      A.    Shrewsbury public schools.

9      Q.    Other than the ones you've mentioned so

10  far, have you held any other jobs in -- at

11  television stations?

12      A.    I worked at Creative Video and Design

13  as a videographer and an editor.  I worked at

14  Channel 5 as a producer for Miller's Court.  I

15  worked in the tape library, the news library.

16  And I was a producer for telethons, I was a field

17  producer for telethons.

18      I worked at New England Cable News as an

19  editor.  I worked at WQTV, Channel 68, which was

20  owned by The Monitor.

21      Q.    Is Channel 5 a broadcast TV station?

22      A.    Yes.  WCVB.

23      Q.    Have you ever worked in government?

24      A.    Yes.

1        Q.    Where was that?

2        A.    I was a public relations intern for the

3   Massachusetts Department of Commerce.

4        Q.    Have you had any other jobs in

5   government?

6        A.    Shrewsbury Media Connection was owned

7   by the Town of Shrewsbury.

8        Q.    Have you ever run for office?

9        A.    Yes.

10       Q.    What office was that?

11       A.    Town meeting member.

12       Q.    In what town?

13       A.    Shrewsbury.

14       Q.    Were you elected?

15       A.    Yes.  Number one, I want to say, on the

16   list.  But everyone knew my name because it was

17   on all the videos in Shrewsbury, so it was pretty

18   easy to find me.

19       Q.    What years did you serve in that role?

20       A.    Boy.  Let's see.  I think it was about

21   '98 to 2001, maybe.  It was around that time.  I

22   don't recall the exact time.  It was before 9/11,

23   I remember that.  Yeah.  2001.  Did I say 2001 or

24   did I say 2011?

1        Q.   Is a town meeting similar to a city

2   council?

3        A.   Yes, in a way.  They're the governing

4   body of the town, kind of.

5        Q.   Do you have any post-high school

6   educational degrees?

7        A.   Yes.

8        Q.   What are those?

9        A.   I have a communications, a Bachelor of

10  Science in Communications and Media from

11  Framingham State College.  And I have a mini MBA

12  from Bentley.

13            MR. PYLE:  Did you say "mini MBA"?

14       A.   A mini MBA.  Not a complete MBA.  A

15  mini MBA.

16       Q.   Was the mini MBA in a particular field?

17       A.   It was a general MBA.  It was an

18  accelerated course.

19       Q.   Are you an officer or director of any

20  other charities or nonprofit organizations?

21       A.   I'm on the board of the Waltham Chamber

22  of Commerce, and I am -- I am on the board of the

23  Lion's Club.  I was recently on the Salvation

24  Army board, but I recently stepped down from

1   that.

2       Q.   Have you been officer or director of

3   any other charities or nonprofit organizations?

4       A.   Yes.

5       Q.   Which charities or nonprofit

6   organizations have you been an officer of in,

7   say, since 2020?

8       A.   Since 2020?  Salvation Army, the Rotary

9   Club.  That's it, since 2020.

10      Q.   You said you're currently on the board

11  of the Lion's Club?

12      A.   Yes.  I'm the past president.

13      Q.   And that's the Waltham Lion's Club?

14      A.   Mm-hmm.

15           MR. PYLE:  You have to say "yes" or

16  "no."

17      A.   Yes.  I'm sorry.  Yes.

18      Q.   How long have you been a member of the

19  Waltham Lion's Club?

20      A.   About five years.  It was during COVID

21  I moved over there.  I was a Rotarian, and I

22  moved over there.

23      Q.   Have you ever studied media law?

24      A.   No.

```
 1        Q.    Have you had any formal or informal
 2   training in media law?
 3        A.    No.
 4        Q.    Have you ever studied defamation or
 5   libel law?
 6        A.    No.
 7        Q.    Do you have any formal or informal
 8   training in defamation or libel law?
 9        A.    No.
10        Q.    Have you learned about defamation or
11   libel law?
12        A.    No.
13        Q.    Have you ever studied copyright law?
14        A.    Yes.
15        Q.    Where did you study it?
16        A.    Framingham State College.
17        Q.    Was that as part of your undergraduate
18   education?
19        A.    Yes.
20        Q.    Since college, have you had any formal
21   or informal training in copyright law?
22        A.    No.
23        Q.    Since college, have you learned more
24   about copyright law?
```

1        A.    Yes.

2        Q.    From what sources?

3        A.    Articles, conferences.

4        Q.    At any time, have you learned about the

5   Fair Use doctrine of copyright law?

6        A.    Yes.

7        Q.    Where did you learn about that?

8        A.    I learned about that recently with

9   Chris Wangler.

10        Q.    When you studied copyright law in

11   college, did you learn about the Fair Use

12   doctrine?

13        A.    I don't recall.

14        Q.    When you read articles or attended

15   conferences, and here I'm talking about before

16   2023, did you learn about the Fair Use doctrine?

17        A.    No.

18        Q.    Would it be fair to say that at the

19   beginning of 2023, you did not know about the

20   Fair Use doctrine?

21        A.    Yes.

22        Q.    When you said you learned about it

23   recently with Chris Wangler, did Mr. Wangler tell

24   you about the Fair Use doctrine?

1          A.    He came to me and discussed it with me,

2    yes.

3          Q.    Other than that, between that time and

4    now, have you learned about the Fair Use doctrine

5    from any other source?

6               MR. PYLE:  You can answer that question

7    "yes" or "no" for now.

8          A.    No.

9          Q.    At any time, have you learned about the

10   copyright enforcement mechanisms available on

11   YouTube?

12         A.    Can you rephrase that again?  Could you

13   say that again?

14         Q.    Have you learned about how YouTube

15   deals with copyright?

16         A.    Yes.

17         Q.    When did you learn about that?

18         A.    When we, when Chris issued the takedown

19   notices on YouTube.

20         Q.    Before Chris issued the takedown

21   notices on YouTube, were you at all familiar with

22   the copyright mechanisms available on YouTube?

23         A.    No.

24         Q.    Other than from Mr. Wangler, have you

1   learned about the copyright mechanisms available

2   on YouTube from any other source?

3          A.    Not that I recall.

4          Q.    You mentioned that you learned about

5   the Fair Use doctrine from Mr. Wangler.  About

6   when was that?

7          A.    I don't recall.

8          Q.    Was it before April of 2023?

9          A.    I don't recall.

10         Q.    You made a statement on the air in the

11  Waltham Newswatch program on about April 6th,

12  2023 about copyright; is that right?

13         A.    Yes.

14         Q.    Did you discuss Fair Use with

15  Mr. Wangler before that, before you made that

16  statement?

17         A.    I don't recall.

18         Q.    And you met with Joshua Kastorf on June

19  15th of 2023; is that right?

20         A.    Yes.

21         Q.    Did you discuss Fair Use with

22  Mr. Wangler before that meeting?

23         A.    I don't recall.  I don't recall.

24         Q.    Where does WCAC's funding come from?

1      A.    We receive grants -- well, they're

2    grants.  They're called grants from Verizon,

3    Comcast and RCN.  We get a percentage of cable

4    revenue from the cable bill.

5          So let's say it's a 4 percent contract.  If

6    you spend $100 on your cable bill, we get $4.

7    But it's charged to the cable subscriber.  It's

8    not charged from Verizon.  So Verizon isn't

9    giving it to us.  It's the cable subscriber.

10         Q.    Do cable subscribers pay WCAC directly?

11         A.    Verizon, Comcast and RCN pay us

12   directly.

13         Q.    Does WCAC have any other sources of

14   funding?

15         A.    We do sponsorships on the channel, and

16   we also rent the studio out from time to time.

17   And we also sell, have sold footage to

18   documentary companies.

19         Q.    Are there any other sources of revenue?

20         A.    Sometimes we get donations.

21         Q.    Is that all?

22         A.    I'm pretty sure, yes.

23         Q.    Does WCAC receive any funding from the

24   Waltham city government?

1          A.    No.

2          Q.    Does the Waltham city government make

3    any payments to WCAC?

4          A.    Technically, yes.  But the funding is

5    all from Verizon.  It's funding that the mayor

6    turned over to the city council.  We spend the

7    money and then we put the bills in for

8    reimbursement.  But it's not city funding.  It's

9    a grant.  It's the grant money.  But it's only a

10   small account.

11         Q.    When you say "small account," about how

12   big is it?

13         A.    I think there's only, maybe, 60- or

14   $70,000 in there currently.

15         Q.    Is that a typical amount to be in that

16   account?

17         A.    We've never had that account before.

18   We've always received the funding directly.

19         The mayor had held on to the Verizon funding

20   for several years because she knew she was going

21   to build the high school.  And the high school

22   has their own channel and they needed funding to

23   build that out.  So she gave us Verizon, Comcast

24   and RCN, and she kept Verizon for the high

1    school.

2         And then in about 2019, she released that

3    funding to us.  So that was extra money that she

4    put into the account.  And there was some law in

5    the State of Massachusetts where it had to go to

6    the city council, I guess.  And so the city

7    council, if we need a reimbursement for

8    something, we send in all the bills.  They review

9    the bills, and then they give us the money back.

10   It's a reimbursement.

11        But it's not -- the money can't go to

12   anybody but us.  It's our funding.  They're just

13   making sure we're not being frivolous with the

14   funds.

15        Q.   Now, I'm sorry, when did that account

16   get opened?

17        A.   The account that we get the

18   reimbursement from?  I believe it was 2021 maybe,

19   2022.

20        Q.   You said in 2019 the mayor released

21   that funding to WCAC.  So was that account

22   established before 2019?

23        A.   So she --

24             MR. PYLE:  I just want to caution the

1    witness to wait until Mr. Stoltz is done with his

2    question.

3            THE WITNESS:  I'm sorry.  Okay.  Sorry.

4    Go ahead.

5    BY MR. STOLTZ:

6        Q.   I'll repeat the question.  You said

7    earlier that in about 2019, the mayor released

8    funding to WCAC.  So was that account established

9    in 2019 or before?

10       A.   The mayor had held on to the Verizon

11   funding until 2019.  In 2019, we started getting

12   the Verizon checks directly.

13       She used a good majority of that funding to

14   upgrade the city to HD in 2016 and to build the

15   new high school TV studio.  The extra funding

16   that was in that pile of money, she released to

17   the city council around '21, '22 because they

18   changed the law in Massachusetts.

19       And so that's when that funding, that fund

20   was created.

21       Q.   So I'm just trying to understand what

22   the prior arrangement was.

23       Before 2019, did Verizon send all of its --

24   strike that.

1          Are you familiar with the term "PEG"?

2          A.    Yes.

3          Q.    Does Verizon provide PEG funding?

4          A.    Yes.

5          Q.    Before 2019, did Verizon send PEG

6     funding to the City of Waltham?

7          A.    Yes.

8          Q.    And not to WCAC directly?

9          A.    No.

10         Q.    No, they did not send it to WCAC

11    directly?

12         A.    No.  They did not send it to WCAC

13    directly.

14         Q.    You said the mayor used a good majority

15    of that funding to upgrade the city to HD in

16    2016.

17         When you said "upgrade the city to HD," was

18    that something that WCAC did?

19         A.    Yes.

20         Q.    What does that mean, "upgrade the city

21    to HD"?

22         A.    We had to upgrade all the equipment to

23    HD equipment.  There was six different studios

24    that needed to be upgraded to HD, high-definition

1    television.

2          Q.   Were those all studios owned by WCAC?

3          A.   Yes.

4          Q.   Does WCAC own the high school TV

5    studio?

6          A.   Yes.  We own the equipment.  We don't

7    own the studio.

8          Q.   Whose decision was it to establish the

9    high school's TV studio?

10         A.   Can I make a correction?

11         Q.   Yes.

12         A.   I thought you were talking about where

13   they do the school committee meetings, which is

14   at the high school.  We don't have anything to do

15   with the high school TV studio.  That's the

16   Education Channel, and that's run by the high

17   school.

18         But there is a studio at the high school

19   where they do the school committee meetings.  And

20   we run that.  We own the equipment there.

21         Q.   Thank you.  So there is a studio at the

22   high school that is not owned by WCAC?

23         A.   Yes.

24         Q.   Is it owned by the high school?

1      A.    Yes.

2      Q.    Did PEG funding from Verizon fund the

3 studio that's owned by the high school?

4      A.    Yes.

5      Q.    Who made the decision to use PEG

6 funding from Verizon to fund the studio owned by

7 the high school?

8      A.    I believe the mayor did.  She's the

9 authority of the contract with Verizon, Comcast

10 and RCN.

11      Q.    You said earlier the mayor released

12 that funding to the city council in 2021 or '22;

13 is that right?

14      A.    Yes.

15      Q.    Since that time, has all the money

16 released from that fund gone to WCAC?

17      A.    Yes.

18            (City Council Docket for April 22,

19      2024 marked Exhibit 47.)

20 BY MR. STOLTZ:

21      Q.    I'm showing you what's been marked as

22 Exhibit 47.

23      Do you recognize this document?

24      A.    No.

1      Q.    Is it a docket for the Waltham City

2   Council?

3            MR. PYLE:   Objection.

4      A.    Yes.

5      Q.    Have you seen the dockets of the

6   Waltham City Council before?

7      A.    I have, but not this one specifically.

8   They don't send me dockets.  They just send me an

9   email saying show up.  They don't send me...

10     Q.    Does this appear to be a docket of the

11  Waltham City Council?

12     A.    It does, yeah.

13     Q.    Could you turn to page 3, please.

14  Could you read the line under the heading "Cable

15  Access"?

16     A.    "Cable Access Committee recommends that

17  WCAC request for reimbursement of $135,656.67 be

18  approved."

19     Q.    Thank you.  Is it fair to say there was

20  at least $135,656 in the fund as of April 22,

21  2024?

22     A.    There was.  Yes.  There's about $70,000

23  left, currently.

24                 (Document Bates-stamped WCAC0000760

1      and -0761 marked Exhibit 48.)

2  BY MR. STOLTZ:

3      Q.   I'm showing you what's been marked as

4  Exhibit 48.

5          Do you recognize this document?

6      A.   Yes.

7      Q.   What is it?

8      A.   It's the minutes from the December 10th

9  -- well, no, not the December -- the October 22nd

10  board meeting.

11     Q.   And that's the board of WCAC?

12     A.   Yes.

13     Q.   Aside from the redaction here that says

14  "attorney-client privilege," is this a true and

15  correct copy of the board minutes from that date?

16     A.   Yes.

17     Q.   In the middle of the first page, do you

18  see a line that begins "M. Justin Barrett told

19  the BOD"?

20     A.   Yup.

21     Q.   Could you --

22     A.   Yes.

23     Q.   Could you read that line?

24     A.   "M. Justin Barrett told the BOD that we

1     are in good shape.  We will be getting more funds

2     back from the city."

