# Exhibit D



# Transcript of Justin Barrett, Jr.

**Date:** July 8, 2025
**Case:** Channel 781 News -v- Waltham Community Access Corporation

**Planet Depos**
**Phone:** 888.433.3767 **| Email:** transcripts@planetdepos.com
**www.planetdepos.com**
**Michigan #8598 | Nevada #089F | New Mexico #566**

1              IN THE UNITED STATES DISTRICT COURT

2                FOR THE DISTRICT OF MASSACHUSETTS

3    - - - - - - - - - - - - - - - -x

4    CHANNEL 781 NEWS,                   :

5           Plaintiff,                   :

6       v.                              : Case No.

7    WALTHAM COMMUNITY ACCESS            : 1:24-cv-11927-PBS

8    CORPORATION,                        :

9           Defendant.                   :

10   - - - - - - - - - - - - - - - -x

11

12      Videotaped Deposition of JUSTIN BARRETT, JR.

13                 Boston, Massachusetts

14                 Tuesday, July 8, 2025

15                      9:03 a.m.

16

17

18

19

20

21

22   Job No.:  590640

23   Pages: 1 - 88

24   Reported By:  Michelle Keegan, RMR, CRR, CSR

1          Deposition of JUSTIN BARRETT, JR., held at

2    the offices of:

3

4          BROWN RUDNICK LLP

5          One Financial Center

6          Boston, Massachusetts 02111

7          (617) 856-8200

8

9

10

11

12          Pursuant to notice, before Michelle

13    Keegan, Registered Merit Reporter and Notary

14    Public in and for the Commonwealth of

15    Massachusetts.

16

17

18

19

20

21

22

23

24

```
 1                    A P P E A R A N C E S

 2

 3   ON BEHALF OF PLAINTIFF CHANNEL 781 NEWS:

 4          BETELHEM GEDLU, ESQ.

 5          MITCH STOLTZ, ESQ.

 6          ELECTRONIC FRONTIER FOUNDATION

 7          815 Eddy Street

 8          San Francisco, California 94109

 9          (415) 436-9333

10

11   ON BEHALF OF DEFENDANT WALTHAM COMMUNITY ACCESS

12   CORPORATION:

13          JEFFREY J. PYLE, ESQ.

14          PRINCE LOBEL TYE LLP

15          One International Place, Suite 3700

16          Boston, Massachusetts 02110

17          (617) 456-8000

18

19   ALSO PRESENT:

20          Isaac Weaver, Videographer

21

22

23

24
```

```
1                   C O N T E N T S

2    EXAMINATION OF JUSTIN BARRETT, JR.          PAGE

3        By Ms. Gedlu                            6

4

5

6                   E X H I B I T S

7                (Attached to transcript.)

8    BARRETT DEPOSITION EXHIBITS                 PAGE

9    Exhibit A    Video recording produced as a    45

10                YouTube URL

11   Exhibit 20  "Justin Barrett for Ward 2"       18

12   Exhibit 21  Email, WCAC0000433 through -434   47

13   Exhibit 22  Email, WCAC0000018 through -19    54

14   Exhibit 23  Email, WCAC0000109 through -111   60

15   Exhibit 24  Email, WCAC0000112 through -113   62

16   Exhibit 25  Email, WCAC00000005 through -7    63

17   Exhibit 26  Email, WCAC0000021 through -23    68

18   Exhibit 27  Email, WCAC0000034 through -36    71

19   Exhibit 28  Email, WCAC0000020                78

20   Exhibit 29  Email, WCAC0000028 through -29    80

21   Exhibit 30  Email, WCAC0000118                82

22

23   ** Documents quoted on the record are transcribed

24                   as read **
```

```
 1              P R O C E E D I N G S
 2         THE VIDEOGRAPHER:  Here begins Media          09:03:16
 3    Number 1 in the videotaped deposition of Justin   09:03:28
 4    Barrett in the matter of Channel 781 News versus  09:03:30
 5    Waltham Community Access Corporation in the United 09:03:35
 6    States District Court for the District of         09:03:39
 7    Massachusetts, Case Number 1:24-cv-11927-PBS.     09:03:40
 8         Today's date is July 8th, 2025.  The time    09:03:53
 9    on the video monitor is 9:03.  The videographer   09:03:59
10    today is Isaac Weaver, representing Planet Depos.  09:04:02
11    This video deposition is taking place at Brown    09:04:06
12    Rudnick LLP, in One Financial Center in Boston,    09:04:09
13    Massachusetts.                                     09:04:13
14         Would counsel please voice-identify          09:04:14
15    themselves and state whom they represent.         09:04:16
16         MS. GEDLU:  Betelhem Gedlu, representing      09:04:19
17    Channel 781.                                       09:04:22
18         MR. STOLTZ:  Mitchell Stoltz, also           09:04:24
19    representing Channel 781.                          09:04:26
20         MR. PYLE:  Jeffrey Pyle, representing the     09:04:28
21    defendant, Waltham Community Access Corporation.   09:04:30
22         THE VIDEOGRAPHER:  The court reporter         09:04:32
23    today is Michelle Keegan, representing Planet      09:04:34
24    Depos.                                             09:04:37
```

1      The witness will now be sworn.                      09:04:37

2            JUSTIN BARRETT, JR.,

3  having been satisfactorily identified and duly

4  sworn by the Notary Public, was examined and

5  testified as follows:

6            EXAMINATION BY COUNSEL FOR

7            PLAINTIFF CHANNEL 781 NEWS                    09:04:48

8  BY MS. GEDLU:                                           09:04:50

9     Q. Good morning, Mr. Barrett.                        09:04:54

10       MS. GEDLU:  Good morning, Jeff.                   09:04:56

11    Q. Can we start by setting some stipulations?        09:04:58

12  Can we agree that all objections, other than           09:05:05

13  objections to the form of a question, be               09:05:07

14  preserved?                                             09:05:10

15       MR. PYLE:  Yes.                                   09:05:10

16       MS. GEDLU:  And also, can we agree that           09:05:11

17  once the deponents on both sides, from both            09:05:15

18  parties, after they receive the transcript, they       09:05:18

19  would have, like, 30 days to make any revisions or     09:05:21

20  corrections?                                           09:05:24

21       MR. PYLE:  Yes.                                   09:05:25

22       MS. GEDLU:  Thank you.                            09:05:26

23    Q. Mr. Barrett, can you please state your            09:05:31

24  full name for the record.                              09:05:34

| | | |
|---|---|---|
| 1 | A. I'm Justin Barrett, Jr. | 09:05:34 |
| 2 | Q. Have you ever been deposed before? | 09:05:36 |
| 3 | A. I have. | 09:05:39 |
| 4 | Q. Just to help us set some ground rules, | 09:05:39 |
| 5 | I'll ask you questions and you will answer.  Your | 09:05:44 |
| 6 | answers need to be audible responses, such as | 09:05:46 |
| 7 | "yes" or "no."  The court reporter cannot record | 09:05:49 |
| 8 | head nods or other nonverbal answers, so please | 09:05:52 |
| 9 | speak.  Do you understand? | 09:05:55 |
| 10 | A. I do. | 09:05:56 |
| 11 | Q. To help our court reporter, only one of us | 09:05:56 |
| 12 | can speak at a time, so please let me complete my | 09:06:00 |
| 13 | question before you start your answer and I'll do | 09:06:03 |
| 14 | the same.  I'll wait for you to finish your answer | 09:06:05 |
| 15 | before I speak again.  Can we agree on that? | 09:06:07 |
| 16 | A. Yes. | 09:06:10 |
| 17 | Q. If you do not understand my question, | 09:06:11 |
| 18 | please say so and I'll rephrase it.  Can you do | 09:06:15 |
| 19 | that? | 09:06:18 |
| 20 | A. I understand that.  Yeah. | 09:06:18 |
| 21 | Q. It is possible that your attorney may | 09:06:20 |
| 22 | object to a question I ask you.  Unless they | 09:06:23 |
| 23 | explicitly instruct you not to answer, you will | 09:06:25 |
| 24 | need to answer my question.  Is that okay? | 09:06:27 |

1    A. That's fine.                                    09:06:31

2    Q. I'll try to take breaks so that we are not     09:06:32

3    sitting for long periods of time.  If you need to  09:06:35

4    take a break before then --                       09:06:38

5    A. Trust me, I will.                              09:06:40

6    Q. Okay.  I would only ask that you answer        09:06:41

7    any pending questions before you take any break.  09:06:43

8    Is that okay?                                     09:06:47

9    A. Fine.                                          09:06:47

10   Q. Something that can happen is when I ask a      09:06:48

11   question, you give an answer that at the time you 09:06:54

12   believe is complete but later on in the deposition 09:06:56

13   you realize that you have additional information   09:06:58

14   to add to your response.  If that happens, please  09:07:00

15   let me know what you would like to add in response 09:07:04

16   to a particular question.                         09:07:06

17   A. I will.                                        09:07:08

18   Q. Good.  Have you done anything to prepare       09:07:08

19   for today's deposition?                           09:07:11

20   A. Have I done anything what?                     09:07:12

21   Q. To prepare for this deposition.                09:07:14

22   A. I took a shower.  But no.                      09:07:15

23   Q. Have you met with anyone to prepare for        09:07:21

24   this deposition?                                  09:07:23

| | | |
|---|---|---|
| 1 | A. Yes. | 09:07:24 |
| 2 | Q. Who did you meet with? | 09:07:24 |
| 3 | A. Zoom -- we had a Zoom call with Jeff. | 09:07:26 |
| 4 | Q. Who else was on the Zoom? | 09:07:30 |
| 5 | A. Maria Sheehan and Chris Wangler. | 09:07:32 |
| 6 | Q. And for how many hours did you meet on | 09:07:35 |
| 7 | Zoom? | 09:07:38 |
| 8 | A. I want to guess 15 minutes. | 09:07:39 |
| 9 | Q. Have you reviewed any documents to help | 09:07:41 |
| 10 | you prepare for the deposition? | 09:07:46 |
| 11 | A. I have. | 09:07:47 |
| 12 | Q. How many documents? | 09:07:48 |
| 13 | A. Probably 15.  15 emails.  15 sheets of | 09:07:50 |
| 14 | paper with email on them. | 09:07:57 |
| 15 | Q. And did those emails help refresh your | 09:07:59 |
| 16 | recollection? | 09:08:02 |
| 17 | A. Maybe. | 09:08:03 |
| 18 | Q. Was there anyone else besides Maria | 09:08:07 |
| 19 | Sheehan, Chris Wangler, and Jeff that -- scratch | 09:08:22 |
| 20 | that.  Sorry. | 09:08:26 |
| 21 | Have you met with anyone else besides | 09:08:27 |
| 22 | Maria Sheehan, Chris Wangler, and Jeff to prepare | 09:08:30 |
| 23 | for this deposition? | 09:08:34 |
| 24 | A. No. | 09:08:34 |

| | | |
|---|---|---|
| 1 | MR. PYLE:  I'll just ask you, Justin, to | 09:08:35 |
| 2 | wait until the question is fully out of Betty's | 09:08:37 |
| 3 | mouth before beginning your answer. | 09:08:40 |
| 4 | THE WITNESS:  All right. | 09:08:41 |
| 5 | MR. PYLE:  Thank you. | 09:08:42 |
| 6 | Q. Are you taking any medications today that | 09:08:43 |
| 7 | might affect your testimony? | 09:08:45 |
| 8 | A. No. | 09:08:46 |
| 9 | Q. You understand that you are here to give | 09:08:46 |
| 10 | testimony under oath in the lawsuit filed by my | 09:08:52 |
| 11 | client, Channel 781, against WCAC? | 09:08:56 |
| 12 | A. I do. | 09:09:00 |
| 13 | Q. And do you understand that when I say | 09:09:01 |
| 14 | "WCAC" I mean Waltham Community Access | 09:09:06 |
| 15 | Corporation? | 09:09:09 |
| 16 | A. I do. | 09:09:09 |
| 17 | Q. Also, when I say "Channel 781" I'm | 09:09:09 |
| 18 | referring to the group that brought this lawsuit. | 09:09:14 |
| 19 | Do you understand that? | 09:09:17 |
| 20 | A. I do. | 09:09:17 |
| 21 | Q. Mr. Barrett, do you live in Waltham? | 09:09:17 |
| 22 | A. I do. | 09:09:25 |
| 23 | Q. Where do you live? | 09:09:26 |
| 24 | A. 12 Curve Street. | 09:09:27 |

| | | |
|---|---|---|
| 1 | Q. How long have you lived in Waltham? | 09:09:28 |
| 2 | A. Since 1981. | 09:09:31 |
| 3 | Q. And what post-secondary education or | 09:09:33 |
| 4 | degrees do you have? | 09:09:38 |
| 5 | A. I've got a bachelor's degree. | 09:09:40 |
| 6 | Q. A bachelor's degree in what? | 09:09:42 |
| 7 | A. Community management. | 09:09:45 |
| 8 | Q. And what's your current employment? | 09:09:50 |
| 9 | A. I'm retired. | 09:09:52 |
| 10 | Q. And before you retired, what were you | 09:09:53 |
| 11 | working -- what was your last job? | 09:09:58 |
| 12 | A. I was in the car business. | 09:10:00 |
| 13 | Q. Can you explain to me what exactly did you | 09:10:03 |
| 14 | do with the car business? | 09:10:06 |
| 15 | A. I was in sales, in sales management. | 09:10:07 |
| 16 | Q. Do you own any businesses? | 09:10:10 |
| 17 | A. I have real estate. | 09:10:13 |
| 18 | Q. So you're involved in a real estate | 09:10:21 |
| 19 | business? | 09:10:23 |
| 20 | A. I am. | 09:10:23 |
| 21 | Q. What else? | 09:10:25 |
| 22 | A. That's it. | 09:10:30 |
| 23 | Q. Do you have any other business? | 09:10:30 |
| 24 | Are you an officer or director of any | 09:10:34 |

| | | |
|---|---|---|
| 1 | businesses? | 09:10:36 |
| 2 | A. When you say "businesses," are you talking | 09:10:36 |
| 3 | for profit or for nonprofit? | 09:10:43 |
| 4 | Q. We can get to the nonprofit part. | 09:10:47 |
| 5 | A. So no. | 09:10:49 |
| 6 | Q. So currently you're not an officer or | 09:10:49 |
| 7 | director of any businesses, even your real estate | 09:10:51 |
| 8 | business? | 09:10:53 |
| 9 | A. No. | 09:10:53 |
| 10 | Q. How are you involved in your real estate | 09:10:56 |
| 11 | business? | 09:10:57 |
| 12 | A. I own it outright. | 09:10:57 |
| 13 | Q. Is there anyone who runs the real estate | 09:10:59 |
| 14 | business for you as an officer or director? | 09:11:05 |
| 15 | A. No. | 09:11:06 |
| 16 | Q. Okay.  Are you an officer or a director of | 09:11:07 |
| 17 | a nonprofit organization? | 09:11:16 |
| 18 | A. I am. | 09:11:17 |
| 19 | Q. Can you tell me? | 09:11:17 |
| 20 | A. The Waltham Channel, for one. | 09:11:19 |
| 21 | Q. What else? | 09:11:22 |
| 22 | A. Middlesex Human Service Agency is another | 09:11:23 |
| 23 | one; I'm the president, on the board.  I am on the | 09:11:27 |
| 24 | Rexhame Beach Community Association as a director. | 09:11:34 |

| | | |
|---|---|---|
| 1 | Waltham Centennial Scholarship; I'm the president. | 09:11:45 |
| 2 | There's one or two others, but I can't | 09:11:57 |
| 3 | remember, off the top of my head. | 09:11:59 |
| 4 | Q. Are you involved with the Lions Club, the | 09:12:00 |
| 5 | Waltham Lions Club? | 09:12:04 |
| 6 | A. Yes.  As a past president, I'm on the | 09:12:06 |
| 7 | board. | 09:12:09 |
| 8 | Q. So you said you're a past president? | 09:12:09 |
| 9 | A. I was a past president, so that | 09:12:11 |
| 10 | automatically puts me on the board. | 09:12:14 |
| 11 | Q. Are you currently a member? | 09:12:16 |
| 12 | A. I am. | 09:12:17 |
| 13 | Q. How about Waltham Trust -- Waltham Land | 09:12:17 |
| 14 | Trust?  Are you involved in that? | 09:12:23 |
| 15 | A. Waltham Lions Trust? | 09:12:24 |
| 16 | Q. No.  Land trust. | 09:12:27 |
| 17 | A. No. | 09:12:28 |
| 18 | Q. Were you involved at any point? | 09:12:29 |
| 19 | A. No.  I may have joined.  I don't know | 09:12:30 |
| 20 | whether I gave $25 to join years ago.  But again, | 09:12:39 |
| 21 | I could -- but I wouldn't have been an officer, | 09:12:45 |
| 22 | anyway. | 09:12:47 |
| 23 | Q. And just, did you say you were also the | 09:12:50 |
| 24 | president of the Middlesex Human Services? | 09:12:53 |

