Exhibit T

**CENTER FOR SOCIAL MEDIA**

School of Communication
American University

AMERICAN UNIVERSITY
WASHINGTON
COLLEGE of LAW

PROGRAM ON INFORMATION JUSTICE
AND INTELLECTUAL PROPERTY

**JUNE 2013**

## SET OF PRINCIPLES IN
# FAIR USE FOR JOURNALISM

**centerforsocialmedia.org/journalism**
**pijip-impact.org/fairuse/journalism**



SET OF PRINCIPLES IN FAIR USE FOR JOURNALISM

June 2013

## WHAT THIS IS

This document is a statement of principles to help journalists in the United States interpret the copyright doctrine of fair use. It is intended for anyone who engages in the set of practices that entails creating media of any kind that refers to real-life events of public interest, in service of public knowledge, whether that person is a full-time professional or an individual who takes it upon himself or herself to report about specific issues or events. In other words, the definition of "journalism" to which this document speaks is defined by acts, not titles, and is an inclusive one, reflecting (in part) the changing nature of the technologies that support and enable journalistic practice.

Fair use is the right to use copyrighted material without permission or payment under some circumstances—especially when the cultural or social benefits of the use are predominant. It is a general right that applies even in situations where the law does not provide an explicit authorization for the specific use in question.  As with more familiar rights of free expression, people use this right without any formal notification or registration.

This guide identifies seven situations that represent the current consensus within the community of working journalists about acceptable practices for the fair use of copyrighted materials. It identifies some common situations encountered by journalists, principles for the application of fair use in those situations, and the limitations that journalists recommend to define the zone of greatest comfort for employment of this right—all consistent with the development of the fair use doctrine in the courts.

## WHAT THIS ISN'T

This set of principles does not describe the full extent of fair use rights. Instead, it describes how those rights should apply in certain common situations for journalists. The fair use rights of journalists may, of course, extend to other situations as well.

It is not a guide to using material that authors or owners give the public permission to use, such as works covered by Creative Commons licenses. Anyone can use those works the way their owners authorize—although other uses may also be permitted under the fair use doctrine, depending on the terms of the license in question. Likewise, it is not a guide to the use of material that has been specifically licensed,

which may be subject to contractual limitations, or to material that the journalist has received with permission and under some limiting terms, whether they are made orally or in writing.

It is not a guide to material that is already free to use without considering copyright. For instance, all works produced by an employee of the federal government on work time (and that includes no third-party copyrighted material) are in the public domain, as are many older works. For more information on "free use," consult the document "Yes, You Can!" (centerforsocialmedia.org/files/pdf/free_use.pdf). It is also important to remember that facts are not copyrightable. Thus, journalists (and anyone else) are free to report facts first reported by others, as well as reasonable inferences others have derived from facts, though not always in the same words. In addition, headlines and many leads are free for all to repeat, if indeed they are simple declarations of facts.

This is not a guide to ways of using material that are without copyright consequences. For example, current court decisions indicate that simply linking to content that is legitimately available online is an activity that copyright does not regulate.

Obviously, plagiarism, the representation of others' work as your own, is never acceptable, and would also be infringing, if the others' work were copyrighted.

Fair use does not apply in situations where a journalist or the journalist's organization has contracted with another organization to provide materials. In most cases, contractual agreements that require payment for use—for instance, an agreement to pay for a photograph or a video clip if a trial version has been sent, or an agreement to pay per use for an acquired news photograph, or standing contracts with providers— override otherwise valid fair use arguments.

Likewise, this document does not deal with journalists' legal responsibilities under bodies of law other than copyright, such as privacy, defamation, and national security. Nor does it address the current resurgence of interest (however well- or ill-founded) in legal regulation of the process by which journalists repeat "hot news" first reported by others.

