UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| CHANNEL 781 NEWS,<br><br>  Plaintiff,<br><br>v.<br><br>WALTHAM COMMUNITY ACCESS CORPORATION,<br><br>  Defendant. | Civil Action No. 1:24-CV-11927-PBS |

# DEFENDANT WALTHAM COMMUNITY ACCESS CORPORATION'S OPPOSITION TO PLAINTIFF CHANNEL 781 NEWS'S MOTION FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

INTRODUCTION

A plaintiff who brings a claim of misrepresentation under Section 512(f) of the Digital Millennium Copyright Act carries a heavy burden of proof. Such a plaintiff must show that the sender of a takedown notice "<u>knowingly</u> materially misrepresent[ed]" that the sender had "a <u>good faith belief</u> that use of the material in the manner complained of [was] not authorized" by the copyright holder or the law. 17 U.S.C. § 512(c)(3)(A)(v),(f)(emphasis supplied).

Here, summary judgment must enter in favor of defendant Waltham Community Access Corporation ("Defendant" or "WCAC") because there is no genuine issue of fact on this "demanding *scienter* requirement." *Turner v. Henderson*, No. CV 5:25-244-DCR, 2025 WL 2045172, at *3 n. 7 (E.D. Ky. July 21, 2025). As explained in WCAC's motion for summary judgment, Christopher Wangler, the WCAC staff member responsible for sending the takedown notices, researched the law of fair use, gave due consideration to the different ways that plaintiff

#5996803v1

Channel 781 News ("Plaintiff" or "Channel 781") used WCAC content, and limited WCAC's takedown notices to videos that simply excerpted its content without any changes Wangler considered to be transformative, while leaving plaintiff's more creative uses unchallenged. *See Fox News Network, LLC v. Tveyes, Inc.*, 883 F.3d 169, 177 (2d Cir. 2018) ("use of copyrighted material that merely repackages or republishes the original is unlikely to be deemed a fair use.") (cleaned up). In reaching his fair use determination, Wangler also considered the length of each of the infringing clips and the possibility of competitive harm to WCAC, factors that implicate multiple prongs of the fair use inquiry.

Channel 781 does not meaningfully dispute these facts. Instead, Plaintiff asks the Court to adopt a novel "objective" standard for liability under Section 512(f), and to find WCAC liable under it as a matter of law. As explained below, the Court should reject this request and adhere to the unanimous judgment of other federal appellate and district courts that "[a] copyright owner cannot be liable simply because an unknowing mistake" about fair use "is made, even if the copyright owner acted unreasonably in making the mistake. . . . Rather, there must be a demonstration of some actual knowledge of misrepresentation on the part of the copyright owner." *Rossi v. Motion Picture Ass'n of Am. Inc.*, 391 F.3d 1000, 1005 (9th Cir. 2004). Applying this standard, there is no triable issue as to whether WCAC "knowingly misrepresent[ed] in the takedown notification that it had formed a good faith belief the video[s]" posted by Plaintiff were "not authorized by the law, i.e., did not constitute fair use," *Lenz v. Universal Music Corp.*, 815 F.3d 1145, 1154 (9th Cir. 2016). Indeed, all the evidence shows that it made no such misrepresentation.

FACTS

The relevant undisputed facts are set forth in defendant Waltham Community Access Corporation's memorandum of law in support of its motion for summary judgment, and its accompanying statement of undisputed facts. Additionally, Plaintiff has submitted its own statement of purportedly undisputed facts, and WCAC has filed a response to that statement.

ARGUMENT

**I.    THE STANDARD OF LIABILITY FOR A DMCA MISREPRESENTATION CLAIM IS SUBJECTIVE GOOD FAITH, NOT OBJECTIVE REASONABLNESS.**

Channel 781 insists that it can prevail on its claim of misrepresentation under the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 152(f), if it shows that WCAC's determination that Plaintiff's clips were infringing was objectively "unreasonable." (Plaintiff's Memo at 29). Plaintiff is incorrect. Section 512(f) enacts a subjective good faith standard of liability, not one of objective reasonableness.

