UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| CHANNEL 781 NEWS,<br><br>　Plaintiff,<br>v.<br><br>WALTHAM COMMUNITY ACCESS CORPORATION,<br><br>　Defendant. | Civil Action No. 1:24-CV-11927-PBS |

# DEFENDANT WALTHAM COMMUNITY ACCESS CORPORATION'S RESPONSE TO STATEMENT OF DISPUTED FACTS OF PLAINTIFF CHANNEL 781 NEWS

Pursuant to Fed. R. Civ. P. 56 and Local Rule 56.1, Defendant Waltham Community Access Corporation ("WCAC") submits this response to plaintiff Channel 781 News's ("Channel 781") statement of undisputed material facts in support of its cross-motion for summary judgment.

1. Channel 781 operates a YouTube-based news outlet focusing on local affairs in the city of Waltham, Massachusetts (the "City"). Declaration of Betelhem Gedlu Ex. B, Wangler Dep. 94:15-95:20; 97:22-98:14; Ex. A, Kastorf Dep. 24:20-27:4; 27:19-29:4; Declaration of Joshua Kastorf ("Kastorf Decl.") ¶ 3.

   **WCAC's Response: Undisputed.**

2. One of the purposes of Channel 781 is to inform City voters by creating a searchable, accessible archive of the statements of particular city officials on selected municipal issues. Ex. A, Kastorf Dep. 26:3-29:4.

   **WCAC's Response: Undisputed.**

3. Channel 781's audience differs from the traditional cable access audience in both demographics and political outlook, consisting largely of younger individuals who are not longtime Waltham residents. Ex. B, Wangler Dep. 96:8-98:14.

   **WCAC's Response: Disputed in that the referenced deposition testimony does not support the statement. When asked whether Channel 781 appeals to a different audience than MAC-TV, the WCAC government channel, Wangler stated, "Yes and no,"

1

**explaining that "many" MAC-TV viewers are "older Waltham residents that are interested in the workings of city government," and are more "traditional consumers of news," whereas "Channel 781 News's audience is a younger audience," or it "skews younger." (Ex. B, Wangler Dep at 96-98). However, there is also overlap: WCAC's flagship news program, Waltham Newswatch, has "younger viewers." (*Id.* at 157).**

4. Channel 781 is non-commercial. The material it produces is available to all at no cost. It does not sell subscriptions or advertising. Members of Channel 781 contribute their time on a volunteer basis and the association does not compensate members for their work. Ex. B, Wangler Dep. 135:21-136:7; Kastorf Decl. ¶ 4.

    **WCAC's Response: Undisputed.**

5. Waltham Community Access Corporation ("WCAC") is a Massachusetts nonprofit corporation headquartered in Waltham, Massachusetts. WCAC operates the public and government access channels WCAC-TV and MAC-TV, serving the City of Waltham. Ex. E, WCAC's Answer ¶¶ 5,17, ECF No. 37.

    **WCAC's Response: Undisputed.**

6. MAC-TV produces and broadcasts government programming, including meetings of the Waltham City Council and its committees. Ex. R at WCAC0000556; Ex. C, Sheehan Dep. 28:4-20; Ex. B, Wangler Dep. 49:3-50:1.

    **WCAC's Response: Undisputed.**

7. The City of Waltham does not record its own government meetings; WCAC records those meetings on the City's behalf. Ex. B, Wangler Dep. 50:2-5.

    **WCAC's Response: Disputed only to the extent that Wangler did not testify that WCAC records government meetings "on the City's behalf," as opposed to doing so to fulfill WCAC's own nonprofit mission. (Ex. B, Wangler Dep. at 50).**

8. WCAC is the only entity designated by the City to carry out government-access broadcasting functions. Ex. B, Wangler Dep. 73:13-75:1; Ex. C, Sheehan Dep. 27:113; 29:5-10.

    **WCAC's Response: Disputed, in that the referenced deposition testimony does not support the statement in paragraph 8.**

9. Only WCAC regularly records Waltham city government meetings. Ex. B, Wangler Dep. 50:6-20.

    **WCAC's Response: Undisputed.**

10. WCAC records entire government meetings, without editing. Ex. B, Wangler Dep. 55:5-56:5; Ex. R at WCAC0000557-58.

2

**WCAC's Response: Undisputed.**

11. The members of WCAC's board of directors are appointed by the mayor of Waltham. Ex. C, Sheehan Dep. 55:21-56:15; Ex. D, Barrett Dep. 29:7-30:4.

