IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Channel 781 News,<br><br>        Plaintiff,<br><br>    v.<br><br>Waltham Community Access Corporation<br><br>        Defendant. | Case No.: 1:24-cv-11927-PBS |

**REPLY IN SUPPORT OF PLAINTIFF CHANEL 781 NEWS'S
MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................................1

I.    SECTION 512(f) STATES AN OBJECTIVE STANDARD OF LIABILITY. ..................1

II.   AT A MINIMUM, WCAC'S FAILURE TO CONSIDER KNOWN FACTS
IN LIGHT OF FAIR USE PRECLUDES A "GOOD FAITH BELIEF." ..........................3

    A.    Even Following *Rossi*, the *Lenz* Decision Still Requires Consideration
of Known Facts in a Fair Use Analysis. ..................................................................4

    B.    WCAC Did Not Have a Good Faith Belief Under Any Standard,
Because It Avoided Consideration of Fair Use Factors Along with
Known Facts. ...........................................................................................................5

        1.    WCAC Knew the Clips Had a Different Purpose and Character
than the Original Videos. .............................................................................5

        2.    WCAC Knew and Ignored that the Clips Were Factual Records
Created for a Public Purpose. .......................................................................7

        3.    WCAC Did Not Consider the Length of the Clips in Good
Faith. .............................................................................................................8

        4.    WCAC Knew the Clips Caused No Harm to the Market for or
Value of the Original Recordings. ...............................................................9

CONCLUSION..................................................................................................................10

**INTRODUCTION**

Local governments like the City of Waltham create and fund government access broadcasters not to raise revenue or protect elected officials, but to enable citizens to hold those officials accountable. That's exactly what Plaintiff Channel 781 News ("Channel 781") was doing when it posted clips of government meetings on its YouTube page alongside its own news and opinion programming. Appearing in that context, "stand-alone" clips from those meetings were part of Channel 781's journalistic work. But employees of Waltham Community Access Corporation ("WCAC"), out of disdain for Channel 781's political views and its use of recordings from WCAC's government access channel, set out to chastise Channel 781 using the powerful mechanism of Digital Millennium Copyright Act takedown notices. Undisputed facts show that they accomplished this by disregarding essential elements of the fair use doctrine, along with significant facts that they knew would have informed any good faith consideration of fair use. Accordingly, this Court should grant summary judgment to Channel 781.

**I.     SECTION 512(f) STATES AN OBJECTIVE STANDARD OF LIABILITY.**

As an initial matter, the Ninth Circuit's holding in *Rossi v. Motion Picture Association of America*—that a subjective belief that a work is infringing is enough to avoid liability under 17 U.S.C. § 512(f)[1]—is wrong, and this Court should not follow it. Other courts have correctly concluded that Section 512(f) requires an objectively reasonable belief. *See Moonbug Ent. Ltd. v. BabyBus (Fujian) Network Tech. Co.*, No. 21-CV-06536-EMC, 2024 WL 2193323, at *15 (N.D. Cal. May 15, 2024) ("'Knowingly' means that a party actually knew, should have known if it acted with reasonable care or diligence, or would have had no substantial doubt had it been acting in good faith, that it was making misrepresentations."). This Court should conclude likewise because

---

[1] 391 F.3d 1000, 1004 (9th Cir. 2004).

the statutory text points to an objective standard, and because an objective standard best fulfills Congress's intent. Memorandum in Support of Plaintiff Channel 781's Motion for Summary Judgment ("Channel 781 Mem.") at 9-13.

Aside from *Rossi* and its progeny, WCAC points to no case that construes "good faith" as creating a purely subjective standard.[2] In fact, Congress frequently uses the phrase "good faith" to specify an objective standard. Channel 781 Mem. at 11-12 (citing cases). And while WCAC insists these statutes "use the phrase differently" than Section 512(c) does, WCAC does not identify the difference—because none exists.

Securities law provides a close parallel. 15 U.S.C. § 78t(a) makes "controlling" parties vicariously liable for violations by those they supervise, unless the supervisor "acted in good faith." Interpreting this language to require "a reasonable and proper system of supervision"—more than subjectively well-intentioned "supervisory procedures"—balanced Congress's dual intent to avoid overbroad liability while protecting the public against abuses. *Hollinger v. Titan Cap. Corp.,* 914 F.2d 1564, 1575-77 (9th Cir. 1990) (en banc).

