**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| CHANNEL 781 NEWS,<br><br>Plaintiff,<br><br>v.<br><br>WALTHAM COMMUNITY ACCESS CORPORATION,<br><br>Defendant. | Civil Action<br>No. 24-cv-11927-PBS |

**MEMORANDUM AND ORDER**

August 18, 2026

Saris, J.

**INTRODUCTION**

Plaintiff Channel 781 News ("Channel 781") is a YouTube-based news outlet focusing on local affairs in Waltham, Massachusetts. Channel 781 posted clips from Waltham municipal government meetings that it believed to be newsworthy. Channel 781 took these clips without permission from recordings of the meetings produced by Defendant Waltham Community Access Corporation ("WCAC") for the city's public access channel. The clips Channel 781 posted were accompanied by titles and captioning but otherwise consisted entirely of excerpts from WCAC's recordings.

In September 2023, WCAC sent three notices to YouTube asking YouTube to take down fifteen of Channel 781's clip videos on the basis that they infringed WCAC's copyrights. YouTube complied and

temporarily deactivated Channel 781's account. Channel 781 subsequently sued WCAC under 17 U.S.C. § 512(f), alleging that WCAC failed to adequately consider that Channel 781's videos were fair use and, thus, knowingly misrepresented in its takedown notices that it had a good faith belief that the videos were infringing.

The Court previously denied WCAC's motion to dismiss Channel 781's claim. See Channel 781 News v. Waltham Cmty. Access Corp., 761 F. Supp. 3d 371 (D. Mass. 2025). The parties engaged in discovery and now cross-move for summary judgment. After hearing, the Court **ALLOWS** WCAC's motion for summary judgment (Dkt. 43) and **DENIES** Channel 781's cross-motion for summary judgment (Dkt. 49).

## BACKGROUND

When evaluating a summary judgment motion, courts "construe the relevant facts in the light most favorable to the non-moving party." Deaton v. Town of Barrington, 100 F.4th 348, 353 (1st Cir. 2024). The following facts are undisputed except where stated otherwise.

### I. The Parties

WCAC, a nonprofit organization, is Waltham's community access cable television company. The mayor of Waltham appoints the members of WCAC's board of directors, and certain city officials either serve on the board or work on WCAC programs. WCAC operates "MAC-TV," a public access channel that airs unedited recordings of the

entirety of Waltham city government meetings. These recordings, which are created by WCAC staff, generally focus on the speaker and lack narration and commentary. WCAC's videos do not have closed captioning for the hearing impaired.

MAC-TV viewers are generally older longtime Waltham residents who are consumers of traditional news and have relationships with local officials. WCAC's content is available on cable television, social media, and the organization's website. Pursuant to agreements negotiated by Waltham's law department, cable providers pay WCAC a cut of the subscription fees they receive, which makes up most of WCAC's funding. WCAC does not track the number of people who view its channels or website but understands that its audience is primarily local.

In 2021, a group of Waltham residents, including Joshua Kastorf, created Channel 781, a YouTube-based news outlet focusing on local affairs in Waltham.[1] Channel 781 makes its material available at no cost, does not sell subscriptions or advertising, and does not compensate its volunteer members. Channel 781's audience is largely younger Waltham residents. Much of Channel 781's content is critical of the local government and unflattering to city officials.

---

[1] The YouTube page was originally called "Waltham DATA" before the founders changed its name to "Channel 781." The Court refers to the page as "Channel 781" for ease of reference.

Channel 781 publishes various types of videos that include recordings of Waltham government meetings taken from WCAC's website. For example, Channel 781 posts "recap" shows consisting of recordings of Zoom discussions among Channel 781 members about city council meetings and excerpts of those meetings from WCAC's footage. Channel 781 initially reposted a number of WCAC's full recordings of government meetings, but it stopped doing so in part due to copyright concerns. Later on, Channel 781 began posting videos consisting of excerpts from WCAC's recordings that Channel 781 deemed interesting or significant with the addition of a title written by Channel 781. The purposes of these clips were to express Channel 781's view that the excerpted portions of the meetings were important, to encourage people to share and discuss the clips online, to access YouTube's auto-captioning feature, to preserve the clips longer than they remained on WCAC's website, and to facilitate searching for statements by city officials and sending them to journalists.