3          Q.   Does "getting more funds back from the

4     city" refer to a reimbursement from that account

5     we discussed?

6          A.   Yes.

7                    (Letter dated February 29, 2024,

8              with attachment marked Exhibit 49.)

9     BY MR. STOLTZ:

10         Q.   I'm showing you what's been marked as

11    Exhibit 49.

12         Please take a moment to look at it.  Rest

13    assured, I'm not going to ask you about this

14    entire document.

15              MR. PYLE:  You can flip through it, if

16    you wish.

17              THE WITNESS:  I know it.  I've seen it

18    a lot of times before.  I know this one.

19              MR. PYLE:  Okay.

20              THE WITNESS:  I do.

21    BY MR. STOLTZ:

22         Q.   Do you recognize this document?

23         A.   Yes, I do.

24         Q.   What is it?

1      A.    This is all of the equipment that we

2  bought that we put in for reimbursement and

3  anything that we have asked.

4      Q.    Over what range of time did you buy the

5  equipment that's mentioned in here?

6      A.    I don't recall.  I'm not sure if this

7  is chronological so I can't really speak to that.

8      Q.    Is this a document you submitted to the

9  Waltham city government?

10      A.    Yes.

11      Q.    Is this a true and correct copy of what

12  you submitted to the city government?

13      A.    Yes.

14      Q.    Looking at the first page, where it --

15  at the top, where it says, "The attached is an

16  itemized list including invoices paid for

17  equipment to be reimbursed through the ad hoc

18  committee formed by Mayor McCarthy to reimburse

19  for PEG equipment."

20      What is the ad hoc committee?

21      A.    The city council has committees that

22  are subcommittees of the city council.  So we are

23  a subcommittee of the city council.  These are

24  not taxpayer funds.  It's a private -- it's an

1    account of the extra money.

2          And the city councilors look over these to

3    make sure that we're not lying about what we're

4    buying.  And when they see that we have receipts

5    for everything, they reimburse us.

6          Q.   Did the ad hoc committee have a name?

7          A.   I think it's the WCAC Committee.  I

8    believe.  I'm not sure.  I don't remember.

9          Q.   Is it the Cable Access Committee?

10         A.   The Cable Access Committee.  I think

11   that might be it.  Yes.

12         Q.   If you could look at the second page

13   here, please.  If you see where it says "from

14   Comcast Cable franchise."

15         A.   Mm-hmm.

16         Q.   Do you have an understanding of what

17   "Comcast Cable franchise" means?

18         A.   The -- the city gets a percentage of

19   funds directly.  They get.4 percent.  I believe

20   that's that throughout the years.  And Comcast

21   gives us a grant of $50,000 a year to buy

22   equipment.

23         So I believe that's what that is.  And that

24   must be what the mayor used.  I always thought it

1  was Verizon money, but I guess it's Comcast

2  money.  Comcast money.

3      Q.   When you say "Comcast gives us a grant

4  of $50,000 a year," does Comcast give that money

5  to the city?

6      A.   They do.  They used to give it to us,

7  but now they give it to the city.  When the mayor

8  gave us the Verizon money, she held on to the

9  equipment money.

10     Q.   And when you say "the equipment money,"

11 you mean --

12     A.   It was the $50,000 a year.

13     Q.   From Comcast?

14     A.   Yes.

15     Q.   Do you know why the mayor held on to

16 the equipment money?

17     A.   You'd have to ask her.  No, I don't.

18     Q.   On the next line, do you see where it

19 says "Comcast PEG equipment"?

20     A.   Yes.

21     Q.   Do you have an understanding of what

22 that means?

23     A.   That's the $50,000 a year, I'm

24 assuming.

1      Q.   How is that different from Comcast

2   Cable franchise?

3      A.   The city gets, I think, .4 percent of

4   the cable revenue every year.  That goes directly

5   to the city.  It does not come to WCAC.

6      Q.   So at the time you submitted this

7   document, both of those pots of money, the

8   Comcast Cable franchise and the Comcast PEG

9   equipment, were held by the city?

10      A.   Yes.  In a separate account, I assume,

11   because it's not taxpayer money.

12      Q.   So you've mentioned PEG funding and

13   equipment funding that Comcast pays to the city.

14   You've also mentioned funding that Verizon has

15   paid to the city.

16      A.   Mm-hmm.

17      Q.   Does any of that money go to entities

18   other than WCAC?

19      A.   The high school.

20      Q.   Any others?

21      A.   No.  It's only -- it's MAC Channel,

22   WCAC, and the Education Channel.

23      Q.   When you say the Education Channel,

24   that's the one, the high school --

1      A.    The high school TV studio.

2      Q.    Please let me finish my question.

3      A.    I'm sorry.

4      Q.    The Education Channel is the channel

5  run by the high school?

6      A.    Yes, sir.

7      Q.    And WCAC is not part of that?

8      A.    No.

9      Q.    You've mentioned various funds held by

10 the city government.

11     Can WCAC access any of those funds without

12 approval from the city council?

13     A.    I don't believe so.  No.

14     Q.    Has the city council ever reimbursed

15 WCAC for less than the amount that WCAC

16 requested?

17     A.    No.

18     Q.    Has the city ever declined to reimburse

19 WCAC?

20     A.    No.

21     Q.    In your understanding, does the city

22 council have the power to reimburse WCAC for less

23 than the amount that WCAC requested?

24     A.    I believe they do, yes.

1      Q.   And does the city council have the

2   power to decline to reimburse WCAC?

3      A.   Yes.

4      Q.   I'm sorry.  Before we move away from

5   this document, if you turn to the fourth page,

6   please.  Is this an invoice from B&H photo?

7      A.   Is this the right one here?

8      Q.   It's the page that begins, "Your order

9   is being prepared."

10      A.   Yes, yes.  Mm-hmm.

11      Q.   Sorry.  Let me ask again to get a clean

12   record.

13      Is this an invoice from B&H Photo?

14      A.   Yes.  It's B&H Photo Video.

15      Q.   B&H Photo Video, great company.  I've

16   been to their storefront.

17      Was this equipment purchased for WCAC?

18      A.   Yes.

19      Q.   And did the City of Waltham reimburse

20   WCAC for this purchase?

21      A.   Yes.  It's all part of this.

22      Q.   Thank you.

23           (Document Bates-stamped WCAC0000664

24      through -0697 marked Exhibit 50.)

1    BY MR. STOLTZ:

2         Q.   I'm showing you what's been marked as

3    Exhibit 50.

4         Do you recognize this document?

5         A.   Yes.

6         Q.   What is it?

7         A.   It's the contract between the City of

8    Waltham and Verizon, I believe.  Yes.  Verizon.

9         Q.   Is it dated January 17, 2019?  I

10   believe there's a typo in the date.

11        A.   Yeah.  2109 would be tough.

12        Q.   Is this document from 2019?

13        A.   Yes.

14        Q.   Could you please take a look through it

15   and tell me if this is a true and correct copy of

16   the agreement between Waltham and Verizon.

17        A.   I don't see the signature pages on

18   here, but the majority is there.

19             MR. PYLE:  Yeah.  I'll note that the

20   document appears to end at WCAC 0697 --

21             MR. STOLTZ:  Hmm.

22             MR. PYLE:  -- on page 4 of Exhibit C.

23   There is a signature page, however, on page 690.

24             THE WITNESS:  There it is.

1    BY MR. STOLTZ:

2         Q.    If you look at page 5, please.  Has

3    there been any new agreement between Verizon and

4    the City of Waltham since 2019?

5         A.    No.

6         Q.    Is it your understanding that this

7    agreement is still in force?

8         A.    It's still in force until a new one is

9    negotiated.  It's a five-year contract, so --

10        Q.    So it hasn't expired?

11        A.    It has expired, but they continue to

12   pay the franchising fees.  But the equipment is

13   only for the first ten years -- I mean, the first

14   five years, and then that stops.  And it just,

15   they just continue with the same contract.

16        Q.    Including the franchising fees?

17        A.    Yes.

18        Q.    If you look on page 5, at the line

19   labeled 1.27 PE -- I'm sorry, strike that.

20        If you look at the line labeled "1.28, PEG

21   access designee," is WCAC a PEG access designee?

22        A.    Yes.

23        Q.    Does Waltham have any other PEG access

24   designee?

1          A.    The high school.

2          Q.    Is that the only other one?

3          A.    As far as I know, yes.

4          Q.    Who negotiated this contract?

5          A.    The law department.

6          Q.    Is that the law department of the city?

7          A.    Yes.

8          Q.    Was WCAC involved in negotiating this

9    contract?

10         A.    No.

11         Q.    Was Mayor McCarthy involved in

12   negotiating this contract?

13         A.    I have no idea.

14         Q.    Could you turn to page 13, please, the

15   paragraph labeled 5.3.4, "PEG access support."

16         Could you read the first few lines of that

17   paragraph, please.

18         A.    "The licensee shall provide annual

19   funding to the WCAC for PEG access channel

20   operating support and other PEG access channel

21   costs and expenses, PEG access support, in the

22   amount of four and six-tenths (4.6 percent) of

23   the licensee's annual gross revenue and shall

24   also provide an annual funding to Waltham school

1  committee."

2      Q.   That's enough.  Thank you.  Thank you.

3  Who set that percentage?

4      A.   It's usually negotiated by Verizon and

5  the law department.  I have no -- I have no say,

6  so I don't know.

7      Q.   Thank you.

8          MR. STOLTZ:  Thank you.  We're done

9  with that document for now.

10         We've been going about an hour.  Do you

11  need a break?

12         THE WITNESS:  I'm good.

13         MR. PYLE:  I could use one.

14         THE WITNESS:  Well, if you're taking

15  one, I'll take one too.

16         MR. STOLTZ:  Okay.  Let's go off the

17  record.

18         THE VIDEOGRAPHER:  We are going off the

19  record.  The time on the monitor is 10:10.

20             (A recess was taken.)

21         THE VIDEOGRAPHER:  We are back on the

22  record.  The time on the monitor is 10:20.

23  BY MR. STOLTZ:

24      Q.   You mentioned earlier that WCAC gets

1    revenue from selling copies of videos; is that

2    right?

3         A.   (Witness nods.)

4              MR. PYLE:  You have to say "yes" or

5    "no."  Sorry.  Don't just nod your head.

6              THE WITNESS:  Yes.  Yes.  I'm getting

7    tired.

8    BY MR. STOLTZ:

9         Q.   Approximately how much revenue did WCAC

10   take in from selling copies of videos in 2023?

11        A.   I have no idea.

12              (2021 Income Tax Return for Waltham

13         Community Access Corporation marked Exhibit

14         51.)

15   BY MR. STOLTZ:

16        Q.   I'm showing you what's been marked as

17   Exhibit 51.

18        Do you recognize this document?

19        A.   It's a tax return, yes.

20        Q.   Is it a tax return of WCAC?

21        A.   Yes.

22        Q.   Did you help prepare WCAC's 2021 tax

23   return?

24        A.   No.

1      Q.   Did you review it?

2      A.   No.

3      Q.   Have you seen this document?

4      A.   I have seen this document.

5      Q.   Please take a look through it and tell

6  me if this is a true and correct copy of WCAC's

7  2021 IRS Form 990.

8      A.   Yes.

9      Q.   Thank you.  If you turn to the ninth

10 page, please.  I'm sorry.  It's -- we're looking

11 for the page that says page 9 in the top right.

12     A.   Mm-hmm.

13     Q.   I believe it's the eighth or ninth

14 page.

15     A.   Yes.

16     Q.   Are you on the page that begins

17 "Statement of Revenue"?

18     A.   Yes.

19     Q.   Near the top, there's a line that says

20 "government grants."

21          Do you see that?  It's line 1E.

22     A.   Mm-hmm.

23     Q.   What is the amount listed there?

24     A.   $129,239.

1      Q.   Do you recall what government grants

2  WCAC received in 2021?

3      A.   I don't.  I don't.  And it could be --

4  I'd have to look -- I'd have to ask my

5  bookkeeper.

6      Q.   Does WCAC typically receive government

7  grants?

8      A.   This could be a reimbursement for an

9  upgrade to equipment somewhere in the city, but I

10  can't say for sure.

11     We don't get government grants.  We get

12  reimbursements.  I don't know why it says that on

13  here.

14     But I think, if it is in this, it's some

15  funding that we got from the account set up by

16  the city.  I just don't recall what we bought in

17  2021.

18      Q.   That's all right.  I know it was a

19  while ago.

20     Do you see on line 2A, where it says

21  "program service fees"?

22      A.   Yes.

23      Q.   Do you know what program service fees

24  are?

1      A.    I believe -- I don't.  I don't prepare

2  these.  Our accountant does.

3      Q.    If you could look near the bottom of

4  this page, on line 11C, where it says "video

5  sales," what are video sales?

6      A.    That's DVD, copies of meetings or

7  shows.

8      Q.    And how much money did WCAC receive in

9  video sales in 2021?

10     A.    $30.  It's still revenue.

11     Q.    Do you have any reason to believe that

12  WCAC received substantially more than $30 in

13  video sales in 2023?

14     A.    I don't.  I have no idea.

15     Q.    Has WCAC ever sold copies of videos of

16  government meetings that it recorded?

17     A.    Yes.

18     Q.    Does WCAC sell those copies on DVD?

19     A.    Yes.

20     Q.    Does it sell them in any other medium?

21     A.    No.

22     Q.    In 2021, would such sales have been

23  included under video sales?

24     A.    Yes.

1      Q.    What does it cost to buy a DVD copy --

2      A.    15 --

3      Q.    -- of a government meeting video from

4   WCAC?

5      A.    $15.

6      Q.    I'm sorry.  Please do let me finish.

7      A.    I'm sorry.

8      Q.    You said it was $15?

9      A.    Yes.

10      Q.    Thank you.  And you don't believe there

11   were substantially more sales of DVDs in 2023 as

12   compared to 2021; is that right?

13      A.    I have no way of knowing.  The MAC

14   Channel and my bookkeeper are in charge of that.

15      Q.    If I could ask you to refer again to

16   Exhibit 31.

17      A.    Sorry.

18      Q.    Number two under Schedule A says,

19   "WCAC's sources of income."  I'm skipping ahead.

20   "And/or income from the sale of licensing of

21   video recordings."

22      Do you see that?

23          MR. PYLE:  Paragraph 2.

24      A.    Right here (indicating).  Yes.

1          Q.   And did you come prepared today to

2     testify on that subject?

3               MR. PYLE:   Objection.   You can answer.

4          A.   I mean, I can't tell you who bought

5     videos, specifically who bought them and what

6     they were for.  But I can tell you that we do

7     sell them.  But I can't tell you if it was

8     Yolanda's Fashion Show that was copied or a

9     government meeting.