1    A. I did.                                      09:12:55

2    Q. Have you ever held a job in video          09:12:56

3  production?                                      09:13:01

4    A. I have not.                                 09:13:01

5    Q. Have you been involved in creating any      09:13:02

6  videos in any context?                           09:13:07

7    A. Creating, no.                               09:13:08

8    Q. Are you involved in any other way?          09:13:17

9  Posting a video?                                 09:13:25

10   A. No.                                          09:13:26

11   Q. How were you involved?                       09:13:27

12   A. I did an auction for a nonprofit on The      09:13:30

13 Waltham Channel.  It was an auction I participated 09:13:37

14 in.  And I did an interview for the Lions Club    09:13:38

15 that, again, I didn't produce, but I emceed, we'll 09:13:43

16 say.                                              09:13:48

17   Q. Have you ever held a job in news             09:13:48

18 reporting?                                        09:13:50

19   A. No.                                          09:13:51

20   Q. Any other journalism?  Have you ever been    09:13:51

21 involved in any journalism?                       09:13:57

22   A. No.                                          09:13:59

23   Q. Have you done any news reporting?            09:13:59

24   A. No.                                          09:14:03

1    Q. What's your role at WCAC?                      09:14:04

2    A. The president of the board.                    09:14:09

3    Q. When did you first become the president of     09:14:10

4    the board?                                        09:14:14

5    A. I think it was 2007, but I'm not               09:14:14

6    100 percent sure.  It could have been 2008.       09:14:21

7    Q. Could it have been in 2006 as well?            09:14:24

8    A. I don't think so, but it -- it was             09:14:29

9    probably -- probably 2007 or 2008.  It could have 09:14:33

10   been 2006, but I doubt it.                        09:14:38

11   Q. Were you a board member before you became      09:14:39

12   a president?                                       09:14:42

13   A. I was.                                         09:14:42

14   Q. When did you join the board as a member?       09:14:43

15   A. 2005.                                          09:14:46

16   Q. And since you became the chair of the          09:14:48

17   board in either 2007 or 2008, have you            09:14:53

18   continuously been the chairperson?                09:14:57

19   A. I have.                                        09:14:59

20   Q. Do you currently hold any office in            09:15:00

21   government?                                       09:15:05

22   A. I'm on boards but not -- I don't hold an       09:15:05

23   office.                                           09:15:15

24   Q. When you say you are on a board, which         09:15:16

| | | |
|---|---|---|
| 1 | board are you on? | 09:15:19 |
| 2 | A. I'm on the board of survey and planning. | 09:15:19 |
| 3 | Q. Any other? | 09:15:23 |
| 4 | A. And I'm on the CPC. | 09:15:24 |
| 5 | Q. What do you mean by "CPC"? | 09:15:28 |
| 6 | A. Community preservation committee. | 09:15:30 |
| 7 | Q. And are you just a member on those two | 09:15:31 |
| 8 | boards? | 09:15:38 |
| 9 | A. I am a member of the planning board and | 09:15:38 |
| 10 | I'm the chair of the CPC. | 09:15:42 |
| 11 | Q. When did you become a member for the board | 09:15:44 |
| 12 | of survey and planning? | 09:15:49 |
| 13 | A. I think 2004 or 2005.  I'm not sure which. | 09:15:51 |
| 14 | Q. And since you joined the board in 2004, | 09:15:59 |
| 15 | 2005, have you continuously been a member of the | 09:16:03 |
| 16 | board? | 09:16:06 |
| 17 | A. Yes. | 09:16:06 |
| 18 | Q. And you said you are the chairman for the | 09:16:06 |
| 19 | community preservation; CPC, as you call it? | 09:16:12 |
| 20 | A. Yeah. | 09:16:16 |
| 21 | Q. When did you become the chair? | 09:16:16 |
| 22 | A. I think the year I joined, 2007. | 09:16:19 |
| 23 | Q. And have you continuously served as the | 09:16:23 |
| 24 | chair since 2007? | 09:16:29 |

1      A. I was not the chair one year.                    09:16:30

2      Q. And that would be in 2004?  Sorry.               09:16:35

3  Scratch that.                                           09:16:39

4         You joined the CPC board in what year?           09:16:40

5      A. 2007.                                            09:16:45

6      Q. Okay.  And you became the chairperson in         09:16:46

7  what year?                                              09:16:49

8      A. 2007.                                            09:16:50

9      Q. So you have always been the chairperson          09:16:50

10 for that board?                                         09:16:53

11     A. I was not chair one year.                        09:16:54

12     Q. So since you joined the board in 2006?           09:16:56

13     A. No.  It was not continuous.                      09:17:01

14     Q. Oh, I see.  Which year --                        09:17:03

15     A. I don't remember which year.  I don't            09:17:06

16 know.                                                   09:17:19

17     Q. How are members elected for this board           09:17:21

18 position?  Let's start with the CPC.                    09:17:25

19     A. The CPC, there is five designated from           09:17:27

20 different boards in the city, and four are              09:17:35

21 designated from the general public.                     09:17:39

22     Q. And who designates them?                         09:17:41

23     A. The city council.                                09:17:43

24     Q. How about for the survey and planning?           09:17:44

| | | |
|---|---|---|
| 1 | A. The mayor and the council. | 09:17:52 |
| 2 | Q. Is the mayor involved in selecting the | 09:17:54 |
| 3 | board for the CPC? | 09:18:03 |
| 4 | A. She is not. | 09:18:04 |
| 5 | Q. Mr. Barrett, I will now show you -- | 09:18:06 |
| 6 | MS. GEDLU: I'll have Exhibit 20 marked. | 09:18:24 |
| 7 | (Barrett Exhibit 20 was marked for | 09:18:41 |
| 8 | identification and is attached to the transcript.) | 09:19:04 |
| 9 | Q. Mr. Barrett, do you recognize this | 09:19:04 |
| 10 | document? | 09:19:05 |
| 11 | A. I do. | 09:19:05 |
| 12 | Q. What is it? | 09:19:06 |
| 13 | A. It was a campaign letter I sent out. | 09:19:07 |
| 14 | Q. When did you send out this letter? | 09:19:10 |
| 15 | A. The year I ran for Ward 2. | 09:19:13 |
| 16 | Was it Ward 2? Yeah. I forget what year | 09:19:18 |
| 17 | it was. | 09:19:25 |
| 18 | Q. And Exhibit 20, is it a true and correct | 09:19:25 |
| 19 | copy of the campaign letter you wrote when you ran | 09:19:29 |
| 20 | for Ward 2? | 09:19:34 |
| 21 | A. Ask that question again. | 09:19:35 |
| 22 | Q. Sure. Is this, Exhibit 20, that you're | 09:19:38 |
| 23 | looking at, is it a true and correct copy of the | 09:19:43 |
| 24 | campaign letter you wrote when you ran for Ward 2? | 09:19:45 |