Finally, this set of principles does not specifically address the issues raised by the 1998 Digital Millennium Copyright Act, which creates barriers to otherwise lawful

fair uses of copyrighted materials that are available only in formats that incorporate technological protection measures (such as encryption), and prohibits the deletion of embedded information identifying the author or source of a document under certain circumstances.

## HOW THIS DOCUMENT WAS CREATED

This set of principles was created by journalists, after the issuing of an American University report, **Copyright, Free Speech, and the Public's Right to Know: How Journalists Think about Fair Use**, on the problems journalists face in understanding their fair use rights. With support from the Society for Professional Journalists, Patricia Aufderheide and Peter Jaszi, sometimes with legal colleagues, led 17 deliberative meetings in Baltimore; Boston; Chicago; Duluth, MN; Fort Lauderdale; Los Angeles; Minneapolis; New York; San Francisco; and Washington, D.C. In these meetings, common, recurrent fair use issues in journalism were discussed in depth by small groups of experienced practitioners. These meetings guided the drafting of the set of principles. The principles were reviewed by an expert legal advisory board, whose members are listed at the end of this document.

## FAIR USE

These days, copyright is ubiquitous—all kinds of new material, from the highly significant to the relatively trivial, is automatically protected upon its creation. Likewise, a wide swath of older material, dating back to 1923 or even before, is (and will for some time continue to be) subject to protection. United States law provides copyright protection to all kinds of "works of authorship," whether deathless prose or someone's to-do list. But this is only one aspect of copyright law, which was designed to implement government policy that fosters the creation of culture. Re-using existing cultural material can be, under some circumstances, a critically important part of generating new culture. In fact, the cultural value of this kind of re-use is so well established that it is written into the social bargain at the heart of copyright law, as inscribed in the United States Constitution.

The bargain is this: we as a society give limited property rights to creators to encourage them to produce culture. At the same time, we give other creators the chance to use that same copyrighted material, without permission or payment, in some circumstances. Without the second half of the bargain, we could all lose

important new cultural work.

Copyright law has several features that permit quotations from copyrighted works without permission or payment, under certain conditions. Fair use is the most important of these features. It has its origins in 18th century British law, has been an explicit part of U.S. copyright for more than 170 years, and includes elements (the right to engage in criticism and commentary, for example) that are widely recognized through the world.  In the U.S., where it applies, fair use is a user's right. In fact, as the Supreme Court has pointed out (in its 2003 Eldred decision and the 2011 Golan decision), fair use helps to keep copyright from violating the First Amendment. New creation inevitably incorporates existing material. As copyright protects more works for longer periods than ever before, creators face new challenges: licenses to incorporate copyrighted sources become more expensive and more difficult to obtain—and sometimes are simply unavailable. As a result, fair use is more important today than ever before.

Copyright law does not specify exactly how to apply fair use, and that gives the fair use doctrine a flexibility that works to the advantage of users. Creative needs and practices differ with the field, with technology, and with time. Rather than following a specific formula, lawyers and judges decide whether an unlicensed use of copyrighted material is "fair" according to a "rule of reason." This means they will take all the facts and circumstances into account to decide if an unlicensed use of copyrighted material generates social or cultural benefits that ultimately are greater than the costs it imposes on the copyright owner.

Fair use is flexible—but it is not unreliable. In fact, for any particular field of critical or creative activity, lawyers and judges have long considered the shared opinions of practitioners in assessing what is "fair" within their field. In weighing the balance at the heart of fair use analysis, judges typically consider the non-exclusive list of "factors" mentioned in Section 107 of the Copyright Act: the nature of the use; the nature of the work used; the extent of the use; and its economic effect (the so-called "four factors"). This still leaves much room for interpretation, especially since the law is clear that these are not the only permissible considerations.

So how have judges interpreted fair use? In reviewing the history of contemporary

fair use litigation, we find that judges return again and again to two key questions:

• Did the unlicensed use "transform" the copyrighted material by using it for a different purpose than that of the original, or did it just repeat the work for the same intent and value as the original?