To begin, it is plain that an "objective reasonableness standard" is "distinct" from a "subjective good faith standard," and "Congress understands this distinction."[1] *Rossi,* 391 F.3d at 1004. Congress chose the latter in the DMCA by requiring a plaintiff to prove that the defendant "<u>knowingly</u> materially misrepresent[ed]" that it "ha[d] a <u>good faith belief</u> that use of the material in the manner complained of is not authorized by the copyright owner, its agent, or the law." 17

---

[1] In *Rossi,* the Ninth Circuit cited several illustrative statutes that treat the concepts differently. *See Alvarez v. IBP, Inc*., 339 F.3d 894, 910 (9th Cir.2003) ("[t]o satisfy [29 U.S.C.] § 260, a FLSA-liable employer bears the difficult burden of proving both subjective good faith and objective reasonableness") (citations omitted); *see also Austin v. McNamara*, 979 F.2d 728, 734 (9th Cir.1992) ("The legislative history of [42 U.S.C.] § 11112(a) indicates that its reasonableness requirements were intended to create an objective standard, rather than a subjective good faith standard.") (emphasis added*); Brooks v. Village of Ridgefield Park*, 185 F.3d 130, 137 (3rd Cir.1999) ("The good faith requirement is a subjective one that requires that the employer have an honest intention to ascertain and follow the dictates of the [Fair Labor Standards] Act. The reasonableness requirement imposes an objective standard by which to judge the employer's conduct.").

U.S.C. §§ 512(f), 512(c)(3)(A)(v). As the Ninth Circuit explained in *Rossi*, Congress's decision to "[j]uxtapos[e] the 'good faith' proviso of the DMCA with the 'knowing misrepresentation' provision of that same statute reveals an apparent statutory structure that predicated the imposition of liability upon copyright owners only for knowing misrepresentations regarding allegedly infringing websites." 391 F.3d at 1004. To impose liability based on "a lesser 'objective reasonableness' standard," as plaintiff urges here, "would be inconsistent with Congress's apparent intent that the statute protect potential violators from subjectively improper actions by copyright owners." *Id.* at 1005. "Congress," the court noted, "could have easily incorporated an objective standard of reasonableness. The fact that it did not do so indicates an intent to adhere to the subjective standard traditionally associated with a good faith requirement."[2] *Id.*

*Rossi*'s core holding – that a Section 512(f) misrepresentation claim requires a showing of a lack of subjective good faith – has been consistently followed in the district courts in the Ninth Circuit and across the country. *See, e.g., Sosa v. AT&T,* No. 25-CV-01310-WHO, 2025 WL 3719229, at *4 (N.D. Cal. Dec. 23, 2025) (". . . the knowing misrepresentation standard under section 512(f) is subjective, not objective."); *Shaffer v. Kavarnos*, No. 23-CV-10059 (KMK), 2025 WL 2299173, at *2 (S.D.N.Y. Aug. 7, 2025)(applying subjective good faith standard, citing *Rossi*); *WhaleCo Inc. v. Shein Tech. LLC*, No. CV 23-3706 (TJK), 2025 WL 2801861, at *9 (D.D.C. Sept. 30, 2025) (same); *Mishiyev v. UMG Recordings, Inc.*, No. 8:23-CV-1942-MSS-NHA, 2025 WL 2624425, at *3 (M.D. Fla. Sept. 11, 2025)("[g]ood faith belief" is "a subjective standard."); *MFB Fertility, Inc. v. Action Care Mobile Veterinary Clinic, LLC*, 730 F. Supp. 3d

---

[2] *Rossi*'s holding is in no way a product of its facts, as Plaintiff suggests. (Plaintiff's Memo at 12). Rather, the court's analysis of the statute is based on its text, interpretive caselaw about "good faith" in other federal statutes, and the "statutory structure of § 512(c)," all of which "support the conclusion that the 'good faith belief' requirement in § 512(c)(3)(A)(v) encompasses a subjective, rather than objective, standard." *Rossi,* 391 F.3d. at 1004.

4

740, 752 (N.D. Ill. 2024) (applying standard of "subjective good faith belief"); *Hosseinzadeh v. Klein*, 276 F. Supp. 3d 34, 47 (S.D.N.Y. 2017) ("undisputed evidence" that "defendants understand the concept of fair use" and considered fair use before sending a takedown notice "clearly establishes the subjective 'good faith belief' required under 17 U.S.C. § 512(g)(3)(C)"); *TD Bank, N.A. v. Hill*, No. CIV. 12-7188 RBK, 2015 WL 4523570, at *21 (D.N.J. July 27, 2015) ("The "good faith belief" requirement of § 512(c)(3)(A)(v) is a subjective standard."); *Third Educ. Grp., Inc. v. Phelps*, 675 F. Supp. 2d 916, 927 (E.D. Wis. 2009) (applying subjective good faith standard, relying on *Rossi*). By contrast, Plaintiff does not offer a single decision applying an "objective reasonableness" test to such a claim.