    **WCAC's Response: Undisputed.**

12. Justin Barrett is the President of WCAC's Board of Directors and has served in that role for more than fifteen years. Mr. Barrett also serves as a member of the City's Survey and Planning Board and as Chair of the City Community Preservation Committee (CPC). Ex. D, Barrett Dep. 15:1-16:10.

    **WCAC's Response: Undisputed.**

13. Members of the Survey and Planning Board are appointed by the mayor and the City Council, while members of the Community Preservation Committee are appointed by the City Council. Ex. D, Barrett Dep. 17:17-18:4.

    **WCAC's Response: Undisputed.**

14. Most of WCAC's funding comes from a percentage of subscription fees paid to the pay-TV providers RCN, Comcast, and Verizon, pursuant to agreements between the providers and the City. Ex. C, Sheehan Dep. 22:24-25:14; 43:18-48:13; Ex. D, Barrett Dep. 30:10-16; Exs. L, M, N.

    **WCAC's Response: Undisputed.**

15. WCAC's funding from pay-TV subscription fees does not vary based on the number of people who view WCAC's programming. Ex. C, Sheehan Dep. 104:17-19.

    **WCAC's Response: Undisputed.**

16. The City's Law Department, under the authority of the mayor, negotiates franchise agreements with the pay-TV providers. Ex. C, Sheehan Dep. 29:5-17; 41:4-10.

    **WCAC's Response: Disputed only in that the referenced testimony does not establish that the Law Department negotiates agreements "under the authority of the mayor;" otherwise undisputed.**

17. The franchise agreements specify that the pay-TV providers (RCN, Verizon, and Comcast) pay an agreed percentage of subscriber fees they receive to support public, educational, and government (PEG) programming. Ex. C, Sheehan Dep. 22:24-23:9; 39:2-8; 41:4-10; Ex. P.

    **WCAC's Response: Undisputed.**

18. Some of the funds from pay-TV providers are paid directly to WCAC and some are collected by the City and reimbursed to WCAC for the purchase of equipment, at the City Council's

discretion. The City has authority to decline or limit reimbursement. Ex. C, Sheehan Dep. 24:2-26:20; 30:13-38:3.

**WCAC's Response: Disputed. The referenced testimony states only that the City of Waltham held certain money for Waltham PEG purposes by Comcast for purposes of building out the TV studio at the new Waltham High School for the education channel, and is releasing the remaining balance in the form of reimbursements to WCAC. The referenced testimony also states that this money can be used only for public access cable.**

19. WCAC does not measure the number of people who view its cable channels or its website. Ex. C, Sheehan Dep. 104:10-16.

    **WCAC's Response: Undisputed.**

20. WCAC allows journalists, residents, city employees, city council members, and candidates to use WCAC video, including city government meeting footage, without charge. Ex. B, Wangler Dep. 73:13-82:15; Ex. C, Sheehan Dep. 69:8-70:6.

    **WCAC's Response: Disputed. There are instances in which payment has been made in return for permission to use WCAC's content. (Ex. B, Wangler Dep. at 80 (testifying that documentary filmmaker paid WCAC for use of footage of a small amount of a community meeting about a triple homicide for inclusion in that program)).**

21. Waltham city council member Carlos Vidal is an anchor on Waltham Newswatch, the TV news program WCAC produces. Ex. C, Sheehan Dep. 55:2-18.

    **WCAC's Response: Undisputed.**

22. Ms. Sheehan communicates with Mayor Jeanette McCarthy several times a year. Ex. C, Sheehan Dep. 60:17-61:10.

    **WCAC's Response: Undisputed.**

23. WCAC News Director Christopher Wangler wrote a news article published on WCAC's website about an award presented to the Middlesex Human Services Agency, identifying Justin Barrett as the charity's board president but making no reference to his role as WCAC's board chair or his service on City commissions. Ex. B, Wangler Dep. 34:4-35:1; Ex. U.

    **WCAC's Response: Undisputed.**

24. WCAC News Director Christopher Wangler wrote a news article published on WCAC's website in August 2022 that described Mayor Jeanette McCarthy, in office since 2004, as a "woman of the people" who has "protected the city's interests above all else." Ex. B, Wangler Dep. 35:5-22; Ex. V.

    **WCAC's Response: Undisputed.**

25. In a November 2023 article published on WCAC's website, Mr. Wangler described Mayor McCarthy's 2023 challenger for the mayoralty, City Councilor Jonathan Paz, as championing resolutions that "have been more feel-good than fruitful." Mr. Wangler also wrote that Councilor Paz's "big-city approach doesn't necessarily resonate in Waltham." Ex. B, Wangler Dep. 36:1-20; Ex. W.