Section 512(f) is likewise a remedial statute enacted to protect the public, and it strikes the same balance. Having established a fast, powerful extrajudicial tool for taking down speech, Congress enacted Section 512(f) "to deter knowingly false allegations to service providers in recognition that such misrepresentations are detrimental to rights holders, service providers, and

---

[2] The holdings on statutory construction cited in the *Rossi* opinion stand for the unremarkable proposition that subjective and objective tests are not the same. All of the cited cases concern statutes that explicitly include the word "reasonable." *Rossi*, 391 F.3d at 1004; *see Alvarez v. IBP, Inc.*, 339 F.3d 894, 909 (9th Cir. 2003); *Austin v. McNamara,* 979 F.2d 728, 734 (9th Cir. 1992); *Brooks v. Village of Ridgefield Park,* 185 F.3d 130, 137 (3d Cir. 1999). None hold that "good faith," standing alone, necessarily states a subjective test. *Id. Contra* WCAC Opp. at 3 n.1.

Internet users." S. REP. NO. 105-190, at 49. Congress intended an effective deterrent that cannot be avoided by knowingly failing to apply the fair use factors in a reasonable way.[3]

WCAC suggests that the phrase "knowingly materially misrepresents" in Section 512(f) transforms Section 512(c)'s "good faith belief" standard into a subjective one. This is incorrect because the word "knowingly" applies to the "misrepresent[ation]" of a good faith belief, not to what's required to form a good faith belief in the first place. A rightsholder who fails to consider fair use as a reasonable person makes a "knowing" misrepresentation when they profess a "good faith belief" that the use is infringing. *Lenz v. Universal Music Corp.*, 815 F.3d 1145, 1154 (9th Cir. 2016) ("A copyright holder who pays lip service to the consideration of fair use by claiming it formed a good faith belief when there is evidence to the contrary is still subject to § 512(f) liability.").

In short, the *Rossi* holding contradicted both the common statutory construction of the phrase "good faith" and Congressional intent. This Court should decline to follow *Rossi* and apply an objective test.

## II. AT A MINIMUM, WCAC'S FAILURE TO CONSIDER KNOWN FACTS IN LIGHT OF FAIR USE PRECLUDES A "GOOD FAITH BELIEF."

If the Court nonetheless follows *Rossi*, it should still grant summary judgment to Channel 781 because under *Lenz*, a belief not based on known facts considered in the context of the four fair use factors is not a good faith belief. 815 F.3d at 1154.

---

[3] WCAC's assertion that "the DMCA is not primarily directed at ensuring that material is not wrongly removed" is not supported by either statutory text or legislative history, and WCAC cites no source for it. WCAC Opp. at 6-7.

### A.     Even Following *Rossi*, the *Lenz* Decision Still Requires Consideration of Known Facts in a Fair Use Analysis.

In *Lenz*, the defendant considered facts that were highly relevant to at least the first and third fair use factors. *Lenz v. Universal Music Corp.,* No. 5:07-CV-03783-JF, 2013 WL 271673, at *6 (N.D. Cal. Jan. 24, 2013)(*aff'd*, 815 F.3d at 1154). The district court found that this was not sufficient, even under a subjective standard, because Universal did not "mak[e] any effort to evaluate the significance of such facts in the context of the [fair use] doctrine itself." *Id.* A partial analysis that doesn't include at least "an initial assessment" of known facts in light of all of the fair use factors does not give rise to a subjective good faith belief under *Lenz.* 2013 WL 271673, at *6; *see also ENTTech Media Grp. LLC v. Okularity, Inc.*, No. 2:20-cv-06298-JWH-Ex, 2021 WL 916307, at *6 (C.D. Cal. Mar. 10, 2021) (allegation that fair use analysis was merely "pro forma" stated a claim for misrepresentation).

In addition, WCAC does not dispute that willful blindness, including "ostrich-like business practices," can be a knowing misrepresentation under Section 512(f). *MFB Fertility, Inc. v. Action Care Mobile Veterinary Clinic, LLC*, 730 F. Supp. 3d 740, 752 (N.D. Ill. 2024).