## II. <u>WCAC's Response to Channel 781's Videos</u>

In 2022, Chris Wangler, WCAC's News Director, learned that Channel 781 was posting WCAC's recordings of government meetings without permission from WCAC. WCAC understood that Channel 781 was using excerpts from its recordings to express a political viewpoint and promote certain political candidates. In response to Channel 781's posting of WCAC's recordings and an unrelated use of a WCAC

photograph by an unknown Reddit user in a post criticizing a Waltham resident for her anti-LGBTQ views, Maria Sheehan, WCAC's Executive Director, delivered the following statement on air on April 6, 2023:

> Our station is a private nonprofit that does not receive taxpayer funding. Over recent years, photographs from our news department, and video from the MAC channel, have been reproduced without our permission. We know this is a reality of the world we live in, but we put copyright disclaimers on our media for a reason. Some have used our content to score political points under the veil of anonymity. Others have used it to encourage residents to hate. This practice can damage reputations and spread misinformation and we do not want to be a part of that. So as we head into a contentious election season, I'm asking the public to respect people who work hard to create our original content. In the interest of transparency, we will entertain requests to reuse our content for free, but misuse is wrong, and it is illegal. Moving forward, [WCAC] will take whatever legal steps necessary to protect our content.

Dkt. 58 ¶ 59. The statement was drafted by Wangler and edited by Sheehan.

Sheehan and Kastorf, one of Channel 781's founders, met at Kastorf's request two months later. Sheehan told Kastorf that people were confused about why Channel 781's page contained WCAC's footage and that she was planning to propose a policy that would require anyone who wished to use a clip from a WCAC recording to request permission from WCAC. According to Kastorf, Sheehan told him that WCAC's issue was that Channel 781 was "not just using these clips to inform people" but was instead "putting [its] spin on them." Dkt. 46-2 at 31-32. Sheehan denied telling Kastorf this.

Kastorf expressed concern to Sheehan that WCAC would deny permission to use a recording based on content or politics and, according to Kastorf, Sheehan responded that she "do[esn't] follow Waltham politics." Id. at 32. When Kastorf asserted that Channel 781's use of WCAC's footage was fair use, Sheehan described how various news stations had sought permission to use WCAC's recordings. According to Kastorf, he ended the meeting once Sheehan got angry and accused Channel 781 of stealing.

Sheehan and Kastorf exchanged emails that evening. Kastorf asked Sheehan to confirm that she did not believe Channel 781's use of WCAC's footage constituted fair use. Sheehan responded that Channel 781's use was "a violation of copyright laws" and that Channel 781 "need[ed] to get [WCAC's] permission to use any of [its] footage." Dkt. 46-6 at 2. Kastorf replied with language from the fair use statute, 17 U.S.C. § 107, and quotations from online resources explaining the fair use doctrine.

Sheehan forwarded Kastorf's email to Wangler, told him about the meeting, and tasked Wangler with assessing whether Channel 781 had the right to post clips from WCAC's recordings. Wangler, who was familiar with fair use principles from his previous work as a book editor, author, and reporter, read Kastorf's email about fair use and watched a five-minute video about the doctrine produced by YouTube. The video stated as follows:

> What counts as fair use? . . . Courts usually focus on whether your use of another person's song or video is transformative. Basically, they're asking if you added new expression or meaning to the original work, or if it basically copies the original. For example, in the US, content that might be considered fair use includes commentary, criticism, or news reporting.
>
> . . .
>
> How is fair use determined by law? Determining fair use is never a cut-and-dried process. In the US, fair use can only be determined in court by a judge. The judge will look at your case overall based on a few different factors. Here are a few things to keep in mind based on what the courts look at.
>
> You're less likely to qualify as fair use if your video merely copies someone else's and adds nothing else, if you're trying to monetize your video, if you're using fictional copyrighted material rather than factual material, if you borrowed a large amount of material rather than a small portion, if the main focus of your video is the copyright protected material, or if your use of the material harms the copyright owner's ability to profit from their original work.
>
> So, all of these are helpful factors to consider when thinking about fair use. But also keep in mind there's no guarantee that you'll qualify for fair use just because you take these factors into account. For example, just because you don't monetize your video, or if you only use a small portion of the copyrighted material, that does not mean you automatically qualify for fair use. Again, the courts look at everything holistically, and there's always a risk involved when using someone else's copyrighted work . . . .

Dkt. 51 ¶ 16 (alterations in original) (emphasis omitted).