10         Q.   What I'm asking about is how many

11    videos were sold.  Do you know how many videos

12    were sold in 2023?

13         A.   No.

14         Q.   WCAC makes recordings of government

15    meetings; is that right?

16         A.   Yes.

17         Q.   Does WCAC put captions on those

18    recordings?

19         A.   Yes.  Captions, as in graphics or

20    captions, as in --

21         Q.   Captions as in closed-captions for the

22    hearing impaired?

23         A.   No.

24         Q.   Does WCAC upload government meeting

1    videos to any platform that adds captions for the

2    hearing impaired?

3         A.   No.

4         Q.   Do you recall a request by several city

5    councilors in early 2022 that WCAC closed-caption

6    its government meeting videos?

7         A.   I don't recall.

8         Q.   Do you recall giving testimony to a

9    meeting of the city's economic and community

10   development meeting in March 2022 on that

11   subject?

12            MR. PYLE:  Objection.

13        A.   I don't recall.

14        Q.   I'd like to show you a video of that

15   meeting.

16            MR. PYLE:  Are we able to mark this

17   video for identification in some way?

18            MR. STOLTZ:  Yeah.  I'd like to mark

19   this video as B for identification.  It's a

20   YouTube video on the Channel 781 archive YouTube

21   channel.  It's titled "Economic and Community

22   Development, 3/7/22."

23            (Exhibit A marked for

24        identification.)

 1              MR. STOLTZ:  And I will provide a URL.

 2                  (Discussion off the record.)

 3                  (Video played.)

 4              THE WITNESS:  Can you put the volume up

 5    on that.

 6              MR. STOLTZ:  I'm sorry.  Unfortunately,

 7    that's -- I'm sorry.  We're having Wi-Fi issues.

 8                  (Discussion off the record.)

 9              THE VIDEOGRAPHER:  Counsel, if you

10    would like to go off the record for a second, I

11    have a speaker.

12              MR. STOLTZ:  Yes, please.

13              THE VIDEOGRAPHER:  We are going off the

14    record.  The time on the monitor is 10:35.

15                  (A recess was taken.)

16              THE VIDEOGRAPHER:  We are back on the

17    record.  The time on the monitor is 10:37.

18    BY MR. STOLTZ:

19        Q.   Is that you on the screen?

20        A.   It is.

21        Q.   Were you testifying to a committee of

22    the Waltham City Council?

23        A.   Yes.

24        Q.   I'm going to play this video, starting

1    at 6 minutes and 10 seconds.

2                    (Video played.)

3                    (End of video.)

4    BY MR. STOLTZ:

5         Q.   I know this was a while ago, but do you

6    remember what subjects you were discussing?

7         A.   I believe it was closed-captioning.

8         Q.   Was it closed-captioning of government

9    meeting videos?

10        A.   I think it was closed-captioning of

11   everything.

12        Q.   Did one of the city councilors ask you

13   if WCAC could post videos to YouTube?

14        A.   Yes.

15        Q.   What did you mean by "Do you want that

16   information out there for anybody to take ahold

17   of"?

18        A.   Well, I mean, there's a lot of

19   different committees in Waltham, and there's a

20   lot of -- it's not just the city council.  It's a

21   lot of different committees.  And you know, you

22   don't know who is watching it.  It could be

23   anybody from anywhere in the world, where Waltham

24   sees Waltham.

1        Does the entire world need to see what

2    Waltham does?  That's a question I was asking

3    them.  It doesn't mean I agree or disagree.  It

4    was just something I asked, what they thought of

5    that, what their opinion was.

6        Q.   How would posting videos on YouTube

7    allow them to be watched by anybody from anywhere

8    in the world, as compared to posting them on

9    WCAC's website?

10        A.   Well, YouTube is a worldwide

11    phenomenon.  The WCAC website is a Waltham

12    phenomenon.  That's the difference, I think.

13        Q.   Did you think it would be harmful if

14    the entire world saw what Waltham does?

15        A.   I don't -- I don't know.  That's why I

16    was asking them.  I mean, it should be considered

17    by every -- every meeting person, do they want

18    this, do they want themselves on YouTube.

19        That's a question you need to ask them.  You

20    know, there's the finance committee.  There's

21    the, you know, there's a million -- there's tons

22    of committees in Waltham.  It's not just the city

23    council.  It's not just the school committee.

24    It's -- you would have to ask every committee.

1    There are committees that don't want us taping

2    them.  So, you know, my question to them was, is

3    that something we want to do.

4          Q.    When you asked that question, did you

5    believe that some people in the city government

6    did not want their meetings on YouTube?

7          A.    I have no idea.  That's why I was

8    asking the question.

9          Q.    Have you ever heard from anyone in the

10   city government saying that they did not want

11   their meetings on YouTube?

12         A.    Not specifically, no.  No.

13         Q.    At any time?

14         A.    Not that I recall.

15         Q.    Have you ever heard from anyone else in

16   Waltham that city government meetings should not

17   be on YouTube?

18         A.    No.  Not that I can recall.

19         Q.    Does WCAC post videos to any platforms

20   besides YouTube?  Strike that.

21         Does WCAC post its video to any public video

22   hosting platforms?

23         A.    Some news segments get posted on

24   YouTube.

1      Q.    But do any government meeting videos

2   get posted on YouTube?

3      A.    I'm not sure.  That's a Bill question.

4   I don't believe we do.  But there will be parts

5   of government meetings in the news that might get

6   posted on YouTube, if it's part of the news

7   program.

8      Q.    Is the news program Waltham Newswatch?

9      A.    Yes.

10      Q.    And Waltham Newswatch uses clips of

11   recordings of the city government meetings?

12      A.    Occasionally.

13      Q.    And those do get posted on YouTube?

14      A.    I couldn't say.  I'd have to look.  But

15   I'm just saying it could happen.

16      Q.    Who is Jeff Whiteley?

17      A.    Jeff Whiteley is the TV teacher at the

18   high school.

19      Q.    Is he an employee of WCAC?

20      A.    No.  He was in 2018, and then he went

21   to the high school.  So he hasn't been around

22   since, I think 2009 he moved to the high school.

23      Q.    Would you say he works closely with

24   WCAC?

1          A.    No.  He doesn't even answer my emails.

2          Q.    Are there any employees of either the

3    City of Waltham or the Waltham schools who work

4    closely with the WCAC staff?

5          A.    The only time, maybe a janitor might

6    help Bill unlock a room to get in to a meeting.

7    But other than that, no.

8          Well, Carlos Vidal hosts our news, but he's

9    the news -- he's the anchor of our news, but he's

10   -- that's it.  He doesn't work.  He's a

11   volunteer.

12         Q.    Is he a city councilor?

13         A.    Yes.  But he's been doing it long

14   before he was a city councilor.

15         Q.    And he's a news anchor?

16         A.    Yes.

17         Q.    On Waltham Newswatch?

18         A.    Yes.

19         Q.    I wanted to ask you a little bit about

20   WCAC's board.

21         How are the board members appointed?

22         A.    They request -- they send requests to

23   the mayor.  And if there's an opening on the

24   board, the mayor looks at the requests and she

1    appoints somebody.

2         Q.   Once appointed, how long do board

3    members serve?

4         A.   It depends.  They all have different --

5    they all have different -- some are six, four.  I

6    think it's four, three, two, one.  It depends on

7    when they're elected and what term it is.

8         Q.   What happens when a board member's term

9    expires?

10        A.   They either -- the mayor either renews

11   them or they leave.

12        Q.   Do you know if the mayor has ever

13   declined to renew a person's seat on the board?

14        A.   I don't believe -- not during my

15   tenure, but I don't know about before that.

16        Q.   As part of your regular duties at WCAC,

17   do you consult with Justin Barrett?

18        A.   Yes.

19        Q.   Is he the chair of the board?

20        A.   Yes.

21        Q.   What aspects of your job do you

22   typically consult with Mr. Barrett about?

23        A.   Budget issues, board issues, policy

24   issues.  If there's something that we feel we

1  need a little extra help with, we'll call him for

2  advice.

3      Q.   Are there any other members of the WCAC

4  board who you regularly call for advice?

5      A.   It depends.  It depends on what the --

6  what the problem is.  They all have different

7  skill sets.  So it depends on what the question

8  is.

9      Q.   Of the members of the WCAC board, who

10  do you talk with most often?

11      A.   Jeanne Umbrello, Marcia MacClary.

12  Marcia MacClary and I were in Rotary together.

13  Pretty much those two, most of the time.  And

14  Richie Flynn is on Lion's with me.

15      Q.   What about Mr. Barrett?

16      A.   And Mr. Barrett, yeah.

17      Q.   You said you typically consult with

18  Mr. Barrett about budget issues, board issues,

19  policy issues, or if there's something we feel we

20  need a little extra help with.

21      Can you give me some examples?

22      A.   If -- currently, we're getting funding

23  back from the city and it was all tied up.  And

24  he knows the guy that writes the checks.  So I

1    said can you give them a call and find out where

2    our check is.  So he did.  Things like that.

3        When he has connections that are better than

4    ours, we can call him and he can give a call and

5    he can help us with situations.

6        Q.   Do you know why funding was tied up?

7        A.   It was something in the city council --

8    the city clerk's office.  There was some kind of

9    miscommunication between the clerk and the

10   assistant clerk or something.  And it got lost in

11   the paperwork.

12       And so when we reminded them, they said, oh,

13   yeah, we owe you a check.

14       Q.   Is copyright something you typically

15   discuss with Mr. Barrett?

16       A.   No.

17       Q.   Have you discussed copyright with

18   Mr. Barrett aside from issues around Channel 781?

19       A.   Yes.

20       Q.   And what was the issue?

21       A.   Creating policies around it.

22       Q.   When did you discuss that with him?

23       A.   I don't recall.

24       Q.   Was it before 2023?

1          A.    I don't recall.

2          Q.    Was it before you heard about Channel

3    781?

4          A.    I don't recall.

5          Q.    You said that you discussed creating

6    policies around copyright with Mr. Barrett?

7          A.    Yes.

8          Q.    Did you have those discussions five

9    years ago?

10         A.    I don't recall.

11         Q.    Did you have those discussions before

12   COVID?

13         A.    I don't recall.

14         Q.    And you tell me you don't remember

15   whether you had any such discussions before you

16   had heard of Channel 781?

17         A.    I don't recall.

18         Q.    When did you first hear of Channel 781?

19         A.    Sometime in 2023.  I don't recall the

20   exact date.

21         Q.    What do you recall about your

22   discussions with Mr. Barrett about copyright

23   policies?

24         A.    That it would be important to have them

1  so that if something came up and we needed to

2  protect our copyright, we had policies in place.

3       Q.   You suggested to him that it would be

4  important to have policies in place?

5       A.   Yes.

6       Q.   How did he respond?

7       A.   Write something up and we'll take a

8  look.

9       Q.   As part of your regular

10  responsibilities at -- strike that.

11       As part of your regular responsibilities

12  with WCAC, do you speak with members of the city

13  council?

14       A.   Occasionally.

15       Q.   Does that include Mayor McCarthy?

16       A.   Yes.

17       Q.   About how often do you speak with any

18  of the members of the city council?

19       A.   Well, Randy LeBlanc, Bill Hanley, and

20  Cathyann Harris are all Lions.  So I see them at

21  meetings and say hi and talk to them there.

22       Caren Dunn is the head of our committee.  So

23  occasionally if we have something we're putting

24  in front of them, we'll reach out to her.  The

1  mayor, mostly I talk to her about events in the

2  city, that we want a "Breakfast with the Mayor"

3  coupon for an auction item or something like

4  that.  I also see the mayor at events, charity

5  events around the city.

6      Q.   About how often would you say you speak

7  with the mayor?

8      A.   Maybe six times a year, maybe six,

9  seven, eight times a year.  It depends on how

10 many events we have.

11     Q.   Have you ever discussed copyright with

12 any members of the city council?

13     A.   Not that I -- no.  Not that I recall.

14     Q.   Have you ever discussed Channel 781

15 with any members of the city council?

16     A.   Yes.

17     Q.   Who did you discuss it with?

18     A.   I believe -- at some point I know I

19 discussed it with Cathyann Harris, but I can't

20 specifically say what the conversation was.  But

21 I know that I have had a conversation with her

22 about it.  But I don't remember when it was or

23 what was said.

24     Q.   Did you discuss Channel 781 with any

1   other member of the city council?

2         A.   Not that I can recall.

3         Q.   So you haven't discussed Channel 781

4   with the mayor?

5         A.   No.

6         Q.   Do you know if that conversation with

7   Councilor Harris was before September of 2023?

8         A.   I don't recall.

9         Q.   Would it have been in 2023?

10        A.   I don't recall.

11        Q.   Would it have been earlier than 2023?

12        A.   I don't recall.

13        Q.   You told me earlier that you first

14  heard of Channel 781 in 2023.  So I suppose you

15  wouldn't have talked to --

16        A.   I don't -- I don't recall.

17        Q.   -- Councilor Harris before --

18        A.   I don't recall the date.  I don't

19  recall.

20        Q.   Please let me finish my question.  You

21  said earlier that you first heard of Channel 781

22  in 2023; is that right?

23        A.   I assume that's the right date.  I

24  assume so.  Yes.  I assume so.  Yes.  2023.

1        Q.    So is it safe to say you would not have

2    talked to Councilor Harris about Channel 781

3    before 2023?

4        A.    I guess that's true.  Yes.

5        Q.    Which employees of WCAC, if any, handle

6    copyright issues?

7        A.    Chris Wangler.

8        Q.    Anyone else?

9        A.    He was the main -- the main person,

10   yeah, at this point.

11       Q.    Is there a copyright lawyer who WCAC

12   consults with regularly about copyright issues?

13       A.    No.

14       Q.    Does WCAC have a lawyer on staff?

15       A.    No.

16       Q.    Before 2023, did WCAC ever have

17   occasion to consider whether the use of a

18   copyrighted material was Fair Use?

19       A.    I don't recall.

20       Q.    Does WCAC have any policies about the

21   use by others of WCAC media?

22       A.    I wrote a policy up, and I saw that in

23   the evidence.  The problem was my computer

24   crashed.  So a lot of the information around

1  that, whether it got passed or not, a lot of that

2  is gone.  So I don't recall.

3      I recall seeing it, but I don't remember

4  what happened after I wrote it, because it was on

5  the other computer that crashed.

6      Q.   Before you wrote that, did WCAC have

7  any policy, written or unwritten, about other

8  people using WCAC media?

9      A.   No.  Well, no, I don't -- no.  No.  I

10  don't think so.  I don't think so.  We have

11  policies for producers, but it's more about their

12  copyright and how to protect their copyright.