1     A. Yes.                                          09:19:49

2     Q. Was this in 2013 that you ran for Ward 2?    09:19:50

3     A. You know, it could have been.  2013?  It     09:19:58

4  could be.  I don't remember.  Oh, wait a second.   09:20:16

5     Q. Do you think it is before 2000?              09:20:19

6     A. No.  Let me see.                             09:20:21

7        MR. PYLE:  Don't look up another document.   09:20:23

8        THE WITNESS:  What I want to do is do some   09:20:26

9  subtraction.                                        09:20:28

10       MR. PYLE:  Okay.                             09:20:28

11    A. Let's see.                                    09:20:31

12       THE WITNESS:  Addition, actually.            09:20:37

13    A. 2013.                                         09:20:47

14       MR. PYLE:  For the record, Mr. Barrett       09:20:48

15 typed in 1981 plus 32.  I assume because --         09:20:49

16       THE WITNESS:  Because 32 years I've been a   09:20:55

17 taxpayer.                                           09:20:57

18       MS. GEDLU:  Thank you, Counsel.              09:20:59

19       MR. PYLE:  As stated in the letter.          09:21:00

20       Thank you.                                    09:21:01

21    A. As stated in the letter.                      09:21:02

22    Q. Mr. Barrett, can you look at the section      09:21:03

23 labeled "Qualifications"?                            09:21:06

24    A. I can.                                         09:21:10

1      Q. Were all of the statements correct at the      09:21:11

2   time that Exhibit 20 was written?                    09:21:13

3      A. Say that again.                                 09:21:15

4      Q. Were all the statements under the section      09:21:16

5   labeled "Qualifications," were they accurate at      09:21:23

6   the time this campaign letter was written?           09:21:28

7      A. Yes.                                            09:21:29

8      Q. How closely do you work with the Waltham       09:21:30

9   City Council as part of your role as the president   09:21:38

10  of WCAC?                                              09:21:40

11     A. I don't.                                        09:21:41

12     Q. You don't work with the city council in        09:21:45

13  your role --                                          09:21:48

14     A. No.                                             09:21:49

15     Q. How closely do you work with the Waltham       09:21:50

16  City Council as part of your role as a member of     09:21:58

17  the survey and planning?                              09:22:00

18     A. Survey and planning, we have joint             09:22:01

19  meetings on a zoning change that we will meet with   09:22:04

20  the city council on a zone change.                    09:22:08

21     Q. What else do you do with the city council      09:22:10

22  as your role as the president of -- sorry -- yeah,   09:22:14

23  as president of the survey -- you were just a        09:22:20

24  board member?                                         09:22:23

1        MR. PYLE:  Objection to the form.                    09:22:23

2        Q. I'll correct the question.                        09:22:25

3        Is there anything else that you do with             09:22:27

4    the Waltham City Council as part of your role as a      09:22:32

5    member of the survey and planning besides              09:22:35

6    planning?                                               09:22:38

7        A. The answer is no, emphatically.                  09:22:44

8        Q. Besides the joint meeting about zoning.          09:22:49

9        A. No.                                              09:22:53

10       Q. How closely do you work with the Waltham         09:22:54

11   City Council as part of your role as the president      09:23:01

12   of the community preservation committee?                09:23:03

13       A. When the CPC approves a project, the             09:23:05

14   recommendation goes to the council.  Oftentimes I      09:23:16

15   will go as a representative of CPC to the              09:23:19

16   long-term debt committee and present it with the       09:23:27

17   petitioner.                                             09:23:30

18       Q. You present it to the petitioner.  What          09:23:35

19   would you present?  The proposal, you said?             09:23:38

20       A. CPC is a funnel for city funding that if         09:23:40

21   it -- all the CPC does is recommend a project to        09:23:48

22   the council.  If it's recommended, oftentimes, not      09:23:52

23   all the time, oftentimes I will go in with the          09:23:57

24   petitioner and present to the long-term debt            09:24:01

1    committee, not to the council.  To the long-term          09:24:05

2    debt committee, which is a committee of the city          09:24:07

3    council.                                                  09:24:11

4        Q. And what does the long-term debt committee        09:24:11

5    do?                                                       09:24:25

6        A. I would say they do long-term debt and            09:24:25

7    finance.  You'd have to ask the council.                  09:24:28

8        Q. How often do you present this kind of             09:24:32

9    petitions to the long-term debt committee?               09:24:48

10       A. Could be once a year, could be three or           09:24:53

11   four times.                                               09:24:56

12       Q. Have you worked with Mayor McCarthy as            09:24:56

13   your -- as part of your role in the CPC?                  09:25:15

14       A. She may have come in before the CPC to            09:25:20

15   present, but I don't work with her.                       09:25:28

16       Q. Have you worked with Mayor McCarthy               09:25:37

17   outside of your role at CPC?                              09:25:39

18       A. I don't understand the question.                  09:25:41

19       Q. Do you work with Mayor McCarthy as part of       09:25:46

20   your role within CPC?                                     09:26:01

21       A. No.  I shouldn't say that.  Again, I said        09:26:03

22   she may have presented a project for the city to         09:26:07

23   the CPC.  Me being chairman, I would be there and        09:26:10

24   asking her questions.  But as far as working with        09:26:17

1    her, no.                                                09:26:19

2        Q. Okay.  Have you worked with City              09:26:20

3    Councillor Kathleen McMenimen within your role at     09:26:30

4    CPC?                                                   09:26:34

5        A. She -- being chairman of the long-term        09:26:35

6    debt committee, I would present in front of her.      09:26:40

7        Q. And outside of presenting to her in her       09:26:45

8    role on the long-term debt committee, do you work     09:26:50

9    with City Councillor Kathleen McMenimen?              09:26:52

10       A. No.                                            09:26:56

11       Q. Have you worked with other members of the     09:26:57

12   Waltham City Council outside of your role at CPC      09:27:08

13   and the survey and planning?                          09:27:17

14       A. Not that I can think of.                       09:27:18

15       Q. Do you consider Mayor McCarthy as a           09:27:20

16   friend?                                                09:27:26

17       A. She's an acquaintance.                         09:27:26

18       Q. Can you explain when you say                   09:27:28

19   "acquaintance," what you mean by that?                09:27:38

20       A. I know her.  I know her probably well.  I     09:27:39

21   like her sometimes and dislike her other times.      09:27:46

22       Q. What are the times that -- when you say       09:27:49

23   you like her at times, can you explain?              09:27:55

24       A. Same as any other person.  Everybody has     09:27:58

1    their ups and downs.                              09:28:03

2        Q. Can you give me an example where you      09:28:05

3    didn't like Mayor McCarthy?                       09:28:07

4        A. When she yells at me.                      09:28:09

5        Q. And can you tell me a time where you like  09:28:12

6    Mayor McCarthy?                                   09:28:17

7        A. When she doesn't yell at me.               09:28:18

8        Q. Do you remember an instance where Mayor    09:28:20

9    McCarthy has yelled at you?                       09:28:28

10       A. I can't, off the top, no.  Mayor McCarthy  09:28:30

11   is very mercurial.                                09:28:33

12       Q. Can you explain what you mean by           09:28:35

13   "mercurial"?                                      09:28:37

14       A. She's up and down.                         09:28:38

15       Q. Mr. Barrett, I want to direct your         09:28:40

16   attention on Exhibit 20.  Can you read the second 09:29:03

17   sentence in the second paragraph?                 09:29:14

18       A. "I do not know will I receive state and    09:29:16

19   municipal pensions and am vehemently opposed to   09:29:21

20   city council's receiving healthcare subsidized by 09:29:24

21   taxpayers of Waltham."                            09:29:28

22       Q. Can you go on to the second sentence?      09:29:30

23       A. "I have been involved in civic             09:29:32

24   organizations that help the boys and girls of this 09:29:34

1    city."                                                    09:29:37

2        Q. All the way to the end, please.                    09:29:40

3        A. "Organizations that help the boys and              09:29:41

4    girls of this city, organizations that lend               09:29:45

5    support to people that need help but may be too            09:29:48

6    proud to ask, and city boards that are involved in         09:29:51

7    preserving attributes that make the city great."           09:29:53

8        Q. At the time that you wrote this letter,             09:29:57

9    did you consider -- what did you consider to be            09:30:01

10   the attributes that make this city great?                  09:30:04

11       A. The board of planning and survey and the            09:30:07

12   CPC.                                                        09:30:10

13       Q. Do you still consider those attributes to           09:30:10

14   make Waltham great?                                         09:30:30

15       MR. PYLE:  Objection.                                  09:30:32

16       A. I do.                                                09:30:32

17       Q. How do these -- scratch that.  Sorry.               09:30:33

18       So you consider the board of planning and              09:30:52

19   survey and the CPC to be the great attributes of           09:30:55

20   the city?                                                  09:30:58

21       MR. PYLE:  Objection.                                  09:30:59

22       Q. You may still answer.                               09:31:01

23       A. They help make the city great.                      09:31:03

24       Q. Can you explain how?                                09:31:07

1    A. Our function is to fund for the city on          09:31:08

2  the CPC and to enact zoning and setbacks and          09:31:14

3  things like that on the board of survey and           09:31:22

4  planning.                                             09:31:25

5    Q. You mentioned earlier that you own a real        09:31:43

6  estate business.                                      09:31:48

7    A. I didn't say business.                           09:31:49

8    Q. Sorry.  Real estate?                             09:31:50

9    A. Correct.                                         09:31:51

10    Q. Well, you mentioned earlier that you owned      09:31:52

11  real estate.  Do you own them directly or through    09:31:54

12  a subsidiary?                                         09:31:57

13    A. I've sold all but one, and they were owned      09:31:58

14  in my trust.                                          09:32:04

15    Q. And the one that you still have, the real       09:32:06

16  estate that you still have, do you own it directly   09:32:08

17  or through the trust?                                09:32:10

18    A. I own it in a trust.                            09:32:12

19    Q. What kind of property is that?                  09:32:14

20    A. It's mixed property.                            09:32:19

21    Q. Can you --                                      09:32:21

22    A. It's not in Waltham.                            09:32:22

23    Q. Where is it?                                    09:32:24

24    A. It's in Marshfield.                             09:32:25

1     Q. And when you say it's a mixed one, can you          09:32:26

2   explain what you mean?                                    09:32:28

3     A. It's a business.  It's got a business in            09:32:30

4   it and an apartment.                                      09:32:34

5     Q. A business and --                                    09:32:34

6     A. -- and an apartment.                                 09:32:36

7     Q. Mr. Barrett, do you consider zoning and             09:32:37

8   setbacks make the City of Waltham great?                  09:32:58

9     A. In some cases.                                       09:33:01

10    Q. In what cases do you consider them to be            09:33:10

11  great for the city?                                       09:33:14

12    A. If there is a curb that's going to open             09:33:15

13  into an intersection and it's too close to that           09:33:19

14  intersection, it saves someone from being killed,         09:33:23

15  that makes it great.                                      09:33:26

16    Q. Any other way that you consider zoning and          09:33:29

17  setbacks to be great attributes to Waltham city?          09:33:35

18    A. It's not just -- we don't just do that.             09:33:39

19  There is development.                                      09:33:43

20        Do you want to get into the whole thing?            09:33:45

21  Because I'd have to get the zoning book out.  I'd          09:33:47

22  have to get my board survey and planning book out,         09:33:50

23  and I didn't bring it.                                     09:33:54

24        But there's several.  We set up                     09:33:54

1   developments, subdivisions, things like that.  So          09:33:56

2   those compiled in that planning board make the              09:33:59

3   city great.                                                 09:34:06

4       Q. Is there anything else besides CPC and the           09:34:07

5   survey and planning that you consider to be great          09:34:15

6   attributes of Waltham city?                                 09:34:19

7           MR. PYLE:  Objection.                              09:34:20

8       A. I don't know.                                        09:34:21

9       Q. I will now ask you a few questions about            09:34:40

10  WCAC.  When was WCAC founded?                               09:34:44

11      A. I think it was 1988, but I'm not sure.              09:34:46

12      Q. What's the mission of WCAC?                          09:34:54

13      A. It is to -- it's multi.  It's to give the          09:34:58

14  viewers of cable a chance to see local programming          09:35:05

15  and to teach local people to use the channel.              09:35:11

16      Q. When you say "to use the channel," what              09:35:17

17  channel are you referring to?                               09:35:24

18      A. The Waltham Channel.                                 09:35:25

19      Q. And what do you mean by teaching the                 09:35:26

20  people how to use The Waltham Channel?                      09:35:36

21      A. We are hoping to educate the people how to          09:35:38

22  use television equipment, how to do shows, how to          09:35:43

23  do things like that.                                        09:35:46

24      Q. And is there anything else that you                  09:35:50

1    consider to be the mission of WCAC?                      09:35:52

2        A. Well, we have a MAC channel that we               09:35:54

3    broadcast the local government on.                       09:35:59

4        Q. When did you become a board member of            09:36:02

5    WCAC?                                                     09:36:24

6        A. 2005.                                             09:36:25

7        Q. And how do WCAC board members get elected?       09:36:26

8        A. They don't get elected.  They're                 09:36:34

9    appointed.                                               09:36:37

10       Q. How are they appointed?  Who appoints the        09:36:37

11   board members?                                           09:36:40

12       A. The mayor appoints them.                          09:36:41

13       MR. PYLE:  Objection to the form.                    09:36:42

14       Go ahead.  Please just wait until the                09:36:43

15   question is done.                                        09:36:46

16       THE WITNESS:  Okay.                                  09:36:46

17       MR. PYLE:  Thanks.                                   09:36:47

18       Q. Who appoints WCAC board members?                 09:36:49

19       A. Let me say it again.  The mayor.                  09:37:01

20       Q. Is there anyone else besides the mayor who       09:37:03

21   gets involved in appointing WCAC board members?         09:37:11

22       A. Not that I know of.                               09:37:14

23       Q. Can you explain the process of how WCAC          09:37:15

24   board members get appointed and -- sorry.  Yeah.        09:37:27

1      Can you explain the process how the board          09:37:34

2   members of WCAC get appointed by the mayor?           09:37:36

3      A. I believe they send a request in to the         09:37:40

4   mayor that they would like to be on the board.        09:37:48

5      Q. And do you know if -- what the mayor            09:37:55

6   considers in appointing WCAC board members?           09:37:59

7      A. You have to ask her.                            09:38:04

8      Q. I asked you if you know.                        09:38:05

9      A. I do not.                                       09:38:06

10      Q. Where does WCAC funding come from?             09:38:07

11      A. It comes from RCN, it comes from Comcast,      09:38:17

12   and it comes from Verizon.                           09:38:23

13      Q. When you say it comes from RCN, Comcast,       09:38:24

14   and Verizon, do you mean by subscriptions to the     09:38:30

15   services?                                            09:38:36

16      A. Correct.                                       09:38:36

17      Q. Do the services like RCN, Comcast, and        09:38:37

18   Verizon pay WCAC directly?                           09:38:45

19      A. They do.                                       09:38:47

20      Q. Do the payments go to the city government     09:38:48

21   before they are given to WCAC?                       09:39:01

22      A. I don't believe so.                            09:39:03

23      Q. Does the Waltham city government grant any     09:39:04

24   money to WCAC?                                        09:39:11

| | | |
|---|---|---|
| 1 | A. They can. | 09:39:12 |
| 2 | Q. Have they done so? | 09:39:15 |
| 3 | A. They have. Let me clarify. | 09:39:16 |
| 4 | It's not grants. It's payback, is what it | 09:39:22 |
| 5 | is. It's not a grant. If The Waltham Channel | 09:39:26 |
| 6 | goes out and does work, let's say at city hall, we | 09:39:29 |
| 7 | buy the equipment. They reimburse us for it, the | 09:39:34 |
| 8 | services. | 09:39:40 |
| 9 | Q. What services besides -- | 09:39:40 |
| 10 | A. Well, setting the thing up, if we had | 09:39:42 |
| 11 | people coming in to do it. | 09:39:45 |
| 12 | Q. And you said if Waltham Channel goes out | 09:39:47 |
| 13 | and does work. What kind of work does it do? | 09:39:58 |
| 14 | A. It wouldn't -- it would be -- it would be | 09:40:03 |
| 15 | setting up audiovisual. Not televising or | 09:40:10 |
| 16 | anything else; that's different completely. This | 09:40:15 |
| 17 | would be in design and in installation and | 09:40:17 |
| 18 | purchasing equipment. | 09:40:22 |
| 19 | Q. And who owns the equipment that WCAC set | 09:40:23 |
| 20 | up for the city government? | 09:40:30 |
| 21 | A. The Waltham Channel. The Waltham Channel | 09:40:31 |
| 22 | has most of it. I'm not sure the split. The city | 09:40:39 |
| 23 | may own some of it and The Waltham Channel owns | 09:40:42 |
| 24 | some of it. I don't know exactly. | 09:40:45 |

1     Q. And when you say "The Waltham Channel owns          09:40:46

2  some of it" and maybe the city government owns            09:40:55

3  some of it, are you referring to two different            09:40:58

4  equipments?                                               09:41:00

5     A. Yes.                                                09:41:01

6     Q. And for a particular equipment, is there a          09:41:01

7  chance that the city of -- the city government --         09:41:06

8  I'll say that again.                                      09:41:12

9        For a particular government equipment, is           09:41:13

10  there a chance that both WCAC and the city               09:41:17

11  government have partial ownership?                       09:41:22

12     A. It's possible.                                     09:41:23

13     Q. And what is the source of the funds for            09:41:25

14  those grants or paybacks?                                09:41:46

15        MR. PYLE:  Objection.                              09:41:51

16     A. It would come out of a fund that the city          09:41:52

17  has received from the vendors, the three vendors,        09:42:02

18  RCN, Comcast, and Verizon.                               09:42:04

19     Q. So the three vendors, RCN, Comcast, and            09:42:09

20  Verizon, would give some of the money to the city        09:42:25

21  government and the city government would use that         09:42:28

22  money to pay WCAC.  Is that correct?                     09:42:30

23        MR. PYLE:  Objection.                              09:42:33

24        Go ahead.                                          09:42:33

1    A. Did you read the contracts?                     09:42:34

2    Q. Yes, I did.                                      09:42:38

3    A. Okay.  In there, it's stated the amount         09:42:39

4    the city gets and the amount The Waltham Channel    09:42:43

5    gets.  So the city gets a percentage, and I think   09:42:46

6    it's half a percent or a percent of that funding    09:42:54

7    from the three cable companies.  And they've got    09:42:59

8    an account for audiovisual coming from that that    09:43:04

9    we would get funding from.                          09:43:08

10   Q. Does WCAC board decide the budget for WCAC       09:43:10

11   every year?                                         09:43:19

12   A. Correct.                                         09:43:20

13   Q. What are the considerations the board            09:43:20

14   makes in deciding the budget for WCAC?              09:43:25

15   A. Expenses, salaries, and projected revenue.       09:43:28

16   Q. Is there anyone else besides WCAC who is a       09:43:37

17   part of the decision-making for WCAC's budget?      09:43:44

18   A. No.                                              09:43:47

19       MR. PYLE:  Objection.                           09:43:47

20   Q. Does the Waltham city government have any        09:43:48

21   say in deciding WCAC's budget?                      09:43:58

22   A. No.                                              09:44:00

23   Q. Does WCAC have any other funding besides         09:44:01

24   the money that it gets from the pay TV services,    09:44:18

| | | |
|---|---|---|
| 1 | RCN, Comcast, and Verizon? | 09:44:25 |
| 2 | A. We charge for -- a minimal amount for CDs, | 09:44:28 |
| 3 | and then we have sponsorship for $300 if you want | 09:44:33 |
| 4 | to be a sponsor. | 09:44:39 |
| 5 | Q. How do you become a sponsor? | 09:44:40 |
| 6 | A. You pay $300. | 09:44:44 |
| 7 | Q. Anything else? | 09:44:45 |
| 8 | A. That's it.  We put your name up on the -- | 09:44:47 |
| 9 | as a sponsor. | 09:44:52 |
| 10 | Q. Okay.  And besides what you just | 09:44:53 |
| 11 | mentioned, the amount that you get from selling | 09:44:58 |
| 12 | the CDs, is there any other source of funding for | 09:44:59 |
| 13 | WCAC? | 09:45:11 |
| 14 | MR. PYLE:  Object to the form. | 09:45:12 |
| 15 | A. Not that I know of. | 09:45:13 |
| 16 | MR. PYLE:  Could we take a little break? | 09:45:25 |
| 17 | MS. GEDLU:  Sure. | 09:45:26 |
| 18 | MR. PYLE:  Thanks. | 09:45:27 |
| 19 | THE VIDEOGRAPHER:  We are going off the | 09:45:28 |
| 20 | record.  The time on the monitor is 9:44. | 09:45:29 |
| 21 | (Recess, 9:44 a.m. to 9:50 a.m.) | 09:45:32 |
| 22 | THE VIDEOGRAPHER:  We are back on the | 09:50:26 |
| 23 | record.  The time on the monitor is 9:50. | 09:50:34 |
| 24 | BY MS. GEDLU: | 09:50:38 |