• Was the material taken reasonably appropriate in kind and amount, considering the nature of the copyrighted work and of the use?

If the answers to these two questions are "yes," a court is likely to find a use fair. Because that is true, such uses often are not challenged in the first place. Many of the cases that proceed into the courtroom involve uses that test the limits of fair use, rather than ones within the large field of common fair use practice

Both key questions touch on, among other things, the question of whether the use will cause excessive economic harm to the copyright owner. Courts have told us that copyright owners are not entitled to an absolute monopoly over transformative uses of their works. By the same token, however, when a use supplants a copyright owner's core market, it is unlikely to be fair. For example, a journalist cannot reproduce large parts of a competitor's article merely to avoid the trouble of doing their own reporting. Another consideration may influence the way in which these questions are analyzed in practice: Whether the user acted reasonably and in good faith, in light of general practice in his or her particular field. The fact that community practice influences judicial decisions makes it important for communities of practice to understand and articulate their fair use rights.

Many of the most common journalistic activities in which quoting, reproducing, or referencing copyrighted material occurs are self-evidently transformative, when done in a responsible and professional manner. This is true whether the journalist is working in print, audio, video, or online; fair use is not medium-specific. Likewise, the principles of fair use apply equally to a newspaper article, a piece of music, a film, a user's tweet, and a website. However, since all fair use instances are context-dependent and case-by-case, potential fair users of copyrighted material should weigh all the circumstances in making a decision about how to proceed.

## JOURNALISTS AND FAIR USE

Journalists have long depended upon the right of fair use to incorporate copyrighted material into their work, and to this day, they do so constantly. Journalists use it, often without thinking about it or even knowing they are doing so, to quote or paraphrase source material, to provide proof or illustration of assertions, and to engage in comment or critique, among other uses. Indeed, the business of journalism is sustained in part by fair use, which enables appropriate, timely, unlicensed quotations and references to newsworthy material.

Fair use protects journalists' free speech rights from within the structure of copyright. Those rights fuel journalists' mission to inform the public. Thus mission has a far-reaching effect; journalists play a key part in shaping the way members of a society understand the actions and motives of others—and sometimes of themselves. This self-understanding is generated not only by the headline news of the day and hard-hitting investigative reporting of government malfeasance, but by cultural criticism, editorial writing, sports reporting, beat, and community reporting.

Journalists' fair use rights are particularly favored in U.S. copyright law. Criticism, comment and news reporting are all singled out in the law as specific examples of general purposes appropriate for fair use. But whether specific instances constitute fair use must be determined on a case-by-case basis.

For many years, journalistic practice on fair use was established by journalists' newsroom conventions, often grounded in advice from manuals previously vetted by company lawyers, and on the occasional visit to their institution's lawyers. Increasingly, journalists, particularly those who work outside of large media organizations, find themselves unsure about their right to quote copyrighted material, particularly in newer, digital formats and in social media. As the American University study, ***Copyright, Free Speech, and the Public's Right to Know***, documented, the most common consequences of such insecurity are delay, higher costs, and failure to publish and innovate.

Journalists recognize that re-using copyrighted material is central to their work. Responsible aggregation is a key and perennial feature of journalism; journalists always have "advanced the story" by building upon the work of other journalists, whether through attributed quotation or unattributed reference. Of course, much

common journalistic re-use of existing material does not even require fair use, since facts themselves are not copyrightable. Often, however, bare facts are not enough; the very words or images through which information is expressed may be part of the story. Thus, in practice, much journalistic re-use and follow-on work has always (if sometimes unknowingly) depended on fair use.

However, the rise of journalistic enterprises that embrace aggregation as a business model has created a heightened awareness, and sometimes alarm, about re-use and sharing of journalistic work. This document will help journalists understand what is acceptable re-use, and what the journalistic community, with expert legal advice, believes goes beyond fair use.