Lacking any cases that apply its proposed standard, Plaintiff offers strained analogies to other federal statutes that use the words "good faith." However, those statutes use the phrase differently than the DMCA does. For example, Plaintiff cites the Stored Communications Act, which provides that "[a] good faith reliance on . . . a court warrant or order" among other types of process "is a complete defense to any civil or criminal action brought under this chapter or any other law." 18 U.S.C. § 2707. But a statutory provision about "good faith reliance" on a warrant is obviously different from a provision about "<u>knowingly</u> materially misrepresent[ing]" that a person has "good faith <u>belief</u>" in a proposition. 17 U.S.C. §§ 512(f), 512(c)(3)(A)(v) (emphasis supplied). The latter standard of "knowing" misrepresentation of a "belief" implies a much higher level of subjectivity than the question of whether a warrant appears to be valid.[3]

---

[3] Plaintiff's other examples are similar: they use the words "good faith" in contexts that are unlike the DMCA's standard of a "knowing" misrepresentation of a "good faith belief." *See* Plaintiff's Memorandum at 11, citing 11 U.S.C. § 548 (protecting the interests of a transferee "that takes for value and in good faith"); U.C.C. § 1-201(b)(20) (defining "good faith" in the context of sale of goods under UCC Article 2 as "honesty in fact and the observance of reasonable commercial standards of fair dealing," *but see* U.C.C. § 5-102(7) (defining "good faith" in UCC Article 5 subjectively: "honesty in fact in the conduct or transaction concerned."); 28 U.S.C. § 1915 ("An appeal may not be taken in forma pauperis if the trial court certifies in writing that it is not taken in good faith."); 15 U.S.C. § 78t(a) ("good

#5996803v1

Plaintiff also argues that Congress could not have intended Section 512(f) to enact a subjective good faith standard because that would render misrepresentation claims "toothless." (Plaintiff's Memorandum at 12-13). Plaintiff is again mistaken: numerous cases, including *Lenz,* have allowed Section 512(f) claims to proceed to trial under this standard where the plaintiff could show that there was a dispute of fact as to whether the rightsholder made a knowing misrepresentation. *See, e.g., Lenz,* 815 F.3d at 1149 (finding genuine issue of fact where notice-giver did not consider fair use *per se*, but only whether protected song was "the focus of the [allegedly infringing] video."); *Disney Enters., Inc. v. Hotfile Corp.,* No. 11–cv–20427, 2013 WL 6336286, at *48 (S.D. Fla. Sept. 20, 2013) ("there is sufficient evidence in the record to suggest that [the counterclaim defendant] intentionally targeted files it knew it had no right to remove."); *Rosen v. Hosting Servs., Inc.*, 771 F. Supp. 2d 1219, 1223 (C.D. Cal. 2010) (denying summary judgment where takedown notice misidentified allegedly infringing content).

In a similar vein, Plaintiff pulls one sentence of the Senate report on the DMCA out of context – indicating that the act seeks to "ensure that material is not disabled without proper justification" – but ignores the sentence immediately following: "The provisions in the bill <u>balance the need for rapid response to potential infringement</u> with the end-users['] legitimate interests in not having material removed without recourse." S. REP. NO. 105-190 at 21 (1998) (emphasis supplied). As the Senate report reflects, the DMCA is not primarily directed at ensuring that material is not wrongly removed. Rather, in enacting the statute, Congress sought to ensure that rightsholders could move quickly to request removal of material they considered to

---

faith" defense of a supervisor from securities liability requires showing that "the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action," which implies a reasonable system of supervision); 15 U.S.C.A. § 13 (seller accused of price discrimination may show "that his lower price or the furnishing of services or facilities to any purchaser or purchasers was made in good faith to meet an equally low price of a competitor, or the services or facilities furnished by a competitor.").

be infringing, while tempering that right with a requirement that takedown notices be issued in subjective good faith.