   **WCAC's Response: Undisputed.**

26. The City designates WCAC as its sole "Government Access" broadcaster. A central function of a Government Access broadcaster is recording and broadcasting city government meetings. Ex. C, Sheehan Dep. 39:2-41:3; Ex. B, Wangler Dep. 41:22-42:21; Ex. O.

   **WCAC's Response: Disputed in that neither the deposition testimony nor the document attached to the Gedlu Affidavit as Exhibit O establish that Waltham "designates WCAC as its sole 'Government Access' broadcaster." The second sentence is undisputed.**

27. WCAC records meetings of the City Council, various city council committees, and many other city commissions and boards. Ex. B, Wangler Dep. 38:15-39:21; Ex. O.

   **WCAC's Response: Undisputed.**

28. WCAC typically records city council meetings using cameras installed in the council chamber. WCAC owns the only video equipment installed in the chamber. Ex. B, Wangler Dep. 40:13-42:21.

   **WCAC's Response: The first sentence is undisputed. The second sentence is disputed in that the referenced testimony does not support the statement.**

29. These meetings are recorded pursuant to an internal policy stating that the camera be maintained on the person speaking. Ex. B, Wangler Dep. 52:12-54:18; Ex. R at WCAC0000557.

   **WCAC's Response: Disputed. The policy states as follows: "Meeting telecasts should be consistent in terms of content, appearance, and viewability. Wherever feasible, the speaker should be on-camera. Wherever possible, a graphic indicating the meeting and date should be shown." (Ex. B, Wangler Dep. 52:18-52:22; Ex. R).**

30. Meetings are recorded in their entirety, from call to order through adjournment. Ex. B, Wangler Dep. 55:5-20; Ex. R at WCAC0000558.

   **WCAC's Response: Undisputed.**

31. WCAC employees do not edit, rearrange, or add narration or commentary to the meeting recordings. Ex. B, Wangler Dep. 54:19-55:4; 55:21-56:5; Ex. R at WCAC0000558.

   **WCAC's Response: Undisputed.**

32. The only creative contributions WCAC identifies in its videos are "the choice of camera angles, inclusion of graphics, and sound engineering." Ex. F, Response No. 3.

    **WCAC's Response: Disputed. The above creative contributions are not an exclusive list, as it states: "WCAC personnel are responsible for all creative choices represented in those works, *including but not limited to* the choice of camera angles, inclusion of graphics, and sound engineering." (Gedlu Aff., Ex. F, Response No. 3. (emphasis added)). Chris Wangler testified that camera operators and switchers "make other decisions during shooting." (Ex. B, Wangler Dep. at 51).**

33. WCAC's government meeting recordings are broadcast on WCAC's MAC-TV cable channel and later uploaded to the "government" section of WCAC's website. Ex. B, Wangler Dep. 42:11-43:1; Ex. O.

    **WCAC's Response: Undisputed.**

34. The audience for WCAC programming tends to be older residents who have lived in Waltham for many years and are familiar with their elected officials. Ex. B, Wangler Dep. 96:8-98:14.

    **WCAC's Response: Disputed. See response to statement no. 3, above.**

35. WCAC Executive Director Maria Sheehan understood that posts on YouTube could be seen by "anybody from anywhere in the world," while posts to WCAC's website were unlikely to be, and she questioned whether Waltham city officials wanted their meetings viewable by a broader audience. (Ex. C, Sheehan Dep. 51:12-53:3, Ex. J, Sheehan testimony to Waltham City Council at time 6:10).

    **WCAC's Response: Undisputed.**

36. WCAC does not caption its video programming. Ex. C, Sheehan Dep. 48:14-49:3; 111:10-24.

    **WCAC's Response: Disputed. Sheehan testified that WCAC does caption its recordings with graphics, but does not provide closed captions for the hearing impaired**. **Ex. C, Sheehan Dep. 48:14-23.**

37. Through its programming, Channel 781 presents a perspective on city governance that differs from WCAC's news reporting. Ex. B, Wangler Dep. 108:22-109:9; Ex. C, Sheehan Dep. 88:2-89:24.

    **WCAC's Response: Disputed. Not all Channel 781 news-related programming differs materially in "perspective" from WCAC's programming. The standalone clips at issue, for example, are not materially different from WCAC's MAC-TV videos, in that they consist of mere excerpts of the same without additions or commentary.**

38. The clips at issue in this lawsuit range from one minute and six seconds to 20 minutes and 46 seconds and contain between 1.03% and 22.2% of a complete meeting recording. Exs. H, I.