WCAC acknowledges that the statutory phrase "good faith" can encompass different "level[s] of subjectivity" based on its "context." WCAC Opp. at 5 & n.3. But WCAC argues for a standard that reads "good faith" out of the statute entirely, at least when fair use is at issue. If Section 512(f) does not require a rightsholder to apply the facts it knows to the fair use factors, then the incomplete fair use analysis done by the defendant in *Lenz*—which the defendant subjectively believed was sufficient—would have been enough to grant summary judgment to the defendant.

WCAC's view renders fair use—one of copyright's "built-in First Amendment accommodations"—an illusion in the online context. *Eldred v. Ashcroft*, 537 U.S. 186, 219-20

4

(2003). A subjectively held but incorrect belief that commercial uses are never fair, for example, would be enough to suppress fair uses that a good faith consideration would otherwise reveal. Under WCAC's view, rightsholders would have a strong incentive to label their analysis as "fair use" while remaining ignorant about what fair use actually is. Under any standard, Congress could not have intended that "fair use" be a mere shibboleth that one can utter to avoid responsibility for a harmful takedown made without due consideration.

> **B.    WCAC Did Not Have a Good Faith Belief Under Any Standard, Because It Avoided Consideration of Fair Use Factors Along with Known Facts.**

WCAC did not consider fair use as the law requires, because undisputed facts show it avoided consideration of the second, third, and fourth factors and significant known facts that bear on the first factor.

> **1.    WCAC Knew the Clips Had a Different Purpose and Character than the Original Videos.**

To be "transformative" under the first factor, "alterations or additions" are not required—use for a distinct purpose, in a distinct context, is sufficient. *Nuñez v. Caribbean Int'l News Corp.*, 235 F.3d 18, 23 (1st Cir. 2000); *contra* WCAC Opp. at 8.[4] WCAC News Director Chris Wangler understood this, having used unaltered clips of others' video in his own news reporting and considered it a fair use. Channel 781 Br. at 26; (Ex. B, Wangler Dep. 67:8-17).[5]

---

[4] WCAC quotes the statement from *Fox News Network, LLC v. Tveyes, Inc.,* 883 F.3d 169, 177 (2d Cir. 2018), that a use that "merely repackages or republishes the original" is not transformative. WCAC Opp. at 9. In fact, that case held that providing excerpts from copyrighted broadcasts *was* transformative because it enabled access to material "that would otherwise be irretrievable, or else retrievable only through prohibitively inconvenient or inefficient means." *Id.* The court ruled against fair use based on other factors not present in this case, including commerciality. *Id.* at 180-181.

[5] Wangler testified that "I did alter *some* of the clips" by removing the sound while others had "the original sound." (Ex. B, Wangler Dep. 69:7-19) (emphasis added). "Ex." herein refers to exhibits to the Declaration of Betelhem Gedlu in Support of Channel 781's Motion for Summary Judgment (ECF No. 53).

5

Wangler was also aware of significant facts that bear on the purpose and character of Channel 781's clips, including that they had a different audience and expressed criticism through their titles. Channel 781 Mem. 17-18, 25-26. And Wangler knew that Channel 781 was "against the status quo" and criticized elected officials, which the original MAC-TV recordings did not. *See* Channel 781 Mem. at 4. He was also aware that Channel 781 caused its clips to be captioned for the hearing-impaired, something WCAC did not do. (Ex. B, Wangler Dep. 128:8-14).

Moreover, Wangler knew that the MAC-TV channel and "Government" webpage are not part of WCAC's "competitive news business" because they do not contain news reporting or editorial content. Instead, they fulfill WCAC's separate "government access" role. *See* Channel 781 Mem. at 4. Wangler viewed Channel 781's stand-alone video clips in their context—the "Waltham DATA" YouTube channel—where he could see that they served as news reporting and commentary, not government access broadcasting, and were therefore a transformative use. (Ex. B, Wangler Dep. 148:19-21); *see Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 756 F.3d 73, 84-85 (2d Cir. 2014) (where original work presented corporate officers' statements as "true or reliable" and secondary user "was simply revealing the newsworthy information" they contained, use was transformative).