After watching this video, Wangler sent Sheehan the following email:

> Youtube does NOT determine fair use, only a judge would. But Youtube can strike or remove videos that directly copy copywritten material. That is what this is about.

> It's possible [Channel] 781 . . . Zoom videos using short clips qualify as Fair Use.
>
> What does not qualify are the large number of videos taken directly from us and reproduced verbatim with zero editing or commentary. Those will be the ones we should file copyright claims against because they "merely copy", a lot of it is used without permission, and the main focus i[s] the copywritten material.

Dkt. 46-8 at 2. Wangler attached a screenshot from the video he watched that read:

> You're less likely to qualify for fair use if:
>
> Your video merely copies.
> You're trying to monetize.
> You're using fictional copyrighted material.
> You borrowed a large amount of material.
> The main focus is the copyrighted material.
> Your use harms the copyright owner's ability to profit.

Dkt. 46-9 at 2 (emphasis omitted). Wangler and Sheehan agreed that WCAC should send takedown notices to YouTube about the videos Channel 781 posted that clipped WCAC's recordings with the addition of no more than a title.

## III. WCAC's Takedown Notices

In July 2023, Wangler tried to submit a takedown notice to YouTube for one Channel 781 clip video that he did not believe amounted to fair use. The notice was rejected for technical reasons relating to WCAC's YouTube account.

Wangler submitted another takedown notice for the same video on September 1, 2023, the day after Channel 781 posted an unedited recording of a campaign statement by the Waltham mayor that WCAC

had mistakenly uploaded to its website. YouTube immediately took down the video that was the subject of Wangler's notice. When Channel 781 learned about the takedown, one of its founders described the "screen grab[s] with no commentary" as a "pretty big risk" from a fair use perspective, while Kastorf stated his view that those clips did amount to fair use. Dkt. 46-11 at 3. On September 6 and 7, 2023 -- within days of Waltham's primary election -- Wangler submitted two more takedown notices to YouTube about an additional fourteen of Channel 781's excerpted clips of WCAC's footage. YouTube took those videos down as well.

The fifteen clip videos YouTube took down at WCAC's request were all between one minute and twenty-one minutes long, with eleven less than three minutes long. The excerpted clips of the government meetings in these videos represented between 1.03% and 22.2% of the full WCAC recordings; ten of the clips used less than 3% of the original recording, and all but one used less than 9%. The videos all had descriptive titles, such as a quotation from a city official, and captioning automatically added by YouTube. The only graphics in the videos were the name and date of the government meeting and the MAC-TV logo.[2] Channel 781 selected the

[2] Some of the clip videos at issue include a Channel 781 logo for a few seconds at the beginning and/or end. Neither party mentions this aspect of the clip videos or argues that it materially affects the analysis of Channel 781's claim in this lawsuit.

clips to upload to its YouTube account to highlight important local issues.

When deciding which of Channel 781's videos to ask YouTube to take down, Wangler watched the entirety of each of the videos, except for the longest one. He looked for videos that consisted only of footage from WCAC's recordings, believing such videos to be nontransformative because they focused on the copyrighted work and, thus, to not be entitled to fair use protection. He considered (1) the length of the clips; (2) the fact that WCAC and Channel 781 are competitors and Channel 781 was trying to attract viewers using WCAC's content; and (3) the "sensational titles" of some of the clips meant to draw viewers to WCAC's copywritten content. Dkt. 46-1 at 42. He gave little or no weight to the fact that Channel 781 was not monetizing the clips and, since both organizations are nonprofits, to the question of whether Channel 781's use of WCAC's recordings harmed WCAC's ability to profit from the footage. He did not consider how much of the original WCAC recordings Channel 781 had clipped or what effect Channel 781's use of WCAC's footage had on the market value of that footage. Finally, he could not recall if he factored in the factual rather than fictional nature of the videos or the two organizations' differing audiences.

Four days after Wangler sent the third takedown notice, Sheehan emailed the chair of WCAC's board a first draft of a "WCAC

Video Use Policy." Dkt. 53-17 at 2 (capitalization omitted). Sheehan wrote the draft, possibly with input from Wangler. Although the draft policy distinguished between for-profit, news reporting, and educational uses of WCAC's footage, it provided that any use of WCAC's recordings would require WCAC's permission. This policy was never finalized or issued.