13      Does that make sense?

14      Q.   What do you mean by "producers"?

15      A.   The people that come and use our

16  studio.  We have policies for them.  So we have

17  copyright -- you know, about using music that,

18  you know, using noncopywritten music, things like

19  that.  It's in our policies for our producers.

20      Q.   You wrote that policy sometime in 2023;

21  is that right?

22      A.   I wrote that policy in 2008.

23          MR. PYLE:  Objection.  Let's clarify

24  which policy we're talking about.

1          MR. STOLTZ:  I apologize.

2     BY MR. STOLTZ:

3          Q.   Speaking about the WCAC's copyright

4     policy.

5          A.   The copyright policy I believe I wrote

6     in 2023.  I believe.  I don't remember because my

7     computer crashed.  So I don't know the exact

8     date.

9          Q.   Before you wrote that policy, did WCAC

10    ever allow other people to use WCAC media?

11         A.   If they called and asked permission,

12    yes.  A lot of the news agencies have used our

13    footage.  We've sold it to documentary companies.

14    They're all -- they've all been given permission

15    to use our footage.

16         Q.   How many documentary companies have you

17    sold footage to?

18         A.   Two.

19         Q.   Who were they?

20         A.   They were both documentaries about the

21    Tsarnaev brothers.  I don't remember the names

22    offhand.

23         Q.   Did both of those documentary companies

24    pay WCAC for permission to use media?

1          A.    Yes.

2          Q.    Do you know what sort of media they

3     used?

4          A.    Mostly meetings.  Meetings with the

5     sheriff's department.  B-roll of people outside

6     of the house of the kids that they murdered.

7     There were three kids from Newton that they

8     murdered before they went on their other rampage

9     at the Boston Marathon.

10         And then there was a community meeting about

11    that, I believe, and that was part of the sale

12    too.

13         Q.    Were any of those meetings shown on

14    MAC-TV?

15         A.    I believe so.  Yes.  They were either

16    shown on MAC-TV or on the news, one or the other.

17         Q.    Were any of those Waltham city council

18    meetings?

19         A.    No.  Not that I -- not that I recall.

20    They were the DA's meeting and -- I think it was

21    the DA or -- not the sheriff.  But the public --

22    is it the DA's office?  It would be the DA's

23    office, right?  I think it's the DA's office.

24         Q.    I don't know.  But when you say "the

1  DA's office," do you mean the Middlesex County

2  DA?

3      A.   Yes.  Sorry.

4      Q.   Other than those two documentary

5  filmmakers, has WCAC gotten other requests to use

6  media?

7      A.   Yes.

8      Q.   What sort of entities did those come

9  from?

10     A.   We got a request from a law firm in New

11 York that wanted to use one of our meetings for

12 training.  But we felt that that was not

13 something we could sell.  So we didn't sell it.

14 We didn't do it.

15     Q.   You didn't allow them to use it?

16     A.   No.

17     Q.   Why not?

18     A.   I just didn't feel it was, you know, I

19 -- I just didn't feel it was something we wanted

20 to do.  So I didn't.  I didn't allow it.

21     Q.   What else went into that decision for

22 you?

23     A.   I just -- I didn't want to -- I just --

24 I didn't feel it was right to sell something in

1    that context.

2         Q.   In what context?

3         A.   The training, somebody training and

4    using it over and over and over again for the

5    training of people.

6         Q.   What sort of video were they asking to

7    use?

8         A.   I don't -- I don't recall.  It was one

9    of the meetings.  They liked what the lawyer did,

10   so I assume it was probably -- I'm trying to

11   think which committee does that, the building

12   committee, when they go and want to put a deck on

13   their house, you know, that kind of thing.  I

14   forget what committee that is.  But it was that

15   kind of a meeting.

16        Q.   It was a meeting of one of the

17   committees of the city council?

18        A.   No.  It was one of the boards in the

19   city.

20        Q.   Around what year was that?

21        A.   2020, maybe.

22        Q.   Are there any other instances that you

23   can recall where someone asked for permission to

24   use WCAC media and you said no?

```
1          A.    Not that I recall.

2          Q.    Just the one?

3          A.    Just the one.

4          Q.    Why did you feel that wasn't right?

5          A.    I don't know.  I just -- just a gut

6    feeling, just a gut feeling about it, and I just

7    didn't feel it was something we should do.

8          Q.    Do other TV stations ever ask for

9    permission to use WCAC media?

10          A.    Yes.

11          Q.    Have you ever said no to such a

12    request?

13          A.    No.

14          Q.    Have you ever asked for payment for

15    such a request?

16          A.    No.  No.  Just the documentary

17    companies came to us with, saying we would like

18    to buy this because it was part of the

19    documentary.  But if it's a news program, no.  We

20    don't sell the video.

21          Q.    When you say you "don't sell the

22    video," do you allow them to use video?

23          A.    Yes.  They call, they ask for

24    permission, they tell us what they're using, and
```

1    they tag us.

2         Q.   What do you mean by "tag us"?

3         A.   Courtesy of the Waltham Channel,

4    courtesy of the MAC Channel, courtesy of the

5    Waltham Channel, whatever the tag is for whatever

6    they're using.

7         Q.   Is that a tag that appears on screen --

8         A.   Yes.

9         Q.   -- with the video?

10        A.   Yes.  Yes.  Or it ends up in the

11   credits.  One or the other.

12        Q.   We've talked about documentary

13   filmmakers, the law firm, and other TV stations.

14        Is there any other folks out there who have

15   requested permission to use WCAC media that we

16   haven't talked about?

17        A.   Not that I recall.

18        Q.   Overall, about how many requests do you

19   think you get a year?

20        A.   It depends on the news cycle.

21   Sometimes there's a lot of people murdered in

22   Waltham and some people -- sometimes there

23   aren't.  It just depends on the news cycle.

24        Q.   Do you ever get requests from print

1  media like the "Boston Globe"?

2       A.   Yes.

3       Q.   What sort of things do they ask

4  permission to use?

5       A.   Pictures.

6       Q.   Still photos?

7       A.   Yes.

8       Q.   Not video?

9       A.   Not video.

10      Q.   When print media asks to use a still

11  photo, do you ask them to pay?

12      A.   No.

13      Q.   Do you ask them to give credit?

14      A.   Yes.

15      Q.   In what way?

16      A.   Chris Wangler took the picture.  Chris

17  Wangler, WCAC, you know, or the Waltham Channel,

18  depending on whatever -- whatever we decide the

19  tag should be.

20      Q.   Other than Channel 781, has WCAC ever

21  encountered someone using WCAC media without your

22  permission?

23      A.   Yes.

24      Q.   What was that?

1      A.   Someone used a picture that Chris took

2   and put it on Reddit with some derogatory

3   comments about people in the picture.

4      Q.   Around when was that?

5      A.   I believe it was the beginning of 2023,

6   I believe, maybe.

7      Q.   Other than that, any other instances

8   that you're aware of?

9      A.   Not that I'm aware of.

10      MR. STOLTZ:  I'd like this one marked,

11   please.

12      (Document Bates-stamped WCAC0000121

13      and -0122 marked Exhibit 52.)

14   BY MR. STOLTZ:

15      Q.   I'm showing you what's been marked as

16   Exhibit 52.

17      Do you recognize this document?

18      A.   Yes.

19      Q.   What's the first page of this document?

20      A.   It's an email to Justin Barrett.

21      Q.   Is the second page of this document the

22   attachment to that email?

23      A.   Yup.  Yes.

24      Q.   Is this a true and correct copy of --

1          A.   Yes.

2          Q.   -- the email to Justin Barrett and the

3    attachment?

4          A.   Yes.

5          Q.   And this is dated September 11th, 2023;

6    is that right?

7          A.   Yes.

8          Q.   Looking at the attachment, what is this

9    document?

10         A.   This was a rough draft of our video use

11   policy, first draft.  It wasn't voted on.  It was

12   a working copy.

13         Q.   Is this the policy you mentioned

14   earlier?

15         A.   Yes.

16         Q.   Who wrote it?

17         A.   I did.

18         Q.   Did anyone else contribute to it?

19         A.   This is the first draft, so I think it

20   was just me.  And I was sending it out to people

21   to take a look at it.

22         Q.   Was there another draft at some point?

23         A.   I don't recall because, like I said, my

24   computer crashed.  So I don't know.  I don't know

1    where it would be.

2         Q.   I understand you're saying it may have

3    been deleted.  But at some point, was there

4    another version?

5         A.   I don't recall.

6         Q.   Who, if anyone, gave input on this

7    policy at any time?

8         A.   It was just me doing research.  That's

9    my job is writing policies.

10        Q.   Mr. Wangler didn't give input on this?

11        A.   I don't recall.

12        Q.   What about Mr. Barrett?

13        A.   I assume he did, because I sent him an

14   email asking him to take a look at it.

15        Q.   Did your board ever adopt this policy?

16        A.   I don't recall.

17        Q.   Why did you write this?

18        A.   Because we felt that we needed to have

19   some kind of policy to protect our footage.

20        Q.   When did you start writing this?

21        A.   I assume it was in September of 2023.

22        Q.   And when was it finished?

23        A.   I don't recall.

24        Q.   Did you ever consult with a lawyer

1    about this draft?

2         A.   No.

3         Q.   As you were writing this, what sources

4    did you consult?

5         A.   Probably Googled a lot.  Probably

6    Googled a lot of things and talked to other

7    access centers, asked them what they do, if they

8    do anything at all, and did my best to try and

9    put something together.

10        Again, this is a rough draft.

11        Q.   When you say "access centers," does

12   that mean other public access channels?

13        A.   Yes.

14        Q.   Do you know which ones you would have

15   talked to?

16        A.   I probably talked to Lexington, because

17   I talk to her all the time.  Maybe Belmont.  I

18   don't recall exactly who, but those are the two

19   that I usually go to if I have a question.

20        Q.   Could you please read the second

21   paragraph on this page that begins "WCAC's Fair

22   Use policy."

23        A.   "Applies to news gathering.  Please see

24   No. 2 below.  Libraries for archive purposes,

1    colleges, schools and nonprofits who work with

2    the deaf and visually impaired who use this

3    footage for educational purposes only.  This is

4    for classroom use only and does not apply to

5    rebroadcast online streaming of any kind.

6    Requests for our footage for educational purposes

7    must be made in writing and must receive written

8    permission from WCAC executive director."

9        Q.   Did WCAC require that people make a

10   written request to use your footage for

11   educational purposes?

12            MR. PYLE:  Objection.

13       A.   This is a rough draft of a policy that

14   I don't even know if we ever agreed upon.  The

15   board -- I don't even know if the board voted on

16   it.  I don't think they did.  This is just a

17   rough draft.

18       Q.   I understand.  Independently of this

19   policy, was it the regular practice of WCAC to

20   ask people for written permission to use your

21   footage for educational purposes?

22       A.   We never got any requests.

23       Q.   Did you ever get any requests from

24   Mr. Whiteley?

1         A.    No.

2         Q.    Was this policy ever posted publicly?

3         A.    Not that I know of.  I don't recall.  I

4    don't even know if it was voted on.

5         Q.    You're not aware that it was ever

6    posted publicly?

7         A.    I would say no.

8         Q.    Today, does WCAC have a video use

9    policy of any kind?

10        A.    No.

11        Q.    Could you please read the paragraph

12   after 2E that begins "All requests for use."

13        A.    "All requests to use WCAC and MAC

14   content must be made in writing to the WCAC

15   executive director.  Producers requesting footage

16   must provide their name and phone number to the

17   WCAC executive director."

18        Q.    Why did you write that requests must be

19   made in writing?

20        A.    There was so much anonymity online at

21   the time that we felt it was important to have a

22   name connected to requests.

23        Q.    Was it for the same reason that you

24   wrote "Producers requesting footage must provide

1    their name and phone number to the executive

2    director"?

3        A.   Yes.

4        Q.   Why were you concerned about anonymity?

5        A.   Because we wanted to know who was using

6    our footage.  We didn't want it to go to somebody

7    we didn't know who they were.  We don't know what

8    they're doing with it.  We wanted to make sure we

9    had -- you know, we know who is using it so that

10   we can properly understand what they're using it

11   for.

12       Q.   Why was it important to understand what

13   they might be using it for?

14       A.   Because, as I said, this is a rough

15   draft that I sent to Justin.  It is not the

16   policy.  It is a rough draft.  And it was

17   something I put out there to see what other

18   people would think.  Is this -- is this something

19   legitimate or not.

20            The reason I put it in there was because a

21   lot of people were having problems online, not

22   just us, with people taking footage, doing

23   whatever they want with it, editing it, making

24   people say things they don't say.  I mean, you

1    guys see AI, now, right?  They can't -- I could

2    have you say anything I want you to say, correct?

3         So we wanted to know, in this, you know,

4    first draft, is this a good idea.  Should we have

5    this in here?

6         Q.   Could you read the paragraph after 2F,

7    please, the next paragraph.

8         A.   "If permission is granted, the user

9    must caption the video file Waltham Community

10   Access Corporation."

11        Q.   You told me earlier that people who

12   requested to use WCAC media used various

13   different formulations of that caption; is that

14   correct?

15        A.   Yes.

16        Q.   And independently of this draft, it was

17   acceptable to WCAC to use slightly different

18   variations on that caption?

19        A.   Depending on where the -- depending on

20   where the footage came from; if it came from

21   WCAC, if it came from the MAC channel, if it came

22   from Waltham Newswatch.  It just depends on what

23   the footage was and what it was being used for.

24        Again, this is a rough draft.

1      Q.   I understand.  Independently of this

2  draft, was it acceptable to WCAC to caption MAC

3  channel footage with the MAC channel logo?

4      A.   We can use the MAC channel logo.  We

5  can put a bug up.  But I wouldn't want someone

6  else using the MAC Channel logo.  I would like

7  them to have just a graphic that says "courtesy

8  of the MAC Channel, MAC-TV."

9      Q.   Does the MAC Channel logo on a video

10  clip identify that video clip as having come from

11  the MAC Channel?

12      A.   Sometimes.  Not all the time.  We have

13  different shows that we produce.  So we have the

14  veterans show.  We have a bunch of different

15  shows we do with government agencies.  And the

16  MAC Channel logo isn't on them all the time.

17      Q.   I understand.  But when the MAC Channel

18  logo appears on a video clip, does that suggest

19  that the video clip came from the MAC Channel?

20      A.   Yes.

21      Q.   Would you call that giving credit to

22  the MAC Channel?

23           MR. PYLE:  Objection.

24      A.   No.

1     Q.   Why not?

2     A.   Because it's just -- it's our logo.

3  They're not saying thank you.  They're not saying

4  thank you.  That's our logo.

5     Q.   Does this draft policy ask users of

6  video to thank WCAC?

7     A.   When you tag somebody, you're thanking

8  them.  When you give them credit at the end,

9  you're thanking them for the footage.  That's

10 common knowledge in TV.  That's the thank you

11 when you put it up there.