1     Q. Mr. Barrett, other than the ones you        09:50:40

2  mentioned before the break, is there any other    09:50:42

3  source of funding for WCAC?                        09:50:44

4     A. Not that I'm aware of.                       09:50:46

5     Q. Did you own any property in Waltham?         09:50:51

6     A. I did.                                       09:50:55

7     Q. When did you no longer own properties in     09:50:55

8  Waltham?                                           09:51:01

9     A. I've owned a lot of property.  I've bought   09:51:01

10 and sold.  The last piece of property I sold -- I  09:51:08

11 still live in Waltham and own that property.  The  09:51:12

12 last piece of property I sold was March of '23, I  09:51:14

13 think.  Yeah, March of '23.                        09:51:23

14    Q. Two years ago?  About two years ago?         09:51:26

15    A. A little more than two.                       09:51:28

16    Q. What's your day-to-day role as president     09:51:30

17 of WCAC?                                           09:51:36

18    A. There is no real role day to day.  I hold    09:51:37

19 meetings and oversee things.  If a problem comes   09:51:46

20 up, I get called.                                  09:51:50

21    Q. What are the kind of things that you         09:51:51

22 oversee?                                           09:51:53

23    A. The budget, for one.  If there's a -- it     09:51:53

24 doesn't come up.  If there were a personnel        09:52:02

| | | |
|---|---|---|
| 1 | problem, I would be advised.  Something like that. | 09:52:05 |
| 2 | If there was complaints to the -- about the | 09:52:10 |
| 3 | service, I would be advised. | 09:52:12 |
| 4 | Q. When you say "personal problem" -- | 09:52:13 |
| 5 | A. Personnel. | 09:52:26 |
| 6 | Q. Personnel.  Was there ever a time where | 09:52:26 |
| 7 | you were involved in personnel problems? | 09:52:29 |
| 8 | A. There may have been one probably 20 years | 09:52:31 |
| 9 | ago and I was involved in that. | 09:52:40 |
| 10 | Q. Was there any other problem where you were | 09:52:45 |
| 11 | involved, any other problem that you were | 09:52:51 |
| 12 | consulted on? | 09:52:52 |
| 13 | A. Not that I can remember. | 09:52:55 |
| 14 | Q. What types of issues does Ms. Sheehan | 09:52:56 |
| 15 | regularly consult with you? | 09:53:04 |
| 16 | A. Say that again. | 09:53:05 |
| 17 | Q. What types of issues does Ms. Sheehan | 09:53:05 |
| 18 | consult -- | 09:53:09 |
| 19 | A. Oh, Sheehan.  Okay.  I'm just trying to | 09:53:10 |
| 20 | think.  Whether vacation time should be -- things | 09:53:19 |
| 21 | like that, whether vacation time should be taken, | 09:53:31 |
| 22 | when, days off, holiday, if we should close on the | 09:53:33 |
| 23 | day after Thanksgiving, things like that. | 09:53:38 |
| 24 | Q. Any other issues that Ms. Sheehan | 09:53:40 |

1    regularly consults with you?                    09:53:50

2        A. Not that I can think of.                 09:53:52

3        Q. Do you communicate with Ms. Sheehan on a 09:53:55

4    regular basis?                                  09:54:07

5        A. Say that again, please.                  09:54:07

6        Q. Do you communicate with Ms. Sheehan on a 09:54:09

7    regular basis?                                  09:54:12

8        A. Communicate.  At least once a week.      09:54:13

9        Q. And what are the general topics that you 09:54:23

10   discuss?                                        09:54:25

11       A. How everything is going at the station,  09:54:25

12   basically.                                      09:54:29

13       Q. Does Ms. Sheehan communicate with you on 09:54:29

14   all aspects of WCAC operations?                 09:54:44

15       A. I would say no.                          09:54:46

16       Q. What are the typical issues that she would 09:54:52

17   bring to your attention?                        09:54:57

18       A. We just said, personnel problems, things 09:54:57

19   like that, a complaint.                         09:55:02

20       Q. What kind of complaint?                  09:55:05

21       A. A viewer complaint.                      09:55:09

22       Q. A viewer complaint.  Does Ms. Sheehan    09:55:11

23   consult with you regarding legal issues?        09:55:18

24       A. She does occasionally.  Yeah.  That would 09:55:20

1    be one of the things she would consult with me on.          09:55:35

2        Q. When is the last time that Ms. Sheehan              09:55:37

3    brought a legal issue to your attention?                   09:55:39

4        A. This has been ongoing.  So the last time            09:55:41

5    was the last time we talked about this.  And it            09:55:48

6    was probably before the Zoom call with Jeff.  She          09:55:51

7    brought me up to date on this situation as it goes          09:55:56

8    on.                                                        09:56:00

9        Q. Besides the legal issues that are at issue          09:56:02

10   in this lawsuit, was there ever a time that                09:56:05

11   Ms. Sheehan consulted with you regarding any legal         09:56:08

12   issues?                                                    09:56:12

13       A. There could have been.  Nothing that comes          09:56:12

14   to mind.                                                   09:56:17

15       Q. Does Ms. Sheehan specifically consult with          09:56:17

16   you on copyright issues?                                   09:56:27

17       A. No.                                                 09:56:29

18       Q. Does Ms. Sheehan consult with you                   09:56:29

19   regarding legal issues involving WCAC, such as             09:56:39

20   defamation suits?                                          09:56:47

21       A. Say that again, please.                             09:56:51

22       Q. Does Ms. Sheehan consult with you                   09:56:52

23   regarding legal issues involving WCAC, such as             09:56:54

24   potential defamation concerns?                             09:56:58

```
1      A. The last two words, please.                    09:56:59

2         MR. PYLE:  Defamation.                          09:57:02

3         THE WITNESS:  Oh, defamation.  Okay.            09:57:03

4      A. Okay.  Now put it all together.  I'm            09:57:09

5   sorry.  I didn't get it.  So would you say it,        09:57:11

6   please.                                               09:57:16

7      Q. Sure.  Does Ms. Sheehan consult with you        09:57:16

8   regarding legal issues involving WCAC, such as        09:57:19

9   potential defamation concerns?                        09:57:23

10     A. She would.                                       09:57:25

11     Q. Has she done so before?                          09:57:26

12     A. I would imagine, but I can't remember            09:57:30

13  off -- the defamation is the thing that -- I can't    09:57:35

14  remember a defamation.  But if there were a           09:57:39

15  defamation, she would have said something to me.      09:57:42

16  And I don't remember.  I'm sorry.                      09:57:45

17     Q. Does Ms. Sheehan consult with you before        09:57:47

18  setting any WCAC organizational policies?             09:57:55

19     A. She wouldn't have to.  When you're saying        09:57:58

20  "policies," in-the-studio policies, no.  So the        09:58:10

21  answer is no, she wouldn't have to.                    09:58:17

22     Q. She wouldn't have to, but has she ever           09:58:19

23  consulted with you before setting any of WCAC's       09:58:22

24  organizational policies?                              09:58:26
```

1      A. She probably has.  She's been there          09:58:27

2   17 years.  She probably has.                       09:58:29

3      Q. Do you remember?                             09:58:31

4      A. No, I don't.                                 09:58:33

5      Q. Did Ms. Sheehan consult with you about the   09:58:34

6   use by others of video recordings of government    09:58:46

7   meetings produced by WCAC?                          09:58:48

8      A. She mentioned it.                            09:58:50

9      Q. When did she mention it?                     09:58:51

10     A. You're going back.  I don't remember when.   09:58:53

11     Q. Do you remember who used those videos?       09:58:58

12     A. 781.                                         09:59:06

13     Q. Anyone else?                                 09:59:09

14     A. Not that I can think of.                     09:59:11

15     Q. Have you ever requested Ms. Sheehan to       09:59:13

16  provide regular updates to you on a particular     09:59:24

17  issue?                                             09:59:26

18     A. On a what?                                   09:59:26

19     Q. On any particular issue.                     09:59:27

20     A. No.                                          09:59:29

21     Q. Have you requested Ms. Sheehan to provide    09:59:30

22  you regular updates about the use of WCAC          09:59:36

23  government meeting recordings by Channel 781?      09:59:41

24     A. Not that I can remember.                     09:59:44

1    Q. Who has the final decision-making          09:59:45

2  authority on the matters that you and Ms. Sheehan   09:59:53

3  discuss?                                           09:59:56

4    A. It depends upon the matters discussed.       09:59:57

5    Q. What are the matters that you would have     10:00:04

6  the final decision-making authority on?            10:00:06

7    A. I wouldn't have it.  The board would.        10:00:08

8    Q. And what would be those -- what are the      10:00:12

9  matters where the board would have the final       10:00:17

10  decision?                                         10:00:19

11    A. If there were a major expense that had to   10:00:21

12  be paid, a major change, something like that.     10:00:27

13    Q. And what are the matters where Ms. Sheehan  10:00:29

14  has the final decision-making authority?          10:00:34

15    A. Things pertaining to The Waltham Channel.   10:00:36

16  Not big issues.                                   10:00:42

17    Q. What do you mean by "not big issues"?       10:00:44

18    A. Not a lot of money.  Not a problem, a       10:00:47

19  legal problem.  Not a legal problem.  I can't     10:00:55

20  think of anything else.  Personnel problem, that  10:01:06

21  would be the other thing.                         10:01:10

22    Q. Who would have the final authority, the     10:01:10

23  final decision-making authority, for legal issues? 10:01:13

24    A. The board would make that.                  10:01:16

| | | |
|---|---|---|
| 1 | Q. Who would have the final decision-making | 10:01:50 |
| 2 | authority about the use by others of video | 10:01:52 |
| 3 | recordings of government meetings produced by | 10:01:54 |
| 4 | WCAC? | 10:01:57 |
| 5 | A. That would be Maria. | 10:01:58 |
| 6 | Q. Who has the final authority over | 10:01:59 |
| 7 | copyright-related decisions? | 10:02:18 |
| 8 | A. That would be Maria. | 10:02:20 |
| 9 | Q. For the legal matters that the WCAC board | 10:02:21 |
| 10 | has the final decision-making authority, what is | 10:02:29 |
| 11 | your role as the president of the board? | 10:02:37 |
| 12 | A. To preside over the board. | 10:02:39 |
| 13 | Q. Is a decision made by a majority vote? | 10:02:43 |
| 14 | A. Correct. | 10:02:50 |
| 15 | Q. Do you as the president of the board have | 10:02:50 |
| 16 | a veto power? | 10:02:56 |
| 17 | A. You know, I don't know.  I've never vetoed | 10:02:57 |
| 18 | anything, but I don't know. | 10:03:08 |
| 19 | Q. When did you first become aware of | 10:03:09 |
| 20 | Channel 781? | 10:03:13 |
| 21 | A. I don't know. | 10:03:14 |
| 22 | Q. Was it in 2022? | 10:03:20 |
| 23 | A. Could be 2020, could be two thousand | 10:03:22 |
| 24 | whenever this suit started.  I don't know. | 10:03:29 |

| | | |
|---|---|---|
| 1 | Q. Did you know about Channel 781 before the | 10:03:31 |
| 2 | lawsuit started? | 10:03:35 |
| 3 | A. I may have.  I don't know. | 10:03:35 |
| 4 | Q. How about Waltham DATA? | 10:03:39 |
| 5 | A. I don't know anything about Waltham DATA. | 10:03:44 |
| 6 | Q. When did you first become aware of -- do | 10:03:45 |
| 7 | you know Chris Gamble? | 10:03:54 |
| 8 | A. I know who he is. | 10:03:54 |
| 9 | Q. When did you first become aware of Chris | 10:03:55 |
| 10 | Gamble? | 10:03:58 |
| 11 | A. I don't know. | 10:03:59 |
| 12 | Q. Was it in the last ten years? | 10:04:03 |
| 13 | A. Probably. | 10:04:07 |
| 14 | Q. Was it in the last two years? | 10:04:10 |
| 15 | A. No.  I've probably known of him longer | 10:04:13 |
| 16 | than that. | 10:04:18 |
| 17 | Q. So any time between ten -- between 2015 | 10:04:18 |
| 18 | and 2023? | 10:04:22 |
| 19 | A. That sounds reasonable. | 10:04:24 |
| 20 | Q. Do you know Josh Kastorf? | 10:04:26 |
| 21 | A. No. | 10:04:37 |
| 22 | Q. You don't know Josh as part of | 10:04:37 |
| 23 | Channel 781, who is one of the members of | 10:04:43 |
| 24 | Channel 781 who brought this lawsuit? | 10:04:45 |

| | | |
|---|---|---|
| 1 | A. I don't know him. | 10:04:47 |
| 2 | Q. Do you know Jamie Krikeles? | 10:04:48 |
| 3 | A. Who? | 10:04:54 |
| 4 | Q. Jamie Krikeles. | 10:04:55 |
| 5 | A. No. | 10:04:56 |
| 6 | Q. Do you know Tom Benavides? | 10:04:57 |
| 7 | A. I don't. | 10:05:00 |
| 8 | Q. Were you at any time aware of any | 10:05:01 |
| 9 | statements or comments on Channel 781 that you | 10:05:11 |
| 10 | understood to be critical of you? | 10:05:14 |
| 11 | A. I don't know. The answer is, I don't | 10:05:16 |
| 12 | know. | 10:05:25 |
| 13 | Q. I want to introduce a video that I'm -- | 10:05:25 |
| 14 | MR. STOLTZ: I'm sorry. This is not an | 10:05:51 |
| 15 | exhibit, but we would like to show you a video. | 10:05:53 |
| 16 | We can mark it as A for identification. | 10:05:56 |
| 17 | MR. PYLE: Okay. Can we go off the record | 10:06:00 |
| 18 | real quick? | 10:06:03 |
| 19 | THE VIDEOGRAPHER: Let me take us off. | 10:06:04 |
| 20 | One second. | 10:06:06 |
| 21 | We are going off the record. The time on | 10:06:07 |
| 22 | the monitor is 10:05. | 10:06:09 |
| 23 | (Recess, 10:05 a.m. to 10:06 a.m.) | 10:06:11 |
| 24 | THE VIDEOGRAPHER: We are back on the | 10:06:51 |

| | | |
|---|---|---|
| 1 | record.  The time on the monitor is 10:06. | 10:06:53 |
| 2 | MR. STOLTZ:  So this is a video publicly | 10:06:57 |
| 3 | available on YouTube, titled "Channel 781 News, | 10:06:59 |
| 4 | Week of 10/1/2022."  And this is an excerpt from | 10:07:04 |
| 5 | it, starting at 23 minutes and 40 seconds. | 10:07:09 |
| 6 | (Barrett Exhibit A was marked for | |
| 7 | identification and is attached to the transcript.) | 10:07:13 |
| 8 | (Video played) | 10:07:13 |
| 9 | ". . . with the WCAC director.  And I | 10:07:23 |
| 10 | called her out before, but this time I don't want | 10:07:26 |
| 11 | to call her out.  I want to call out her boss, | 10:07:28 |
| 12 | Justin Barrett. | 10:07:30 |
| 13 | "So Justin Barrett recently received the | 10:07:31 |
| 14 | Ritcey award from the city council for his service | 10:07:35 |
| 15 | to our community.  He's the head of the board of | 10:07:38 |
| 16 | WCAC.  I've contacted him to ask him why they | 10:07:41 |
| 17 | don't caption their content, and he hasn't | 10:07:45 |
| 18 | responded. | 10:07:46 |
| 19 | "He's also very involved in the Lions | 10:07:47 |
| 20 | Club.  And the Lions Club is the organization | 10:07:50 |
| 21 | that's held holiday light celebrations at the | 10:07:52 |
| 22 | Fernald for two years.  There were protests.  And | 10:07:56 |
| 23 | as far as I know, there was no response to the | 10:07:58 |
| 24 | protests.  Neither the mayor or the Lions Club | 10:08:00 |