Journalists' commonly-held understandings, as documented in the Statement, are drawn from the their collective experience and supported by legal analysis. This set of principles will enhance capacity to employ fair use, both for journalists and for their various gatekeepers, including editors, publishers, insurers and lawyers, who determine whether and in what form the work of journalists reaches the public. Thus, this set of principles helps to show that the uses of copyrighted materials described here are reasonable and appropriate for the purposes of journalism.

Fair use is in wide and vigorous use today in many professional communities beyond journalism. Some of these other professional communities have also set forth their understandings in consensus documents, including the *2005 Documentary Filmmakers' Statement of Best Practices in Fair Use*, which may be useful to some journalists. All these documents are available at centerforsocialmedia.org/fair-use. Although professional groups typically create such documents, no one needs to be a member of a professional group to benefit from their interpretations.

## GENERAL POINTS ABOUT PRINCIPLES AND VALUES

These principles apply to all forms of media. In all cases, a digital copy is the same as a hard copy in terms of fair use, and an on-line use (unless otherwise noted) is equivalent to an off-line one. Text, photography, music, and video are all equally eligible for fair use.

These principles apply to situations in which a journalist has unconditioned access to material, regardless of the source. When a user has obtained a copy illegally, however, that may affect fair use analysis. Further, in situations where there is only one source of the material (as may be true of some archival items), the holder of the material may impose the conditions he/she chooses, and fair use will yield to them. If a journalist receives material subject to specific restrictions on use, the journalist is bound by those restrictions.

The principles are all subject to a "rule of proportionality." Journalists have a right under fair use to employ as much of a copyrighted work that they need to accomplish their goals—and sometimes even to use an entire work, such as a photograph, or a critical source document. By the same token, the fairness of a use depends, in part, on whether the user took only what was reasonably appropriate to accomplish his or her legitimate purpose. Journalists thus cannot reliably use numerical rules of thumb in making this determination.

Journalists share values that shape their expectations for fair use of others' copyrighted material. Attribution is a highly prized journalistic value, though not one that features significantly in the U.S. copyright law (unlike that of other countries).  Merely identifying the source material does not make an otherwise unjustified use "fair," nor does the law literally require that uses be accompanied by attribution in order to be considered fair. However, journalists believe strongly that there is an ethical and academic imperative to provide proper attribution. And, obviously, if it is important to use specific copyrighted content in a particular piece of journalism, appropriate citation helps make that justification more apparent. At the same time, journalists appreciate that the form and content of an appropriate attribution will vary by medium and context. And of course, journalists may wish to use works for which full attribution cannot be provided (because of a promise of confidentiality, for example, or because the information is not discoverable).

Journalists also share the strong value that when copyrighted material has been prepared, even indirectly, with taxpayer money, the journalist's responsibility and the fair use claim on the material are both increased. The public's investment in the original material correspondingly emphasizes the public's right to know.

Journalists also value the importance of honoring each other's work not only with attribution but, where possible and appropriate, with payment. Particularly in dealing with work that comes from war zones or other areas of difficult and dangerous access, they highly value their colleagues' contribution to the mission to inform the public. While this value does not override either the ability or will to employ fair use where appropriate, it may sometimes color journalists' decisions on whether to employ their fair use right.

Journalists recognize the importance of timeliness, which is part of the core mission of journalism. They respect the importance of deadlines not merely for their business model but to meet the mission of informing the public in a timely way. This is particularly true for issues of public safety, public health, and fast-moving news of universal interest and impact. Therefore, journalists consider the issue of timeliness in relation to public importance as well in making their fair use decisions. Consideration of the urgency of the public's need to know may influence not only a decision to fairly use material; it may also affect how much material is taken. By the same token, however, journalists understand that merely beating the competition to a story should not, in itself, a justification for violating the copyrights of third parties.  The Principles and Limitations below represent, among other things, a balancing of sometimes conflicting journalistic imperatives.

In general, the Principles and Limitations below apply with equal force to all kinds of source material, from cell phone videos of a war zone to routine coverage of a political campaign. In specific instances, of course, they will apply differently depending on how the considerations they detail play out in specific journalistic contexts.