Next, Plaintiff argues that even if the test is subjective, a rightsholder's fair use determination must be based "on the relevant known facts" or else he is liable. (Plaintiff's Memorandum at 15). Again, the leading cases frame the test differently. They hold that "even if the copyright owner acted unreasonably" in making an erroneous no-fair-use determination, the rightsholder cannot be liable unless its "notification is a <u>knowing misrepresentation.</u>" *Lenz*, 815 F.3d at 1154 (emphasis supplied), quoting *Rossi,* 391 F.3d 1005. The mere fact that a rightsholder failed to appreciate the import of a fact that it knew, or that it did not conduct a rigorous, lawyerly analysis of each relevant known fact under each prong of the fair use rubric, does not demonstrate "actual knowledge of misrepresentation on the part of the copyright owner." *Id.* Rather, all that is required is that the rightsholder's "actions" be "sufficient to form a subjective good faith belief about the video's fair use or lack thereof." *Lenz*, 815 F.3d at 1154. Plaintiff's notion that the Court should examine whether WCAC grounded its judgment on all "relevant known facts" is another way of introducing an objective test where it does not belong.

## II.    WHETHER CHANNEL 781'S VIDEOS ARE PROTECTED BY FAIR USE IS NOT RELEVANT TO WHETHER DEFENDANT MADE A KNOWING MISREPRESENTATION.

Next, Plaintiff argues at length that its repackaging of unaltered excerpts of WCAC content into its own YouTube videos was "a clear fair use." (Plaintiff's Memorandum at 15-23). The dubious merits of this argument aside, whether Plaintiff's uses of WCAC's videos were fair is not a question that is properly before the Court. Rather, the only question is whether Plaintiff has adduced sufficient evidence that WCAC made a "knowing misrepresentation" of its "good faith belief" that the fair use doctrine did not apply. Where "a copyright holder forms a subjective

7

*good faith* belief the allegedly infringing material does not constitute fair use," courts are "in no position to dispute the copyright holder's belief even if [they] would have reached the opposite conclusion." *Lenz*, 815 F.3d at 1154 (emphasis in original); *Shaffer v. Kavarnos*, No. 23-CV-10059 (KMK), 2025 WL 2299173, at *4 (S.D.N.Y. Aug. 7, 2025) (rejecting plaintiff's argument that usage was "'plainly fair use'" because "Defendant need not have formed an objectively reasonable belief that Plaintiff's videos infringed Defendant's copyright" to avoid liability).

### III. WCAC DID NOT "AVOID" CONSIDERING FAIR USE.

Plaintiff next argues that WCAC reached its belief about whether the clips were fair uses by "knowingly avoiding consideration of the second, third, and fourth fair use factors, as well as significant, known facts material to the first factor." (Plaintiff's Memorandum at 23). Plaintiff is incorrect. WCAC's staff member, Chris Wangler, appropriately considered the fair use doctrine as a whole, including each of its distinct elements. *Lenz,* 815 F.3d at 1154.

#### A.   Purpose and Character of the Use.

Channel 781 does not seriously dispute that WCAC considered to the first fair use factor, "the purpose and character of the use." 17 U.S.C. § 107. That factor, importantly, is "'[t]he heart of the fair use inquiry.'" *Cariou v. Prince*, 714 F.3d 694, 705–06 (2d Cir. 2013), quoting *Blanch v. Koons,* 467 F.3d 244, 251 (2d Cir. 2006). It examines "whether the new work merely supersedes the objects of the original creation, or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message; it asks, in other words, whether and to what extent the new work is 'transformative.'" *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994).

In choosing the clips to identify in the takedown notices, Chris Wangler focused on precisely the correct question: whether the Channel 781 videos "add[ed] something new" through transformative alterations or additions, or whether they "merely copied" WCAC's

original work and used it for similar purposes. *Campbell,* 510 U.S. at 579; (Pyle Aff., Ex. 1, Wangler Dep. at 125-126; Ex 8). "Although transformative use is not absolutely necessary for a finding of fair use, transformative works lie at the heart of the fair use doctrine and a use of copyrighted material that <u>merely repackages or republishes the original</u> is unlikely to be deemed a fair use." *Fox News Network, LLC*, 883 F.3d at 177 (cleaned up, emphasis supplied). As Wangler memorialized in an email, he determined that videos "taken directly from [WCAC] and reproduced verbatim with zero editing or commentary" were unlikely to be protected by fair use. (Pyle Aff., Ex. 8). It is undisputed that Wangler believed that videos that "merely copied copywritten MAC channel content and focused entirely on the copywritten content and failed to have a transformative effect on that content would not qualify for copyright exemption under fair use." (Pyle Aff., Ex. 1, at 125-126).