6

#6006169v1

**WCAC's Response: Undisputed.**

39. The members of Channel 781 who posted the clips at issue added descriptive titles, sometimes including provocative quotations from city officials. Exs. H, I.

    **WCAC's Response: Undisputed.**

40. By posting the clips at issue to YouTube, the members of Channel 781 caused them to be captioned, and caused YouTube to generate searchable transcripts. Ex. A, Kastorf Dep. 47:8-48:21; 102:5-24.

    **WCAC's Response: Undisputed that the Channel 781 videos were automatically given closed captioning by YouTube. The referenced testimony does not establish that YouTube generated searchable transcripts of the statements in the videos.**

41. Channel 781's audience finds short, searchable clips more accessible than long recordings, and is more likely to discuss clips. Ex. A, Kastorf Dep. 47:8-48:21.

    **WCAC's Response: Disputed in that the referenced testimony does not establish that Channel 781's audience finds short clips "more accessible than long recordings," only that Channel 781 excerpted WCAC's content because it thought it could generate more discussion online of such clipped statements.**

42. WCAC was aware that its failure to caption the MAC-TV videos was one reason Channel 781 posted clips to YouTube. Ex. B, Wangler Dep. 128:4-14.

    **WCAC's Response: Undisputed.**

43. Channel 781 does not sell advertising or subscriptions and does not charge viewers for access to its content. Kastorf Decl. ¶ 4.

    **WCAC's Response: Undisputed.**

44. Channel 781's members contribute their time on a volunteer basis and the association does not compensate them for their work. Kastorf Decl. ¶ 4.

    **WCAC's Response: Undisputed.**

45. WCAC understood that Channel 781's reporting "criticized" or "challenged" the City's perspective. Ex. B, Wangler Dep. 108:22-110:2; Ex. C, Sheehan Dep. 88:2-92:4; 129:22-132:12.

    **WCAC's Response: Disputed. The referenced portion of Wangler's deposition states only that he had noticed that Channel 781 "had used some of [WCAC's] content to criticize elected officials in Waltham." (Ex. B, Wangler Dep. at 109:3-7). There is no mention of "the City's perspective." The referenced portion Sheehan's deposition states that Channel 781 "would take segments that were less flattering of the mayor" and "they took**

**footage that was derogatory of the mayor and put it online." Ex. C, Sheehan Dep. 88:22-89:20. Neither excerpt references Channel 781's standalone clips.**

46. Channel 781 created short video clips drawn from WCAC's MAC-TV government meeting recordings. Ex. C, Sheehan Dep. 107:4-108:3; Ex. B, Wangler Dep. 124:1721; Ex. A, Kastorf Dep. 44:12-45:5.

    **WCAC's Response: WCAC disputes that the clips Channel 781 copied from WCAC were "short." (Gedlu Aff., Ex. H).**

47. The members of Channel 781 inserted some clips into their Debrief and Headlines shows, and uploaded some to their YouTube channel separately. Ex. A, Kastorf Dep. 41:24-47:3.

    **WCAC's Response: Undisputed.**

48. The only graphics that appear in the 15 clips at issue are the name and date of the meeting and the "MAC-TV" logo. Gedlu Decl. ¶ 13.

    **WCAC's Response: Undisputed.**

49. No sound engineering beyond a verbatim reproduction of each speaker's words is evident in any of the 15 clips at issue. Gedlu Decl. ¶ 14.

    **WCAC's Response: Disputed in that the referenced declaration is not based on personal knowledge of what sound engineering went into the original WCAC videos from which the Channel 781 clips were derived, and is therefore not competent evidence on summary judgment.**

50. Of the fifteen clips at issue, eleven are less than 3 minutes. Ten of the clips use less than 3% of the source recording and all but one use less than 9%. Exs. H, I.

    **WCAC's Response: Undisputed.**

51. Each of the clips at issue captures a statement by a specific city official (or in one clip, two officials) on a specific issue. Exs. H, I.

    **WCAC's Response: Undisputed.**

52. The criteria that the members of Channel 781 used to select the clips included identifying statements by City officials on selected issues that the members of Channel 781 believed important; identifying clips where "someone expressed a certain idea or certain attitude in a way where [the members of Channel 781] thought the audience needed to hear them say it rather than hear us recount;" choosing clips that were short enough to encourage viewers to discuss issues online; seeking to draw the attention of other news outlets such as the Boston Globe; and choosing clips that were long enough to reassure viewers that they accurately reflected a speaker's opinions. Ex. A, Kastorf Dep. 44:12-49:5; 61:2-66:12; 82:8-21; 86:6-88:11.