Despite knowing these facts, and the fair use factors, Wangler chose to focus on a single fact that he believed supported a claim of infringement—that the clips were verbatim excerpts from the MAC-TV meeting videos:

> Q: Did you consider whether Channel 781 had chosen those clips in part to portray the people in the clips in a bad light?
> MS. DOELGER: Objection.
> A: I don't know. I don't know. Possibly.
> Q: Was that an issue you considered?
> MS. DOELGER: Objection.

> A: *The main consideration was this is a stand-alone clip.* It merely copies. The focus of the clip is the copywritten content. It's not transformative; therefore, it's subject to a YouTube takedown notice.

(Ex. B, Wangler Dep. 159:7-18) (emphasis added). Failing to consider the other facts that he knew in light of fair use precludes a "good faith belief."[6]

### 2. WCAC Knew and Ignored that the Clips Were Factual Records Created for a Public Purpose.

It is undisputed that Wangler understood the factual nature of the government meeting recordings, and that they were made to fulfill WCAC's "government access" mission. (Ex. B, Wangler Dep. 49:3-21; 132:12-15). The factual nature of a work is highly significant to fair use when the public interest favors broad access to the underlying facts. *See Google LLC v. Oracle Am., Inc.*, 593 U.S. 1, 21 (2021).

Joshua Kastorf attempted to put WCAC on notice of this issue by recommending the "Set of Principles in Fair Use for Journalism" paper, which noted that "[o]ften, however, *bare facts* are not enough; the very *words or images* through which information is expressed may be part of the story." (Ex. T at 7) (emphasis added); Ex. S. Wangler saw Kastorf's recommendation but did not read the paper. (Ex. B, Wangler Dep. 127:6-15).

In summarizing his purported fair use consideration to Sheehan, Wangler did not mention the factual nature of the material or its public function. (Ex. Y). He again omitted this factor during

---

[6] WCAC mischaracterizes Channel 781's own deliberations regarding fair use. Its members did not "reach[] the same conclusion" as WCAC did that "the standalone excerpts were not fair." WCAC Opp. at 14. While they discussed whether "stand-alone" clips were sufficiently transformative, Jamie Krikeles also asserted in their group chat that "fair use is a thing, I find it hard to imagine them making the case that clipping a recording of a publicly recorded meeting isn't fair use. … We also aren't commercializing it." (Pyle Aff., Ex. 5, at C781_00000510). Joshua Kastorf ultimately did more research on fair use, applied the four factors holistically, unlike Wangler, and concluded that the clips were a fair use. Channel 781 nonetheless refrained from posting stand-alone clips after WCAC's DMCA takedowns in an attempt to avoid further improper takedowns by WCAC. *See* Channel 781 Mem. at 27-28; (Ex. A, Kastorf Dep. 182:20-183:1).

7

his deposition when summarizing the process he went through before sending WCAC's third and largest DMCA takedown. (Ex. B, Wangler Dep. 155:1-10). Against this evidence, Wangler's recollection that he "possibly" considered the issue does not show a good faith consideration of the facts in light of fair use. At most it shows only "lip service" to a fair use consideration. *Lenz*, 815 F.3d at 1154.

### 3. WCAC Did Not Consider the Length of the Clips in Good Faith.

The third fair use factor looks at whether a use "employs more of the copyrighted work than is necessary, and whether the copying was excessive in relation to any valid purposes asserted under the first factor." *Authors Guild, Inc. v. HathiTrust,* 755 F.3d 87, 96 (2d Cir. 2014). Chris Wangler understood this. When selecting clips from "Top Chef" to use on WCAC, he "use[d] only the parts that involved the Waltham guy." (Ex. B, Wangler Dep. 67:11-22). In other words, the amount he used was related to the purpose for which he used it.

Wangler used no such care in his review of Channel 781's clips. Having watched the clips, he was aware that the majority included less than 3 minutes of a multi-hour meeting. (Ex. B, Wangler Dep. 149:22-24). More importantly, Wangler was on notice that each clip encompassed the discussion of a single issue by one or two city councilors, congruent with the themes expressed in the clip title and Channel 781's reporting. Channel 781 Mem. at 20-21. Limiting the clips in that way ensured they were no substitute for watching an entire meeting video—something Wangler knew MAC-TV viewers sometimes do. (Ex. B, Wangler Dep. 96:15-97:1). Yet, in communicating his purported fair use analysis to Sheehan, he reported only that "a lot of it is used without permission." (Ex. Y). He later testified that he made no effort to determine whether a 1-to-2 minute excerpt was excessively long, and instead "focused more on the reproduction of our copyright-protected video in its entirety." (Ex. B, Wangler Dep. 133:6-16). Consistent with this lack of

8

consideration, while Wangler noted that the clips varied in length, he did not spare the short clips when sending takedown notices.