Pursuant to its three-strikes policy, YouTube disabled Channel 781's account following the third takedown notice. Channel 781 sent YouTube counter-notices asking YouTube to restore its account and videos, which YouTube eventually did on November 27, 2023. While its account was disabled, Channel 781 uploaded some of its videos to a new YouTube account.

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute is one which 'a reasonable jury could resolve . . . in the favor of the non-moving party,' and a material issue is one with the 'potential to affect the outcome . . . under the applicable law.'" Kinzer v. Whole Foods Mkt., Inc., 99 F.4th 105, 108 (1st Cir. 2024) (alterations in original) (quoting Cherkaoui v. City of Quincy, 877 F.3d 14, 23-24 (1st Cir. 2017)). In determining whether to grant summary judgment, a court must construe "the facts in the light most favorable to the non-moving

party" and "draw[] all reasonable inferences" in her favor. Id. (quoting Harley-Davidson Credit Corp. v. Galvin, 807 F.3d 407, 408 (1st Cir. 2015)).

The party seeking summary judgment "must [first] adumbrate 'an absence of evidence to support the nonmoving party's case.'" Pleasantdale Condos., LLC v. Wakefield, 37 F.4th 728, 733 (1st Cir. 2022) (alteration in original) (quoting Brennan v. Hendrigan, 888 F.2d 189, 191 (1st Cir. 1989)). Once the movant does so, "[t]he burden then shifts to the nonmovant to establish the existence of a genuine issue of material fact." Id. To satisfy this burden, the nonmovant "must present definite, competent evidence" showing that a trialworthy issue exists. Id. (quoting Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991)). "[C]onclusory allegations, improbable inferences, and unsupported speculation" do not suffice. Kinzer, 99 F.4th at 108 (quoting Ellis v. Fid. Mgmt. Tr. Co., 883 F.3d 1, 7 (1st Cir. 2018)).

This standard "do[es] not change where the parties file cross-motions for summary judgment." Roberge v. Travelers Prop. Cas. Co. of Am., 112 F.4th 45, 51 (1st Cir. 2024). On cross-motions, the court "review[s] each motion 'separately, drawing facts and inferences in favor of the non-moving party.'" Id. (quoting Scottsdale Ins. Co. v. United Rentals (N. Am.), Inc., 977 F.3d 69, 72 (1st Cir. 2020)).

## DISCUSSION

### I. Takedown Procedures Under the Digital Millennium Copyright Act

In the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 1201 et seq., Congress "gave service providers a safe-harbor defense to secondary copyright liability." Cox Commc'ns, Inc. v. Sony Music Ent., 607 U.S. 583, 588 (2026). One of these safe harbors protects service providers against liability for copyright infringement "by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider." 17 U.S.C. § 512(c)(1). This safe harbor includes "a 'notice and takedown' regime for the benefit of copyright owners on the other side of the scales." Athos Overseas Ltd. Corp. v. YouTube, Inc., 162 F.4th 1330, 1335 (11th Cir. 2026) (quoting S. Rep. No. 105-190, at 45 (1998)).

To trigger the notice-and-takedown procedure, the copyright owner must send the service provider a notice that includes, among other things, "[a] statement that the complaining party has a good faith belief that use of the material in the manner complained of is not authorized by the copyright owner, its agent, or the law." 17 U.S.C. § 512(c)(3)(a)(v). "[U]pon notification of claimed infringement" that satisfies the statute's requirements, the service provider must "respond[] expeditiously to remove, or disable access to, the material that is claimed to be infringing

or to be the subject of infringing activity." Id. § 512(c)(1)(C). A service provider that fails to do so is not protected from claims of copyright infringement under the safe harbor. See id.; Athos Overseas, 162 F.4th at 1335-36; In re Subpoena of Internet Subscribers of Cox Commc'ns, LLC, 148 F.4th 1056, 1061 (9th Cir. 2025).

"If an entity abuses the" notice-and-takedown procedures, "it may be subject to liability under" the DMCA. Lenz v. Universal Music Corp., 815 F.3d 1145, 1151 (9th Cir. 2016). Specifically, the DMCA provides that "[a]ny person who knowingly materially misrepresents under [§ 512] . . . that material or activity is infringing . . . shall be liable for any damages . . . incurred by the alleged infringer . . . who is injured by such misrepresentation[] as the result of the service provider relying upon such misrepresentation in removing or disabling access to the material or activity claimed to be infringing." 17 U.S.C. § 512(f). To establish liability under this provision, a plaintiff must show that the defendant made a knowing and material misrepresentation of the existence of copyright infringement, that the internet service provider relied on the misrepresentation, and that the plaintiff suffered a resulting injury. See Automattic Inc. v. Steiner, 82 F. Supp. 3d 1011, 1026 (N.D. Cal. 2015).