12    Q.   Showing the producer's logo on the

13 screen is not giving credit?

14    A.   Putting a graphic up that says

15 "courtesy of."

16    Q.   Was it your regular practice to require

17 users of WCAC video to use the phrase "courtesy

18 of"?

19    A.   Yes.  And Channel 7, Channel 8 -- I

20 mean Channel 7, New England Cable News.  If they

21 say who is the tag for -- and if you watch the

22 news and you see that they borrowed videos, it

23 will always say "courtesy of" whatever the

24 channel is or wherever they got it.  If it's

1   Suzie Smith took this picture, courtesy of Suzie

2   Smith.

3       Q.   If that's so, then why didn't you write

4   courtesy of Waltham Community Access Corporation

5   in this draft policy?

6            MR. PYLE:  Objection.

7       A.   This is a first draft policy.  It is

8   not the policy.  This is something I sent to

9   Justin and said, What do you think?  It's not the

10  final policy.  It is a draft.

11      I'm sure if we sat down, we would have

12  changed it.  This is the first draft.

13           MR. STOLTZ:  I'm done with this

14  document for now.

15           THE WITNESS:  Can we take a bathroom

16  break?

17           MR. STOLTZ:  Absolutely.

18           THE WITNESS:  Thank you.

19           THE VIDEOGRAPHER:  We are going off the

20  record.  The time on the monitor is 11:28.

21           (A recess was taken.)

22           THE VIDEOGRAPHER:  We are back on the

23  record.  The time on the monitor is 11:37.

24           (Document Bates-stamped WCAC0000419

1          marked Exhibit 53.)

2     BY MR. STOLTZ:

3          Q.   Ms. Sheehan, I'm showing you what has

4     been marked as Exhibit 53.

5          Do you recognize this document?

6          A.   Yes.

7          Q.   What is it?

8          A.   It's an email to Justin Barrett about

9     Fair Use.

10         Q.   Is this a true and correct copy of an

11    email you wrote to Mr. Barrett?

12         A.   Yes.

13         Q.   What is the date and time on this

14    email?

15         A.   September 11th, 2023, 8:14 a.m.

16         Q.   And if you wouldn't mind looking at the

17    previous exhibit as well.  That would be 52.

18         What was the date stamp on that email?

19         A.   9/11/2023, 4:02 p.m.

20         Q.   So Exhibit 53, you sent earlier the

21    same day as Exhibit 52; is that right?

22         A.   Yes.

23         Q.   In Exhibit 53, could you read your

24    email, please?

1      A.    "Hi, Justin.  I'm currently writing a
2  policy to use for WCAC footage.  I will send a
3  rough draft as soon as I'm done.  I found this
4  online that explains Fair Use on page 21.
5  Maria."
6      And this is the entire website.
7      Q.    And there are two links in that email,
8  are there not?
9      A.    Yes.
10      Q.    So is it fair to say that you read the
11  pages at those links as you were drafting the
12  policy in Exhibit 52?
13      A.    Yes.
14      Q.    Okay.  We can put those aside.  Going
15  back to something we talked about earlier, you've
16  worked at other TV stations and other studios; is
17  that right?
18      A.    Yes.
19      Q.    Did any of those have policies about
20  the use of media by others?
21      A.    I'm assuming Channel 5 did, because
22  they had a legal department.  So everything went
23  to legal before it was released from the
24  building.  And I assume Channel 68 did as well.

1      Q.   Do you recall ever seeing such a policy

2   at Channel 5?

3      A.   When I was at Channel 5, I worked in

4   the tape library and in the news library.  You

5   couldn't let anything out of that building until

6   legal checked it out first.

7      So if somebody was on The Good Day Show

8   dancing, their little girl was dancing, she's

9   five, we couldn't make a copy of it until legal

10   looked at it.

11      MR. PYLE:  And the question was about

12   did you see a policy.

13      A.   No.  I didn't see a policy.  But I was

14   told that that was what we had to do.  That was

15   as close to the policy as I got.

16      Q.   What about at Channel 68?

17      A.   No.

18      Q.   At Channel 68, were you ever told how

19   to handle requests to use media?

20      A.   It wasn't my department.

21      Q.   So you were never told?

22      A.   I was never told because it wasn't one

23   of my responsibilities at Channel 68.

24      Q.   I understand.  I see.  You told me

1    earlier that you first became aware of Channel

2    781 sometime in 2023; is that right?

3          A.    It is.

4          Q.    Have you heard of Channel 781 referred

5    to as "Waltham Data"?

6          A.    After -- at some point in time, yes.

7    Yes.  I don't recall when.

8          Q.    To the best of your knowledge, who is

9    part of Channel 781?

10         A.    Josh, Jamie, Chris, and Tom.

11         Q.    Is that Josh Kastorf?

12         A.    Yes.

13         Q.    And Jamie Krikeles.

14         A.    Yes.

15         Q.    And Chris Gamble.

16         A.    Yes.

17         Q.    And Tom Benavides?

18         A.    Yes.

19         Q.    Is there anyone else that you're aware

20   of?

21         A.    Not that I know of.

22         Q.    Is it your understanding that there are

23   other people involved in Channel 781?

24         A.    All I know is that those four, those

1    four are involved.

2         Q.   Have you ever watched Channel 781's

3    debrief show?

4         A.   I've watched parts of it.

5         Q.   At any time, did you believe that

6    Channel 781 operated anonymously?

7         A.   Yes.

8         Q.   When did you believe that?

9         A.   When we first heard about them, we

10   didn't know who was -- we didn't know who was

11   behind it.  We didn't know who was 781 News.

12        Q.   How did you find out who was behind it?

13        A.   Josh came in and talked to me.

14        Q.   Before Josh came in and talked to you,

15   did you watch any of the videos on Channel 781's

16   YouTube channel?

17        A.   I don't recall.

18        Q.   Before Josh came in and talked to you,

19   why did you believe that Channel 781 operated

20   anonymously?

21        A.   Because no one seemed to know who was

22   behind it.

23        Q.   But before that time, you don't

24   remember watching any of their videos?

1      A.    I don't remember.  I don't recall.

2      Q.    At any time, did you believe that

3  Channel 781 was working to help a political

4  candidate or candidates?

5      A.    Can you restate -- can you state that

6  again?  Can you say that again?

7      Q.    Did you ever believe that Channel 781

8  was trying to help a candidate?

9      A.    Yes.

10      Q.    Which candidate?

11      A.    I think Jonathan Paz.

12      Q.    Any other candidates?

13      A.    Not that I recall.

14      Q.    What led you to believe that?

15      A.    Some of the clips that I had seen kind

16  of -- it wasn't so much that they boosted him up,

17  but they didn't boost up his competition.

18      Q.    Who was his competition?

19      A.    Mayor McCarthy.

20      Q.    What do you mean by -- what do you mean

21  when you say they didn't boost up Mayor McCarthy?

22      A.    Well, they would take segments that

23  were less flattering of the mayor.

24      Q.    Segments of what?

1        A.    The videos.  They took videos from the

2   MAC Channel.  They took videos from Chamber.

3   They took videos from WCAC.

4        Q.    Sorry.  What do you mean by "Chamber"?

5        A.    The Waltham Chamber has a Women in

6   Business series.  And the mayor was one of the

7   speakers and they took -- they took that video.

8        Q.    You said you believe that Channel 781

9   was working to help Jonathan Paz.

10       Why do you think so?

11       A.    Because there were -- I think that they

12  probably had the same, you know, same goals.

13       Q.    What do you think those goals are?

14       A.    I have no idea.  I have no idea.

15       Q.    Why do you think they probably have the

16  same goals as Mr. Paz?

17       A.    Because they, like I said, they took

18  footage that was derogatory of the mayor and put

19  it online.  They didn't take any derogatory video

20  of Mr. Paz and put it online.

21       Q.    Based on your understanding, what is

22  the purpose of Channel 781?

23       A.    It's to have a different perspective on

24  Waltham.

1       Q.   Different from whom?

2       A.   Anybody.  It's their perspective.  It's

3   a different development.  Just everybody has

4   their own perspective.  It's their perspective of

5   Waltham.

6       Q.   In your opinion, does Channel 781 have

7   a particular political orientation?

8       A.   I haven't seen enough of their footage

9   to know.  I would believe that they were probably

10  more on a liberal side than a conservative side.

11  That's just...

12      Q.   Based on your understanding, are the

13  members of Channel 781 journalists?

14      A.   What is your -- what -- do they have

15  journalism degrees?  I don't know.  It depends on

16  what your definition of a journalist is, I

17  suppose.  They could be citizen journalists, I

18  suppose.

19      But I don't know if any of them have gone to

20  journalism school.  So I don't know.  I don't

21  know if any of them have media degrees.  I don't

22  know.

23      Q.   Based on your understanding, was

24  Channel 781 doing news reporting?

1      A.   I think parts of it was news reporting

2  and parts of it was editorial.

3      Q.   Based on the Channel 781 material that

4  you have seen, do you believe that Channel 781's

5  news reporting had a political bias?

6           MR. PYLE:  Objection.  Go ahead.

7      A.   Yes.

8      Q.   How would you describe that political

9  bias?

10     A.   They were taking segments of candidates

11 they didn't agree with and taking parts of what

12 was being said and putting it up online.  What --

13 and putting their own spin on that, which is

14 fine.

15     They can do whatever they want.  It's their

16 show.  But it was our footage that they were

17 using.

18     Q.   My question was:  How would you

19 characterize the political bias of 781's news

20 reporting?

21     A.   They were -- they were singling out

22 certain candidates and showing them in a bad

23 light.  Certain councilors, I should say.  Not

24 candidates.  Councilors.

1      Q.   Do you know which councilors?

2      A.   I don't.

3      Q.   Did that include the mayor?

4      A.   Yes.

5      Q.   When did you first become aware that

6   Channel 781 was using clips from WCAC's

7   government meeting videos?

8      A.   I don't recall the exact date.

9      Q.   Was it before the beginning of 2023?

10     A.   I don't recall.

11     Q.   Was it before April of 2023?

12     A.   I don't recall.

13          MR. STOLTZ:  If it's all right with

14   you, I plan to go a little bit past 12:00 and

15   then break for lunch.

16          MR. PYLE:  That's fine.

17             (Document Bates-stamped WCAC0000437

18      marked Exhibit 54.)

19   BY MR. STOLTZ:

20     Q.   Ms. Sheehan, I'm showing you what's

21   been marked as Exhibit 54.

22      Do you recognize this?

23     A.   Yes.

24     Q.   What is it?

1          A.    It's a script to an editorial that I

2     recorded on WCAC.

3          Q.    Is this a true and correct copy of that

4     script?

5          A.    Yes.

6               MR. PYLE:  Objection.  Go ahead.

7          Q.    I'm sorry.  I'm not sure we got a clean

8     record of that.

9          So is this a true and correct copy of the

10    script for the editorial you gave?

11              MR. PYLE:  Objection.

12         A.    Yes.

13              MR. STOLTZ:  Jeff, what are the grounds

14    for your objection?

15              MR. PYLE:  Prior -- a prior exhibit

16    marked at Chris Wangler's deposition showed that

17    there was additional material added to this

18    before it was actually read online.  And it is a

19    script.

20              The grounds for my objection is it's a

21    draft of a script, and I didn't want there to be

22    an implication that this is what Maria actually

23    read online, on the air, as opposed to this was

24    something that Chris sent her and then she sent

1      to Justin.

2              MR. STOLTZ:  Thank you.  I understand.

3      Can we go off the record for a minute.

4              THE VIDEOGRAPHER:  We are going off the

5      record.  The time on the monitor is 11:56.

6              (A recess was taken.)

7              THE VIDEOGRAPHER:  We are back on the

8      record.  The time on the monitor is 11:57.

9      BY MR. STOLTZ:

10         Q.   I'd like to show you what has already

11     been marked as Exhibit 21.

12              (Previously marked Exhibit 21

13         incorporated by reference.)

14     BY MR. STOLTZ:

15         Q.   Do you recognize this document?

16         A.   Yes.

17         Q.   Is this a true and correct copy of the

18     script for the editorial that you gave?

19              MR. PYLE:  Objection.

20         A.   Justin says he's asking him to add

21     something.  So I believe there's got to be

22     another copy, an update that Chris did after

23     this.

24         Q.   Could you read the first sentence of

1  the email, please.

2       A.   "I have Chris adding that we are a

3  nonprofit and receive no taxpayer monies.  I know

4  Chris Gamble thinks we can use our footage

5  because he thinks we are taxpayer funded."

6       Q.   With the addition of saying "we are a

7  nonprofit and receive no taxpayer monies," is

8  this the script for your editorial?

9       A.   Yes.  It's pretty close.

10       Q.   Who wrote this script?

11       A.   Chris Wangler.

12       Q.   Did anyone else contribute to the

13  writing?

14       A.   I don't recall.

15       Q.   Does the first sentence of that email

16  suggest that you added to the script?

17       A.   I don't recall.

18       Q.   Could you read the first sentence

19  again.

20       A.   I guess I did.  "I'm having Chris add

21  that we are a nonprofit and receive no taxpayer

22  monies."

23       Q.   Did anyone besides you and Mr. Wangler

24  contribute to the script?

1       A.   I don't recall.

2       Q.   Why did you show this script to

3  Mr. Barrett?

4       A.   He's the president of our board of

5  directors.

6       Q.   Why did you believe this was something

7  that merited showing to the president of your

8  board of directors?

9       A.   Because we've never done an editorial

10 before.  This was the first time I was doing one,

11 and I wanted his feedback.

12      Q.   Did you share it with any other member

13 of the WCAC board?

14      A.   I don't recall.

15      Q.   Did you give this editorial during the

16 April 6th, 2023 Waltham Newswatch episode?

17      A.   I don't remember the date, but it must

18 have been around that time.  It was a Thursday,

19 so -- more than likely, because Thursday is news

20 day.

21      Q.   Why did you make this statement?

22      A.   Because we had someone take one of our

23 pictures and put it on Reddit, and it was very

24 derogatory.  And we felt in the situation,

1    something needed to be said.

2         Q.   In what way was the picture derogatory?

3         A.   I don't -- I don't recall exactly what

4    it said, but it was inflammatory towards a woman

5    holding a sign and one of the city councilors,

6    she was holding one of the signs.

7         And it had something to do with the LGBQ

8    community, basically saying that these two people

9    hated gay people, I believe, was what happened.

10   And it was on Reddit and it was a bad situation.

11        Q.   Did you say that one of the city

12   councilors was depicted in the photo?

13        A.   Her sign was.  The person that they

14   were badmouthing was holding a sign for one of

15   the city councilors.  So they tied the city

16   councilor to the person holding the sign.