1   ever put out a statement saying here is why we        10:08:03

2   think it's okay to do this at the Fernald.            10:08:05

3       "And regardless of what their reasons            10:08:08

4   were, the lack of response is concerning.  And        10:08:09

5   those are two issues that affect the disability      10:08:12

6   community that Justin Barrett has refused to          10:08:16

7   respond to.  And I would like to challenge him to    10:08:19

8   respond to them publicly.                             10:08:22

9       "The other reason this is important is          10:08:23

10  because Mr. Barrett still plays a role in the        10:08:25

11  Fernald.  We found out at this meeting, which I'll   10:08:29

12  be summarizing soon, as the head of the CPC, which   10:08:32

13  purchased the Fernald, he still plays a role in      10:08:34

14  the story of it being reused.                         10:08:38

15      "And so to have somebody who is so             10:08:40

16  conspicuously ignoring the concerns of the          10:08:43

17  disability community, I think he needs to answer     10:08:45

18  to it.  I think he needs to say something publicly  10:08:47

19  about it.                                             10:08:50

20      "And if he doesn't, I think Councillor         10:08:51

21  Harris does because she pushed through this award   10:08:54

22  for him in a not very transparent manner that        10:08:56

23  we've discussed before.  And I would like to know   10:09:00

24  if she -- if she is, in fact, planning on running   10:09:02

| | | |
|---|---|---|
| 1 | for mayor.  She seems like somebody who would be | 10:09:06 |
| 2 | interested in having the support of the" . . . | 10:09:08 |
| 3 | (End of video) | 10:09:12 |
| 4 | BY MS. GEDLU: | 10:09:18 |
| 5 | Q. Mr. Barrett, have you seen this video | 10:09:18 |
| 6 | before? | 10:09:19 |
| 7 | A. I haven't. | 10:09:20 |
| 8 | Q. Did anyone mention about this video to you | 10:09:20 |
| 9 | before? | 10:09:27 |
| 10 | A. I don't know.  I don't think so.  It could | 10:09:28 |
| 11 | have been.  I don't know. | 10:09:34 |
| 12 | MS. GEDLU:  I would also like to -- I'll | 10:10:00 |
| 13 | skip that one. | 10:10:02 |
| 14 | I would like to mark another exhibit as | 10:10:26 |
| 15 | Exhibit 21. | 10:10:28 |
| 16 | (Barrett Exhibit 21 was marked for | 10:10:29 |
| 17 | identification and is attached to the transcript.) | 10:10:56 |
| 18 | Q. Mr. Barrett, do you recognize this | 10:10:56 |
| 19 | document? | 10:10:57 |
| 20 | A. I do. | 10:10:58 |
| 21 | Q. What is it? | 10:10:58 |
| 22 | A. It's an email. | 10:11:00 |
| 23 | Q. An email from what date? | 10:11:02 |
| 24 | A. It looks like 4/6/23. | 10:11:08 |

| | | |
|---|---|---|
| 1 | Q. And is it an email from you, Justin | 10:11:13 |
| 2 | Barrett, to Maria Sheehan and Chris Wangler? | 10:11:18 |
| 3 | A. Yes, it is.  The top part is.  Yup. | 10:11:22 |
| 4 | Q. And is it a true and correct copy of the | 10:11:28 |
| 5 | email that you sent on April 6th, 2023 to Maria | 10:11:32 |
| 6 | Sheehan and Chris Wangler? | 10:11:36 |
| 7 | A. Yes. | 10:11:38 |
| 8 | Q. Mr. Barrett, I'll direct your attention to | 10:11:38 |
| 9 | the second page, marked as WCAC0000434.  In the | 10:12:48 |
| 10 | first paragraph on that page, it states, "In the | 10:13:01 |
| 11 | interest of transparency, we'll entertain requests | 10:13:04 |
| 12 | to use our content for free, that misuse is not | 10:13:06 |
| 13 | only wrong, it is illegal." | 10:13:11 |
| 14 | What did you understand "misuse" to mean | 10:13:13 |
| 15 | in this statement? | 10:13:18 |
| 16 | A. Someone using it by mistake. | 10:13:18 |
| 17 | Q. And what do you mean by "mistake"? | 10:13:20 |
| 18 | A. It was not used with malintent. | 10:13:24 |
| 19 | Q. And what would you consider to be a | 10:13:31 |
| 20 | malintent? | 10:13:33 |
| 21 | A. A malintent is done knowing they're doing | 10:13:33 |
| 22 | it, knowing it's illegal and doing it anyway, or | 10:13:41 |
| 23 | it's wrong and doing it. | 10:13:52 |
| 24 | Q. So is it fair to say that you consider | 10:13:53 |

1    "misuse" to mean illegal?                                    10:14:00

2        A. No.  It can be, but it isn't.                         10:14:02

3        Q. Because you told me that a misuse would be            10:14:12

4    a mistaken use.  When I asked you what you meant             10:14:18

5    by "mistake," you said a malintent.  When I asked            10:14:21

6    what a malintent was, you said, you know, knowing            10:14:24

7    and doing it when it's illegal.                              10:14:28

8        So you do not consider a misuse to be --                 10:14:30

9        MR. PYLE:  Objection.                                    10:14:34

10       A. Are you quoting me?                                   10:14:34

11       Q. No.  I'm trying to --                                 10:14:38

12       A. So you're not quoting me?                             10:14:39

13       Ask the question so I can understand it,                 10:14:41

14   please.  Okay?  Because I don't understand some of           10:14:44

15   these questions.  And I think I'm doing a                    10:14:46

16   disservice to both you and to me by answering when           10:14:49

17   not understanding.                                           10:14:53

18       And again, I apologize.                                  10:14:55

19       Q. Thank you for the clarification.  What                10:14:56

20   kind of uses do you consider to be wrong?                    10:15:02

21       A. Something that's used, not given credit               10:15:04

22   for.  Something that's used and used with -- taken           10:15:19

23   and used for a wrong intent.                                 10:15:24

24       Just to let you know, this is not my                     10:15:27

1   policy.  This was sent to me.  So this is not my          10:15:30

2   opinion.  Okay?                                           10:15:34

3       Q. But this statement was sent to you and you         10:15:39

4   said it was great.  Correct?                              10:15:42

5       A. As far as I was concerned, the way it was          10:15:43

6   put, it was great.                                        10:15:47

7       Q. Do you consider use of WCAC videos, video          10:15:48

8   clips, to report facts to be a misuse?                    10:16:11

9           MR. PYLE:  Objection.                             10:16:18

10      A. Do I consider the use of WCAC clips to be          10:16:25

11  a misuse?                                                 10:16:32

12      Q. Yeah.  If they were used to report facts.          10:16:34

13      A. I don't know.                                      10:16:43

14      Q. Do you consider the use of the WCAC videos         10:16:58

15  to express an opinion would be a misuse or wrong?         10:17:01

16          MR. PYLE:  Objection.                             10:17:05

17      A. Again, I guess I would have to see a               10:17:06

18  certain -- how it's used.  I don't know.                  10:17:11

19          And if I may, I'm not an expert in misuse         10:17:20

20  and copyright.  That's not my bailiwick at all.           10:17:23

21  Okay?  I have no education or knowledge of the            10:17:27

22  laws.                                                     10:17:33

23      Q. Ms. Sheehan, in her email to you on                10:17:47

24  April 6th, 2023, shown on Exhibit 21, said, "Some         10:17:50

| | | |
|---|---|---|
| 1 | have used our content to score political points | 10:17:54 |
| 2 | under the veil of anonymity." | 10:17:57 |
| 3 | It's on the first page. | 10:18:02 |
| 4 | A. Okay. | 10:18:15 |
| 5 | Q. Do you consider use of WCAC video clips to | 10:18:15 |
| 6 | score political points is a misuse or wrong? | 10:18:20 |
| 7 | MR. PYLE: Objection. | 10:18:22 |
| 8 | A. I don't know. | 10:18:22 |
| 9 | Q. Do you consider the use of WCAC government | 10:18:27 |
| 10 | meeting video clips by Channel 781 to be a misuse? | 10:18:38 |
| 11 | A. Again, I don't know. | 10:18:43 |
| 12 | Q. Do you consider use of WCAC meeting video | 10:18:45 |
| 13 | clips by Channel 781 to be a copyright | 10:19:00 |
| 14 | infringement? | 10:19:03 |
| 15 | A. I don't know. | 10:19:04 |
| 16 | Q. When did you first become aware that WCAC | 10:19:04 |
| 17 | intended to send a take-down notice to YouTube? | 10:19:30 |
| 18 | I'll restate the question. | 10:19:40 |
| 19 | When did you first become aware that WCAC | 10:19:49 |
| 20 | intended to send copyright infringement notices to | 10:19:54 |
| 21 | YouTube regarding the video clips posted by | 10:19:58 |
| 22 | members of Channel 781? | 10:20:01 |
| 23 | A. I don't know. | 10:20:02 |
| 24 | Q. Did you agree with the decision to send | 10:20:03 |