# PRINCIPLES IN FAIR USE FOR JOURNALISM

**SITUATION ONE:** **INCORPORATION OF COPYRIGHTED MATERIAL CAPTURED INCIDENTALLY AND FORTUITOUSLY IN THE PROCESS OF RECORDING AND DISSEMINATING NEWS.**

**DESCRIPTION:**
Journalists report on a modern reality permeated with copyrighted content. They constantly capture such material incidentally in the course of reporting on specific events and activities. This is not material they have chosen to include for its own sake; rather, it is an inseparable part of the reality they seek to portray. Excluding (or drastically curtailing) the amount of such material contained in reporting would compromise the truth-telling mission of journalism.

**PRINCIPLE:**
Fair use applies to the incidental and fortuitous capture of copyright material in journalism.

**LIMITATIONS:**
- Fair use does not apply where a journalist has gained access to a person or place by agreeing, either orally or in writing, to forego specific uses of the material gathered as a result.

- Neither does it apply if a journalist inserts copyrighted material into the reality being recorded and disseminated, as by asking musicians playing at an event to perform a particular song, or distorts news choices in order to include copyrighted material.

- The journalist should not repurpose incidentally captured material—for instance, a popular song sung by a celebrity at an event—for aesthetic or entertainment purposes, whether elsewhere in the same piece or in other work.

- The journalist should attribute the material in a reasonable manner. Where relevant, attribution should extend to entities or individuals other than copyright owners (e.g., the art gallery where a picture is hanging or the performer who interprets a song at a public event).

### SITUATION TWO: USE OF COPYRIGHTED MATERIAL AS PROOF OR SUBSTANTIATION IN NEWS REPORTING OR ANALYSIS.

**DESCRIPTION:**

Journalists routinely include copyrighted material, whether from a report, a memo, a video, or a photograph, and whether informally generated in social media or through traditional media channels, as evidence of their claim that something did or did not happen, or to support (or negate) the assertions of a source or other newsworthy person.

**PRINCIPLE:**

Fair use applies when journalists use copyrighted material as documentation, to validate, prove, support, or document a proposition.

**LIMITATIONS:**

- The journalist should take as much as is reasonably appropriate to enable the news consumer to assess validity of a journalist's assertions and interpretations.

- The journalist should consider the value of the copyrighted material to the public's understanding of and confidence in the reporting.

- The journalist should attribute the material in a reasonable manner.

### SITUATION THREE: WHEN COPYRIGHTED MATERIAL IS USED IN CULTURAL REPORTING AND CRITICISM.

**DESCRIPTION:**

Journalists quote elements from movies, songs, books, articles, blog posts, exhibit displays, online videos, images circulated in social media, and other copyrighted material, in the course of reporting on cultural phenomena, and in reviewing and commenting on cultural products, events, and expression. Journalists employ copyrighted material both in referring to the existence of phenomena and in developing arguments about them. Journalistic reporting, comment and criticism on cultural expression is a critically important part of the circulation of culture in a society. In order to do that work, journalists need to be able to reference and quote the material they discuss, making their selections and forming their commentary without the permission of the owners of the work.

**PRINCIPLE:**

The use of textual, visual and other quotations of cultural material for purposes of reporting, criticism, commentary, or discussion constitutes fair use.

**LIMITATIONS:**

- The journalist should take as much is reasonably appropriate to enable the news consumer to understand the point being made.
- The journalist should contextualize the material to make clear its relevance to the current work.
- The journalist should make the connection between the cultural criticism or commentary and the selection of copyrighted material clear to the news consumers, by means of text references, captions, voice-over, or other signaling.
- The journalist should honor any promises that he or she has affirmatively made to the provider of copyrighted cultural material (such as video clips from new movies).
- The journalist should attribute the material in a reasonable manner.