Plaintiff insists that its standalone verbatim excerpts of WCAC meeting videos qualify as "opinion journalism," and that Channel 781's excerpting changed the clips' "meaning and message, giving them a political valence that WCAC found concerning." (Plaintiff's Memorandum at 25-26). But there is no evidence that Wangler, the person who made the fair use determinations, viewed the videos that way.[4] (Pyle Aff., Ex. 8). Indeed, the undisputed facts are

---

[4] WCAC attempts to rely on statements about "political bias" by WCAC's Executive Director, Maria Sheehan, to establish that WCAC viewed the clips as transformative, but it is undisputed that Sheehan was not the person responsible for the takedown notices. Rather, Sheehan delegated this task to Wangler. (Response to WCAC Statement of Undisputed Material Facts, ¶ 18 (failing to dispute that Sheehan delegated responsibility for selecting what videos to identify in takedown notices to Wangler)). There is "no caselaw for the proposition that one employee's knowledge that a use may be non-infringing should be imputed to another employee who independently issues a takedown notice on behalf of the company." *White v. UMG Recordings, Inc.*, No. 20 CIV. 9971 (AT), 2024 WL 3952721, at *4 (S.D.N.Y. Aug. 27, 2024). In any event, Sheehan's deposition testimony does not amount to evidence that WCAC "knew" that Channel 781's stand-alone clips were "transformative." (Plaintiff's Memorandum at 17). Sheehan was asked, "Based on the Channel 781 material that you have seen, do you believe that Channel 781's <u>news reporting</u> had a political bias?" to which Sheehan responded, "Yes." (Gedlu Aff., Ex. C, p. 91) (emphasis supplied). She described the "news reporting" as "taking segments of candidates they didn't agree with and taking parts of what was being said and putting it up online. What -- and putting their own spin on that, which is fine. They can do whatever they want. <u>It's their show</u>. But it was our footage that

9

the opposite: Wangler thought that "[u]ses of short clips" in Channel 781's politically opinionated "debriefs" <u>were</u> "likely to qualify as fair use of MAC channel video," (Pyle Aff., Ex. 1, p. 125), whereas the standalone clips did not, precisely because they had "zero editing or commentary."[5] (Pyle Aff., Ex. 8).

Further, Wangler knew that the videos of Channel 781 and WCAC shared the purpose of "inform[ing] the public about Waltham city government," and he considered that Channel 781 "might draw viewers and/or subscribers away from WCAC" by using WCAC's copyrighted content in a way that was contrary to how the "competitive" news business generally operated. (Pyle Aff., Ex. 1, Wangler Dep. at 95, 157); *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 531–32 (2023) ("A use that shares the purpose of a copyrighted work . . . is more likely to provide the public with a substantial substitute for matter protected by the copyright owner's interests in the original work or derivatives of it, which undermines the goal of copyright.") (cleaned up). Wangler was concerned that the standalone Channel 781 excerpts merely superseded the original videos in a way that harmed WCAC, and he did not view their purposes to be sufficiently different as to constitute a transformative use. (*Id.* at 157-159).

Contrary to Plaintiff's arguments, the mere fact that Wangler knew that both WCAC and Channel 781 are nonprofit entities does not invalidate his concern about Channel 781's uses of WCAC content. Courts have held the "nature and purpose of the use" factor may cut against fair

---

they were using." (*Id.*) (emphasis supplied). In other words, Sheehan was asked only about Channel 781's "news reporting," such as its headline news and "debrief" shows, not about Channel 781's stand-alone clips of government meetings.