**WCAC's Response: Undisputed.**

53. Channel 781 uses the excerpted video clips to highlight significant municipal issues for the public, adding discussion-provoking descriptions and provocative quotes in the video titles. Ex. A, Kastorf Dep. 46:17-49:5; 58:3-60:2; 64:16-65:22; Ex. B, Wangler Dep. 124:17-21; Exs. H, I.

    **WCAC's Response: Undisputed, except that Wangler testified only that some of the video titles were "sensational," and others "are not sensational at all." (Ex. B, Wangler Dep. at 158-159).**

54. The clip created by Channel 781 titled "Councilor LaFauci - Fossil Fuels Aren't Going Away" highlights a quote by one of the Waltham city councilors that evinces an "attitude about environmental issues" that Channel 781 member Joshua Kastorf believed was "very out of touch with a lot of our audience," appearing within a discussion of "building codes." Ex. A, Kastorf Dep. 79:24-82:4; Ex. I, Clip No. 5.

    **WCAC's Response: Undisputed.**

55. Members of Channel 781 created and posted the clip titled "McMenemin and Harris versus Paz, Tenant Rights Notification Ordinance" in part to illustrate that two city councilors were wasting time on procedural issues to avoid substantive discussion of a proposal. Ex. A, Kastorf Dep. 66:15-70:3; Ex. I, Clip No. 2.

    **WCAC's Response: Undisputed.**

56. WCAC Executive Director Maria Sheehan understood that by creating the excerpts, the members of Channel 781 added "their own spin," changing the message of the source videos. Ex. C, Sheehan Dep. 91:3-17, 107:4-108:3; Ex. A, Kastorf Dep. 116:23117:2.

    **WCAC's Response: Disputed. The statement mischaracterizes Sheehan's testimony, which is in reference to Channel 781's "news reporting," not its excerpting of clips of WCAC content. Sheehan was asked, "Based on the Channel 781 material that you have seen, do you believe that Channel 781's <u>news reporting</u> had a political bias?" to which Sheehan responded, "Yes." (Gedlu Aff., Ex. C, p. 91) (emphasis supplied). She described the "news reporting" as "taking segments of candidates they didn't agree with and taking parts of what was being said and putting it up online. What -- and putting their own spin on that, which is fine. They can do whatever they want. <u>It's their show</u>. But it was our footage that they were using." (Id.) (emphasis supplied). In other words, Sheehan was asked, and testified, only about Channel 781's "news reporting," such as its headline news and "debrief" shows, not about Channel 781's stand-alone clips of government meetings.**

57. Sheehan knew that Channel 781 was using meeting video clips "to promote political candidates in the city." Ex. C, Sheehan Dep. 129:22-130:6; 88:2-13.

    **WCAC's Response: Undisputed that Sheehan characterized Channel 781's uses generally in this way in an email. Answering further, WCAC states that Sheehan was not**

9

**clearly asked at her deposition whether she thought Channel 781 was using standalone clips of WCAC content to promote political candidates.**

58. Neither WCAC nor Channel 781 monetized government meeting videos. Ex. B, Wangler Dep. 131:4-15; 135:21-136:7; 155:21-156:6; Kastorf Decl. ¶ 4.

    **WCAC's Response: Undisputed.**

59. On April 6, 2023, WCAC aired a Waltham Newswatch segment in which Executive Director Maria Sheehan read a prepared statement: "Our station is a private nonprofit that does not receive taxpayer funding. Over recent years, photographs from our news department, and video from the MAC channel, have been reproduced without our permission. We know this is a reality of the world we live in, but we put copyright disclaimers on our media for a reason. Some have used our content to score political points under the veil of anonymity. Others have used it to encourage residents to hate. This practice can damage reputations and spread misinformation and we do not want to be a part of that. So as we head into a contentious election season, I'm asking the public to respect people who work hard to create our original content. In the interest of transparency, we will entertain requests to reuse our content for free, but misuse is wrong, and it is illegal. Moving forward, the Waltham Channel will take whatever legal steps necessary to protect our content." The statement was written by News Director Christopher Wangler and edited by Ms. Sheehan. Ex. B, Wangler Dep. 99:23-101:12; Ex. C, Sheehan Dep. 94:15-96:1; Ex. X.