### 4. WCAC Knew the Clips Caused No Harm to the Market for or Value of the Original Recordings.

The fourth factor looks to whether the use "would frustrate the purposes of copyright by materially impairing [the rightsholder's] incentive to publish the work." *Cambridge Univ. Press v. Patton*, 769 F.3d 1232, 1276 (11th Cir. 2014). It is sometimes called "the single most important element of fair use." *Monsarrat v. Newman*, 28 F.4th 314, 324 (1st Cir. 2022) (quoting *Harper & Row, Publishers Inc. v. Nation Enterprises*, 471 U.S. 539, 566 (1985)).

It is undisputed that WCAC did not believe Channel 781's clips caused it any financial harm. (Ex. B, Wangler Dep. 155:21-156:6). Wangler testified that WCAC allowed political candidates, television news programs, and a high school educator to use its video free of charge. (Ex. B, Wangler Dep. 80:16-81:13).[7]

Regarding non-financial harm, Wangler testified:

> Potentially drawing, you know—drawing viewers to a different—drawing viewers to content we thought was copyright protected, drawing eyeballs, drawing viewers to content that we believed was infringing. So building an audience based in part on infringing content, *I considered that maybe not a harm but not a benefit.*

(Ex. B, Wangler Dep. 121:9-122:4) (emphasis added). Wangler knew that MAC-TV and Channel 781 have different audiences and purposes, such that one was unlikely to "draw" significant numbers of viewers from the other. *See supra* II.B.1. Because MAC-TV meeting videos fulfill an open-government function funded by city contracts regardless of how many people view them, no

---

[7] The *only* instance that Wangler could recall where WCAC was paid for the use of video footage involved a "for-profit documentary film house that had a significant budget for a series that would air on a top streaming platform," and which had "offered to pay." (Ex. B, Wangler Dep. 81:21-82:15). The footage used was of a community meeting called in the aftermath of a triple homicide, not a scheduled city government meeting. (Ex. B, Wangler Dep. 80:8-15).

marginal "draw" of viewers could diminish WCAC's incentive to create the videos. *See* Channel 781 Mem. at 3, 21. Sheehan also testified that WCAC doesn't care about its viewership. (Ex. C, Sheehan Dep. 104:10-19). But just as with the third factor, Wangler dismissed the importance to his analysis of any such "draw," testifying that "the worry was more about the use of copywritten content." (Ex. B, Wangler Dep. 156:17-21).

In short, undisputed facts show that Wangler did not believe Channel 781's clips caused meaningful harm to the "market for or value of" the MAC-TV videos. Yet his contemporaneous written conclusions concerning fair use made no mention of this factor. (Ex. Y).

## CONCLUSION

Undisputed evidence shows that Wangler, acting for WCAC, focused on the verbatim nature of Channel 781's clips to the exclusion of all the other facts they knew about them. Focusing on the one fact he believed most supported sending the takedown notices, he did not form a good faith or reasonable belief concerning fair use. Accordingly, this Court should grant summary judgment to Channel 781.

Dated: February 3, 2026

Respectfully submitted,
 */s/ Rebecca MacDowell Lecaroz*

Rebecca MacDowell Lecaroz
Marcus Strong (*admitted pro hac vice*)
Brown Rudnick LLP
One Financial Center
Boston, MA 02111
Tel: (617) 856-8200
rlecaroz@brownrudnick.com

Mitchell L. Stoltz (*admitted pro hac vice*)
Betelhem Gedlu (*admitted pro hac vice*)
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109
Telephone: (415) 436-9333
Facsimile: (415) 436-9993

*Attorneys for Plaintiff Channel 781 News*

## CERTIFICATE OF SERVICE

  I hereby certify that the within document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and by first-class mail to any non-registered participants.

Dated:  February 3, 2026        _/s/ Rebecca MacDowell Lecaroz_
                 Rebecca MacDowell Lecaroz