## II. Standard for Assessing Good Faith Belief

Channel 781 alleges that WCAC is liable under § 512(f) for knowingly misrepresenting in its takedown notices to YouTube that Channel 781's clip videos were infringing. The parties agree that "a copyright holder must consider the existence of fair use before sending a takedown notification." Lenz, 815 F.3d at 1153. They also agree that the relevant inquiry under § 512(f) asks whether WCAC "knowingly misrepresented that it had formed a good faith belief the video[s] did not constitute fair use" before it sent the takedown notices. Id.

The parties dispute, however, whether the "good faith belief" requirement creates a subjective or objective standard. WCAC asserts that it had to form only a subjective good faith belief that Channel 781's videos were not fair use. Channel 781 responds that the DMCA requires that WCAC's belief that the videos were not fair use be both subjectively held and objectively reasonable. Channel 781 argues, in other words, that WCAC may be held liable under § 512(f) if it made an unreasonable mistake in determining that the videos were not fair use.

In Rossi v. Motion Picture Ass'n of America Inc., the Ninth Circuit held that this "good faith belief" requirement "encompasses a subjective, rather than objective, standard." 391 F.3d 1000, 1004 (9th Cir. 2004); see Lenz, 815 F.3d at 1153 ("Though [the plaintiff] argues [the defendant] should have known

the video qualifies for fair use as a matter of law, . . . a copyright holder need only form a subjective good faith belief that a use is not authorized.”). District courts analyzing § 512(f) claims have for the most part followed Rossi in holding that the “good faith belief” standard is a subjective one. See, e.g., WhaleCo Inc. v. Shein Tech. LLC, No. 23-cv-3706, 2025 WL 2801861, at *9 (D.D.C. Sep. 30, 2025); Imposter Pastor Movie, LLC v. Oliver, No. 24-cv-00115, 2025 WL 819117, at *5 (E.D.N.C. Mar. 14, 2025); MFB Fertility, Inc. v. Action Care Mobile Veterinary Clinic, LLC, 730 F. Supp. 3d 740, 752 (N.D. Ill. 2024); Nat’l Acad. of Television Arts & Scis., Inc. v. Multimedia Sys. Design, Inc., 551 F. Supp. 3d 408, 432 (S.D.N.Y. 2021); Makeup Blowout Sale Grp., Inc. v. All That Glowz, Inc., No. 20-cv-20906, 2020 WL 5535533, at *2 (S.D. Fla. Sep. 15, 2020); Stern v. Lavender, 319 F. Supp. 3d 650, 683 (S.D.N.Y. 2018); Tuteur v. Crosley-Corcoran, 961 F. Supp. 2d 333, 342 (D. Mass. 2013).[3]

[3] Channel 781 cites one case from the Northern District of California that states that § 512(f)’s knowledge requirement is satisfied if the party “should have known if it acted with reasonable care or diligence . . . that it was making misrepresentations.” Moonbug Ent. Ltd. v. BabyBus (Fujian) Network Tech. Co., No. 21-cv-06536, 2024 WL 2193323, at *15 (N.D. Cal. May 15, 2024), aff’d on other grounds, No. 24-3748, 2025 WL 3111597, (9th Cir. Nov. 6, 2025). At least in the context of a representation in a takedown notice that the material at issue is infringing, this standard appears to be inconsistent with the Ninth Circuit’s decisions in Rossi and Lenz.

The Court agrees with this consensus that the statute imposes a subjective standard. At the time of the DMCA's enactment, Black's Law Dictionary defined "good faith" to mean, in relevant part, a "state of mind consisting in . . . honesty in belief or purpose." Good Faith, Black's Law Dictionary (7th ed. 1999); see U.S. Postal Serv. v. Konan, 607 U.S. 391, 399 (2026) (looking to "[d]ictionaries published around the time Congress enacted" a statute to determine its meaning). This definition reflects a subjective standard. Moreover, § 512(f) imposes liability only when a takedown notice contains a knowing misrepresentation. This knowledge requirement makes clear that a "copyright owner cannot be liable simply because an unknowing mistake is made, even if the copyright owner acted unreasonably in making the mistake." Rossi, 391 F.3d at 1005. "Measuring compliance with a[n] . . . 'objective reasonableness' standard would be inconsistent with Congress's apparent intent that the statute protect potential violators from subjectively improper actions by copyright owners." Id.; see Teles de Menezes v. Rubio, 156 F.4th 1, 12 (1st Cir. 2025) (explaining that courts interpreting statutory text "must take account of the ' . . . broader context of the statute as a whole'" (quoting United States v. Roberson, 459 F.3d 39, 51 (1st Cir. 2006))).