17        Q.   Do you know who made the Reddit post?

18        A.   I don't.

19        Q.   At any time, did you believe that a

20   member of Channel 781 made the Reddit post?

21        A.   No.

22        Q.   Was the Reddit post the reason you made

23   this editorial statement?

24        A.   Yes.

1        Q.   Was there any other reason you made

2   this editorial statement?

3        A.   I think, in general, we just wanted

4   people to know that they should respect our --

5   respect our copyright.  You know, online anger

6   was everywhere, and we just wanted people to

7   respect our things.

8        Q.   Could you read the second sentence of

9   your script, please, as it appears here.

10       A.   "Over recent years, photos from our

11  news department and videos from the MAC Channel

12  have been reproduced without our permission."

13       Q.   Which videos from the MAC Channel were

14  reproduced without your permission?

15       A.   781's videos, for one.

16       Q.   Were there any others?

17       A.   I don't recall.

18       Q.   Could you please read the paragraph

19  starting with "Some have used."

20       A.   "Some have used our content to score

21  political points under the veil of anonymity.

22  Others have used it to encourage residents to

23  hate."

24       Q.   At the time you made this statement,

1  who had used WCAC content to score political

2  points under the veil of anonymity?

3      A.   The person who did the Reddit post.

4      Q.   Anyone else?

5      A.   I don't recall.

6      Q.   You told me earlier that before you met

7  with Mr. Kastorf you believed that Channel 781

8  was operating anonymously?

9      A.   Mm-hmm.

10     Q.   Is that a yes?

11     A.   Yes.

12     Q.   And you met with Mr. Kastorf in June of

13  that year; is that right?

14     A.   Yes.

15     Q.   So in April, when you made this

16  statement, did you believe that Channel 781 was

17  using WCAC content under the veil of anonymity?

18     A.   During this, right here, when we did

19  this editorial, the only thing I was aware of was

20  the Reddit post.  And Chris and I discussed it,

21  and it was about the Reddit post.

22     Q.   But did the Reddit post use video from

23  the MAC Channel?

24     A.   No.

1      Q.    Does this statement refer in any way to

2   Channel 781?

3      A.    No.

4      Q.    So when you said "video from the MAC

5   Channel have been reproduced without our

6   permission," you were referring to someone other

7   than Channel 781?

8      A.    When I did this editorial, Chris

9   brought the Reddit post to me and said, This has

10  to stop and we need to do something about it.

11         That is what this is about.

12     Q.    I understand.  But when you said "video

13  from the MAC Channel has been reproduced without

14  our permission," whose use were you referring to?

15     A.    I don't recall.  When I discussed this

16  with Chris, we were doing this for the Reddit

17  post.

18     Q.    At the time that you wrote this, did

19  you believe that Channel 781 was encouraging

20  residents to hate?

21     A.    I didn't write that.

22     Q.    I understand.  Did you believe that was

23  true?

24     A.    I believed that someone on Reddit was

1   doing that.

2        Q.    But not Channel 781?

3        A.    No.

4        Q.    Just a couple of minutes ago, I asked:

5   "Which videos from the news channel were

6   reproduced without your permission?"

7        And you said: "781's video for one"; is that

8   correct?

9             MR. PYLE:  Objection.

10       A.    Wait.  I'm sorry.  They used news

11  videos of ours?  Is that what you just said?  I'm

12  sorry.  I didn't hear you correctly.

13       Q.    I'm sorry.  My question earlier was:

14  "Which videos from the news channel were

15  reproduced without your permission?"

16            MR. PYLE:  Objection.

17       A.    It was --

18       Q.    I'm sorry.  I haven't asked a question.

19       A.    Sorry.

20       Q.    My earlier question was:  "Which videos

21  from the news channel were reproduced without

22  your permission?"

23       You answered: "781's video, for one"; is

24  that correct?

1        A.    Can you state that again.  I'm not

2   understanding this.  I'm sorry.

3        Q.    Earlier, I asked you which videos from

4   the MAC Channel have been reproduced without our

5   permission, meaning WCAC's permission.

6        A.    Mm-hmm.

7        Q.    And you answered: "781's video, for

8   one."

9        A.    Right.  They took sections of our

10  thing, of our MAC Channel meetings, they took

11  video from the Chamber, and they took video from

12  WCAC.

13       Q.    So is it fair to say that, when you

14  said in your April 2023 editorial, "Video from

15  the MAC Channel has been reproduced without our

16  permission," you were referring, in part, to

17  Channel 781?

18       A.    I only recall Chris talking to me about

19  the Reddit post when we were doing this, when we

20  were doing this editorial.  And he had shown me

21  stuff, you know, the pictures and what was going

22  on with these people.  And that was why I agreed

23  to do it.

24       Q.    So at the time you didn't know why this

1  script included the phrase "video from the MAC

2  Channel"?

3       A.   I just -- I just -- no.  I don't

4  remember.  I don't recall.

5       Q.   Do you know why this script referred to

6  a contentious election season?

7       A.   All elections are contentious.

8       Q.   Why was that relevant to your

9  copyrights?

10      A.   Because we just wanted people to -- you

11  know, we do these "You Don't Say" videos.  We did

12  -- we take a lot of pictures of candidates.  We

13  do a lot of work with the candidates, all the

14  candidates.  And we just wanted people to know,

15  don't, you know, don't take our stuff without

16  asking us first.

17           MR. PYLE:  Mitch, might this be a good

18  time to break for lunch?

19           MR. STOLTZ:  Is it all right if I do

20  one or two more questions?

21           MR. PYLE:  Sure.

22           MR. STOLTZ:  Let's take a break now.

23           THE WITNESS:  Thank you.

24           MR. STOLTZ:  Thank you.

 1              THE VIDEOGRAPHER:  We are going off the

 2      record.  The time on the monitor is 12:14.

 3                  (Lunch recess was taken.)

 4              THE VIDEOGRAPHER:  We are back on the

 5      record.  The time on the monitor is 13:07.

 6      BY MR. STOLTZ:

 7          Q.   Ms. Sheehan, did you review any

 8      documents over the lunch break?

 9          A.   No.

10          Q.   Does WCAC measure viewership on its

11      channels?

12          A.   No.

13          Q.   What about on its website?

14          A.   We can probably figure that out, but we

15      don't, you know, we don't -- we don't look into

16      that.  We don't care.

17          Q.   Does WCAC's funding vary based on its

18      viewership?

19          A.   No.

20          Q.   You met with Josh Kastorf on April --

21      strike that.

22              You met with Josh Kastorf on June 15, 2023;

23      is that right?

24          A.   Yes.

1        Q.    Who requested that meeting?

2        A.    Josh.

3        Q.    At the time that he requested that

4    meeting, what concerns did you have about what

5    Channel 781 was doing?

6              MR. PYLE:   Objection.

7        A.    I didn't have any concerns.  I just

8    wanted to meet him and talk to him.

9                  (Document Bates-stamped WCAC0000129

10            marked Exhibit 55.)

11   BY MR. STOLTZ:

12       Q.    I'm showing you what's been marked as

13   Exhibit 55.

14       A.    Mm-hmm.

15       Q.    Do you recognize this document?

16       A.    Yes.

17       Q.    What is it?

18       A.    It's a request from Josh to come and

19   talk to me.

20       Q.    Does it also contain a message from

21   you?

22       A.    Yes.

23       Q.    To Mr. Barrett?

24       A.    Yes.

1       Q.   Is this a true and correct copy of that
2  email chain?
3       A.   Yes.
4       Q.   Can you read your email, please.
5       A.   Yes.  "I'm sure I'm going to be set up
6  if I call them.  What do you want me to do?
7  Thanks."
8       Q.   What did you mean by "I'm sure I am
9  going to be set up if I call them"?
10       A.   I was afraid they were going to take my
11  words and split them around.
12       Q.   What do you mean by "take my words and
13  split them around"?
14       A.   I was afraid that, you know, that they
15  would take my words and split them around.
16  That's the best way to describe it.  You know,
17  use my words against me.  That's why I didn't
18  know if I should meet with them or not.
19       Q.   Use your words against you with what
20  goal?
21       A.   I don't know.  That's the thing.  They
22  were -- they were twisting things for other
23  people.  And I was afraid they were going to do
24  that to us as well.

1        But I did want to meet with them because I

2    wanted to see -- I just wanted to talk to them

3    about everything.

4        Q.    What do you mean when you say "they

5    were twisting things for other people"?

6        A.    They were taking content and editing it

7    in a way that seemed like, you know, that it

8    wasn't -- it wasn't the full context of the

9    situation.  So they were taking excerpts out that

10   weren't the whole context.

11       Q.    Would you say they were editing video

12   to convey a particular message?

13       A.    Yes.

14       Q.    And the message they were conveying was

15   not the message conveyed in the original MAC-TV

16   videos?

17       A.    They would take portions out and make

18   it -- they would only access certain clips, not

19   the whole thought.

20        So if it said, you know, Johnny went to the

21   store and bought apples, you know, it would just

22   be "Johnny went to the store."  Do you know?  It

23   wouldn't be "and bought apples."  It wouldn't be

24   the whole context of whatever the situation was.

1      Q.   By doing so, do you feel like they

2  changed the meaning of the video?

3      A.   Yes.

4      Q.   And at that point, you had seen videos

5  posted on the Channel 781 Waltham Data channel

6  that did that?

7      A.   Yes.

8      Q.   And you believed somehow that when you

9  met with Josh that he would do that to you?

10     A.   I didn't know.  I didn't know.  It was

11 -- there was -- I just didn't know.  I didn't

12 know what -- what would happen, and I had

13 concerns.

14     Q.   You said earlier -- I said at the time

15 that Josh requested that meeting, what concerns

16 did you have about what Channel 781 was doing?

17     You answered "I didn't have any concerns.  I

18 just wanted to meet him and talk to him."

19     Do you want to amend that answer?

20     A.   Yes.  I -- I -- you know, it was a very

21 difficult time for me at that time.  So you don't

22 need to know that, but just things are --

23 memories are a little -- a little -- I should

24 just say I don't remember, but I'm trying very

1   hard to remember some of the stuff that happened.

2        Q.   So before that meeting, did you have

3   concerns about Channel 781?

4        A.   Yes.  Yes.  A few.

5        Q.   What were those concerns?

6        A.   That they would make the Waltham

7   Channel look bad.

8        Q.   How would they make the Waltham Channel

9   look bad?

10       A.   I wasn't sure exactly what they would

11  do, but I was -- I just felt that they would take

12  what I said and twist it.

13       Q.   What led you to believe that they would

14  make the Waltham Channel look bad?

15       A.   I just felt that, you know, they didn't

16  seem very welcoming towards us.

17       Q.   What gave you that impression?

18       A.   I think that there was a lot of

19  comments about us to other people, you know,

20  there was gossip around the city.  And I was

21  basing a lot of it on that, and I shouldn't have.

22       Q.   When you say "gossip around the city,"

23  was it gossip that put the Waltham Channel in a

24  negative light?

1      A.   No.  That if we -- if we -- that they

2  would put us in a negative light.

3      Q.   At that point, had Channel 781 put the

4  Waltham Channel in a negative light?

5      A.   I don't recall.

6      Q.   But at that time you believed that they

7  might?

8      A.   Yes.

9      Q.   And you believed that because of

10  gossip?

11      A.   Well, not gossip.  But just, you know,

12  be careful with them.  They twist things around.

13  So that's what I was told.  And so that's what I

14  did.

15      And that's why I wanted to meet with them so

16  that I could find out who they were.  We didn't

17  even know who they were, really.

18      So, you know, we just wanted to find out who

19  they were and what they wanted.

20      Q.   Who told you that they twist things?

21      A.   I don't remember.

22      Q.   Was it someone in government?

23      A.   I don't remember.

24      Q.   In this email, why did you ask

1   Mr. Barrett, "What do you want me to do"?

2        A.   Because I wanted to know if he wanted

3   me to meet with them or not.

4        Q.   How did he respond?

5        A.   Well, I met with them.

6        Q.   Did Mr. Barrett say that it was all

7   right for you to meet with Josh?

8        A.   I don't recall, but he must have

9   because I did meet with him.

10        Q.   What happened at the meeting?

11        A.   Josh came in and I welcomed him in, and

12   I told him that I commended him for what he was

13   doing.  He seemed shocked that I was saying that.

14   But I said it's great to have another voice in

15   Waltham, and that if he ever wanted to use the

16   studio, he could; and that he could use any

17   footage he wanted as long as he just told us what

18   he was taking and tagged us.

19        And we talked about closed-captioning.  And

20   I explained to him that we just didn't have the

21   budget for closed-captioning, and that seemed to

22   upset him.  And I said I wish we could, but we

23   just don't have the finances to do it.

24        And that's pretty much what I remember.

1      Q.    Did you tell Mr. Kastorf that any time

2   he wanted to use WCAC video clips, he needed to

3   ask permission?

4      A.    I said if you're using -- yeah, I said

5   if you're using clips, just let us know what

6   you're using.  You can have whatever you want.

7   Just let us know.  Just let us know what you're

8   using.

9      Q.    I want to be very clear on this.  Did

10  you tell him that any time he wanted to use a

11  clip, he needed to ask your permission?

12     A.    Yeah.  I just told him that that's what

13  all the TV stations do in Boston.  If they want

14  to use something, they just call and they tell

15  us, you know, we're going to use the school

16  committee meeting where Suzie is picking up the

17  book or whatever and how do you want to be

18  tagged.

19        So I was just treating them the way I would

20  treat any other TV station in Boston.

21     Q.    During that meeting, did you tell

22  Mr. Kastorf that you were concerned about his

23  using clips to express opinions?

24     A.    I don't recall that.  And I can't

1  imagine I would, because that's the point of

2  Public Access TV is to have an opinion.

3      Q.   During that meeting, did you make any

4  distinction between MAC-TV videos and other WCAC

5  videos?

6      A.   I don't recall.

7      Q.   Do you remember any discussion of that?

8      A.   I don't recall.

9      Q.   Aside from telling Mr. Kastorf that he

10 needed to ask for permission and give credit, did

11 you tell him anything else about what uses WCAC

12 would or would not approve?

13     A.   All I said to him was the -- I talked

14 to him the same way I talk to any other TV

15 station; you can have whatever you want, just

16 give us a call, let us know what you're taking,

17 and tag us.

18          MR. STOLTZ:  I'd like to show you two

19 exhibits already marked.  They are Nos. 30 and

20 39.

21          (Previously marked Exhibit 30

22     incorporated by reference.)

23          (Previously marked Exhibit 39

24     incorporated by reference.)

1  BY MR. STOLTZ:

2       Q.   If you could look at the exhibit marked

3  30, please.