1    take-down notices to YouTube?                          10:20:18

2          MR. PYLE:  Objection.                            10:20:23

3      A. I didn't disagree, so I guess I agree.            10:20:24

4      Q. What were your reasons for agreeing to            10:20:30

5    send the take-down notices to YouTube regarding        10:20:35

6    the video clips posted by members of Channel 781?      10:20:38

7          MR. PYLE:  Objection.                            10:20:43

8          Go ahead.                                        10:20:44

9      A. As a warning to stop.  That's my                  10:20:44

10   interpretation.                                        10:20:58

11     Q. So you agreed with the decision because           10:21:03

12   it's a warning?                                        10:21:04

13     A. Yeah.                                             10:21:06

14     Q. Any other reason why you agreed with the          10:21:06

15   decision to take -- to send the take-down notices?     10:21:18

16     A. No.                                               10:21:21

17     Q. Who made the ultimate -- who ultimately           10:21:22

18   made the decision to send the take-down notices to     10:21:33

19   YouTube?                                               10:21:36

20     A. I would say Maria, with no opposition from        10:21:36

21   me.                                                    10:21:45

22     Q. Did you personally consider whether the           10:21:45

23   use of video clips by Channel 781 might qualify as     10:21:54

24   fair use, before the take-down notices were sent?      10:21:58

1    A. Again, I don't know anything about fair                    10:22:00

2  use.  That's not my bailiwick.                                  10:22:02

3    Q. Did you ask Maria Sheehan about fair use                   10:22:04

4  before you agreed to send the take-down notices?               10:22:13

5    A. I did not.                                                 10:22:16

6    Q. At any point did you believe that                          10:22:16

7  Channel 781 had the legal right to use the WCAC                 10:22:27

8  video clips that are at issue in this lawsuit?                  10:22:30

9    A. Say that again, please.                                    10:22:33

10   Q. At any point did you believe that                          10:22:35

11 Channel 781 had a legal right to use the WCAC                   10:22:38

12 video clips that are at issue in this lawsuit?                  10:22:42

13   MR. PYLE:  I'm going to object and                            10:22:44

14 instruct the client not to reveal in his answer                10:22:46

15 any communication from counsel that he may have                10:22:49

16 received at any time concerning Channel 781's                   10:22:53

17 legal rights to use content.                                    10:22:57

18   And if you can answer the question without                    10:22:59

19 revealing any communication with counsel, you're               10:23:01

20 free to do so.                                                  10:23:03

21   A. I don't remember.  I don't know and I                      10:23:04

22 don't -- I don't remember.                                      10:23:16

23   Q. You don't remember whether you had a                       10:23:23

24 belief that Channel 781 --                                      10:23:25

1     A. I don't remember whether I was asked it.          10:23:28

2     Q. Regardless of whether you were asked or           10:23:29

3  not, did you have a belief --                           10:23:37

4     MR. PYLE:  Can we set a time frame for               10:23:40

5  when this belief might have been formed?  I think       10:23:43

6  that might be helpful.  Before or after the             10:23:45

7  lawsuit, before or after the take-down notices.         10:23:47

8  Do you want to set a time frame for this?               10:23:49

9     MS. GEDLU:  Sure.                                     10:23:52

10    Q. Did you believe that Channel 781 had a            10:23:52

11 legal right to use WCAC video clips that are at         10:23:55

12 issue in this lawsuit before April 2023?               10:23:58

13    A. From what I was told, no.  They had no            10:24:07

14 right.                                                   10:24:12

15    Q. Who told you?                                      10:24:12

16    A. Maria told me.                                     10:24:13

17    Q. Before Maria told you, did you have a             10:24:17

18 personal belief?                                         10:24:23

19    A. I had no knowledge of anything to do with         10:24:24

20 this, so I wouldn't have any belief.                    10:24:31

21    MS. GEDLU:  I would like to mark this as             10:25:18

22 Exhibit 22.                                              10:25:20

23    (Barrett Exhibit 22 was marked for                   10:25:21

24 identification and is attached to the transcript.)      10:25:37

1    Q. Mr. Barrett, do you recognize this              10:25:37

2  document?                                            10:26:04

3    A. I do.                                           10:26:04

4    Q. What is it?                                     10:26:05

5    A. It's an email from Maria to Dave Gauthier.      10:26:05

6    Q. The email started from Maria Sheehan to         10:26:26

7  David on July 17th, 2023.  Is that correct?          10:26:39

8    A. Correct.                                        10:26:43

9    Q. And on that same date, you also sent an         10:26:43

10  email to Maria Sheehan in response to this          10:26:51

11  conversation in the email thread.  Correct?         10:26:54

12    A. I guess I did.                                  10:26:56

13    Q. And do you consider this Exhibit 22 to be       10:27:12

14  a true and correct copy of the email exchange        10:27:17

15  between you and Ms. Sheehan?                         10:27:20

16    A. I don't remember writing that email, but        10:27:23

17  it's got my email on it, so yeah.                    10:27:46

18    Q. Can you please read your email that starts      10:27:49

19  with "Maria."                                        10:28:07

20    A. "Maria, if you want to call Attorney            10:28:09

21  Parker and see what he says, good.  I would not      10:28:11

22  commit to anything until we get some kind of         10:28:14

23  estimate of the cost.  I did notice on 718's video   10:28:17

24  the MAC channel logo was shown.  That may be         10:28:22

1    enough to get them off the hook."                10:28:26

2        Q. What did you mean when you told          10:28:28

3    Ms. Sheehan that "I did notice on the 781 video  10:28:30

4    the MAC channel logo was shown.  That may be     10:28:33

5    enough to get them off the hook"?                10:28:36

6        A. It was pertaining to copyright.  And I    10:28:37

7    thought maybe that would be -- showing a MAC     10:28:43

8    channel, that would be reason that it shouldn't  10:28:47

9    be -- it wouldn't go any further.                10:28:51

10       Q. What do you mean by "it wouldn't go any   10:28:53

11   further"?                                        10:28:57

12       A. That that was the excuse they would give. 10:28:57

13   That may not help us, our cause.                 10:29:04

14       Q. And what do you mean by "help our cause"? 10:29:13

15       A. Well, again, I was concerned about the MAC 10:29:16

16   channel logo not being shown.  It was shown.     10:29:19

17        Again, I had no idea on copyright and fair  10:29:23

18   use.  So I thought that may be enough -- that    10:29:27

19   would not help our cause in this situation because 10:29:32

20   they did show the MAC channel.                   10:29:39

21       Q. Again, help me understand.  What do you   10:29:41

22   mean by "help our cause"?                        10:29:46

23       A. Well, again, I don't know copyright and I 10:29:48

24   don't know fair trade.  They had said that -- what 10:29:53

1   I was told was they were using it -- and again,          10:30:00

2   they're going back two to three years.  I can't          10:30:10

3   remember exactly.                                        10:30:13

4        But I did not think they were using -- I            10:30:14

5   thought the issue was going to be the MAC channel        10:30:17

6   trade logo, and it wasn't.  That's what it comes         10:30:22

7   down to.                                                 10:30:24

8        Q. And when you were referring to -- when you       10:30:24

9   were saying "our cause," were you referring to           10:30:44

10  WCAC's cause?                                            10:30:47

11       MR. PYLE:  Cause.                                   10:30:49

12       THE WITNESS:  Oh, cause.                            10:30:50

13       A. Yes.                                             10:30:51

14       Q. And what is WCAC's cause?                        10:30:52

15       A. We felt that they were using the materials       10:30:55

16  without permission and against our policy.               10:31:01

17       Q. Who was using?                                   10:31:04

18       A. 781.                                             10:31:08

19       Q. But my question is, what do you consider         10:31:09

20  to be WCAC's cause?                                      10:31:14

21       MR. PYLE:  Asked and answered.                      10:31:16

22       Go ahead.                                           10:31:18

23       A. I just said it.  They were using material        10:31:18

24  without our permission.                                  10:31:25

1      Q. Channel 781 was using WCAC videos without        10:31:28

2   WCAC's permission?                                     10:31:35

3      A. Correct.                                         10:31:36

4      Q. And you consider that to be WCAC's cause?        10:31:37

5         MR. PYLE:  Objection.                            10:31:42

6      A. Yeah.  Yes.                                      10:31:42

7      Q. In Ms. Sheehan's email to David, on the          10:31:45

8   third line she said, "We have a group of people in     10:32:38

9   Waltham who have started their own program and are     10:32:41

10  using all of our footage."                             10:32:44

11        I will restate the question.  It's               10:32:49

12  actually line 5 where she said, "They are using        10:33:03

13  this footage to promote political candidates in        10:33:06

14  the city."  Do you see that?                           10:33:12

15     A. Line 5?  Oh, "They're using the footage."        10:33:13

16  Okay.  I do see it.                                    10:33:30

17     Q. What did you understand Ms. Sheehan to           10:33:32

18  mean when she said "they are using this footage to     10:33:34

19  promote political candidates in the city"?             10:33:37

20     A. I don't know.  I didn't read that part of        10:33:39

21  it.                                                    10:33:42

22     Q. You didn't read that part of it when you         10:33:43

23  responded to Maria?                                    10:33:47

24     A. No.  The part I responded to, "Maria, I          10:33:48

| | | |
|---|---|---|
| 1 | talked to the Mass. access governance committee, | 10:33:54 |
| 2 | and I'm comfortable with the passing on a | 10:33:57 |
| 3 | recommendation to an attorney out of Newton." | 10:34:00 |
| 4 | That's what I was responding to. Hence | 10:34:04 |
| 5 | the I didn't want to commit to any money until we | 10:34:25 |
| 6 | got -- talked to a lawyer. | 10:34:31 |
| 7 | Q. Reading Ms. Sheehan's email right now, | 10:34:32 |
| 8 | what do you understand Ms. Sheehan meant when she | 10:34:46 |
| 9 | said "they are using this footage to promote | 10:34:49 |
| 10 | political candidates in the city"? | 10:34:51 |
| 11 | MR. PYLE: Objection. | 10:34:53 |
| 12 | A. I'm not a mind reader. I don't know. | 10:34:53 |
| 13 | Q. I didn't ask you what Ms. Sheehan meant. | 10:34:56 |
| 14 | A. Yes, you did. | 10:34:59 |
| 15 | Q. I asked what you understand what | 10:34:59 |
| 16 | Ms. Sheehan meant. | 10:35:02 |
| 17 | A. I didn't understand. | 10:35:03 |
| 18 | Q. So sitting down here reading that email, | 10:35:04 |
| 19 | you do not understand what it means? | 10:35:19 |
| 20 | A. No. | 10:35:21 |
| 21 | Q. What is it that you do not understand? | 10:35:22 |
| 22 | A. I don't understand the political | 10:35:39 |
| 23 | candidates. I have no idea what she's talking | 10:35:51 |
| 24 | about. | 10:35:54 |

| | | |
|---|---|---|
| 1 | Q. Do you know if Ms. Sheehan contacted | 10:36:10 |
| 2 | Attorney Parker? | 10:36:13 |
| 3 | A. I think, but I'm not sure.  I can't | 10:36:13 |
| 4 | remember. | 10:36:19 |
| 5 | Q. Do you know if anyone at WCAC besides | 10:36:19 |
| 6 | Maria Sheehan contacted Attorney Parker? | 10:36:27 |
| 7 | A. I don't know. | 10:36:30 |
| 8 | Q. Do you know if anyone from the board of | 10:36:30 |
| 9 | directors on WCAC contacted Attorney Parker? | 10:36:37 |
| 10 | A. I don't know. | 10:36:40 |
| 11 | MS. GEDLU:  We would like to take a break. | 10:38:00 |
| 12 | MR. PYLE:  Okay.  Sure. | 10:38:02 |
| 13 | THE VIDEOGRAPHER:  We are going off the | 10:38:03 |
| 14 | record.  The time on the monitor is 10:37. | 10:38:05 |
| 15 | (Recess, 10:37 a.m. to 10:42 a.m.) | 10:38:10 |
| 16 | THE VIDEOGRAPHER:  We are back on the | 10:43:19 |
| 17 | record.  The time on the monitor is 10:42. | 10:43:25 |
| 18 | MS. GEDLU:  I would like to mark our next | 10:43:31 |
| 19 | exhibit, Exhibit 23. | 10:43:32 |
| 20 | (Barrett Exhibit 23 was marked for | 10:43:34 |
| 21 | identification and is attached to the transcript.) | 10:43:52 |
| 22 | BY MS. GEDLU: | 10:43:52 |
| 23 | Q. Do you recognize this document, | 10:44:19 |
| 24 | Mr. Barrett? | 10:44:20 |

1    A. Not really.  I see what it is.  I know I    10:44:21

2    probably -- it was sent to me, so probably.    10:44:28

3    Q. It was sent to you on November 15th, 2023.    10:44:32

4    Correct?    10:44:36

5    A. Yup.    10:44:36

6    Q. And it was sent from Maria Sheehan.    10:44:40

7    Correct?    10:44:42

8    A. Correct.    10:44:42

9    Q. And do you consider this Exhibit 23 a true    10:44:43

10   and correct copy of the email that Maria Sheehan    10:44:53

11   forwarded to you?    10:44:56

12   A. I do.    10:44:58

13   Q. Do you remember what you did when    10:44:59

14   Ms. Sheehan forwarded this email to you?    10:45:07

15   A. I would think not a thing, but I don't    10:45:09

16   remember.    10:45:14

17   Q. And do you know if Ms. Sheehan has taken    10:45:14

18   any action after receiving this email?    10:45:21

19       MR. PYLE:  Objection.    10:45:23

20   A. I don't remember.    10:45:23

21   Q. Do you know anyone at WCAC who has taken    10:45:37

22   any action on behalf of WCAC after receiving this    10:45:41

23   email from YouTube dated November 9, 2023?    10:45:44

24       MR. PYLE:  Objection.    10:45:49

1      A. Not that I know of.                          10:45:49

2      Q. Do you know who sent the email to Maria      10:45:51

3   using the MAC-TV WCAC email address which is       10:46:01

4   walthammactv@wcac.org?                             10:46:09

5      MR. PYLE:  Objection.                           10:46:12

6      A. I don't.                                     10:46:12

7      MS. GEDLU:  I would like to mark our next       10:46:48

8   exhibit as Exhibit 24.                             10:46:56

9      (Barrett Exhibit 24 was marked for              10:46:57

10  identification and is attached to the transcript.) 10:47:39

11     Q. Do you recognize this document,              10:47:39

12  Mr. Barrett?                                       10:47:40

13     A. I do.                                        10:47:41

14     Q. What is it?                                  10:47:41

15     A. It's an email from Maria to me about the     10:47:43

16  copyright violation notice and responding to       10:47:50

17  demands by Mitchell Stoltz.                        10:47:57

18     THE WITNESS:  Sorry.                            10:48:05

19     MR. STOLTZ:  That's all right.                  10:48:06

20     Q. It was dated November 15, 2023.  Is that     10:48:07

21  correct?                                           10:48:10

22     A. Correct.                                     10:48:10

23     Q. And is this Exhibit 24 a true and correct    10:48:10

24  copy of the email that Maria sent to you?          10:48:17

1    A. It is.                                      10:48:24

2    Q. As you can see, Maria is forwarding an      10:48:24

3    email that she received from MAC-TV WCAC email, 10:48:33

4    which is walthammactv@wcac.org.                 10:48:40

5        Do you know who sent it using this email    10:49:00

6    address?                                        10:49:03

7    A. No.                                          10:49:03

8    Q. Do you know if there was a written           10:49:04

9    response for this counternotice?                10:49:15

10   A. Do I know if --                              10:49:16

11   Q. If there was a response sent to YouTube.     10:49:19

12   A. I don't.                                     10:49:22

13   MS. GEDLU:  I would like to mark our next       10:49:44

14   exhibit as Exhibit 25.                          10:49:46

15       (Barrett Exhibit 25 was marked for          10:49:47

16   identification and is attached to the transcript.) 10:50:55

17   A. Yup.                                          10:50:55

18   Q. Mr. Barrett, do you recognize this           10:50:55

19   document?                                        10:50:59

20   A. I guess.  Yes.                                10:51:00

21   Q. What is it?                                   10:51:01

22   A. Good question.  It's an email from me to      10:51:02

23   Maria about Phantom Gourmet, the board, and I    10:51:10

24   guess the -- the start of it was, "The problem   10:51:38

1    with YouTube.  They agreed with us that's a          10:51:41

2    copyright infringement, no one from Brandeis          10:51:43

3    reached out to me for comment.  Just noise.          10:51:47

4    Thanks for sending this.  Maria."          10:51:50

5        Q. Do you know why Ms. Sheehan sent this          10:51:55

6    email to you?          10:51:58

7        A. Well, I guess she was looking for what we          10:51:58

8    were going to have for the board meeting and to          10:52:13

9    find out how the Phantom Gourmet was going.  I          10:52:19

10   think we went with the meatball sandwiches.          10:52:46

11       MR. PYLE:  Good choice.          10:52:50

12       (Interruption)          10:53:02

13       MR. STOLTZ:  My apologies.          10:53:04

14       Q. Mr. Barrett, I would like to draw your          10:53:08

15   attention to the email that you sent on          10:53:11

16   September 23, 2023, at 2:00 p.m.          10:53:15

17       A. 2:00 p.m.          10:53:19

18       Q. It's on that first page.          10:53:21

19       A. Thank you.          10:53:23

20       Q. Can you read that starting with "Maria."          10:53:30

21       A. "Maria, I agree with you 100 percent.          10:53:39

22   Just wanted you to know out there.  I am not the          10:53:42

23   least concerned.  Also I want to let you know the          10:53:49

24   board, no big deal."          10:53:57

| | | |
|---|---|---|
| 1 | That was Maria.  No.  Okay. | 10:54:00 |
| 2 | "I am not the least bit concerned.  Also I | 10:54:04 |
| 3 | want to let the board know.  No big deal." | 10:54:06 |
| 4 | Q. When you said, "I am not the least bit | 10:54:37 |
| 5 | concerned," what were you referring to? | 10:54:40 |
| 6 | A. There was a problem.  There should be -- | 10:54:42 |
| 7 | their problem was with YouTube.  They agreed with | 10:54:52 |
| 8 | us for the copyright.  That's what I -- no big | 10:54:55 |
| 9 | deal, that's what I'm referring to. | 10:54:59 |
| 10 | Q. Mr. Barrett, I would like to draw your | 10:55:01 |
| 11 | attention to the last page in this document, which | 10:55:40 |
| 12 | is WCAC0000007.  It shows that there was an email | 10:55:42 |
| 13 | that was forwarded to you on September 23rd, 2023, | 10:56:08 |
| 14 | at 9:28 a.m. from someone, Kathy MC.  Do you see | 10:56:11 |
| 15 | that? | 10:56:18 |
| 16 | A. I do. | 10:56:18 |
| 17 | Q. Who is Kathy MC? | 10:56:19 |
| 18 | A. That, I don't know. | 10:56:21 |
| 19 | MR. PYLE:  Objection -- oh, sorry. | 10:56:24 |
| 20 | Objection withdrawn. | 10:56:26 |
| 21 | A. Without the name, I don't know. | 10:56:28 |
| 22 | Q. This is an email that you received, but | 10:56:30 |
| 23 | you don't know who sent it to you? | 10:56:38 |
| 24 | A. Correct. | 10:56:39 |

| | | |
|---|---|---|
| 1 | Q. Could it be Kathleen McMenimen? | 10:56:39 |
| 2 | A. Kathy McMenimen?  It could be. | 10:56:51 |
| 3 | Q. The City Councillor Kathleen McMenimen? | 10:56:52 |
| 4 | A. It could be. | 10:56:58 |
| 5 | Q. But you're not sure? | 10:56:58 |
| 6 | A. No, I'm not sure. | 10:57:00 |
| 7 | Q. In your understanding, why did | 10:57:02 |
| 8 | Ms. McMenimen send you a link to this article by | 10:57:10 |
| 9 | Brandeis Justice? | 10:57:15 |
| 10 | MR. PYLE:  Objection. | 10:57:16 |
| 11 | A. I'd have to see it.  I don't know. | 10:57:17 |
| 12 | Q. It's right here in the document. | 10:57:20 |
| 13 | MR. PYLE:  Objection. | 10:57:23 |
| 14 | Q. Can you see it? | 10:57:24 |
| 15 | A. I see the link.  Yeah.  I don't know what | 10:57:25 |
| 16 | the article is, so I don't know. | 10:57:28 |
| 17 | Q. I would like to draw your attention back | 10:57:29 |
| 18 | to the first page, WCAC0000005, where you said, | 10:58:06 |
| 19 | "Maria, I agree with you 100 percent." | 10:58:16 |
| 20 | A. Uh-hmm. | 10:58:20 |
| 21 | Q. What were you agreeing with? | 10:58:20 |
| 22 | A. I think you already asked that question. | 10:58:22 |
| 23 | I think I already answered it. | 10:58:24 |
| 24 | Q. What I asked you was about the part where | 10:58:25 |