### SITUATION FOUR: WHEN COPYRIGHTED MATERIAL IS USED AS ILLUSTRATION IN NEWS REPORTING OR ANALYSIS.

**DESCRIPTION:**

Journalists use copyrighted material to illustrate as well as provide proof of a story. They may include a photograph from an event, include quotations from people attending an event, or provide an audio sound portrait from an event, among many other uses of illustration. Illustration in reporting is not merely decorative. It serves a news function by adding information and context otherwise either not available or provided in a much less efficient or effective way.

**PRINCIPLE:**

Fair use applies to illustration in news reporting.

**LIMITATIONS:**
- The illustration should add meaningfully to the audience's understanding of the facts or issues.
- The amount employed should be reasonably appropriate to the illustrative purpose.
- When the illustrative material is provided by a business that provides material primarily designed to illustrate current events, such as a syndicated news service, and the use is for reporting on current events, the journalist should purchase the material.
- The journalist should attribute the material in a reasonable manner.

### SITUATION FIVE: WHEN COPYRIGHTED MATERIAL IS USED AS HISTORICAL REFERENCE IN NEWS REPORTING OR ANALYSIS.

**DESCRIPTION:**
Journalists often make reference to previous events, to people in earlier situations, to previously existing structures, and to other historical items in the process of reporting or commenting on the news. Historical contextualizing is an important aspect of the work of reporting and analysis. Journalists not only share facts with their users, but help them to understand the meaning of those facts. Arts journalists often need to compare current work to earlier work, or provide a meaningful comparison with others' work to situate creative effort within a tradition or a trend.

**PRINCIPLE:**
Fair use applies to journalistic incorporation of historical material.

**LIMITATIONS:**
- The journalist should contextualize the historical material to make clear its relevance to the current work.
- The journalist should take an appropriate amount that will provide the relevant historical context.
- The journalist should attribute the material in a reasonable manner.

### SITUATION SIX: USING COPYRIGHTED MATERIAL FOR THE SPECIFIC PURPOSE OF STARTING OR EXPANDING A PUBLIC DISCUSSION OF NEWS.

**DESCRIPTION:**

Sometimes journalists make available to users copyrighted material garnered in the process of news reporting or analysis, to enrich discussion about the public significance of that material. Increasingly, journalists enlist members of the news-consuming public to participate in news generation—through "crowdsourcing" techniques, for example. Such practices must function, of course, as an adjunct to a journalist's reporting, editorializing, analysis or critique, rather than as a substitute for it. But now that it is more possible than ever before to tap into expertise distributed throughout the populace, it is part of the journalist's mission not only to deliver information, but to share, responsibly and appropriately, underlying documentation that can deepen the understanding of news.

**PRINCIPLE:**

The use of copyrighted material to promote public discussion and analysis can qualify as fair use.

**LIMITATIONS:**

- The journalist should make clear to news consumers why the material is being made available, and what kinds of responses it is intended to elicit – for example, critical commentary, analysis, new contextual information, or follow-on reporting of additional facts.

- The journalist should use as much material as is appropriate to provide news consumers with an opportunity to engage productively with the material.

- Where linking to the material is an alternative compatible with the journalist's objectives, it should be preferred to unlicensed re-use of copyrighted material.

- The journalist (or outlet) should make available tools and forums designed to encourage participation by news consumers.

- The journalist should make efforts to use the ensuing discussion or other contributions to further generate news.

- The journalist should attribute the material in a reasonable manner.

**SITUATION SEVEN:** **QUOTING FROM COPYRIGHTED MATERIAL TO ADD VALUE AND KNOWLEDGE TO EVOLVING NEWS.**

**DESCRIPTION:**

Journalists constantly derive knowledge from earlier journalism as they advance the story, contributing new information while summarizing or quoting from what is already known. Although some of this aggregation merely consolidates non-copyrightable facts, some takes verbatim excerpts of copyrighted material reporting facts or opinions. When done in ways that conform to the journalistic mission, uses of this kind recontextualize the excerpted material. Such recontextualization can be transformative, making the quotation a fair use in some circumstances.