[5] As such, Channel 781's assertion in its summary judgment memorandum that "WCAC stubbornly clung to the notion that *every* use of its video required its express permission" is a gross mischaracterization of the evidence. (Plaintiff's Memorandum at 27). Indeed, Channel 781 contradicts itself, insisting at once that WCAC believed every use required permission, while at the same time acknowledging that Wangler drew "*some* distinction between uses" by Channel 781. (Plaintiff's Memorandum at 28-29).

use where the user secured a noneconomic benefit, such as an enhanced reputation, from the use of copyright-protected material. *Soc'y of Holy Transfiguration Monastery, Inc. v. Gregory,* 689 F.3d 29, 61 (1st Cir.2012), *cert. denied,* 113 S.Ct. 1315 (2013) (first factor weighed against fair use where an archbishop used copyrighted translations of a religious text on his website; although the use was educational, the archbishop profited from the use, in part, in the form of enhanced professional reputation); *Worldwide Church of God v. Philadelphia Church of God, Inc.,* 227 F.3d 1110, 1118 (9th Cir.2000) (factor weighed against fair use where a religious organization distributed copies of a copyrighted book for use in its religious observance; the use was nontransformative, and although the use was educational, the organization profited indirectly by using the work to attract new members who would tithe ten percent of their income); *Weissmann v. Freeman,* 868 F.2d 1313, 1324 (2d Cir. 1989) (first factor weighed against fair use where a professor claimed an assistant's paper as his own work and copied it for use in his class, under the professor's name, because the professor profited from the use by enhancing his professional reputation and gaining a valuable authorship credit). So here, Wangler understood that although Channel 781 may not have secured "monetary profit," from using WCAC videos, "there's also the profit of gathering followers using copywritten content. And that was definitely something considered." (Pyle Aff., Ex. 1, Wangler Dep., p. 136). There is no dispute that Wangler subjectively believed that Channel 781's act of "drawing eyeballs, drawing viewers to content that we believed was infringing," and "building an audience based in part on infringing content," was unprotected by fair use. (*Id.* p. 121-122).

      B.      **The Nature of the Copyrighted Work.**

Wangler also considered the second fair use factor, the "nature of the copyrighted work." (Pyle Aff., Ex. 1, Wangler Dep. at 132). He recognized that unlike "fictional" material, which the

11

YouTube instructional video about fair use explained may be entitled to greater protection, the MAC-TV meeting videos were more "factual" than creative in nature. (*Id.*; Pyle Aff., Ex. 7). Wangler testified that he "possibly" considered the factual nature of the original meeting videos to be a factor in Channel 781's favor on the issue of fair use. (Pyle Aff., Ex. 1, at 132-133). However, the YouTube instructional video did not state that "factual" videos are never protected by copyright, and Wangler ultimately did not determine that this characteristic of the videos rendered Channel 781's uses fair. (Pyle Aff., Ex. 7).

      C.      **The Amount and Substantiality of the Portion Used.**

Wangler also considered "the amount and substantiality of the portion used in relation to the copyrighted work as a whole." 17 U.S.C. § 107. In his June 16, 2023 email to Sheehan, Wangler observed that the standalone Channel 781 videos used "a lot" of WCAC's copyrighted material, unlike the "short clips" Plaintiff used in its news-related Zoom videos. (Pyle Aff., Ex. 8). The shortest of the standalone clips was one minute and six seconds long, and the longest was twenty minutes, forty-six seconds in length. (Gedlu Aff., Ex. H). At his deposition, Wangler was asked, "Did you consider the length of any of those videos before choosing to include them in your next takedown notice?" (Pyle Aff., Ex. 1, p. 152) Wangler responded, "Yes." (*Id.*). "Some of the videos were lengthy, long. Some of the videos were shorter." (*Id.* at 153).

      D.      **The Effect of the Use on the Potential Market For or Value of the Copyrighted Work.**

Wangler was asked at his deposition if he considered whether Channel 781's videos harmed WCAC financially, and Wangler replied that he did consider this factor. (Pyle Aff., Ex. 1, p. 155). Neither Channel 781 nor WCAC was "monetizing" the government meetings, he noted, so financial harm was not a primary driver of his determination. (*Id.* at 156). Nonetheless, Wangler considered that "Channel 781 was a competitor" to WCAC, and thought that it was

12

"trying to draw viewers and subscribers using our copyright-protected content," including "younger viewers" who watched WCAC shows. (*Id.* at 157). Further, Wangler knew that on at least one occasion, a documentary filmmaker had paid WCAC to license footage that Wangler had shot of a community meeting. (Pyle Aff. Ex, 1, at 72, 80). The license reflects that the filmmaker paid WCAC $12,880.[6] (Supplemental Affidavit of Jeffrey J. Pyle, Ex. A).