    **WCAC's Response: Undisputed.**

60. Following the broadcast, Joshua Kastorf, a member of Channel 781, requested a meeting with Sheehan to discuss WCAC's statement and Channel 781's use of WCAC's recordings. The meeting occurred on June 15 2023 at WCAC's offices. Ex. A , Kastorf Dep. 107:23-109:24; 114:21-115:7.

    **WCAC's Response: Undisputed.**

61. When they met, Kastorf asked Sheehan why WCAC did not provide captions for its programming. Sheehan responded that WCAC was not legally required to provide captions and that no one had requested them. Ex. A, Kastorf Dep. 115:9-116:8.

    **WCAC's Response: Disputed. Ms. Sheehan described her conversation with Mr. Kastorf as follows: "we talked about closed-captioning. And I explained to him that we just didn't have the budget for closed-captioning, and that seemed to upset him. And I said I wish we could, but we just don't have the finances to do it." Ex. C, Sheehan Dep. 111:11-24.**

62. The discussion then turned to Channel 781's use of WCAC's government-meeting clips. Sheehan told Kastorf that "the problem with what you're doing is that you're not just using these clips to inform people—you're putting your spin on them." Ex. A, Kastorf Dep. 116:17-117:22.

**WCAC's Response: Disputed. When Sheehan was asked at her deposition if she told Mr. Kastorf that she was concerned about his using clips to express opinions, Sheehan answered: "I don't recall that. And I can't imagine I would, because that's the point of Public Access TV is to have an opinion." Ex. C, Sheehan Dep. 112:24-113:2.**

63. Sheehan said she would consult WCAC's board about creating a new policy on clip usage, under which Channel 781 would need to request permission for each individual clip. Kastorf objected that such a policy would chill free speech, since WCAC could deny permission based on content or politics. Kastorf explained that, while requesting permission might be standard industry courtesy, fair use under copyright law allowed Channel 781 to use short clips for commentary and public-interest reporting. Ex. A, Kastorf Dep. 117:23-119:22.

    **WCAC's Response: Undisputed.**

64. WCAC subsequently created a draft policy on clip usage but never published it. Ex. C, Sheehan Dep. 72:15-75:2; 77:2-10; Ex. Q.

    **WCAC's Response: Undisputed.**

65. After leaving, Kastorf sent Sheehan an email providing more information about fair use. Ex. A, Kastorf Dep. 120:19-121:1; Exs. S, T.

    **WCAC's Response: Undisputed.**

66. Sheehan confirmed she received Kastorf's email and assigned Wangler the task of considering whether Channel 781 had the legal right to post the clips. Ex. C, Sheehan Dep. 126:21-127:1; 137:15-138:5.

    **WCAC's Response: Undisputed.**

67. Wangler read Kastorf's email but did not read the external documents hyperlinked in it. Ex. B, Wangler Dep. 126:12-127:15; Exs. S,T.

    **WCAC's Response: Undisputed.**

68. On June 16, 2023, a day after Sheehan met with Kastorf, Wangler wrote an e-mail to Sheehan asserting that the clips of government meetings that Channel 781 posted to its YouTube channel that were not incorporated into Channel 781's "Debrief" program were not fair use because they were "reproduced verbatim with zero editing or commentary," that they " 'merely copy', a lot of it is used without permission, and the main focus in [sic] the copywritten material." He concluded that "Those will be the ones we should file copyright claims against." Ex. B, Wangler Dep. 130:5-24; 134:22135:7; Exs. Y, Z.

    **WCAC's Response: Disputed. The text of the email states: "Youtube does NOT determine fair use, only a judge would. But Youtube can strike or remove videos that directly copy copywritten material. That is what this is about. It's possible 781 News Zoom videos using short clips qualify as Fair Use. What does not qualify are the large number of videos**

11

**taken directly from us and reproduced verbatim with zero editing or commentary. Those will be the ones we should file copyright claims against because they 'merely copy', a lot of it is used without permission, and the main focus in the copywritten material." Ex. Y.**

69. Sheehan agreed with Wangler's recommendation and informed Board President Justin Barrett that WCAC would move forward with takedown notices. Ex. C, Sheehan Dep. 125:7-126:5.

    **WCAC's Response: Undisputed.**

70. Mr. Wangler was aware of the fair use factors. Ex. B, Wangler Dep. 131:4-134:10; Ex. K.

    **WCAC's Response: Undisputed.**

71. WCAC had not formed any particularized belief about the effect that Channel 781's posting of the clips at issue had on the market value of each of the source videos at the time it sent the takedown notices. Ex. F, Response No. 5.