Under this subjective standard, when "a copyright holder forms a subjective good faith belief the allegedly infringing

material does not constitute fair use," a court is "in no position to dispute the copyright holder's belief even if [it] would have reached the opposite conclusion." Lenz, 815 F.3d at 1154 (emphasis omitted). But "if a copyright holder ignores or neglects" the rule "that it must consider fair use before sending a takedown notification, it is liable for damages under § 512(f)." Id. And a "copyright holder who pays lip service to the consideration of fair use by claiming it formed a good faith belief when there is evidence to the contrary is still subject to § 512(f) liability." Id.

**III. Application to WCAC's Takedown Notices**

Applying this standard to the undisputed facts of this case, the Court concludes that no reasonable jury could find that WCAC failed to form a subjective good faith belief that the Channel 781 clip videos for which WCAC sent takedown notices did not constitute fair use. There is no genuine dispute, then, that WCAC did not make a knowing misrepresentation in its takedown notices. Summary judgment is therefore warranted in WCAC's favor.

The record makes manifest that WCAC "consider[ed] fair use before sending [its] takedown notification[s]" and "form[ed] a subjective good faith belief the allegedly infringing material d[id] not constitute fair use." Id. (emphasis omitted). After Sheehan and Kastorf's meeting about Channel 781's use of WCAC's recordings, Sheehan asked Wangler to assess whether Channel 781

had the right to post clips from WCAC's recordings. To do so, Wangler read the email Kastorf sent to Sheehan about the fair use doctrine and watched a YouTube video on the same topic. He then emailed Sheehan that "[i]t's possible [Channel] 781 . . . Zoom videos using short clips qualify as [f]air [u]se" but that "[w]hat does not qualify are the large number of videos taken directly from us and reproduced verbatim with zero editing or commentary." Dkt. 46-8 at 2. He attached to his email a screenshot from the YouTube video he watched describing facts that make a use "less likely to qualify for fair use." Dkt. 46-9 at 2 (emphasis omitted). Wangler and Sheehan then agreed to send takedown notices only for the clip videos reproducing WCAC's recordings with no editing or commentary except for the addition of a title. When Wangler later decided which videos to include in the takedown notices, he chose clip videos that consisted solely of excerpts from WCAC's recordings, which he believed did not qualify for fair use protection. Given Wangler's viewing of a YouTube video about fair use, his determination that some of Channel 781's videos may have qualified as fair use while others did not, and the fact that WCAC only sent takedown notices for the latter set of videos, the record does not support a reasonable finding that WCAC failed to consider fair use or form a subjective good faith belief that the clip videos posted by Channel 781 were not fair use.

Channel 781's primary rejoinder is that Wangler's analysis of fair use omitted certain facts of which he was aware and was erroneous in various respects. Channel 781 argues that Wangler concluded that the clip videos were not fair use solely because they contained no content beyond the excerpts from WCAC's recordings. Channel 781 points to Wangler's testimony that he did not consider that the clip videos were short portions of the full WCAC recordings, could not recall factoring in the factual nature of the recordings, and gave little weight to whether Channel 781's use harmed WCAC financially. And Channel 781 contends that the clip videos were plainly transformative, as Channel 781 added provocative titles and posted the videos to YouTube for a different audience to promote a political message. In Channel 781's view, Wangler's "knowingly incomplete fair use analysis is not enough to establish a subjective good faith belief that" the clip videos were not fair use. Dkt. 48 at 37.