4       Do you recognize this document?

5       A.   Yes.

6       Q.   What is it?

7       A.   It's an email to Justin Barrett.

8       Q.   Is it from you?

9       A.   Yes.

10      Q.   Did you send it on November 14, 2023?

11      A.   Yes.

12      Q.   Could you read your email, please.

13      A.   "Hi, Justin.  Michael told Marcia that

14  we need to give the mayor a heads-up on 781, so I

15  gave her a copy of the EFF letter.  This is my

16  first attempt.  Is it okay?  Thanks, Maria."

17      Q.   And if you could look at the exhibit

18  marked 39, please.

19      What is this document?

20      A.   This is a response to you from your

21  original letter, I believe.

22      Q.   Was this letter attached to the email

23  marked Exhibit 30?

24      A.   I have no idea.

1       Q.   I can represent that that's how your
2  counsel produced it to us.
3       Is Exhibit 39 a copy of the EFF letter that
4  you refer to in your email?
5       A.   I don't -- I don't know.  I don't know
6  if it was this letter or if it was your letter.
7  I don't know.
8       Q.   Looking at Exhibit 39, did you write
9  this letter?
10      A.   Yes.
11      Q.   Did you send it?
12      A.   I believe I sent it.  I sent it to you,
13 I think, right?
14      Q.   We never received it.
15      A.   You never received it?  Well, maybe
16 this was another first draft that never made it
17 off the -- off the production line.  Maybe
18 somebody else at the station read it and said
19 don't send that letter.  I don't know.
20      Q.   Did you show this letter to
21 Mr. Barrett?
22      A.   I guess so.  If it's attached, I guess
23 I did.
24      Q.   Switching back to the letter -- excuse

1   me, switching back to the email, Exhibit 30, who

2   is Michael?

3        A.   Michael is Marcia MacClary's son.

4        Q.   And Marcia MacClary is a member of the

5   WCAC board; is that right?

6        A.   Yes.

7        Q.   Do you know why Michael told Marcia

8   that WCAC needed to give the mayor a heads-up on

9   781?

10            MR. PYLE:  May I interject and instruct

11   the witness not to answer to the extent the

12   response draws on attorney-client communications.

13            Michael is a lawyer, the son of a board

14   member.  And I'll represent on the record that

15   this was produced to plaintiff in discovery by my

16   office without realizing who Michael was at the

17   time.

18   BY MR. STOLTZ:

19        Q.   Do you know if Marcia asked her son

20   Michael for legal advice?

21            MR. PYLE:  You can answer that "yes" or

22   "no."

23        A.   Yes.

24        Q.   In your understanding, did WCAC need to

1   give the mayor a heads-up?

2          MR. PYLE:  You can answer that

3   question.

4       A.   I was just following advice.  I didn't

5   know either way.  I just was doing what I was

6   told.

7       Q.   Told by whom?

8          MR. PYLE:  I'm going to instruct the

9   witness not to answer on the grounds of

10  attorney-client privilege.

11  BY MR. STOLTZ:

12      Q.   What, if anything, did you send to the

13  mayor?

14      A.   I don't recall.

15      Q.   Was it the letter attached to this

16  email?

17      A.   I don't recall.

18      Q.   Why did you attach this letter, Exhibit

19  39, to this email, Exhibit 30?

20      A.   I assumed I was showing it to him to

21  take a look at it.  Again, sometimes I run things

22  by him to see what he thinks before I send them

23  out because he's the president of the board.

24      Q.   So you don't recall whether you sent a

1  copy of this letter, Exhibit 39, to Mayor

2  McCarthy?

3       A.   I don't recall.  And if this was a

4  draft, I know I didn't.

5       Q.   Did you send anything regarding Channel

6  781 to Mayor McCarthy around --

7       A.   I don't --

8       Q.   -- that time?

9       A.   I don't -- I don't recall.  I don't

10  recall.

11       Q.   I'm sorry.  Please do allow me to

12  finish my questions.

13       A.   I'm sorry.  I'm very sorry.

14       Q.   Have you, at any time, had any

15  conversation with Mayor McCarthy about Channel

16  781?

17       A.   No.

18       Q.   Have you ever communicated with Mayor

19  McCarthy about Channel 781?

20       A.   Not that I can recall.

21       Q.   Turning to this letter, Exhibit 39,

22  could you please read the bottom of the page,

23  starting with "I told Mr. Kastorf," to the bottom

24  of the page?

1      A.   "I told Mr. Kastorf he could use the

2  video if he did these three things.  He would

3  have to send a written request for each clip that

4  he wanted to use; he would have to post a link

5  for the entire video content on YouTube so

6  viewers could see what the meaning was in its

7  entirety; and if he could credit MAC-TV with any

8  of our footage that he used."

9      Q.   Just to be clear, did you write, "he

10  would have to post a link to the entire video in

11  the comments on YouTube"?

12      A.   Yes.

13      Q.   Does this accurately reflect what you

14  told Mr. Kastorf?

15      A.   I believe so, yes.  He -- we wanted

16  people to have the complete link so that they

17  could watch the entire meeting, if they wanted

18  to, and not just an excerpt.

19      Q.   You mentioned earlier that you gave

20  licenses to two documentary filmmakers to use

21  clips of WCAC video; is that right?

22      A.   Yes.

23      Q.   Did you ask either of them to include a

24  link to the entire video?

1       A.    No.   I -- we had a contract with other

2  uses for it, because they were paying for it and

3  they were using it in a documentary.   It was a

4  different situation.

5       Q.    How was it different?

6       A.    They were using it in a documentary.

7  They weren't just putting it out there for the

8  world to see.   They were actually making a

9  program with our footage.

10       They were getting paid to make this fact

11  documentary.   781 isn't getting paid to do their

12  videos.   The documentary company was being paid

13  by -- I think it was Netflix, but I can't -- I

14  think it was Netflix.

15       Q.    If you could turn to the second page of

16  that letter, please, and read the paragraph in

17  the middle, starting with "As for 781 News."

18       A.    "As for 781 News Waltham Data, being a

19  nonprofit, they do not have a nonprofit status

20  with the IRS.   They're not a legitimate news

21  organization.   We still don't know who else is

22  involved in this channel."

23       Q.    At the time you wrote this, you had

24  already met with Mr. Kastorf; is that right?

1         A.    Mm-hmm.

2         Q.    Had you watched some videos on the

3    Waltham Data YouTube channel?

4         A.    Yes.

5         Q.    Had you watched any episodes of their

6    debrief program?

7         A.    No.  I watched the links that they used

8    of ours, mostly so I could see what they were

9    taking.

10         Q.    Had you made any other attempt to find

11    out who was involved in Channel 781 at that

12    point?

13         A.    No.

14         Q.    Why did you say Channel 781 is not a

15    legitimate news organization?

16         A.    Because they didn't have a business

17    behind them.  They didn't have -- what I meant

18    legitimate, I meant a broadcast channel.  They

19    weren't a broadcast channel.  They weren't a

20    nonprofit.  They weren't -- they weren't an

21    organization.

22         Q.    Did you believe that a group that did

23    not have a broadcast channel or a nonprofit

24    status was not a legitimate news organization?

 1       A.   When I said legitimate news

 2   organization, I meant a nonprofit or broadcast

 3   channel.  Are they a nonprofit or a broadcast

 4   channel?  I don't believe they are.

 5       Q.   So is it fair to say that you believe

 6   that when you wrote this letter, that a

 7   legitimate news organization is either a

 8   nonprofit or a broadcast channel?

 9            MR. PYLE:  Objection.

10       A.   I believe that legitimate news

11   organizations have a nonprofit or a business

12   plan.  They have something.  These are citizen

13   journalists, but they're not -- they're not a

14   business.  Correct?

15       Q.   Why was the fact that Channel 781 is

16   not a business significant enough for you to

17   include in this letter?

18            MR. PYLE:  Objection.  Do you want to

19   show her your letter which she's obviously

20   responding to?

21            THE WITNESS:  This one?

22            MR. PYLE:  No.  His letter.

23            MR. STOLTZ:  I can.  We'll come back to

24   that.  We'll come back to this letter.

1  BY MR. STOLTZ:

2      Q.    After your meeting with Mr. Kastorf on

3  June 15th of 2023, did you have conversations

4  about that meeting with WCAC staff?

5      A.    With Chris Wangler.

6      Q.    Anyone else?

7      A.    I don't recall.

8      Q.    Could you walk me through that

9  conversation?

10      A.    No.

11      Q.    What did you tell Mr. Wangler about the

12  meeting?

13      A.    That I met with him, that I talked to

14  him about the clips, that he was very upset about

15  closed-captioning.  That seemed to be something

16  he really wanted, and I tried to explain to him

17  why we couldn't closed-caption.  And, you know,

18  about the Fair Use, about is it Fair Use or not.

19      And Chris knows a lot about Fair Use, so

20  he's the one that started to look into it.

21      Q.    Who first suggested sending

22  infringement notices to YouTube?

23      A.    I believe it was Chris.

24      Q.    Did that happen after your meeting with

1  Mr. Kastorf?

2      A.   I think it happened after that.  I'm

3  trying -- there was another situation.  There

4  were situations that were coming up.  And I'm not

5  sure if they had taken the mayor at that point in

6  time or not from the Chamber.  And that was when

7  we started to get concerned, because they weren't

8  just taking government videos.  They were taking

9  the Chamber's video too.

10     So I think that's when we started to think

11 that maybe we should -- we should start looking

12 into YouTube and see what the situation was

13 there.

14     Q.   Can you tell me more about what you

15 meant by taking the mayor from the Chamber?

16     A.   The mayor, the Chamber has their own

17 show called Women in Business.  And --

18         MR. PYLE:  Do you want to clarify that

19 it's the Chamber of Commerce?

20     A.   It's the Chamber of Commerce's show.

21 And the mayor was one of their speakers, and they

22 took that video and put it on the air without

23 asking the Chamber permission.

24     Q.   Does WCAC own that show?

1          A.    No.   The Chamber does.

2          Q.    Then when you heard about that, why was

3    that when you started to get concerned?

4          A.    Because not only were they violating

5    the MAC Channel's copyright; they were violating

6    one of my producer's copyrights.

7          Q.    You said you believe Mr. Wangler

8    suggested sending infringement notices to

9    YouTube; is that right?

10          A.    (Witness nods.)

11              MR. PYLE:   You have to verbalize the

12    answer.

13              THE WITNESS:   Yes.   Sorry.   It's

14    getting late in the day.

15    BY MR. STOLTZ:

16          Q.    Who made the final decision to send

17    takedown notices to YouTube?

18          A.    I did.

19          Q.    Did you consult Mr. Barrett about that

20    decision?

21          A.    Yes.

22          Q.    Did he approve?

23          A.    Yes.

24          Q.    Did you consult with any other WCAC

1  board members about that decision?

2      A.   I think I had discussed the situation

3  at a board meeting before this all went down.  We

4  didn't vote on anything or anything.  It was just

5  part of, you know, this has been going on.

6      Q.   Around the time of this meeting,

7  talking about June and July of 2023, did you

8  watch any of the videos that Channel 781 had

9  posted?

10      A.   Yes.  Chris -- Chris had me watch some

11  of them to see what was being taken.

12      Q.   Did you watch any of Channel 781's

13  debrief shows?

14      A.   No.

15      Q.   Did you watch clips of government

16  meetings that stood alone?

17      A.   Yes.

18      Q.   Did you watch any other kind of videos

19  on the Channel 781 YouTube channel?

20      A.   No.

21      Q.   Did you consider whether Channel 781

22  might have had the legal right to post any of the

23  clips that you watched?

24      A.   I assigned Chris to this task, and

1  Chris was in charge of it.

2      Q.   To your knowledge, when did WCAC first

3  send an infringement notice to YouTube about

4  Channel 781?

5      A.   We tried very early on, probably late

6  June, early July.  And we couldn't get into the

7  account because it was a Gmail account that

8  another employee had set up.

9      So we had to try and get another way into

10  YouTube.  There was no help from YouTube.  We

11  were trying really hard to get in there, and we

12  couldn't get in.

13      And it took a couple of months to actually

14  get access to make a complaint.

15          MR. STOLTZ:  I'd like to show you

16  what's previously been marked as Exhibit 22.

17              (Previously marked Exhibit 22

18      incorporated by reference.)

19  BY MR. STOLTZ:

20      Q.   Do you recognize this document?

21      A.   Yes.

22      Q.   What is it?

23      A.   It's an email to Dave Gauthier, who was

24  the head of Mass Access at the time.

1     Q.    And did you forward that email to

2    Mr. Barrett?

3     A.    Yeah.  I guess I must have.  Yeah.

4     Q.    Is this a true and correct copy of that

5    email chain?

6     A.    Yes.

7     Q.    Do you see near the bottom of that

8    page, where you wrote "We are having no luck with

9    YouTube shutting them down"?

10     A.    Yup.  Yes.

11     Q.    What did you mean by "shutting them

12    down"?

13     A.    We had no way of getting into YouTube

14    to take the clips down.

15     Q.    So when you wrote "shutting them

16    down" --

17     A.    Shutting down the clips.

18     Q.    You're saying that when you wrote

19    "YouTube shutting them down," you mean shutting

20    down clips?

21     A.    Yeah.  Shutting down the clips that we

22    were trying to take down.  We were having no luck

23    getting YouTube to shut them down.  We couldn't

24    get in there.  So we didn't know what to do.  So

1    I asked Mass Access for the name of a lawyer.

2         Q.   At the time you wrote this, were you

3    hoping that the Channel 781 Waltham Data YouTube

4    channel would be shut down?

5         A.   No.  No.  I was not hoping that at all.

6         Q.   That's not what you meant by YouTube

7    shutting them down?

8         A.   Shutting them, YouTube -- no luck,

9    YouTube shutting them down.  We did not want to

10   shut down their channel.  We wanted to get -- we

11   wanted them to respect our copyright.  That's

12   what we wanted them to do.  And we wanted to get

13   the clips off of YouTube.

14        Q.   So when you wrote "YouTube shutting

15   them down," you meant respect our copyright?

16        A.   When I said "YouTube shutting them

17   down," I meant shutting down the clips that we

18   were trying to get back.  I would never have

19   wanted to shut their channel down in a million

20   years.  All I wanted them to do is respect our

21   copyright.  That's all I wanted them to do.

22        Q.   One line above that, you write, "They

23   are using this footage to promote political

24   candidates in the city."

1      Does that refer to what we talked about

2  earlier, when you -- when we spoke about Channel

3  781's politics?

4      A.   I -- yeah.  They were using our footage

5  to promote political candidates in the city.

6  Yes.

7      Q.   How was Channel 781 using WCAC footage

8  to promote political candidates in the city?

9      A.   They were making other candidates

10  look -- taking other candidates, other city

11  councilors' footage and editing it in a way that

12  seemed like -- out of context.