1    you said "I'm not the least bit concerned."          10:58:52

2         But now I'm asking about the part where          10:58:54

3    you say you agree with Maria 100 percent.          10:58:57

4         A. I'm responding to her email.  So shall I          10:59:04

5    read the email?          10:59:09

6         Q. You don't need to read the email.  But I          10:59:10

7    am asking you which part of her email you're          10:59:13

8    agreeing with.          10:59:15

9         A. I'm agreeing with the whole thing.          10:59:16

10        Q. You agreed that the problem should be with          10:59:29

11   YouTube?          10:59:32

12        A. Yup.  Also agreed no one from Brandeis          10:59:33

13   reached out to her for comment.          10:59:42

14        Q. And also the "just noise" part?          10:59:43

15        A. Yes.          10:59:49

16        Q. What did you consider to be just noise?          10:59:49

17        A. Whatever was disputed before or whatever          11:00:02

18   they were talking about.  I can't tell you because          11:00:11

19   I don't know right now.          11:00:13

20        Q. When you said "what was disputed          11:00:14

21   before" --          11:00:31

22        A. Whatever this email is pertaining to.  I          11:00:31

23   don't know what -- not having any background, I          11:00:35

24   can't tell you what was just noise.  I agree with          11:00:38

1    the whole email.                                    11:00:44

2        Q. What was your basis for agreeing that it    11:00:44

3    was a copyright infringement?                       11:01:00

4        MR. PYLE:  Objection.                           11:01:04

5        A. On what I understood from Maria what        11:01:05

6    copyright was.  Again, copyrights and fair use, I   11:01:12

7    have no clue.                                        11:01:16

8        MS. GEDLU:  I would like to mark the next      11:01:50

9    exhibit as Exhibit 26.                              11:01:52

10       (Barrett Exhibit 26 was marked for             11:01:54

11   identification and is attached to the transcript.)  11:03:15

12       A. Okay.                                         11:03:15

13       Q. Mr. Barrett, do you recognize this          11:03:15

14   document?                                            11:03:17

15       A. I don't, but yeah, it looks like it came    11:03:17

16   to me -- from me.                                    11:03:24

17       Q. What is it that you do not recognize?       11:03:27

18       A. I don't recognize -- I don't remember.      11:03:29

19   Recognize that it's a document.  Recognize whether  11:03:37

20   I sent it, if I did, I don't remember it.           11:03:41

21       Q. Even after looking at the email, you do     11:03:47

22   not remember whether you sent this email or not?    11:03:49

23       A. Correct.                                      11:03:50

24       Q. As shown on Exhibit 26, it is an email      11:03:51

1    that you sent on January 31st, 2024 to Kathy MC.                11:04:03

2    Is that correct?                                                11:04:09

3        A. Correct.  And that would have been Kathy                 11:04:09

4    McMenimen, which you were looking for back there.               11:04:17

5        Q. You are referring to the previous exhibit?               11:04:19

6        A. Whatever.  Yes.                                          11:04:22

7        Q. And is this Exhibit 26 a true and correct                11:04:23

8    copy of the email that you sent to Ms. McMenimen?               11:04:31

9           MR. PYLE:  Objection.                                    11:04:36

10          Go ahead.                                                11:04:36

11       A. And again, I don't remember it, but it's                 11:04:37

12   certainly got my email address on it.                           11:04:42

13       Q. Mr. Barrett, do you remember -- I'll                     11:04:44

14   restate the question.                                           11:04:54

15          Have you provided any of your emails to                  11:04:55

16   counsel in regards to the lawsuit?                              11:05:02

17       A. Yeah.                                                    11:05:05

18       Q. Do you believe this is one of the                       11:05:07

19   documents that --                                               11:05:09

20       A. I would say it probably is.  Not probably.               11:05:11

21   It is.  But I get a lot of emails and I don't pay               11:05:15

22   attention to a lot.  It's in and out.  It                       11:05:19

23   definitely came from me, so . . .                               11:05:23

24       Q. Mr. Barrett, can you read the whole -- the               11:05:26

1    email that starts with "Kathy."                          11:05:38

2       A. "Kathy, thanks.  I somehow am on his email         11:05:41

3    list.  Maria also forwarded to me.  I told her to        11:05:44

4    tell Chris Wangler he is doing a great job and not       11:05:47

5    to be intimidated by the article."                       11:05:50

6       Her response was "Excellent.  They are                11:05:53

7    ignoring it completely.  I hope other people             11:05:55

8    realize these people are not our sheeple and have        11:05:57

9    little idea how dangerous they are."                     11:06:01

10      Q. What did you mean when you said her                11:06:06

11   response was excellent?                                  11:06:08

12      A. I think I meant Maria's response.  What            11:06:09

13   it's to, I don't remember the context where this         11:06:24

14   came from.  I don't -- what I'm responding to is         11:06:29

15   some kind of article that I don't remember,              11:06:34

16   so . . .                                                 11:06:44

17      Q. Do you remember what you were referring to         11:06:44

18   when you were saying "they are ignoring it               11:07:05

19   completely"?                                             11:07:09

20      A. I would be guessing, but I would think it          11:07:11

21   would be Chris and Maria.  And what they're              11:07:15

22   ignoring, I don't know.  Some kind of article that       11:07:19

23   was written against either The Waltham Channel --        11:07:22

24   and again, I'm --                                        11:07:28

| | | |
|---|---|---|
| 1 | MR. PYLE:  You don't need to guess. | 11:07:30 |
| 2 | I just want to put on the record that | 11:07:42 |
| 3 | whatever is on Exhibit 26, starting in the middle | 11:07:45 |
| 4 | of the first page and going down all through the | 11:07:47 |
| 5 | second page, is illegible, so it's unclear from | 11:07:51 |
| 6 | this exhibit what the context of this exchange is | 11:07:54 |
| 7 | even about.  I think it has to do with the fact | 11:07:59 |
| 8 | that it's a black background communication, but | 11:08:02 |
| 9 | there's very few words shown here on this | 11:08:05 |
| 10 | document. | 11:08:07 |
| 11 | Q. We'll come back to this exhibit.  We'll | 11:08:18 |
| 12 | print the section that is blacked out and we'll | 11:08:21 |
| 13 | come back to it. | 11:08:23 |
| 14 | MR. STOLTZ:  We'll come back to | 11:09:26 |
| 15 | Exhibit 26. | 11:09:28 |
| 16 | MS. GEDLU:  I would like to mark the next | 11:09:33 |
| 17 | exhibit as Exhibit 27. | 11:09:35 |
| 18 | (Barrett Exhibit 27 was marked for | 11:09:36 |
| 19 | identification and is attached to the transcript.) | 11:10:30 |
| 20 | Q. Mr. Barrett, do you recognize this | 11:10:30 |
| 21 | document? | 11:10:32 |
| 22 | A. I do. | 11:10:32 |
| 23 | Q. What is it? | 11:10:32 |
| 24 | A. It's an email from January 14th of this | 11:10:34 |

| | |
|---|---|
| 1 | year. | 11:10:44 |
| 2 | Q. And it's an email that you sent to -- | 11:10:47 |
| 3 | A. Kathy McMenimen. | 11:10:50 |
| 4 | Q. And this Exhibit 27 is a true and correct | 11:10:52 |
| 5 | copy of the email that you sent? | 11:10:58 |
| 6 | A. Yup.  Yes. | 11:10:59 |
| 7 | Q. And your email is in response to an email | 11:11:00 |
| 8 | that you received from Ms. McMenimen, forwarding | 11:11:18 |
| 9 | you a January 14, 2025 newsletter that was sent | 11:11:24 |
| 10 | out by Jonathan Paz.  Is that correct? | 11:11:30 |
| 11 | A. Say that again, please. | 11:11:34 |
| 12 | Q. Is your email in response to an email that | 11:11:37 |
| 13 | you received from Ms. McMenimen, forwarding you a | 11:11:42 |
| 14 | January 14, 2025 newsletter that was sent out by | 11:11:47 |
| 15 | Jonathan Paz? | 11:11:50 |
| 16 | A. I guess.  I don't know for sure. | 11:11:52 |
| 17 | Q. Can you see in the middle of the page | 11:11:58 |
| 18 | where it says "Forwarded message"? | 11:12:07 |
| 19 | A. The middle of the exhibit? | 11:12:11 |
| 20 | Q. Yes. | 11:12:17 |
| 21 | A. Yup. | 11:12:19 |
| 22 | Q. And it says "Forwarded message"? | 11:12:21 |
| 23 | A. Correct. | 11:12:24 |
| 24 | Q. It is from Jonathan Paz? | 11:12:25 |

| | | |
|---|---|---|
| 1 | A. Correct. | 11:12:28 |
| 2 | Q. And it was sent on January 14th, 2025? | 11:12:28 |
| 3 | A. Correct. | 11:12:30 |
| 4 | Q. And right above that, Ms. McMenimen | 11:12:32 |
| 5 | forwarded that email to you on Tuesday, | 11:12:40 |
| 6 | January 14th, 2025, at 10:44 a.m.  Is that | 11:12:42 |
| 7 | correct? | 11:12:45 |
| 8 | A. Correct. | 11:12:45 |
| 9 | Q. Why did Ms. McMenimen share with you what | 11:12:47 |
| 10 | Jonathan Paz has written in 2025? | 11:12:59 |
| 11 | MR. PYLE:  Objection. | 11:13:02 |
| 12 | A. You'd have to ask her. | 11:13:03 |
| 13 | Q. Why do you think she sent it?  Do you have | 11:13:05 |
| 14 | any idea why she would send it to you? | 11:13:15 |
| 15 | A. Probably wanted me to see it. | 11:13:18 |
| 16 | Q. Why would she want you to see it? | 11:13:20 |
| 17 | A. I don't know. | 11:13:25 |
| 18 | Q. Let me direct your attention to the very | 11:13:31 |
| 19 | top where it starts with "Kathy."  The email that | 11:13:40 |
| 20 | you sent to her.  Can you read it? | 11:13:44 |
| 21 | A. "Kathy, thanks very much.  We was not the | 11:13:46 |
| 22 | least bit surprised.  Pat sent this out.  Was | 11:13:51 |
| 23 | surprised it didn't come sooner.  The progressives | 11:13:54 |
| 24 | are trying to set precedent with this nationally. | 11:13:57 |

| | |
|---|---|
| 1 | They have got EFI media law firm from | 11:14:00 |
| 2 | San Francisco suing us.  Our insurance company is | 11:14:04 |
| 3 | basically calling the shots after we pay the | 11:14:09 |
| 4 | $10,000 deductible.  They are demanding attorney's | 11:14:12 |
| 5 | fees and over $100,000.  Good luck.  Good you have | 11:14:15 |
| 6 | a happy and healthy 2025." | 11:14:23 |
| 7 |     Q. Before I ask you a question about this | 11:14:25 |
| 8 | one, who is Jonathan Paz? | 11:14:28 |
| 9 |     A. He was a city councillor in Waltham. | 11:14:31 |
| 10 |     Q. What were you referring to when you said | 11:14:33 |
| 11 | you were not the least bit surprised Paz sent this | 11:15:02 |
| 12 | out? | 11:15:05 |
| 13 |     A. Because I wasn't. | 11:15:09 |
| 14 |     Q. I am asking which part were you referring | 11:15:12 |
| 15 | from the newsletter when you said -- | 11:15:15 |
| 16 |     A. Concerning 781. | 11:15:17 |
| 17 |     Q. Why weren't you surprised? | 11:15:19 |
| 18 |     A. Because I wasn't. | 11:15:23 |
| 19 |     Q. You were not surprised about Paz sending | 11:15:34 |
| 20 | this newsletter about Channel 781? | 11:15:37 |
| 21 |     A. I was not surprised that Paz sent the | 11:15:39 |
| 22 | newsletter out about 781. | 11:15:42 |
| 23 |     Q. Why were you not surprised? | 11:15:43 |
| 24 |     A. Because 781 and he are very friendly. | 11:15:45 |

1       Q. What makes you say that they are friendly?        11:15:58

2       A. Acquaintances.  I don't know.                     11:16:00

3       Q. How do you know that they are                     11:16:32

4    acquaintances?                                          11:16:33

5       A. I really don't.  I don't -- I've seen them        11:16:35

6    together at, actually, city council meetings.  I        11:16:38

7    don't know that for sure.                               11:16:43

8       Q. Do you see them at city council meetings           11:16:49

9    sitting together?  Is that correct?                     11:16:52

10      A. No.  Jonathan was a councilman, so they           11:16:55

11   wouldn't sit together.                                  11:17:00

12      Q. So what do you mean by you have seen them          11:17:01

13   together?                                               11:17:04

14      A. Outside the hall.                                 11:17:04

15      Q. Did you see them outside of the hall               11:17:08

16   talking to each other?                                  11:17:11

17      A. Correct.                                          11:17:12

18      Q. Did you see them outside of the hall               11:17:13

19   talking to each other more than once?                   11:17:18

20      A. I can't remember.                                 11:17:20

21      Q. But you at least saw them talking together         11:17:20

22   once?                                                   11:17:25

23      A. Yes.                                              11:17:25

24      Q. Who are you referring to when you said the        11:17:26

| | |
|---|---|
| 1 | progressives? | 11:17:40 |
| 2 | A. It's a group.  Jonathan Paz is in that | 11:17:41 |
| 3 | group and Chris Gamble and one of the 781 people I | 11:17:46 |
| 4 | know. | 11:17:51 |
| 5 | Q. Who is one of the -- | 11:17:51 |
| 6 | A. I don't know.  I don't know whether | 11:17:53 |
| 7 | it's -- there's a Tom and a Josh. | 11:17:54 |
| 8 | Q. And is this group -- I'll restate the | 11:17:56 |
| 9 | question. | 11:18:07 |
| 10 | Is there anyone else in this progressive | 11:18:08 |
| 11 | group other than the ones you mentioned? | 11:18:11 |
| 12 | A. I'm sure there are several, but I don't | 11:18:13 |
| 13 | know the names, offhand. | 11:18:15 |
| 14 | Q. And is this group an established group? | 11:18:17 |
| 15 | MR. PYLE:  Objection. | 11:18:25 |
| 16 | A. What do you mean "established"? | 11:18:26 |
| 17 | Q. Scratch that.  I'll restate my question. | 11:18:28 |
| 18 | What makes you believe that this group had | 11:18:34 |
| 19 | formed a progressive group?  Have you ever heard | 11:19:03 |
| 20 | them call themselves progressive? | 11:19:05 |
| 21 | MR. PYLE:  Objection. | 11:19:08 |
| 22 | A. I have not. | 11:19:09 |
| 23 | Q. Why did you refer to them as a progressive | 11:19:09 |
| 24 | group, then? | 11:19:16 |