**PRINCIPLE:**

Fair use can apply to the quotation of earlier journalism.

**LIMITATION:**

- The journalist should make clear what she or he is adding to the existing work.

- Reviews of preexisting reports on a story or issue should where possible incorporate excerpts from multiple sources.

- The excerpts should be as brief as is reasonably appropriate to the journalist's objectives, and, in any event, not be so extensive that they effectively replicate the original stories or function as a consumer substitute for them.

- The journalist should attribute the material in a reasonable manner. Attribution should be clearly apparent to the reader or viewer, and it should be possible for that individual to navigate easily to the original source.

- Any contractual restrictions that the journalist agreed in receiving the material would apply to quotation from it should be observed.

**COORDINATORS:**

**Professor Peter Jaszi** co-founded the Program on Information Justice and Intellectual Property, which promotes social justice in law governing information dissemination and intellectual property through research, scholarship, public events, advocacy, and provision of legal and consulting services. The program is a project of the Washington College of Law at American University in Washington, D.C.

**Professor Patricia Aufderheide** founded and directs the Center for Social Media, which showcases and analyzes media for social justice, civil society and democracy, and the public environment that nurtures them. The center is a project of the School of Communication, at American University in Washington, D.C.

**LEGAL ADVISORY BOARD:**

Jamie B. Bischoff, Esq.
Ballard Spahr, LLP
Philadelphia, Pennsylvania

Michael Donaldson, Esq.
Donaldson & Callif
Los Angeles, California

Anthony Falzone, Esq.
Deputy General Counsel, Pinterest, Inc.
San Francisco, California

Prof. Jack I. Lerner
USC Gould School of Law and Annenberg School of Journalism
Los Angeles, California

Prof. Michael J. Madison
University of Pittsburgh School of Law
Pittsburgh, Pennsylvania

**THANK YOU:**

Thank you to the many journalists who took precious time to participate in this process; to Society for Professional Journalists executive director Joe Skeel, Associate director Chris Vachon and board member Kevin Z. Smith, for support throughout the process; to Janet Liao and Mark Hallett of the Robert R. McCormick Foundation for financial support and commitment to the project and the concept; to Prof. Jennifer Urban of University of California Berkeley School of Law and to Dan Satorius, Esq., for hosting sessions; to Angelica Das, the project manager; to our graduate fellows including Bryan Bello, Katie Bieze, and Jan Lauren Boyles; and to Center for Social Media intern Miles Zinni.

**Feel free to reproduce this work in its entirety.
For excerpts and quotations, depend upon
the principles of fair use.**

**centerforsocialmedia.org/journalism**

**pijip-impact.org/fairuse/journalism**

SET OF PRINCIPLES IN FAIR USE FOR JOURNALISM

CENTER FOR
SOCIAL MEDIA

School of Communication
American University

AMERICAN UNIVERSITY
WASHINGTON
COLLEGE of LAW
PROGRAM ON INFORMATION JUSTICE
AND INTELLECTUAL PROPERTY

**ENDORSERS**

**ASSOCIATION FOR EDUCATION IN JOURNALISM AND MASS COMMUNICATION**

**ASSOCIATION OF ALTERNATIVE NEWSMEDIA**

**ASSOCIATION OF SCHOOLS OF JOURNALISM AND MASS COMMUNICATION**

**J-LAB**

**MEDIASHIFT**

**NATIONAL ASSOCIATION OF BLACK JOURNALISTS, DIGITAL JOURNALISM TASK FORCE**

**NEW AMERICA MEDIA**

**POYNTER INSTITUTE**

**ROBERT R. McCORMICK FOUNDATION**

**FUNDED BY**

**Robert R. McCormick Foundation**

**centerforsocialmedia.org/journalism**
**pijip-impact.org/fairuse/journalism**