## IV. IF "REASONABLENESS" IS CONSIDERED, THE COURT SHOULD FIND WCAC'S FAIR USE DETERMINATION REASONABLE.

As explained above, the test for a misrepresentation claim under 17 U.S.C. § 512(f) is subjective good faith and not objective reasonableness. However, even if the Court were to consider whether WCAC's fair use belief was reasonable, it should hold that it was, for the reasons set forth above. It was reasonable for Wangler to determine that each of Channel 781's standalone videos amounted to "a use of copyrighted material that merely repackages or republishes the original," which courts have long held "is unlikely to be deemed a fair use." *Fox News Network, LLC*, 883 F.3d at 177 (cleaned up). It was reasonable for Wangler to determine that Channel 781's mere excerpting and retitling of the clips for the purpose of informing the Waltham public about the doings of local government – the same purpose as WCAC's MAC-TV channel – was a use "for purposes that are substantially the same as those of the originals." *Andy Warhol Found. for the Visual Arts, Inc.*, 598 U.S. at 546. It was also reasonable for Wangler to

---

[6] It is true that Wangler found the non-transformative nature of Channel 781's uses of the WCAC videos to be an important factor in his determination – perhaps more important than other factors. (Pyle Aff., Ex. 1, Wangler Dep. at 134 (testifying that impact on WCAC's "ability to profit" was "not as important a consideration as the excerpting of copywritten material without a transformative purpose.")). However, courts frequently do the same thing. In 2019, law professor Jiarui Liu conducted an empirical study of all reported "transformative use" decisions in U.S. law and found that the concept "has been gradually approaching total dominance in fair use jurisprudence, involved in 90% of all fair use decisions in recent years." Further, of the dispositive decisions that found a transformative use, "94% eventually led to a finding of fair use." The factor, he concluded, has "essentially turned the four-factor" fair use "test into a one-factor test." Jiarui Liu, "An Empirical Study of Transformative Use in Copyright Law," 22 Stanford Tech. Law Rev. 163 (2019).

deem the length of the clips (up to 20 minutes) to be longer than what fair use would allow, and to be concerned about possible nonmonetary harm caused by Channel 781's practice of drawing audience members (and possibly diminishing WCAC's audience) through its routine piracy of WCAC content. (Pyle Aff., Ex. 1, Wangler Dep. at 156).

Indeed, the reasonableness of WCAC's determination that the standalone excerpts were not fair is reinforced by the fact that Channel 781 members *reached the same conclusion themselves* after consulting with copyright counsel. (WCAC Statement of Undisputed Facts at ¶¶ 24-27). Channel 781 "principal member" Tom Benavides (the signer of Channel 781's answers to interrogatories (Gedlu Aff., Ex. I)), told Channel 781 members after the first copyright strike that he assumed every "screen grab" of WCAC content "with no commentary" (in other words, each standalone clip) was a "pretty big liability," and a "pretty big risk" from a fair use perspective. (WCAC statement of Undisputed Facts, ¶ 24). The group later resolved to stop using such standalone clips of WCAC "without commentary," or at least without "adding 20 seconds at the beginning of us explaining the clip." (WCAC Statement of Undisputed Facts, ¶ 27). They did so <u>after</u> consulting with a lawyer from the Electronic Frontier Foundation and receiving legal advice concerning copyright and fair use. (*Id.*). That Channel 781 is now insisting that WCAC's fair use determination was unreasonable, when it was identical to the determination of both Channel 781 and (presumably) its copyright counsel, speaks volumes about this case.

## CONCLUSION

For the foregoing reasons, the Court should deny Channel 781's motion for summary judgment and allow the motion for summary judgment of defendant Waltham Community Access Corporation.

14

#5996803v1

        Respectfully submitted,

        WALTHAM COMMUNITY ACCESS
        CORPORATION,

        By its attorneys,

        */s/ Jeffrey J. Pyle*
        Jeffrey J. Pyle (BBO # 647438)
        jpyle@princelobel.com
        Sarah L. Doelger (BBO # 712677)
        sdoelger@princelobel.com
        PRINCE LOBEL TYE LLP
        One International Place, Suite 3700
        Boston, MA 02110
        T: 617-456-8000
        F: 617-456-8100

Dated: January 13, 2026

## Certificate of Service

    I hereby certify that the within document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and by first-class mail to any non-registered participants.

        /s/ Jeffrey J. Pyle
        Jeffrey J. Pyle

#5996803v1