    **WCAC's Response: Undisputed.**

72. Mr. Wangler knew that Channel 781 appealed to a different audience than WCAC's MAC-TV but did not remember considering this fact when deciding whether to send an infringement notice. Ex. B, Wangler Dep. 134:11-21.

    **WCAC's Response: Disputed. Wangler considered that "Channel 781 was a competitor" to WCAC, and thought that it was "trying to draw viewers and subscribers using our copyright-protected content," including "younger viewers" who watched WCAC shows. (Ex. B, Wangler Dep. at 157).**

73. When deciding to send infringement notices, Mr. Wangler did not attempt to apply the third fair use factor, the amount of copyrighted material used, because he considered it "a difficult concept to understand as a layperson." Ex. B, Wangler Dep. 133:2-16.

    **WCAC's Response: Disputed. At his deposition, Wangler was asked, "Did you consider the length of any of those videos before choosing to include them in your next takedown notice?" (Ex. B, Wangler Dep. p. 152) Wangler responded, "Yes." (*Id*.). "Some of the videos were lengthy, long. Some of the videos were shorter." (*Id*. at 153).**

74. The only harm WCAC identified as resulting from Channel 781's posting of MAC-TV clips were that "someone is using our content without permission." Channel 781 "building an audience based in part on infringing content" was "maybe not a harm but not a benefit" to WCAC. Ex. B, Wangler Dep. 118:21-122:4.

    **WCAC's Response: Disputed. Wangler considered that Channel 781 "was a competitor to WCAC's news work" and concluded that "Channel 781 was reproducing these videos without our permission, which was not in keeping with professional practices we were accustomed to with network affiliates and others. And they were trying to draw viewers and subscribers using our copyright-protected content." (Ex. B, Wangler Dep. at 156).**

12

**He also considered that Channel 781 would "possibly" "draw viewers and/or subscribers away from WCAC." (*Id.*).**

75. Mr. Wangler testified in deposition that when choosing which videos to include in a takedown notice, he did not recall considering the factual nature of the MAC-TV videos. Ex. B, Wangler Dep. 155:1-20.

    **WCAC's Response: Undisputed.**

76. When selecting additional videos to include in infringement notices, Mr. Wangler observed that the videos varied in length but made no distinction among them on that basis, instead selecting all additional videos simply because they were "stand-alone videos." Ex. B, Wangler Dep. 152:9-153:2.

    **WCAC's Response: Disputed. This statement mischaracterizes Wangler's testimony, where he affirmed that he considered the length of the videos before choosing to include them in the takedown notice. (Ex. B, Wangler Dep. 152:12-19). Wangler further testified that he concluded that "some of the videos were lengthy, long. Some of the videos were shorter." (Ex. B, Wangler Dep. 153:1-2). Wangler further testified that, "In order to make the takedown request, I navigated to the Waltham DATA page, watched ones that were stand-alone, determined they were similar to the first video I had submitted a takedown request for, and prepared takedown requests for additional similar classes – class of videos, stand-alone videos. (Ex. B, Wangler Dep. 152:13-19).**

77. Mr. Wangler used commercial video footage of a Waltham resident's appearance on the reality TV program Top Chef in a series of videos for Waltham Newswatch, and relied on fair use to do so. Ex. B, Wangler Dep. 66:18-67:10; 68:15-19.

    **WCAC's Response: Disputed. While Wangler did consider whether using the footage was a fair use, he could not recall whether he received permission from the network or anyone else to use the footage. (Ex. B, Wangler Dep. 67:2-10).**

78. Mr. Wangler believed using the Top Chef clips was transformative because it was for news reporting and highlighted "the Waltham angle" and because he was not monetarily benefiting from the use. Ex. B, Wangler Dep. 67:8-17.

    **WCAC's Response: Undisputed.**

79. Mr. Wangler believed that using "only the parts that involved the Waltham guy" was an appropriate amount of Top Chef video to use. Ex. B, Wangler Dep. 67:18-22.

    **WCAC's Response: Undisputed.**

80. Some of the clips from Top Chef were used in unaltered form. Ex. B, Wangler Dep. 69:7-19.

13

**WCAC's Response: Disputed. Wangler testified only that some of the clips "include[d] the original sound," not that the clips were used "in unaltered form." (Ex. B, Wangler Dep. at 69).**

81. After consulting with Ms. Sheehan, Mr. Wangler first sent a notice to YouTube targeting one Channel 781 video in July. YouTube rejected the notice. Ex. B, Wangler Dep. 123:11-124:5; Ex. C, Sheehan Dep. 125:7-126:5; 126:21-127:14.