The Court is unpersuaded. It is true that the fair use statute lays out a set of factors relevant to whether a particular use of a copyrighted work constitutes fair use,[4] see 17 U.S.C. § 107, and

[4] The four fair use factors are:

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>
> (2) the nature of the copyrighted work;

that courts "evaluate fair use on a case-by-case basis and weigh the factors 'together in light of the purposes of copyright,'" Monsarrat v. Newman, 28 F.4th 314, 321 (1st Cir. 2022) (quoting Núñez v. Caribbean Int'l News Corp., 235 F.3d 18, 21 (1st Cir. 2000)). Certain considerations that Wangler testified he did not or could not recall taking in account when determining whether Channel 781's clip videos constituted fair use are pertinent to the fair use inquiry, such as the factual nature of WCAC's recordings and Channel 781's use of relatively short excerpts from those recordings. See 17 U.S.C. § 107(3) (directing consideration of "the amount and substantiality of the portion used in relation to the copyrighted work as a whole"); Monsarrat, 28 F.4th at 323 ("The scope of fair use is narrower when works 'fall closer to the creative end of the copyright spectrum than the informational or factual end' . . . ." (quoting Soc'y of Holy Transfiguration Monastery, Inc. v. Gregory, 689 F.3d 29, 62 (1st Cir. 2012))).

At core, though, Channel 781's arguments are a misguided effort to smuggle an objective reasonableness inquiry into the applicable subjective standard. The key question is whether WCAC

---

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107.

considered fair use before sending the takedown notices and formed a subjective good faith belief that Channel 781's clip videos were not a fair use of its recordings. See Lenz, 815 F.3d at 1154. For the reasons just discussed, any reasonable jury would answer this question in the affirmative. Even if Wangler failed to take into account various facts relevant to the fair use inquiry or incorrectly analyzed certain factors, the record does not support a reasonable finding that Wangler knew at the time that his fair use analysis was defective or that he merely "pa[id] lip service to the consideration of fair use." Id. Moreover, this Court is simply "in no position to dispute [Wangler]'s belief even if [it] would have reached the opposite conclusion" on the question of fair use, id., nor may Channel 781 prevail on its claim by showing that WCAC should have known that the videos at issue amounted to fair use, see id. at 1153; WhaleCo, 2025 WL 2801861, at *9; Shaffer v. Kavarnos, No. 23-cv-10059, 2025 WL 2299173, at *4 (S.D.N.Y. Aug. 7, 2025); Nat'l Acad. of Television Arts & Scis., 551 F. Supp. 3d at 433. The DMCA requires that a copyright holder consider fair use before sending a takedown notice, not that the copyright holder conduct a perfect or even reasonable fair use analysis. See Lenz, 815 F.3d at 1153-54.

The Ninth Circuit's decision in Lenz is not to the contrary. At issue in Lenz was a takedown notice sent by the publisher for the musician Prince about a video posted to YouTube by the

plaintiff of her children dancing to a Prince song. See id. at 1149. Before sending the notice, the publisher evaluated whether the video made "significant use of" the song and whether the song "was the focus" of the video but did not explicitly consider if the video was fair use. Id. While the publisher argued that "its procedures, while not formally labeled consideration of fair use, were tantamount to such consideration," the court held that there was a genuine dispute as to "whether [the publisher]'s actions were sufficient to form a subjective good faith belief about the video's fair use or lack thereof." Id. at 1154. Here, by contrast, Wangler expressly researched the fair use doctrine; made an effort to apply the doctrine to Channel 781's clip videos; and determined before sending the takedown notices that the relevant videos were not fair use. No reasonable jury could find that Wangler's actions were insufficient to form a subjective good faith belief that he was sending takedown notices about videos that were not fair use.

Channel 781 next emphasizes certain statements from WCAC suggesting that it believed all uses of its recordings without permission constituted copyright infringement. For example, Sheehan told Kastorf at their meeting that she was planning to propose a policy that would require anyone who wished to use a clip from a WCAC recording to request advanced permission. She subsequently emailed Kastorf that Channel 781 "need[ed] to get [WCAC's] permission to use any of [its] footage." Dkt. 46-6 at 2.

And a few days after Wangler sent the third takedown notice, Sheehan circulated internally a draft policy providing that any use of WCAC's recordings would require WCAC's permission.