13      So by making other city councilors look bad,

14  they were making their candidates look good.

15      Q.   Incumbent city councilors look bad?

16      A.   Well, yeah.  They were -- yeah.

17  Mm-hmm.  There were certain -- they were going

18  after certain city councilors.

19      Q.   Why did you include that fact in this

20  email?

21      A.   Because I was very frustrated with the

22  whole situation, and you can see my frustration

23  in this email.  And, you know, sometimes you get

24  angry and you say things you don't mean, and, you

1  know, sometimes it comes out wrong because you're

2  frustrated.

3      Q.   So you didn't mean to say they were

4  using this footage to promote political

5  candidates in the city?

6      A.   No.  I probably phrased things

7  differently because I was very frustrated with

8  the entire situation.  I was angry at the time

9  when I wrote this email.  I felt very frustrated

10 I couldn't get into YouTube.  We didn't know what

11 to do.  I was looking for my -- for some help in

12 the situation.

13     Q.   Were you frustrated that Channel 781

14 was using WCAC footage to promote political

15 candidates in the city?

16     A.   I was frustrated that they were using

17 our footage without respecting our copyright.

18     Q.   Were you also frustrated that they were

19 using the footage to promote political

20 candidates?

21     A.   I was frustrated that they were using

22 our footage without our copyright and misusing

23 some of the content.

24     Q.   How were they misusing it?

1        A.    They were editing it in a way to make

2   certain people look bad, and they were using our

3   footage to do it.

4        Q.    And that frustrated you?

5        A.    Yes.  They were violating our

6   copyright.

7        Q.    In response to your email, it looks

8   like Mr. Gauthier recommended that you speak to

9   an attorney; is that right?

10       A.    Yes.

11       Q.    Did anyone at WCAC speak to Ken Parker?

12       A.    No.

13            MR. STOLTZ:  I'd like to show you

14  another exhibit that's been previously marked as

15  Exhibit 45.

16                (Previously marked Exhibit 45

17       incorporated by reference.)

18            THE WITNESS:  Thank you.

19  BY MR. STOLTZ:

20       Q.    Do you recognize this document?

21       A.    Yes.

22       Q.    What is it?

23       A.    It's the -- 781 News took a show

24  produced by the --

1              MR. PYLE:  What is the document?

2         A.   Oh, it's an email.  Sorry.

3         Q.   Is it an email you sent to Mr. Wangler

4    on September 1st of 2023?

5         A.   Yes.

6         Q.   Is this a true and correct copy of that

7    email?

8         A.   Yes.

9         Q.   Could you read your email to

10   Mr. Wangler, please.

11        A.   "Hi.  Waltham Data took the mayor's

12   video with the mistakes and are using it.  Since

13   YouTube won't take the video down, we need to

14   suspend streaming until the election is over.

15   Your thoughts?"

16        Q.   What was the mayor's video?

17        A.   We do a show on WCAC called "You Don't

18   Say" where every candidate gets to come in and

19   gets to give five minutes of what their, what

20   they want to let the voters know.

21        And the mayor did one, and she started and

22   stopped a couple of times.  My staff person, Phil

23   McGrady, put the wrong clip on the air.

24        He put the one with the mistakes on the air,

1  not the one that was edited for the final show.

2  And 781 took it and put it online.

3       So they had violated the MAC Channel

4  copyright, the Chamber's copyright, and now they

5  were violating the WCAC copyright.

6       Q.   When WCAC recorded the mayor's video

7  and other candidates' videos for the "You Don't

8  Say" program, did every candidate get the same

9  number of takes?

10       A.   Yes.  They get very nervous because a

11  lot of them aren't video people.  So if they need

12  them, they get them, because we want them all to

13  look the best they can possibly look.  That's our

14  job.

15       Q.   Did every candidate get the same number

16  of takes?

17       A.   If they needed them, sure.

18       Q.   When you wrote this email, were you

19  concerned about Channel 781 showing the mayor in

20  a bad light?

21       A.   No.  I was concerned about 781 showing

22  WCAC in a bad light.  This was extremely

23  embarrassing to us.  Extremely embarrassing.  And

24  I was also upset about them violating yet another

1  copyright.

2      Q.   Do you believe that the unedited video

3  of the mayor that 781 posted was newsworthy?

4          MR. PYLE:   Objection.

5      A.   No.

6      Q.   What did you mean when you said "Since

7  YouTube will not take down the video, I think we

8  need to suspend streaming until the election is

9  over"?

10     A.   Because they just kept taking whatever

11 they wanted.  It didn't matter whose copyright it

12 was.  They took the Chamber's.  They took ours.

13 They took everybody's.  They were just taking

14 whatever they wanted.

15     And the WCAC is only required to run our

16 channels on cable.  We're not required to run

17 anything online.  And I was getting fed up.  I

18 was getting fed up with it all.  They embarrassed

19 us.  And I was very angry, and I said let's just

20 take it all down, let's take it all down.

21     Q.   So what did you mean by "suspend

22 streaming"?

23     A.   Just not stream.  Not put anything on

24 the website.  Take it down.  Take the whole

1  website down.

2       Q.   Which website?

3       A.   WCAC.

4       Q.   You weren't referring to taking the

5  Channel 781 YouTube channel down?

6       A.   No.  I was talking about taking our

7  channel down.

8       Q.   Did you take your channel down?

9       A.   No.  As you can see, I vent a lot.

10      Q.   Do you know why Mr. Wangler responded,

11  "You have to become admin of Bill's channel and

12  make 30 removal claims"?

13      A.   No.  I think -- I don't know what that

14  means.  It might have had something to do with

15  setting up a channel somewhere.  I don't

16  remember.  I don't recall.

17      Q.   Do you know why he used the number 30?

18      A.   Those must have been the videos he saw

19  that were violating the copyright.

20      Q.   After you sent this email, did WCAC

21  send another infringement notice to YouTube?

22           MR. PYLE:  Objection.

23      A.   That was really Chris Wangler's

24  department.  I didn't send any of those, so I

1    don't know.

2         Q.    When were you first aware that YouTube

3    had suspended the Channel 781 Waltham Data

4    YouTube channel?

5         A.    When Chris got an email and said,

6    You're not going to believe this; they took their

7    channel down, which we did not want them to take

8    the channel down, but they did.

9              MR. STOLTZ:  Can we go off the record.

10             THE VIDEOGRAPHER:  We are going off the

11   record.  The time on the monitor is 14:09.

12                  (A recess was taken.)

13             THE VIDEOGRAPHER:  We are back on the

14   record.  The time on the monitor is 14:39.

15             MR. STOLTZ:  I'd like to show you again

16   what was marked as Exhibit 42.

17                  (Previously marked Exhibit 42

18         incorporated by reference.)

19   BY MR. STOLTZ:

20        Q.    Just to clarify, the bottom of that

21   page is an email that Mr. Kastorf sent to you; is

22   that right?

23        A.    Yes.

24        Q.    And does that email contain some links

1    pertaining to Fair Use?

2         A.    Yes.

3         Q.    And you received that email; is that

4    right?

5         A.    Yes.

6              MR. STOLTZ:  Okay.  Thanks.  You can

7    put that one away.

8              I am showing you again what was

9    previously marked as Exhibit 39.  I'd also like

10   to show you one more exhibit, after it's marked.

11   BY MR. STOLTZ:

12        Q.    I am also showing you what has been

13   marked as Exhibit 56.

14              (Letter dated November 8, 2023 to

15        Maria Sheehan from Mitchell Stoltz marked

16        Exhibit 56.)

17   BY MR. STOLTZ:

18        Q.    Do you recognize that document?

19        A.    Yes.

20        Q.    Is that a letter I wrote to you in

21   November of 2023?

22        A.    Yes.

23        Q.    Did you receive it?

24        A.    Yes.

1      Q.   Please take a moment to read through

2 it.

3      Did you write the letter in Exhibit 39 in

4 response to my letter in Exhibit 56?

5      A.   Yes.

6      Q.   Having read the letter that you were

7 responding to, does it refresh your memory of

8 what you meant when you wrote "they," meaning

9 Channel 781 News, is not a legitimate news

10 organization?

11           MR. PYLE:   Objection.

12      A.   I've already answered that question.

13      Q.   So your answer hasn't changed?

14      A.   No.   They are not a nonprofit or a

15 broadcast station.

16      Q.   Why did you include that in this draft

17 letter?

18      A.   Because they're not -- they're not a

19 nonprofit or a broadcast channel.

20      Q.   My question was why did you include

21 that.

22      A.   I don't know.   Just because that's what

23 they are.   It's what I -- I saw them as not a

24 nonprofit and not a broadcast channel.

1        Q.    Do you see on the second page of your
2   draft letter, Exhibit 39, right in the middle of
3   the page, "we still don't know who else is
4   involved in this channel"?
5        Do you see that?
6        A.    Yes.
7        Q.    You wrote this in November of 2023; is
8   that right?
9        A.    Yes.
10        Q.    At that point, had you watched any of
11   the Channel 781 debrief shows?
12        A.    I watched the clips that were -- that
13   Chris said were not Fair Use.
14        Q.    Do you know if Mr. Wangler had watched
15   any of the debrief shows at that point?
16        A.    I have no idea.
17        Q.    Before you wrote this letter, had you
18   asked Mr. Wangler or anyone else at WCAC who was
19   involved in Channel 781?
20        A.    Whatever discussions we had was with
21   Chris.  And I don't recall a conversation about
22   specifically who was involved in 781 News.
23        Q.    You -- today you named several people
24   who you know to be involved in 781 News.

1        A.    Today, yeah.  Today, I do.  Today, I

2   know who they are.

3        Q.    Is it fair to say that, when you wrote

4   this letter, you didn't know who they were?

5        A.    Yes.

6        Q.    When did you learn who was involved in

7   Channel 781 News?

8        A.    I don't recall.

9        Q.    How did you learn who was involved in

10  Channel 781 News?

11       A.    I don't recall.

12       Q.    But that was after November 22nd, 2023?

13       A.    I don't recall.

14       Q.    Well, you said just a moment ago that,

15  when you wrote this letter, you didn't know who

16  else was involved in Channel 781.  Was that

17  correct?

18       A.    Yeah.

19       Q.    So as of that date, you did not know

20  who else, besides Mr. Kastorf, was involved in

21  Channel 781?

22       A.    Yes.  I don't think I knew who the rest

23  of them were until we had -- we were sued by you.

24  That was when I found out who everybody was.

1    Because I had given this all to Chris to do.  It

2    was his -- it was his job to take this on.

3         Q.   If it was Mr. Wangler's job to take

4    this on, then why didn't you ask him who was

5    involved with Channel 781 before you wrote this

6    draft letter?

7              MR. PYLE:  Objection.

8         A.   It's a draft letter.  It's a draft.

9    It's not a real letter.  It's a draft.  You

10   didn't get this letter, did you?

11        Q.   I didn't.

12        A.   Right.  So it's a draft.

13             MR. STOLTZ:  Well, I think we're all

14   set.

15             Jeff, did you have any questions for

16   the witness?

17             MR. PYLE:  No.  I do not.  Thank you.

18             MR. STOLTZ:  Again, we'd request to

19   review and correct the transcript within 30 days

20   of receiving it.  Do you also request?

21             MR. PYLE:  So that's a -- it's

22   generally my practice to have the witness be able

23   to read and sign.  Do you also suggest that you

24   as questioner also reads and signs and corrects

1    the transcript, because you're obviously not

2    going to edit her testimony?

3              MR. STOLTZ:  No, we're not.

4              MR. PYLE:  Okay.  Yeah.  I mean, I'm

5    not familiar with a procedure where counsel

6    reviews the deposition transcript --

7              MR. STOLTZ:  Well --

8              MR. PYLE:  -- and signs.  But we

9    request 30 days.

10             MR. STOLTZ:  Do you make that request?

11             MR. PYLE:  Yes.  We request 30 days to

12   read and sign after receiving the transcript.

13             MR. STOLTZ:  All right.  Then I think

14   we're done.

15             MR. PYLE:  All right.

16             THE VIDEOGRAPHER:  We are going off the

17   record.  This concludes the testimony of Maria

18   Sheehan.  The time on the monitor is 14:50.

19             COURT REPORTER:  Could I just get the

20   transcript orders.  You had realtime.  Did you

21   want a rough draft?

22             MR. STOLTZ:  We didn't.

23             COURT REPORTER:  No?  Okay.  And

24   regular delivery on the final?

1              MR. STOLTZ:  Regular delivery is fine.

2    Ten days?

3              COURT REPORTER:  Yes.  Okay.  Mr. Pyle,

4    did you want a copy of the transcript?

5              MR. PYLE:  Yes, please.  Regular

6    delivery is fine.

7         (Deposition concluded at 2:51 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

No. 590642

Re:   Deposition of **Maria Sheehan**
       Date: 7/10/2025
       Case: Channel 781 News -v- Waltham Community Access Corporation
       Return to: transcripts@planetdepos.com

| Page | Line | Correction/Change and Reason |
|------|------|------------------------------|
| 24 | 23/24 | Delete verizon - "So she gave us Verizon, Comcast and RCN "- She only gave us the funds from Comcast and RCN |
| 54 | 20 | It's 2008, not 2018 No. He was in 2018, and then he went to the high school. - - |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

_____       _____
     (Date)                              (Signature)

No. 590642

Re:    Deposition of **Maria Sheehan**
       Date: 7/10/2025
       Case: Channel 781 News -v- Waltham Community Access Corporation
       Return to: transcripts@planetdepos.com

ACKNOWLEDGMENT OF DEPONENT

I, Maria Sheehan, do hereby acknowledge that
I have read and examined the foregoing testimony, and
the same is a true, correct and complete
transcription of the testimony given by me and any
corrections appear on the attached Errata sheet
signed by me.

(Date)                    (Signature)

1                    C E R T I F I C A T E

2    COMMONWEALTH OF MASSACHUSETTS

3    SUFFOLK, SS.

4            I, Janet M. McHugh, a Registered Merit

5    Reporter and a Notary Public within and for the

6    Commonwealth of Massachusetts do hereby certify:

7            THAT MARIA SHEEHAN, the witness whose

8    testimony is hereinbefore set forth, was duly

9    sworn by me and that such testimony is a true and

10   accurate record of my stenotype notes taken in

11   the foregoing matter, to the best of my

12   knowledge, skill and ability; that before

13   completion of the deposition review of the

14   transcript was requested.

15           I further certify that I am not related

16   to any parties to this action by blood or

17   marriage; and that I am in no way interested in

18   the outcome of this matter.

19           IN WITNESS WHEREOF, I have hereunto set

20   my hand this 17th day of July, 2025.

21

22   _____

23   JANET M. MCHUGH
     Notary Public

24   My Commission Expires: July 16, 2028