1        MR. PYLE:  Objection.                    11:19:17

2     A. That's a good question.  You know, I don't    11:19:17

3  know.                                          11:19:53

4     Q. Do you believe Jonathan Paz is part of the    11:19:53

5  Channel 781 group?                             11:19:55

6     A. I don't know.                            11:19:57

7     Q. You don't know whether Jonathan Paz is    11:19:57

8  part of the Channel 781 group, but do you believe    11:20:12

9  he is?                                         11:20:15

10       MR. PYLE:  Objection.                    11:20:15

11    A. I don't know.                            11:20:16

12    Q. Who did you believe had got EFI -- in your    11:20:17

13 email, you said "EFI."  I believe you meant EFF.    11:20:32

14 Is that correct?                               11:20:36

15    A. I don't know.  Is that --                11:20:36

16       MR. PYLE:  Objection.                    11:20:38

17    A. -- correct?  If that's who -- yeah, it    11:20:39

18 would be EFF, then.                            11:20:42

19    Q. You are referring to the --              11:20:43

20    A. Who we're being sued by.                 11:20:46

21    Q. And you said you believed it had got EFF    11:20:47

22 media law firm from SF suing us.  Who did you    11:20:57

23 believe had got EFF media law firm to sue you?    11:21:01

24    A. Ask the question again, please.          11:21:04

1    Q. Sure.  Who did you believe had got EFF          11:21:08

2  media law firm from SF suing us, in your response?    11:21:14

3    A. I would think 781.                              11:21:21

4    Q. Did you think that Jonathan Paz was part        11:21:22

5  of 781 when you wrote this email?                     11:21:29

6    A. I don't know.                                   11:21:31

7    MS. GEDLU:  I would like to mark our next          11:22:27

8  exhibit as Exhibit 28.                                11:22:28

9    (Barrett Exhibit 28 was marked for                 11:22:29

10  identification and is attached to the transcript.)   11:23:12

11    A. Okay.                                           11:23:12

12    Q. Mr. Barrett, do you recognize this             11:23:13

13  document?                                            11:23:15

14    A. I do.                                           11:23:15

15    Q. What is it?                                     11:23:15

16    A. It's an email from me to Maria.  "Good to      11:23:16

17  know they will discuss and am sure will come back    11:23:22

18  with a recommendation."                              11:23:24

19    Q. Is it an email that you sent to Maria          11:23:26

20  Sheehan on Monday, July 17th, 2023?                  11:23:28

21    A. It is.                                          11:23:31

22    Q. And is this Exhibit 28 a true and correct      11:23:32

23  copy of that email you sent?                         11:23:37

24    A. It appears to be.                              11:23:39

1    Q. Who is David Gauthier?  I'm not sure how          11:23:47

2    the pronunciation is, but the person who sent the    11:23:54

3    email to Maria on July 17th, 2023 at 10:13 a.m.      11:23:56

4    A. I would think he is from a Mass. access.          11:24:01

5    I'm not sure.                                        11:24:06

6    Q. Do you know why Ms. Sheehan reached out to        11:24:07

7    him?                                                 11:24:13

8    A. It says, "I need some help.  We have a            11:24:13

9    group of people in Waltham who have started their    11:24:18

10   own news program and are using all of our            11:24:20

11   footage."  I think that's probably why she reached   11:24:25

12   out to him.                                          11:24:27

13   Q. She writes -- she reached out to him              11:24:28

14   because she needs help finding an attorney.  Is      11:24:32

15   that correct?                                        11:24:34

16   A. Well, I don't know if it's finding --             11:24:34

17   let's see.                                           11:24:38

18       "I had them come in to discuss what they         11:24:39

19   are doing and they claim fair use.  They are using   11:24:42

20   footage to promote political candidates in the       11:24:47

21   city.  Is there a copyright lawyer?"                 11:24:50

22       Yes, so she is looking for a lawyer or a         11:24:53

23   recommendation.                                      11:24:54

24   Q. I would like to draw your attention to the        11:25:06

| | | |
|---|---|---|
| 1 | email David Gauthier sent to Maria on July 17th, | 11:25:08 |
| 2 | 2023 at 10:13 a.m. | 11:25:13 |
| 3 | He said, "Hi, Maria.  This is a tough | 11:25:16 |
| 4 | one." | 11:25:19 |
| 5 | Do you know why he said it's a tough one? | 11:25:20 |
| 6 | MR. PYLE:  Objection. | 11:25:23 |
| 7 | A. Again, it's supposition, so . . . | 11:25:23 |
| 8 | MS. GEDLU:  I would like to mark our next | 11:26:10 |
| 9 | exhibit as Exhibit 29. | 11:26:12 |
| 10 | (Barrett Exhibit 29 was marked for | 11:26:13 |
| 11 | identification and is attached to the transcript.) | 11:27:10 |
| 12 | Q. Do you recognize this document? | 11:27:10 |
| 13 | A. I do. | 11:27:12 |
| 14 | Q. What is it? | 11:27:13 |
| 15 | A. It's an email from me to Maria. | 11:27:14 |
| 16 | Q. And it is dated on July 9, 2024.  Is that | 11:27:22 |
| 17 | correct? | 11:27:28 |
| 18 | A. Correct. | 11:27:28 |
| 19 | Q. And this document marked as Exhibit 29 is | 11:27:28 |
| 20 | a true and correct copy of the email that you sent | 11:27:35 |
| 21 | to Maria on July 9, 2024? | 11:27:38 |
| 22 | A. It appears to be. | 11:27:40 |
| 23 | Q. Mr. Barrett, I would like to draw your | 11:27:48 |
| 24 | attention to the section where Josh Stanton sent | 11:28:08 |

| | | |
|---|---|---|
| 1 | the email to Sharon Ackerman, Patrick Bonner, | 11:28:15 |
| 2 | Marianne at wcac.org and Maria at wcac.org. Do | 11:28:23 |
| 3 | you see that section? | 11:28:32 |
| 4 | A. I do. | 11:28:33 |
| 5 | Q. It starts with, "Hello, Maria and | 11:28:33 |
| 6 | Marianne"? | 11:28:37 |
| 7 | A. Uh-hmm. | 11:28:37 |
| 8 | Q. What did you understand Mr. Stanton to | 11:28:38 |
| 9 | mean, when you read this email? | 11:28:50 |
| 10 | A. That we were being sued but would -- | 11:28:51 |
| 11 | there's no -- they're not looking for money, so | 11:29:00 |
| 12 | there's not much to be done. | 11:29:05 |
| 13 | Q. At this time, on July 9, 2024, do you know | 11:29:06 |
| 14 | if WCAC has decided to comply with Channel 781's | 11:29:17 |
| 15 | requests? | 11:29:20 |
| 16 | A. I don't. | 11:29:21 |
| 17 | Q. And your response to Maria after seeing | 11:29:23 |
| 18 | this email is that "It's fine"? Do you see it on | 11:29:32 |
| 19 | top where it states "It's fine"? | 11:29:36 |
| 20 | A. Yeah. | 11:29:39 |
| 21 | Q. What did you mean when you say "It's | 11:29:39 |
| 22 | fine"? | 11:29:43 |
| 23 | A. It's okay. It's fine. Thanks. | 11:29:43 |
| 24 | Q. Did you mean that WCAC would comply with | 11:29:57 |

1    Channel 781's requests?                            11:29:59

2        MR. PYLE:  Objection.                          11:30:01

3    A. No.  I meant that Jeff's email was fine.        11:30:02

4        MS. GEDLU:  I would like to mark our next      11:30:34

5    exhibit as Exhibit 30.                             11:30:36

6        (Barrett Exhibit 30 was marked for             11:30:37

7    identification and is attached to the transcript.) 11:31:00

8    Q. Do you recognize this document?                 11:31:00

9    A. I do.                                           11:31:02

10   Q. What is it?                                     11:31:02

11   A. It's an email from Maria to me.                 11:31:03

12   Q. Is it dated on November 14, 2023?               11:31:05

13   A. It is.                                          11:31:09

14   Q. And do you consider this Exhibit 30 to be       11:31:09

15   a true and correct copy of the email that Maria    11:31:13

16   sent to you on November 14, 2023?                  11:31:17

17   A. I do.                                           11:31:18

18   Q. The person who is referenced as Marcia in       11:31:19

19   the email, do you know who that is?                11:31:34

20   A. That's a board member.                          11:31:37

21   Q. Do you recall instructing Chris Wangler to      11:31:45

22   email Marcia?                                      11:31:47

23   A. I don't.                                        11:31:49

24   Q. Who is Michael referenced in the email?         11:31:57

| | | |
|---|---|---|
| 1 | A. Michael is Marcia's son. | 11:32:01 |
| 2 | Q. Is he a lawyer? | 11:32:08 |
| 3 | A. He is. | 11:32:09 |
| 4 | Q. Does Michael work for the city? | 11:32:10 |
| 5 | A. He does not. | 11:32:28 |
| 6 | Q. Does Michael consult WCAC? | 11:32:29 |
| 7 | A. He does not. | 11:32:36 |
| 8 | Q. In the email, Michael told Marcia that | 11:32:36 |
| 9 | they needed to give the mayor a heads up on 781. | 11:32:50 |
| 10 | Do you know why Michael said that? | 11:33:00 |
| 11 | MR. PYLE:  Objection. | 11:33:02 |
| 12 | A. I don't. | 11:33:03 |
| 13 | Q. In response to this email, did you give | 11:33:03 |
| 14 | the mayor a heads up? | 11:33:39 |
| 15 | A. I don't remember.  I'm sure she was told. | 11:33:40 |
| 16 | Q. Who was she told by? | 11:33:46 |
| 17 | A. I don't remember. | 11:33:48 |
| 18 | Q. Do you know if Maria gave the mayor a | 11:33:49 |
| 19 | heads up? | 11:33:56 |
| 20 | A. I don't remember.  It could have been | 11:33:56 |
| 21 | Maria.  It could have been Marcia.  I don't know. | 11:33:59 |
| 22 | It could have been me. | 11:34:03 |
| 23 | Q. Did you talk with Mayor McCarthy about | 11:34:04 |
| 24 | Channel 781 after reading this email? | 11:34:17 |

1        A. I did not.                                          11:34:19

2        Q. Did you talk with Mayor McCarthy before            11:34:24

3    reading this email about Channel 781?                     11:34:27

4        A. I did not.                                          11:34:29

5        Q. Do you know if Ms. Sheehan talked to Mayor         11:34:34

6    McCarthy about Channel 781?                               11:34:37

7        A. Not 100 percent sure, but would think she          11:34:38

8    would have.                                               11:34:43

9        Q. Do you know if anyone associated with WCAC         11:34:43

10   has talked with Mayor McCarthy besides Maria?             11:35:12

11       A. I don't.                                            11:35:23

12       Q. Did Mayor McCarthy ever voice any concerns         11:35:23

13   to you about Channel 781?                                 11:35:30

14       A. She did not.                                        11:35:31

15       Q. Do you know if Mayor McCarthy has ever             11:35:32

16   voiced her opinion about Channel 781 to anyone            11:35:40

17   associated with WCAC?                                     11:35:43

18       A. I do not know.                                      11:35:45

19       Q. In this email, Maria said that she gave            11:35:46

20   the mayor a copy of the EFF letter.  Do you see           11:36:06

21   that?                                                     11:36:15

22       A. I do.                                               11:36:15

23       Q. Do you know why the mayor needed to see            11:36:15

24   the letter from EFF?                                      11:36:24

| | | |
|---|---|---|
| 1 | A. I don't. | 11:36:26 |
| 2 | MS. GEDLU:  Let's take a break. | 11:36:40 |
| 3 | THE VIDEOGRAPHER:  We are going off the | 11:36:43 |
| 4 | record.  The time on the monitor is 11:36. | 11:36:44 |
| 5 | (Recess, 11:36 a.m. to 11:47 a.m.) | 11:36:48 |
| 6 | THE VIDEOGRAPHER:  We are back on the | 11:47:19 |
| 7 | record.  The time on the monitor is 11:47. | 11:47:30 |
| 8 | BY MS. GEDLU: | 11:47:34 |
| 9 | Q. Mr. Barrett, was there any other -- any -- | 11:47:35 |
| 10 | I'll restate the question. | 11:47:41 |
| 11 | Was there any other member of the WCAC | 11:47:42 |
| 12 | board whom you discussed Channel 781 with outside | 11:47:47 |
| 13 | of a board meeting? | 11:47:51 |
| 14 | A. I don't know.  I could have.  I don't | 11:47:51 |
| 15 | remember if I did. | 11:48:01 |
| 16 | Q. Have you discussed it with Marcia? | 11:48:03 |
| 17 | A. I don't think so.  Maria would have | 11:48:12 |
| 18 | discussed it with Marcia. | 11:48:17 |
| 19 | MS. GEDLU:  That's all the questions we | 11:48:23 |
| 20 | have. | 11:48:24 |
| 21 | Do you have any? | 11:48:24 |
| 22 | MR. PYLE:  I do not. | 11:48:27 |
| 23 | MS. GEDLU:  I think with that, we still -- | 11:48:29 |
| 24 | we have already agreed that we'll get the | 11:48:31 |

1  transcript and then you will have 30 days to                 11:48:35

2  review.                                                      11:48:38

3       MR. PYLE:  Yes.  And to the extent there's              11:48:39

4  any notarization requirement, we're happy to waive          11:48:41

5  that, if that's okay with you, so that he doesn't           11:48:43

6  have to go to a notary public.                              11:48:45

7       MR. STOLTZ:  We are as well.                           11:48:47

8       MS. GEDLU:  Thank you, Mr. Barrett, for                11:48:49

9  your time.                                                   11:48:50

10       THE VIDEOGRAPHER:  This marks the end of              11:48:52

11  the deposition of Mr. Justin Barrett.  We are              11:48:53

12  going off the record at 11:48.                             11:48:55

13       (Off the record at 11:48 a.m.)

14

15

16

17

18

19

20

21

22

23

24

No. 590640

Re:     Deposition of **Justin Barrett, Jr.**
        Date: 7/8/2025
        Case: Channel 781 News -v- Waltham Community Access Corporation
        Return to: transcripts@planetdepos.com

| Page | Line | Correction/Change and Reason |
|------|------|------------------------------|
| 24 | 18 | "Know" should be "nor" |
| 80 | 24 | "Josh" should be "Geoff" |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

8/13/25
(Date)

(Signature)

No. 590640

Re:   Deposition of **Justin Barrett, Jr.**
      Date: 7/8/2025
      Case: Channel 781 News -v- Waltham Community Access Corporation
      Return to: transcripts@planetdepos.com

ACKNOWLEDGMENT OF DEPONENT

I, Justin Barrett, Jr., do hereby
acknowledge that I have read and examined the
foregoing testimony, and the same is a true, correct
and complete transcription of the testimony given by
me and any corrections appear on the attached Errata
sheet signed by me.

8/13/25
(Date)                    (Signature)

1    CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

2          I, MICHELLE KEEGAN, Registered Merit

3    Reporter and Notary Public in and for the

4    Commonwealth of Massachusetts, the officer before

5    whom the foregoing deposition was taken, do hereby

6    certify that the foregoing transcript is a true

7    and correct record of the testimony given; that

8    said testimony was taken by me stenographically

9    and thereafter reduced to typewriting under my

10   direction; that reading and signing was requested;

11   and that I am neither counsel for, related to, nor

12   employed by any of the parties to this case and

13   have no interest, financial or otherwise, in its

14   outcome.

15         IN WITNESS WHEREOF, I have hereunto set my

16   hand and affixed my notarial seal this 8th day of

17   July, 2025.

18   My commission expires May 15, 2026.

19

20

21

22   _____

23   NOTARY PUBLIC IN AND FOR

24   THE COMMONWEALTH OF MASSACHUSETTS