    **WCAC's Response: Undisputed.**

82. In September 2023, Ms. Sheehan and Mr. Wangler learned that Channel 781 had posted an unedited video of a campaign speech by Mayor McCarthy that was embarrassing to WCAC. Channel 781 posted the video to illustrate that WCAC was giving Mayor McCarthy special treatment compared with other candidates. Ex. B, Wangler Dep. 140:20-144:10; Ex. A, Kastorf Dep. 167:20-168:16.

    **WCAC's Response: Disputed as to the second sentence only. The referenced deposition testimony does not show that "Channel 781 posted the video to illustrate that WCAC was giving Mayor McCarthy special treatment compared with other candidates." Rather, different Channel 781 members wanted to post the video for different reasons. Chris Gamble, a principal Channel 781 member, registered his "vote" to "put it online because I think it's funny and I wouldn't want to not share it with someone who also found it funny." (Pyle Aff., Ex. 11).**

83. WCAC submitted three infringement notices to YouTube on September 1, 6, and 7, 2023, asserting that fifteen of Channel 781's clips infringed WCAC copyrights. Ex. B, Wangler Dep. 151:7-18; 152:6-11; 154:7-14.

    **WCAC's Response: Undisputed.**

84. After receiving each of WCAC's three infringement notices, YouTube disabled the identified videos and, following the third notice on September 7, 2023, terminated Channel 781's YouTube channel pursuant to its three-strikes policy. Ex. B, Wangler Dep. 153:18-154:6; 159:7-160:4; Ex. A, Kastorf Dep. 158:12-159:16.

    **WCAC's Response: Undisputed.**

85. Channel 781, through counsel, sent counter-notifications and follow-up communications to YouTube asking that Channel 781's channel and videos be restored. After receiving Channel 781's counter-notification, YouTube reinstated Channel 781's channel and the videos it contained on November 27, 2023. Kastorf Decl. ¶ 6.

    **WCAC's Response: Disputed. Channel 781's counter-notices were repeatedly rejected by Google. (Complaint, ¶¶ 38-39, 45-46). The channel was reinstated only after Channel 781's counsel sent an email to Nicole Jones, counsel for Google, asking her to take another look at the initially rejected counternotice and stating that "EFF is going to write about this incident on our blog and social media, but before we do, I'm hoping you can take**

**another look or forward this to the right person and let us know if YouTube can restore our client's channel."** (Supplemental Affidavit of Jeffrey J. Pyle, Ex. B, GOOGLE-000089).

86. Channel 781 was unable to share its reporting with the Waltham community from when its channel was disabled until the members of Channel 781 created a new channel and populated it with videos. Ex. A, Kastorf Dep. 191:23-192:16; 162:7-20.

    **WCAC's Response: Undisputed. Further answering, Kastorf established the new channel and uploaded Channel 781's recent videos (starting with candidate videos related to the election) to the new channel on the very same day the old channel was disabled. (Ex. A, Kastorf Dep. at 161-162).**

87. Members of Channel 781 spent approximately six hours responding to the disabling of their channel, including creating a new channel and populating it with videos. Ex. A, Kastorf Dep. 161:7-162:6; Ex. G, Response No. 5.

    **WCAC's Response: Undisputed.**

88. After YouTube removed Channel 781's channel in response to WCAC's notices, Channel 781 members retained counsel to help restore the channel and vindicate their rights. Ex. A, Kastorf Dep. 198:4-11; Ex. G, Response No. 5.

    **WCAC's Response: Undisputed.**

Respectfully submitted,

WALTHAM COMMUNITY ACCESS
CORPORATION,

By its attorneys,

/s/ Jeffrey J. Pyle
Jeffrey J. Pyle (BBO # 647438)
jpyle@princelobel.com
Sarah L. Doelger (BBO # 712677)
sdoelger@princelobel.com
PRINCE LOBEL TYE LLP
One International Place, Suite 3700
Boston, MA 02110
T: 617-456-8000
F: 617-456-8100

Dated: January 13, 2026

#6006169v1

## Certificate of Service

       I hereby certify that the within document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and by first-class mail to any non-registered participants.

                                                  /s/ *Jeffrey J. Pyle*
                                                  Jeffrey J. Pyle

#6006169v1