As the Court indicated in denying WCAC's motion to dismiss, a copyright holder may be liable under § 512(f) if it sends a takedown notice on the premise that any use of its work requires permission. See Channel 781, 761 F. Supp. 3d at 373. That is because the copyright holder must consider fair use before sending a takedown notice, see Lenz, 815 F.3d at 1154, and the fair use doctrine authorizes certain uses of copyrighted works without permission, see Monsarrat, 28 F.4th at 321. Sheehan's comments to Kastorf, however, predated Wangler's viewing of the YouTube video on fair use, his determination that some of Channel 781's videos constituted fair use while others did not, and his and Sheehan's decision to send takedown notices about only the latter set of videos. These events make clear that WCAC did consider fair use by the time it sent the takedown notices. See Shaffer, 2025 WL 2299173, at *3 (finding no liability under § 512(f) despite a similar comment by the copyright holder where the copyright holder's "Internet search history and the webpages she viewed . . . discussing fair use suggest[ed] that [she] was at least aware of the concept of fair use at the time she issued the takedown notices"). And while WCAC's draft policy may not have fully incorporated the fair use doctrine to allow for certain uses

of its recordings without permission, there is no evidence that Wangler was following this policy, which was never finalized or issued, when he sent the takedown notices. Rather, as discussed above, Wangler sent the takedown notices after considering the fair use doctrine and determining that Channel 781's clip videos were infringing.

Channel 781 also contends that WCAC had non-copyright-related motivations for sending takedown notices about Channel 781's videos. Channel 781 points to WCAC's close connections to Waltham government officials and argues that WCAC was politically motivated to send the takedown notices in order to censor Channel 781 and protect incumbent city interests. Channel 781 notes as well that WCAC sent the notices right after Channel 781 posted an unedited recording of a campaign statement by the Waltham mayor that WCAC had mistakenly uploaded to its website.

Liability under § 512(f), however, focuses on whether the copyright holder knowingly misrepresented that it had formed a subjective good faith belief that the use of its material was infringing. While a party's motivation for sending a takedown notice may be relevant to discerning whether it formed such a belief, the record clearly reflects that Channel 781 did consider the fair use doctrine and subjectively concluded that the clip videos that were the subject of its takedown notices were infringing. Given this evidence, any non-copyright-related

motivation on WCAC's part for sending the takedown notices is insufficient for a reasonable jury to find in Channel 781's favor on its § 512(f) claim. Cf. id. (finding no liability under § 512(f) where the copyright holder included both "non-intellectual property reasons" and "intellectual property reasons" in her takedown notices).

Finally, Channel 781 argues that a reasonable jury could rely on a theory of willful blindness to find that WCAC knowingly misrepresented that it formed a good faith belief that the clip videos were infringing. The Ninth Circuit has held, and WCAC does not dispute, that a showing of willful blindness satisfies § 512(f)'s knowledge requirement. See Lenz, 815 F.3d at 1155. A party acts with willful blindness when it "takes deliberate actions to avoid confirming a high probability of wrongdoing and . . . can almost be said to have actually known the critical facts." Glob.-Tech Appliances, Inc. v. SEB S.A., 563 U.S. 754, 769 (2011); see United States v. Sepetu, 176 F.4th 104, 112 (1st Cir. 2026) (explaining that willful blindness means that the party was "aware of a high probability of [a fact] but 'consciously and deliberately avoided learning of [it]'" (second alteration in original) (quoting United States v. Burgos, 703 F.3d 1, 11 (1st Cir. 2012))).

The record does not support a reasonable determination that WCAC was willfully blind to the possibility that Channel 781's clip videos were fair use. Channel 781 contends that WCAC was made

aware of a high probability that the videos were fair use when Kastorf told WCAC as much during his meeting with Sheehan and in his follow-up emails. Even assuming a reasonable jury could find that WCAC was aware of this possibility, there is no genuine dispute that Wangler did take steps to learn about and apply the fair use doctrine. Specifically, Wangler made efforts to determine whether Kastorf was correct that Channel 781's use of WCAC's recordings were fair use and analyzed Channel 781's videos to decide which were likely infringing and which were not. While Wangler's fair use analysis may have been deficient, he did not intentionally fail to consider the possibility that Channel 781's clip videos were fair use. See Shaffer, 2025 WL 2299173, at *3 (finding no willful blindness in the context of a § 512(f) claim where the evidence demonstrated that the defendant "took deliberate action to learn about fair use before issuing the takedown notices").

**ORDER**

For the foregoing reasons, WCAC's motion for summary judgment (Dkt. 43) is **ALLOWED**, and Channel 781's cross-motion for summary judgment (Dkt. 49) is **DENIED**.

SO ORDERED.

/s/ PATTI B. SARIS
Hon. Patti B. Saris
United States District Judge